1  DIMITRIOS P. Biller (142730)
   LDT CONSULTING, INC.
2  13115 West Sunset Blvd., Suite "9"
   Pacific Palisades, California 90272
3  Telephone: (310) 459-9870
   E-mail: biller_ldtconsulting@verizon.net
4
   Defendant Paula Thomas
5

6

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  RIVERSIDE DIVISION

11  In re                              | Case No. 6:16-bk-15889-SY
    PDTW, LLC,
12                                     | Chapter 7
              Debtor.
13                                     | Adv. No. 6:17-ap-01200-SY
    _____
14                                     | DECLARATION OF DIMITRIOS P.
    LARRY SIMONS, Chapter 7 Trustee,   | BILLER IN SUPPORT OF
15                                     | DEFENDANT PAULA THOMAS'
              Plaintiff,               | NOTICE OF MOTION AND MOTION
16                                     | FOR AN ORDER TO (1) COMPEL
    vs.                                | RESPONSES AND DOCUMENTS
17                                     | FROM PDTW, LLC TO PAULA
    PAULA THOMAS, an individual;       | THOMAS' FIRST SET OF REQUEST
18  THOMAS WYLDE, LLC, a California    | FOR PRODUCTION; (2) DISMISS THE
    limited liability company; THOMAS  | ADVERSARIAL COMPLAINT AND
19  WYLDE HOLDINGS, LLC, a California  | COUNTER-COMPLAINT FILED BY
    limited liability company, and DOES 1 - | TW, LLC
20  10,
                                       | EXHIBITS "22" THROUGH "27"
21            Defendants.
22                                     | DATE:  October 18, 2018
                                       | TIME: 9:30 a.m.
23                                     | PLACE: Courtroom 302
24
                                       | JUDGE SCOTT L. YUN
25

26

27

28

                              1

1943225

## DECLARATION OF DIMITRIOS P. BILLER

1.     I am the attorney for Paula Thomas in the bankruptcy proceedings, adversary proceedings, in a case filed in the United States District Court for the Central District of California, and two cases in the California Superior Court.  I have conducted all the discovery and law/motion practice in the adversary proceedings.  All the facts, statements, comments, situations, circumstances and documents described in this declaration are true and correct.  If called to testify regarding these issues I could and would provide competent testimony.

2.     This Declaration is submitted and filed with the Court to support Paula Thomas' position that PDTW and TW are in collusion and in a conspiracy to conceal evidence and to conceal the destruction of evidence in violation of *Penal Code §§ 135 and 182* in an effort to consummate a deal they reached without the knowledge of the Court or Paula Thomas.  The collusion and conspiracy took the form of (a) strategizing and filing the Complaint for Adversary Proceedings; (b) concealing ESI/evidence and the destruction of evidence; (c) share ESI at the exclusion of Paula Thomas to deny her a fair opportunity to present her case; and (d) discovery strategy to unnecessarily delay discovery to increase litigation costs.

**A.     Discovery Dispute and Joint Stipulation Exhibits**

3.     When counsel for PDTW realized Paula Thomas was not going to sign a Global Protective Order in early September 2018, counsel stated that she needed more time to produce documents because she had to go back and react confidential information; she needed two to three months.  I requested that she produce the non-confidential documents.  Counsel stated that documents would be produced in a "link"

2

1    without any designation as to what documents were responsive to the specific requests.

2    Counsel did not specify how many documents would be produced through the "link."

3    Furthermore she refused to produce the QuickBooks that the Trustee obtained from

4    Richard Peddie.  See Request for Production No. 42, 41 [sic], 42 [sic], and 43.

5        4.    This Declaration serves also to be a "Declaration of Non-Cooperation"

6    under *LBR 7026-(c)(4)*.  After completing the "meet & confer" I sent PDTW's counsel

7    (Reagan Boyce) a [PROPOSED] Stipulation for Discovery Dispute on September 4,

8    2018.  I sent a draft of the Stipulation that I prepared to Counsel in "word" so she

9    could input PDTW's position.  On the 7th day to complete the Stipulation, PDTW sent

10   me a pdf version of the Joint Stipulation, and I requested a "word" version so I would

11   not have type Counsel's changes into my version.  I never received that "word"

12   document.  On September 17, 2018 I sent my revised Stipulation and requested that

13   Counsel reduce the Introduction Section for PDTW to three pages.  She stated she

14   would have it back to me "mid-week."  **Exhibit "28"** includes the e-mail exchanges

15   between me and Regan Boyce regarding the Stipulation that was not presented to this

16   Court.

17       5.    In the meantime, I was preparing the Notice of Motion and Motion to

18   Compel, the Declaration of Paula Thomas, my Declaration and assembling exhibits.  I

19   complete these tasks on September 17, 2018.  I certify that I have met and conferred

20   with opposing counsel in a good faith effort to resolve this dispute.

21       6.    **Exhibit "1"** is a true and correct copy of Paula Thomas' First Set of

22   Requests for Production of Documents referred to in the Stipulation.

23       7.    **Exhibit "2"** is a true and correct copy of PDTW's Responses to Thomas'

24   First Set of Requests for Production of Documents referred to in the Stipulation.

3

1943225

8.    **Exhibit "3"** is a true and correct copy of the Thomas' Requests for Inspection of Computers referred to in the Stipulation.

9.    **Exhibit "4"** is a true and correct copy of the Objections PDTW served to the Request for Inspection of Documents referred to in the Stipulation.

8.    **Exhibit "5"** is the Jun 10, 2017 e-mail that Larry Simons produced related to Peddie's "laypersons" accountant analysis of Thomas's debt that Zamora sent to PDTW's accountant.

9.    **Exhibit "6"** is the June 10, 2017 e-mail that I obtained from Larry Simons related to an agreement between Peddie and Zamora/Trust/Debtor in which Peddie reminds Zamora that he gave over stuff and they agreed to fight over the money later.

10.    **Exhibit "7"** is a true and correct copy of the Complaint for Adversary Proceedings.

9.    **Exhibit "8"** is a true and correct copy of portions of Larry Simons' deposition testimony.

10.    **Exhibit "9"** are two e-mails that Richard Peddie sent to Nancy Zamora encouraging the Trustee to file a complaint for adversary proceedings.

11.    **Exhibit "10"** is an e-mail from Peddie to Nancy Zamora revising a Reply Brief that Peddie help Zamora write.

12.    **Exhibit "11"** are e-mails from Peddie to Zamora informing her that TW has registered the trademark **THOMAS WYDLE** and the Henna Skull in the name of TW even through ownership is disputed.

| EXHIBITS | DESCRIPTION OF EXHIBITS |
|---|---|
| Exhibit No. 1 | Paula Thomas' First Set of Requests for Production of Documents |
| Exhibit No. 2 | PDTW's Responses to Thomas' First Set of Requests for Production of Documents |
| Exhibit No. 3 | Thomas' Requests for Inspection of Computers |
| Exhibit No. 4 | Objections PDTW served to the Request for Inspection of Documents |
| Exhibit No. 5 | E-mail that Larry Simons produced related to Peddie's "laypersons" accountant analysis of Thomas's debt that Zamora sent to PDTW's accountant |
| Exhibit No. 6 | June 10, 2017 e-mail that I obtained from Larry Simons related to an agreement between Peddie and Zamora/Trust/Debtor in which Peddie reminds Zamora that he gave over stuff and they agreed to fight over the money later |
|  |  |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1943225

| | |
|---|---|
| Exhibit No. 7 | Complaint for Adversary Proceedings |
| Exhibit No. 8 | Deposition Testimony Transcript of Larry Simons |
| Exhibit No. 9 | Two e-mails that Richard Peddie sent to Nancy Zamora encouraging the Trustee to file a complaint for adversary proceedings |
| Exhibit No. 10 | E-mail from Peddie to Nancy Zamora revising a Reply Brief that Peddie help Zamora write |
| Exhibit No. 11 | E-mails from Peddie to Zamora informing her that TW has registered the trademark **THOMAS WYDLE** and the Henna Skull in the name of TW even through ownership is disputed |
| Exhibit No. 12 | Courter-Claim TW presents to this Court |
| Exhibit No. 13 | Declaration of Mr. Fife filed in Support of the Motion for Summary Judgment that PDTW filed |
| Exhibit No. 14 | Declaration of David Schnider |
| | |

6

1943225

| Exhibit No. 15 | Declaration of David Schnider |
|---|---|
| Exhibit "16" | Declaration of David Schnider |
| Exhibit "17" | E-mail exchange between David Schnider and Andre Apfelberg |
| Exhibit "18" | Deposition Testimony Transcript of David Schnider |
| Exhibit "19" | Deposition Testimony Transcript of Eniluz Gonzalez |
| Exhibit "20" | Deposition Testimony Transcript of Ed Smith |
| Exhibit "21" | Declaration of Dan Fuchs |
| Exhibit "22" | Richard Peddie e-mail exchanged with Andrew Apfelberg |
| Exhibit "23" | Richard Peddie e-mail exchanged with Andrew Apfelberg |
| Exhibit "24" | July 6, 2017 e-mail from Peddie to Zamora regarding the |

1943225

|  | lack of value the computers have |
|---|---|
| Exhibit "25" | Deposition Testimony Transcript for Meldy Rafols |
| Exhibit "26" | May 14, 2015 Termination Letter Richard Peddie wrote for TW |
| Exhibit "27" | Agreement to Purchase Membership Interests with an effective date of January 1, 2015. |
| Exhibit "28" | Declaration of Biller attaching e-mails showing Andrew Apfelberg was involved in the transaction from the beginning, not starting in June/July |
| Exhibit "29" | E-mails exchanged between Biller and Boyce regarding the Joint Stipulation |
| Exhibit "30" | Incomplete pdf document of the Stipulation |

## C.    Litigation Background

13.    From the moment I got involved in representing Paula Thomas in or about June 2017, I had to prepare a case for trial commencing on October 10, 2017 in the Superior Court.  I immediately started to conduct discovery because the prior firm representing Paula Thomas did not conduct sufficient discovery to present sufficient

evidence to prevail on the various claims.  I took the depositions of (a) Eniluz Gonzalez, (b) David Schnider (three times before trial), (c) Meldy Rafols, (d) PMK Witness for TW on 20 topics (including Jene Park and David Schnider) and (e) Thomas Pastore.  I requested the production of documents, but TW simply produced the documents it produced to Plaintiff on February 26, 2016 and an additional 1,000 pages of documents.  David Schnider only produced Paula Thomas' file at his first deposition, but claimed all the previously produced documents and the additional documents produced on August 8, 2017, at 9:00 p.m. were all the responsive documents to the Demand to Produce Documents set forth in the PMK Notice of Taking Deposition and in the subpoena duces tecum served on Schnider.  However, on September 28, 2017 he produced three and a half inches of e-mails for the first time, but he did not produce the attachments to those e-mails.  On September 19, 2017, PDTW filed a Adversarial Complaint and the Superior Court case was stayed.  That was nearly one year ago.

14.    The Adversarial Complaint is a fraud because it alleges that Paula Thomas did not have the right to "assign" the trademark and copyrights that she owned to TW Holding, LLC on the grounds that PDTW owned those rights through the "employee acting within the scope of employment" and/or worker for hire concepts. PDTW did NOT attached to the Complaint the September 13, 2013 Trademark Licensing Agreement or the Copyright Licensing Agreements Paula Thomas that PDTW executed.  **(Exhibit "7")**  Those agreements clearly show Paula Thomas to be the owner of the IP and PDTW merely being a "licensee"  with an obligation to pay Paula Thomas $1,000.00 a year.  *See* Paula Thomas' Declaration.  The Complaint for Adversarial proceedings did not make any factual allegations to support the concept

9

PDTW put the trademark in commence first for use.  It did not present any such

evidence in opposition to Thomas' Motion for Partial Summary Judgment.


15.    The only Counter-Claim TW seeks is for Declaratory Relief.  **Exhibit**

**"12"** is a true and correct copy of the Counter-Claim TW presents to this Court.  The

allegations of the claim are dependent on having reliable accounting, business finance,

and tax records.  Those allegations include:

197.  As alleged by Trustee, actual controversies exist as to ownership of

the Copyrights and Trademarks at issue in this case. *See* Complaint ¶¶

101-102.

198. **TW instead contends that Debtor at all times understood and**

**agreed that the subject intellectual property would be assigned to**

**TW in exchange for those amounts expended by TW on its behalf or**

**lent to it or used to pay off debts assumed by Thomas momentarily**

**and solely for "transactional and/or tax-motivated reasons."**

199. **TW thus contends that Debtor was at all times obligated to**

**transfer to TW anything that Thomas herself could not transfer as**

**part of the "agreed-upon plan." Thus TW lays claim to the**

**intellectual property itself, as well as to those designs Thomas**

**purported to assign to TW, as well as to their embodiment, in the**

**form of the archives.**

200. **TW contends that Debtor's acceptance of millions of dollars on**

**the one hand, as well as its acquiescence to the transfer of the**

**intellectual property demonstrates Debtor's understanding and,**

**more importantly, its "performance of this plan**."

201. TW further contends that the fact that Debtor left the archives with

TW demonstrates Debtor's understanding and, once again, its

"**performance of this plan**."

202. Thus, TW contends that whatever defects or infirmities there may

have been in the execution of the plan, the transfer to TW of the subject

intellectual property is not void.

203. Thus, TW contends that the archives were delivered to it and belong

to it.

204. And thus, TW requests that this Court declare TW to be the owner of

the Copyrights and Trademarks and the archives.

16.    The above allegations in the Counter-Claim are reliant on the

computers and ESI in the computers at PDTW and TW from 2012 to 2016.

Plaintiff cannot defend herself without this ESI.  However, PDTW refuses to

produce the ESI that Richard Peddie gave to Larry Simons and who then gave

that ESI to the accountant for the Trustee.  **Exhibit "13"** is a true and correct

copy of the Declaration of Mr. Fife filed in Support of the Motion for Summary

Judgment that PDTW filed.  TW maintains that it incurred $4.4 million in

expenses for PDTW in 2014 and 2015, and TW shows a $4 million advance to

PDTW on its 2015 tax returns.  *See infra*.  Thomas maintains that the alleged

$4.4 was never incurred by PDTW and is a fabricated debt.

**D.    TW's Allegations are FALSE and Paula Thomas Is the**

**Majority Owner of TW**

11

17.    Richard Peddie has filed at least three Declarations signed by David Schnider with the United States Bankruptcy Court that directly contradict the notion that there was an "agreed upon plan" for Paula Thomas to transfer the IP to TW.   Those Declarations also contain false statements.  The November 30, 2017 Declaration states:

> 9.    **Exhibit J to the Opposition is at true and correct copy of an e-mail chain starting on July 9, 2014 and ending on July 10, 2014, in which I was copied**.  These e-mail chain contains the initial proposal I was aware of from a potential investor concerning obtaining capital and restructuring the THOMS WYLDE fashion house.  This was before TW was formed.  Paula Thomas was a participant in these communications.  **I am informed and believe that at the time she had hired attorney Andrew Apfelberg to represent her interests in the contemplated transaction. It is my understanding that Apfelberg represented Thomas throughout the transaction**.  He worked with me on Thomas' Agreement to Purchase Membership Interest and the related instruments.

8.    **Exhibit "14"** is a true and correct copy of the Declaration of David Schnider containing the above quote.  The July 9, 2014 e-mail chain actually ends on July 18, 2014 and it represents a contract to create TW.  David Schnider and Richard Peddie apparently did not include the July 18, 2014 portion because David Schnider accepts the offer:

12

Dear Doug:

**Thank you for conveying the proposal from Stephen Choi. We agree to the basic terms with four minor adjustments, as reflected below.! First, we have adjusted the ownership percentages to 45% for Steve, 32% for Paula, 9% for John, 9% for Jene, and 2.5 percent each for you and Roger.**

Second, we added in a provision that once Stephen recoups his equity, Paula may "claw-back" 2% of his interest.

Third, we adjusted the amount of the loan to [????].

Fourth, we added in a provision that there will be no pre-payment penalty on the loan.

We understand that the details will be ironed out in the legal documents to be drawn up shortly. Please get those to us at your earliest convenience so we can begin discussing the contractual provisions and ironing out the final points.

**Equity:**

• $5.5 Million equity investment for all assets of Thomas Wylde Holdings LLC and PDTW LLC that would include Thomas Wylde intellectual property, accounts receivables, all logos and imagery, customers files, designs, library and client list.

• **New LLC would be created to include all the above assets. The IP, on the other hand, would remain under the Thomas Wylde Holdings LLC**.

• Both NewCo and Thomas Wylde Holdings LLC membership interest

13

would be divided as follows: Stephen Choi 45%, Paula Thomas 32%, Jene Park 9%, John Hanna 9%, Doug Lee, 2.5, Roger Kuo 2.5%.

• Upon Stephen Choi's recoupment from profit sharing of his initial $5.5 Million equity investment, he shall transfer back 2% of his interest to Paula Thomas, reducing his membership interest to 43% and increasing hers to 34%

• All executives must commit for five years and sign management contracts accordingly.

• Paula Thomas would have control over the creative aspects of the design elements and direction of the product and imagery of the brand.

• Financial and operations matters would be under the direction of management team designated by Stephen Choi.

• Funds would be deployed as per a schedule to be prepared and submitted by TW CEO.

**Debt:**

• $2.0 Million in loans would be made available to replace outstanding liabilities of the PDTW, LLC which include liabilities to CBC partners LLC, Jene Park and suppliers.

• Payment made quarterly by the NewCo to Stephen Choi.

• Interest rate, length of term and collateral will be determined in the coming weeks. There will be no pre-payment penalty.

**The above are the general points for your approval. Once, we get receive your approval we would get lawyers to draft legal documents. Funds would be deployed once the documents are executed**.

1943225

We look forward to working together in building TW into a highly valuable luxury brand.! If you have any questions, please do not hesitate to ask.

9.    **Exhibit "9"** attached to the Declaration of Paula Thomas that represents the entire July 9, 2014 e-mail chain. The contract was between Stephen Choi (NOT Hillshore Investment, S.A.) and Thomas.  The next Declaration that David Schnider signed and that Richard Peddie prepared includes the following:

5.    Certain investors **[Stephen Choi]** were located in the summer of 2014 who were interested in investing in the THOMAS WYLDE brand. This is how TW was formed. **[This sentence is consistent with TW being formed under the July 18, 2014 e-mail/contract; a company just does become formed without a contract when assets are transferred from one company to the New Company]**

6.    At that time, Debtor was being sued by Dr. Michael Schiffman and there were other secured lenders, the largest being CBC.

7.    For these reasons, and others besides, a merger between Debtor and TW was deemed unadvisable. So too, a bulk purchase of all tor Debtor's assets was out of the question given the pending litigation and also given the security agreements held by the other parties; Any such plan was likewise deemed unadvisable because of the risk that

15

1  Schiffman or a secured creditor would claim a fraudulent

2  transfer.

3  8.    **Thus, from mid-2014 or so onwards, and as Debtor**

4  **and TW studied how best to hand off Debtor's business**

5  **to TW,** started lending money to Debtor either directly or

6
7  through paying its creditors and vendors.  This was also so

8  that Debtor could pay things like rent and payroll and

9  otherwise continue operations at a time when it was

10  insolvent and once again on the verge of collapsing.

11  9.    **Debtor's CEO** fully understood that these advances

12  and loans constituted debt owed to TW and they were

13  recorded as such.

14
15  10.    The above quote is in the Declaration of Schnider attached as **Exhibit**

16  **"15."**  PDTW did not have a CEO in 2014. *See* Paula Thomas' Declaration.  **Exhibit**

17  **"15"** is a true and correct copy of the Declaration of David Schnider containing the

18  above quote.   The next Declaration, **Exhibit "16"**, that contains false statements is

19  the Declaration TW filed in Opposition to Paula Thomas' Motion for Partial Summary

20  Judgment.

21
22  5.    Attached to that Declarations & Exhibits Package

23  attached to the Opposition as Exhibit E are true and correct

24  copies of certain e-mails between myself and attorney

25  Andrew Apfelberg of the law firm of Greenberg Glusker

26  Fields Claman & Machtinger LLLP, a well-know law firm in

27  Los Angeles.  **These are two samples from a series of**

28

16

1943225

**emails chains involving Mr. Apfelberg regarding the**

**negotiation of Paula Thomas' APRI and the transaction**

**to purchase the THOMAS Wylde intellectual property**.

6.      The first chain, commencing at **OppMSJ00037**, show

that Andrew Apfelberg was already informed of the

discussion points for the contemplated transaction.  And in

fact, **I was in communication with Andre Apfelberg**

**throughout this process, staring in July of 2014**, and into

February of 2015. (Emphasis added; false statement)

7.      **I informed Paula Thomas, either directly or**

**through her counsel, Andrew Apfelberg, that the**

**members would join TW in three phases and that she**

**would not be one of the "original" members but would**

**instead join later.  This was done for tax reasons to**

**benefit her and the other minority members.  I similarly**

**informed Paula Thomas, either directly or through her**

**counsel , Andrew Apfelber, that Hillshore Investment,**

**S.A. would be the last to become a member for TW for**

**the same reasons**.  (Emphasis added; completely false)

8.      **The second chain, commencing at OppMSJ00040,**

**shows communications on just before Dec. 22, 2014, the**

**date Paula Thomas signed the APRM and related**

**instruments.  TW was bound, under the APRI and**

17

**Attachments, to pay off CBC Partners I, LC for**

**Thomas**."  (Emphasis added; completely false)

11.    The underscored/bold language in the Declaration of David Schnider set forth immediately *infra* are false statements that are proven to be false by the following evidence.  The following e-mail exchange between David Schnider and Andrew Apfelberg is inconsistent with "**These are two samples from a series of emails chains involving Mr. Apfelberg regarding the negotiation of Paula Thomas' APRI and the transaction to purchase the THOMAS Wylde intellectual property**:"

"Andrew:"

"Attached for your review are the Operating Agreement for Thomas Wylde, LLC and the deal docs for Paula's investment in the company. It may be helpful to discuss further by phone, but so you understand I'll break down the basic structure. Paula is dissolving Thomas Wylde Holdings, LLC, the sole asset of which is the Thomas Wylde IP. Paula is assuming three specific liabilities from PDTW, LLC, consisting of the CBC loan and two loans to Steve Prestemon. Based on advice from our outside CPA, **those assets and debts should cancel out so that Paula has no tax consequence**. (Emphasis added; [**This is not a tax benefit at all**])  Paula will then assign the Thomas Wylde IP, the CBC loan, and the Prestemon loans to Thomas Wylde, LLC and will also provide $3200 cash for her 32% interest in the company. Thomas Wylde, LLC will then immediately pay off the CBC loan and Prestemon loans. In practice, that pay off may actually happen before we get the transfer

18

1943225

documents all signed. Thomas Wylde, LLC anticipates that it will then

issue a membership interest to **Hillshore Investments** in exchange for a

$5.5M cash investment. If Hillshore earns out its full investment in

distributions within three years, then each of the four current LLC

members will give a unit of their membership interest back to Paula,

representing a 2% total stake in the company.

Let me know if you need anything further from me. Otherwise, please

review the documents and provide me with your comments. **[There is**

**not a discussion about tax benefits to any other party]**

Regards,"

"David"

> "David –
>
> I need my engagement letter and retainer returned before I
>
> can do anything.  Then I need to talk with you about the
>
> structure before I can comment on this."
>
> "Andrew"

12.    **Exhibit "17"** is a true and correct copy of the above e-mail exchange.

TW was created on July 22, 2014 with the filing of the Articles of Organizations and

David Schnider waited five months to prepare the above documents?

13.    The following statement is also false: "**I was in communication**

**with Andre Apfelberg throughout this process, staring in July of 2014**."

The Declaration of Biller attached as **Exhibit "16"** sets forth e-mails showing

Andrew Apfelberg was involved from the beginning in February 2014.  Based

on my review of the client files that Greenberg Glusker produced on July 30,

19

1   2018, I prepared and filed a 2nd Amended Complaint naming Greenberg

2   Glusker, Andrew Apfelberg and Olivia Goodkin as defendants to the legal

3   malpractice, fraud, fraud by concealment and other intentional tort claims.

4       14.   The deposition testimony of David Schnider proves he did not

5   inform Paula Thomas of the following:

6           **I informed Paula Thomas, either directly or through her**

7           **counsel, Andrew Apfelberg, that the members would join**

8
            **TW in three phases and that she would not be one of the**
9
            **"original" members but would instead join later.  This**
10
11          **was done for tax reasons to befit her and the other**

12          **minority members.  I similarly informed Paula Thomas,**

13          **either directly or through her counsel , Andrew Apfelber,**

14
            **that Hillshore Investment, S.A. would be the last to**
15
16          **become a member for TW for the same reasons**.

17      15.   Schnider added at his fourth deposition that if he did not have an e-mail

18  informing Thomas about Hillshore Investment, S.A. being a member then he did not

19  inform her. **Exhibit "18"** is a true and correct copy of David Schnider's testimony.

20      **E.      Hillshore Investment is a Phantom Corporation**

21
        16.   Hillshore Investment, S.A. does not exist based on the
22
23  deposition testimony of Eniluz Gonzalez. **Exhibit "19"** is a true and

24  correct copy of the deposition testimony of Eniluz Gonzalez and a

25  summary of that testimony.  Set forth below are the facts that I based this

26
    conclusion upon; these facts were taken from the deposition transcript of
27
28  Eniluz Gonzalez:

1. Eniluz Gonzalez testified on July 31, 2017. (pg. 8, lns. 7-16)

2. Eniluz Gonzalez was instructed that she was going to have to testify in the state court action and as a Defendant in the federal case. (pg. 9, ln. 11 - pg. 10, ln. 1)

3. Gonzalez stated she was going to be in the United States until November 2017. (pg. 14, lns. 13-15)

4. Gonzalez then testified that she has travel plans leaving the next Wednesday and returning on November 2017. (Gonzalez, pg. 14, ln. 18 through pg. 15, ln. 23)

5. Gonzalez received the subpoena duces tecum and she was required to produced documents, but she did not produce any documents. (Gonzalez, pg. 19, lns. 4-19)

6. Gonzalez testified that she did not know why she did not produce any documents at the deposition. (Gonzalez, pg. 19, ln. 23-25)

7. Gonzalez testified that she does not have any documents. (Gonzalez, pg 21, ln. 17 though pg. 22, ln. 15)

8. Gonzalez claims she is the President of Hillshore Investment. (Gonzalez, pg. 22, lns. 21-23)

9. Gonzalez did not know if Hillshore Investment invested nearly $10 million in TW. (Gonzalez, pg 22, ln. 24 though pg. 23, ln. 1)

10. Gonzalez did not know how much money Hillshore Investment invested in TW. (Gonzalez, pg 23, lns. 2-4)

11. Gonzalez does not have any duties or responsibilities as the President of Hillshore. (Gonzalez, pg 23, lns. 11-13)

1943225

12. Gonzalez was not familiar with **Exhibit "22",** an Agreement to Purchase Membership Interests (Gonzalez, pg. 23, ln. 19 through pg. 24, ln. 17)

13. Gonzalez testified that she is the General Manager of Hillshore as stated on **Exhibit "22."** (Gonzalez, pg. 24, lns. 10-25)

14. Gonzalez testified that she holds two positions at Hillshore -- President and General Manager.  (Gonzalez, pg. 25, lns. 1-6)

15. She does not have any duties or responsibilities as the General Manager for Hillshore.  (Gonzalez, pg. 25, lns. 7-9)

16. Gonzalez testified that she does not know if she has other job positions at Hillshore.  (Gonzalez, pg. 25, lns. 10-15)

17. Gonzalez' signature appears on **Exhibit "22",** but she does not remember signing the document, and she did not read the document before signing.  (Gonzalez, pg. 25, lns. 16-25)

18. She does not know why she signed **Exhibit "22"** and she does not have a copy of the document.  (Gonzalez, pg. 26, lns. 8-15)

19. Gonzalez does not know if Hillshore Investment has a copy of the Exhibit.  (Gonzalez, pg. 26, lns. 12-15)

20. Gonzalez does not know if Hillshore has an office.  (Gonzalez, pg. 16-18)

21. She does not remember how long she has been the President of Hillshore (Gonzalez, pg. 26, ln. 25 through pg. 27, ln. 3)

22. She has not walked into the offices of Hillshore Investment.  (Gonzalez, pg. 27, lns. 4-6)

22

1943225

23. Gonzalez has a laptop computer at home but she does not have any ESI regarding Hillshore Investment on it. (Gonzalez, pg. 27, lns. 9-12)

24. She does not have any documents regarding Hillshore whatsoever. (Gonzalez, pg. 27, lns. 13-15)

25. Gonzalez claims she owns shares in Hillshore, but her attorney would not allow her to provide the number of shares and she does not have a Certificate of Shares. (Gonzalez, pg. 27, ln. 25 through pg. 28, ln. 13)

26. She does not have any documents indicating that she owns all the shares of Hillshore. (Gonzalez, pg. 28, lns. 11-13)

27. Gonzalez does not know the telephone number of Hillshore. (Gonzalez, pg. 28, lns. 18-20)

28. She does not know of any physical location of Hillshore Investments. (Gonzalez, pg. 28, lns. 21-23)

29. She does nothing to operate Hillshore Investments. (Gonzalez, pg. 29, lns. 14-19)

30. She does not know if Hillshore Investment has any business operations. (Gonzalez, pg. 29, lns. 21-23)

31. **The only personal knowledge of any business operations she has is of Thomas Wylde. (Gonzalez, pg. 29, ln. 23 through pg. 30, ln. 8)**

32. She does not know what Hillshore Investment does. (Gonzalez, pg. 31, lns. 11-12)

33. However, Gonzalez then testified that she does not have any business operations with Thomas Wylde. (Gonzalez, pg. 31, lns. 13-15)

23

1943225

34. Gonzalez does not know why Hillshore Investment invested money into Thomas Wylde. (Gonzalez, pg. 31, lns. 16-18)

35. She did not make the decision to invest $9.1 million into Thomas Wylde. (Gonzalez, pg. 31, ln. 16-18)

36. She does not know whose decision it was to invest $9.1 million into TW (Gonzalez, pg. 31, lns. 22-23) , but then she testified that her husband Stephen Choi made that decision. (Gonzalez, pg. 32, lns. 3-8)

37. She did not have any discussions with Choi regarding his decision to invest in TW. (Gonzalez, pg. 32, 10-20)

38. Gonzalez does not know how many employees Hillshore Investment currently has. (Gonzalez, pg. 35, lns. 7-9)

39. Gonzalez does not know the maximum number of employees it had during its existence. (Gonzalez, pg. 35, ln. 11-13)

40. Gonzalez does not have any documents to prove Hillshore Investment actually employs people. (Gonzalez, pg. 35, lns.11-17)

41. The subpoena duces tecum requested 22 categories of documents to be produced. (Gonzalez, pg. 36, ln. 17 though pg. 37, ln. 20)

42. Gonzalez did not produce and did not have any documents that were subpoenaed, including: (a) bylaws of Hillshore; (b) articles of incorporation; (c) minutes of board of directors from 2014 to the present; (d) purchase agreement of TW by Hillshore; (e) physical location of Hillshore; (f) business purpose of Hillshore; (g) advertising for Hillshore; (h) organizational charts for Hillshore; (i) bank statements reflecting transfer of money between accounts in the name of Hillshore

24

1943225

and Thomas Wylde; (j) documents regarding the physical location of Hillshore, (k) the names, addresses, telephone numbers, e-mail addresses of any agents, employees, directors and officers of Hillshore; (l) documents related to the number of shares Hillshore issued; (m) documents related to loans Hillshore made to TW; (n) documents related to investments by Hillshore to TW; (o) documents regarding returns of investments to TW.  (Gonzalez, pg. 37, ln. 10 through pg. 44, ln. 3)

43. Other than herself, she does not know of shares being issued to anybody else.  (Gonzalez, pg. pg. 44, lns. 16-23)

44. She did not know what Paula Thomas did at TW. (Gonzalez, pg. 47, lns. 7-23)

45. Gonzalez does not know if Hillshore has any bank accounts. (Gonzalez, pg. 52, lns. 17-19)

46. Gonzalez was born in Venezuela and obtain a high school degree. (Gonzalez, pg. 57, lns. 5-12)

47. Gonzalez was born on June 18, 1974.  (Gonzalez, pg. 58, lns. 17-18)

48. At the time of her deposition, Gonzalez was 43 years old.  (Gonzalez, pg. 58, lns. 17-18)

49. Her husband (Stephen Choi) created Hillshore Investment.  (Gonzalez, pg. 60, ln. 22 through pg. 61, ln. 5)

50. She did not know when Hillshore Investment was created.  (Gonzalez, pg. 61, lns. 6-13)

1943225

51. Gonzalez' work experience includes working at a bank out of high school, selling phones, buying swim suits for sale, and working as a waitress.  (Gonzalez, pg. 59, ln. 6 though pg. 63, ln. 2)

52. From 2000 to the present (2017 at the time of her deposition), she has been a stay at home mom.  (Gonzalez, pg. 64, lns. 21-23)

53. She has not worked outside the home during that time.  (Gonzalez, pg. 64, ln. 25 through pg. 65, ln. 1)

54. She has not worked for any business inside the home.  (Gonzalez, pg. 65, ln. 5-7)

55. Gonzalez does not have any education, background, training, work experience to be a President of an investment company like Hillshore Investment.  (Gonzalez, pg. 66, lns. 4-8)

56. Gonzalez does not have any education, background, training, work experience to be a General Manager of an investment company like Hillshore Investment.  (Gonzalez, pg. 66, lns. 9-13)

57. She learned from her husband that she was the President of Hillshore. (Gonzalez, pg. 67, lns. 3-6)

58. She claims there is a document that states she is the President, but she does not remember the document and she does not remember the last time she saw it.  (Gonzalez, pg. 67, lns. 7-13)

59. Gonzalez claims Hillshore was the only company for which she was a President. (Gonzalez, pg. 74, lns. 1-4)

60. She is noted on **Exhibit 25** to be the President and Director **BUCANOS ENTERPRISES** and the President and Founding Member

26

of the company **MAGNETIC BLUE INVESTMENT FOURNDATION**, but she has never utter those words. (Gonzalez, pg. 73, ln. 17 though pg. 75, ln. 7)

61. She does not know if she was the Presidents of those companies. (Gonzalez, pg. 76, lns. 8-18)

62. She does not know that she was a President and Founding Member of **MAGNETIC BLUE INVESTMENT FOURNDATION**. (Gonzalez, pg. 76, ln. 25 through 77, ln. 1)

63. Her brother is the Secretary of **MAGNETIC BLUE INVESTMENT FOURNDATION** but they have never talked about that company. (Gonzalez, pg. 86, ln. 19 though pg. 87, ln. 4)

64. She did not tell anybody or write anything stating she was going to be the President of **MAGNETIC BLUE INVESTMENT FOURNDATION.** (Gonzalez, pg. 87, ln. 23 through pg. 88, ln. 6)

65. John Wilson would not allow the witness to state what Stephen Choi does for a living. (Gonzalez, pg. 91, ln. 23 - pg. 93, ln. 8)

66. She does not know if she ever caused any money to be transferred from a bank account in the name of Hillshore Investment to a bank account in the name of TW. (Gonzalez, pg. 95, lns. 13-17)

67. Gonzalez does not know if she ever caused money to be transferred from Hillshore Investment, S.A. to any bank account in the United States in the name of TW. (Gonzalez, pg. 95, ln. 23 through pg. 96, ln. 2)

68. As the alleged President for Hillshore, Gonzalez has never instructed anybody to wire transfer from a bank account in Hillshore Investment, S.A.'s name to TW.  (Gonzalez pg. 96, lns. 6-12)

69. As the alleged General Manager for Hillshore, Gonzalez has never instructed anybody to wire transfer from a bank account in Hillshore Investment, S.A.'s name to TW.  (Gonzalez pg. 97, lns. 15 through pg. 98, ln. 1)

70. Gonzalez has never seen **Exhibit "26"** (Certificate of Incorporation for Hillshore Investment).  (Gonzalez, pg. 98, lns. 13-20)

71. Gonzalez has never seen the Certificate of Incorporation as the President and General Manager for Hillshore and she does not know what the document is.  (Gonzalez, pg. 98, ln. 25 through pg. 99, ln. 6)

72. Gonzalez was never involved in any activities or conversation or cause anybody to get involved in any of the business purposes set forth in **Exhibit "26."**  (Gonzalez, pg. 98, ln. 17 through pg. 103, ln. 23)

73. Gonzalez never had any meetings as 100% Shareholder in Panama City as required by **Exhibit "26."**  (Gonzalez pg. 109, lns. 16-22)

74. There has never been a shareholder's meeting for Hillshore Investment.  (Gonzalez pg. 109, ln. 24 through pg. 110, ln. 10)

75. She does not know how many directors are on the board for Hillshore.  (Gonzalez, pg. 109, lns. 11-16)

76. Gonzalez does not understand the powers of the corporation for Hillshore Investment.  (Gonzalez, pg. 112, lns. 11-13)

1943225

77. Gonzalez does not know who the officers of Hillshore Investment are. (Gonzalez, pg. 112, lns. 11-14)

78. Gonzalez never voted for officers or directors as the 100% shareholder of Hillshore Investment. (Gonzalez, pg. 115, lns. 6-9)

79. She does not know if Hillshore Investment made any type of loans to Thomas Wylde. (Gonzalez, pg. 118, lns. 9-12)

80. She does not know the difference between a loan and an investment. (Gonzalez, pg. 118, lns. 13-19)

81. Her attorney would not allow Gonzalez to provide her understanding of the relationship between TW and Hillshore. (Gonzalez, pg. 118, ln. 21 through pg. 120, 15)

82. She has never seen the Operating Agreement for TW. (Gonzalez, pg. 126, ln. 25 through pg. 126, ln. 13)

**F.    Richard Peddie Gave PDTW the Five Computers and Six iPads Containing Irrelevant Information and Irrelevant QuickBooks Data that PDTW will NOT Produce in Discovery -- Evidence of Collusion**

17.    Ed Smith describe the number of computers used at PDTW in the early years as MAC and iPads, but the number of computers purchased over the years reached 40. As of April 15, 2015 there were approximately 30 computers and three severs at PDTW/TW, but as of December 2017 there were only 18 computers. Now, the ESI is stored in an Amazon Cloud under the control of Jene Park. PDTW allegedly had the ESI imaged and copied from the five MAC computers, but it has not distributed copies of that ESI to prove the ESI is irrelevant. PDTW preserved the five

29

1   MAC computers and iPads containing information and ESI regarding PDTW in the

2   early years, not the computers that existed in 2016 and up to December 2017 regarding

3   2012 to 2017.  **Exhibit "20"** is a true and correct copy of the pages to Ed Smith's

4   deposition testimony supporting this summary.

5   **G.     1839 Pages of E-mails Larry Simons Produced at His Deposition on**

6   **May 2, 2018 Representing Communications between Peddie and**

7   **Simons/Zamora -- <u>Evidence of Collusion to Initiate Adversary</u>**

8   **<u>Proceedings</u>**

9

10   18..   Larry Simons did produce e-mails, but not all (some were deleted),

11   exchanged between Peddie, Zamora and Simons.  **Exhibit "10"** is an exchange

12   between Peddie and Zamora (when Paula Thomas is a Creditor) in which Zamora

13   thanks Peddie for his legal analysis and she will forward Peddie's legal analysis to the

14   accountant retained by PDTW.  **Exhibit "6"** is the June 10, 2017 e-mail from Peddie

15   to Zamora  stating:

17         So what do you want to do? We claim to have had every right to sell what

18         we sold pre-petition as self-help. Don't forget that Paula Thomas just

19         delivered into TW's hands EVERYTHING in 2014 because she knew the

20         deal and she and PDTW were enjoying all of this debt relief and she

21         knew that TW would be the new company and PDTW would never be

22         able to pay it back completely.

24         **<u>Thus, just a reminder and a preview: (a) We agreed the estate could</u>**

25         **<u>take and sell everything contingent upon it recognizing that we claim</u>**

26         **<u>an interest in that stuff but agree we can argue about the money</u>**

27         **<u>later; and (b) we are not terribly interested in "settling" the state</u>**

28

30

1943225

**court litigation as we have cross-claims for the debts, etc., that**

**completely swallow those claims up**. (Emphasis added)

**Unless you can show that we have hidden goods or that we have not**

**credited PDTW for large amounts of inventory sold pre-petition, etc.,**

**I would suggest that we just work together to put together something**

**that will convince the judge that there is not much there.** And look

out, because our dear Mr. Biller has now claimed there are 10,000 items,

and nobody seems to remember that we've given all we've got to you

already and it's all at the auctioneer's . . . (Emphasis added)

And watch out for this other about-face we're seeing: **After approving**

**the auctioneer and offering to be helpful and all of that -- and you've**

**got me and Paula Thomas on the record on March 30 talking about**

**that, with me suggesting that Paula Thomas might need more time to**

**prepare for the hearings, especially if she's going to be helping the**

**auctioneer as proposed, etc. -- now Paula Thomas will be objecting to**

**the auctioneer under the "it's a fire sale" argument -- to which I**

**think you've already basically said, "Yes, but it's a bankruptcy, so**

**what do you expect?" You're going to need to keep doing that, and**

**let me know how I can help**. (Emphasis added)

19.     Richard Peddie repeatedly hood winked PDTW into filing an

adversary proceeding/complaint.  Richard Peddie stated in his July 9, 2017 e-

mail:

"And yes, I think the thing to do would be to **hit Paula Thomas with an adversarial proceeding to establish the amount of her debt**. We have to knock some sense into her counsel somehow." (Emphasis added)

20.    **Exhibit "9"** is a true and correct copy of the July 9, 2017 e-mail that Peddie wrote to Zamora; I received this e-mail in the ordinary course of my law practice and I have maintained it in a safe and secure place as part of my regular business practice.  On July 19, 2017 (60 days before the adversarial complaint is filed) Richard Peddie states in another e-mail to Zamora:

> **So, will the Trustee bring adversarial proceedings over the archives plus the PT debt to Debtor, plus also, if deemed advantageous, this nonsense re PDTW's debts to PT for bogus independent contractor services rendered by PT to PDTW while she was the salaried, CEO and majority member**? I just can't see anything short of the nuke being appropriate in these circumstances, and **I cannot see that anyone but Trustee should initiate that battle**.  (Emphasis added)

21.    **Exhibit "9"** is a true and correct copy of the July 19, 2017 e-mail quoted above.  I received this Exhibit in the ordinary course of my business and I have maintained a copy of this e-mail in a safe and secure place as is my regular business practice.

22.    PDTW did not object to TW renewing the THOMAS WYLDE trademark to cover garments under Thomas Wylde, LLC name.  On November 18, 2017, after the adversarial complaint and the *12(b)(6) Motion to Dismiss* was filed, Richard Peddie wrote to Zamora:

32

1943225

**As you know, some months ago we took preemptive action to renew**

**the THOMAS WYLDE trademark covering garments. We did so**

**even though there exists a dispute as to the ownership of the mark: It**

**served no one to allow the registration to lapse, could have brought**

**that asset value down a bit, etc**.

This is something different: We have, pending, an application to register

the mark THOMAS WYLDE in classes involving eyewear products and

body care products. This was an "Intent to Use" application. Thus,

the USPTO cleared it, published it for opposition, etc., but it cannot be

registered until actual use is proven.

As you may know, a lawsuit was filed by SAMA Eyewear against TW

and was set to go to trial on Nov. 7. Fortunately, that case settled on Nov.

5, but we have no real eyewear line to speak of, and production was

all based upon a trademark licensing agreement -- and you can see where

that ended up. Prototypes samples had been created, but these were

owned by SAMA. They were worn by models at fashion shows;

the glasses were shown in ads we took out in Paris Vogue; we promoted

the eyewear line on social media; and there were perhaps even minimal,

liquidating sales of those prototypes by SAMA (maybe). I don't think

there was any actual production. There certainly weren't any royalties

paid over to TW. In sum, it's dead in the water. Nor do we have anybody

care products. Thus, we do not feel we can establish use in either

case. The ITU extension we obtained just to keep this alive is attached.

You will see that it is about to run out.

33

I provide this to you in case you disagree and so that you can take whatever protective action you deem necessary. We appear as the applicant, just as we appear as the owner of the THOMAS WYLDE garment class registration, so any action would have to be done through us (at least if it is to be done quickly and efficiently), but we will certainly work with you. However, I suspect you'll agree that this is just dead in the water.

22.    Renewing the Trademark **THOMAS WYLDE** in TW's name as the owner is completely inconsistent with PDTW claiming it owned the trademark as alleged in the Complaint, opposition to the *Rule 11 Motion* for Sanctions, Opposition to the Motion for Partial Summary Judgment and PDTW's Motion for Summary Judgment.  If PDTW believed it owns the trademark THOMAS WYLDE, then it could have registered it in its name, or bring the issue up for the Court to address.  **Exhibit "11"** is a true and correct copy of the above quoted e-mail.

**H.    E-Mails From Greenberg Glusker Proving Peddie and Park had a Attorney Client Relationship Before TW, LLC Was Established**

23.    Before TW, LLC was created, Jene Park and Richard Peddie had a very personal and professional relationship. *See* Declaration of David Fuchs, **Exhibit "21."**  However, Richard Peddie was representing Jene Park in negotiations with counsel for PDTW and TW Holding, LLC regarding her percentage of ownership in the NewCo. ("TW").  **Exhibits "22"** and **"23"** are true and correct copies of e-mails I obtained from Greenberg Glusker in July 2018 after demanding such documents since June 2017.  Andrew Apfelberg represented PDTW and TW Holding at that I received

34

in the ordinary course of my law practice and I have kept the original in a safe and secure place as is my regular business practice June 2014.

## I. More Evidence of Collusion Evidenced By the Coordinated Filing of Motions for Protective Order and Emergency Ex Parte Applications for Protective Order With Producing no Documents

22.     Every time Paula Thomas sought discovery from PDTW, TW, and third parties in this litigation, the targets of the discovery used the same litigation tactics that was the brain child of Richard Peddie: file motions for protective order and do NOT produce any documents.  In the meantime, PDTW and TW have not sought any discovery from Paula Thomas.

23.     **Exhibit "29"** are true and correct copies of the e-mails that I exchanged with PDTW's counsel, Reagan Boyce, regarding the Joint Stipulation.

30.     **Exhibit "30"** is a true and correct copy of the incomplete Joint Stipulation that I received from Reagan Boyce on September 11, 2018 -- the last day to return the document so I did not have any time to revise and Reagan Boyce refused to send me "word" copy of the Stipulation.

24.     I, Dimitrios P. Biller, declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.  I executed this Declaration on September 17, 2018 in Pacific Palisades, California.

Dimitrios P. Biller

35

1943225

1
2
3

# PROOF OF SERVICE
## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

4        I declare under penalty of perjury that I live in the County of Los Angeles, state
of California, I am over the age of 18 years; my business is located at 15113 West
5   Sunset Blvd., Suite "9", Pacific Palisades, CA 90272.  On **September 18, 2018**, I
6   caused to be served, via e-mail, the following pleadings:

7        **Declaration of Dimitrios P. Biller in Support the Paula Thomas' Motion to**
8        **Compel and Termination Sanctions/Order dismissing Adversarial**
         **Proceedings**
9

10            Richard Byron Peddie,
              lawstudios@comcast.net
11            Lawstudios Richard Bryon Peddie
12            5105 Euclid Avenue
              Boulder, Co 80303-2811
13            e-mail: lawstudios@comcast.net
14            Counsel for ALL Thomas Wylde, LLC

15
              Reagan Boyce
16            David Seror
              Brutzkus Gubner Rozansky Seror Weber LLP
17            21650 Oxnard St., Suite 500
18            Woodland Hills, CA 91367-4911

19

20

21   **XXX** BY MAIL – I placed such envelope for deposit in the U.S. Mail for service by
     the United States Postal service, with postage thereon fully prepaid.  I am "readily
22   familiar" with the practice of collection and processing correspondence for mailing.
23   Under that practice, it would be deposited with the United States Postal Service on
     that same day with postage thereon fully prepaid at Pacific Palisades, California.  I am
24   aware that on motion of the party served, service is presumed invalid if postal
25   cancellation date or postage meter date is more than one day after date of deposit for
     mailing in affidavit.
26

27        BY FEDERAL EXPRESS – I am familiar with the practice at my place of
     business for collection and processing of correspondence for overnight delivery
28   maintained by Federal Express.  Such correspondence will be deposited with a facility

1943225

1    regularly maintained by Federal Express for receipt on the same day in the ordinary
     course of business.  The envelope was sealed and placed for collection and delivery by
2    Federal Express with delivery fees paid or provided for in accordance with ordinary
3    business practices.
          BY PERSONAL SERVICE – I caused such envelope to be delivered by hand to
4    the offices of the addressee.

5    **XXX**:  E-mail at the above e-mail addresses.
6
7    **XXX** (State) I declare **under penalty of perjury under the laws of the State of
     California** that the foregoing is true and correct.
8
9    Executed on **September 18, 2018**, at Pacific Palisades, California.
10
     /S/ Dimitrios P. Biller
11   Dimitrios P. Biller
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

37

# EXHIBIT "22"

# Re: introduction

| | |
|---|---|
| **From:** | Richard <lawstudios@comcast.net> |
| **To:** | "Apfelberg, Andrew M." <aapfelberg@greenbergglusker.com> |
| **Cc:** | Jene Park <jene@thomaswylde.com> |
| **Date:** | Wed, 04 Jun 2014 09:19:23 -0700 |

Hi Andrew,

Richard Peddie writing.

We should talk soon, obviously, but I wanted to give you a preview of my initial concerns:

Jene has been involved with the company for over eight years and, as far as we are concerned, by rights is already a 10% owner of the company, for that is what she was promised long ago. And by "company" I mean all that Jen worked so hard to build, wherever any asset may now reside and whatever reorganizations there may have been.

Keep in mind that, above and beyond her efforts, Jene has personally guaranteed company debt in the amount of $1.6M. This is not the gesture of a mere employee; nor is it really something a mere 10% owner would jump in and do in many cases: It is more like something a full 50% partner would do.

It is my understanding that the IP has migrated out of PDTW and is either in a new company or held by Paula directly. This largely eviscerates PDTW of whatever value it may have, and may prove problematic eventually should other creditors -- secured or unsecured -- find it necessary to pursue PDTW.

The warrant you prepared is fairly straightforward. I can see you were trying to be fair and all of that, and you certainly have your marching orders. However, the bottom line is that the warrant gives Jene the option to acquire 10% of something that is already beleaguered with debt and is, apparently, fairly hulled out, once it is considered that the IP is elsewhere.

10% was promised long ago and should be acknowledged or even increased, given that Jene is now liable on the debt, and it should be a significant percentage of the *real business* however it is configured, with all of its working parts.

Jene needs to make career decisions. If even what was promised long ago will not be acknowledged, or if it is only superficially acknowledged by granting a small percentage in something that no longer has, within it, that which is important, and that which Jene was central in building, we need to know it: In that event, we are all just wasting our time.

I remain delighted by the opportunity to make your acquaintance by telephone. Jene speaks very highly of you. I will call shortly to discuss.

Thanks!

Richard Byron Peddie

From: "Andrew M. Apfelberg" <aapfelberg@greenbergglusker.com>
To: "Jene Park" <jene@thomaswylde.com>, "Richard" <lawstudios@comcast.net>
Sent: Monday, June 2, 2014 6:55:20 PM
Subject: RE: introduction

Richard, I look forward to talking with you.

PDTW_TW_GG000663

Best,
Andrew

**Andrew M. Apfelberg | Attorney at Law | Biography**
D: 310.201.7408 | F: 310.201.2310 | AApfelberg@greenbergglusker.com
**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com

**IRS Circular 230 Disclosure:**
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

**From:** Jene Park [mailto:jene@thomaswylde.com]
**Sent:** Monday, June 02, 2014 3:51 PM
**To:** Apfelberg, Andrew M.; Richard
**Subject:** introduction

Hi Andrew,

I would like to introduce Richard my business attorney. Richard will give you a call to further discuss about my situation regarding Thomas Wylde ownership.

Hi Richard,

Please find Andrew's info as blow:


Andrew M. Apfelberg
Greenberg Glusker
310.553.3610
www.greenbergglusker.com


Kindest,


Jene Park
Chief Operating Officer

T H O M A S   W Y L D E
www.thomaswylde.com

# EXHIBIT "23"

# Re: introduction

| | |
|---|---|
| **From:** | Richard <lawstudios@comcast.net> |
| **To:** | "Apfelberg, Andrew M." <aapfelberg@greenbergglusker.com> |
| **Cc:** | Jene Park <jene@thomaswylde.com> |
| **Date:** | Fri, 06 Jun 2014 10:27:16 -0700 |

Andrew,

Thanks for taking the time to speak with me the other day.  I later spoke with David to clarify the history of the trademark and have had additional discussions with Jene.

While you have corrected my understanding of the extent to which the company is "gutted", please understand that, from our point of view, the trademark is the company and the company is the trademark. I am told that the license is terminable for any reason or no reason within 30 days.  That is very little security for Jene.

I understand why the trademark now resides in Thomas Wylde Holdings, LLC -- it is to secure the loan. But that loan is guaranteed by Jene.

You say that TWH receives only nominal income from PDTW.  But we are not concerned with that:  We are concerned with the mark and its value.  That there are inconsequential royalties flowing from PDTW to TWH does not alter the fact that the thing with ever increasing value -- the mark -- resides within TWH -- and that value is directly linked to the success of PDTW, where Jene expends her efforts.

I am told that PDTW has spent approximately $13M in building and protecting that mark, with well over $2M spent in settling ownership of it, but the major long-term benefit of such expenditures will inure to the benefit of the person or entity owning the mark.  In no way do I suggest that there is anything wrong with how any of this has been handled; I do, however, maintain that if Jene does not participate in the appreciation of mark value, she is missing the main attraction.  Surely you are not suggesting that under any criteria PDTW does not suffer a tremendous devaluation if it does not have the use of its mark locked down completely.

Jene has worked for many years to build the value of this mark.  She has lent considerable sums to PDTW and has even co-signed on this $1.6M loan which directly benefits TWH.  She has been Paula's companion along this road, sharing the risk, and going above and beyond the call of duty with every form of sacrifice.  And a continuation of that is quite obviously what is expected, given that the warrant itself terminates automatically should she accept any form of outside work.  We cannot invite her in for all the risk and work and yet shove her out into the cold when it comes time to enjoy the fruits of all of this -- the ultimate fruits.

Yes, I can educate my client.  Jene will make the ultimate decision, but I cannot tell her that all is well and that not having at least an indirect interest in the mark is "no big deal" under the circumstances.  She herself raises some very valid concerns in addition to those we have discussed.

This isn't what Jene expected.  We will need to work something out -- or, better yet, Paula and Jene will need to work something out that we later set down.

Thanks!

RBP

From: "Andrew M. Apfelberg" <aapfelberg@greenbergglusker.com>
To: "Jene Park" <jene@thomaswylde.com>, "Richard" <lawstudios@comcast.net>
Sent: Monday, June 2, 2014 6:55:20 PM
Subject: RE: introduction

PDTW_TW_GG000665

Richard, I look forward to talking with you.

Best,
Andrew


**Andrew M. Apfelberg | Attorney at Law | Biography**
D: 310.201.7408 | F: 310.201.2310 | AApfelberg@greenbergglusker.com
**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com

**IRS Circular 230 Disclosure:**
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

**From:** Jene Park [mailto:jene@thomaswylde.com]
**Sent:** Monday, June 02, 2014 3:51 PM
**To:** Apfelberg, Andrew M.; Richard
**Subject:** introduction

Hi Andrew,

I would like to introduce Richard my business attorney. Richard will give you a call to further discuss about my situation regarding Thomas Wylde ownership.

Hi Richard,

Please find Andrew's info as blow:


Andrew M. Apfelberg
Greenberg Glusker
310.553.3610
www.greenbergglusker.com


Kindest,


**Jene Park**
**Chief Operating Officer**

**T H O M A S   W Y L D E**
www.thomaswylde.com

PDTW_TW_GG000666

# EXHIBIT "24"

7/6/2017 10:05:11 AM

Re draft reply

Nancy,

Thanks for sharing the draft reply Just a few suggestions/edits.

/~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~/

2 23 'Thoms" should be "Thomas"

3 20 yes, disinterested person, but also NOT an auctioneer with expertise liquidating things in the timeframes required by bankruptcy. Consider adding something RBP LATER: I think you covered this further down.

9 27 -- probably not terribly important, but you use "La Brea Storage" for the first time but then define it on the next page Consider bringing the defining part up to the first use, or just skip it if you don't have time We'll all "get it"

p. 10 -- can you add something about Thomas' consent and offer to assist in the inventory process and in marketing? So to tie in her consent to and approval of the auctioneer and the sale . . RBP LATER I guess this was covered in the original motion, but consider emphasizing it at this point.

10:27 -- you can add here, even just as a footnote, that on p. 6 of the Response Thomas was jumping up and down that Trustee had not taken possession . . . and now is threatening you for having done so . . .

11:7 -- you could add that this property apparently consists of certain garment-making forms, an oval table, and some older electronic equipment consisting of perhaps a few computers and perhaps some Apple hand held devices -- none of it considered to be terribly valuable.

11:22 add a paragraph? Something like:

Moreover, an examination of Debtor's 2014 tax return indicates that Thomas owes Debtor money for officer advances that may exceed $170,000.00. Thomas has confessed to owing at least $129,901.69: Section 341 hearings were held on August 14, September 7, and October 11, 2016. DKT. NOS. 4, 14 & 24. At her Sept. 7 hearing, Thomas conceded that she owed $125,000.00 to Debtor for monies borrowed in 2011. See Exhibit XXX -- annexed and incorporated -- excerpt from transcript from Sec. 341 hearing held on Sept. 7, 2016 -- at 16:6-14. In the schedules, Thomas admits to having borrowed an additional $4,901.69 from Debtor pre-petition Thus, between the schedules and her Sec. 341 testimony alone, THOMAS has thus far admitted to owing at least $129,901.69 to Debtor. And Trustee's review of the accounting suggests that Thomas reclassified various personal expenses paid for by Debtor, moving them out of the "advances to officer" category where her debt to Debtor is tracked, and reclassifying them as company expense This raises very troubling issues concerning fraud not only here but also in the form of income tax evasion. Investigation into these fraudulent reclassifications is ongoing, but the current amount of such reclassifications is believed to exceed $40,000 00 Trustee has made various demands upon Thomas for payment of her debt to Debtor, but these have gone unanswered, and indeed, much of the agitation and vexatious argument we see at this point may well be attributable to a desperate attempt to get away from this liability

LET ME KNOW WHAT YOU MAY WANT TO SUBSTANTIATE THAT

14:18 -- perhaps a footnote -- "And, prior to that date, TW agreed, as an accommodation, to continue storing goods, and in fact paid for the ongoing storage of such goods at the various locations. As we have seen, certain objects weighed 3,000 lbs each. The Personal Property occuppied considerable space and the estate had not yet generated any money whatsoever to pay for any storage.

[I JUST WANT TO GET AWAY FROM THIS ARGUMENT THAT WE ARE TO BE VILIFIED FOR STORING THIS STUFF . .]

15:22 consider adding. But the July 2017 Emails were foreshadowed by earlier menacing e-mails For example, when Trustee's Counsel, together with TW's counsel, copied Debtor on certain filings, as they must under the Local Rules -- see LOCAL BANKRUPTCY RULE 9013-1(d)(1) -- each received the attached rambling, menacing e-mail accusing them of having violated not only the ethical rules, but of having committed the crime of intimidating a witness, and congratulating each upon having made Biller's "witness list". See Biller's June 11, 2017 e-mail to Trustee's Counsel and TW's counsel

16 9 -- are four claims being heard in August? I thought only three were set to be heard . . Thomas' claim, the Schiffman related claim, and TW's claim no 10

20:28 it's Claim No. 9.

21:24 change "Action" to "Auction"

22:5 add a period at end.

22:5 perhaps add something like "While Thomas complains that Auctioneer has no direct experience in high end fashion, this too is irrelevant: All that will be necessary is that the sale be marketed widely to those in the fashion industry to ensure price pressure. Thomas remains free to inform anyone she wants to about the sale."

23:17 we compromised ourselves in delivering the property to Trustee. Can we have the abandonment language instead say "or to any secured party.""?

From: zamora3@aol.com
To: "lawstudios" <lawstudios@comcast.net>
Sent: Thursday, July 6, 2017 2 59 48 AM
Subject: draft reply

TR000903

# EXHIBIT "25"

Rafols is an account, graduated in bachelor of accountancy in the philipines, took the board I the Philippines and practiced as a CAP. (pg. 15, ln. 22 – pg. 16, 6)

Rafols worked for Fashion House starting in 2003 as an accountant and she left that position in 2008. (pg. 17, lns. 1-12)

She then started to privately consult, and she continues to do that work, before taking a job at TW (pg. 19, ln. 19   pg. 20, ln. 6)

John Hanna was the CEO at TW. (pg. 20, lns. 7-10)

She worked independently from 2009 to the present but worked for TW starting in July 2014. (pg. 21, lns. 8-14)

John Hanna brought Rafols to TW. (pg. 22, lns. 1-6) She worked with John Hanna for five years at Fashion House where he was he CEO and that company went bankrupt. (pg. 23, lns. 7-17)

Rafols left TW in June 2016 and she worked at TW for two years. (pg. 24, ln. 24 to pg. 25, ln. 8)

TW is in bad financial position today. (pg. 23, lns. 18-21)

TW is planning to file for bankruptcy. (pg. 23, ln. 23 though pg. 23, ln. 2)

She overhears a discussion between David Schnider and John Hanna about TW filing for bankruptcy, but Richard Peddie would not allow the witness to testify about the discussion. (pg. 25, ln. 9 through pg. 27, ln. 6)

She had personal knowledge of the financial state of Thomas Wylde as late as June 2016. (pg. 29, lns. 22-25)

She was the Financial Controller and in charge of Human Resources at TW. (pg. 30, lns. 1-40

As the Financial Controller for TW, Rafols duties between 2014 and 2016 was to oversee the financials, the bank accounts, and reporting and coordination with management and budget. She handled the QuickBooks by taking information off on other sources (expenses and revenues) and inputting the data in the QuickBooks software program. QuickBooks data has three sources of information and is only as accurate as the information inputted. (pg. 37. ln. 2 – pg. 38, ln.21)

**She verified investments by Hillshore by getting information bank she believes $9.1 to $9.5 was invested in TW/Choi. (pg. 40, ln. 3 – 13)**

**The loan amounts are determined by the promissory notes. (pg. 40, lns. 19-25)**

**Exhibit "65" is a schedule from QuickBooks. (pg. 41, lns. 12-19) Rafols made the entries on August 26, 2014 for $600,000, September 18, 2014 for $350,000, October 14, 2014 for $350,0000 and November 13, 2014 for $500,000.00, and December 2014 for $500,000. (pg. 42, lns. 2-25)**

**These loans were reclassified from loans to equity in the amount of $2.3 by December 31, 2014. (Pg. 43, lns. 16)  When there is a loan converted to equity there is a legal document. (pg. 45, ln. 16- pg. 46, ln. 21)**

**The $2.3 was invested or loaned to TW over the course of five months and TW actually received the money. (pg. 50, 16 – pg. 51, ln. 5)**

**It is important to PT that she know $2.3 million was received by TW and it was a material fact to know. (pg. 51, lns. 14-23)**

Exhibit "66" is the Agreement to Purchase Membership Interest with an effective date of November 5, 2017 giving Hillshore 3,300 additional units and Hillshore investing $3,500,013.00 at $1,060.61 per unit.  (pg. 53, ln. 9 – 23)

Exhibit "67" is the payment schedule attached to Exhibit "66" but the numbers on the Purchase Agreement are inconsistent with the numbers on the Schedule; the Purchase Agreement stated $3,500,000. 00 but the schedule states $2 million (pg. 54, ln. 5 – pg. 55, ln. 56, ln. 16)

The company should have bank slip and backup documents for the investments. (pg.58, 17 – 59, 6)

**QuickBooks can be easily manipulated to give false information and reports by entering the wrong data. (pg. 38, lns. 19-24)**

**Any changes to QuickBooks would change the financial statements (Profit & Loss and Balance Sheet).  (pg. 63, lns. 11-16)**

**Exhibit "65" does not have any entries for money received by TW in 2015. (pg. 59, 11 – 60, ln. 7)**

**Backup data is required to verify QuickBooks.  (pg. 65, ln. 1-11)**

**The backup documents are needed to do an audit of QuickBooks. (pg. 9-21)**

**Rafols prepared Exhibit "68", transmittal form sent to Paula about the notice of issuance of new membership; she created this document and assembled all the documents attached in the regular course of business.  (pg. 67, ln. 24 – pg. 68, ln. 22)**

**<u>As a member of TW, PT has a say regarding anything that affects the finances of the company.</u>  (pg. 70, lns. 18-24)**

**QuickBooks needs to be verified with the actual back up documents. (pg. 74, lns. 11-15)**

The back-up documents were stored in folders at TW and should be in TW possession. (pg. 75, ln. 1-9) This material should not be destroyed because it is important and the IRS requires that the documents be stored for seven years. (pg. 75, lns. 2-15)

If TW does not have the back-up documents for seven years that would be a violation of the IRS regulations.  (pg. 76, ln.2-8)

The backup materials for TW were located at TW in Rafols' drawer.  (pg. 78, 18-25)

There was a filing cabinet in the back (several) in her office and a drawer on the table; the documents did not go back seven years.  (pg. 78, ln. 22 – pg. 79, ln. 10)

The backup materials were in her office, but they moved and she does not know where the documents are located now.  (pg. 79, ln. 13-23)

As of June 2016, the documents were in her office.  (pg. 80, lns.3-5)

She maintained bank statements by down loading them on line and they would be put in the TW folder in her computer.  (pg. 81, lns. 7-16)

Rafols maintained folders name "financials"; "AP"; "accounts payable; accounts receivable and stored bank statements invoices received on line and the electronic folders still existed when she left in June 2016.  (pg. 81, 20 – pg. 82, ln.6)

Rafols could easily transfer all the documents to a flash drive and transfer folders.  (pg. 82, ln. 10-25)

It is not burdensome to transfer documents.  (Pg. 83, ln. 1-8)

As a member and owner of the company Paula Thomas is allowed to inspect those documents.  (pg. 83, ln. 18-23)

She had separate electronic folders for pdf/word document and separate e-mail folder for e-mail regarding Thomas. (pg. 86, lns. 14-24)

When she left in June 2016, the electronic folder and e-mail folders were st
in existence.  (pg. 87, lns. 5-8)

These materials were not produce at her deposition and Peddie said "we" can
discuss is. (pg. 87, lns. 9-22)

**The financial condition at TW required the salaries to be cut by 1/3 as
reflected in Exhibit "70."  (pg. 88, ln. 17, pg. 89, ln. 1)**

**Paula Thomas' payment cycle was once a month at the beginning of the
month.  (pg. 88, ln.21 – pg. 89, 17)**

**Exhibit "72" is the Third Amended Exhibit B"/Members and Contributions
November 15, 2015.  (pg. 95, ln. 4-17)**

**Exhibit "72" reflects Hillshore's capital investment of $9,000,013 and that
money was at TW.  (pg. 98, 2-9)**

**Exhibit "73" is the 2015 tax return for TW and she sent the materials to the
accountant to prepare the returns.  (pg. 98, ln. 14 – pg. 99, ln. 3)**

**Exhibit "72" indicates that Hillshore invested $ 9 million by November 15,
2015. (pg. 99, 21-24)**

**The ordinary business loss for TW in 2015 was $4.6 million.  (pg. 99, ln. 25 –
pg. 100, ln.3)**

**The ordinary income was -$4,613,388.83 and it was operating at a lost in 2015.
(Pg. 100, lns. 11-21)**

**As of December 31, 2015, there was only $7,504,813 identified as capital
contribution for TW.  (pg. 104, lns. 20-23)**

**That figure is inconsistent with Exhibit "65" showing Hillshore made a
$9,000,013 capital contribution for 3390 units. (pg. 104, 20 – pg. 105, 21)**

**Exhibit "73" 2015 tax returns, "65" Account Transaction, and 68 membership
contributions show three different numbers of capital contribution in 2015:
zero, 9,000,013 and $7,504,813.  (pg. 103, ln. 10 – pg. 105, ln. 21)**

**She did not have an explanation for the inconsistency.  (pg. 105, ln. 22 – pg. 106, ln. 1)**

**After this testimony Peddie attempting to change witnesses testimony by point to documents.  (pg. 106, ln. 13 – pg. 107, 109, 5)**

**An audit or review has to be done to figure out the inconsistencies.  (pg. 109, ln.7 – ln. 7 – pg. 110, ln. 5)**

**Once there is a check in the data in QuickBooks then an analysis of QuickBooks can be done to fine the inconsistency. (pg. 110, ln. 9-16)**

**Peddie distracted the witness when he point to the document.  (pg. 113, ln.l16-24)**

**Exhibit "74" is the 2014 income tax return for TW.  (117, ln. 16 – 25)  It indicates that the investments in TW for 2014 was $700.  (pg. 118, lns. 2-20)**

**Exhibit "75" is the 2014 tax return for TW. (pg. 124, lns. 19)**

**Exhibit "74" shows Hillshore made $4.3 million in loans to TW in 2014.  (pg. 127, ln. 18 – pg. 129, ln. 9)**

**Exhibit is an QuickBooks report showing expense TW made for PDTW in the amount of $4.4 million in 2014.  (pg. 128, ln. 9 – pg. 22)**

**Exhibit "75" shows $4.4 was paid to vendors on behalf of TW (pg. 129, ln.12 – pg. 130, ln.5)**

**Exhibit "75" is a balance sheet account/liability account indicating what TW and PDTW owe each other.  (pg. 131, lns. 11-25)**

**The PDTW data in QuickBooks was not transferred to the TW QuickBooks and all the debt was left with PDTW while TW stated with a clean slate.  (pg. 133, ln. 21-pg. 134, ln. 14)  TW did not have an obligation to pay any loans owed by PDTW. (pg. 134, lns.15-25)**

**TW took the assets of PDTW an sold its clothes (pg. 135, ln. 17-20)**

**The clothes that PDTW had were sold and invoiced to PDTW. (pg. 137, pg. 13 -pg. 138, ln. 1)**

**There should be $9.1 million contributed by November 15, 2015, but the 2015 tax returns only shows 7.7 million as contributions.  (pg. 155, ln. 13- pg. 156, ln. 5)**

```
 1        CALIFORNIA SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2              COUNTY OF LOS ANGELES, CENTRAL DISTRICT
 3
 4   PAULA THOMAS, INDIVIDUALLY        )
     AND IN THE RIGHT OF AND FOR       )
 5   THE BENEFIT OF THOMAS WYLDE,      )
     LLC, A CALIFORNIA LIMITED         )
 6   LIABILITY COMPANY, AND PDTW       )
     [PAULA DOROTHY THOMAS WYLDE],     )
 7   LLC, A CALIFORNIA LIMITED         )
     COMPANY,                          )
 8                                     )
                        Plaintiffs,    )
 9                                     )
               vs.                     )   Case No.:  BC596495
10                                     )
     THOMAS WYLDE, LLC, A              )
11   CALIFORNIA LIMITED LIABILITY      )
     COMPANY, JOHN HANNA, AN           )
12   INDIVIDUAL, JENE PARK, AN         )
     INDIVIDUAL, SHOT IN THE           )
13   ARMOIRE, LLC, A FLORIDA           )
     LIMITED LIABILITY COMPANY, AND)
14   H&H FASHION, LLC, A FLORIDA       )
     LIMITED LIABILITY COMPANY,        )
15   AND DOES 1 THROUGH 50,            )
                                       )
16                      Defendants.    )
     _____ )
17
18                 DEPOSITION OF MELDY RAFOLS
19                   Los Angeles, California
20                   Friday, August 18, 2017
21
22   Reported by:
     Damon M. LeBlanc
23   CSR No. 11958
     Job No. 2679975
24
25
```

Page 1

```
 1        CALIFORNIA SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2              COUNTY OF LOS ANGELES, CENTRAL DISTRICT
 3
 4   PAULA THOMAS, INDIVIDUALLY    )
     AND IN THE RIGHT OF AND FOR   )
 5   THE BENEFIT OF THOMAS WYLDE,  )
     LLC, A CALIFORNIA LIMITED     )
 6   LIABILITY COMPANY, AND PDTW   )
     [PAULA DOROTHY THOMAS WYLDE], )
 7   LLC, A CALIFORNIA LIMITED     )
     COMPANY,                      )
 8                                 )
                       Plaintiffs, )
 9                                 )
                 vs.               ) Case No.: BC596495
10                                 )
     THOMAS WYLDE, LLC, A          )
11   CALIFORNIA LIMITED LIABILITY  )
     COMPANY, JOHN HANNA, AN       )
12   INDIVIDUAL, JENE PARK, AN     )
     INDIVIDUAL, SHOT IN THE       )
13   ARMOIRE, LLC, A FLORIDA       )
     LIMITED LIABILITY COMPANY, AND)
14   H&H FASHION, LLC, A FLORIDA   )
     LIMITED LIABILITY COMPANY,    )
15   AND DOES 1 THROUGH 50,        )
                                   )
16                     Defendants. )
     _____)
17
18          Deposition of MELDY RAFOLS, taken on behalf
19   of the Plaintiff, at 2049 Century Park East,
20   Suite 2400, Los Angeles, California, beginning at
21   8:43 a.m. and ending at 12:20 p.m., Friday,
22   August 18, 2017, before Damon M. LeBlanc, Certified
23   Shorthand Reporter, Number 11958.
24
25
```

Page 2

```
 1    APPEARANCES:
 2    For the Plaintiffs:
 3            DT CONSULTING, INC.
              By:  Dimitrios P. Biller, Esq.
 4            15113 West Sunset Boulevard
              Suite 9
 5            Pacific Palisades, California 90272
              Telephone:  310-459-9870
 6            E-mail:  biller_idtconsulting@verizon.net
 7    For the Defendants:
 8            LAW OFFICES OF RICHARD BYRON PEDDIE
              By:  Richard Byron Peddie, Esq.
 9            5051 Euclid Avenue
              Boulder, Colorado 80303
10            Telephone:  303-444-5447
11    Also Present:
12            Paula Thomas
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2   THE WITNESS:                        EXAMINATION
 3   MELDY RAFOLS
 4                                           Page
 5              BY MR. BILLER:            6, 143
 6              BY MR. PEDDIE:          139, 156
 7
 8                  E X H I B I T S
                                       Page        Page
 9   Exhibit        Description     Introduced   Marked
10   Exhibit 65     Thomas Wylde LLC      41          41
                    Transactions by
11                  Account
12   Exhibit 66     Agreement to Purchase 53          53
                    Membership Interest
13
     Exhibit 67     Exhibit A to Agreement 54         54
14                  to Purchase Membership
                    Interest
15
     Exhibit 68     Thomas Wylde documents 67         67
16                  beginning with Notice
                    of Issuance of New
17                  Membership Interest
18   Exhibit 69     E-mail from David      84         84
                    Schnider to Paula Thomas
19                  Subject: Meeting today
20   Exhibit 70     E-mails between John   88         88
                    Hanna and Meldy Rafols
21                  Subject: Executive Paycut
22   Exhibit 71     E-mails between Paula  91         92
                    Thomas and Meldy Rafols
23                  Subject: Executive Paycut
24   Exhibit 72     Third Amended Exhibit B 95        95
25                        Continued...
```

Page 4

1    INDEX OF EXHIBITS (CONTINUED):

| Exhibit | Description | Page Introduced | Page Marked |
|---|---|---|---|
| Exhibit 73 | November 9, 2016 "CONFIDENTIAL" Kyu Hong Kim, CPA letterhead and attached tax returns | 98 | 98 |
| Exhibit 74 | Thomas Wylde 2014 Tax Returns | 117 | 117 |
| Exhibit 75 | Thomas Wylde LLC QuickReport | 128 | 128 |

10              Witness Instructed Not To Answer
11                   Page        Line
12                    25          24
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        Los Angeles, California, Friday, August 18, 2017

2                    8:43 a.m. - 12:20 p.m.

3

4                        MELDY RAFOLS,

5    having been first duly sworn by the Certified Shorthand

6    Reporter, was examined and testified as follows:

7

8                        EXAMINATION

9    BY MR. BILLER:

10           Q        State your name for the record, please.

11           A        Meldy Rafols.

12           Q        Do you mind if I called you Meldy or

13    Ms. Rafols?

14           A        Meldy is okay.

15           MR. PEDDIE:  I'd like to enter an appearance.

16           MR. BILLER:  I'm sorry.

17           MR. PEDDIE:  Richard Peddie on behalf of

18    Thomas Wylde, LLC, and noting that it is 8:43 a.m.

19           MR. BILLER:  Dimitrios Biller on behalf of

20    Plaintiff.  Also, Paula Thomas is sitting in on the

21    deposition.

22    BY MR. BILLER:

23           Q        Meldy, have you had your deposition

24    taken before?

25           A        No.

Page 6

```
 1              Q     Have you ever testified in court?

 2              A     Once.

 3              Q     When was that?

 4              A     Long time ago.  I can't remember.

 5   2006-7, maybe.

 6              Q     Was that for a civil case or criminal

 7   case?

 8              A     It's bankruptcy.

 9              Q     Was that your own case?

10              A     No, it's a company.

11              Q     What company?

12              A     The Fashion House.

13              Q     I'm sorry?

14              A     The Fashion House.

15              Q     Okay.  And when did that bankruptcy take

16   place?

17              A     I believe, 2007.

18              Q     Okay.  Were you working for the company

19   at the time?

20              A     Yeah.

21              Q     In what position?

22              A     Controller.

23              Q     Okay.  And what chapter was that

24   bankruptcy?

25              A     11.
```

Page 7

1       Q       What was the result of the bankruptcy

2    proceedings?

3       A       I have no idea.

4       Q       Okay.  And why were you called as a

5    witness, do you know?

6       A       Just to verify some information.

7       Q       On authenticating documents, things of

8    that nature?

9       A       No, just questions.

10      Q       Well, let's go over some of the ground

11   rules that govern these proceedings.  I don't think

12   we're going to have any problems because you seem to be

13   a person who listens very well and waits until

14   responses are appropriate.

15      Only one person should speak at a time because

16   the court reporter is taking down what is being said by

17   everybody.  So when everybody talks at the same time,

18   he cannot possibly take down what is being said.  Do

19   you understand?

20      A       Yes.

21      Q       Okay.  Also, you can't say "uh-huh" or

22   "huh-uh," physical gestures.  The reporter is not

23   entitled to interpret those physical gestures.  You

24   always have to give a verbal response.  Do you

25   understand?

Page 8

1          A       Yes.

2          Q       You understand that you took an oath to

3     tell the truth?

4          A       Yes.

5          Q       You understand that you have to tell the

6     truth even if the information or answers you give are

7     damaging to yourself personally or to Thomas Wylde or

8     anybody else.  Do you understand?

9          A       Yes.

10         Q       It's very important because our whole

11    system of justice depends on honesty and truthfulness.

12    Do you understand?

13         A       Yes.

14         Q       If you make a dishonest statement that I

15    believe to be truthful, it may change the whole course

16    of this case that's on going to trial on October 10.

17         A       Yes.

18         Q       The penalty of perjury applies.  Do you

19    understand that?

20         A       Yes.

21         Q       Do you understand the penalty of

22    perjury?

23         A       Yes.

24         Q       If any question or statement that I make

25    is vague, ambiguous, unintelligible, please tell me.

Veritext Legal Solutions
866 299-5127

```
 1    I'll rephrase; okay?

 2         A      Okay.

 3         Q      Or I'll have the court reporter read the

 4    question back.

 5         A      Okay.

 6         Q      If you don't tell me you have the

 7    problem with the nature of the question, then I'll

 8    assume and the court will assume and the jury will

 9    assume you understood the question.  Do you understand?

10         A      Yes.

11         Q      You're not entitled to speculate.  You

12    can't give speculative answers.  You could give

13    estimates and approximations but no speculation.  Do

14    you understand?

15         A      Yes.

16         Q      Do you understand the difference between

17    a speculation and an estimate?

18         A      Yes.

19         Q      Okay.  During the course of these

20    proceedings, objections will be made.  I'll give you an

21    opportunity for the attorney to make the objection for

22    the record.  And then you can either answer the

23    question, have the question read back; or if your

24    attorney instructs you not to answer the question, you

25    can either disregard with what he says or you can
```

Page 10

```
1    answer the question.  Do you understand?

2         A     Yes.

3         Q     At the end of these proceedings, you'll

4    receive a transcript.  The transcript will contain

5    everything that was said here today by counsel, by me,

6    by you, objections, statements -- things of that

7    nature.  Do you understand?

8         A     Yes.

9         Q     Have you ever seen a transcript?

10        A     Discoverable accounts?

11        Q     No.  Let me explain.  A transcript is

12   going to be a -- it's going to be a booklet.  And it's

13   going to have all the statements made here, my

14   questions, your answers, objections -- things of that

15   nature.  Do you understand?

16        A     Yes.

17        Q     You'll be given an opportunity to change

18   any answer that you make here today when you receive

19   the transcript and review it.  Do you understand?

20        A     Yes.

21        Q     But it's very important that you

22   minimize any opportunity that you will have to make

23   changes after the deposition.  Do you understand?

24        A     Yes.

25        Q     It's very important that you provide
```

Page 11

1    your most accurate testimony here today.  Do you

2    understand?

3            A        Yes.

4            Q        Although you have the right and freedom

5    to make changes before you sign the transcript under

6    penalty of perjury, if you make changes, you're denying

7    me the opportunity to question you about those changes.

8    Do you understand?

9            A        Yes.

10           Q        Because that's how this works.  I'll ask

11   you a question.  You'll make a response, and that

12   response may trigger another question I didn't think

13   about.

14           A        Okay.

15           Q        And I'll go off on a tangent.  I'll

16   develop that information until it's exhausted.  Do you

17   understand?

18           A        Yes.

19           Q        When you get the transcript after you

20   review and approve of it and after you make any changes

21   you deem necessary, you have to sign under penalty of

22   perjury.  Do you understand?

23           A        Yes.

24           Q        What you are saying when you do that is

25   every answer you gave at that time was truthful and

Page 12

1    answer honest.  Do you understand?

2         A     Yes.

3         Q     If there is an answer that is not

4    truthful and not honest, believe me I will

5    cross-examine you hard on that.  Do you understand?

6         A     Yes.

7         Q     In front of the judge and jury, because

8    you are going to be a trial witness; okay?

9         A     Yes.

10        Q     At the end of the deposition, Counsel

11   and I will reach a stipulation in which we'll probably

12   agree -- we may not -- that you'll have two weeks to

13   review the transcript.  You'll send it to counsel.

14        MR. BILLER:  She doesn't have to send it to

15   you.  She can send it to me.  She's not an employee.

16   We'll deal with that later.

17        MR. PEDDIE:  It can be sent to her directly.

18   Keep it fast, I guess.

19        MR. BILLER:  Yeah.

20   BY MR. BILLER:

21        Q     You understand everything I just said?

22        A     Yes.

23        Q     Okay.  Have you done anything to prepare

24   for this depo?  Have you done anything to prepare for

25   the deposition?

                                              Page 13

```
 1          A         Probably just tried to recollect what
 2     you might be asking me.
 3          Q         Do you know Richard Peddie?
 4          A         Yes.
 5          Q         When did you meet with him?
 6          MR. PEDDIE:   Meet with me?
 7     BY MR. BILLER:
 8          Q         Did you ever meet with Richard Peddie
 9     before the deposition?
10          A         No.
11          Q         How do you know Mr. Peddie?
12          A         From the -- there was a legal issue that
13     he handled in Thomas Wylde.
14          Q         Okay.  What legal issue was that?
15          A         I think that was a case that was filed
16     against Thomas Wylde?
17          Q         By Schiffman?  By Dr. Schiffman?
18          A         Schiffman is -- I'm not sure if he
19     handled Schiffman.  I think it was someone else.
20          Q         Can you identify the case?
21          A         It was a case filed by Paula.
22          Q         Okay.  All right.  Let's talk about you.
23     Why don't you give me some background information about
24     your personal life; like when and where were you born,
25     things of that nature?
```

Page 14

1          A       I was born in the Philippines.

2          Q       And when were you born?

3          A       1966.

4          MR. PEDDIE:  That's three of us.

5          THE WITNESS:  We have the same birthday.

6     BY MR. BILLER:

7          Q       So when did you move to the

8     United States?

9          A       2003.

10         Q       When you were 23.  So --

11         THE WITNESS:  2003.

12         MR. PEDDIE:  2003.

13    BY MR. BILLER:

14         Q       Oh, 2003.  So that would make you 40

15    years old?

16         A       50.

17         Q       You were born in 1963?

18         A       '66.

19         Q       And you moved to the United States in

20    2003?

21         A       Yes.

22         Q       Okay.  Before coming to the

23    United States, what did you do?

24         A       I'm an accountant.

25         Q       Tell me your educational background.

Page 15

```
 1          A      I graduated in bachelor of accountancy
 2   in the Philippines.  Took the board in the Philippines
 3   as well, CPA.  Practicing CPA in the Philippines.
 4          Q      Did you work for an accounting firm when
 5   with you first go your CPA license?
 6          A      In the Philippines, yes.
 7          Q      So for how many companies did you work
 8   for in the Philippines?
 9          A      I would say about four, I think.
10          Q      Okay.  Each of those companies you were
11   the CPA?
12          A      Yes.
13          Q      And each of those companies were
14   accounting firms?
15          A      No.
16          Q      What type of businesses were each of
17   these four companies?  And give me chronological order?
18          A      Last quarter of --
19          Q      Chronological order.  What was the first
20   company you worked for?
21          A      It's a telecommunication company.
22   That's just very brief.  And then I worked for the
23   accounting firm.
24          Q      Okay.  So then after the first company
25   you worked for, you worked for three accounting firms?
```

Page 16

1          A       No.  Jut one accounting firm, and the

2     rest are private.

3          Q       Okay.  So identify the four companies

4     you worked for in the Philippines?

5          A       One is a manufacturing company, one is a

6     fashion company, and then the last one is a -- it's

7     involved with ships.

8          Q       Is it a shipping company?

9          A       It's a shipping company.

10         Q       Own ships or --

11         A       No.  It's --

12         Q       Export/import businesses?

13         A       Yes.

14         Q       In each of those companies, did you use

15    QuickBooks?

16         A       No.

17         Q       What system did you use?

18         A       It was manual back then.

19         Q       It was all manual?

20         A       Yeah.

21         Q       Good old days.

22         A       I think QuickBooks was being introduced

23    when I was leaving.  Not QuickBooks, Peachtree.

24         Q       Are you married?

25         A       I was.

Page 17

1       Q       Divorced I take it?

2       A       Yes.

3       Q       Children?

4       A       No.

5       Q       And you came to the United States in

6    2003 because?

7       A       I moved here, visit my sister, and came

8    for work.

9       Q       So you came to the United States to

10   visit your sister and to look for work?

11      A       Yes.

12      Q       And what type of work were you looking

13   for?

14      A       Accounting.

15      Q       And for any particular firm?

16      A       Private.

17      Q       Private business?

18      A       Yes.

19      Q       Give me your work experience from

20   2003 --

21      A       (Indicating.)

22      Q       Sure.  If you need to get a drink of

23   water, you need to go to the restroom, you want to take

24   a break, just let me know.

25      A       I will.

Page 18

```
 1          Q        I mean, you can do that.  So let's talk

 2    about the companies you worked for starting in 2003.

 3          A        I worked with the Fashion House.

 4          Q        Fashion House.  And what did you do?

 5          A        As an accountant.

 6          Q        And how long did you work for that

 7    company?

 8          A        About a little over five years.

 9          Q        So approximately 2008 you left that

10    company?

11          A        Early -- toward the end of 2008, early

12    2009.

13          Q        And that was the Fashion House?

14          A        Yes.

15          Q        Was that a fashion business?

16          A        Yeah.

17          Q        Okay.

18          A        It's footwear.

19          Q        Footwear, okay.  So then you started

20    with another company I take it in 2009?

21          A        I practice independently.

22          Q        Independently.

23          A        Consulting.

24          Q        And how long did you do that?

25          A        I am still doing that now on different
```

                                                    Page 19

1    clients.

2         Q        You work for Thomas Wylde at some point,

3    didn't you?

4         A        Yes.

5         Q        And you worked for PDTW?

6         A        No, not for PDTW.

7         Q        Who's John Hanna?

8         A        John Hanna is the CEO of Thomas Wylde.

9         Q        He was the CEO of Thomas Wylde?

10        A        He was the CEO.

11        Q        So what do you know about his departure

12   from Thomas Wylde?

13        A        I'm not sure, but I believe he -- I

14   believe he was let go.

15        Q        Okay.  Have you talked to him since he

16   worked at Thomas Wylde?

17        A        Yeah.

18        Q        When?

19        A        I've been working with him.

20        Q        So when did you talk to him last?

21        A        Yesterday.

22        Q        So did you talk about this case?

23        A        No.  I just told him I'm going to a

24   deposition but not particularly details.

25        Q        John Hanna did not tell you what to say

Page 20

```
 1    or don't say?

 2          A      No.

 3          Q      John Hanna did not say anything about

 4    the litigation?

 5          A      He just said stay relaxed and be calm.

 6          Q      Did he say anything else?

 7          A      No.

 8          Q      Okay.  So you were working independently

 9    from 2009 until now?

10          A      Yes.

11          Q      When did you start working for

12    Thomas Wylde?

13          A      2014.

14          Q      2014.  What month?

15          A      July.

16          Q      Okay.  Were you working directly for

17    Thomas Wylde?

18          A      Yes.

19          Q      So you were receiving a paycheck from

20    Thomas Wylde?

21          A      Yes.

22          Q      Did you have other business on the side?

23          A      Yes.

24          Q      Did Thomas Wylde know that?

25          A      Yes.
```

Page 21

```
 1            Q       So who brought you into Thomas Wylde?

 2            A       John Hanna.

 3            Q       Do you remember the month you started?

 4            A       For Thomas Wylde?

 5            Q       Yes.

 6            A       July 2014.

 7            Q       Okay.  Interesting.  Do you remember the

 8   day you started?

 9            A       Not particularly.

10            Q       Okay.  Because --

11            A       I think it was middle.

12            Q       -- in -- before July 22nd, there was no

13   Thomas Wylde.  Do you understand that?

14            A       Okay.

15            Q       Thomas Wylde started to exist on

16   July 22, 2014.  Do you know that?

17            A       I don't remember.

18            Q       Okay.  So did you start to work for

19   John Hanna before the 26th of 2014?

20            A       I came on board in July.  And he came on

21   board, I think, a few weeks after me.  I interviewed

22   with Paula and Jene.

23            Q       And he's the one who told you you should

24   interview with him; right?

25            A       With whom?
```

Veritext Legal Solutions
866 299-5127

```
1            Q       Thomas Wylde -- or Paula and Jene.

2            A       Yes.

3            Q       And what did he tell you about why you

4    should do that?

5            A       Well, he wanted me on board because he

6    trust how I work.

7            Q       Okay.  And how many -- how much time did

8    you spend working with John Hanna over the years before

9    2014?

10           A       I've worked with him at the

11   Fashion House.

12           Q       Five years?

13           A       Yes.

14           Q       What was his title at Fashion House?

15           A       He was president and CEO.

16           Q       And that company went bankrupt?

17           A       Yes.

18           Q       And Thomas Wylde is in bad financial

19   position today, isn't it?

20           A       I believe so.

21           MR. PEDDIE:  Objection, calls for speculation.

22   BY MR. BILLER:

23           Q       Do you think it is close to filing for

24   bankruptcy?

25           MR. PEDDIE:  Objection, calls for speculation.
```

Page 23

1   BY MR. BILLER:

2          Q      You can answer.

3          A      I believe that's their plan before.

4          Q      Okay.  And what do you know about that?

5          A      Not much.

6          Q      Okay.  When did you hear that they were

7   first going to file for bankruptcy?

8          MR. PEDDIE:  Objection, assumes facts; calls

9   for speculation.

10  BY MR. BILLER:

11         Q      You can answer.

12         A      I don't know if they are filing.

13         Q      Did John Hanna tell you that they might

14  file for bankruptcy?

15         A      No.

16         Q      How did you learn that Thomas Wylde may

17  file for bankruptcy?

18         A      It was just talk at that.  I think it

19  was a suggestion.

20         Q      When was the suggestion made?

21         A      I can't remember.

22         Q      Was it in 2014?

23         A      No.

24         Q      When did you leave Thomas Wylde?

25         A      Last year.

Page 24

1       Q       2016?

2       A       Yes.

3       Q       What month?

4       A       I think in either early June or middle

5   of June.

6       Q       So you were there for two years

7   essentially?

8       A       Yes.

9       Q       Did you hear about bankruptcy discussion

10  closer to July 2014 or closer to June 2016?

11      A       It was not a discussion.

12      Q       Okay.

13      A       I think it was just a suggestion -- an

14  idea or suggestion, but it was not --

15      Q       Who came up with the idea or suggestion?

16      A       I'm not so sure.  I believe David might

17  have said it.

18      Q       David Schnider?

19      A       David Schnider.

20      Q       How about John Hanna, he's the CEO?

21      A       He's talking to David.  I was not

22  participating in their discussion.

23      Q       So you overheard this discussion between

24  Schnider and John Hanna; correct?

25              MR. PEDDIE:  Objection, solicits

Page 25

1    attorney-client privileged material.

2         MR. BILLER:  Okay.  Do you instruct her not to

3    answer?

4         MR. PEDDIE:  If she overheard something that

5    was between John and David as a private conversation.

6         MR. BILLER:  Well, they didn't take any

7    reasonable steps to make sure there was no disclosure

8    to a third party.

9         MR. PEDDIE:  I don't know whether they took

10   reasonable steps or not.

11        MR. BILLER:  So are you instructing her to

12   answer?  That's all I want to know.

13        MR. PEDDIE:  Yes, I do.  Would you like a

14   stipulation that the discussion of bankruptcy was

15   occurring at least as early as August of 2015?

16        MR. BILLER:  I don't know that to be true.

17        MR. PEDDIE:  Well, okay.  I thought that's what

18   you wanted to establish.

19        MR. BILLER:  If that's what you're saying and

20   that's the truth, then I can't stipulate it because I

21   don't know if it's the truth.  But if you are telling

22   me that's true, it's on the record and I think it's an

23   admission.

24        MR. PEDDIE:  You know that we had to go seek

25   additional capital and all that.  And if that hadn't

Page 26

1    happened, we would have been belly up.

2         MR. BILLER:  And the additional capital was

3    from Choi?

4         MR. PEDDIE:  That's the only place we could

5    find it.

6    BY MR. BILLER:

7         Q     Okay.  Let's get moving on to more

8    interesting topics.  I would like to know, other than

9    being a CPA from 2003 to the present time and working

10   for Thomas Wylde, have you worked for any other company

11   beside Fashion Company?

12        A     Can I just stipulate that I'm not a CPA

13   here?

14        Q     That's fine.  You took the CPA license

15   in the Philippines; right?

16        A     Yes.

17        Q     Is there any reason why you didn't take

18   it here?

19        A     I don't want to practice as a CPA here.

20        Q     You want to do more work like an

21   accountant?

22        A     More managerial, more forecasting.

23        Q     That's great.  So I need to identify

24   your complete employment history between 2003 and the

25   present time.  I know between 2003 and 2009 you worked

                                        Page 27

```
 1    for this fashion company; correct?

 2         A     Uh-huh.

 3         Q     Is that a yes?

 4         A     Yes.

 5         Q     Then you went on your own; is that

 6    correct?

 7         A     Yes.

 8         Q     And you started to work for Thomas Wylde

 9    in July 2014; correct?

10         A     Yes.

11         Q     And you stopped working for Thomas Wylde

12    in June 2016; correct?

13         A     Yes.

14         Q     Did you work for any company between

15    2009 and 2014?

16         A     Yes.

17         Q     What company?

18         A     Interior design company.

19         Q     What's it called?

20         A     Crate Interiors, C-r-a-t-e.

21         Q     How long did you work for that company?

22         A     Until 2012.

23         Q     Okay.  So from 2009 to 2012?

24         A     Yes.

25         Q     What did you do between 2012 and 2014?
```

Page 28

```
 1            A       I moved up north.

 2            Q       Did you work for any company up there?

 3            A       Yes.

 4            Q       What company?

 5            A       It's wholesale and retail and

 6    manufacturing as well.

 7            Q       Okay.  What's that company called?

 8            A       It's called -- it's two companies.  One

 9    is The Laughing Giraffe and Earthly Nutrition.

10            Q       Are those the only two companies you

11    worked for between -- that you worked for in that time

12    frame?

13            A       Yes.

14            Q       And in all of these jobs that you've

15    had, you've been -- you've not been performing the work

16    as a CPA but of an accountant?

17            A       Yeah, internal controller.

18            Q       What is an internal controller?

19            A       Basically an accounting manager handling

20    the books, financial statements, budgets, and

21    reporting.

22            Q       Okay.  So you had personal knowledge of

23    the financial state of Thomas Wylde as late as

24    June 2016?

25            A       Yes.
```

Page 29

1          Q        Now, identify all the positions you had

2    with Thomas Wylde?

3          A        Financial controller.

4          Q        Human resource?

5          A        Yes.

6          Q        So what did you do as human resource?

7          A        I just got documents and filed their HR

8    files, personnel files, and payroll.

9          Q        You got to walk me through this; okay?

10   Let's talk about the first one.  What documents did you

11   get?

12         A        From the employees?

13         Q        Yes.  Wherever you got them from.  I

14   don't know.

15         A        They're W4, I-9, and offer letter.

16         Q        Anything else?

17         A        And a copy of the ID.

18         Q        And did you get documents from any other

19   source?

20         A        I don't understand.  Like, what source?

21         Q        Whatever source.  It could be anybody.

22   Did you get any documents from any other source in your

23   position as human resource person?

24         A        That's about all I can remember.

25         Q        Were you the manager of human resource?

Page 30

1    What was your title?

2          A      It was not part of that.  I was handling

3    part of HR in that aspect.

4          Q      Okay.  You were the only one handling

5    HR; right?

6          A      At that time, yes.

7          Q      Okay.  Tell me exactly what your duties

8    and responsibilities were specifically when you were

9    handling HR?

10         A      Just coordination with the time; time

11   sheet; payroll; and again, keeping those documents,

12   record keeping.

13         Q      What is included in record keeping?  Of

14   the document you received from employees?

15         A      Yes, those files, personnel files.

16         Q      Did you do anything else?

17         A      That's about it.

18         Q      Did you sit in any conversations with

19   Paula Thomas regarding complaints she had about

20   Jene Park and John Hanna?

21         A      Yes, I did.

22         Q      And how many times?

23         A      I can't really remember.  I would say

24   two or three times maybe.

25         Q      What year?

```
 1          A       Late -- probably late 2014.

 2          Q       And what were the nature of the

 3   discussions?

 4          A       I think about function and --

 5          Q       Production?

 6          A       Function.

 7          Q       But function meaning production?

 8          A       Function in terms of decision making or

 9   who's handling what.

10          Q       What did you hear Paula Thomas say

11   during those discussions?

12          A       Well, she just mentioned that -- I can't

13   remember if it's a function between Jene and her, who's

14   going to be handling what.

15          Q       Was it a discussion about design and who

16   is going to be the creative director?

17          A       No.

18          Q       What was it about, then?

19          A       It's a little bit more personal.  Like

20   she doesn't like Jene, to that effect.

21          Q       And what did you hear to make you

22   conclude that she didn't like Jene?

23          A       She said it herself.

24          Q       And did Jene like Paula?

25          A       I'm not so sure, but it seems to me.
```

Page 32

1        Q        So there was a mutual dislike for each

2    other?

3            MR. PEDDIE:  Objection, mischaracterizes the

4    testimony.

5    BY MR. BILLER:

6        Q        You can answer the question.

7        A        I can only assume.

8        Q        But did you see anything or hear

9    anything to indicate to you that Jene Park liked

10    Paula Thomas?

11        A        They seemed to be civil with each other

12    when in the office.

13        Q        But you said Paula Thomas told you she

14    didn't like Jene Park; right?

15        A        She said that.

16        Q        Did Jene Park say anything similar to

17    that, what Paula said to you?

18        A        No.  Jene -- Jene loves everybody.

19    That's what she keeps saying.

20        Q        She loves everybody?

21        A        Yes.

22        Q        You have to worry about people like

23    that.

24        A        That's -- I do my own precaution.

25        Q        Okay.  Were you involved in creating the

Page 33

1    employee handbook?

2        A      No.

3        Q      Who created that?

4        A      It was there already when I got in.  I

5    believe it was David Schnider who introduced that.

6        Q      And who actually drafted it?

7        A      I would I just assume it's David.  It

8    came from him.

9        Q      Okay.  And are you certain that was in

10   2014?

11       A      No.  I don't -- I'm not certain, but I

12   know it was in place at the time.  But I'm not sure if

13   it is 2014, if it was done in 2014.

14       Q      Were all the employees supposed to sign

15   off receipt of that booklet?

16       A      Yes.

17       Q      And did you maintain a record of that?

18       A      Yes.

19       Q      And where are those records maintained?

20       A      It should be in their folders as well.

21       Q      In their individual folders?

22       A      Yes.  Or in the handbook.

23       Q      So it would be in Paula's handbook or

24   her folder; right?

25       A      It should be, yes.

Page 34

```
 1          Q       And that would tell us when it was

 2    distributed?

 3          A       Yes.

 4          MR. BILLER:  Why wasn't that document produced?

 5          MR. PEDDIE:  It is produced.

 6          MR. BILLER:  No.

 7          MR. PEDDIE:  You have that employee handbook.

 8          MR. BILLER  I don't have the receipt.  When I

 9    use the word "documents related to" --

10          MR. PEDDIE:  I'm not sure -- if you don't have

11    it, then we may not have it.

12          MR. BILLER:  I don't have it, because I was led

13    to believe that was given after Paula had left.

14    So --

15          MR. PEDDIE:  My understanding there was an

16    April 2015 draft -- and I can look into this -- and I

17    have never gotten a clear answer as to who signed it

18    and when and all the rest.

19          MR. BILLER:  All I'm asking you is that that

20    document, that receipt that has a date of distribution

21    is important in this case.  And I'm asking you to

22    produce it.  Are you going to produce it?

23          MR. PEDDIE:  You have the --

24          MR. BILLER:  I have the book.

25          MR. PEDDIE:  -- book.  And it says, "Draft
```

Page 35

```
 1    April 2015"?
 2              MR. BILLER:  I have no idea.
 3              MR. PEDDIE:  It's right on there.
 4              MR. BILLER:  I don't remember seeing it.  But
 5    the point is I'm looking for the receipt.
 6              MR. PEDDIE:  You're looking for
 7    Paula Thomas's signed one?
 8              MR. BILLER:  Yes.
 9              MR. PEDDIE:  If it exists, I will try to find
10    it.
11              MS. THOMAS:  Can I just interject for a second?
12    Can we just take a two-minute break?  I just have to
13    talk to you about something.
14              MR. BILLER:  Do you mind?
15              MR. PEDDIE:  No, not at all.
16                   (Break taken:  9:12 a.m. - 9:16 a.m.)
17    BY MR. BILLER:
18         Q    Let's talk about your position as
19    financial controller.
20         A    Yes.
21         Q    That was a position that you had going
22    in to Thomas Wylde; correct?
23         A    Yes.
24         Q    And that was a position you had going
25    out of Thomas Wylde; correct?
```

Page 36

```
 1            A       Yes.

 2            Q       So what are your duties and

 3    responsibilities as a financial controller for

 4    Thomas Wylde between July 2014 and June 2016?

 5            A       The function did you say?

 6            Q       What were your duties?

 7            A       Duties?  I handled the books.  I

 8    oversee the financials, the bank accounts, and

 9    reporting and coordination with management and the

10    budget as well.

11            Q       Okay.  You handled the books, oversee

12    the financials, did the banking, coordinated with

13    management, and budget.  Did I miss anything?  I think

14    I missed one.

15            A       Partial HR.

16            Q       Okay.  Well, if I missed one --

17            MR. BILLER:  Can you read her answer back,

18    please?

19                    (The record was read by the Certified

20            Shorthand Reporter.)

21            MR. BILLER:   Okay.  I got it all.

22    BY MR. BILLER:

23            Q       All right.  Let's talk about handling

24    the books.  What did you do in terms of the book, and

25    what books are you talking about?
```

Page 37

```
 1          A       QuickBooks.

 2          Q       QuickBooks?

 3          A       Yeah.

 4          Q       You handled QuickBooks?

 5          A       Yes.

 6          Q       Now, does that include simply taking

 7  information off of other sources regarding expenses and

 8  revenues and things of that nature and inputting that

 9  information into the QuickBooks software program?

10          A       Yes.

11          Q       So the QuickBooks data is actually the

12  third party to receive information.  The first is from

13  the vendor or the expenses, whatever, the second is

14  from you, and then you got QuickBooks; right?

15          A       When you say source --

16          Q       Well, you can't put data into QuickBooks

17  without receiving information from a third party.

18          A       Source documents.

19          Q       Right.  Source documents.  So QuickBooks

20  is only as accurate as the information going in.

21          A       Yes.

22          Q       Okay.  QuickBooks can be easily

23  manipulated to give false information reports; correct?

24          A       Yes, if you enter wrong data.

25          Q       So if you were given an invoice
```

Page 38

1    regarding $2 million and you believed it to be a true

2    document but it wasn't, that would affect all of the

3    data in QuickBooks; correct?

4         A       I verify the documents.

5         Q       How do you verify the documents?

6         A       I would go to the person, the bank, to

7    what that is about.  And I would ask what the nature of

8    the transaction and input in the QuickBooks.

9         Q       So if you got a bill from the telephone

10   company, you would call up telephone company and say,

11   "I just got a bill from the telephone company for

12   $9,000.  Can you verify this"?

13        A       Not --

14        Q       For every source document you verified?

15        A       Yes.

16        Q       Every single one?

17        A       As much as I can, yes.

18        Q       So there might be times where you didn't

19   verify documents?

20        A       No.  Because before you enter it, you

21   need to verify the accuracy of the information you

22   input in QuickBooks to make sure that the transaction

23   is valid and legit.

24        Q       How did you verify the investments by

25   Hillshore?

Page 39

1          A        Getting the information from the bank
2    and their -- what the nature of that transaction is.
3          Q        Who did you talk to from Hillshore?
4          A        Stephen Choi.
5          Q        How many times did you talk to
6    Stephen Choi?
7          A        Very seldom.
8          Q        How much did he invest in Thomas Wylde
9    while you were there?
10         A        I don't remember.  I believe it's up to
11   about 9 million.
12         Q        9.1?
13         A        Maybe 9.1.  9.5 maybe.
14         Q        And all of that was investment?
15         A        Some of it, I think, are loans.
16         Q        Like what?
17         A        I can't remember if I don't see the
18   documents.
19         Q        How much was the loan?
20         A        I don't remember the amount.
21         Q        Okay.  What loan documents did you
22   receive to confirm it was a loan as opposed to
23   investment?
24         A        There should be a promissory note that
25   was executed.

Page 40

1          Q       Is that it?

2          A       Yes.

3          Q       Really?  Okay.  Since we're on this

4     topic -- where were we at?

5          THE REPORTER:  I have no idea.  Didn't you have

6     other depositions?

7     BY MR. BILLER:

8          Q       I'm going make the representation to you

9     that Stephen Choi, he testified in this case.  Came by

10    TW to pick up a document showing what his investments

11    were, and I'm about to show you that document.

12         MR. BILLER:  Let's have this marked as

13    Exhibit 65.

14              (Exhibit 65 was marked for

15              identification by the Certified Shorthand

16              Reporter and is attached hereto.)

17    BY MR. BILLER:

18         Q       Are you familiar with that document?

19         A       Yeah.  This schedule is from QuickBooks.

20         Q       Did you hand -- did you generate this

21    document and give it to Mr. Choi?

22         MR. PEDDIE:  Objection to form.

23         THE WITNESS:  I don't remember giving it to

24    him.

25    ///

Page 41

```
 1    BY MR. BILLER:

 2         Q       Are you the one who made the entries?

 3         A       Yes.

 4         Q       So on August 8 -- August 26, 2014, you

 5    made the entry, "Incoming Domestic Wire in 1/Hillshore

 6    600,000."  You made that entry?

 7         A       Yes.

 8         Q       Okay.  The next one says, "Incoming

 9    Domestic Wire in Hillshore 350,000," dated

10    September 18, 2014.  Did you make that entry?

11         A       Yes.

12         Q       Next one says [as read] "Fund transfer

13    from Hillshore investment on October 14, 2014 for

14    $350,000."  Do you see that?

15         A       Yes.

16         Q       Did you make that entry?

17         A       Yes.

18         Q       The next one is 500,000 loan to

19    Thomas Wylde to be converted to equity L.A. in the

20    amount of $500,000, dated November 13, 2014.  Did you

21    make that entry?

22         A       Yes.

23         Q       Okay.  The next one says

24    [as read], "December 12, 2014, December Funding 2014

25    $500,000."  Do you see that?
```

Page 42

1      A      Which one?

2      Q      The one dated --

3      A      Oh, yeah.

4      Q      You made that entry?

5      A      Yes.

6      Q      And the one dated December 31, 2014, it

7   says, "To reclass Hillshore loan to Equity $2.3

8   million."  Do you see that?

9      A      Yes.

10     Q      Did you make that entry?

11     A      Yes.

12     Q      When did that reclassification take

13  place?

14     A      Year end of 2014.

15     Q      So by December 31, 2014?  Is that a yes?

16     A      Yes.

17     Q      And how do you know that?

18     A      There should be some documents to

19  support that.  I don't remember what those were.

20     Q      There should be, shouldn't there?

21     A      Yeah.

22     MR. BILLER:  Are you going to produce those?

23     MR. PEDDIE:  You have hem.

24     MR. BILLER:  No, I don't.

25     MR. PEDDIE:  You have the unit --

Page 43

1          MR. BILLER:  You know what --

2          MR. PEDDIE:  -- issuance from September 2015

3     where Hillshore committed -- this is 2014.  Hillshore

4     committed $5.5 million of investments.

5          MR. BILLER:  That has nothing to do with

6     $2.3 million loaned to equity conversion.

7          MR. PEDDIE:  It has everything in do with it.

8          MR. BILLER:  There's no document.

9          MR. PEDDIE:  You have the document.

10          MR. BILLER:  No, I don't.

11          MR. PEDDIE:  You have the document.  It's the

12     Hillshore --

13          MR. BILLER:  That document does not state

14     anything about conversion.  Nothing.

15          MR. PEDDIE:  If you owe me a hundred

16     dollars --

17          MR. BILLER:  I don't want to argue.

18          MR. PEDDIE:  That's it, Dimitrios.  By the way,

19     I'm objecting to this exhibit only as much as it's a

20     report generated in February 2017.  And obviously the

21     entries go beyond her knowledge --

22          MR. BILLER:  Obviously that's because --

23          MR. PEDDIE:  -- because she no longer worked

24     there after the entries.

25          MR. BILLER:  Fine.

Page 44

1              MR. PEDDIE:  Can you give me 20 seconds?

2              MR. BILLER:  Why?

3              MR. PEDDIE:  I need to grab some documents from

4      her.

5              MR. BILLER:  Yeah.

6              MR. PEDDIE:  Actually go ahead.

7      BY MR. BILLER:

8          Q      Do you have any reason to believe that

9      somebody changed the information depicted in this

10     Exhibit 65?

11         A      Repeat that again.

12         Q      Do you have any reason to believe that,

13     after you made these entries, somebody else went into

14     QuickBooks and changed the entries?

15         A      I wouldn't know that.

16         Q      Okay.  Now, when you have a loan to

17     conversion -- loan conversion to equity, identify the

18     types of documents that should go with that

19     transaction?

20         A      I believe there -- the legal document

21     that might have been executed --

22             MR. PEDDIE:  Objection, calls for an expert

23     opinion.

24     BY MR. BILLER:

25         Q      You can answer the question.  Go ahead,

Page 45

1    answer.

2         A       A distribution.  I can't remember what

3    the document is called.  But there is a list of

4    distribution, what the capitalization is.

5         Q       Okay.  And are you talking about the

6    Schedule B on the operating agreement?

7         A       I don't remember that one.

8         Q       Okay.  Do you understand what a loan to

9    equity conversion is?

10        A       I would believe so.

11        Q       Why don't you explain that to me.

12        A       Well, it was a loan -- well, basically

13   converted to equity because the company owned more

14   shares for -- the distribution has been -- it was

15   distributed to the owners.

16        Q       So when Hillshore made these, quote,

17   loans and they were to be converted to equity, that

18   would be known at the time the money received?

19        A       Say that again.

20        Q       Okay.  You have these various entries of

21   monies, and you have these entries that say loan

22   converted to equity.  Did you input those entries when

23   you received the money?

24        A       No.  When the document was executed.

25        Q       On December 31?

Page 46

```
 1          A      It could be other date, but it's the
 2     year end when you reclass that.
 3          Q      So you went back in the system, and you
 4     made these entries?
 5          A      Not --
 6          Q      I want to know when these entries were
 7     made.  We have these deposits dated August, September,
 8     October to November, December and December.
 9     $2.3 million.  And they were allegedly loans converted
10     to equity.  The words establishing that fact are
11     printed on this Document 65; right?
12          A      Yes.
13          Q      And you inputted those words; right?
14          A      Yes.
15          Q      So when did you input the words?
16          A      I don't remember when I put the entry.
17          Q      Okay.  What was your normal custom and
18     practice?  You were an accountant for, I don't know, 20
19     or 30 years.  It can't be the first time that you made
20     an entry loan to conversion equity, did you?
21          A      Not very often.
22          Q      So what was your custom and practice?
23          A      Well, you input the transaction when the
24     transaction happened.
25          Q      How about the entries?
```

Page 47

1        A      Well, the entry indicates here the date.

2   But that's not mean I inputted on 12/31/14.

3        Q      But it can mean that, could it?

4        A      It could be.  But when you go to

5   QuickBooks, you can see there is an audit trail in

6   there.  You can see the date when it was inputted.

7        Q      When the memo was inputted?

8        A      Yes.  I could do an entry for 12/31, but

9   it could be January 1st.

10       Q      So is it your testimony, then, money

11  would be received on one day, and then you would go

12  back and write a memo regarding that money and not

13  identify the date the memo was written?

14       A      When you say "go back," what do you

15  mean?

16       MR. PEDDIE:  Objection, compound.

17  BY MR. BILLER:

18       Q      I want to understand when these

19  memos were inputted into QuickBooks.

20       A      I don't remember the date.  It would say

21  the date here.  But as to when the actual journal entry

22  is made, it's probably not this date.

23       Q      How do you know that?

24       A      That's what I'm saying.  I don't.

25       Q      Don't say anything you don't know.

Page 48

```
 1          A       Okay.

 2          Q       So you made the entry, but you don't

 3   remember what dates?

 4          A       Yes.

 5          Q       But you're telling me, in QuickBooks,

 6   there is a journal that states the dates this

 7   information was made; right?

 8          A       There's audit trail, yes.

 9          Q       There's an audit trail.  And what is

10   that called?

11          A       It's audit trail.

12          Q       How do you get to it?

13          A       You go to reports.

14          Q       And how do you do that?

15          A       You enter into QuickBooks as an

16   admin.  You go to reports.  I can't remember the

17   module, but there should be an audit trail there.

18          Q       Okay.  And if there's not?

19          A       There is.  QuickBooks --

20          Q       If there's not an audit trail regarding

21   these entries, what does that mean?

22          A       QuickBooks wouldn't be able to -- there

23   is an audit trail in QuickBooks.

24          Q       For everything that goes in?

25          A       Yes.
```

Veritext Legal Solutions
866 299-5127

 1          Q       So the audit trail my indicate that the

 2    first entry was made August 26, 2014?

 3          A       It could say that.

 4          Q       Or it could say it was made on

 5    December 31, 2014?

 6          A       It could say that.  The audit trail

 7    would indicate all the dates there was an edit to a

 8    transaction.

 9          Q       Is there any system in QuickBooks that

10    prevents somebody from going into the audit trail and

11    changing dates or information?

12          A       I don't believe so.  An admin could go

13    to the QuickBooks.  All the edits in there in the

14    transaction would show all the edits on one particular

15    transaction.

16          Q       But we know -- based on this document,

17    we know for a fact that $2.3 million was either

18    invested or loaned to Thomas Wylde as of

19    December 31, 2014; right?

20          A       Uh-huh.

21          Q       Is that yes?

22          A       Yes.

23          Q       And we also know that that amount was

24    accumulated over the course of four or five months

25    between August and December; correct?

Page 50

1          A     Yes.

2          Q     Okay.  So this shows that Thomas Wylde

3    actually received that money between August and

4    December of 2014; correct?

5          A     Yes.

6          Q     Now, do you think that's a lot of money?

7          A     It depends on --

8          Q     Perspective; right?

9          A     Yes, it's relative.

10         Q     Right.  But do you think it was a lot of

11   money for Thomas Wylde considering its financial

12   condition at the time?

13         A     At that time I wouldn't think so.

14         Q     Do you think it's important for

15   Thomas -- Paula Thomas to know that $2.3 million is

16   being injected over that period of time?

17         A     Yes, it is important.

18         Q     It's a material fact, isn't it?

19         A     Yes, I believe so.

20         Q     It's a material fact for an officer or

21   somebody in Paula Thomas's position to know that;

22   right?

23         A     Yes.

24         MR. PEDDIE:  Objection, calls for a legal

25   conclusion.

Page 51

```
 1    BY MR. BILLER:

 2         Q     Can you tell me why Thomas Wylde did not

 3    inform --

 4         MR. PEDDIE:  Objection, calls for speculation.

 5         MR. BILLER:  Let me finish the question.

 6    BY MR. BILLER:

 7         Q     Inform Paula Thomas that, from August

 8    2014 to December 2014, Hillshore invested or loaned

 9    $2.3 million?  Do you know any reason?

10         MR. PEDDIE:  Objection, calls for speculation.

11         THE WITNESS:  I believe she was informed.

12    BY MR. BILLER:

13         Q     How do you know that?

14         A     I don't know, but I believe she was.

15         Q     I'm asking if you know that how do you

16    know?

17         A     I know they are having a meeting.  They

18    discussed these matters.

19         Q     How Doe know that?  How do you know that

20    $2.3 million was discussed?

21         A     I think that was in the agreement that

22    they have.

23         Q     Oh, so it's the agreement?

24         A     It's --

25         Q     The purchase agreement?
```

Page 52

1          A       It could be.

2          Q       The purchase agreement says $2 million,

3    not 2.3.

4          A       I'm not so sure about that.

5          Q       Okay.  I wasn't going to bring this

6    document, but I'm glad I did.

7               MR. BILLER:  Let's have the next document

8    marked as 66.

9                    (Exhibit 66 was marked for

10                   identification by the Certified Shorthand

11                   Reporter and is attached hereto.)

12   BY MR. BILLER:

13         Q       Can you look to page 2236, paragraph 3,

14   "Consideration."  Do you see that?

15         A       Yes.

16         Q       Do you want to read it yourself?

17         A       (Witness complies.)

18         Q       Now, that paragraph talks about

19   $3.5 million; right?

20         A       Yes.

21         Q       Two installments, 1.5 and 2 million;

22   right?

23         A       Yes.

24         Q       And there's Exhibit B that refers to the

25   dates of investment; right?

Page 53

```
1              A      Exhibit B or Exhibit A?

2              Q      I have it separately.

3              MR. BILLER:  Let's go ahead and mark the next

4    document as Exhibit Number 67.

5                      (Exhibit 67 was marked for

6              identification by the Certified Shorthand

7              Reporter and is attached hereto.)

8    BY MR. BILLER:

9              Q      Do you see that, Exhibit 67?

10             A      Yes.

11             Q      Did you create that document?

12             A      No.

13             Q      Okay.  That's Exhibit A to the purchase

14   agreement; correct?

15             A      Yes.

16             Q      And that shows investments of 500,000 on

17   November 15; 500,000 on January 16; 250,000 on February

18   2016; 2,500 on March 2016 --

19             MR. PEDDIE:  You said "2,500" before.

20             MR. BILLER:  Yeah, March 1.

21             MR. PEDDIE:  2,500?

22             MR. BILLER:  No.  250,000

23             MR. PEDDIE:  Right.

24   BY MR. BILLER:

25             Q      And then 500,000 on April 1, 2016, for a
```

Page 54

1      total of $2 million.  Do you see that?

2              A     Yes.

3              Q     Do you believe this schedule of payments

4      corresponds to the 2,000,013 stated in Clause 4 of

5      Exhibit 66?

6              A     This information, I think, is beyond the

7      date that this one.  This is 2016.

8              Q     It says [as read] "Exhibit 'A' to

9      Purchase Agreement Membership Interest."  That's what

10     it says.  Exhibit A.

11             MR. PEDDIE:  Objection, calls for

12     interpretation of the document.

13     BY MR. BILLER:

14             Q     And Exhibit A is referred to in

15     paragraph -- Clause 3 of the purchase agreement; right?

16             MR. PEDDIE:  Objection, calls for a legal

17     conclusion.

18     BY MR. BILLER:

19             Q     Right?

20             MR. PEDDIE:  Calls for speculation.

21     BY MR. BILLER:

22             Q     You can answer the question.  It says,

23     does it not, "Exhibit 'A'" -- pursuant to Exhibit A

24     $2,000,013 would be invested?

25             A     Yes.

                                              Page 55

```
 1          Q      Okay.  Exhibit 67 and Exhibit 65 are
 2   totally inconsistent, aren't they?
 3          MR. PEDDIE:  Objection, calls for a legal
 4   opinion.  Calls for speculation.
 5          THE WITNESS:  Yes.  What was the last question?
 6   BY MR. BILLER:
 7          Q      Are the data on Exhibit 67 and the data
 8   on 65 -- Exhibit 65 are inconsistent; correct?
 9          MR. PEDDIE:  Objection, foundation; calls for a
10   legal opinion; calls for speculation.
11   BY MR. BILLER:
12          Q      You're an accountant.  You're a CPA also
13   in the Philippines.  Just look at the numbers.
14   Exhibit 65 states that in November there was a $500,000
15   loan; right?
16          A      Yes.
17          Q      That's consistent with the payment
18   schedule of Exhibit A, correct?
19          MR. PEDDIE:  Objection, assuming facts.
20          THE WITNESS:  You're referring to the total?
21          MR. BILLER:  Yes.
22   BY MR. BILLER:
23          Q      No.  I'm referring to the amount of
24   money -- this is not difficult.  Really it's not.  I
25   know you want to help your client and your friend,
```

Page 56

1    John Hanna.  But you're supposed to be honest.  This is

2    not this difficult that we have to spend this amount of

3    time answering this simple question.

4         Isn't the data noted in Exhibit 65 and

5    Exhibit 67 regarding the amount of money Thomas Wylde

6    was to receive consistent?

7         A    You're referring to the 2,300

8    and -- sorry, 2,000,300 and the 2,000,000?

9         Q    No.  I'm referring to the November 15,

10   500,000 and the November 13, 500,000?

11        A    November 13 of --

12        Q    2014.

13        A    -- 2014, and this is 2015.  This is a

14   balance to be paid the year after.

15        Q    Where is that indicated in the purchase

16   agreement?

17        A    Well, it says [as read], "Purchaser will

18   pay the remaining balance of 2,000,013 U.S. dollars

19   pursuant to the payment schedule attached hereto as

20   Exhibit A."  This is 2015 up to 2016.  This

21   reclassification is 2014 pertaining to the previous

22   transactions.

23        Q    So are you saying that should there

24   should be information regarding these entries?

25        A    I'm sorry?

Page 57

1          Q          Should there be information regarding

2    these entries?

3          A          I believe it's here in -- sorry.

4          Q          There are no entries for 2015.  Look at

5    Exhibit 65.  There are no entries for 2015.

6          A          Not on this account.  There might be

7    other accounts.

8          Q          I'm not worried about other accounts.

9    This is the Hillshore account.

10         MR. PEDDIE:  Objection, assumes facts.

11   BY MR. BILLER:

12         Q          Do you doubt this is the Hillshore

13   account?  Do you have any question that this

14   Document 65 relates to the Hillshore account?

15         A          Unless I see the backup documents on

16   this.

17         Q          So you don't -- if you don't have the

18   backup documents, you don't know if the data is right;

19   correct?

20         A          I could verify that with the backup

21   documents.

22         Q          Okay.  Where are the backup documents?

23         A          I don't have it.  I don't know.  You

24   should have it.  The company should have it.

25         Q          The company should have it, but I don't

Page 58

1    have it.

2              A      I'm sorry about that.

3              Q      What type of backup documents are you

4    referring to?

5              A      There would be deposit slip or bank

6    credits -- bank statements.

7              Q      So unless you have backup documents, you

8    can't rely on QuickBooks.  Is that what you're saying?

9              A      No.  The QuickBooks entries has backup

10   documents before you enter them.

11             Q      Just answer me a simple question.  There

12   is no entries for any money received by Thomas Wylde on

13   Exhibit 65 for 2015; correct?

14             A      Rephrase that.

15             MR. BILLER:  Read the question back.

16                    (The record was read by the Certified

17                    Shorthand Reporter.)

18             THE WITNESS:  If it's recorded here, the money

19   was received.

20   BY MR. BILLER:

21             Q      Just answer the question, Exhibit 65,

22   are there any entries for 2015?

23             A      2015 for this?

24             Q      Just answer my question, please.  I know

25   you're trying to help John Hanna.  Please, you have to

Page 59

```
 1    be honest --

 2          MR. PEDDIE:  Objection, argumentative.

 3    BY MR. BILLER:

 4          Q     -- you have to be straight forward, and

 5    you have to be honest.  It's a simple question.  Are

 6    there any entries on Exhibit 65 for 2015?

 7          A     There's not.

 8          Q     Thank you.  Was that hard?  That took 15

 9    minutes to answer.

10          MR. PEDDIE:  Counsel, she told you there may be

11    other accounts --

12          MR. BILLER:  I asked on the exhibit.

13          MR. PEDDIE:  Before you were asking questions

14    suggesting this was the only account.

15    BY MR. BILLER:

16          Q     Now, let's turn to 67.  There is an

17    entry for November 15, 2015.  Do you see that?

18          A     Yes.

19          Q     For $500,000?

20          A     Yes.

21          Q     Do you see that?

22          A     Yes.

23          Q     Why isn't that on Exhibit Number 65?

24          A     I don't know.  It might be recorded to

25    another account.
```

Page 60

 1          Q       So why would it be recorded to another

 2     account?

 3          A       It might be recorded as an equity

 4     directly.

 5          Q       Is there an account for equity?

 6          A       Yes, there is.  It's in QuickBooks.

 7          Q       And it states the date of the entries?

 8          A       Yes, it should.

 9          Q       And it states -- it should have some

10     type of memo; right?

11          A       Yes.

12          Q       All right.  So we got 2016, 2016, 2016,

13     2016, and $1.5 million reflected on Exhibit 67.  Do you

14     see that?

15          A       Yes.

16          Q       That is not reflected on Exhibit 65;

17     correct?

18          A       Yes.

19          Q       Okay.  Isn't it true once entries are

20     made -- I don't know if it's true, frankly.  Once

21     entries are made in QuickBooks, can anybody go back and

22     change the data?

23          A       If they have access to it, yes.

24          Q       If they have access to QuickBooks?

25          A       Yes.

Page 61

1          Q        Stephen Choi produced Exhibit 65 at his

2    deposition and swore it was a record he obtained from

3    Thomas Wylde.  Do you understand?

4          A        Yes.

5          Q        I believe he obtained it on -- well,

6    there's a date here of February 27, 2017 at 11:41 a.m.

7    That would reflect the date that this was printed out;

8    correct?

9          A        Yes.

10          Q        Is that true?

11          A        Yes.  It would be the date it was

12    generated.

13          Q        Right.  His deposition was March 2017.

14    So that's consistent with generating this report in

15    February; right?

16          A        Yes.

17          Q        So can you think of any reason, any

18    reason why Stephen Choi would make changes in

19    QuickBooks regarding the data on Exhibit 65?

20          MR. PEDDIE:  Objection, assumes facts.

21          THE WITNESS:  No, I can't.

22          MR. BILLER:  Okay.

23    BY MR. BILLER:

24          Q        If he did make any changes, wouldn't

25    that affect the rest of the QuickBooks data?

Page 62

1          A       Yes.

2          Q       Impact everything?

3          A       Yes.

4          Q       Correct?

5          A       Yes.

6          Q       So if he went in and deleted the

7    infusion of $3.5 million in 2015 and 2016, what would

8    the consequences be for the QuickBooks' data?

9          MR. PEDDIE:  Objection, calls for a

10   hypothetical.

11         THE WITNESS:  Any changes in QuickBooks would

12   change the financial statements.

13   BY MR. BILLER:

14         Q       What are the financial statements?

15         A       The profit and loss, balance sheet, and

16   statement of cash flow.

17         Q       And all those are one document or

18   separate documents?

19         A       Separate documents.

20         MR. BILLER:  Counsel, do you want to explain

21   why I don't have that?

22         MR. PEDDIE:  You do.

23         MR. BILLER:  I just looked.

24         MR. PEDDIE:  You have the entire QuickBooks

25   file.

Veritext Legal Solutions
866 299-5127

1           MR. BILLER:  I don't want the entire QuickBooks

2     file.  I want the documents.

3           MR. PEDDIE:  This is how they are kept.

4           MR. BILLER:  The QuickBooks file --

5           MR. PEDDIE:  Mr. Biller, this is how they are

6     kept.

7           MR. BILLER:  The QuickBooks file can be

8     manipulated.

9           MR. PEDDIE:  This is how they are kept.  These

10    documents exist within QuickBooks.  You generate them,

11    and you print them.

12          MR. BILLER:  No.  The data in QuickBooks,

13    unless I have the backup file, backup data cannot be

14    checked.

15          MR. PEDDIE:  The backup data does not consist

16    of a profit and loss statement, balance sheet, and

17    statement of cash flows.  Those are generated in

18    QuickBooks and printers.

19          MR. BILLER:  You know what, Richard, I swear to

20    God, I'm going to -- this is recorded.  If these are

21    the type of tricks that you can play with other

22    lawyers --

23          MR. PEDDIE:  This is not a trick.

24          MR. BILLER:  The QuickBooks cannot be verified.

25    ///

Page 64

1    BY MR. BILLER:

2         Q    Can the QuickBooks be verified without

3    checking all the backup data?

4         MR. PEDDIE:  Objection, calls for speculation

5    and hypothetical.

6         THE WITNESS:  You can generate report and

7    verify with backup data.

8    BY MR. BILLER:

9         Q    You need the backup documents to verify

10   what data is being spit out of QuickBooks; right?

11        A    Yes.

12        Q    Because when you input the information,

13   you have that backup data; right?

14        A    Source documents, yes.

15        Q    And you're the one who makes sure it's

16   accurate; correct?

17        A    Yes.

18        Q    And if a third party wanted to do an

19   audit, that third party couldn't do an audit without

20   the backup documents; correct?

21        A    Yes.

22        MR. PEDDIE:  You were asking about financial

23   statements.  They are generated by QuickBooks.

24        MR. BILLER:  You know what, Richard, don't

25   treat me like a fool.  Okay.  You know -- you tell it

Page 65

1   to the judge.

2          MR. PEDDIE:  You were asking her --

3          MR. BILLER:  Hey, let me speak.

4          MR. PEDDIE:  Why don't you let me speak for

5   once.

6          MR. BILLER:  You've already said it.  My

7   specific request for production of documents asks for

8   all documents related to financial --

9          MR. PEDDIE:  You said to me a moment ago,

10  "Counsel, why don't I have the balance sheet, profit

11  and loss statement, and the statement of cash flows?"

12         MR. BILLER:  I don't.

13         MR. PEDDIE:  You do.  They are generated by

14  QuickBooks, which you have.

15         MR. BILLER:  No, I don't.  Tell it to the

16  judge.

17         MR. PEDDIE:  It's not a separate document.

18         MR. BILLER:  Tell it to the judge.

19         MR. PEDDIE:  She does not take the balance

20  sheet, the profit and loss statement --

21         MR. BILLER:  Tell it to the judge.

22         MR. PEDDIE:  -- and input that into the

23  QuickBooks --

24         MR. BILLER:  Tell it to the judge.

25         MT. PEDDIE:  QuickBooks makes those documents.

Page 66

1          MR. BILLER:  You're wasting my time now.

2          MR. PEDDIE:  You're wasting your time because

3     you don't understand financial matters.

4          MR. BILLER:  You represent crooks, thieves,

5     mafia personnel from South Korea.  That's who you

6     represent.

7          MR. PEDDIE:  No.  Your theory that Roger Kuo

8     and Doug Lee and Stephen Choi are all from Korea and

9     all speak Korean to each other and are part of a mafia

10    is absolutely outlandish.  It comes out of a crack

11    pipe, I'm telling you.

12         MR. BILLER:  Are you saying --

13         MR. PEDDIE:  I'm being emphatic to tell you

14    that I don't think those guys speak Korean.  In fact,

15    some of them are not even Korean.

16         MR. BILLER:  Let's mark the next document as

17    68.

18              (Exhibit 68 was marked for

19              identification by the Certified Shorthand

20              Reporter and is attached hereto.)

21         MR. BILLER:  Sorry.

22         MR. PEDDIE:  Please be careful.  I don't like

23    being hit in the head with documents.

24         MR. BILLER:  It hit you in the chest.

25         MR. PEDDIE:  It hit me in the forehead,

Page 67

```
 1    Dimitrios.

 2    BY MR. BILLER:

 3              Q        Do you know what this is?

 4              A        Yes.

 5              Q        What is it?

 6              A        It's a transmittal form sent to

 7    Paula about the notice of issuance of new membership.

 8              Q        Do you see your name at the bottom?

 9              A        Yes.

10              Q        And you signed it; right?

11              A        Yes.

12              Q        You signed your name in the regular

13    course of business?

14              A        Yes.

15              Q        Did you produce this exhibit in the

16    regular course of your business?

17              A        Say that again.

18              Q        Did you create this exhibit in the

19    ordinary course of your business?

20              A        "Exhibit" meaning this document?

21              Q        Yes.

22              A        Yes.

23              Q        You assembled all the documents referred

24    to in Exhibit 68; correct?

25              A        Yes, it was given to me.
```

                                                  Page 68

1      Q      Who gave it to you?

2      A      I believe it's David.

3      Q      David Schnider?

4      A      Yes.

5      Q      Okay.  Why did he give you these
6   documents?

7      A      He's the lawyer of the company, and he
8   prepares these documents.

9      Q      He prepared all of them?

10     A      Yes, I believe so.

11     Q      Okay.  Did you have any involvement in
12   preparing these documents?

13     A      No.

14     Q      Now, remember we had a bit of a
15   discussion about whether Exhibit A that is marked as
16   Exhibit number -- they're right next to you.

17     A      Yes.

18     Q      The page attached to Exhibit 68 that
19   you're looking at is the same as the previous exhibit
20   that was titled, "Exhibit 'A' to Purchase Agreement."

21     A      Yes.

22     Q      Same document?

23     A      Yes.

24     Q      And why was this document distributed?

25     A      I believe it's for information.

Page 69

1          MR. PEDDIE:  Objection, calls for speculation.

2     BY MR. BILLER:

3          Q       You're the financial controller.  You

4     signed the facsimile form; correct?

5          A       Yes.

6          Q       And who did you fax it to

7          MR. PEDDIE:  Objection, assumes facts.

8          THE WITNESS:  It is by mail in Korea.

9     BY MR. BILLER:

10         Q       And you mailed it to Paula Thomas?

11         A       Paula Thomas and the legal counsel that

12    she has at that time.

13         Q       And why did you do that?

14         A       I was advised that she needs to be

15    advised.

16         Q       Because she's a member?

17         A       Yes.

18         Q       She should be advised of the finances of

19    the company; right?

20         A       Yes.

21         Q       As a member of the company, she still

22    has a say regarding anything that affects the finances

23    of the company; correct?

24         A       Yes, I believe so.

25         MR. PEDDIE:  Objection, calls for legal

Page 70

1    conclusion.

2    BY MR. BILLER:

3        Q      That includes making decisions regarding

4    loans and equity; correct?

5        A      Yes.

6        MR. PEDDIE:  Can we just keep this further?  It

7    doesn't look like it's mine.

8        MR. BILLER:  I didn't think it was yours.

9    BY MR. BILLER:

10       Q      Now, who is Ms. Gonzalez on page 4?

11       A      Stephen Choi's wife.

12       Q      Have you ever met her?

13       A      Yes.

14       Q      How many times?

15       A      A few times.

16       Q      What were the purposes of the meeting?

17       A      She came over to shop.

18       Q      Just to shop?

19       A      Yes.

20       Q      She didn't come over for business

21   purposes?

22       A      Not that I know of.

23       Q      And who calculated the total of

24   $9,005,013?

25       A      Which one is that?

Page 71

1          Q       It's the bottom entry, last page.  It's

2     actually $9,000,013.  Who inputted that total?

3          A       I believe it was David Schnider who

4     computed the shares.

5          Q       But who computed the capital account

6     balance?

7          A       I don't know.

8          Q       Okay.  Did you ever -- do you remember

9     ever inputting into QuickBooks $9 million in

10    investments by Hillshore?

11         A       I don't remember.

12         Q       Okay.  Does that sound accurate to you?

13         A       I don't know.

14         Q       Because you were still at Thomas Wylde

15    obviously when this document was created?

16         A       Yes.

17         Q       So who would have access to the amount

18    of money that was invested into the company?

19         A       That would be me.

20         Q       Okay.  And how would you find out

21    $9,000,013 was invested, if it was?

22         A       I would assume it's collected from all

23    of these contribution.

24         Q       You assume that?

25         A       Yes.

Page 72

1         Q      Where would you go to find out if that
2    was accurate?

3         A      In QuickBooks it would say all of this
4    cash that came in, it's a matter of reclassification.
5    It would be in the equity account in QuickBooks.

6         Q      Would the reclassification take place on
7    the same day the money was received?

8         A      The money would be recorded at the time
9    it was received.  But the reclassification of this,
10   based on the documents, may come later.

11        Q      So suppose the 9 million -- assume for
12   purposes of my question that the 9 million came into
13   Thomas Wylde as equity investment.  When would that be
14   noted in the equity account?

15        A      Upon execution of these documents, when
16   it's converted to equity.

17        Q      Okay.  So the money could come in in any
18   fashion, but you have to have the execution of the
19   Schedule B for that to be converted into equity; is
20   that what you're saying?

21        MR. PEDDIE:  Objection, calls for a legal
22   conclusion.

23        THE WITNESS:  Unless there is a document prior
24   that says it's an equity, then it would be in the
25   equity.  This money could be in there already.  This is

Page 73

1    just the distribution of how much each member has.

2    BY MR. BILLER:

3         Q      If the money is in there already, where

4    would it be in QuickBooks?

5         A      It would be in equity.

6         Q      Anyplace else?  Loans?

7         A      It could be in loans if it's not sure

8    with the documents.  But once we have the documents to

9    verify the nature of the transaction, it would have

10   been recorded as an equity.

11        Q      I hear you saying repeatedly, which I

12   think is completely accurate, that you need to verify

13   QuickBooks with the actual documents that contain the

14   information that goes in QuickBooks; right?

15        A      Yes.

16        Q      So relying on QuickBooks, unless you

17   verify it, that's not a reasonable thing to do; is it?

18        A      It's the normal practice to do.

19        Q      It's a normal practice, but it's not the

20   normal practice when there is a legal dispute as to

21   whether the QuickBooks data is accurate or not.

22        MR. PEDDIE:  Objection, calls for a legal

23   opinion.

24        THE WITNESS:  As long as you have the backup,

25   you can verify the nature of the transaction.

Page 74

 1    BY MR. BILLER:

 2         Q    Where did you store all the backup?

 3         A    There would be files.  There would be

 4    folders.

 5         Q    Describe the folders.  Paper folders?

 6         A    Paper folders.

 7         Q    Where would those paper folders be?

 8         A    It should be in Thomas Wylde's

 9    possession.

10         Q    It shouldn't be destroyed, should they?

11         A    No.

12         Q    That's important data, isn't it?

13         A    Yes.  And IRS requires for data to be --

14         Q    Seven years?

15         A    Yes.

16         Q    So if Thomas Wylde doesn't produce

17    backup documents that you're describing, that would be

18    in violation of IRS regulations; correct?

19         MR. PEDDIE:  Objection, calls for a legal

20    opinion.

21         THE WITNESS:  Well, there could be other

22    documents, or there could be other means for them to

23    verify.

24    BY MR. BILLER:

25         Q    Put that side -- move to strike.  Non

Page 75

1    responsive.

2            If Thomas Wylde does not have the backup

3    documents for the last seven years regarding the data

4    going into QuickBooks, that would be a violation of IRS

5    regulations; correct?

6            MR. PEDDIE:  Objection, calls for legal

7    conclusion.

8            THE WITNESS:  I believe so.

9            MR. BILLER:  Thank you.

10           What time do you have?

11           THE REPORTER:  10:03.

12           MR. BILLER:  It's been an hour.  Let's take a

13   break.

14           MR. PEDDIE:  Before we go off, Dimitrios, I'm

15   going to hand you 2014 income tax return.  I think you

16   have a copy already.  I'm going to hand you 2015 income

17   tax return marked "Confidential."  I ask that you just

18   verify -- I have tried to do this -- that Social

19   Security numbers of everyone from Paula Thomas to

20   John Hanna have been redacted.

21           MR. BILLER:  If you say they have been

22   redacted, that's fine.

23           MR. PEDDIE:  Well, they're --

24           MR. BILLER:  I've never accused you of using or

25   allowing Paula's Social Security number to be left in

1   the open and seen by everybody.

2           MR. PEDDIE:  I understand.

3           MR. BILLER:  I never did that.  What I've

4   accused you of and is clear to me today in this one

5   hour is that you withheld, you've concealed, and you

6   may have destroyed material documents regarding

7   QuickBooks.

8           MR. PEDDIE:  Well, I can assure you I have not.

9           MR. BILLER:  You probably haven't.

10          MR. PEDDIE:  My point is I'm handing you these

11  documents because I know you would like them.  I think

12  you already have them.

13          MR. BILLER:  I don't have 14.  I have 15.

14          MR. PEDDIE:  But before you use them in court,

15  just have a double check on the Social Security

16  numbers; all right?

17          MR. BILLER:  And why didn't you produce them

18  earlier?

19          MR. PEDDIE:  We did.

20          MR. BILLER:  When?

21          MR. PEDDIE:  During the whole Kring and Chung

22  phase.

23          MR. BILLER:  I looked at all 175 documents in

24  your index, and I looked at all the documents I have

25  from Kring and Chung.  And it's just not true.  Stop

Page 77

```
 1   saying that.
 2           MR. PEDDIE:  You say there are no tax returns
 3   in there?
 4           MR. BILLER:  I didn't say that.  I did not say
 5   that.  I said your index does not match the documents
 6   for Kring and Chung.  That's what I'm saying.  So stop
 7   saying it.
 8           MR. PEDDIE:  I sent you all 24 batches Bates
 9   numbered.  And if there are error, let me know.
10           THE REPORTER:  Are we going off?
11           MR. PEDDIE:  Yes, that's fine.
12               (Break taken:  10:04 a.m. - 10:26 a.m.)
13   BY MR. BILLER:
14       Q      Let's talk about now -- you say oversee
15   financials.  What does that mean?
16       A      The record keeping, analysis of the
17   accounts, and generating the financial statements.
18       Q      Record keeping meaning the backup
19   material received for the information put into the
20   QuickBooks?
21       A      Yes.
22       Q      Explain to me where that material is
23   located at Thomas Wylde?
24       A      It used to be in my drawer.  I don't
25   know now.
```

Page 78

1          Q         Your drawer meaning your office?

2          A         My office at the time and table.

3          Q         Was there a filing cabinet?

4          A         There's a drawer on the table, and there

5     is a separate filing cabinet in the back.

6          Q         And how many cabinets does the filing

7     cabinet have?

8          A         There are several in the back.

9          Q         Okay.  And how far back do those

10    documents go?  Seven years?

11         A         Not in my tenure, so I have the current

12    records that I have.

13         Q         So I want to know where all the

14    documents -- the backup documents are located so

15    Mr. Peddie can go get them for me?

16         A         I don't know where they are right now.

17         Q         But they were in your office; right?

18         A         The current ones were in my office.

19         Q         Right.

20         A         I believe they moved.

21         Q         You think they moved?  Where did they

22    go?

23         A         They moved office.

24         MR. PEDDIE:  We moved.

25         THE WITNESS:  They moved office, so I don't

Page 79

1    know where it is now.

2    BY MR. BILLER:

3          Q      When you left in June of 2016, those

4    documents were in your office; right?

5          A      Yes.

6          Q      Okay.

7          MR. PEDDIE:  All of them?

8          THE WITNESS:  The ones that I have.

9          MR. PEDDIE:  Every last invoice?

10         MR. BILLER:  This is not your chance to cross.

11         MR. PEDDIE:  I just want you to get a clear

12   answer.

13         MR. BILLER:  I got an idea, believe me.

14         MR. PEDDIE:  Just don't think everything is in

15   a single drawer.

16         MR. BILLER:  No.  Because it's been destroyed.

17         MR. PEDDIE:  No, nothing has been destroyed.

18   BY MR. BILLER:

19         Q      Let's talk about your duties with regard

20   to bank accounts.

21         A      Say that again.

22         Q      With regard to bank accounts, you said

23   you had some duties and responsibilities regarding bank

24   accounts.  What were they?

25         A      Viewing the bank statements, generating

Page 80

```
 1    the bank statements, and getting information online.

 2         Q      Okay.  That's what I wanted to ask you.

 3    You didn't maintain bank statements in the old fashion

 4    way where you put a paper in the filing cabinet;

 5    correct?

 6         A      I would generate it sometimes.

 7         Q      Okay.  How would you receive the bank

 8    statements?

 9         A      Downloading it from online.

10         Q      So let's talk about your computer.  What

11    folders did you have in your computer that related to

12    Thomas Wylde?

13         A      There should be a TW folder in my

14    computer.  It says, "TW LLC."  I don't remember all the

15    folders.  I keep specific folders for some information

16    in there, but I don't remember them all.

17         Q      Just tell me what you remember.

18         A      There should be bank; there should be

19    financials; AP, accounts payable; accounts receivables.

20         Q      And let's go over those folders.  What

21    type of documents would you electronically store in

22    each those folders?

23         A      Would be bank statements.  AP will be

24    some invoices received online.  If it's physical, it is

25    filed in the file cabinet.  And AR would be list of
```

Page 81

1    customers' invoices as to follow up.

2          Q        Payments?

3          A        Will be in AP if there is any.

4          Q        Okay.  And did your electronic folder

5    still exist when you left in June of 2016?

6          A        Yes.

7          Q        And how many documents do you think were

8    stored in that folder?

9          A        I don't remember.

10          Q        Now, you can easily transfer all of

11    those documents by putting a flash drive in the

12    computer and transferring the TW folder; correct?

13          A        Yes, that could be done.

14          Q        That will result in not only the folders

15    in TW folder be transferred but that would result in

16    all the documents within each folder to be transferred;

17    right?

18          A        That could be.

19          Q        And you could do that with a flash or a

20    hard drive?

21          A        Yes.

22          Q        It could take anywhere from a couple

23    hours to six hours.

24          A        Yes.  If they know the password of the

25    PC.

Page 82

```
 1          Q      So that's not a burden to you, is it?

 2          A      What do you mean "burden"?

 3          Q      To press a button and transfer the

 4    document, do you think that's burdensome?

 5          A      It shouldn't be.

 6          Q      Do you think it's annoying to have to

 7    do?

 8          A      I don't believe so.

 9          Q      Do you think it's harassing to ask that

10    be done so Paula can have the records?

11          MR. PEDDIE:  Objection, assumes facts.

12          THE WITNESS:  That can be anyone's opinion.

13    BY MR. BILLER:

14          Q      But is it yours?

15          A      It depends on the nature of the file.

16    It depends on -- well, I would say it depends on the

17    mood of the person, also.

18          Q      But as a member, as a member of the

19    company, a holder of units, she's entitled to review

20    those documents; isn't she?

21          MR. PEDDIE:  Objection, calls for legal

22    opinion.

23          THE WITNESS:  Yes.

24    BY MR. BILLER:

25          Q      Let me hand you the next document.
```

Page 83

```
 1                    (Exhibit 69 was marked for

 2              identification by the Certified Shorthand

 3              Reporter and is attached hereto.)

 4    BY MR. BILLER:

 5         Q    Do you know what 69 is?

 6         A    Pardon?

 7         Q    Exhibit 69, you can read it.

 8         A    Yes.

 9         Q    Did you read it?

10         A    Not yet.

11         Q    Go ahead and read it to yourself.

12         A    (Witness complies.)

13         Q    Have you read Exhibit 69?

14         A    Yes.

15         Q    Do you know why you were sent this

16    e-mail?

17         A    As a copy for reference information and

18    maybe file.

19         Q    What file?

20         A    It could be an HR file.

21         Q    Okay.  Was there an HR file on

22    Paula Thomas?

23         A    You mean a folder?

24         Q    A folder.

25         A    Yes.
```

Veritext Legal Solutions
866 299-5127

1        Q        What was in that folder?

2        A        Her agreement, her -- I believe there's

3    W-2 in there.

4        Q        Did she have a separate file other than

5    the file you're trying to describe?

6        A        Not that I know of.

7        Q        Was there a disciplinary file, for

8    example?

9        A        No, not that I know of.

10        Q        Did you have an electronic folder in

11    your opinion computer regarding Paula Thomas?

12        A        I believe only the transmittal form or

13    whatever I might have sent her in this context.

14        Q        Okay.  So whatever you would have sent

15    her would be in a electronic Paula Thomas folder?

16        A        Whatever I sent her?

17        Q        You just said in the electronic folder

18    you have anything you would have sent her.

19        A        Like this (indicating).  Others might be

20    e-mailed.

21        Q        I just want to know if you had a

22    separate electronic folder that contained documents and

23    information on Paula Thomas?

24        A        There is only few documents in there,

25    and they're in a separate folder.

Page 85

1      Q      Did you have that for every employee?

2      A      For?

3      Q      Do you have it for Jene Park,

4   John Hanna, David Schnider, other designers, or did you

5   just have a folder for Paula Thomas?

6      A      There is a folder -- in the e-mail there

7   is a folder for them.  There are some, not all

8   employees.

9      Q      So you have separate folder regarding

10  e-mails that you sent and received regarding

11  Paula Thomas; right?

12     A      The e-mail context.  Some people that I

13  have separate folders, too.

14     Q      Okay.  So it sounds like -- and correct

15  me if I'm wrong -- you have a separate electronic

16  folder for Paula Thomas regarding Word or PDF

17  documents; right?

18     A      What do you mean "Word" and "PDF"?

19     Q      Documents that you would store in an

20  electronic folder; correct?

21     A      Yeah.

22     Q      And then you have a separate folder for

23  e-mails --

24     A      Yes.

25     Q      -- that you would send and receive for

Page 86

1    Paula Thomas; right?

2           A      For different people, yes.

3           Q      Including Paula Thomas?

4           A      Yes.

5           Q      And when you left in June of 2016, was

6    the e-mail folder and the electronic folder in

7    existence?

8           A      Yes, I believe so.

9           Q      Did you produce it as well?

10          MR. PEDDIE:  The Meldy Rafols' e-mail folder?

11          MR. BILLER:  Yeah.

12          MR. PEDDIE:  I don't think so.

13          MR. BILLER:  I didn't think so.  They relate to

14   Paula Thomas.  That's the subject of the request.  You

15   want to produce those, or do I have to go

16   file -- whatever?

17          MR. PEDDIE:  We can discuss specific requests

18   for actual things like that.

19          MR. BILLER:  I want everything that she

20   discussed in this deposition.  It's that simple.

21          MR. PEDDIE:  Well, We can make a list later and

22   discuss it.

23   BY MR. BILLER:

24          Q      Now, when you received this Exhibit 69,

25   what did you think?

Page 87

1          MR. PEDDIE:  Objection, relevance.

2          THE WITNESS:  I just thought that it was an

3     instruction.

4     BY MR. BILLER:

5          Q     And that's it; right?

6          A     Yes.

7          Q     Did you think it was a termination

8     letter?

9          A     No.

10         Q     Did you think Paula Thomas was being

11    threatened she was going to be terminated if her

12    behavior did not change?

13         A     Not that I believe so.  It's an

14    instruction about function.

15         Q     Right.  Thank you.  Now at some

16    point -- let me show you another e-mail.

17               (Exhibit 70 was marked for

18               identification by the Certified Shorthand

19               Reporter and is attached hereto.)

20    BY MR. BILLER:

21         Q     Please read Exhibit 70.

22         A     (Witness complies.)

23         Q     Why was the salaries cut by a third as

24    indicated in Exhibit 70?

25         A     I believe it's because of the financial

Page 88

```
 1    condition.

 2            Q        Okay.   Who made the decision to cut the

 3    salaries?

 4            A        I believe they all talk about it and

 5    agreed to it.

 6            Q        Including Paula Thomas?

 7            A        Yes, that's why I confirmed.

 8            Q        Okay.   And then you prepared a chart of

 9    what the salaries were and how they would be impacted

10    with the one third reduction; correct?

11            A        I believe so.

12            Q        Yeah.   And what was the payment cycle

13    for Paula Thomas?

14            A        I can't remember.   I think once a month.

15            Q        Once a month.   At the end of the month

16    or the beginning of the month?

17            A        The beginning of the month.

18            Q        So if the chart showed that Paula Thomas

19    received $16,000 -- approximately $16,000 in April of

20    2015 and nothing in May 2015, what would that tell you

21    about her employment status?

22            MR. PEDDIE:   Objection, vague.   It calls for

23    speculation.

24    BY MR. BILLER:

25            Q        She didn't work for free, did she?
```

Page 89

1          A       No, I don't believe so.

2          Q       Everybody worked for a salary; right?

3          A       Yes.

4          Q       So if she didn't get paid in May of

5     2015, don't you think that would indicate that she was

6     no longer employed with the company?

7                MR. PEDDIE:  Objection, calls for speculation.

8                THE WITNESS:  I can't remember if she got paid

9     in May or not.

10    BY MR. BILLER:

11         Q       She did not.  I can't believe I didn't

12    bring the chart, which I'm sorry.  But I have it

13    completely memorized, and I'll be wrong if I ask you a

14    question that misrepresents the chart.  But the chart

15    shows she was not paid in May of 2015.  And she was

16    paid 16,000 out of a $25,000 salary in April of 2015.

17               When would she have received the approximately

18    $16,000 in April 2015?

19         A       That would have been on the 1st.

20         Q       And the first salary was $25,000.  What

21    would one third of that be?

22               MR. PEDDIE:  Objection, calls for math.

23               THE WITNESS:  One third would be about --

24    BY MR. BILLER:

25         Q       Two-thirds would be about 16; right?

Page 90

```
 1        A      About 16, yes.

 2        Q      So that would represent her salary with

 3   the one -- the 33 deduction; correct?

 4        A      Yes.

 5        Q      So if she was still employed with

 6   Thomas Wylde in May of 2015, she would have received a

 7   paycheck for approximately 16,000 on May 1, 2015;

 8   correct?

 9        MR. PEDDIE:  Objection, assumes facts.

10        THE WITNESS:  Yes, if she's employed at the

11   time.

12        MR. BILLER:  Okay.  Thank you.

13   BY MR. BILLER:

14        Q      Now, all these documents signed by

15   John Hanna, notice approval of action, notice of

16   issuance of new membership, action by written

17   consent -- did you have any involvement in deciding

18   those issues?

19        A      No.

20        Q      Did you have any involvement in

21   preparing those documents?

22        A      No.  These documents, no.

23        Q      Let me go ahead and hand you another

24   document as 71.

25   ///
```

Page 91

```
 1                      (Exhibit 71 was marked for

 2                 identification by the Certified Shorthand

 3                 Reporter and is attached hereto.)

 4      BY MR. BILLER:

 5           Q      Did you prepare Exhibit 71?

 6           A      Yes.

 7           Q      Okay.  You wrote this document; right?

 8           A      Yes.

 9           Q      And you wrote it in the ordinary course

10      of your business; correct?

11           A      Yes.

12           Q      And you sent it to Paula Thomas and cc'd

13      it to John Hanna; right?

14           A      Yes.

15           Q      And for what purpose did you write this

16      e-mail?

17           A      This is for backup.

18           Q      Backup?

19           A      And information.

20           Q      Okay.  And this relates to Paula Thomas?

21           A      Yes.

22           Q      And so it says here, "With the paycut

23      and the membership contribution deduction, your net pay

24      will be $8,247.95 for the month April and May."  Do you

25      see that?
```

Page 92

```
 1          A       Yes.

 2          Q       Did I read that correctly?

 3          A       Yes.

 4          Q       And then it says, "After the

 5   membership deduction, your monthly net pay will be

 6   $9,847.95 starting in June 1, 2015."  Did I read that

 7   correctly?

 8          A       Yes.

 9          Q       Okay.  And this was sent on

10   March 30, 2015; right?

11          A       Yes.

12          Q       So as of the date of this e-mail,

13   Paula Thomas was employed with Thomas Wylde; correct?

14          A       Yes.

15          Q       Now, if my memory of the charts are

16   correct and Paula Thomas did not receive any money in

17   May, June, and July 2015 and never again, what does it

18   indicate to you?

19          MR. PEDDIE:  Objection, calls for speculation.

20   It calls for a legal opinion.

21   BY MR. BILLER:

22          Q       You can answer.

23          A       I don't remember, but I -- at that time

24   I believe it was on hold.  I was waiting for an advice.

25          Q       Did you ever get advice?
```

Page 93

1          A       After -- I can't remember the time, but

2     after a while I was advised that she's no longer with

3     the company.

4          Q       And how long did it take them to inform

5     you of that fact?

6          A       I can't remember.

7          Q       Did they tell you when she was no longer

8     employed?

9          A       I believe there's a document for that.

10    I don't remember.

11         Q       No.  I'm asking for your personal

12    knowledge.

13         A       I don't remember.

14         Q       Okay.  Who is Natalie?

15         A       Natalie?

16         Q       Do you know a woman named Natalie?

17         A       There are two Natalies.

18         Q       Which one do you know?

19         A       There's Natalie in production and then a

20    Natalie in sales.

21         Q       How long did Natalie work -- Natalie in

22    sales, how long did she work at TW?

23         A       I don't remember.  I'm not sure

24    if -- probably less than a year.

25         Q       Okay.  And did Jene Park or John Hanna

Page 94

```
 1    or David Schnider tell you not to let Natalie know that

 2    Paula Thomas is no longer working there?

 3           A      No.

 4           MR. BILLER:  Let's go ahead and mark the next

 5    document in order Exhibit 72.

 6                  (Exhibit 72 was marked for

 7                  identification by the Certified Shorthand

 8                  Reporter and is attached hereto.)

 9    BY MR. BILLER:

10           Q      You see Exhibit Number 72?

11           A      Yes.

12           Q      That's a "THIRD AMENDED EXHIBIT B";

13    correct?

14           A      Yes, it says here.

15           Q      And it states, "MEMBERS AND CAPITAL

16    CONTRIBUTIONS November 15, 2015."  Right?

17           A      Yes.

18           Q      Who created this document??

19           A      David Schnider, I believe.

20           Q      Okay.  Where did he get the number

21    "9,000,013" at the bottom for "Hillshore Investments"?

22           MR. PEDDIE:  9,513,000?

23           MR. BILLER:  9,000,013.

24           MR. PEDDIE:  It says 9,005,513.

25           MR. BILLER:  No, it doesn't.
```

Page 95

1          THE WITNESS:  This one (indicating).

2          MR. PEDDIE:  Oh, I'm sorry.  I apologize.

3   BY MR. BILLER:

4          Q     Do you know where he got that number,

5   where that number came from?

6          A     I can't remember.  I can't remember.

7          Q     Do you remember Hillshore investing

8   $9,000,013 as of November 15, 2015?

9          A     I don't remember.

10         Q     Okay.

11         A     It looks like a total of these two.

12         Q     And it shows 3200 units; right?

13         A     33 here.

14         MR. PEDDIE:  3390

15         MR. BILLER:  I'm sorry, 3390.  Sorry, that was

16   my mistake.

17   BY MR. BILLER:

18         Q     And that was his ownership interest in

19   the company; right?

20         A     Yes.

21         Q     In 2015?

22         A     Yes.

23         Q     Okay.  Can you determine what the

24   percentage of the company he owned at that time?

25         A     I think approximately over 90.

Page 96

```
 1            Q      Over 90.  Now, I'm going back to
 2    Exhibit 65 and ask you whether Exhibit 65, without any
 3    entries in 2015, is consistent with 72 where there is a
 4    capital account balance of $9,000,013 for Hillshore.
 5    Are those two documents consistent?
 6            MR. PEDDIE:  Objection, lacks foundation;
 7    assumes facts.
 8            THE WITNESS:  In numbers.  But again, there
 9    could be other account that supports this.
10    BY MR. BILLER:
11            Q      I understand.  But in purely numbers,
12    are they consistent?
13            A      Again, not in numbers.
14            Q      So can you explain the inconsistencies?
15            A      It could be on another account.
16            Q      I want to know if you have personal
17    knowledge of any facts that explain the
18    inconsistencies?
19            A      It could be in QuickBooks.  I don't
20    remember, but if it's in QuickBooks it would generate
21    the account.
22            Q      Okay.  I don't want you to think where
23    the inconsistency can be found.  I want to know if you
24    have any personal knowledge of any facts that you know
25    about that can explain the inconsistency?
```

Page 97

```
 1          A       Not that I know of.

 2          Q       Okay.  Now, this Document 72 is supposed

 3     to reflect, as of the date this document is generated,

 4     Hillshore made a capital contribution of $9,000,013;

 5     correct?

 6          A       Yes.

 7          Q       The money was actually in Thomas Wylde;

 8     correct?

 9          A       Yes.

10          MR. PEDDIE:  Objection, vague.

11     BY MR. BILLER:

12          Q       Let's discuss the next document in

13     order.

14                  (Exhibit 73 was marked for

15                  identification by the Certified Shorthand

16                  Reporter and is attached hereto.)

17     BY MR. BILLER:

18          Q       Are you familiar with Exhibit 73?

19          A       Yes.

20          Q       I'm sorry?

21          A       Yes.

22          Q       Were you involved in any way preparing

23     any materials that were sent to the accountant who

24     prepared the 2015 tax return?

25          A       I don't believe so.  If they filed for
```

Page 98

1    an extension, I'm not there anymore.

2         Q      Have you participated in that process

3    before at Thomas Wylde?

4         A      2015, yes.

5         Q      Tell me what you did.

6         A      Sent her the financial statements for

7    tax return, the CPA.  And she prepared the --

8         Q      When you say financial statements, what

9    is included in that?

10        A      Profit and loss; balance sheet.

11        Q      Okay.  Can you explain why the financial

12   statements profit and loss and balance sheet are not

13   attached to this tax return?

14        A      I can't, but profit and loss is

15   indicated in this the schedules here in the balance

16   sheet as well.

17        Q      Okay.  Now Exhibit 73, that relates

18   to -- that relates to the tax year ending on 12/2015;

19   right?  Do you see that?

20        A      Yes.

21        Q      Now, Exhibit 72 indicates there was an

22   investment by Hillshore of $9 million by

23   November 15, 2015; right?

24        A      Yes.

25        Q      Okay.  And the ordinary business income

Page 99

1    loss for Thomas Wylde that year 2015 was $4.6 million;

2    right?

3           A     Yes.   That's what it states here.

4           Q     The difference between $4.6 million and

5    $9 million is approximately 4.4 million; right?

6           MR. PEDDIE:   Objection, calls for speculation

7    and calls for a legal opinion.

8           THE WITNESS:   Mathematically, yes.   But it is

9    not the result of this versus minus this (indicating).

10   BY MR. BILLER:

11          Q     We're going through it.   We'll get

12   there.   We'll get there.   Ordinary business income on

13   line 22 on the 1065 form.

14          A     Line 22?

15          Q     Do you see that?

16          A     Yes.

17          Q     Okay.   It's 4,613,388.83; right?

18          A     Yes.

19          Q     It was operating at a loss that year

20   2015; right?

21          A     Yes.

22          Q     Please find for me in this document

23   where it states that Hillshore made an investment.

24          The document doesn't show

25   Hillshore Investments made any investment in

Page 100

1     Thomas Wylde for 2015; right?

2            MR. PEDDIE:  Objection, misstates the

3     truth -- the facts.

4     BY MR. BILLER:

5            Q     Does the document show that?

6            A     It's not on the balance sheet.  But if

7     you see analysis of partners capital accounts, there's

8     capital cash of 7 million 500 in there.  There should

9     be a breakdown of that.

10           Q     But that doesn't indicate it was made in

11    2015, does it?

12           A     Sorry?

13           Q     That doesn't indicate it was made in

14    2015.

15           A     No.  It's a carry over.  A balance

16    sheet account is cumulative.

17           Q     Okay.  So we're talking about -- it says

18    on Schedule B-1 Hillshore owns 100 percent of

19    Thomas Wylde; right?

20           A     Which page?

21           Q     B-1.

22           A     Okay.  Give me one second.

23           Q     Okay.  Did you find it?

24           A     Not yet.

25           Q     "Information on Partners Owning 50% or

Page 101

```
 1    More of the Partnership."

 2              MR. PEDDIE:  It may be 20 pages in, or 15.

 3              MR. BILLER:  I hate tax returns.

 4              THE WITNESS:  Give me one second.  I'm actually

 5    on the K already.

 6              MR. PEDDIE:  It's before that.  It's right

 7    after 1125-A.

 8              MR. BILLER:  This is where I got the number of

 9    160,000 for legal fees.  It's on the tax return.

10              MR. PEDDIE:  I would love that if that were

11    true.

12    BY MR. BILLER:

13         Q    You want to just look at mine?

14         A    Yes, please.

15         Q    You see it shows hundred percent

16    ownership by Hillshore Investments?

17         A    Yes.

18         Q    Okay.  What does that mean to you?

19              MR. PEDDIE:  Objection, calls for speculation.

20              THE WITNESS:  That it's a hundred percent

21    owned.

22              MR. BILLER:  Okay.

23    BY MR. BILLER:

24         Q    And on the next three or four pages, it

25    identifies others who have an ownership interest in the
```

Page 102

1   company and it identifies a percentage of ownership.

2   So if that were the case, how it could it be a hundred

3   percent?

4        A        I don't know.

5        Q        Isn't that inconsistent?

6        A        I could probably ask the CPA how it's

7   presented.

8        Q        I'm going to.

9        A        I don't know.

10       Q        Now, where do you say Hillshore's -- the

11   amount of money Hillshore invested in TW is indicated

12   on that Exhibit 73?

13       A        As I was saying, it's probably here in

14   the Analysis of Partners' Capital Accounts.

15       Q        What page?

16       A        Page 5 of this.

17       Q        Okay.  That's good.  What line number?

18       A        Line Number 2 on Schedule M-2.

19       Q        Line Number 2 Attach Form 1125-A, is

20   that what you're looking at?

21       A        No.  I'm looking at this one

22   (indicating).

23       Q        I'm not on the right page.  "Analysis of

24   Partners' Capital Accounts."  Okay.

25       A        Yes.

Page 103

1        Q       Balance at the beginning of the year

2    "-181,359."  Do you see that?

3        A       Yes.

4        Q       Capital contribution cash "7,504,813."

5    Do you see that?

6        A       Yes.

7        Q       Net income per books, "-4,651,971."  Do

8    you see that?

9        A       Yes.

10       Q       It doesn't indicate here whether the

11   $7,504,813 is only the capital contribution of

12   Hillshore Inc., does it?

13       A       No.

14       Q       This is a capital contribution of

15   everybody?

16       A       Yes.

17       Q       And this is a capital contribution from

18   2014 and 2015 or just 2015?

19       A       It's accumulated over the years.

20       Q       So as of December 31, 2015, there was

21   only $7,504,813 identified as capital contribution for

22   Thomas Wylde?

23       A       Yes.

24       Q       That figure is inconsistent with

25   Exhibit 72 wherein it states Hillshore Investments made

Page 104

1    a $9,000,013 capital contribution for 3390 units;

2    right?

3            MR. PEDDIE:  Objection, calls for a legal

4    conclusion.

5    BY MR. BILLER:

6        Q       Right?

7        A       Yes.

8        Q       Okay.  Both those documents -- both

9    those documents are inconsistent with the information

10   on Exhibit 65; right?

11           MR. PEDDIE:  Objection, calls for a legal

12   conclusion; assumes facts.

13           THE WITNESS:  The numbers, yes.

14   BY MR. BILLER:

15       Q       The numbers are inconsistent on all

16   three documents; correct?

17       A       They don't tie up.

18       Q       They don't tie up; right?

19       A       (Inaudible response.)

20       Q       Is that right?

21       A       Yes.

22       Q       Can you explain why you have three

23   different numbers for capital contributions by

24   Hillshore Investments in 2015; zero, short of 9

25   million, and 9 million?

Page 105

1          A       I can't.

2          Q       If you want to determine why you have

3     three inconsistent numbers coming from tax returns,

4     members and capital contributions Third Amended

5     Exhibit B and the QuickBooks analysis or QuickBooks

6     data on Exhibit Number 65, how would you do that?

7          A       You have to look at the other accounts

8     in balance sheet.  It could be in other account, and

9     then you have to ask the tax CPA how she classified

10    those accounts in presenting the tax return.  I'm not a

11    tax person.

12         Q       You have to have all the backup; right?

13         MR. BILLER:  What are you pointing the witness

14    at?

15         MR. PEDDIE:  I'm just showing her your exhibit.

16         MR. BILLER:  No.  You pointed to a page on my

17    exhibit.

18         MR. PEDDIE:  On your exhibit, that's right.

19         MR. BILLER:  And you looked at her, and you

20    wanted her to read it.

21         MR. PEDDIE:  Yes.

22         MR. BILLER:  That's not proper, Counsel.

23         MR. PEDDIE:  Why not?

24         MR. BILLER:  Because that's interfering with my

25    examination, and you're trying to coach the witness.

                                        Page 106

```
 1              MR. PEDDIE:  Will I have a chance to ask some
 2      questions.
 3              MR. BILLER:  Of course you will.  So why don't
 4      you stop interfering with my --
 5              MR. PEDDIE:  I'm not interfering with anything.
 6              MR. BILLER:  Of course you are.
 7              MR. PEDDIE:  This is your exhibit.
 8              MR. BILLER:  It doesn't matter if it's my
 9      exhibit.
10              MR. PEDDIE:  You're asking her about
11      documents and --
12              MR. BILLER:  You're interfering with my depo.
13      Do you got it?
14              MR. PEDDIE:  I'm just showing her the
15      document.
16              MR. BILLER:  You're not showing -- you're
17      showing her a page within the document.
18              MR. PEDDIE:  Dimitrios --
19              MR. BILLER:  Don't do it again.
20              MR. PEDDIE:  Dimitrios, you have the
21      commitment --
22              MR. BILLER:  Don't do it again.
23              MR. PEDDIE:  You have a commitment to
24      contribute $1.5 million in 2016.
25              MR. BILLER:  So what.  Are you testifying now?
```

Page 107

1          MR. PEDDIE:  No.

2          MR. BILLER:  Take his oath.

3          Take your oath.

4          MR. PEDDIE:  No.

5          MR. BILLER:  I'm going to get your deposition,

6     buddy.

7          Take his oath.

8          MR. PEDDIE:  You're not getting my deposition.

9     Listen --

10         MR. BILLER:  Don't talk to me.  I'm doing an

11    examination.

12         MR. PEDDIE:  You need to demonstrate a little

13    bit of sophistication.  Let the record reflect that

14    Counsel is screaming.

15         MR. BILLER:  And let the record reflect that

16    Counsel is a thief and cheater and liar, somebody who

17    conceals evidence, somebody who may have destroyed

18    evidence, somebody who would put his name on legal

19    documents intentionally lying to opposing counsel and

20    the court.

21         And we'll see how you're going to get out the

22    bankruptcy when you signed your own name to those

23    claims, not the claimants.  You're going to be called

24    on the stand.  Do you understand that?

25         MR. PEDDIE:  No, I don't think I will.

Page 108

1          MR. BILLER:  You signed those under penalty of

2    perjury and that you had personal knowledge.

3          MR. PEDDIE:  Calm down, Mr. Biller.  You need

4    to read your own documents.

5          MR. BILLER:  Excuse me.

6    BY MR. BILLER:

7          Q     In order to figure all this out, you

8    have to do an audit; right?

9          MR. PEDDIE:  Objection, calls for a legal

10   opinion.

11         THE WITNESS:  A review or an audit.

12   BY MR. BILLER:

13         Q     What is the difference between a review

14   and an audit?

15         A     Well, a review is not as thorough as an

16   audit.

17         Q     Of course not.  A review doesn't look at

18   the backup material; right?

19         A     They do sometimes.

20         Q     They don't most of the time; correct?

21   They just look at the QuickBooks; right?

22         A     They ask for backup.

23         Q     Do they look for all the backup?

24         A     Not all of it.

25         Q     But an audit looks at all the backup

Page 109

```
 1    material to make sure that the data going into

 2    QuickBooks is consistent with the backup; right?

 3              MR. PEDDIE:  Objection, assumes facts; calls

 4    for a legal opinion.

 5              THE WITNESS:  Yes.  Whatever they want

 6    to --

 7              MR. PEDDIE:  Calls for an expert opinion.

 8    BY MR. BILLER:

 9         Q     And then once you check if the data in

10    QuickBooks is proper and accurate, then you can do an

11    analysis of QuickBooks to try and find why there was an

12    inconsistency; correct?

13              MR. PEDDIE:  Objection, calls for a legal

14    opinion; calls for an expert opinion; calls for

15    speculation.

16              THE WITNESS:  Yes.

17    BY MR. BILLER:

18         Q     Okay.  Why do you think Counsel was

19    showing you a particular page?

20              MR. PEDDIE:  Will you allow her to look at the

21    page?

22    BY MR. BILLER:

23         Q     Why do you think Counsel -- when he

24    showed you a page from one of my exhibits, what did you

25    think at that moment?
```

Page 110

1      A      He's just pointing out the number, the

2  amount.

3      Q      What did you think?

4      A      Just pointing out the number.

5      Q      And what did you -- do you know why he

6  was pointing out the number?

7      A      Probably to strike a recollection.

8      Q      So he's trying to force you to recall

9  some information?

10     MR. PEDDIE:  Objection, mischaracterizes what

11 she's --

12     THE WITNESS:  I wouldn't say force.

13 BY MR. BILLER:

14     Q      He was asking you to recall some

15 information; right?

16     A      Just pointing out a number in there.

17     Q      And that was to recall information;

18 right?  Do you know what information he was trying to

19 get you to recall?

20     A      It's the same schedule that you have

21 given.  It's the same number that I have.

22     Q      What do you mean it's the same number?

23     A      It's on the document that we both have.

24     Q      What is?

25     A      The amount.

Page 111

```
 1              Q       And what's the date of that document?

 2              A       It's 16.

 3              Q       I'm sorry?

 4              A       2016, 1/1/16.

 5              Q       I'm talking about 2015.  So what is that

 6     relevant to 2015?

 7              A       I don't know.

 8              Q       It's not relevant, is it?

 9              A       I don't know.

10              Q       There is no relevance to any information

11     on 2016 as related to 2015; right?

12              A       I don't know.

13              Q       You don't know because you don't know

14     what he was trying to tell you; right?

15              A       Yes.

16              Q       He was interfering with your testimony,

17     wasn't he?

18              A       I don't know his intention.

19              Q       But did it interfere with your

20     testimony?

21              A       Not really.  I was looking at both

22     documents.

23              Q       Were you distracted while I was giving

24     you questions?

25              A       Just a little bit.
```

Page 112

```
 1        Q       So he was -- he distracted you when I

 2   gave -- when I was in the middle of formulating and

 3   asking you questions; correct?

 4        A       I wouldn't really say distracted.   I

 5   just glanced --

 6        Q       You just said he was.

 7        A       I was glancing through it.

 8        Q       Which is it, you weren't distracted or

 9   you were distracted; because you gave two different

10   answers?

11        A       I said I wasn't really distracted.

12        Q       That's now a third, actually.   A third

13   answer.

14        MR. PEDDIE:  Objection, argumentative.

15   BY MR. BILLER:

16        Q       Let's start all over.   When opposing

17   counsel inappropriately showed you

18        MR. PEDDIE:  Objection --

19   BY MR. BILLER:

20        Q       -- a document before to try to refresh

21   your recollection, were you distracted?

22        MR. PEDDIE:  Objection, argumentative;

23   mischaracterizes.

24        THE WITNESS:  A bit, yes.

25        MR. BILLER:  Thank you.
```

                                          Page 113

```
 1    BY MR. BILLER:

 2          Q      Let's talk about John Hanna.  You've

 3    known him for five years; right?

 4          A      No, longer.

 5          Q      How long have you known him?

 6          A      About 13 years?

 7          Q      13 years?

 8          A      2003.

 9          Q      Yeah.  How did you meet him?

10          A      He hired me.

11          Q      And did you have a personal

12    relationship?

13          A      No.

14          Q      Did you ever have dinner with him

15    outside of work?

16          A      No.  With -- only on meetings.  Not

17    dinner, a meeting.

18          Q      All right.  And were you always

19    financial controller?

20          A      Sorry?

21          Q      Were you always a financial controller

22    with him?

23          A      Yes.

24          Q      And he was your supervisor?

25          A      He's my boss, yes, CEO.
```

Page 114

| 1  | Q | And where does he work now? |
|----|---|---|
| 2  | A | Thale Blanc. |
| 3  | Q | I'm sorry? |
| 4  | A | Thale, T-h-a-l-e, one word. |
| 5  | Q | Where? |
| 6  | A | In Melrose Place. |
| 7  | Q | Melrose Place.  Okay.  And what is his |
| 8  |   | position? |
| 9  | A | CEO. |
| 10 | Q | And how long has he been working there? |
| 11 | A | Just recently. |
| 12 | Q | When did he start, do you know? |
| 13 | A | I don't -- I believe maybe late July. |
| 14 | Q | Okay.  And what's his position? |
| 15 | A | CEO. |
| 16 | Q | And what kind of business is that? |
| 17 | A | It's a fashion company as well. |
| 18 |   | Wholesale and retail purses. |
| 19 | Q | How many people work for that company? |
| 20 | A | Three or four at the time that he |
| 21 |   | joined. |
| 22 | Q | Okay.  Where is that company located? |
| 23 | A | Melrose Place. |
| 24 | Q | Address? |
| 25 | A | 8481. |

Page 115

1        Q        8481?

2        A        8481 Melrose Place, L.A., California

3    90069.

4        Q        Do you have his telephone number?

5        A        His cell phone, yes.

6        Q        Can you give it to us, please?

7        THE WITNESS:  Am I allowed to do that?

8        MR. BILLER:  Yes.

9        MR. PEDDIE:  Did the other one not work?  You

10   have it?

11       THE WITNESS:  Yes.  310-770-3741.

12       MR. BILLER:  Okay.

13   BY MR. BILLER:

14       Q        And you're working with him currently?

15       A        Yes.

16       Q        I thought you were working at a trucking

17   company.  No?

18       A        No.  Where did you get that?

19       MR. PEDDIE:  Same place he gets everything

20   else.

21       MR. BILLER:  My assistant told me that.

22       THE WITNESS:  I have another client that I'm

23   working with.  It's an apparel company.

24       MR. BILLER:  Okay.

25   ///

Page 116

```
 1    BY MR. BILLER:

 2         Q    So how many days a week do you work with

 3    John Hanna?

 4         A    How many?

 5         Q    Days do you work with John Hanna per

 6    week?

 7         A    Two to three days.

 8         Q    Okay.  I only have one copy of this

 9    document, unfortunately.  I'll give it to you because I

10    think it's more important for you to have it because

11    I'll be asking you about it.  I'll be asking you

12    questions; okay?

13         A    Okay.

14         MR. BILLER:  Let's have the next document

15    marked.

16              (Exhibit 74 was marked for

17              identification by the Certified Shorthand

18              Reporter and is attached hereto.)

19    BY MR. BILLER:

20         Q    I want you to flip through 74 and let me

21    know when you become familiar with it.

22         MR. BILLER:  Let's go off the record.

23              (Break taken:  11:14 a.m. - 11:19 a.m.)

24    BY MR. BILLER:

25         Q    Are you ready?
```

Page 117

1        A        Yes.

2        Q        Can you please show me where in

3    Exhibit Number 74 it indicates the investments

4    Thomas Wylde received in 2014?

5            MR. PEDDIE:  I'm going to object to this entire

6    line of questioning in that it asks this witness to be

7    an expert on finding things in a U.S. tax return and

8    also on relevance.

9    BY MR. BILLER:

10       Q        Did you find something?

11       A        Well, I would go against this schedule,

12   Schedule M-2?

13       Q        And what does it state?

14       A        Capital contributed 700.

15       Q        700?  Is that $700 or $7 million?

16       A        It says $700 here.

17       Q        $700.  So the 2014 tax return for

18   Thomas Wylde indicates that there was a capital

19   contribution of $700 in total; correct?

20       A        Yes.

21       Q        Okay.  It doesn't show 2.3 million?

22       A        It could be in the other liabilities

23   here.

24       Q        I'm not asking where it could be.  I'm

25   asking where it should be.  Is it in the partners

Page 118

1    analysis contribution portion of the tax return?

2          MR. PEDDIE:  Objection, calls for an expert

3    opinion.  It's a continuation of the quiz.  This

4    witness is not an expert on U.S. tax return.

5    BY MR. BILLER:

6          Q     Does it show in that section you're

7    looking at any contribution larger than $700?

8          A     It does not on this schedule.

9          Q     Do you do your own taxes?

10         A     I do.

11         Q     So you're familiar with filling out tax

12   returns in the State of California and for the federal

13   government?

14         A     Individual yes, not corporate.

15         Q     This is not a corporation, is it?

16         A     This is an LLC.

17         Q     It's not a corporation, though; right?

18   There's a difference between a corporation and an LLC;

19   right?

20         A     Yes.

21         Q     An LLC is not as complicated as a

22   corporation; right?

23         MR. PEDDIE:  Objection, calls for --

24         THE WITNESS:  But it's extensive.

25   ///

Page 119

```
 1    BY MR. BILLER:

 2         Q      Are you saying you can't read a tax

 3    return?  Is that what you're saying?

 4         A      I could but this is -- as I said, it's a

 5    tax return for an entity.

 6         Q      I understand.  But you can read it;

 7    right?

 8         A      Yes.

 9         Q      Okay.  So can you explain why there are

10    no -- there's only $700 in capital contribution into

11    Thomas Wylde for 2014?

12         MR. PEDDIE:  Objection, calls for an expert

13    opinion.

14         THE WITNESS:  I can't.  As I said, it could be

15    in the liabilities and not reclassed yet.

16         MR. BILLER:  Okay.

17    BY MR. BILLER:

18         Q      Do you see any amount in liabilities for

19    3.2 million?

20         A      Not that exact figure.

21         Q      That adds up to that figure?

22         A      More than that.  It's 4.3 here.

23         Q      In liabilities?

24         A      In other liabilities, and there is a

25    statement that pertains to that schedule.
```

Page 120

```
 1        Q       And what's that statement?

 2        A       Statement 7.

 3        Q       Can I look behind you?

 4        MR. PEDDIE:  Yeah, come on over.  I think you

 5   may have flown past the statements.  What's this here?

 6        THE WITNESS:  It's Form 1065.

 7        MR. PEDDIE:  These are California statements?

 8        THE WITNESS:  Yeah.

 9        MR. PEDDIE:  Well, go back in May.

10        THE WITNESS:  Schedule L, notes payable

11   long-term.

12   BY MR. BILLER:

13        Q       What do you see?

14        A       Notes payable long-term.

15        Q       What does that mean?

16        A       It's in the notes payable, the

17   4,000,300.

18        Q       What does that indicate to you?

19        A       It's in the liability account.  It's

20   not -- it's not in the capital account.

21        Q       If there were any loans made to the

22   company, would that be included in the tax returns?

23        A       On the schedule.

24        Q       On the schedules?

25        A       Yes.
```

Page 121

1          Q        Can you please find if any loans were

2     made to the company?

3          A        On the schedule here, not necessarily

4     the schedule itself.

5          Q        So is there any information in the U.S.

6     tax return that will indicate that

7     Hillshore Investments received a loan in 2014?

8          A        I don't believe so.

9          MR. PEDDIE:  Objection, it's calling for her to

10    go through an entire tax return that she did not

11    prepare.

12         MR. BILLER:  That's not an objection.  That's a

13    speaking statement.

14         MR. PEDDIE:  Can you give her time to go

15    through it, then?

16         MR. BILLER:  Of course I can.  I'll give her

17    all the time she needs.

18         MR. PEDDIE:  All right.

19         THE WITNESS:  I don't believe it's here.  It's

20    a schedule that's given to the tax CPA to classify that

21    as such.

22         MR. BILLER:  Okay.

23    BY MR. BILLER:

24         Q        But wouldn't it be noted in the tax

25    return?

Page 122

```
 1         A      It's here.  It's on the statement 7 and

 2   schedule but not the actual detail, if you're asking

 3   for that.

 4         Q      There's $4 million looking on the

 5   schedule and the other page; right?

 6         A      Yes.

 7         Q      You don't know if that's loans, do you?

 8         A      It's classified as notes payable.

 9         Q      Is that a loan?

10         A      Yes.  A notes payable is a loan.

11         Q      Okay.  So when did -- how many loans did

12   Hillshore -- Thomas Wylde have?

13         A      I don't remember.

14         Q      Okay.  Now, to determine the loans for

15   that document, you would have to go back to QuickBooks

16   and the backup; right?

17         A      Yes.

18         Q      So what type of backup would you need to

19   look at or find to confirm there were loans in that

20   amount?

21         A      Promissory note.

22         Q      That's it?

23         A      Yes.

24         Q      How about money coming in representing

25   the loan?
```

Page 123

1          A       Yes.   Money coming into the bank

2     supported by the notes payable, the promissory note.

3          Q       Okay.   And so when a loan is to be

4     converted in equity, that would have an impact on the

5     tax return information; right?

6          A       Yes.

7          Q       You would have more equity than $700;

8     correct?

9          A       Yes.

10         MR. PEDDIE:   Objection, it's calling for an

11    expert opinion.

12    BY MR. BILLER:

13         Q       And 2014 tax return is prepared sometime

14    in 2015; right?

15         A       Yes.

16         Q       And when was this Exhibit 75 prepared?

17         A       75?

18         Q       No, 2014 tax return.

19         A       74.

20         Q       74, thank you.   When was it prepared?

21         A       I don't remember.   September 10, 2015.

22         Q       September 10, 2015.   So if any loans in

23    2014 were converted to equity in 2014, should it be

24    reflected as a loan or equity?

25         A       Say that again.

Page 124

```
 1          Q        When conversion of a loan takes place in

 2   2015 -- you know, before January 1, 2016, and when a

 3   loan is converted to equity before 2015 in 2014, how

 4   should it be described in the tax return; as a loan or

 5   equity?

 6          A        It would have been classified as an

 7   equity.

 8          Q        Thank you.  Who is identified as the

 9   partner in that tax return for 2014?

10          A        There's Hillshore.

11          Q        And how much capital contribution did it

12   make?

13          A        I'm only showing the profit sharing in

14   his K-1.  I'm only showing the profit sharing and loss

15   sharing in K-1.

16          Q        You're only showing losses?

17          A        No.  The percentage of profit sharing

18   and loss sharing and the losses.  I can't seem to find

19   the investment in here.

20          Q        Why not?

21          A        I don't know where to look here.

22          Q        Can I see that real quick, Exhibit 74.

23   The reason you can't find it is because it's all blank.

24   This is highly unusual.  It states here under

25   Hillshore Investments profit sharing to be 45 percent;
```

Page 125

1    correct?

2            A       Yes.

3            Q       Okay.  So that means Hillshore has 45

4    percent interest in Thomas Wylde; correct?

5            A       The profit sharing.

6            Q       Profit sharing?

7            A       Yes.

8            Q       But isn't profit sharing equal to its

9    investment interest?

10           A       I can't tell from that.

11           Q       Okay.  All right.

12           A       I think you have to ask the tax CPA how

13   they determined that.

14           Q       And this loss sharing 100 percent, do

15   you see that?

16           A       Yes.

17           Q       You saw that; right?

18           A       Yes.

19           Q       And then there is ownership of capital

20   45 percent; right?

21           A       Yes.

22           Q       Okay.  And ownership of capital, that is

23   a percentage of equity owned; correct?

24           A       I believe so.

25           MR. PEDDIE:  Objection, calls for --

Page 126

```
 1    BY MR. BILLER:

 2         Q      Say that again.

 3         A      I believe so.

 4         Q      This Exhibit 74 is a tax return for

 5    Thomas Wylde for 2014, and it shows that in 2014 it had

 6    a 45 percent equity -- ownership of capital of 45

 7    percent; correct?

 8         A      Yes.

 9         Q      Okay.  That information is completely

10    inconsistent with Exhibit 65 that shows $2.3 million

11    loan conversion to equity into Thomas Wylde; correct?

12         MR. PEDDIE:  Objection, calls for a legal

13    opinion and an expert opinion.

14         THE WITNESS:  In numbers, yes.

15         MR. BILLER:  Thank you.  Let's take a break.

16              (Break taken:  11:32 a.m. - 11:37 a.m.)

17    BY MR. BILLER:

18         Q      Would you please find, if there is any,

19    information in Exhibit 74 that relates to loans made to

20    Thomas Wylde in 2014?

21         A      The line that I showed you earlier, the

22    one that says "Notes Payable" on it.

23         Q      Does it indicate how much?

24         A      4,300,000.

25         Q      4,300,000?
```

Page 127

```
 1           A       Yes.

 2           Q       But it doesn't indicate where that money

 3    came from?

 4           A       Not specifically.

 5           Q       Would the QuickBooks note that?

 6           A       Yes.

 7           MR. BILLER:  Okay.  Let's go ahead and mark the

 8    next document in order.

 9                   (Exhibit 75 was marked for

10                   identification by the Certified Shorthand

11                   Reporter and is attached hereto.)

12    BY MR. BILLER:

13           Q       Do you know what Exhibit 75 is?

14           A       Yes.

15           Q       What is it?

16           A       It's an account schedule for advance to

17    PDTW LLC.

18           Q       And is this an indication of monies

19    going to PDTW?

20           A       Not necessarily.  It looks like it's

21    payments on behalf.  Payments made by Thomas Wylde on

22    behalf of PDTW.

23           Q       Now, is there a calculation at the

24    bottom at the end of September 2015?

25           MR. PEDDIE:  Dimitrios, I'm going to object on
```

Page 128

1     the grounds of relevance, this entire line of

2     questioning.  It seems to be more about the bankruptcy

3     proceedings.

4              MR. BILLER:  Please.

5              MR. PEDDIE:  Just give me a standing objection,

6     and we'll be done with it.

7              MR. BILLER:  Yeah.

8              MR. PEDDIE:  Do you give me that?  Do you?

9              MR. BILLER:  Yes.  State your objection.

10    That's fine.

11    BY MR. BILLER:

12         Q     Do you see that bottom line entry

13    4,425,996.71?  Do you see that?

14         A     Yes.

15         Q     That's dated September 15, 2015.  And

16    this document starts on September 2, 2015 -- no,

17    September 2, 2014, I'm sorry.

18         A     Yes.

19         Q     So what is all the information dated

20    from September 2, 2014, to December 15, 2015, indicate

21    to you?

22         A     These, I believe, are liabilities.

23         Q     Where did you see the negative?

24         A     It doesn't say negative in it.

25         Q     But you believe this is liabilities.

Page 129

1          A       These are payments to this these

2     vendors.

3          Q       Okay.  So this document indicates that

4     $4,425,996.71 was paid to vendors?

5          A       Yes, I believe so.

6          Q       And the bottom beneath that it shows

7     advance from PDTW for a total amount of 88,300?

8          A       Yes.

9          Q       What does the advance mean?  Is that

10    money PDTW was paying out?

11         A       Some transaction looks like a fund

12    transfer from PDTW account to TW, and some looks like a

13    collection from customers for invoices -- customers'

14    invoices related to PDTW.

15         Q       I want you to compare the number

16    4,425,996.71 to the information on the 2014 tax return,

17    which is Exhibit 74.  You have it in front of you.

18         A       How do you want me to compare?

19         Q       I'll tell you.  Did Thomas while operate

20    on a fiscal year or calendar year?

21         A       Calendar year.

22         Q       Actually, it's this one.  It's 73.  I

23    want you to look at.  If Exhibit 75 indicates a loss

24    for Thomas Wylde in 2015, a magnitude of 4,425,000,

25    shouldn't that be reflected in the tax return?

Page 130

1       A       Say that again.

2       Q       If Exhibit Number 75 shows a loss of at

3  least $4,425,000 --

4       MR. PEDDIE:  Objection, mischaracterizes the

5  exhibit.

6       MR. BILLER:  Can I finish my question?  Can I

7  finish my question?

8       MR. PEDDIE:  You may finish your question.

9       MR. BILLER:  Thank you.

10  BY MR. BILLER:

11      Q       If Exhibit Number 75 indicates at least

12  a $4 million loss for 2015 related to Thomas Wylde,

13  that would be consistent with the $4,538,000 entry made

14  on line 19 on the 1065 form.

15      MR. PEDDIE:  Objection, mischaracterizes the

16  exhibit and calls for an expert opinion.

17      THE WITNESS:  Line 19 is employee benefits

18  programs.

19  BY MR. BILLER:

20      Q       Line 20, I'm sorry.

21      A       And Exhibit 75 is a balance sheet

22  account.  It's a liability account.  It's not an

23  operating loss account.  So this is like an advance to

24  advance from account, which is PDTW and TW owing each

25  other.

Page 131

1         Q       So that's what 75 reflects?

2         A       Yes.

3             MR. PEDDIE:   I'm okay with this exhibit being

4     used.   But obviously she can't authenticate it, so I

5     object to it.

6     BY MR. BILLER:

7         Q       Are you familiar with any QuickBooks

8     accounts for samples?

9         A       Yes.

10        Q       What is that?

11        A       It's an expense account.

12        Q       And it's an expense account recognizing

13    the amount of money generated by Thomas Wylde or PDTW

14    selling samples; right?

15        A       No.   It's a sample cost, producing the

16    sample.

17        Q       Oh, producing the sample?

18        A       Yes.

19        Q       Is there anything in QuickBooks that

20    recognizes the money generated from the sale of

21    samples?

22        A       It should be on the -- it should be on

23    the income account.   It could be a sale account in

24    there on a revenue side.

25        Q       So it could be an entry that talks about

Page 132

```
 1    sample sales?

 2         A     Not -- maybe not specific.  Probably a

 3    generic account like sales.

 4         Q     Did you ever see QuickBooks accounts for

 5    PDTW?

 6         A     Briefly.

 7         Q     Now, this has always bothered me about

 8    this case.  Well, a lot of things have bothered me

 9    about it.  Here you have a business, PDTW, that shuts

10    down essentially.  It stops business operations in

11    2015, July 2015.  And a new company is formed in July

12    2015 called Thomas Wylde.

13         A     2014.

14         Q     2014 called Thomas Wylde.

15         A     And the reason that company is created

16    is to shield or protect the members and the owners from

17    any debt that is owed by PDTW.

18         MR. PEDDIE:  Objection, assumes facts.

19         MR. BILLER:  That's what Schnider testified to.

20    BY MR. BILLER:

21         Q     And it was essentially a new company to

22    protect itself from paying any of its creditors the

23    money it owed.  So shouldn't -- in normal

24    circumstances, shouldn't the QuickBooks data be

25    transferred to the Thomas Wylde data, QuickBooks?
```

Page 133

1   A  Thomas Wylde data transferred to?

2   Q  The PDTW QuickBooks data be transferred

3 to Thomas Wylde QuickBooks data.

4   A  No.  It's still a different company.

5   Q  So the company started new?

6   A  Yes.

7   Q  Okay.  Started with a clean slate?

8   A  Yes.

9   Q  Didn't owe any money?

10   A  Yes.

11   Q  And all the losses were left with PDTW;

12 right?

13   A  Whatever the transaction is left in

14 there.

15   Q  So if PDTW owned, you know, loans and

16 those weren't transferred to Thomas Wylde, Thomas Wylde

17 had no obligation to pay them; right?

18   MR. PEDDIE:  Objection, calls for a

19 hypothetical.  Calls for a legal opinion.

20   THE WITNESS:  It's not Thomas Wylde loans, yes.

21 BY MR. BILLER:

22   Q  Do you know how the Great Depression was

23 caused?  Do you know how the Great depression was

24 caused?

25   A  No.

Page 134

1        Q       Companies and corporations would set up

2   sister corporations and then put all the debt into

3   these sister corporations?

4        A       Okay.

5        Q       And the mother corporation only had the

6   revenue.  So all these companies -- mother companies

7   showed great profits and lots of revenue until one

8   company was discovered to have all the debt of a sister

9   company.  And that's what caused the Great Depression.

10  Did you know that?

11       A       No.

12       Q       You know there are laws against that now

13  to prevent that from happening?  Do you know that?

14       A       I'm not aware of it.

15       Q       Have you ever worked with the accounting

16  firm that prepared the tax returns?

17       A       Worked with?  Coordinate you mean?

18       Q       Yes.

19       A       Yes.

20       Q       Does the person who prepares the tax

21  return, does that person speak English?

22       A       Who are you talking about?

23       Q       Well, this letter is signed by

24  Hong Kim -- Kyu Hong Kim, do you know that entity?

25       A       No.  I know Alison, but I don't know

                                            Page 135

1    what -- it might be a Korean name.

2            Q      Is that the person you dealt with?

3            A      Yes.

4            Q      And what is her last name?

5            A      I can't remember.  Alison -- I believe

6    she's on this.  It could be Kim.  I'm not sure.  I

7    don't remember.

8            Q      Okay.  All right.  Let me just have a

9    one-minute break.

10                  (Break taken:  11:50 a.m. - 11:54 a.m.)

11   BY MR. BILLER:

12           Q      Now, we just finished talking about the

13   money or the debt that would not have been necessarily

14   transferred over but the clothes were.  Isn't that

15   right?

16           A      Excuse me?  Say that --

17           Q      Thomas Wylde simply took the assets of

18   PDTW and sold the clothes; right?

19           A      I believe that was the intention at that

20   time?

21           Q      So it left all the debt with PDTW, but

22   it --

23                  MR. PEDDIE:  Objection, calls for legal

24   opinion.

25   ///

Page 136

```
 1    BY MR. BILLER:
 2         Q       -- but it took the clothing and the name
 3    and the brand of the company and sold those; right?
 4              MR. PEDDIE:  Objection, calls for a legal
 5    opinion.
 6    BY MR. BILLER:
 7         Q       The clothes, it sold the clothes.
 8         A       There was a cut-off season.
 9         Q       But they still sold the clothes that
10    were --
11         A       After the -- when Thomas Wylde was
12    created, it started with its own season.
13         Q       But what did they do with the
14    clothes that Paula PDTW had already manufactured and
15    had on sale before July 22, 2014?  Did they throw it
16    away?
17         A       No.  It was invoiced under PDTW.  That's
18    why we have these advances.  So whatever collection is
19    in there it goes to this account, advances to advances
20    from.  And so when that happened, invoices pertaining
21    to PDTW stayed in PDTW books.
22         Q       So people works on the PDTW books?
23         A       Yes.
24         Q       And so those books should show what
25    property was sold; right?
```

Page 137

1          A       Yeah, it should.

2          Q       Okay.  Are you sure that the property

3     that was sold belonging to PDTW wasn't put on the books

4     for Thomas Wylde?

5          A       I'm not sure.  I can't remember.

6          Q       All right.  Now, were you in the meeting

7     where Jene Park and John Hanna were trying to find a

8     description for Paula Thomas's job?

9          MR. PEDDIE:  Objection, assumes facts.

10    BY MR. BILLER:

11         Q       Go ahead.  Answer.

12         A       Say that again.

13                 (The record was read by the Certified

14                 Shorthand Reporter.)

15         THE WITNESS:  I don't remember what particular

16    meeting, but there were meetings discussing certain

17    things.  Not the details, though.

18    BY MR. BILLER:

19         Q       Let's talk about the meetings that you

20    attended in which Paula Thomas was discussed.  How many

21    of those meetings did you have?

22         A       A few times, maybe two or three.

23         Q       And isn't it true that they did a Google

24    search for a creative director while Paula Thomas was

25    there?

Page 138

```
 1          A       I don't know.

 2          Q       You're not saying there was no meeting?

 3          A       I wasn't saying there was no such

 4   search, but I don't know.

 5          Q       All right.  I'll pass.

 6          MR. PEDDIE:  Okay.

 7

 8                              EXAMINATION

 9   BY MR. PEDDIE:

10          Q       Do you recall earlier when Mr. Biller

11   was talking about how the year end figure for capital

12   contributions for the year of 2015 --

13          A       Mr. Biller is him; right?

14          Q       Yes.

15          A       You called him "Dimitrios."

16          Q       Came to 7.5 million?

17          A       Say that again.

18          Q       We were looking at Thomas Wylde's 2015

19   tax return earlier.

20          A       Yes.

21          Q       And tell me if I'm mischaracterizing

22   this, but we came up with total contributions from

23   Hillshore of $7.5 million in that return.  Do you

24   recall that?

25          MR. BILLER:  Misstates facts not in evidence.
```

Page 139

1          THE WITNESS:  Yeah, I think it's 2015.

2    BY MR. PEDDIE:

3          Q      All right.  We do have several copies of

4    the 2015 return.  I refer you to the K1 of the 2015

5    return.  Can you find on that page of the return where

6    it lists Hillshore's capital contributions for that

7    year?

8          A      Yes.  It says capital contributed during

9    the year.

10         Q      And what is the figure given?

11         A      $7,500,013.

12         Q      And do you recall earlier when

13   Mr. Biller was trying to sort out with you how that

14   number ever became $9,000,013?

15         A      Yes.

16         MR. BILLER:  Misstates and mischaracterizes the

17   question and response.

18   BY MR. PEDDIE:

19         Q      Do you remember when Mr. Biller was

20   referring you to the Third Amended Exhibit B and

21   talking about Hillshore Investments capital account

22   balance?

23         A      Yes.

24         Q      And do you remember when he asked you

25   what the amount of the Hillshore Investment capital

                                             Page 140

1    contribution was?  Do you remember talking about this?

2         A     Yes.

3         Q     And what figure is shown on

4    Third Amended Exhibit B, which is Exhibit 72 to this

5    deposition?

6         A     He referred to the last line, which is

7    $9,000,013.

8         Q     Okay.  So on tax return, we see

9    $7,500,013.  We just went through that.  On Amended

10   Exhibit B we see $9,000,013.  And another source that

11   we looked at earlier, what was this transmittal form?

12        A     That's 68.

13        Q     I'm referring to what is shown as

14   Exhibit A to Exhibit 68 to this deposition.  Would you

15   please read the title of Exhibit A for us.

16        MR. BILLER:  I just want to interpose an

17   objection.  This is the same exact page of the document

18   I introduced that Counsel put in front of the witness

19   on my direct examination and pointed to to distract

20   her.  It's been tainted.

21        MR. PEDDIE:  And I'm trying to clear that up,

22   Mr. Biller.

23   BY MR. PEDDIE:

24        Q     Would you please read the first caption

25   to Exhibit 68 to this deposition?

Page 141

```
 1          A        [As read] "Exhibit A to agreement to

 2   purchase membership interest."

 3          Q        And what is the sort -- sub-caption?

 4          A        "Payment Schedule."

 5          Q        And do you see some -- do you see a

 6   table set forth on this page?

 7          A        Yes.

 8          Q        And in terms of this payment schedule,

 9   when is the first payment due?

10          A        It was dated 11/15/2015.

11          Q        And how much is asked for on that date?

12          A        For 500,000.

13          Q        Do you see some other payments scheduled

14   in that table?

15          A        Yes.

16          Q        How many more?

17          A        Four more.

18          Q        And in what year are these to be paid?

19          A        2016.

20          Q        And in these four payments, how much

21   total -- if you don't mind adding them -- is to be paid

22   in 2016?

23          A        It's 1.5 million?

24          Q        Okay.  So if you add 1.5 million to the

25   $7,500,013 shown in 2015 tax return, what figure do you
```

1    get?

2           MR. BILLER:  One second.  Clearly irrelevant,

3    immaterial, intentionally misleading the witness by

4    comparing payments in 2016 with a tax return in 2015

5    and misleading.

6    BY MR. PEDDIE:

7           Q     What figure -- you may answer.  What

8    figure do you get when you add the payments that

9    Hillshore committed to pay in 2016 which is how much

10   again?

11          A     1,500,000.

12          Q     To the capital contributed during the

13   year according to the 2015 tax return?

14          A     $9,000,013.

15          MR. PEDDIE:  Thank you.  No more questions.

16          MR. BILLER:  Now I'll clear this up to show how

17   misleading and dishonest that was.

18

19                    FURTHER EXAMINATION

20   BY MR. BILLER:

21          Q     On the 2015 tax return, whatever

22   happens in 2016 is immaterial; correct?

23          MR. PEDDIE:  Objection, mischaracterizes the

24   law.  It calls for a legal opinion.

25   ///

Page 143

```
 1   BY MR. BILLER:

 2           Q       You can answer the question.

 3           A       No, not really.

 4           Q       So you can you can take capital

 5   contributions that were supposed to be paid in

 6   2016 --

 7           MR. PEDDIE:  Mr. Biller, can you sit down?

 8   BY MR. BILLER:

 9           Q       -- and add them to the capital

10   contribution for 2015 tax return.  Is that what you're

11   saying?

12           MR. PEDDIE:  Mr. Biller, please sit down.  Can

13   we go off the record for just one second?

14           MR. BILLER:  No, we can't.

15   BY MR. BILLER:

16           Q       You can answer the question.

17           MR. PEDDIE:  Calls for a legal opinion,

18   objection.

19   BY MR. BILLER:

20           Q       Is that what you're saying?

21           MR. PEDDIE:  Objection, calls for a legal

22   opinion.

23           THE WITNESS:  I was going to say there is some

24   subsequent events in the accounting that may affect the

25   previous year.
```

Page 144

```
 1    BY MR. BILLER:

 2         Q     That may affect?

 3         A     Yes.

 4         Q     What sequence of events occurred that

 5    affected this case tax returns for 2015 and capital

 6    contributions in 2016?  What sequence of events?

 7              MR. PEDDIE:  Objection, relevance.  Objection,

 8    calls for legal opinion.

 9              THE WITNESS:  This is November 15, related to

10    November 15 transaction.  Although the payment might

11    have been made in 2016, this is a transaction that

12    transpired in 2015.

13    BY MR. BILLER:

14         Q     That doesn't make any sense either;

15    because that says $9,000,013, and the previous document

16    on the tax return says 7 million.  I'm asking you what

17    facts affected -- what sequence of facts affected this

18    irrational thought that monies contributed to

19    Thomas Wylde in 2016 can be added to a 2015 tax return?

20              MR. PEDDIE:  Objection, calls for a legal

21    opinion.

22              THE WITNESS:  I just need to go back through

23    this.

24              MR. BILLER:  You need to go back to explain

25    this one.  You really need to go back.
```

Page 145

1           You just jeopardized the integrity of the

2   witness, buddy.

3           MR. PEDDIE:  No, I didn't.  Mr. Biller, in

4   California a commitment to contribute money in the

5   future is a proper capital contribution by law.

6           MR. BILLER:  It's not on a tax return.

7           MR. PEDDIE:  You ought to know this.  It's a

8   legal matter.

9           MR. BILLER:  Make it to the jury.  Just make it

10  to the jury.

11          MR. PEDDIE:  You need to show some knowledge --

12          MR. BILLER:  I don't want to hear it --

13          MR. PEDDIE:  -- partnership taxation rules.

14          MR. BILLER:  The witness is here.  Stop

15  speaking.  The witness is here.

16          MR. PEDDIE:  These are not part of her

17  providence.

18          MR. BILLER:  Would you please stop speaking in

19  front of the witness.  Can you do that?  You already

20  showed your propensity to shove documents in her

21  face --

22          MR. PEDDIE:  I showed her one number.

23          MR. BILLER:  Stop speaking in front of the

24  witness.

25          MR. PEDDIE:  I showed her one number.  Let the

                                            Page 146

1    record reflect Mr. Biller is screaming at me.

2            MR. BILLER:   Let the record reflect the

3    attorney across from me has tainted this witness.

4            MR. PEDDIE:   I showed her a number --

5            MR. BILLER:   Stop -- stop talking.   Stop

6    talking.

7            THE WITNESS:   Can I just point out this

8    Section C?

9            MR. BILLER:   Sure.

10           THE WITNESS:   Section C says [as read],

11   "Pursuant to its knowledge of intent to exercise its

12   opinion, purchaser hereby agrees to purchase all

13   3,300 units at the price of $1,060.61 per unit for a

14   total exercise price of $3,500,013 payable on the terms

15   set forth herein."   And that's the 3,500,013 here, and

16   it says --

17   BY MR. BILLER:

18           Q       And you're pointing to the

19   Third Amended Exhibit B?

20           A       Yes, 6872.   Exhibit 72.

21           Q       That's the document that shows $9

22   million contribution; right?

23           A       Yes.   And I read on Exhibit 66,

24   Section C.   And it also says on Exhibit 66, Item

25   Number 3, which you asked me to read earlier:

Page 147

```
 1              [As read] "Consideration.  In consideration for
 2      the Membership Interest, Purchaser shall make a capital
 3      contribution to Seller in the amount of Three Million
 4      Five Hundred Thousand and Thirteen US dollars.  Seller
 5      acknowledges that prior to the Effective Date,
 6      Purchaser advance Seller One Million Five Hundred
 7      Thousand US dollars, which advance shall be applied as
 8      consideration under this Agreement.  Purchaser shall
 9      pay the remaining balance of Two Million and
10      Thirteen" --
11          Q      You're reading the document.  Can you
12      get to your point, please?
13          A      Well, it says, "pay the remaining
14      balance of Two Million and Thirteen US dollars pursuant
15      to the payment schedule attached hereto as
16      Exhibit 'A.'"
17          Q      Okay.  So you read from a document
18      signed in 2014; right?  2014?
19              MR. PEDDIE:  I don't think so.  I think that's
20      mischaracterizing the document.
21              MR. BILLER:  This is a purchase agreement.
22              MR. PEDDIE:  There were two transactions.
23              THE WITNESS:  It's 2015 here.
24      BY MR. BILLER:
25          Q      So what is --
```

Page 148

1         A       I --

2         Q       This is an amendment to the purchase

3    agreement?

4         A       Yeah.

5         Q       So did Counsel meet with you and talk

6    about this document?

7         A       No.

8         Q       So why -- so you have the thought that

9    the tax return showing $7.5 million in capital

10   contribution for 2015 should have been $9 million.  Is

11   that what you're saying?

12        MR. PEDDIE:  Objection, mischaracterizing the

13   testimony of the witness.

14   BY MR. BILLER:

15        Q       Are you saying that it should have been

16   $9 million?

17        A       No.  I was just tying up the number

18   9 million.

19        Q       But I'm asking you -- you're tying it

20   up.  You're coming up with some theory that you didn't

21   have on your own; correct?

22        A       No.  I just realized now the total.

23        Q       You just realized this minute; correct?

24        A       Yes.

25        Q       This minute, 12 afternoon after three

Page 149

 1   hours of cross-examination, you just realized that this

 2   theory existed.  Is that what you're telling me?

 3        A      I'm objecting to the relevance of all

 4   this, and I'm objecting to the ongoing quiz of this

 5   witness of lengthy documents that she did not prepare

 6   and not sign.

 7   BY MR. BILLER:

 8        Q      You can answer my question.

 9        MR. BILLER:  Those are not objections.

10        MR. PEDDIE:  I'm allowing some questions, but I

11   want to register that objection.

12   BY MR. BILLER:

13        Q      That what you're saying?

14        A      Say that again.

15        Q      After three hours of cross-examination

16   over these documents, you spent five minutes with

17   opposing counsel --

18        MR. PEDDIE:  When are these five minutes?

19   Objection.

20        MR. BILLER:  In cross-examination.  Jesus.

21   BY MR. BILLER:

22        Q      And you came up with this theory; right?

23   You just realized it?

24        A      I'm tying up the numbers.

25        Q      I'm asking you when did you realize to

                                        Page 150

```
 1    tie up the numbers?
 2         A      When I saw the total here and tying it
 3    up with the 9 million.
 4         Q      The same exhibits that I showed you?
 5         A      Yes.
 6         Q      The same exhibits that I said to you
 7    these are inconsistent numbers, and you said yes?
 8         A      Yes.
 9         Q      The same exhibits that I said numerous
10    times these documents show inconsistent numbers; right?
11         A      Yes.
12         Q      And you never said, no, they're not
13    inconsistent because of these reasons.  You never said
14    that; right?
15         A      No, I did not.
16         Q      So you came up with the first time after
17    we've had numerous breaks and you've had numerous
18    opportunities -- whether it happened or not, I don't
19    know -- you had numerous opportunities to talk with
20    Defense counsel; right?
21         MR. PEDDIE:  I object.
22         THE WITNESS:  I did not talk to him.
23    BY MR. BILLER:
24         Q      This is the same document that is shoved
25    in your face -- he put in your face --
```

Page 151

1           MR. PEDDIE:  Objection, mischaracterizes --

2    BY MR. BILLER:

3           Q     Put in your face this chart and he

4    wanted you to talk about these figures on this chart;

5    right?  That happened at this deposition; right?

6           A     He showed me the number, yes.

7           Q     While I was cross-examining you; right?

8           A     He pointed it out, yes.

9           Q     When I was cross-examining you; right?

10          A     Yes.

11          Q     And he distracted you; right?  That's

12   what you testified to, he distracted you; right?

13          A     Yes.

14          Q     So now why didn't you say at that time,

15   at that time when he shoved this document in your face

16   and I was asking you why are these numbers not

17   consistent, why didn't you come up with a theory just

18   tying up the numbers?  Why not?

19          A     It didn't occur to me at that time.

20          Q     It didn't occur to you at the time when

21   I've been cross-examining up for three hours over

22   approximately 15 exhibits having all these

23   numbers -- 2014, 2015 tax returns, the check register,

24   the account transaction by QuickBooks showing a $2.3

25   million transaction with Hillshore in 2014, and all the

Page 152

 1    other documents we discussed, you didn't think of it;

 2    is that what you're saying?

 3              A      The total.

 4              Q      You didn't think about it?

 5              A      It didn't occur to me to tie up the

 6    total with this --

 7              Q      But we talked about the $9 million;

 8    right?

 9              A      Yes, we did.

10              Q      And Counsel shoved this paper with a

11    chart showing $1.5 million while I was cross examining

12    you --

13              MR. PEDDIE:  Objection, mischaracterizes --

14    BY MR. BILLER:

15              Q      -- and you didn't think about it to

16    point it out at that time that they really were

17    consistent.  Is that what you're saying?

18              A      No.  It's the date after that.

19              Q      But he shoved the document in front of

20    you.  He told -- he was essentially telling you look at

21    this document.  That didn't trigger anything in your

22    mind that, Oh, maybe these numbers tie up?

23              A      At that time, no.

24              Q      No.  Amazing.  Then I finish my

25    cross-examination, and then he comes up and questions

Page 153

```
 1    you.  And you all of a sudden say these numbers tie up.

 2    Is that what happened?

 3          A       I suddenly remembered it.

 4          Q       After three hours you suddenly remember

 5    it.  Is that what happened?

 6          A       I remember reading this.

 7          MR. PEDDIE:  Objection, argumentative.

 8    BY MR. BILLER:

 9          Q       Is that what happened, that you came up

10    with that theory when counsel for the defendants was

11    asking you questions; right?

12          A       Yes.

13          Q       Now, how do you know your theory is

14    right?

15          A       I don't.

16          Q       It's just a theory that you came up

17    with; right?

18          A       No.  It's --

19          Q       How do you know your theory is right?

20          A       Because you have the schedule here.

21          Q       You just said you don't know, and now

22    you're saying because you have the schedule here.

23    Which is the truth, that you don't know or that you

24    have the schedule here?  I want to know the truth.

25          A       You have the schedule here.
```

Page 154

1          Q        So you now say you have the schedule.

2    So how do you know your theory is right?  How do you

3    know the numbers should add up?  How do you know?

4          A        The balance of 1.5 is stated here

5    (indicating).  The 7.5 is recorded here (indicating).

6    If you add it up, it totals up to this (indicating).

7    And this 3 million --

8          Q        But you said -- you said that there was

9    $9 million contributed as of November 15; right?  2015,

10   that's what you said?

11         A        Yes, with the intention to payment

12   schedule.

13         Q        No.  You never said that.  I want to go

14   over your testimony now.  You said in your testimony

15   according to -- there should have been $9 million

16   contributed by November 15, 2015 because that's the

17   only time this document would have been created; right?

18         A        Yes.

19         Q        So this document is created

20   November 15, 2015; right?

21         A        Yes.

22         Q        But the tax return for 2015 shows

23   7.7 million; right?

24         A        Yes.

25                  MR. PEDDIE:  Objection --

                                                Page 155

1    BY MR. BILLER:

2         Q      In 2015 there is supposed to be

3    $9 million.  The tax return only shows $7 million;

4    right?

5         A      Yes.

6         MR. BILLER:  Thank you.  No further questions.

7    BY MR. BILLER:

8         Q      You've just ruined your credibility,

9    ma'am.  At the time of trial, I'm going to really show

10   the jury that you are in the pocket of Choi and

11   Plaintiff's counsel.  He coached you.  He made you

12   change your testimony.

13        MR. PEDDIE:  I have some additional questions.

14

15                      FURTHER EXAMINATION

16   BY MR. PEDDIE:

17        Q      Ms. Rafols, we've had various breaks

18   today.

19        A      Yes.

20        Q      During these breaks, did we discuss

21   anything having to do with the case at any point in

22   time?

23        A      No.  You went out, and I just stayed and

24   got water.

25        MR. BILLER:  Okay.  Do you know there is a jury

Page 156

 1   instruction that says if a witness can't be believed in

 2   one area, you can't believe anything that witness says?

 3          MR. PEDDIE:   Objection, mischaracterizes the

 4   jury instruction.

 5          MR. BILLER:   How many chases have you tried in

 6   California?

 7          MR. PEDDIE:   Enough.

 8          MR. BILLER:   How many.

 9          MR. PEDDIE:   I'm not on the stand here.

10          MR. BILLER:   None.   Zero.   You never tried a

11   case in California.   Zero.   I know that for a fact.

12   You are not a trial lawyer.   You're a litigator.

13          I propose the following stipulation:   That the

14   transcript be prepared within two weeks; that the

15   transcript be sent directly to the witness.   She will

16   have one week.

17          MR. PEDDIE:   No.   Two weeks.

18          MR. BILLER:   One week.

19          MR. PEDDIE:   Two weeks.

20          MR. BILLER:   Do it by code.   She has to come

21   back.   Do it by code.

22          MR. PEDDIE:   What do you mean "Do it by code"?

23          MR. BILLER:   The court reporter will maintain

24   custody and control of the transcript.

25          MR. PEDDIE:   Why does she need -- it's a half

                                                Page 157

1    day.  One week?  All right.

2            MR. BILLER:  Let me start over.  Why do you

3    think you can always out trick me?

4            MR. PEDDIE:  I don't.

5            MR. BILLER:  I don't.  It's only the part about

6    me beating you every time in the courtroom.  That might

7    have something to do with it.

8            MR. BILLER:  You know --

9            MR. PEDDIE:  Let the record reflect I have

10   Mr. Biller standing in front of me in my fact --

11           MR. BILLER:  No, leaning forward.  Winning a

12   motion, Counsel --

13           MR. PEDDIE:  How about six or eight.

14           MR. BILLER:  Winning 20 motions, Counsel,

15   doesn't mean you win a trial.

16           MR. PEDDIE:  I retract the comment.  I feel bad

17   about it.  It was a stupid comment to make.

18           MR. BILLER:  I propose the following

19   stipulation:  The court reporter be relieved of his

20   duties under the California Code of Civil Procedure and

21   Federal Rules of Civil Procedure.

22           The transcript will be prepared within two

23   weeks and sent to the witness. The witness will have

24   one week to read the transcript, make any changes she

25   wants to the transcript, sign the transcript under

Page 158

1    penalty of perjury, and send me the original

2    transcript.

3          Can you provide the witness with a

4    self-addressed stamped envelope so that she can easily

5    put the transcript in the envelope and drop it in the

6    mail?

7          THE REPORTER:  Yes.

8          MR. BILLER:  So if the original is lost,

9    destroyed, misplaced or damaged in any way, a certified

10   copy may be used in lieu of the original.  I will keep

11   custody and control of the original.  I will make the

12   original available upon reasonable notice for any

13   hearing and for trial.

14         MR. PEDDIE:  For any hearing or for trial?

15         MR. BILLER:  Yeah.

16         MR. PEDDIE:  Or just in general if I request it

17   may I please have access to it?

18         MR. BILLER:  The original?  Aren't you getting

19   a certified copy?

20         MR. PEDDIE:  If I need to see it.

21         MR. BILLER:  If you need to see the original?

22   Why would you need to see the original?

23         MR. PEDDIE:  If I do.

24         MR. BILLER:  No.  That's not part of the

25   stipulation.  We'll go by code.

Page 159

1          MR. PEDDIE:  Carry on.

2          MR. BILLER:  So stipulated.

3          MR. PEDDIE:  So stipulated.

4          THE REPORTER:  Counsel, would you like to order

5     a copy of the transcript?

6          MR. PEDDIE:  Not at this time.

7

8               (Deposition concluded at 12:20 p.m.

9               Declaration under penalty of perjury on the

10              following page hereof.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 160

1                                        **

2

3

4

5

6                    I DO SOLEMNLY DECLARE UNDER PENALTY OF

7     PERJURY THAT THE FOLLOWING IS MY DEPOSITION UNDER OATH;

8     THAT THESE ARE THE QUESTIONS ASKED OF ME AND MY ANSWERS

9     THERETO; THAT I HAVE READ SAME AND HAVE MADE THE

10    NECESSARY CORRECTIONS, ADDITIONS, OR CHANGES TO MY

11    ANSWERS THAT I DEEM NECESSARY.

12                    IN WITNESS WHEREOF, I HEREBY SUBSCRIBE

13    MY NAME THIS_____DAY OF_____, 20_____.

14

15                                    _____

16                                    WITNESS SIGNATURE

17

18

19

20

21

22

23

24

25

Page 161

```
 1                    CERTIFICATION

 2                         OF

 3            CERTIFIED SHORTHAND REPORTER

 4

 5            I, the undersigned, a Certified

 6   Shorthand Reporter of the State of California do hereby

 7   certify:

 8            That the foregoing proceedings were

 9   taken before me at the time and place herein set forth;

10   that any witnesses in the foregoing proceedings, prior

11   to testifying, were placed under oath; that a verbatim

12   record of the proceedings was made by me using machine

13   shorthand which was thereafter transcribed under my

14   direction; further, that the foregoing is an accurate

15   transcription thereof.

16            I further certify that I am neither

17   financially interested in the action nor a relative or

18   employee of any attorney of any of the parties.

19            IN WITNESS WHEREOF, I have this date

20   subscribed my name

21

22

23            Damon M. LeBlanc, CSR No. 11958

24   Dated:   September 1, 2017

25

                                          Page 162
```

**[1 - 250,000]**

**1**

**1**   1:15 2:15 42:5
54:20,25 91:7
93:6 101:18,21
125:2,14,15
162:24
**1,060.61**   147:13
**1,500,000**   143:11
**1.5**   53:21 61:13
107:24 142:23,24
153:11 155:4
**1/1/16**   112:4
**10**   9:16 124:21,22
**100**   101:18 126:14
**1065**   100:13 121:6
131:14
**10:03**   76:11
**10:04**   78:12
**10:26**   78:12
**11**   7:25
**11/15/2015**   142:10
**1125**   102:7 103:19
**117**   5:6,6
**11958**   1:23 2:23
162:23
**11:14**   117:23
**11:19**   117:23
**11:32**   127:16
**11:37**   127:16
**11:41**   62:6
**11:50**   136:10
**11:54**   136:10
**12**   42:24 149:25
**12/2015**   99:18
**12/31**   48:8
**12/31/14**   48:2
**128**   5:8,8
**12:20**   2:21 6:2
160:8
**13**   42:20 57:10,11
114:6,7

**139**   4:6
**14**   42:13 77:13
**143**   4:5
**15**   54:17 57:9 60:8
60:17 77:13 95:16
96:8 99:23 102:2
129:15,20 145:9
145:10 152:22
155:9,16,20
**15113**   3:4
**156**   4:6
**16**   54:17 90:25
91:1 112:2
**16,000**   89:19,19
90:16,18 91:7
**160,000**   102:9
**175**   77:23
**18**   1:20 2:22 6:1
42:10
**181,359**   104:2
**19**   131:14,17
**1963**   15:17
**1966**   15:3
**1st**   48:9 90:19

**2**

**2**   39:1 53:2,21
55:1 85:3 103:18
103:18,19 118:12
129:16,17,20
**2,000,000**   57:8
**2,000,013**   55:4,24
57:18
**2,000,300**   57:8
**2,300**   57:7
**2,500**   54:18,19,21
**2.3**   43:7 44:6 47:9
50:17 51:15 52:9
52:20 118:21
127:10 152:24
**2.3.**   53:3

**20**   45:1 47:18
102:2 131:20
158:14 161:13
**2003**   15:9,11,12,14
15:20 18:6,20
19:2 27:9,24,25
114:8
**2006-7**   7:5
**2007**   7:17
**2008**   19:9,11
**2009**   19:12,20 21:9
27:25 28:15,23
**2012**   28:22,23,25
**2014**   5:6 21:13,14
22:6,16,19 23:9
24:22 25:10 28:9
28:15,25 32:1
34:10,13,13 37:4
42:4,10,13,20,24
42:24 43:6,14,15
44:3 50:2,5,19
51:4 52:8,8 57:12
57:13,21 76:15
104:18 118:4,17
120:11 122:7
124:13,18,23,23
125:3,9 127:5,5,20
129:17,20 130:16
133:13,14 137:15
148:18,18 152:23
152:25
**2015**   26:15 35:16
36:1 44:2 57:13
57:20 58:4,5
59:13,22,23 60:6
60:17 63:7 76:16
89:20,20 90:5,15
90:16,18 91:6,7
93:6,10,17 95:16
96:8,21 97:3
98:24 99:4,23

**100**:1,20 101:1,11
101:14 104:18,18
104:20 105:24
112:5,6,11 124:14
124:21,22 125:2,3
128:24 129:15,16
129:20 130:24
131:12 133:11,11
133:12 139:12,18
140:1,4,4 142:25
143:4,13,21
144:10 145:5,12
145:19 148:23
149:10 152:23
155:9,16,20,22
156:2
**2016**   5:3 25:1,10
28:12 29:24 37:4
54:18,18,25 55:7
57:20 61:12,12,12
61:13 63:7 80:3
82:5 87:5 107:24
112:4,11 125:2
142:19,22 143:4,9
143:22 144:6
145:6,11,19
**2017**   1:20 2:22 6:1
44:20 62:6,13
162:24
**2049**   2:19
**22**   22:16 100:13,14
137:15
**2236**   53:13
**22nd**   22:12
**23**   15:10
**24**   5:12 78:8
**2400**   2:20
**25**   5:12
**25,000**   90:16,20
**250,000**   54:17,22

**[26 - a.m.]**

**26**   42:4 50:2
**2679975**   1:23
**26th**   22:19
**27**   62:6

**3**

**3**   53:13 55:15
   147:25 155:7
**3,300**   147:13
**3,500,013**   147:14
   147:15
**3.2**   120:19
**3.5**   53:19 63:7
**30**   47:19 93:10
**303-444-5447**   3:10
**31**   43:6,15 46:25
   50:5,19 104:20
**310-459-9870**   3:5
**310-770-3741**
   116:11
**3200**   96:12
**33**   91:3 96:13
**3390**   96:14,15
   105:1
**350,000**   42:9,14

**4**

**4**   55:4 71:10 123:4
   131:12
**4,000,300**   121:17
**4,300,000**   127:24
   127:25
**4,425,000**   130:24
   131:3
**4,425,996.71**
   129:13 130:4,16
**4,538,000**   131:13
**4,613,388.83**
   100:17
**4,651,971**   104:7
**4.3**   120:22

**4.4**   100:5
**4.6**   100:1,4
**40**   15:14
**41**   4:10,10
**45**   125:25 126:3,20
   127:6,6

**5**

**5**   103:16
**5.5**   44:4
**50**   1:15 2:15 15:16
   101:25
**500**   101:8
**500,000**   42:18,20
   42:25 54:16,17,25
   56:14 57:10,10
   60:19 142:12
**5051**   3:9
**53**   4:12,12
**54**   4:13,13

**6**

**6**   4:5
**600,000**   42:6
**65**   4:10 41:13,14
   45:10 47:11 56:1
   56:8,8,14 57:4
   58:5,14 59:13,21
   60:6,23 61:16
   62:1,19 97:2,2
   105:10 106:6
   127:10
**66**   4:12 15:18 53:8
   53:9 55:5 147:23
   147:24
**67**   4:13,15,15 54:4
   54:5,9 56:1,7 57:5
   60:16 61:13
**68**   4:15 67:17,18
   68:24 69:18
   141:12,14,25

**6872**   147:20
**69**   4:18 84:1,5,7,13
   87:24

**7**

**7**   101:8 118:15
   121:2 123:1
   145:16 156:3
**7,500,013**   140:11
   141:9 142:25
**7,504,813**   104:4,11
   104:21
**7.5**   139:16,23
   149:9 155:5
**7.7**   155:23
**70**   4:20 88:17,21
   88:24
**700**   118:14,15,15
   118:16,17,19
   119:7 120:10
   124:7
**71**   4:22 91:24 92:1
   92:5
**72**   4:24 95:5,6,10
   97:3 98:2 99:21
   104:25 141:4
   147:20
**73**   5:3 98:14,18
   99:17 103:12
   130:22
**74**   5:6 117:16,20
   118:3 124:19,20
   125:22 127:4,19
   130:17
**75**   5:8 124:16,17
   128:9,13 130:23
   131:2,11,21 132:1

**8**

**8**   42:4
**8,247.95**   92:24

**80303**   3:9
**84**   4:18,18
**8481**   115:25 116:1
   116:2
**88**   4:20,20
**88,300**   130:7
**8:43**   2:21 6:2,18

**9**

**9**   3:4 5:3 30:15
   40:11 72:9 73:11
   73:12 99:22 100:5
   105:24,25 147:21
   149:10,16,18
   151:3 153:7 155:9
   155:15 156:3
**9,000**   39:12
**9,000,013**   72:2,21
   95:21,23 96:8
   97:4 98:4 105:1
   140:14 141:7,10
   143:14 145:15
**9,005,013**   71:24
**9,005,513**   95:24
**9,513,000**   95:22
**9,847.95**   93:6
**9.1**   40:12
**9.1.**   40:13
**9.5**   40:13
**90**   96:25 97:1
**90069**   116:3
**90272**   3:5
**91**   4:22
**92**   4:22
**95**   4:24,24
**98**   5:3,3
**9:12**   36:16
**9:16**   36:16

**a**

**a.m.**   2:21 6:2,18
   36:16,16 62:6

Page 2

**[a.m. - asked]**

78:12,12 117:23
117:23 127:16,16
136:10,10
**able** 49:22
**absolutely** 67:10
**access** 61:23,24
72:17 159:17
**account** 4:11 58:6
58:9,13,14 60:14
60:25 61:2,5 72:5
73:5,14 97:4,9,15
97:21 101:16
106:8 121:19,20
128:16 130:12
131:22,22,23,24
132:11,12,23,23
133:3 137:19
140:21 152:24
**accountancy** 16:1
**accountant** 15:24
19:5 27:21 29:16
47:18 56:12 98:23
**accounting** 16:4
16:14,23,25 17:1
18:14 29:19
135:15 144:24
**accounts** 11:10
37:8 58:7,8 60:11
78:17 80:20,22,24
81:19,19 101:7
103:14,24 106:7
106:10 132:8
133:4
**accumulated**
50:24 104:19
**accuracy** 39:21
**accurate** 12:1
38:20 65:16 72:12
73:2 74:12,21
110:10 162:14

**accused** 76:24
77:4
**acknowledges**
148:5
**action** 91:15,16
162:17
**actual** 48:21 74:13
87:18 123:2
**add** 142:24 143:8
144:9 155:3,6
**added** 145:19
**adding** 142:21
**additional** 26:25
27:2 156:13
**additions** 161:10
**address** 115:24
**addressed** 159:4
**adds** 120:21
**admin** 49:16 50:12
**admission** 26:23
**advance** 128:16
130:7,9 131:23,24
148:6,7
**advances** 137:18
137:19,19
**advice** 93:24,25
**advised** 70:14,15
70:18 94:2
**affect** 39:2 62:25
144:24 145:2
**afternoon** 149:25
**ago** 7:4 66:9
**agree** 13:12
**agreed** 89:5
**agreement** 4:12,13
46:6 52:21,23,25
53:2 54:14 55:9
55:15 57:16 69:20
85:2 142:1 148:8
148:21 149:3

**agrees** 147:12
**ahead** 45:6,25
54:3 84:11 91:23
95:4 128:7 138:11
**alison** 135:25
136:5
**allegedly** 47:9
**allow** 110:20
**allowed** 116:7
**allowing** 76:25
150:10
**amazing** 153:24
**ambiguous** 9:25
**amended** 4:24
95:12 106:4
140:20 141:4,9
147:19
**amendment** 149:2
**amount** 40:20
42:20 50:23 56:23
57:2,5 72:17
103:11 111:2,25
120:18 123:20
130:7 132:13
140:25 148:3
**analysis** 78:16
101:7 103:14,23
106:5 110:11
119:1
**angeles** 1:2,19 2:2
2:20 6:1
**annoying** 83:6
**answer** 5:10 10:22
10:24 11:1,18
12:25 13:1,3 24:2
24:11 26:3,12
33:6 35:17 37:17
45:25 46:1 55:22
59:11,21,24 60:9
80:12 93:22
113:13 138:11

143:7 144:2,16
150:8
**answering** 57:3
**answers** 9:6 10:12
11:14 113:10
161:8,11
**anybody** 9:8 30:21
61:21
**anymore** 99:1
**anyone's** 83:12
**anyplace** 74:6
**ap** 81:19,23 82:3
**apologize** 96:2
**apparel** 116:23
**appearance** 6:15
**appearances** 3:1
**applied** 148:7
**applies** 9:18
**appropriate** 8:14
**approval** 91:15
**approve** 12:20
**approximately**
19:9 89:19 90:17
91:7 96:25 100:5
152:22
**approximations**
10:13
**april** 35:16 36:1
54:25 89:19 90:16
90:18 92:24
**ar** 81:25
**area** 157:2
**argue** 44:17
**argumentative**
60:2 113:14,22
154:7
**armoire** 1:13 2:13
**asked** 60:12
140:24 142:11
147:25 161:8

[asking - biller]

**asking** 14:2 35:19
35:21 52:15 60:13
65:22 66:2 94:11
107:10 111:14
113:3 117:11,11
118:24,25 123:2
145:16 149:19
150:25 152:16
154:11
**asks** 66:7 118:6
**aspect** 31:3
**assembled** 68:23
**assets** 136:17
**assistant** 116:21
**assume** 10:8,8,9
33:7 34:7 72:22
72:24 73:11
**assumes** 24:8
58:10 62:20 70:7
83:11 91:9 97:7
105:12 110:3
133:18 138:9
**assuming** 56:19
**assure** 77:8
**attach** 103:19
**attached** 5:5 41:16
53:11 54:7 57:19
67:20 69:18 84:3
88:19 92:3 95:8
98:16 99:13
117:18 128:11
148:15
**attended** 138:20
**attorney** 10:21,24
26:1 147:3 162:18
**audit** 48:5 49:8,9
49:11,17,20,23
50:1,6,10 65:19,19
109:8,11,14,16,25
**august** 1:20 2:22
6:1 26:15 42:4,4

47:7 50:2,25 51:3
52:7
**authenticate** 132:4
**authenticating** 8:7
**available** 159:12
**avenue** 3:9
**aware** 135:14

**b**

**b** 4:8,24 46:6
53:24 54:1 73:19
95:12 101:18,21
106:5 140:20
141:4,10 147:19
**bachelor** 16:1
**back** 10:4,23
17:18 37:17 47:3
48:12,14 59:15
61:21 79:5,8,9
97:1 121:9 123:15
145:22,24,25
157:21
**background** 14:23
15:25
**backup** 58:15,18
58:20,22 59:3,7,9
64:13,13,15 65:3,7
65:9,13,20 74:24
75:2,17 76:2
78:18 79:14 92:17
92:18 106:12
109:18,22,23,25
110:2 123:16,18
**bad** 23:18 158:16
**balance** 57:14,18
63:15 64:16 66:10
66:19 72:6 97:4
99:10,12,15 101:6
101:15 104:1
106:8 131:21
140:22 148:9,14
155:4

**bank** 37:8 39:6
40:1 59:5,6 80:20
80:22,23,25 81:1,3
81:7,18,23 124:1
**banking** 37:12
**bankrupt** 23:16
**bankruptcy** 7:8,15
7:24 8:1 23:24
24:7,14,17 25:9
26:14 108:22
129:2
**based** 50:16 73:10
**basically** 29:19
46:12
**batches** 78:8
**bates** 78:8
**bc596495** 1:9 2:9
**beating** 158:6
**beginning** 2:20
4:16 89:16,17
104:1
**behalf** 2:18 6:17
6:19 128:21,22
**behavior** 88:12
**believe** 7:17 9:15
13:4 20:13,14
23:20 24:3 25:16
34:5 35:13 40:10
45:8,12,20 46:10
50:12 51:19 52:11
52:14 55:3 58:3
62:5 69:2,10,25
70:24 72:3 76:8
79:20 80:13 83:8
85:2,12 87:8
88:13,25 89:4,11
90:1,11 93:24
94:9 95:19 98:25
115:13 122:8,19
126:24 127:3
129:22,25 130:5

136:5,19 157:2
**believed** 39:1
157:1
**belly** 27:1
**belonging** 138:3
**beneath** 130:6
**benefit** 1:5 2:5
**benefits** 131:17
**beyond** 44:21 55:6
**bill** 39:9,11
**biller** 3:3,6 4:5 6:9
6:16,19,19,22
13:14,19,20 14:7
15:6,13 23:22
24:1,10 26:2,6,11
26:16,19 27:2,6
33:5 35:4,6,8,12
35:19,24 36:2,4,8
36:14,17 37:17,21
37:22 41:7,12,17
42:1 43:22,24
44:1,5,8,10,13,17
44:22,25 45:2,5,7
45:24 48:17 52:1
52:5,6,12 53:7,12
54:3,8,20,22,24
55:13,18,21 56:6
56:11,21,22 58:11
59:15,20 60:3,12
60:15 62:22,23
63:13,20,23 64:1,4
64:5,7,12,19,24
65:1,8,24 66:3,6
66:12,15,18,21,24
67:1,4,12,16,21,24
68:2 70:2,9 71:2,8
71:9 74:2 75:1,24
76:9,12,21,24 77:3
77:9,13,17,20,23
78:4,13 80:2,10,13
80:16,18 83:13,24

Veritext Legal Solutions
866 299-5127

**[biller - case]**

84:4 87:11,13,19
87:23 88:4,20
89:24 90:10,24
91:12,13 92:4
93:21 95:4,9,23,25
96:3,15,17 97:10
98:11,17 100:10
101:4 102:3,8,12
102:22,23 105:5
105:14 106:13,16
106:19,22,24
107:3,6,8,12,16,19
107:22,25 108:2,5
108:10,15 109:1,3
109:5,6,12 110:8
110:17,22 111:13
113:15,19,25
114:1 116:8,12,13
116:21,24 117:1
117:14,19,22,24
118:9 119:5 120:1
120:16,17 121:12
122:12,16,22,23
124:12 127:1,15
127:17 128:7,12
129:4,7,9,11 131:6
131:9,10,19 132:6
133:19,20 134:21
136:11 137:1,6
138:10,18 139:10
139:13,25 140:13
140:16,19 141:16
141:22 143:2,16
143:20 144:1,7,8
144:12,14,15,19
145:1,13,24 146:3
146:6,9,12,14,18
146:23 147:1,2,5,9
147:17 148:21,24
149:14 150:7,9,12
150:20,21 151:23

152:2 153:14
154:8 156:1,6,7,25
157:5,8,10,18,20
157:23 158:2,5,8
158:10,11,14,18
159:8,15,18,21,24
160:2
**birthday**  15:5
**bit**  32:19 69:14
108:13 112:25
113:24
**blanc**  115:2
**blank**  125:23
**board**  16:2 22:20
22:21 23:5
**book**  35:24,25
37:24
**booklet**  11:12
34:15
**books**  29:20 37:7
37:11,24,25 104:7
137:21,22,24
138:3
**born**  14:24 15:1,2
15:17
**boss**  114:25
**bothered**  133:7,8
**bottom**  68:8 72:1
95:21 128:24
129:12 130:6
**boulder**  3:9
**boulevard**  3:4
**brand**  137:3
**break**  18:24 36:12
36:16 76:13 78:12
117:23 127:15,16
136:9,10
**breakdown**  101:9
**breaks**  151:17
156:17,20

**brief**  16:22
**briefly**  133:6
**bring**  53:5 90:12
**brought**  22:1
**buddy**  108:6 146:2
**budget**  37:10,13
**budgets**  29:20
**burden**  83:1,2
**burdensome**  83:4
**business**  18:17
19:15 21:22 68:13
68:16,19 71:20
92:10 99:25
100:12 115:16
133:9,10
**businesses**  16:16
17:12
**button**  83:3
**byron**  3:8,8

**c**

**c**  28:20 147:8,10
147:24
**cabinet**  79:3,5,7
81:4,25
**cabinets**  79:6
**calculated**  71:23
**calculation**  128:23
**calendar**  130:20
130:21
**california**  1:1,1,5
1:7,11,19 2:1,1,5,7
2:11,20 3:5 6:1
116:2 119:12
121:7 146:4 157:6
157:11 158:20
162:6
**call**  39:10
**called**  6:12 8:4
28:19 29:7,8 46:3
49:10 108:23
133:12,14 139:15

**calling**  122:9
124:10
**calls**  23:21,25 24:8
45:22 51:24 52:4
52:10 55:11,16,20
56:3,4,9,10 63:9
65:4 70:1,25
73:21 74:22 75:19
76:6 83:21 89:22
90:7,22 93:19,20
100:6,7 102:19
105:3,11 109:9
110:3,7,13,14,14
119:2,23 120:12
126:25 127:12
131:16 134:18,19
136:23 137:4
143:24 144:17,21
145:8,20
**calm**  21:5 109:3
**capital**  26:25 27:2
72:5 95:15 97:4
98:4 101:7,8
103:14,24 104:4
104:11,14,17,21
105:1,23 106:4
118:14,18 120:10
121:20 125:11
126:19,22 127:6
139:11 140:6,8,21
140:25 143:12
144:4,9 145:5
146:5 148:2 149:9
**capitalization**  46:4
**caption**  141:24
142:3
**careful**  67:22
**carry**  101:15
160:1
**case**  1:9 2:9 7:6,7
7:9 9:16 14:15,20

Page 5

[case - consist]

14:21 20:22 35:21
41:9 103:2 133:8
145:5 156:21
157:11
**cash**  63:16 64:17
66:11 73:4 101:8
104:4
**caused**  134:23,24
135:9
**cc'd**  92:12
**cell**  116:5
**central**  1:2 2:2
**century**  2:19
**ceo**  20:8,9,10
23:15 25:20
114:25 115:9,15
**certain**  34:9,11
138:16
**certification**  162:1
**certified**  2:22 6:5
37:19 41:15 53:10
54:6 59:16 67:19
84:2 88:18 92:2
95:7 98:15 117:17
128:10 138:13
159:9,19 162:3,5
**certify**  162:7,16
**chance**  80:10
107:1
**change**  9:15 11:17
61:22 63:12 88:12
156:12
**changed**  45:9,14
**changes**  11:23
12:5,6,7,20 62:18
62:24 63:11
158:24 161:10
**changing**  50:11
**chapter**  7:23
**chart**  89:8,18
90:12,14,14 152:3

152:4 153:11
**charts**  93:15
**chases**  157:5
**cheater**  108:16
**check**  77:15 110:9
152:23
**checked**  64:14
**checking**  65:3
**chest**  67:24
**children**  18:3
**choi**  27:3 40:4,6
41:9,21 62:1,18
67:8 156:10
**choi's**  71:11
**chronological**
16:17,19
**chung**  77:21,25
78:6
**circumstances**
133:24
**civil**  7:6 33:11
158:20,21
**claimants**  108:23
**claims**  108:23
**classified**  106:9
123:8 125:6
**classify**  122:20
**clause**  55:4,15
**clean**  134:7
**clear**  35:17 77:4
80:11 141:21
143:16
**clearly**  143:2
**client**  26:1 56:25
116:22
**clients**  20:1
**close**  23:23
**closer**  25:10,10
**clothes**  136:14,18
137:7,7,9,14

**clothing**  137:2
**coach**  106:25
**coached**  156:11
**code**  157:20,21,22
158:20 159:25
**collected**  72:22
**collection**  130:13
137:18
**colorado**  3:9
**come**  71:20 73:10
73:17 121:4
152:17 157:20
**comes**  67:10
153:25
**coming**  15:22
106:3 123:24
124:1 149:20
**comment**  158:16
158:17
**commitment**
107:21,23 146:4
**committed**  44:3,4
143:9
**companies**  16:7,10
16:13,17 17:3,14
19:2 29:8,10
135:1,6,6
**company**  1:6,7,11
1:13,14 2:6,7,11
2:13,14 7:10,11,18
16:20,21,24 17:5,6
17:8,9 19:7,10,20
23:16 27:10,11
28:1,14,17,18,21
29:2,4,7 39:10,10
39:11 46:13 58:24
58:25 69:7 70:19
70:21,23 72:18
83:19 90:6 94:3
96:19,24 103:1
115:17,19,22

116:17,23 121:22
122:2 133:11,15
133:21 134:4,5
135:8,9 137:3
**compare**  130:15
130:18
**comparing**  143:4
**complaints**  31:19
**complete**  27:24
**completely**  74:12
90:13 127:9
**complicated**
119:21
**complies**  53:17
84:12 88:22
**compound**  48:16
**computed**  72:4,5
**computer**  81:10
81:11,14 82:12
85:11
**concealed**  77:5
**conceals**  108:17
**conclude**  32:22
**concluded**  160:8
**conclusion**  51:25
55:17 71:1 73:22
76:7 105:4,12
**condition**  51:12
89:1
**confidential**  5:4
76:17
**confirm**  40:22
123:19
**confirmed**  89:7
**consent**  91:17
**consequences**  63:8
**consideration**
53:14 148:1,1,8
**considering**  51:11
**consist**  64:15

[consistent - date]

**consistent** 56:17
57:6 62:14 97:3,5
97:12 110:2
131:13 152:17
153:17
**consulting** 3:3
19:23
**contain** 11:4 74:13
**contained** 85:22
**context** 85:13
86:12
**continuation**
119:3
**continued** 4:25 5:1
**contribute** 107:24
146:4
**contributed**
118:14 140:8
143:12 145:18
155:9,16
**contribution**
72:23 92:23 98:4
104:4,11,14,17,21
105:1 118:19
119:1,7 120:10
125:11 141:1
144:10 146:5
147:22 148:3
149:10
**contributions**
95:16 105:23
106:4 139:12,22
140:6 144:5 145:6
**control** 157:24
159:11
**controller** 7:22
29:17,18 30:3
36:19 37:3 70:3
114:19,21
**conversation** 26:5

**conversations**
31:18
**conversion** 44:6
44:14 45:17,17
46:9 47:20 125:1
127:11
**converted** 42:19
46:13,17,22 47:9
73:16,19 124:4,23
125:3
**coordinate** 135:17
**coordinated** 37:12
**coordination**
31:10 37:9
**copies** 140:3
**copy** 30:17 76:16
84:17 117:8
159:10,19 160:5
**corporate** 119:14
**corporation**
119:15,17,18,22
135:5
**corporations**
135:1,2,3
**correct** 25:24 28:1
28:6,9,12 36:22,25
38:23 39:3 50:25
51:4 54:14 56:8
56:18 58:19 59:13
61:17 62:8 63:4
65:16,20 68:24
70:4,23 71:4
75:18 76:5 81:5
82:12 86:14,20
89:10 91:3,8
92:10 93:13,16
95:13 98:5,8
105:16 109:20
110:12 113:3
118:19 124:8
126:1,4,23 127:7

127:11 143:22
149:21,23
**corrections** 161:10
**correctly** 93:2,7
**corresponds** 55:4
**cost** 132:15
**counsel** 11:5 13:10
13:13 60:10 63:20
66:10 70:11
106:22 108:14,16
108:19 110:18,23
113:17 141:18
149:5 150:17
151:20 153:10
154:10 156:11
158:12,14 160:4
**county** 1:2 2:2
**couple** 82:22
**course** 9:15 10:19
50:24 68:13,16,19
92:9 107:3,6
109:17 122:16
**court** 1:1 2:1 7:1
8:16 10:3,8 77:14
108:20 157:23
158:19
**courtroom** 158:6
**cpa** 5:4 16:3,3,5,11
27:9,12,14,19
29:16 56:12 99:7
103:6 106:9
122:20 126:12
**crack** 67:10
**crate** 28:20
**create** 54:11 68:18
**created** 34:3 72:15
95:18 133:15
137:12 155:17,19
**creating** 33:25
**creative** 32:16
138:24

**credibility** 156:8
**creditors** 133:22
**credits** 59:6
**criminal** 7:6
**crooks** 67:4
**cross** 13:5 80:10
150:1,15,20 152:7
152:9,21 153:11
153:25
**csr** 1:23 162:23
**cumulative** 101:16
**current** 79:11,18
**currently** 116:14
**custody** 157:24
159:11
**custom** 47:17,22
**customers** 82:1
130:13,13
**cut** 88:23 89:2
137:8
**cycle** 89:12

**d**

**d** 4:1
**damaged** 159:9
**damaging** 9:7
**damon** 1:22 2:22
162:23
**data** 38:11,16,24
39:3 56:7,7 57:4
58:18 61:22 62:19
62:25 63:8 64:12
64:13,15 65:3,7,10
65:13 74:21 75:12
75:13 76:3 106:6
110:1,9 133:24,25
134:1,2,3
**date** 35:20 47:1
48:1,6,13,20,21,22
55:7 61:7 62:6,7
62:11 93:12 98:3
112:1 142:11

Page 7

[date - documents]

148:5 153:18
162:19
**dated** 42:9,20 43:2
43:6 47:7 129:15
129:19 142:10
162:24
**dates** 49:3,6 50:7
50:11 53:25
**david** 4:18 25:16
25:18,19,21 26:5
34:5,7 69:2,3 72:3
86:4 95:1,19
**day** 22:8 48:11
73:7 158:1 161:13
**days** 17:21 117:2,5
117:7
**deal** 13:16
**dealt** 136:2
**debt** 133:17 135:2
135:8 136:13,21
**december** 42:24
42:24 43:6,15
46:25 47:8,8 50:5
50:19,25 51:4
52:8 104:20
129:20
**deciding** 91:17
**decision** 32:8 89:2
**decisions** 71:3
**declaration** 160:9
**declare** 161:6
**deduction** 91:3
92:23 93:5
**deem** 12:21
161:11
**defendants** 1:16
2:16 3:7 154:10
**defense** 151:20
**deleted** 63:6
**demonstrate**
108:12

**denying** 12:6
**departure** 20:11
**depends** 9:11 51:7
83:15,16,16
**depicted** 45:9
**depo** 13:24 107:12
**deposit** 59:5
**deposition** 1:18
2:18 6:21,23
11:23 13:10,25
14:9 20:24 62:2
62:13 87:20 108:5
108:8 141:5,14,25
152:5 160:8 161:7
**depositions** 41:6
**deposits** 47:7
**depression** 134:22
134:23 135:9
**describe** 75:5 85:5
**described** 125:4
**describing** 75:17
**description** 4:9
5:2 138:8
**design** 28:18 32:15
**designers** 86:4
**destroyed** 75:10
77:6 80:16,17
108:17 159:9
**detail** 123:2
**details** 20:24
138:17
**determine** 96:23
106:2 123:14
**determined**
126:13
**develop** 12:16
**difference** 10:16
100:4 109:13
119:18
**different** 19:25
87:2 105:23 113:9

134:4
**difficult** 56:24
57:2
**dimitrios** 3:3 6:19
44:18 68:1 76:14
107:18,20 128:25
139:15
**dinner** 114:14,17
**direct** 141:19
**direction** 162:14
**directly** 13:17
21:16 61:4 157:15
**director** 32:16
138:24
**disciplinary** 85:7
**disclosure** 26:7
**discoverable**
11:10
**discovered** 135:8
**discuss** 87:17,22
98:12 156:20
**discussed** 52:18,20
87:20 138:20
153:1
**discussing** 138:16
**discussion** 25:9,11
25:22,23 26:14
32:15 69:15
**discussions** 32:3
32:11
**dishonest** 9:14
143:17
**dislike** 33:1
**dispute** 74:20
**disregard** 10:25
**distract** 141:19
**distracted** 112:23
113:1,4,8,9,11,21
152:11,12
**distributed** 35:2
46:15 69:24

**distribution** 35:20
46:2,4,14 74:1
**district** 1:2 2:2
**divorced** 18:1
**document** 31:14
35:4,20 39:2,14
41:10,11,18,21
44:8,9,11,13 45:20
46:3,24 47:11
50:16 53:6,7 54:4
54:11 55:12 58:14
63:17 66:17 67:16
68:20 69:22,24
72:15 73:23 83:4
83:25 91:24 92:7
94:9 95:5,18 98:2
98:3,12 100:22,24
101:5 107:15,17
111:23 112:1
113:20 117:9,14
123:15 128:8
129:16 130:3
141:17 145:15
147:21 148:11,17
148:20 149:6
151:24 152:15
153:19,21 155:17
155:19
**documents** 4:15
8:7 30:7,10,18,22
31:11 35:9 38:18
38:19 39:4,5,19
40:18,21 43:18
45:3,18 58:15,18
58:21,22 59:3,7,10
63:18,19 64:2,10
65:9,14,20 66:7,8
66:25 67:23 68:23
69:6,8,12 73:10,15
74:8,8,13 75:17,22
76:3 77:6,11,23,24

[documents - exhibit]

78:5 79:10,14,14
80:4 81:21 82:7
82:11,16 83:20
85:22,24 86:17,19
91:14,21,22 97:5
105:8,9,16 107:11
108:19 109:4
112:22 146:20
150:5,16 151:10
153:1
doe 52:19
doing 19:25
108:10
dollars 44:16
57:18 148:4,7,14
domestic 42:5,9
dorothy 1:6 2:6
double 77:15
doubt 58:12
doug 67:8
downloading 81:9
dr 14:17
draft 35:16,25
drafted 34:6
drawer 78:24 79:1
79:4 80:15
drink 18:22
drive 82:11,20
drop 159:5
dt 3:3
due 142:9
duly 6:5
duties 31:7 37:2,6
37:7 80:19,23
158:20

e

e 3:6 4:1,8,18,20
4:22 28:20 84:16
85:20 86:6,10,12
86:23 87:6,10
88:16 92:16 93:12

115:4
earlier 77:18
127:21 139:10,19
140:12 141:11
147:25
early 19:11,11
25:4 26:15
earthly 29:9
easily 38:22 82:10
159:4
east 2:19
edit 50:7
edits 50:13,14
educational 15:25
effect 32:20
effective 148:5
eight 158:13
either 10:22,25
25:4 50:17 145:14
electronic 82:4
85:10,15,17,22
86:15,20 87:6
electronically
81:21
emphatic 67:13
employed 90:6
91:5,10 93:13
94:8
employee 13:15
34:1 35:7 86:1
131:17 162:18
employees 30:12
31:14 34:14 86:8
employment 27:24
89:21
english 135:21
enter 6:15 38:24
39:20 49:15 59:10
entire 63:24 64:1
118:5 122:10
129:1

entitled 8:23 10:11
83:19
entity 120:5
135:24
entries 42:2 44:21
44:24 45:13,14
46:20,21,22 47:4,6
47:25 49:21 57:24
58:2,4,5 59:9,12
59:22 60:6 61:7
61:19,21 97:3
entry 42:5,6,10,16
42:21 43:4,10
47:16,20 48:1,8,21
49:2 50:2 60:17
72:1 129:12
131:13 132:25
envelope 159:4,5
equal 126:8
equity 42:19 43:7
44:6 45:17 46:9
46:13,17,22 47:10
47:20 61:3,5 71:4
73:5,13,14,16,19
73:24,25 74:5,10
124:4,7,23,24
125:3,5,7 126:23
127:6,11
error 78:9
esq 3:3,8
essentially 25:7
133:10,21 153:20
establish 26:18
establishing 47:10
estimate 10:17
estimates 10:13
euclid 3:9
events 144:24
145:4,6
everybody 8:17,17
33:18,20 77:1

90:2 104:15
evidence 108:17
108:18 139:25
exact 120:20
141:17
exactly 31:7
examination 4:2
6:8 106:25 108:11
139:8 141:19
143:19 150:1,15
150:20 153:25
156:15
examine 13:5
examined 6:6
examining 152:7,9
152:21 153:11
example 85:8
excuse 109:5
136:16
executed 40:25
45:21 46:24
execution 73:15
73:18
executive 4:21,23
exercise 147:11,14
exhausted 12:16
exhibit 4:9,10,12
4:13,13,15,18,20
4:22,24,24 5:2,3,6
5:8 41:13,14
44:19 45:10 53:9
53:24 54:1,1,4,5,9
54:13 55:5,8,10,14
55:23,23 56:1,1,7
56:8,14,18 57:4,5
57:20 58:5 59:13
59:21 60:6,12,23
61:13,16 62:1,19
67:18 68:15,18,20
68:24 69:15,16,18
69:19,20 84:1,7,13

Veritext Legal Solutions
866 299-5127

[exhibit - form]

87:24 88:17,21,24
92:1,5 95:5,6,10
95:12 97:2,2
98:14,18 99:17,21
103:12 104:25
105:10 106:5,6,15
106:17,18 107:7,9
117:16 118:3
124:16 125:22
127:4,10,19 128:9
128:13 130:17,23
131:2,5,11,16,21
132:3 140:20
141:4,4,10,14,14
141:15,25 142:1
147:19,20,23,24
148:16
**exhibits**  5:1
110:24 151:4,6,9
152:22
**exist**  22:15 64:10
82:5
**existed**  150:2
**existence**  87:7
**exists**  36:9
**expense**  132:11,12
**expenses**  38:7,13
**experience**  18:19
**expert**  45:22 110:7
110:14 118:7
119:2,4 120:12
124:11 127:13
131:16
**explain**  11:11
46:11 63:20 78:22
97:14,17,25 99:11
105:22 120:9
145:24
**export**  17:12
**extension**  99:1

**extensive**  119:24

**f**

**face**  146:21 151:25
151:25 152:3,15
**facsimile**  70:4
**fact**  47:10 50:17
51:18,20 67:14
94:5 157:11
158:10
**facts**  24:8 56:19
58:10 62:20 70:7
83:11 91:9 97:7
97:17,24 101:3
105:12 110:3
133:18 138:9
139:25 145:17,17
**false**  38:23
**familiar**  41:18
98:18 117:21
119:11 132:7
**far**  79:9
**fashion**  1:14 2:14
7:12,14 17:6 19:3
19:4,13,15 23:11
23:14 27:11 28:1
73:18 81:3 115:17
**fast**  13:18
**fax**  70:6
**february**  44:20
54:17 62:6,15
**federal**  119:12
158:21
**feel**  158:16
**fees**  102:9
**figure**  104:24
109:7 120:20,21
139:11 140:10
141:3 142:25
143:7,8
**figures**  152:4

**file**  24:7,14,17
63:25 64:2,4,7,13
81:25 83:15 84:18
84:19,20,21 85:4,5
85:7 87:16
**filed**  14:15,21 30:7
81:25 98:25
**files**  30:8,8 31:15
31:15 75:3
**filing**  23:23 24:12
79:3,5,6 81:4
**filling**  119:11
**finances**  70:18,22
**financial**  23:18
29:20,23 30:3
36:19 37:3 51:11
63:12,14 65:22
66:8 67:3 70:3
78:17 88:25 99:6
99:8,11 114:19,21
**financially**  162:17
**financials**  37:8,12
78:15 81:19
**find**  27:5 36:9
72:20 73:1 100:22
101:23 110:11
118:10 122:1
123:19 125:18,23
127:18 138:7
140:5
**finding**  118:7
**fine**  27:14 44:25
76:22 78:11
129:10
**finish**  52:5 131:6,7
131:8 153:24
**finished**  136:12
**firm**  16:4,23 17:1
18:15 135:16
**firms**  16:14,25

**first**  6:5 16:5,19
16:24 24:7 30:10
38:12 47:19 50:2
90:20 141:24
142:9 151:16
**fiscal**  130:20
**five**  19:8 23:12
50:24 114:3 148:4
148:6 150:16,18
**flash**  82:11,19
**flip**  117:20
**florida**  1:13,14
2:13,14
**flow**  63:16
**flown**  121:5
**flows**  64:17 66:11
**folder**  34:24 81:13
82:4,8,12,15,16
84:23,24 85:1,10
85:15,17,22,25
86:5,6,7,9,16,20
86:22 87:6,6,10
**folders**  34:20,21
75:4,5,5,6,7 81:11
81:15,15,20,22
82:14 86:13
**follow**  82:1
**following**  157:13
158:18 160:10
161:7
**follows**  6:6
**fool**  65:25
**footwear**  19:18,19
**force**  111:8,12
**forecasting**  27:22
**foregoing**  162:8
162:10,14
**forehead**  67:25
**form**  41:22 68:6
70:4 85:12 100:13
103:19 121:6

[form - hillshore]

131:14 141:11
formed  133:11
formulating  113:2
forth  142:6 147:15
  162:9
forward  60:4
  158:11
found  97:23
foundation  56:9
  97:6
four  16:9,17 17:3
  50:24 102:24
  115:20 142:17,20
frame  29:12
frankly  61:20
free  89:25
freedom  12:4
friday  1:20 2:21
  6:1
friend  56:25
front  13:7 130:17
  141:18 146:19,23
  153:19 158:10
function  32:4,6,7
  32:8,13 37:5
  88:14
fund  42:12 130:11
funding  42:24
further  71:6
  143:19 156:6,15
  162:14,16
future  146:5

g

general  159:16
generate  41:20
  64:10 65:6 81:6
  97:20
generated  44:20
  62:12 64:17 65:23
  66:13 98:3 132:13
  132:20

generating  62:14
  78:17 80:25
generic  133:3
gestures  8:22,23
getting  40:1 81:1
  108:8 159:18
giraffe  29:9
give  8:24 9:6 10:12
  10:12,20 14:23
  16:17 18:19 38:23
  41:21 45:1 69:5
  101:22 102:4
  116:6 117:9
  122:14,16 129:5,8
given  11:17 35:13
  38:25 68:25
  111:21 122:20
  140:10
giving  41:23
  112:23
glad  53:6
glanced  113:5
glancing  113:7
go  8:10 12:15 16:5
  18:23 20:14 26:24
  39:6 44:21 45:6
  45:18,25 48:4,11
  48:14 49:13,16
  50:12 54:3 61:21
  73:1 76:14 79:10
  79:15,22 81:20
  84:11 87:15 91:23
  95:4 117:22
  118:11 121:9
  122:10,14 123:15
  128:7 138:11
  144:13 145:22,24
  145:25 155:13
  159:25
god  64:20

goes  49:24 74:14
  137:19
going  8:12 9:16
  11:12,12,13 13:8
  20:23 24:7 32:14
  32:16 35:22 36:21
  36:24 38:20 41:8
  43:22 50:10 53:5
  64:20 76:4,15,16
  78:10 88:11 97:1
  100:11 103:8
  108:5,21,23 110:1
  118:5 128:19,25
  144:23 156:9
gonzalez  71:10
good  17:21 103:17
google  138:23
gotten  35:17
govern  8:11
government
  119:13
grab  45:3
graduated  16:1
great  27:23 134:22
  134:23 135:7,9
ground  8:10
grounds  129:1
guess  13:18
guys  67:14

h

h  4:8 115:4
h&h  1:14 2:14
half  157:25
hand  41:20 76:15
  76:16 83:25 91:23
handbook  34:1,22
  34:23 35:7
handing  77:10
handled  14:13,19
  37:7,11 38:4

handling  29:19
  31:2,4,9 32:9,14
  37:23
hanna  1:11 2:11
  4:20 20:7,8,25
  21:3 22:2,19 23:8
  24:13 25:20,24
  31:20 57:1 59:25
  76:20 86:4 91:15
  92:13 94:25 114:2
  117:3,5 138:7
happened  27:1
  47:24 137:20
  151:18 152:5
  154:2,5,9
happening  135:13
happens  143:22
harassing  83:9
hard  13:5 60:8
  82:20
hate  102:3
head  67:23
hear  24:6 25:9
  32:10,21 33:8
  74:11 146:12
hearing  159:13,14
help  56:25 59:25
hem  43:23
hereof  160:10
hereto  41:16 53:11
  54:7 57:19 67:20
  84:3 88:19 92:3
  95:8 98:16 117:18
  128:11 148:15
hey  66:3
highly  125:24
hillshore  39:25
  40:3 42:5,9,13
  43:7 44:3,3,12
  46:16 52:8 58:9
  58:12,14 72:10

[hillshore - interior]

95:21 96:7 97:4
98:4 99:22 100:23
100:25 101:18
102:16 103:11
104:12,25 105:24
122:7 123:12
125:10,25 126:3
139:23 140:21,25
143:9 152:25
**hillshore's** 103:10
140:6
**hired** 114:10
**history** 27:24
**hit** 67:23,24,25
**hold** 93:24
**holder** 83:19
**honest** 13:1,4 57:1
60:1,5
**honesty** 9:11
**hong** 5:4 135:24
135:24
**hour** 76:12 77:5
**hours** 82:23,23
150:1,15 152:21
154:4
**house** 7:12,14 19:3
19:4,13 23:11,14
**hr** 30:7 31:3,5,9
37:15 84:20,21
**huh** 8:21,22 28:2
50:20
**human** 30:4,6,23
30:25
**hundred** 44:15
102:15,20 103:2
148:4,6
**hypothetical**
63:10 65:5 134:19

**i**
**idea** 8:3 25:14,15
36:2 41:5 80:13
**identification**
41:15 53:10 54:6
67:19 84:2 88:18
92:2 95:7 98:15
117:17 128:10
**identified** 104:21
125:8
**identifies** 102:25
103:1
**identify** 14:20
17:3 27:23 30:1
45:17 48:13
**idtconsulting** 3:6
**immaterial** 143:3
143:22
**impact** 63:2 124:4
**impacted** 89:9
**import** 17:12
**important** 9:10
11:21,25 35:21
51:14,17 75:12
117:10
**inappropriately**
113:17
**inaudible** 105:19
**include** 38:6
**included** 31:13
99:9 121:22
**includes** 71:3
**including** 87:3
89:6
**income** 76:15,16
99:25 100:12
104:7 132:23
**incoming** 42:5,8
**inconsistencies**
97:14,18

**inconsistency**
97:23,25 110:12
**inconsistent** 56:2
56:8 103:5 104:24
105:9,15 106:3
127:10 151:7,10
151:13
**independently**
19:21,22 21:8
**index** 5:1 77:24
78:5
**indicate** 33:9 50:1
50:7 90:5 93:18
101:10,13 104:10
121:18 122:6
127:23 128:2
129:20
**indicated** 57:15
88:24 99:15
103:11
**indicates** 48:1
99:21 118:3,18
130:3,23 131:11
**indicating** 18:21
85:19 96:1 100:9
103:22 155:5,5,6
**indication** 128:18
**individual** 1:12,12
2:12,12 34:21
119:14
**individually** 1:4
2:4
**inform** 52:3,7 94:4
**information** 8:6
9:6 12:16 14:23
38:7,9,12,17,20,23
39:21 40:1 45:9
49:7 50:11 55:6
57:24 58:1 65:12
69:25 74:14 78:19
81:1,15 84:17

85:23 92:19
101:25 105:9
111:9,15,17,18
112:10 122:5
124:5 127:9,19
129:19 130:16
**informed** 52:11
**infusion** 63:7
**injected** 51:16
**input** 39:8,22
46:22 47:15,23
65:12 66:22
**inputted** 47:13
48:2,6,7,19 72:2
**inputting** 38:8
72:9
**installments** 53:21
**instruct** 26:2
**instructed** 5:10
**instructing** 26:11
**instruction** 88:3
88:14 157:1,4
**instructs** 10:24
**integrity** 146:1
**intent** 147:11
**intention** 112:18
136:19 155:11
**intentionally**
108:19 143:3
**interest** 4:12,14,17
55:9 96:18 102:25
126:4,9 142:2
148:2
**interested** 162:17
**interesting** 22:7
27:8
**interfere** 112:19
**interfering** 106:24
107:4,5,12 112:16
**interior** 28:18

Page 12

**[interiors - leblanc]**

**interiors** 28:20
**interject** 36:11
**internal** 29:17,18
**interpose** 141:16
**interpret** 8:23
**interpretation**
  55:12
**interview** 22:24
**interviewed** 22:21
**introduced** 4:9 5:2
  17:22 34:5 141:18
**invest** 40:8
**invested** 50:18
  52:8 55:24 72:18
  72:21 103:11
**investing** 96:7
**investment** 40:14
  40:23 42:13 53:25
  73:13 99:22
  100:23,25 125:19
  126:9 140:25
**investments** 39:24
  41:10 44:4 54:16
  72:10 95:21
  100:25 102:16
  104:25 105:24
  118:3 122:7
  125:25 140:21
**invoice** 38:25 80:9
**invoiced** 137:17
**invoices** 81:24
  82:1 130:13,14
  137:20
**involved** 17:7
  33:25 98:22
**involvement** 69:11
  91:17,20
**irrational** 145:18
**irrelevant** 143:2
**irs** 75:13,18 76:4

**issuance** 4:16 44:2
  68:7 91:16
**issue** 14:12,14
**issues** 91:18
**item** 147:24

**j**

**january** 48:9
  54:17 125:2
**jene** 1:12 2:12
  22:22 23:1 31:20
  32:13,20,22,24
  33:9,14,16,18,18
  86:3 94:25 138:7
**jeopardized** 146:1
**jesus** 150:20
**job** 1:23 138:8
**jobs** 29:14
**john** 1:11 2:11
  4:20 20:7,8,25
  21:3 22:2,19 23:8
  24:13 25:20,24
  26:5 31:20 57:1
  59:25 76:20 86:4
  91:15 92:13 94:25
  114:2 117:3,5
  138:7
**joined** 115:21
**journal** 48:21 49:6
**judge** 13:7 66:1,16
  66:18,21,24
**july** 21:15 22:6,12
  22:16,20 25:10
  28:9 37:4 93:17
  115:13 133:11,11
  137:15
**june** 25:4,5,10
  28:12 29:24 37:4
  80:3 82:5 87:5
  93:6,17
**jury** 10:8 13:7
  146:9,10 156:10

  156:25 157:4
**justice** 9:11
**jut** 17:1

**k**

**k** 102:5 125:14,15
**k1** 140:4
**keep** 13:18 71:6
  81:15 159:10
**keeping** 31:11,12
  31:13 78:16,18
**keeps** 33:19
**kept** 64:3,6,9
**kim** 5:4 135:24,24
  136:6
**kind** 115:16
**know** 8:5 14:3,11
  18:24 20:11 21:24
  22:16 24:4,12
  26:9,12,16,21,24
  27:8,25 30:14
  34:12 43:17 44:1
  45:15 47:6,18
  48:23,25 50:16,17
  50:23 51:15,21
  52:9,13,14,15,16
  52:17,19,19 56:25
  58:18,23 59:24
  60:24 61:20 64:19
  65:24,25 68:3
  71:22 72:7,13
  77:11 78:9,25
  79:13,16 80:1
  82:24 84:5,15
  85:6,9,21 94:16,18
  95:1 96:4 97:16
  97:23,24 98:1
  103:4,9 111:5,18
  112:7,9,12,13,13
  112:18 115:12
  117:21 123:7
  125:2,21 128:13

**134:15,22,23
  135:10,12,13,24
  135:25,25 139:1,4
  146:7 151:19
  154:13,19,21,23
  154:24 155:2,3,3
  156:25 157:11
  158:8
**knowledge** 29:22
  44:21 94:12 97:17
  97:24 109:2
  146:11 147:11
**known** 46:18
  114:3,5
**korea** 67:5,8 70:8
**korean** 67:9,14,15
  136:1
**kring** 77:21,25
  78:6
**kuo** 67:7
**kyu** 5:4 135:24

**l**

**l** 115:4 121:10
**l.a.** 42:19 116:2
**lacks** 97:6
**larger** 119:7
**late** 29:23 32:1,1
  115:13
**laughing** 29:9
**law** 3:8 143:24
  146:5
**laws** 135:12
**lawyer** 69:7
  157:12
**lawyers** 64:22
**leaning** 158:11
**learn** 24:16
**leave** 24:24
**leaving** 17:23
**leblanc** 1:22 2:22
  162:23

**[led - math]**

led  35:12
lee  67:8
left  19:9 35:13
  76:25 80:3 82:5
  87:5 134:11,13
  136:21
legal  14:12,14
  45:20 51:24 55:16
  56:3,10 70:11,25
  73:21 74:20,22
  75:19 76:6 83:21
  93:20 100:7 102:9
  105:3,11 108:18
  109:9 110:4,13
  127:12 134:19
  136:23 137:4
  143:24 144:17,21
  145:8,20 146:8
legit  39:23
lengthy  150:5
letter  30:15 88:8
  135:23
letterhead  5:5
liabilities  118:22
  120:15,18,23,24
  129:22,25
liability  1:6,11,13
  1:14 2:6,11,13,14
  121:19 131:22
liar  108:16
license  16:5 27:14
lieu  159:10
life  14:24
liked  33:9
limited  1:5,7,11,13
  1:14 2:5,7,11,13
  2:14
line  5:11 100:13
  100:14 103:17,18
  103:19 118:6
  127:21 129:1,12

131:14,17,20
  141:6
list  46:3 81:25
  87:21
listen  108:9
listens  8:13
lists  140:6
litigation  21:4
litigator  157:12
little  19:8 32:19
  108:12 112:25
llc  1:5,7,10,13,14
  2:5,7,10,13,14
  4:10 5:8 6:18
  81:14 119:16,18
  119:21 128:17
loan  40:19,21,22
  42:18 43:7 45:16
  45:17 46:8,12,21
  47:20 56:15 122:7
  123:9,10,25 124:3
  124:24 125:1,3,4
  127:11
loaned  44:6 50:18
  52:8
loans  40:15 46:17
  47:9 71:4 74:6,7
  121:21 122:1
  123:7,11,14,19
  124:22 127:19
  134:15,20
located  78:23
  79:14 115:22
long  7:4 19:6,24
  28:21 74:24 94:4
  94:21,22 114:5
  115:10 121:11,14
longer  44:23 90:6
  94:2,7 95:2 114:4
look  18:10 35:16
  53:13 56:13 58:4

71:7 102:13 106:7
  109:17,21,23
  110:20 121:3
  123:19 125:21
  130:23 153:20
looked  63:23
  77:23,24 106:19
  141:11
looking  18:12 36:5
  36:6 69:19 103:20
  103:21 112:21
  119:7 123:4
  139:18
looks  96:11 109:25
  128:20 130:11,12
los  1:2,19 2:2,20
  6:1
loss  63:15 64:16
  66:11,20 99:10,12
  99:14 100:1,19
  125:14,18 126:14
  130:23 131:2,12
  131:23
losses  125:16,18
  134:11
lost  159:8
lot  51:6,10 133:8
lots  135:7
love  102:10
loves  33:18,20
lying  108:19

        m

m  1:22 2:22
  103:18 118:12
  162:23
ma'am  156:9
machine  162:12
mafia  67:5,9
magnitude  130:24
mail  3:6 4:18 70:8
  84:16 86:6,12

87:6,10 88:16
  92:16 93:12 159:6
mailed  70:10
  85:20
mails  4:20,22
  86:10,23
maintain  34:17
  81:3 157:23
maintained  34:19
making  32:8 71:3
management  37:9
  37:13
manager  29:19
  30:25
managerial  27:22
manipulated
  38:23 64:8
manual  17:18,19
manufactured
  137:14
manufacturing
  17:5 29:6
march  54:18,20
  62:13 93:10
mark  54:3 67:16
  95:4 128:7
marked  4:9 5:2
  41:12,14 53:8,9
  54:5 67:18 69:15
  76:17 84:1 88:17
  92:1 95:6 98:14
  117:15,16 128:9
married  17:24
match  78:5
material  26:1
  51:18,20 77:6
  78:19,22 109:18
  110:1
materials  98:23
math  90:22

Veritext Legal Solutions
866 299-5127

[mathematically - never]

mathematically
  100:8
matter   73:4 107:8
  146:8
matters   52:18
  67:3
mean   19:1 48:2,3
  48:15 49:21 78:15
  83:2 84:23 86:18
  102:18 111:22
  121:15 130:9
  135:17 157:22
  158:15
meaning   32:7
  68:20 78:18 79:1
means   75:22 126:3
meet   14:5,6,8
  114:9 149:5
meeting   4:19
  52:17 71:16
  114:17 138:6,16
  139:2
meetings   114:16
  138:16,19,21
meldy   1:18 2:18
  4:3,20,22 6:4,11
  6:12,14,23 87:10
melrose   115:6,7
  115:23 116:2
member   70:16,21
  74:1 83:18,18
members   95:15
  106:4 133:16
membership   4:12
  4:14,17 55:9 68:7
  91:16 92:23 93:5
  142:2 148:2
memo   48:7,12,13
  61:10
memorized   90:13

memory   93:15
memos   48:19
mentioned   32:12
met   71:12
middle   22:11 25:4
  113:2
million   39:1 40:11
  43:8 44:4,6 47:9
  50:17 51:15 52:9
  52:20 53:2,19,21
  55:1 61:13 63:7
  72:9 73:11,12
  99:22 100:1,4,5,5
  101:8 105:25,25
  107:24 118:15,21
  120:19 123:4
  127:10 131:12
  139:16,23 142:23
  142:24 145:16
  147:22 148:3,6,9
  148:14 149:9,10
  149:16,18 151:3
  152:25 153:7,11
  155:7,9,15,23
  156:3,3
mind   6:12 36:14
  142:21 153:22
mine   71:7 102:13
minimize   11:22
minus   100:9
minute   36:12
  136:9 149:23,25
minutes   60:9
  150:16,18
mischaracterizes
  33:3 111:10
  113:23 131:4,15
  140:16 143:23
  152:1 153:13
  157:3

mischaracterizing
  139:21 148:20
  149:12
misleading   143:3
  143:5,17
misplaced   159:9
misrepresents
  90:14
missed   37:14,16
misstates   101:2
  139:25 140:16
mistake   96:16
module   49:17
moment   66:9
  110:25
money   46:18,23
  48:10,12 51:3,6,11
  56:24 57:5 59:12
  59:18 72:18 73:7
  73:8,17,25 74:3
  93:16 98:7 103:11
  123:24 124:1
  128:2 130:10
  132:13,20 133:23
  134:9 136:13
  146:4
monies   46:21
  128:18 145:18
month   21:14 22:3
  25:3 89:14,15,15
  89:16,17 92:24
monthly   93:5
months   50:24
mood   83:17
mother   135:5,6
motion   158:12
motions   158:14
move   15:7 75:25
moved   15:19 18:7
  29:1 79:20,21,23
  79:24,25

moving   27:7
mt   66:25
mutual   33:1
          n
n   4:1
name   6:10 68:8,12
  108:18,22 136:1,4
  137:2 161:13
  162:20
named   94:16
natalie   94:14,15
  94:16,19,20,21,21
  95:1
natalies   94:17
nature   8:8 10:7
  11:7,15 14:25
  32:2 38:8 39:7
  40:2 74:9,25
  83:15
necessarily   122:3
  128:20 136:13
necessary   12:21
  161:10,11
need   18:22,23
  27:23 39:21 45:3
  65:9 74:12 108:12
  109:3 123:18
  145:22,24,25
  146:11 157:25
  159:20,21,22
needs   70:14
  122:17
negative   129:23
  129:24
neither   162:16
net   92:23 93:5
  104:7
never   35:17 76:24
  77:3 93:17 151:12
  151:13 155:13
  157:10

Page 15

[new - opinion]

**new**  4:16 68:7
91:16 133:11,21
134:5

**non**  75:25

**normal**  47:17
74:18,19,20
133:23

**north**  29:1

**note**  40:24 123:21
124:2 128:5

**noted**  57:4 73:14
122:24

**notes**  121:10,14,16
123:8,10 124:2
127:22

**notice**  4:16 68:7
91:15,15 159:12

**noting**  6:18

**november**  5:3
42:20 47:8 54:17
56:14 57:9,10,11
60:17 95:16 96:8
99:23 145:9,10
155:9,16,20

**number**  2:23 54:4
60:23 69:16 76:25
95:10,20 96:4,5
102:8 103:17,18
103:19 106:6
111:1,4,6,16,21,22
116:4 118:3
130:15 131:2,11
140:14 146:22,25
147:4,25 149:17
152:6

**numbered**  78:9

**numbers**  56:13
76:19 77:16 97:8
97:11,13 105:13
105:15,23 106:3
127:14 150:24

**o**

**oath**  9:2 108:2,3,7
161:7 162:11

**object**  118:5
128:25 132:5
151:21

**objecting**  44:19
150:3,4

**objection**  10:21
23:21,25 24:8
25:25 33:3 41:22
45:22 48:16 51:24
52:4,10 55:11,16
56:3,9,19 58:10
60:2 62:20 63:9
65:4 70:1,7,25
73:21 74:22 75:19
76:6 83:11,21
88:1 89:22 90:7
90:22 91:9 93:19
97:6 98:10 100:6
101:2 102:19
105:3,11 109:9
110:3,13 111:10
113:14,18,22
119:2,23 120:12
122:9,12 124:10
126:25 127:12
129:5,9 131:4,15
133:18 134:18
136:23 137:4
138:9 141:17
143:23 144:18,21
145:7,7,20 149:12
150:11,19 152:1

151:1,7,10 152:16
152:18,23 153:22
154:1 155:3

**numerous**  151:9
151:17,17,19

**nutrition**  29:9

**o**

**objections**  10:20
11:6,14 150:9

**obligation**  134:17

**obtained**  62:2,5

**obviously**  44:20
44:22 72:15 132:4

**occur**  152:19,20
153:5

**occurred**  145:4

**occurring**  26:15

**october**  9:16 42:13
47:8

**offer**  30:15

**office**  33:12 79:1,2
79:17,18,23,25
80:4

**officer**  51:20

**offices**  3:8

**oh**  15:14 43:3
52:23 96:2 132:17
153:22

**okay**  6:14 7:15,18
7:23 8:4,21 10:1,2
10:5,19 12:14
13:8,23 14:14,22
15:22 16:10,24
17:3 19:17,19
20:15 21:8,16
22:7,10,14,18 23:7
24:4,6 25:12 26:2
26:17 27:7 28:23
29:7,22 30:9 31:4
31:7 33:25 34:9
37:11,16,21 38:22
40:21 41:3 42:8
42:23 45:16 46:5
46:8,20 47:17
49:1,18 51:2 53:5
54:13 56:1 58:22

153:13 154:7
155:25 157:3

61:19 62:22 65:25
69:5,11 72:8,12,20
73:17 79:9 80:6
81:2,7 82:4 84:21
85:14 86:14 89:2
89:8 91:12 92:7
92:20 93:9 94:14
94:25 95:20 96:10
96:23 97:22 98:2
99:11,17,25
100:17 101:17,22
101:23 102:18,23
103:17,24 105:8
110:18 115:7,14
115:22 116:12,24
117:8,12,13
118:21 120:9,16
122:22 123:11,22
124:3 126:3,11,22
127:9 128:7 130:3
132:3 134:7 135:4
136:8 138:2 139:6
141:8 142:24
148:17 156:25

**old**  15:15 17:21
81:3

**once**  7:2 61:19,20
66:5 74:8 89:14
89:15 110:9

**ones**  79:18 80:8

**ongoing**  150:4

**online**  81:1,9,24

**open**  77:1

**operate**  130:19

**operating**  46:6
100:19 131:23

**operations**  133:10

**opinion**  45:23 56:4
56:10 74:23 75:20
83:12,22 85:11
93:20 100:7

[opinion - peddie]

109:10 110:4,7,14
110:14 119:3
120:13 124:11
127:13,13 131:16
134:19 136:24
137:5 143:24
144:17,22 145:8
145:21 147:12
**opportunities**
151:18,19
**opportunity** 10:21
11:17,22 12:7
**opposed** 40:22
**opposing** 108:19
113:16 150:17
**order** 16:17,19
95:5 98:13 109:7
128:8 160:4
**ordinary** 68:19
92:9 99:25 100:12
**original** 159:1,8
159:10,11,12,18
159:21,22
**ought** 146:7
**outlandish** 67:10
**outside** 114:15
**overheard** 25:23
26:4
**oversee** 37:8,11
78:14
**owe** 44:15 134:9
**owed** 133:17,23
**owing** 131:24
**owned** 46:13
96:24 102:21
126:23 134:15
**owners** 46:15
133:16
**ownership** 96:18
102:16,25 103:1
126:19,22 127:6

**owning** 101:25
**owns** 101:18

**p**

**p** 3:3
**p.m.** 2:21 6:2
160:8
**pacific** 3:5
**page** 4:4,8,8 5:2,2
5:11 53:13 69:18
71:10 72:1 101:20
103:15,16,23
106:16 107:17
110:19,21,24
123:5 140:5
141:17 142:6
160:10
**pages** 102:2,24
**paid** 57:14 90:4,8
90:15,16 130:4
142:18,21 144:5
**palisades** 3:5
**paper** 75:5,6,7
81:4 153:10
**paragraph** 53:13
53:18 55:15
**pardon** 84:6
**park** 1:12 2:12,19
31:20 33:9,14,16
86:3 94:25 138:7
**part** 31:2,3 67:9
146:16 158:5
159:24
**partial** 37:15
**participated** 99:2
**participating**
25:22
**particular** 18:15
50:14 110:19
138:15
**particularly** 20:24
22:9

**parties** 162:18
**partner** 125:9
**partners** 101:7,25
103:14,24 118:25
**partnership** 102:1
146:13
**party** 26:8 38:12
38:17 65:18,19
**pass** 139:5
**password** 82:24
**paula** 1:4,6 2:4,6
3:12 4:18,22 6:20
14:21 22:22 23:1
31:19 32:10,24
33:10,13,17 35:13
36:7 51:15,21
52:7 68:7 70:10
70:11 76:19 83:10
84:22 85:11,15,23
86:5,11,16 87:1,3
87:14 88:10 89:6
89:13,18 92:12,20
93:13,16 95:2
137:14 138:8,20
138:24
**paula's** 34:23
76:25
**pay** 57:18 92:23
93:5 134:17 143:9
148:9,13
**payable** 81:19
121:10,14,16
123:8,10 124:2
127:22 147:14
**paycheck** 21:19
91:7
**paycut** 4:21,23
92:22
**paying** 130:10
133:22

**payment** 56:17
57:19 89:12 142:4
142:8,9 145:10
148:15 155:11
**payments** 55:3
82:2 128:21,21
130:1 142:13,20
143:4,8
**payroll** 30:8 31:11
**pc** 82:25
**pdf** 86:16,18
**pdtw** 1:6 2:6 20:5
20:6 128:17,19,22
130:7,10,12,14
131:24 132:13
133:5,9,17 134:2
134:11,15 136:18
136:21 137:14,17
137:21,21,22
138:3
**peachtree** 17:23
**peddie** 3:8,8 4:6
6:15,17,17 13:17
14:3,6,8,11 15:4
15:12 23:21,25
24:8 25:25 26:4,9
26:13,17,24 27:4
33:3 35:5,7,10,15
35:23,25 36:3,6,9
36:15 41:22 43:23
43:25 44:2,7,9,11
44:15,18,23 45:1,3
45:6,22 48:16
51:24 52:4,10
54:19,21,23 55:11
55:16,20 56:3,9,19
58:10 60:2,10,13
62:20 63:9,22,24
64:3,5,9,15,23
65:4,22 66:2,4,9
66:13,17,19,22,25

Veritext Legal Solutions
866 299-5127

[peddie - prior]

67:2,7,13,22,25
70:1,7,25 71:6
73:21 74:22 75:19
76:6,14,23 77:2,8
77:10,14,19,21
78:2,8,11 79:15,24
80:7,9,11,14,17
83:11,21 87:10,12
87:17,21 88:1
89:22 90:7,22
91:9 93:19 95:22
95:24 96:2,14
97:6 98:10 100:6
101:2 102:2,6,10
102:19 105:3,11
106:15,18,21,23
107:1,5,7,10,14,18
107:20,23 108:1,4
108:8,12,25 109:3
109:9 110:3,7,13
110:20 111:10
113:14,18,22
116:9,19 118:5
119:2,23 120:12
121:4,7,9 122:9,14
122:18 124:10
126:25 127:12
128:25 129:5,8
131:4,8,15 132:3
133:18 134:18
136:23 137:4
138:9 139:6,9
140:2,18 141:21
141:23 143:6,15
143:23 144:7,12
144:17,21 145:7
145:20 146:3,7,11
146:13,16,22,25
147:4 148:19,22
149:12 150:10,18
151:21 152:1

153:13 154:7
155:25 156:13,16
157:3,7,9,17,19,22
157:25 158:4,9,13
158:16 159:14,16
159:20,23 160:1,3
160:6
**penalty**  9:18,21
12:6,21 109:1
159:1 160:9 161:6
**people**  33:22
86:12 87:2 115:19
137:22
**percent**  101:18
102:15,20 103:3
125:25 126:4,14
126:20 127:6,7
**percentage**  96:24
103:1 125:17
126:23
**performing**  29:15
**period**  51:16
**perjury**  9:18,22
12:6,22 109:2
159:1 160:9 161:7
**person**  8:13,15
30:23 39:6 83:17
106:11 135:20,21
136:2
**personal**  14:24
29:22 32:19 94:11
97:16,24 109:2
114:11
**personally**  9:7
**personnel**  30:8
31:15 67:5
**perspective**  51:8
**pertaining**  57:21
137:20
**pertains**  120:25

**phase**  77:22
**philippines**  15:1
16:2,2,3,6,8 17:4
27:15 56:13
**phone**  116:5
**physical**  8:22,23
81:24
**pick**  41:10
**pipe**  67:11
**place**  7:16 27:4
34:12 43:13 73:6
115:6,7,23 116:2
116:19 125:1
162:9
**placed**  162:11
**plaintiff**  2:19 6:20
**plaintiff's**  156:11
**plaintiffs**  1:8 2:8
3:2
**plan**  24:3
**play**  64:21
**please**  6:10 9:25
37:18 59:24,25
67:22 88:21
100:22 102:14
116:6 118:2 122:1
127:18 129:4
141:15,24 144:12
146:18 148:12
159:17
**pocket**  156:10
**point**  20:2 36:5
77:10 88:16 147:7
148:12 153:16
156:21
**pointed**  106:16
141:19 152:8
**pointing**  106:13
111:1,4,6,16
147:18

**portion**  119:1
**position**  7:21
23:19 30:23 36:18
36:21,24 51:21
115:8,14
**positions**  30:1
**possession**  75:9
**possibly**  8:18
**practice**  19:21
27:19 47:18,22
74:18,19,20
**practicing**  16:3
**precaution**  33:24
**prepare**  13:23,24
92:5 122:11 150:5
**prepared**  69:9
89:8 98:24 99:7
124:13,16,20
135:16 157:14
158:22
**prepares**  69:8
135:20
**preparing**  69:12
91:21 98:22
**present**  3:11 27:9
27:25
**presented**  103:7
**presenting**  106:10
**president**  23:15
**press**  83:3
**prevent**  135:13
**prevents**  50:10
**previous**  57:21
69:19 144:25
145:15
**price**  147:13,14
**print**  64:11
**printed**  47:11 62:7
**printers**  64:18
**prior**  73:23 148:5
162:10

Page 18

[private - receive]

private  17:2 18:16
  18:17 26:5
privileged  26:1
probably  13:11
  14:1 32:1 48:22
  77:9 94:24 103:6
  103:13 111:7
  133:2
problem  10:7
problems  8:12
procedure  158:20
  158:21
proceedings  8:2
  8:11 10:20 11:3
  129:3 162:8,10,12
process  99:2
produce  35:22,22
  43:22 68:15 75:16
  77:17 87:9,15
produced  35:4,5
  62:1
producing  132:15
  132:17
production  32:5,7
  66:7 94:19
profit  63:15 64:16
  66:10,20 99:10,12
  99:14 125:13,14
  125:17,25 126:5,6
  126:8
profits  135:7
program  38:9
programs  131:18
promissory  40:24
  123:21 124:2
propensity  146:20
proper  106:22
  110:10 146:5
property  137:25
  138:2

propose  157:13
  158:18
protect  133:16,22
provide  11:25
  159:3
providence  146:17
purchase  4:12,14
  52:25 53:2 54:13
  55:9,15 57:15
  69:20 142:2
  147:12 148:21
  149:2
purchaser  57:17
  147:12 148:2,6,8
purely  97:11
purpose  92:15
purposes  71:16,21
  73:12
purses  115:18
pursuant  55:23
  57:19 147:11
  148:14
put  38:16 47:16
  75:25 78:19 81:4
  108:18 135:2
  138:3 141:18
  151:25 152:3
  159:5
putting  82:11

q

quarter  16:18
question  9:24 10:4
  10:7,9,23,23,24
  11:1 12:7,11,12
  33:6 45:25 52:5
  55:22 56:5 57:3
  58:13 59:11,15,21
  59:24 60:5 73:12
  90:14 131:6,7,8
  140:17 144:2,16
  150:8

questioning  118:6
  129:2
questions  8:9
  11:14 60:13 107:2
  112:24 113:3
  117:12 143:15
  150:10 153:25
  154:11 156:6,13
  161:8
quick  125:22
quickbooks  17:15
  17:22,23 38:1,2,4
  38:9,11,14,16,19
  38:22 39:3,8,22
  41:19 45:14 48:5
  48:19 49:5,15,19
  49:22,23 50:9,13
  59:8,9 61:6,21,24
  62:19,25 63:8,11
  63:24 64:1,4,7,10
  64:12,18,24 65:2
  65:10,23 66:14,23
  66:25 72:9 73:3,5
  74:4,13,14,16,21
  76:4 77:7 78:20
  97:19,20 106:5,5
  109:21 110:2,10
  110:11 123:15
  128:5 132:7,19
  133:4,24,25 134:2
  134:3 152:24
quickreport  5:8
quiz  119:3 150:4
quote  46:16

r

r  28:20
rafols  1:18 2:18
  4:3,20,22 6:4,11
  6:13 87:10 156:17
reach  13:11

questioning  118:6

read  10:3,23 37:17
  37:19 42:12,24
  53:16 55:8 57:17
  59:15,16 84:7,9,11
  84:13 88:21 93:2
  93:6 106:20 109:4
  120:2,6 138:13
  141:15,24 142:1
  147:10,23,25
  148:1,17 158:24
  161:9
reading  148:11
  154:6
ready  117:25
real  125:22
realize  150:25
realized  149:22,23
  150:1,23
really  31:23 41:3
  56:24 112:21
  113:4,11 144:3
  145:25 153:16
  156:9
reason  27:17 45:8
  45:12 52:9 62:17
  62:18 125:23
  133:15
reasonable  26:7
  26:10 74:17
  159:12
reasons  151:13
recall  111:8,14,17
  111:19 139:10,24
  140:12
receipt  34:15 35:8
  35:20 36:5
receivables  81:19
receive  11:4,18
  38:12 40:22 57:6
  81:7 86:25 93:16

[received - return]

received 31:14
46:18,23 48:11
51:3 59:12,19
73:7,9 78:19
81:24 86:10 87:24
89:19 90:17 91:6
118:4 122:7
receiving 21:19
38:17
reclass 43:7 47:2
reclassed 120:15
reclassification
43:12 57:21 73:4
73:6,9
recognizes 132:20
recognizing
132:12
recollect 14:1
recollection 111:7
113:21
record 6:10 10:22
26:22 31:12,13
34:17 37:19 59:16
62:2 78:16,18
108:13,15 117:22
138:13 144:13
147:1,2 158:9
162:12
recorded 59:18
60:24 61:1,3
64:20 73:8 74:10
155:5
records 34:19
79:12 83:10
redacted 76:20,22
reduction 89:10
refer 140:4
reference 84:17
referred 55:14
68:23 141:6

referring 56:20,23
57:7,9 59:4
140:20 141:13
refers 53:24
reflect 62:7 98:3
108:13,15 147:1,2
158:9
reflected 61:13,16
124:24 130:25
reflects 132:1
refresh 113:20
regard 80:19,22
regarding 31:19
38:7 39:1 48:12
49:20 57:5,24
58:1 62:19 70:22
71:3 76:3 77:6
80:23 85:11 86:9
86:10,16
register 150:11
152:23
regular 68:12,16
regulations 75:18
76:5
relate 87:13
related 35:9 66:8
81:11 112:11
130:14 131:12
145:9
relates 58:14
92:20 99:17,18
127:19
relationship
114:12
relative 51:9
162:17
relaxed 21:5
relevance 88:1
112:10 118:8
129:1 145:7 150:3

relevant 112:6,8
relieved 158:19
rely 59:8
relying 74:16
remaining 57:18
148:9,13
remember 7:4
22:3,7,17 24:21
30:24 31:23 32:13
36:4 40:10,17,20
41:23 43:19 46:2
46:7 47:16 48:20
49:3,16 69:14
72:8,11 81:14,16
81:17 82:9 89:14
90:8 93:23 94:1,6
94:10,13,23 96:6,6
96:7,9 97:20
123:13 124:21
136:5,7 138:5,15
140:19,24 141:1
154:4,6
remembered
154:3
repeat 45:11
repeatedly 74:11
rephrase 10:1
59:14
report 44:20 62:14
65:6
reported 1:22
reporter 2:23 6:6
8:16,22 10:3
37:20 41:5,16
53:11 54:7 59:17
67:20 76:11 78:10
84:3 88:19 92:3
95:8 98:16 117:18
128:11 138:14
157:23 158:19
159:7 160:4 162:3

162:6
reporting 29:21
37:9
reports 38:23
49:13,16
represent 67:4,6
91:2
representation
41:8
representing
123:24
request 66:7 87:14
159:16
requests 87:17
requires 75:13
resource 30:4,6,23
30:25
response 8:24
12:11,12 105:19
140:17
responses 8:14
responsibilities
31:8 37:3 80:23
responsive 76:1
rest 17:2 35:18
62:25
restroom 18:23
result 8:1 82:14,15
100:9
retail 29:5 115:18
retract 158:16
return 76:15,17
98:24 99:7,13
102:9 106:10
118:7,17 119:1,4
120:3,5 122:6,10
122:25 124:5,13
124:18 125:4,9
127:4 130:16,25
135:21 139:19,23
140:4,5,5 141:8

**[return - sent]**

142:25 143:4,13
143:21 144:10
145:16,19 146:6
149:9 155:22
156:3
**returns** 5:5,7 78:2
102:3 106:3
119:12 121:22
135:16 145:5
152:23
**revenue** 132:24
135:6,7
**revenues** 38:8
**review** 11:19
12:20 13:13 83:19
109:11,13,15,17
**richard** 3:8,8 6:17
14:3,8 64:19
65:24
**right** 1:4 2:4 12:4
14:22 22:24 27:15
31:5 33:14 34:24
36:3 37:23 38:14
38:19 47:11,13
49:7 50:19 51:8
51:10,22 53:19,22
53:25 54:23 55:15
55:19 56:15 58:18
61:10,12 62:13,15
65:10,13 68:10
69:16 70:19 74:14
77:16 79:16,17,19
80:4 82:17 86:11
86:17 87:1 88:5
88:15 90:2,25
92:7,13 93:10
95:16 96:12,19
99:19,23 100:2,5
100:17,20 101:1
101:19 102:6
103:23 105:2,6,10

105:18,20 106:12
106:18 109:8,18
109:21 110:2
111:15,18 112:11
112:14 114:3,18
119:17,19,22
120:7 122:18
123:5,16 124:5,14
126:11,17,20
132:14 134:12,17
136:8,15,18 137:3
137:25 138:6
139:5,13 140:3
147:22 148:18
150:22 151:10,14
151:20 152:5,5,7,9
152:11,12 153:8
154:11,14,17,19
155:2,9,17,20,23
156:4 158:1
**roger** 67:7
**ruined** 156:8
**rules** 8:11 146:13
158:21

**s**

**s** 4:8
**salaries** 88:23 89:3
89:9
**salary** 90:2,16,20
91:2
**sale** 132:20,23
137:15
**sales** 94:20,22
133:1,3
**sample** 132:15,16
132:17 133:1
**samples** 132:8,14
132:21
**saw** 126:17 151:2
**saying** 12:24 26:19
33:19 48:24 57:23

59:8 67:12 73:20
74:11 78:1,6,7
103:13 120:2,3
139:2,3 144:11,20
149:11,15 150:13
153:2,17 154:22
**says** 10:25 35:25
42:8,12,23 43:7
53:2 55:8,10,22
57:17 73:24 81:14
92:22 93:4 95:14
95:24 101:17
118:16 127:22
140:8 145:15,16
147:10,16,24
148:13 157:1,2
**schedule** 41:19
46:6 55:3 56:18
57:19 73:19
101:18 103:18
111:20 118:11,12
119:8 120:25
121:10,23 122:3,4
122:20 123:2,5
128:16 142:4,8
148:15 154:20,22
154:24,25 155:1
155:12
**scheduled** 142:13
**schedules** 99:15
121:24
**schiffman** 14:17
14:17,18,19
**schnider** 4:18
25:18,19,24 34:5
69:3 72:3 86:4
95:1,19 133:19
**screaming** 108:14
147:1
**search** 138:24
139:4

**season** 137:8,12
**second** 36:11
38:13 101:22
102:4 143:2
144:13
**seconds** 45:1
**section** 119:6
147:8,10,24
**security** 76:19,25
77:15
**see** 33:8 40:17
42:14,25 43:8
48:5,6 53:14 54:9
55:1 58:15 60:17
60:21 61:14 68:8
92:25 95:10 99:19
100:15 101:7
102:15 104:2,5,8
108:21 120:18
121:13 125:22
126:15 129:12,13
129:23 133:4
141:8,10 142:5,5
142:13 159:20,21
159:22
**seeing** 36:4
**seek** 26:24
**seen** 11:9 77:1
**seldom** 40:7
**self** 159:4
**seller** 148:3,4,6
**selling** 132:14
**send** 13:13,14,15
86:25 159:1
**sense** 145:14
**sent** 13:17 68:6
78:8 84:15 85:13
85:14,16,18 86:10
92:12 93:9 98:23
99:6 157:15
158:23

Page 21

[separate - statement]

**separate** 63:18,19
66:17 79:5 85:4
85:22,25 86:9,13
86:15,22
**separately** 54:2
**september** 42:10
44:2 47:7 124:21
124:22 128:24
129:15,16,17,20
162:24
**sequence** 145:4,6
145:17
**set** 135:1 142:6
147:15 162:9
**seven** 75:14 76:3
79:10
**shares** 46:14 72:4
**sharing** 125:13,14
125:15,17,18,25
126:5,6,8,14
**sheet** 31:11 63:15
64:16 66:10,20
99:10,12,16 101:6
101:16 106:8
131:21
**shield** 133:16
**shipping** 17:8,9
**ships** 17:7,10
**shop** 71:17,18
**short** 105:24
**shorthand** 2:23
6:5 37:20 41:15
53:10 54:6 59:17
67:19 84:2 88:18
92:2 95:7 98:15
117:17 128:10
138:14 162:3,6,13
**shot** 1:12 2:12
**shove** 146:20
**shoved** 151:24
152:15 153:10,19

**show** 41:11 50:14
88:16 100:24
101:5 118:2,21
119:6 137:24
143:16 146:11
151:10 156:9
**showed** 89:18
110:24 113:17
127:21 135:7
146:20,22,25
147:4 151:4 152:6
**showing** 41:10
106:15 107:14,16
107:17 110:19
125:13,14,16
149:9 152:24
153:11
**shown** 141:3,13
142:25
**shows** 51:2 54:16
90:15 96:12
102:15 127:5,10
130:6 131:2
147:21 155:22
156:3
**shuts** 133:9
**side** 21:22 75:25
132:24
**sign** 12:5,21 34:14
150:6 158:25
**signature** 161:16
162:22
**signed** 35:17 36:7
68:10,12 70:4
91:14 108:22
109:1 135:23
148:18
**similar** 33:16
**simple** 57:3 59:11
60:5 87:20

**simply** 38:6
136:17
**single** 39:16 80:15
**sister** 18:7,10
135:2,3,8
**sit** 31:18 144:7,12
**sitting** 6:20
**six** 82:23 158:13
**slate** 134:7
**slip** 59:5
**social** 76:18,25
77:15
**software** 38:9
**sold** 136:18 137:3
137:7,9,25 138:3
**solemnly** 161:6
**solicits** 25:25
**somebody** 45:9,13
50:10 51:21
108:16,17,18
**sophistication**
108:13
**sorry** 6:16 7:13
57:8,25 58:3 59:2
67:21 90:12 96:2
96:15,15 98:20
101:12 112:3
114:20 115:3
129:17 131:20
**sort** 140:13 142:3
**sound** 72:12
**sounds** 86:14
**source** 30:19,20,21
30:22 38:15,18,19
39:14 65:14
141:10
**sources** 38:7
**south** 67:5
**speak** 8:15 66:3,4
67:9,14 135:21

**speaking** 122:13
146:15,18,23
**specific** 66:7 81:15
87:17 133:2
**specifically** 31:8
128:4
**speculate** 10:11
**speculation** 10:13
10:17 23:21,25
24:9 52:4,10
55:20 56:4,10
65:4 70:1 89:23
90:7 93:19 100:6
102:19 110:15
**speculative** 10:12
**spend** 23:8 57:2
**spent** 150:16
**spit** 65:10
**stamped** 159:4
**stand** 108:24
157:9
**standing** 129:5
158:10
**start** 21:11 22:18
113:16 115:12
158:2
**started** 19:19 22:3
22:8,15 28:8
134:5,7 137:12
**starting** 19:2 93:6
**starts** 129:16
**state** 1:1 2:1 6:10
29:23 44:13
118:13 119:12
129:9 162:6
**stated** 55:4 155:4
**statement** 9:14,24
63:16 64:16,17
66:11,11,20
120:25 121:1,2
122:13 123:1

Page 22

[statements - thank]

statements  11:6
   11:13 29:20 59:6
   63:12,14 65:23
   78:17 80:25 81:1
   81:3,8,23 99:6,8
   99:12 121:5,7
states  15:8,19,23
   18:5,9 49:6 56:14
   61:7,9 95:15
   100:3,23 104:25
   125:24
status  89:21
stay  21:5
stayed  137:21
   156:23
stephen  40:4,6
   41:9 62:1,18 67:8
   71:11
steps  26:7,10
stipulate  26:20
   27:12
stipulated  160:2,3
stipulation  13:11
   26:14 157:13
   158:19 159:25
stop  77:25 78:6
   107:4 146:14,18
   146:23 147:5,5,5
stopped  28:11
stops  133:10
store  75:2 81:21
   86:19
stored  82:8
straight  60:4
strike  75:25 111:7
stupid  158:17
sub  142:3
subject  4:19,21,23
   87:14
subscribe  161:12

subscribed  162:20
subsequent  144:24
sudden  154:1
suddenly  154:3,4
suggesting  60:14
suggestion  24:19
   24:20 25:13,14,15
suite  2:20 3:4
sunset  3:4
superior  1:1 2:1
supervisor  114:24
support  43:19
supported  124:2
supports  97:9
suppose  73:11
supposed  34:14
   57:1 98:2 144:5
   156:2
sure  14:18 18:22
   20:13 25:16 26:7
   32:25 34:12 35:10
   39:22 53:4 65:15
   74:7 94:23 110:1
   136:6 138:2,5
   147:9
swear  64:19
swore  62:2
sworn  6:5
system  9:11 17:17
   47:3 50:9

           t

t  4:8 28:20 115:4
table  79:2,4 142:6
   142:14
tainted  141:20
   147:3
take  7:15 8:18
   18:1,23 19:20
   26:6 27:17 36:12
   43:12 66:19 73:6
   76:12 82:22 94:4

108:2,3,7 127:15
   144:4
taken  2:18 6:24
   36:16 78:12
   117:23 127:16
   136:10 162:9
takes  125:1
talk  14:22 19:1
   20:20,22 24:18
   30:10 36:13,18
   37:23 40:3,5
   78:14 80:19 81:10
   89:4 108:10 114:2
   138:19 149:5
   151:19,22 152:4
talked  20:15 153:7
talking  25:21
   37:25 46:5 101:17
   112:5 135:22
   136:12 139:11
   140:21 141:1
   147:5,6
talks  8:17 53:18
   132:25
tangent  12:15
tax  5:5,7 76:15,17
   78:2 98:24 99:7
   99:13,18 102:3,9
   106:3,9,10,11
   118:7,17 119:1,4
   119:11 120:2,5
   121:22 122:6,10
   122:20,24 124:5
   124:13,18 125:4,9
   126:12 127:4
   130:16,25 135:16
   135:20 139:19
   141:8 142:25
   143:4,13,21
   144:10 145:5,16
   145:19 146:6

149:9 152:23
   155:22 156:3
taxation  146:13
taxes  119:9
telecommunicati...
   16:21
telephone  3:5,10
   39:9,10,11 116:4
tell  9:3,5,25 10:6
   15:25 20:25 23:3
   24:13 31:7 35:1
   52:2 65:25 66:15
   66:18,21,24 67:13
   81:17 89:20 94:7
   95:1 99:5 112:14
   126:10 130:19
   139:21
telling  26:21 49:5
   67:11 150:2
   153:20
tenure  79:11
term  121:11,14
terminated  88:11
termination  88:7
terms  32:8 37:24
   142:8 147:14
testified  6:6 7:1
   41:9 133:19
   152:12
testifying  107:25
   162:11
testimony  12:1
   33:4 48:10 112:16
   112:20 149:13
   155:14,14 156:12
thale  115:2,4
thank  60:8 76:9
   88:15 91:12
   113:25 124:20
   125:8 127:15
   131:9 143:15

Veritext Legal Solutions
866 299-5127

[thank - transfer]

156:6

theory 67:7
149:20 150:2,22
152:17 154:10,13
154:16,19 155:2

thereof 162:15

thereto 161:9

thief 108:16

thieves 67:4

thing 74:17

things 8:7 11:6,14
14:25 38:8 87:18
118:7 133:8
138:17

think 8:11 12:12
14:15,19 16:9
17:22 22:11,21
23:23 24:18 25:4
25:13 26:22 32:4
37:13 40:15 51:6
51:10,13,14 52:21
55:6 62:17 67:14
71:8 74:12 76:15
77:11 79:21 80:14
82:7 83:4,6,9
87:12,13,25 88:7
88:10 89:14 90:5
96:25 97:22
108:25 110:18,23
110:25 111:3
117:10 121:4
126:12 140:1
148:19,19 153:1,4
153:15 158:3

third 4:24 26:8
38:12,17 65:18,19
88:23 89:10 90:21
90:23 95:12 106:4
113:12,12 140:20
141:4 147:19

thirds 90:25

thirteen 148:4,10
148:14

thomas 1:4,5,6,10
2:4,5,6,10 3:12
4:10,15,18,22 5:6
5:8 6:18,20 9:7
14:13,16 20:2,8,9
20:12,16 21:12,17
21:20,24 22:1,4,13
22:15 23:1,18
24:16,24 27:10
28:8,11 29:23
30:2 31:19 32:10
33:10,13 36:11,22
36:25 37:4 40:8
42:19 50:18 51:2
51:11,15,15 52:2,7
57:5 59:12 62:3
70:10,11 72:14
73:13 75:8,16
76:2,19 78:23
81:12 84:22 85:11
85:15,23 86:5,11
86:16 87:1,3,14
88:10 89:6,13,18
91:6 92:12,20
93:13,13,16 95:2
98:7 99:3 100:1
101:1,19 104:22
118:4,18 120:11
123:12 126:4
127:5,11,20
128:21 130:19,24
131:12 132:13
133:12,14,25
134:1,3,16,16,20
136:17 137:11
138:4,20,24
139:18 145:19

thomas's 36:7
51:21 138:8

thorough 109:15

thought 26:17
88:2 116:16
145:18 149:8

thousand 148:4,7

threatened 88:11

three 15:4 16:25
31:24 102:24
105:16,22 106:3
115:20 117:7
138:22 148:3
149:25 150:15
152:21 154:4

throw 137:15

tie 105:17,18
151:1 153:5,22
154:1

time 7:4,19 8:15
8:17 12:25 23:7
27:9,25 29:11
31:6,10,10 34:12
46:18 47:19 51:12
51:13,16 57:3
67:1,2 70:12 73:8
76:10 79:2 91:11
93:23 94:1 96:24
109:20 115:20
122:14,17 136:20
151:16 152:14,15
152:19,20 153:16
153:23 155:17
156:9,22 158:6
160:6 162:9

times 31:22,24
39:18 40:5 71:14
71:15 138:22
151:10

title 23:14 31:1
141:15

titled 69:20

today 4:19 11:5,18
12:1 23:19 77:4
156:18

told 20:23 22:23
33:13 60:10
116:21 153:20

topic 41:4

topics 27:8

total 55:1 56:20
71:23 72:2 96:11
118:19 130:7
139:22 142:21
147:14 149:22
151:2 153:3,6

totally 56:2

totals 155:6

trail 48:5 49:8,9
49:11,17,20,23
50:1,6,10

transaction 39:8
39:22 40:2 45:19
47:23,24 50:8,14
50:15 74:9,25
130:11 134:13
145:10,11 152:24
152:25

transactions 4:10
57:22 148:22

transcribed
162:13

transcript 11:4,4,9
11:11,19 12:5,19
13:13 157:14,15
157:24 158:22,24
158:25,25 159:2,5
160:5

transcription
162:15

transfer 42:12
82:10 83:3 130:12

Veritext Legal Solutions
866 299-5127

**[transferred - witness]**

transferred 82:15
82:16 133:25
134:1,2,16 136:14
transferring 82:12
transmittal 68:6
85:12 141:11
transpired 145:12
treat 65:25
trial 9:16 13:8
156:9 157:12
158:15 159:13,14
trick 64:23 158:3
tricks 64:21
tried 14:1 76:18
157:5,10
trigger 12:12
153:21
trucking 116:16
true 26:16,22 39:1
61:19,20 62:10
77:25 102:11
138:23
trust 23:6
truth 9:3,6 26:20
26:21 101:3
154:23,24
truthful 9:15
12:25 13:4
truthfulness 9:11
try 36:9 110:11
113:20
trying 59:25 85:5
106:25 111:8,18
112:14 138:7
140:13 141:21
turn 60:16
tw 41:10 81:13,14
82:12,15 94:22
103:11 130:12
131:24

two 13:12 25:6
29:8,10 31:24
36:12 53:21 90:25
94:17 96:11 97:5
113:9 117:7
138:22 148:9,14
148:22 157:14,17
157:19 158:22
tying 149:17,19
150:24 151:2
152:18
type 16:16 18:12
59:3 61:10 64:21
81:21 123:18
types 45:18

**u**

u.s. 57:18 118:7
119:4 122:5
uh 8:21,22 28:2
50:20
undersigned 162:5
understand 8:19
8:25 9:2,5,8,12,19
9:21 10:9,14,16
11:1,7,15,19,23
12:2,8,17,22 13:1
13:5,21 22:13
30:20 46:8 48:18
62:3 67:3 77:2
97:11 108:24
120:6
understanding
35:15
understood 10:9
unfortunately
117:9
unintelligible 9:25
unit 43:25 147:13
united 15:8,19,23
18:5,9

units 83:19 96:12
105:1 147:13
unusual 125:24
use 17:14,17 35:9
77:14

**v**

vague 9:25 89:22
98:10
valid 39:23
various 46:20
156:17
vendor 38:13
vendors 130:2,4
verbal 8:24
verbatim 162:11
verified 39:14
64:24 65:2
verify 8:6 39:4,5
39:12,19,21,24
58:20 65:7,9 74:9
74:12,17,25 75:23
76:18
verizon.net 3:6
versus 100:9
viewing 80:25
violation 75:18
76:4
visit 18:7,10
vs 1:9 2:9

**w**

w 85:3
w4 30:15
waiting 93:24
waits 8:13
walk 30:9
want 18:23 26:12
27:19,20 44:17
47:6 48:18 53:16
56:25 63:20 64:1
64:2 79:13 80:11

85:21 87:15,19
97:16,22,23
102:13 106:2
110:5 117:20
130:15,18,23
141:16 146:12
150:11 154:24
155:13
wanted 23:5 26:18
65:18 81:2 106:20
152:4
wants 158:25
wasting 67:1,2
water 18:23
156:24
way 44:18 81:4
98:22 159:9
we've 151:17
156:17
week 117:2,6
157:16,18 158:1
158:24
weeks 13:12 22:21
157:14,17,19
158:23
went 23:16 28:5
45:13 47:3 63:6
141:9 156:23
west 3:4
whereof 161:12
162:19
wholesale 29:5
115:18
wife 71:11
win 158:15
winning 158:11,14
wire 42:5,9
withheld 77:5
witness 4:2 5:10
8:5 13:8 15:5,11
41:23 52:11 53:17

Veritext Legal Solutions
866 299-5127

**[witness - zero]**

56:5,20 59:18
62:21 63:11 65:6
70:8 73:23 74:24
75:21 76:8 79:25
80:8 83:12,23
84:12 88:2,22
90:8,23 91:10
96:1 97:8 100:8
102:4,20 105:13
106:13,25 109:11
110:5,16 111:12
113:24 116:7,11
116:22 118:6
119:4,24 120:14
121:6,8,10 122:19
127:14 131:17
134:20 138:15
140:1 141:18
143:3 144:23
145:9,22 146:2,14
146:15,19,24
147:3,7,10 148:23
149:13 150:5
151:22 157:1,2,15
158:23,23 159:3
161:12,16 162:19
**witnesses** 162:10
**woman** 94:16
**word** 35:9 86:16
86:18 115:4
**words** 47:10,13,15
**work** 16:4,7 18:8
18:10,12,19 19:6
20:2 22:18 23:6
27:20 28:8,14,21
29:2,15 89:25
94:21,22 114:15
115:1,19 116:9
117:2,5
**worked** 16:20,22
16:25,25 17:4

19:2,3 20:5,16
23:10 27:10,25
29:11,11 44:23
90:2 135:15,17
**working** 7:18
20:19 21:8,11,16
23:8 27:9 28:11
95:2 115:10
116:14,16,23
**works** 12:10
137:22
**worried** 58:8
**worry** 33:22
**write** 48:12 92:15
**written** 48:13
91:16
**wrong** 38:24 86:15
90:13
**wrote** 92:7,9
**wylde** 1:5,6,10 2:5
2:6,10 4:10,15 5:6
5:8 6:18 9:7 14:13
14:16 20:2,8,9,12
20:16 21:12,17,20
21:24 22:1,4,13,15
23:1,18 24:16,24
27:10 28:8,11
29:23 30:2 36:22
36:25 37:4 40:8
42:19 50:18 51:2
51:11 52:2 57:5
59:12 62:3 72:14
73:13 75:16 76:2
78:23 81:12 91:6
93:13 98:7 99:3
100:1 101:1,19
104:22 118:4,18
120:11 123:12
126:4 127:5,11,20
128:21 130:24
131:12 132:13

133:12,14,25
134:1,3,16,16,20
136:17 137:11
138:4 145:19
**wylde's** 75:8
139:18

**x**

**x** 4:1,8

**y**

**yeah** 7:20 13:19
17:20 19:16 20:17
29:17 38:3 41:19
43:3,21 45:5
54:20 86:21 87:11
89:12 114:9 121:4
121:8 129:7 138:1
140:1 149:4
159:15
**year** 24:25 31:25
43:14 47:2 57:14
94:24 99:18 100:1
100:19 104:1
130:20,20,21
139:11,12 140:7,9
142:18 143:13
144:25
**years** 15:15 19:8
23:8,12 25:6
47:19 75:14 76:3
79:10 104:19
114:3,6,7
**yesterday** 20:21

**z**

**zero** 105:24
157:10,11

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

11 41 AM
02 27/17
Accrual Basis

# THOMAS WYLDE LLC
## Transactions by Account
### All Transactions

| Type | Date | Memo | Debit | Credit | Balance |
|------|------|------|-------|--------|---------|

**Notes Payable - Long Term**

**Notes Payable - Hillshore Contr**

| Type | Date | Memo | | Debit | Credit | Balance |
|------|------|------|------|-------|--------|---------|
| Deposit | 08/26/2014 | INCOMING DOMESTIC WIRE WIRE IN | 1/HILLSHORE | | 600,000 00 | 600,000.0 0 |
| Deposit | 09/18/2014 | INCOMING DOMESTIC WIRE WIRE IN | HILLSHORE | | 350,000.00 | 950,000.0 0 |
| Deposit | 10/14/2014 | Fund transfer from Hillshore, Inv. | | | 350,000.00 | 1,300,000.00 |
| Deposit | 11/13/2014 | $500K loan to Thomas Wylde-LLC, to be converted to Equity fa | | | 500,000.00 | 1,800,000.0 0 |
| Deposit | 12/12/2014 | December Funding 2014 | | | 500,000.00 | 2,300,000.00 |
| General | 12/31/2014 | To reclass Hillshore loan to Equity | | 2,300,000.00 | | 0.00 |
| Transfer | 02/26/2016 | Funds Transfer | | | 249,975.00 | 249,975.00 |
| General | 02/26/2016 | bank fee | | | 25.00 | 250,000.00 |
| Deposit | 03/29/2016 | Deposit | | | 250,000.00 | 500,000.00 |
| Deposit | 04/15/2016 | Deposit | | | 200,000.00 | 700,000.00 |
| Deposit | 04/26/2016 | Deposit | | | 200,000.00 | 900,000.00 |
| Deposit | 05/16/2016 | Deposit | | | 674,000.00 | 1,574,000.00 |
| Deposit | 05/26/2016 | Deposit | | | 277,000.00 | 1,851,000.00 |
| Deposit | 06/15/2016 | Deposit | | | 80,000.00 | 1,931,000.00 |
| Deposit | 06/27/2016 | Deposit | | | 100,000.00 | 2,031,000.00 |
| Deposit | 06/30/2016 | Deposit | | | 280,000.00 | 2,311,000.00 |
| Deposit | 07/13/2016 | 375K | | | 375,000.00 | 2,688,000.00 |
| Deposit | 08/16/2016 | Deposit | | | 250,000.00 | 2,936,000.00 |
| Deposit | 09/02/2016 | Deposit | | | 200,000.00 | 3,136,000.00 |
| Deposit | 10/31/2016 | 99,891.12 | | | 100,000.00 | 3,236,000.00 |
| Deposit | 11/03/2016 | Deposit | | | 25,000.00 | 3,261,000.00 |
| General | 11/04/2016 | pay off -MURPHY ROSEN/Friday, November 4, 2016 3:52 55 | | | 35,000.00 | 3,296,000.00 |
| Deposit | 12/01/2016 | Deposit | | | 70,000.00 | 3,366,000.00 |
| Deposit | 12/09/2016 | Deposit | | | 55,000.00 | 3,421,000.00 |
| Deposit | 01/04/2017 | Deposit | | | 65,000.00 | 3,486,000.00 |
| Deposit | 01/17/2017 | Deposit | | | 60,000.00 | 3,546,000.00 |
| Deposit | 02/07/2017 | Deposit | | | 65,000.00 | 3,611,000.00 |
| Deposit | 02/13/2017 | Deposit | | | 60,000.00 | 3,671,000.00 |

| | | | Debit | Credit | Balance |
|------|---|---|-------|--------|---------|
| **Total Notes Payable - Hillshore Contr** | | | 2,300,000.00 | 5,971,000.00 | 3,671,000.00 |
| **Total Notes Payable - Long Term** | | | 2,300,000.00 | 5,971,000.00 | ,671,000.00 |
| **TOTAL** | | | 2,300,000.00 | 5,971,000.00 | 3,671,000.00 |

PLAINTIFF EXHIBIT
For Identification
Witness: MELODY RAFOLS
Date: 8-18-2015
Damon M. LeBlanc, CSR No. 11958

EXHIBIT NO. 3 2
For Identification
Witness: ENILUZ GONZALEZ
Date: 7-31-2017
Damon M. LeBlanc, CSR No. 11958

## AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

This Agreement to Purchase Membership Interest (the "Agreement") is entered into by and between Thomas Wylde, LLC, a California limited liability company ("Seller"), and Hillshore Investments, a Panamanian corporation with its principal place of business located at Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá ("Purchaser"), effective November 5, 2015 (the "Effective Date").

## RECITALS

A.     Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). All Units Membership Interest in Seller are owned by John Hanna, The Palliative, LLC, Stanley Ducks, LLC, DSRB Group, LLC, Paula Thomas, and Purchaser (the "Members").

B.     On August 25, 2015, John Hanna, as Manager and CEO of Seller (the "Manager") issued a Notice of Proposed Action by Written Consent and Request for Consent to the issuance of 3,300 Membership Interest Units ("Units") at a price of $1,060.61 per Unit. On August 27, 2015, the Manager issued a Notice of Approval of Action informing the Members that a Supermajority of Members had authorized the action. Pursuant to the Operating Agreement, Member Paula Thomas had until September 11, 2015 to exercise her exclusive right to purchase some or all of the Units at the indicated price. On September 14, 2015, the Manager issued a Notice of Non-Exercise informing the Members that Paula Thomas had not exercised her option and giving notice that, pursuant to the Operating Agreement, the remaining Members had until September 28, 2015 to exercise their exclusive right to purchase some or all of the Units at the indicated price. On September 28, 2015, Purchaser exercised its option to purchase all of the Units. No other Member exercised their option. On October 13, 2015, the Manager gave notice to all Members that Purchaser had exercised the option to buy all of the Units.

C.     Pursuant to its notice of intent to exercise its option, Purchasers hereby agrees to purchase all 3,300 Units at a price of $1,060.61 per Unit, for a total exercise price of Three Million Five Hundred Thousand and Thirteen Dollars ($3,500,013), payable on the terms set forth herein.

D.     Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

E.     Seller's Members have approved the sale of such new membership Units to Purchaser by Supermajority, as set forth above.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Sale of the Interest. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, 3,300 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

Agreement to Purchase Membership Interest

PLAINTIFF EXHIBIT  66
For Identification
Witness: MELODY RAFOLS
Date: 8-18-2017
Damon M. LeBlanc, CSR No. 11958

02235

2.     Instruments of Conveyance. Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3.     Consideration. In consideration for the Membership Interest, Purchaser shall make a capital contribution to Seller in the amount of Three Million Five Hundred Thousand and Thirteen US dollars ($3,500,013). Seller acknowledges that prior to the Effective Date, Purchaser advanced Seller One Million Five Hundred Thousand US dollars ($1,500,000), which advance shall be applied as consideration under this Agreement. Purchaser shall pay the remaining balance of Two Million and Thirteen US dollars ($2,000,013) pursuant to the payment schedule attached hereto as Exhibit "A."

4.     Default. If Purchaser fails to make any payment set forth on Exhibit "A" within thirty (30) days of the date on which it is due, it shall be deemed a "Defaulting Member" pursuant to section 3.3 of the Operating Agreement and shall be subject to the provisions of that section relating to Defaulting Members. If Purchaser fails to cure the default within another thirty (30) days thereafter, a pro rata share of its Membership Interest, equal to the percentage of the balance of the consideration remaining due divided by the total consideration set forth in section 3, above, shall automatically revert back to the Company. Furthermore, the Company and its Members shall then have the right to repurchase the balance of Purchaser's Membership Interest subject to the provisions of Section 8 of the Operating Agreement relating to Involuntary Lifetime Transfers.

5.     Purchaser Representations and Warranties. Purchaser represents and warrants to Seller as follows:

a.     This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

b.     Purchaser is aware that the acquisition of its Units in the company has not been registered under the securities act of 1933, as amended, or qualified under the securities laws of any state.

c.     Purchaser is acquiring the Membership Interest for its own account, for investment purposes, and not with a view to the distribution thereof.

d.     Purchaser understands that the sale, pledge, assignment or other transfer of its units in the company is limited by this agreement and in any event may not be effected unless (i) the transfer is registered and qualified under applicable securities laws, or is effected as a non- public offering that is exempt from the registration and qualification requirements of applicable securities laws and (ii) the person acquiring such units represents and warrants to the company and to the other

Agreement to Purchase Membership Interest

Page 2

**02236**

members that such person is acquiring its units in the company solely for its own account and not for the account of any other person, for investment only, and not with a view to or for sale in connection with any distribution of such units.

      e.    Purchaser has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of acquiring its Units in the Company.

      f.    Purchaser acknowledges that there is no guarantee that the Company will be a financial success and is able to bear the economic risk of the loss of its Units in the Company.

      g.    The Company has not solicited or advertised the Units in any way.

      h.    Purchaser has firsthand knowledge of the business and affairs of Company, has reviewed the Operating Agreement, and agrees to be bound by all of the terms and conditions of the Operating Agreement.

      i.    Purchaser acknowledges that the Company and the Members are relying on the foregoing representations.

    6.    <u>Seller Representations and Warranties</u>. Seller represents and warrants to Purchaser as follows:

      a.    Seller has not taken any action, or entered into any agreements, in any way affecting or binding Seller, its Manager, or Members and has full right, power, and authority to sell, transfer, and deliver the Membership Interest pursuant to this Agreement.

      b.    Seller shall transfer title in and to the Membership Interest to the Purchaser free and clear of all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever.

      c.    Seller has received fair equivalent value under the terms of this Agreement.

      d.    Seller has the legal capacity to execute and deliver this Agreement and to effect the sale with respect to the Membership Interest.

      e.    The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance of Seller's obligations hereunder will not conflict with or result in any violation of or default under any provision of any agreement or instrument by which the Seller is bound.

      f.    Except for any consent or approval that has been obtained and remains in full force and effect as of the date hereof, no consent, approval or authorization of, or declaration, notice, filing or registration with, any governmental or regulatory authority, or any other person, is required to be made or obtained by the Seller on or prior to the date hereof in connection with the execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby.

    7.    <u>Benefit</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

Agreement to Purchase Membership Interest

Page 3

8.   Necessary Actions.  Each party agrees to execute and deliver all such other documents or instruments and to take any action as may be reasonably required in order to effectuate the transaction contemplated by this Agreement.

9.   Waiver and Amendment.   No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

10.   Entire Agreement.  This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

11.   Severability. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

12.   Governing Law And Venue. The laws of the State of California shall govern this Agreement. Venue for any legal action arising from or relating to this Agreement shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The parties agree that they are subject to the personal jurisdiction of such courts and waive any objection to such jurisdiction and venue, including any claim that it is an inconvenient forum. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

13.   Drafting.  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

14.   Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

Thomas Wylde, LLC                                          Hillshore Investments

_____                       _____
John Hanna, Manager                                        Eniluz Gonzalez, General Manager

**02238**

## Exhibit "A" to Agreement to Purchase Membership Interest

### Payment Schedule

| Date | Amount |
|------|--------|
| 11/15/15 | $500,000 |
| 1/1/16 | $500,000 |
| 2/1/16 | $250,000 |
| 3/1/16 | $250,000 |
| 4/1/16 | $500,000 |
| Total | $2,000,000 |



PLAINTIFF EXHIBIT  6 7
For Identification
Witness: MELDY RAFLS
Date:  8-18-2017
Damon M. LeBlanc, CSR No. 11958

02239

# THOMAS WYLDE



### THOMAS WYLDE, LLC

### NOTICE OF ISSUANCE OF NEW MEMBERSHIP INTEREST

### TO THE MEMBERS OF THOMAS WYLDE, LLC ("Company"):

On August 25, 2015, the Manager of the Company issued to you a Notice of Proposed Action by Written Consent and Request for Consent to issue new Membership Interest Units ("Units"). Effective August 27, 2015, a Supermajority of Members had returned executed copies of the Notice and Consent. The Manager therefore issued a Notice of Approval of Action on August 27, 2015, informing you that the action was approved and the Manager was authorized to issue an additional 3,300 Units at a price of $1,000.00 per Unit.

The Notice of Approval of Action stated that Member Paula Thomas had the exclusive right to purchase some or all of the Units at the indicated price until September 11, 2015. Ms. Thomas did not exercise that right.

The Notice of Approval of Action further stated that the remaining Members had the exclusive right to purchase some or all of the Units at the indicated price until September 28, 2015. Hillshore Investments exercised its right to purchase 3,300 Units and that no other Member exercised that right.

On January 26, 2016, Hillshore provided the attached executed Agreement to Purchase Membership Interest, effective November 15, 2015 (the "Agreement"). The Manager hereby gives notice that the Company has therefore issued 3,300 additional Units to Hillshore Investments, subject to the terms of the Agreement. The Third Amended Exhibit B to the Operating Agreement memorializing that issuance is attached and will be duly recorded in the Company's minutes.

*Dated this 26th day of January, 2016.*

John Hanna, Manager & CEO

## AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

This Agreement to Purchase Membership Interest (the "Agreement") is entered into by and between Thomas Wylde, LLC, a California limited liability company ("Seller"), and Hillshore Investments, a Panamanian corporation with its principal place of business located at Calle 53 Este, Urbanización Marbella, Torre MMG. 2, Ciudad de Panamá, Panamá ("Purchaser"), effective November 5, 2015 (the "Effective Date").

### RECITALS

A.    Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). All Units Membership Interest in Seller are owned by John Hanna, The Palliative, LLC, Stanley Ducks, LLC, USRB Group, LLC, Paula Thomas, and Purchaser (the "Members").

B.    On August 25, 2015, John Hanna, as Manager and CEO of Seller (the "Manager") issued a Notice of Proposed Action by Written Consent and Request for Consent to the Issuance of 3,300 Membership Interest Units ("Units") at a price of $1,060.61 per Unit. On August 27, 2015, the Manager issued a Notice of Approval of Action informing the Members that a supermajority of Members had authorized the action. Pursuant to the Operating Agreement, Member Paula Thomas had until September 11, 2015 to exercise her exclusive right to purchase some or all of the Units at the indicated price. On September 14, 2015, the Manager issued a Notice of Non-Exercise informing the Members that Paula Thomas had not exercised her option and giving notice that, pursuant to the Operating Agreement, the remaining Members had until September 28, 2015 to exercise their exclusive right to purchase some or all of the Units at the indicated price. On September 28, 2015, Purchaser exercised its option to purchase all of the Units. No other Member exercised their option. On October 15, 2015, the Manager gave notice to all Members that Purchaser had exercised the option to buy all of the Units.

C.    Pursuant to its notice of intent to exercise its option, Purchaser hereby agrees to purchase all 3,300 Units at a price of $1,060.61 per Unit, for a total exercise price of Three Million Five Hundred Thousand and Thirteen Dollars ($3,500,013), payable on the terms set forth herein.

D.    Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

E.    Seller's Members have approved the sale of such new membership Units to Purchaser by Supermajority, as set forth above.

### AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Sale of the Interest. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, 3,300 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

Agreement to Purchase Membership Interest

Page 1

2.      **Instruments of Conveyance.** Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interest.

3.      **Consideration.** In consideration for the Membership Interest, Purchaser shall make a capital contribution to Seller in the amount of Three Million Five Hundred Thousand and Thirteen US dollars ($3,500,013). Seller acknowledges that prior to the Effective Date, Purchaser advanced Seller One Million Five Hundred Thousand US dollars ($1,500,000), which advance shall be applied as consideration under this Agreement. Purchaser shall pay the remaining balance of Two Million and Thirteen US dollars ($2,000,013) pursuant to the payment schedule attached hereto as Exhibit "A".

4.      **Default.** If Purchaser fails to make any payment set forth on Exhibit "A" within thirty (30) days of the date on which it is due, it shall be deemed a "Defaulting Member" pursuant to section 3.3 of the Operating Agreement and shall be subject to the provisions of that section relating to Defaulting Members. If Purchaser fails to cure the default within another thirty (30) days thereafter, a pro rata share of its Membership Interest, equal to the percentage of the balance of the consideration remaining due divided by the total consideration set forth in section 3, above, shall automatically revert back to the Company. Furthermore, the Company and its Members shall then have the right to repurchase the balance of Purchaser's Membership Interest subject to the provisions of Section 8 of the Operating Agreement relating to Involuntary Lifetime Transfers.

5.      **Purchaser Representations and Warranties.** Purchaser represents and warrants to Seller as follows:

a.      This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

b.      Purchaser is aware that the acquisition of its Units in the company has not been registered under the securities act of 1933, as amended, or qualified under the securities laws of any state.

c.      Purchaser is acquiring the Membership Interest for its own account, for investment purposes, and not with a view to the distribution thereof.

d.      Purchaser understands that the sale, pledge, assignment or other transfer of its units in the company is limited by this agreement and in any event may not be effected unless (i) the transfer is registered and qualified under applicable securities laws, or is effected as a non-public offering that is exempt from the registration and qualification requirements of applicable securities laws and (ii) the person acquiring such units represents and warrants to the company and to the other

Agreement to Purchase Membership Interest

2.    **Instruments of Conveyance.** Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3.    **Consideration.** In consideration for the Membership Interest, Purchaser shall make a capital contribution to Seller in the amount of Three Million Five Hundred Thousand and Thirteen U.S. dollars ($3,500,013). Seller acknowledges that prior to the Effective Date, Purchaser advanced Seller One Million Five Hundred Thousand US dollars ($1,500,000), which advance shall be applied as consideration under this Agreement. Purchaser shall pay the remaining balance of Two Million and Thirteen US dollars ($2,000,013) pursuant to the payment schedule attached hereto as Exhibit "A."

4.    **Default.** If Purchaser fails to make any payment set forth on Exhibit "A" within thirty (30) days of the date on which it is due, it shall be deemed a "Defaulting Member" pursuant to section 3.3 of the Operating Agreement and shall be subject to the provisions of that section relating to Defaulting Members. If Purchaser fails to cure the default within another thirty (30) days thereafter, a pro rata share of its Membership Interest, equal to the percentage of the balance of the consideration remaining due divided by the total consideration set forth in section 3, above, shall automatically revert back to the Company. Furthermore, the Company and its Members shall then have the right to repurchase the balance of Purchaser's Membership Interest subject to the provisions of Section 8 of the Operating Agreement relating to Involuntary Lifetime Transfers.

5.    **Purchaser Representations and Warranties.** Purchaser represents and warrants to Seller as follows:

    a.    This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

    b.    Purchaser is aware that the acquisition of its Units in the company has not been registered under the securities act of 1933, as amended, or qualified under the securities laws of any state.

    c.    Purchaser is acquiring the Membership Interest for its own account, for investment purposes, and not with a view to the distribution thereof.

    d.    Purchaser understands that the sale, pledge, assignment or other transfer of its units in the company is limited by this agreement and in any event may not be effected unless (i) the transfer is registered and qualified under applicable securities laws, or is effected as a non-public offering that is exempt from the registration and qualification requirements of applicable securities laws, and (ii) the person acquiring such units represents and warrants to the company and to the other

Agreement to Purchase Membership Interest

members that such persons acquiring its units in the Company's each of its own account, and not with a view to any other person, for investment only, and not with a view toward the sale or other disposition of any distribution of such units.

      e.    Purchaser has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of acquiring interests in the Company.

      f.    Purchaser acknowledges that there is no guarantee that the Company will be a financial success and is able to bear the economic risk of the loss of its rights in the Company.

      g.    The Company has not solicited or advertised the sale in any way.

      h.    Purchaser has firsthand knowledge of the business and affairs of Company, has reviewed the Operating Agreement and agrees to be bound by all of the terms and conditions of the Operating Agreement.

      i.    Purchaser acknowledges that the Company and the Members are relying on the foregoing representations.

    6.    <u>Seller Representations and Warranties</u>. Seller represents and warrants to Purchaser as follows:

      a.    Seller has not taken any action, or entered into any agreement, in any way affecting or binding Seller, its Manager, or Members and has full right, power, and authority to sell, transfer, and deliver the Membership Interest pursuant to this Agreement.

      b.    Seller shall transfer title in and to the Membership Interest to the Purchaser free and clear of all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever.

      c.    Seller has received fair equivalent value under the terms of this Agreement.

      d.    Seller has the legal capacity to execute and deliver this Agreement and to effect the sale with respect to the Membership Interest.

      e.    The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance of Seller's obligations hereunder will not conflict with or result in any violation of or default under any provision of any agreement or instrument by which the Seller is bound.

      f.    Except for any consent or approval that has been obtained and remains in full force and effect as of the date hereof, no consent, approval or authorization of, or declaration, filing or registration with any governmental or regulatory authority, or any other person, is required to be made or obtained by the Seller on or prior to the date hereof in connection with the execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby.

    7.    <u>Benefit</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

8.    Necessary Actions.  Each party agrees to execute and deliver all such other documents or instruments and to take any action as may be reasonably required in order to effectuate the transaction contemplated by this Agreement.

9.    Waiver and Amendment.   No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

10.    Entire Agreement.  This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

11.    Severability. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

12.    Governing Law And Venue. The laws of the State of California shall govern this Agreement. Venue for any legal action arising from or relating to this Agreement shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The parties agree that they are subject to the personal jurisdiction of such courts and waive any objection to such jurisdiction and venue, including any claim that it is an inconvenient forum. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

13.    Drafting.  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement.

14.    Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

Thomas Wylde, LLC                                    Hillsboro Investments


Juan Marco, Manager                                  Emilio Gonzalez, General Manager

Exhibit "A" to Agreement to Purchase Membership Interest

Payment Schedule

| | |
|---|---|
| 11/15/15 | $500,000 |
| 1/1/16 | $500,000 |
| 2/1/16 | $250,000 |
| 3/1/16 | $250,000 |
| 4/1/16 | $500,000 |

THIRD AMENDED EXHIBIT B

MEMBERS AND CAPITAL CONTRIBUTIONS
November 15, 2015

| Name | Contact Information | Capital Contributions and Effective Dates | No. Units | Capital Account Balance |
|---|---|---|---|---|
| John Hanna | 323 S. La Cienega Blvd. Los Angeles, CA 90048 Fax: 310-556-5765 Email: [illegible] | $700 December 15, 2014 | 14 | $700 |
| The Palimtree LLC | 12143 Dewey St. Los Angeles, CA 90066 Fax: 310-559-5703 Email: [illegible] | $900 1 December 15, 2014 | 18 | $900 |
| Shirley Oishia, LLC | 48101 Irvine Blvd Tustin, CA 92780 Fax: 714-237-9991 Email: roger@2edier.com | $350 December 15, 2014 | 7 | $350 |
| DSRB Group LLC | 15144 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: doe@dsrlieve.com | $350 December 15, 2014 | | $350 |
| Paula Thomas | 2515 S. Pelota Ave. Palm Spring, CA 92264 Email: [illegible] with a copy to: Laura Hare Kaye & Ching 18 Corporate Park Irvine, CA 91606 Email: [illegible] | $3,200 + intellectual property and related liabilities December 12, 2014 | 64 | $3,200 |
| Initiative Inchoropolis | Calle 33 [illegible] MMG, 2 [illegible], Panama Attn: Eurlas Gonzalez, General Manager | $3,900,000 January 1, 2015 $3,500,013 November 12, 2015 | 3100 | $9,900,013 |
| Totals | | | 3200 | $9,900,013 |

From: **David Schnider** david@thomaswylde.com
Subject: Meeting today
Date: March 24, 2015 at 5:57 PM
To: Paula Thomas paula@thomaswylde.com
Cc: John Hanna johnhanna@thomaswylde.com, Meldy Rafols meldy@thomaswylde.com

Paula:

I am writing to confirm what you and I discussed at our meeting today. Specifically, John informed you on Friday that you were not to make any decisions relating to company business without first talking to him. That includes not posting anything on social media, not accepting or turning down promotional opportunities, and not committing to any contractual obligations without his authorization. Despite that admonition, you subsequently turned down an opportunity the company was presented with to provide clothing for the celebrity Sia to wear on the UK version of The Voice tv show. This is exactly the type of decision that should not be made without John's approval. Per John's instruction, you are to focus your efforts for now solely on designing the new line and should not take any further action without John's approval. You indicated that you understood this. If it is unclear in any way, please discuss it with me or John.

Regards,
David

PLAINTIFF EXHIBIT  6 9
For Identification
Witness: MELDY RAFOLS
Date: 8-15-2017
Damon M. LeBlanc, CSR No. 11958

## Meldy Rafols

| | |
|---|---|
| **From:** | John Hanna |
| **Sent:** | Thursday, March 26, 2015 5:21 PM |
| **To:** | Meldy Rafols |
| **Cc:** | John Hanna· Hanna Personal Email |
| **Subject:** | Re: Executive Paycut |

Meldy .. Yes. I do confirm that all three executives would have a pay cut of 33% from the current salaries ..

thank you
Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

| | |
|---|---|
| phone: | 310 559 5549 |
| mobile: | 310 770 3741 |

| | |
|---|---|
| email: | johnhanna@ThomasWylde.com |

On Mar 26, 2015, at 9:41 AM, Meldy Rafols <meldy@thomaswylde.com> wrote:

Hi John,

Can you please confirm the effectivity of the Executive paycut and that all of you, Jene and Paula agreed to the cut. Thanks.

Best

Meldy Rafols
Financial Controller

*The secret of success is consistency of purpose.*

PLAINTIFF EXHIBIT ___70___
For Identification
Witness: MELDY RAFOLS
Date: 8-18-2017
Damon M. LeBlanc, CSR No. 11958

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

phone:          +1  310  559  5549
mobile:         +1  323  459  6084
email:          meldy@thomaswylde.com

<image001.jpg>_<image002.jpg>_<image003.jpg> <image004.jpg>

Please help save the trees, print this email only if necessary.
This E-mail and any of its attachments may contain THOMAS WYLDE proprietary information, which is privileged,
confidential, and/or subject to copyright law, belonging to THOMAS WYLDE, its affiliates or clients. This E-mail is
intended solely for the use of the individual or entity to which it is addressed.   If you are not the intended recipient of
this E-mail, any dissemination, distribution, copying, or action taken in relation to this E-mail is strictly prohibited. If
you have received this E-mail in error, please notify the sender immediately and permanently delete the original and
any copy of this E-mail and destroy any printout.

00885

XFINITY Connect                                                https://connect.comcast.net/zimbra/h/printmessage?id=662491&part=2&...

**XFINITY Connect**                                                                        **lawstudios@comcast.net**

<u>+ Font Size -</u>

**Executive Paycut**

**From :** Meldy Rafols <meldy@thomaswylde.com>                                   Mon, Mar 30, 2015 09:59 AM
**Subject :** Executive Paycut                                                          📎4 attachments
   **To :** Paula Thomas <paula@thomaswylde.com>
   **Cc :** John Hanna <johnhanna@thomaswylde.com>

Hi Paula,

Hope you had a great weekend.

As approved by John, the executive paycut of 33% will take effect for the month of April.  As you approved
also, I will be deducting in 2 monthly installment your membership contribution for $1600, total of $3200.
With the paycut and the membership contribution deduction, your net pay will be **$8,247.95** for the month of
April and May.

After the membership deduction, your monthly net pay will be **$9,847.95** starting in June 1, 2015.

FYI and reference.  Please let me know if you have any question or comment.  Thanks.

Best,

Meldy Rafols
Financial Controller

*"The secret of success is consistency of purpose."*

# T H O M A S   W Y L D E

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

phone:        +1 310 559 5549
mobile:       +1 323 459 6084
email:        <u>meldy@thomaswylde.com</u>

Please help save the trees, print this email only if necessary.
This E-mail and any of its attachments may contain THOMAS WYLDE proprietary information, which is privileged, confidential,
and/or subject to copyright law, belonging to THOMAS WYLDE, its affiliates or clients. This E-mail is intended solely for the use of
the individual or entity to which it is addressed.  If you are not the intended recipient of this E-mail, any dissemination,
distribution, copying, or action taken in relation to this E-mail is strictly prohibited. If you have received this E-mail in error, please
notify the sender immediately and permanently delete the original and any copy of this E-mail and destroy any printout.



PLAINTIFF EXHIBIT _71_
For Identification
Witness: MELDY RAFOLS
Date: 8-18-2017
Damon M. LeBlanc, CSR No. 11958

**01441**

XFINITY Connect
https://web.mail.comcast.net/zimbra/h/printmessage?id=662491&part=2&..


**image001.jpg**
8 KB


**image002.jpg**
8 KB


**image003.jpg**
8 KB


**image004.jpg**
8 KB

**01442**

## THIRD AMENDED EXHIBIT B

## MEMBERS AND CAPITAL CONTRIBUTIONS
November 15, 2015

| Name | Contact Information | Capital Contributions and Effective Dates | No. Units | Capital Account Balance |
|---|---|---|---|---|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700 December 15, 2014 | 14 | $700 |
| The Palliative, LLC | 12114 Dewey St., Los Angeles, CA 90066 Fax: 310-559-5765 Email: jene@thomaswylde.com | $900 December 15, 2014 | 18 | S900 |
| Stanley Ducks, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@zther.com | $350 December 15, 2014 | 7 | $350 |
| DSRB Group, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350 December 15, 2014 | 7 | $350 |
| Paula Thomas | 2514 S. Toledo Ave. Palm Spring, CA 92264 Email: paulathomas@me.com *With a copy to: Laura Hess Kring & Chung 38 Corporate Park Irvine, CA 92606 Email: lhess@kringandchung.com* | $3,200 + intellectual property and certain liabilities December 22, 2014 | 64 | $3,200 |
| Hillshore Investments | Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá Attn: Eníluz Gonzalez, General Manager | $5,500,000 January 1, 2015 $3,500,013 November 15, 2015 | 3390 | $9,000,013 |
| Totals | | | 3500 | $9,005,513 |

PLAINTIFF EXHIBIT  72
For Identification
Witness: MELDY DAFDLS
Date:  8-18-2017
Damon M. LeBlanc, CSR No. 11958

02240

**Kyu Hong Kim, CPA, Inc.**
**3435 Wilshire Blvd Ste 1970**
**Los Angeles, CA 90010-1938**
**213-381-3557**

November 9, 2016

**CONFIDENTIAL**

THOMAS WYLDE LLC
235 W 31ST ST
LOS ANGELES, CA 90007

Dear :

We have prepared the enclosed amended returns from information provided by you without
verification or audit. We suggest that you examine these returns carefully to fully acquaint
yourself with all items contained therein to ensure that there are no omissions or misstatements.

**Federal Filing Instructions**

Your amended 2015 Form 1065 shows no balance due.

Your amended return is being filed electronically and is not required to be mailed. If you mail a
paper copy of Form 1065 to the IRS it will delay processing of the return. The electronically filed
return is not complete without a signature. A limited liability company member should sign and
date Form 8879-PE, IRS *e-file* Signature Authorization for Form 1065. The form must be signed
and returned before the electronic file can be transmitted to the IRS.

Mail the signed Form 8879-PE as soon as possible to:

Kyu Hong Kim, CPA, Inc.
3435 Wilshire Blvd Ste 1970
Los Angeles, CA 90010-1938

**California Filing Instructions**

Your amended California 2015 Form 568 shows no balance due.

Your amended return is being filed electronically and is not required to be mailed. If you mail a
paper copy of Form 568 to the California Franchise Tax Board it will delay processing of your
return. The electronically filed return is not complete without your signature. A limited liability
company member should sign and date Form 8453-LLC, California e-file Return Authorization
for Limited Liability Companies. The form must be signed and returned before the electronic file
can be transmitted to California Franchise Tax Board.

Mail signed Form 8453-LLC as soon as possible to:

Kyu Hong Kim, CPA, Inc.
3435 Wilshire Blvd Ste 1970
Los Angeles, CA 90010-1938

PLAINTIFF EXHIBIT _75_
For Identification
Witness: MELDY RAFOLS
Date: 8—18—2017
Damon M. LeBlanc, CSR No. 11958

Also enclosed is any material you furnished for use in preparing the returns. If the returns are examined, requests may be made for supporting documentation. Therefore, we recommend that you retain all pertinent records for at least seven years.

In order that we may properly advise you of tax considerations, please keep us informed of any significant changes in your financial affairs or of any correspondence received from taxing authorities.

If you have any questions, or if we can be of assistance in any way, please call.

Sincerely,

Kyu Hong Kim, CPA, Inc.

Form **1065X**

(January 2012)

Department of the Treasury
Internal Revenue Service

## Amended Return or Administrative Adjustment Request (AAR)

(For use by filers of Forms 1065, 1065-B, and 1066)

▶ See separate instructions.

OMB No. 1545-0099

**For tax year ending**
▶ 12/2015
(Enter month and year.)

| | |
|---|---|
| Please Type or Print | **Name** THOMAS WYLDE LLC | **Employer identification number** 47-1444612 |
| | **Number, street, and room or suite no. (If a P.O. box, see instructions.)** 235 W 31ST ST | |
| | **City or town, state, and ZIP code** LOS ANGELES    CA 90007 | **Telephone number (optional)** |

Enter name and address used on original return (if same as above, write "Same")

Same

Internal Revenue Service Center where original return was filed ▶ Ogden, UT 84201-0011

### TEFRA/NonTEFRA Determination

**A** Has the partnership made an election to be treated as an electing large partnership (ELP) under the provisions of section 775? ☐ Yes ☒ No

If "Yes," the partnership is not subject to TEFRA. Enter the date of the election ▶ _____ , go to Item E, and check the "Not subject to TEFRA" box. Do not complete Items B through D.

You must determine if the partnership is subject to the rules for consolidated audit proceedings (TEFRA proceedings) under sections 6221 through 6234. See instructions for details.

**B** Did the partnership have 10 or fewer partners at all times during the tax year? (**Note.** A husband and wife are considered one partner for TEFRA purposes.) ☒ Yes ☐ No

**C** At all times during the partnership's tax year, were all partners U.S. citizens, resident aliens, C corporations, or estates of deceased partners? ☐ Yes ☒ No

If the answers to questions B and C are "Yes," the partnership is not subject to TEFRA proceedings. A partnership that is not subject to TEFRA cannot file an Administrative Adjustment Request. See instructions for details.

**D** If the partnership is not otherwise subject to TEFRA, has the partnership filed Form 8893, Election of Partnership Level Tax Treatment, or its equivalent, to make an election to be treated as a TEFRA partnership? ☐ Yes ☒ No

If the answer to question D is "Yes," enter the tax year that the election to be treated as a TEFRA partnership was originally filed with the partnership return ▶

**E** The partnership is ☒ Subject to TEFRA ☐ Not subject to TEFRA

**F** Check the applicable box (see instructions): ☐ Amended Return ☐ Administrative Adjustment Request (AAR)

**G** If you are a Tax Matters Partner (TMP) or a Partner With Authority (PWA) filing an AAR on behalf of the pass-through entity, are you requesting substituted return treatment? (see instructions) ☐ Yes ☒ No

**H** Check the applicable box to identify the type of pass-through entity: ☒ Partnership ☐ Electing Large Partnership (ELP) ☐ Real Estate Mortgage Investment Conduit (REMIC)

**I** Partnerships and ELPs, enter the number of Schedules K-1 being filed with this return ........................ ▶ 6

### Fill in applicable items and use Part III to explain any changes

| Part I | Amended or Administrative Adjustment Request (AAR) Items for Partnerships Filing Form 1065 Only (ELPs and REMICs, use Part II) | | (a) As originally reported on Schedule K or as previously adjusted | (b) Net change — increase or (decrease) — explain in Part III | (c) Correct amount |
|---|---|---|---|---|---|
| | **1** Ordinary business income (loss) | 1 | −4,613,383 | 0 | −4,613,383 |
| | **2** Net rental real estate income (loss) | 2 | | | |
| | **3** Other net rental income (loss) (see instructions) | 3 | | | |
| | **4** Guaranteed payments | 4 | | | |
| Income (Loss) | **5** Interest income | 5 | | | |
| | **6a** Ordinary dividends | 6a | | | |
| | **b** Qualified dividends | 6b | | | |
| | **7** Royalties | 7 | | | |
| | **8** Net short-term capital gain (loss) | 8 | | | |
| | **9a** Net long-term capital gain (loss) | 9a | | | |
| | **b** Collectibles (28%) gain (loss) | 9b | | | |
| | **c** Unrecaptured section 1250 gain (see instructions) | 9c | | | |
| | **10** Net section 1231 gain (loss) | 10 | | | |
| | **11** Other income (loss) (see instructions) | 11 | | | |

Form 1065X (1-2012)        THOMAS WYLDE LLC                        47-1444612                              Page **2**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Deductions** | 12 | Section 179 deduction | 12 | | | |
| | 13a | Contributions | 13a | 2,400 | 0 | 2,400 |
| | b | Investment interest expense | 13b | | | |
| | c | Section 59(e) expenditures | 13c | | | |
| | d | Other deductions (see instructions) | 13d | | | |
| **Self-Emplmt.** | 14a | Net earnings (loss) from self-employment | 14a | | | |
| | b | Gross farming or fishing income | 14b | | | |
| | c | Gross nonfarm income | 14c | | | |
| **Credits** | 15a | Low-income housing credit (section 42(j)(5)) | 15a | | | |
| | b | Low-income housing credit (other) | 15b | | | |
| | c | Qualified rehabilitation expenditures (rental real estate) | 15c | | | |
| | d | Other rental real estate credits (see instructions) | 15d | | | |
| | e | Other rental credits (see instructions) | 15e | | | |
| | f | Other credits (see instructions) | 15f | | | |
| **Foreign Transactions** | 16a | Name of country or U.S. possession ▶ _____ | | | | |
| | b | Gross income from all sources | 16b | | | |
| | c | Gross income sourced at partner level | 16c | | | |
| | d | Foreign gross income sourced at partnership level passive category | 16d | | | |
| | e | Foreign gross income sourced at partnership level general category | 16e | | | |
| | f | Foreign gross income sourced at partnership level other | 16f | | | |
| | g | Deductions allocated and apportioned at partner level interest expense | 16g | | | |
| | h | Deductions allocated and apportioned at partner level other | 16h | | | |
| | i | Deductions allocated and apportioned at partnership level to foreign source income passive category | 16I | | | |
| | j | Deductions allocated and apportioned at partnership level to foreign source income general category | 16J | | | |
| | k | Deductions allocated and apportioned at partnership level to foreign source income other | 16k | | | |
| | l | Total foreign taxes (check one) ▶ Paid ☐ Accrued ☐ | 16l | | | |
| | m | Reduction in taxes available for credit (see instructions) | 16m | | | |
| | n | Other foreign tax information (see instructions) | | | | |
| **Alternative Minimum Tax (AMT) Items** | 17a | Post-1986 depreciation adjustment | 17a | | | |
| | b | Adjusted gain or loss | 17b | | | |
| | c | Depletion (other than oil or gas) | 17c | | | |
| | d | Oil, gas, and geothermal properties—gross income | 17d | | | |
| | e | Oil, gas, and geothermal properties—deductions | 17e | | | |
| | f | Other AMT items (attach statement) | 17f | | | |
| **Other Information** | 18a | Tax-exempt interest income | 18a | | | |
| | b | Other tax-exempt income | 18b | | | |
| | c | Nondeductible expenses | 18c | 48,960 | 0 | 48,960 |
| | 19a | Distributions of cash and marketable securities | 19a | | | |
| | b | Distributions of other property | 19b | | | |
| | 20a | Investment income | 20a | | | |
| | b | Investment expenses | 20b | | | |
| | c | Other items and amounts (see instructions) | 20c | | | |

**Note. Amended Schedules K-1:** File amended Schedules K-1 with Form 1065X. If the partnership is filing Form 1065X for an
administrative adjustment request (AAR), please inform the partners receiving the amended Schedules K-1 that the partnership is filing
the AAR. If the partnership is not subject to the rules for consolidated audit proceedings (TEFRA proceedings) under sections 6221
through 6234, the partnership cannot file an AAR; and instead must furnish the amended Schedules K-1 to its partners. The partners
must then file their own amended returns (see instructions).

Form 1065X (1-2012)      THOMAS WYLDE LLC                          47-1444612                    Page **3**

**Part II**     **Amended or Administrative Adjustment Request (AAR) Items for ELPs and REMICs Only**

| | (a) Description of Item Being Amended or Adjusted (see instructions) | | (b) As originally reported or as previously adjusted | (c) Net change — increase or (decrease) — explain in Part III | (d) Correct amount |
|---|---|---|---|---|---|
| **1** | | **1** | | | |
| **2** | | **2** | | | |
| **3** | | **3** | | | |
| **4** | | **4** | | | |
| **5** | | **5** | | | |

**Tax and Payments** (see instructions)

| | | | | | |
|---|---|---|---|---|---|
| **6** | ELPs ONLY: Tax and other payments | **6** | | | |
| **7** | REMICs ONLY: Tax on net income from prohibited transactions | **7** | | | |
| **8** | REMICs ONLY: Tax on net income from foreclosure property | **8** | | | |
| **9** | REMICs ONLY: Tax on contributions after the startup day | **9** | | | |
| **10** | Total tax | **10** | | | |
| **11** | Tax paid with Form 7004 | **11** | | | |
| **12** | Tax paid with (or after) the filing of the original return | | | **12** | |
| **13** | Add lines 11 and 12, column (d) | | | **13** | |
| **14** | Overpayment, if any, as shown on original return or as later adjusted | | | **14** | |
| **15** | Subtract line 14 from line 13 | | | **15** | |

**Tax Due or Overpayments** (see instructions)

| | | | |
|---|---|---|---|
| **16** | **Tax Due.** Subtract line 15 from line 10, column (d). For details on how to pay, see instructions | **16** | |
| **17** | **Overpayment.** Subtract line 10, column (d), from line 15 | **17** | |

**Note. Amended Schedules K-1 or Schedules Q.** File amended Schedules K-1 or Schedules Q with Form 1065X. If the ELP or REMIC is filing Form 1065X for an administrative adjustment request (AAR), do not furnish the amended Schedules K-1 or Schedules Q to the partners or residual interest holders. If the REMIC is not filing for an AAR and is not subject to the rules for consolidated audit proceedings under sections 6221 through 6231, the REMIC must furnish the amended Schedules Q to its residual interest holders. See instructions for details.

**Sign Here**    Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ _____    Date _____    ▶ _____ Title
Signature of general partner, limited liability company member manager, or authorized individual

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Kyu Hong Kim | | | | P00288359 |
| | Firm's name ▶ Kyu Hong Kim, CPA, Inc. | | | Firm's EIN ▶ | 20-2861494 |
| | Firm's address ▶ 3435 Wilshire Blvd Ste 1970 Los Angeles, CA        90010-1938 | | | Phone no. | 213-381-3557 |

Form **1065X** (1-2012)

Form 1065X (1-2012)    THOMAS WYLDE LLC                               47-1444612                        Page **4**

**Part III**    **Explanation of Changes to Items in Part I and Part II.** Enter the line number from Part I or Part II for the
items you are changing, and give the reason for each change. For partnerships, show the box number and
code used to report the item on Schedule K-1. Show any computation in detail. Also, see What To Attach in
the instructions.

If this amended return or AAR is reporting any change in the allocation of the partnership's or REMIC's income, gain, loss,
deduction, or credit among its partners or residual interest holders, see Changes in Allocation in the instructions, and check
here ................................................................................................................................................................................ ▶ ☐

This amended return is to correct only partners' share of profit and
capital. Partners' share of loss is same as original return.
Since the taxpayer made loss in current year, change in partners' share of
profit and capital will not affect partner's share of current year income,
deductions, credits, and other items in Part III of Schedule K-1.

Form **1065X** (1-2012)

Form **1065**

Department of the Treasury
Internal Revenue Service

### U.S. Return of Partnership Income

For calendar year 2015, or tax year beginning ............... , ending ...................
▶ Information about Form 1065 and its separate instructions is at www.irs.gov/form1065.

OMB No. 1545-0123

**2015**

| | | | |
|---|---|---|---|
| **A** Principal business activity | **Type** | Name of partnership | **D** Employer identification number |
| MANUFACTURIN | **or Print** | THOMAS WYLDE LLC | 47-1444612 |
| **B** Principal product or service | | Number, street, and room or suite no. If a P.O. box, see the instructions. | **E** Date business started |
| APPAREL | | 235 W 31ST ST | 07/22/2014 |
| **C** Business code number | | City or town, state or province, country, and ZIP or foreign postal code | **F** Total assets (see the instructions) |
| 315990 | | LOS ANGELES      CA 90007 | $ 6,292,703 |

See Statement 1

**G** Check applicable boxes:  (1) ☐ Initial return  (2) ☐ Final return  (3) ☐ Name change  (4) ☐ Address change  (5) ☒ Amended return
 (6) ☐ Technical termination - also check (1) or (2)

**H** Check accounting method:  (1) ☐ Cash  (2) ☒ Accrual  (3) ☐ Other (specify) ▶

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ ............................................. 6

**J** Check if Schedules C and M-3 are attached ............................................................................................................ ☐

Caution. Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| Income | | | | |
|---|---|---|---|---|
| **1a** | Gross receipts or sales | **1a** | 3,971,781 | |
| **b** | Returns and allowances | **1b** | | |
| **c** | Balance. Subtract line 1b from line 1a | | **1c** | 3,971,781 |
| **2** | Cost of goods sold (attach Form 1125-A) | | **2** | 1,932,841 |
| **3** | Gross profit. Subtract line 2 from line 1c | | **3** | 2,038,940 |
| **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | | **4** | |
| **5** | Net farm profit (loss) (attach Schedule F (Form 1040)) | | **5** | |
| **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | **6** | |
| **7** | Other income (loss) (attach statement)                    See Statement 2 | | **7** | 77,661 |
| **8** | Total income (loss). Combine lines 3 through 7 | | **8** | 2,116,601 |

| Deductions (see the instructions for limitations) | | | | |
|---|---|---|---|---|
| **9** | Salaries and wages (other than to partners) (less employment credits) | | **9** | 1,492,031 |
| **10** | Guaranteed payments to partners | | **10** | |
| **11** | Repairs and maintenance | | **11** | 33,607 |
| **12** | Bad debts | | **12** | |
| **13** | Rent | | **13** | 375,439 |
| **14** | Taxes and licenses | | **14** | 8,265 |
| **15** | Interest                                 See Statement 3 | | **15** | 200,000 |
| **16a** | Depreciation (if required, attach Form 4562) | **16a** | 15,295 | |
| **b** | Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | | **16c** | 15,295 |
| **17** | Depletion (Do not deduct oil and gas depletion.) | | **17** | |
| **18** | Retirement plans, etc. | | **18** | |
| **19** | Employee benefit programs | | **19** | 67,230 |
| **20** | Other deductions (attach statement)                    See Statement 4 | | **20** | 4,538,117 |
| **21** | Total deductions. Add the amounts shown in the far right column for lines 9 through 20 | | **21** | 6,729,984 |
| **22** | Ordinary business income (loss). Subtract line 21 from line 8 | | **22** | -4,613,383 |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member manager) is based on all information of which preparer has any knowledge.

May the IRS discuss this return with the preparer shown below (see instructions)?  ☒ Yes  ☐ No

▶ _____  _____
Signature of general partner or limited liability company member manager      Date

| | | | | | |
|---|---|---|---|---|---|
| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
| | Kyu Hong Kim | | | | P00288359 |
| | Firm's name  ▶ Kyu Hong Kim, CPA, Inc. | | | Firm's EIN ▶ | 20-2861494 |
| | Firm's address ▶ 3435 Wilshire Blvd Ste 1970 | | | | |
| | Los Angeles, CA      90010-1938 | | Phone no. | 213-381-3557 | |

For Paperwork Reduction Act Notice, see separate instructions.

Form **1065** (2015)

Form 1065 (2015)   THOMAS WYLDE LLC                    47-1444612                    Page 2

## Schedule B    Other Information

| | | | Yes | No |
|---|---|---|---|---|
| **1** | What type of entity is filing this return? Check the applicable box: | | | |
| **a** | ☐ Domestic general partnership   **b** ☐ Domestic limited partnership | | | |
| **c** | ☒ Domestic limited liability company   **d** ☐ Domestic limited liability partnership | | | |
| **e** | ☐ Foreign partnership   **f** ☐ Other ▶ | | | |
| **2** | At any time during the tax year, was any partner in the partnership a disregarded entity, a partnership (including an entity treated as a partnership), a trust, an S corporation, an estate (other than an estate of a deceased partner), or a nominee or similar person? | | | X |
| **3** | At the end of the tax year: | | | |
| **a** | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization, or any foreign government own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | | | X |
| **b** | Did any individual or estate own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | | | X |
| **4** | At the end of the tax year, did the partnership: | | | |
| **a** | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (iv) below | | | X |

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | | Yes | No |
|---|---|---|---|---|
| **b** | Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below | | | X |

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | Yes | No |
|---|---|---|---|
| **5** | Did the partnership file Form 8893, Election of Partnership Level Tax Treatment, or an election statement under section 6231(a)(1)(B)(ii) for partnership-level tax treatment, that is in effect for this tax year? See Form 8893 for more details | | X |
| **6** | Does the partnership satisfy all four of the following conditions? | | |
| **a** | The partnership's total receipts for the tax year were less than $250,000. | | |
| **b** | The partnership's total assets at the end of the tax year were less than $1 million. | | |
| **c** | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | |
| **d** | The partnership is not filing and is not required to file Schedule M-3 | | X |
| | If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; Item F on page 1 of Form 1065; or Item L on Schedule K-1. | | |
| **7** | Is this partnership a publicly traded partnership as defined in section 469(k)(2)? | | X |
| **8** | During the tax year, did the partnership have any debt that was cancelled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? | | X |
| **9** | Has this partnership filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, to provide information on any reportable transaction? | | X |
| **10** | At any time during calendar year 2015, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See the instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). If "Yes," enter the name of the foreign country. ▶ | | X |

Form 1065 (2015)   THOMAS WYLDE LLC                    47-1444612                    Page **3**

| Schedule B | Other Information (continued) | | |
|---|---|---|---|

| | | Yes | No |
|---|---|---|---|
| 11 | At any time during the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. See instructions | | X |
| 12a | Is the partnership making, or had it previously made (and not revoked), a section 754 election? . . . . . . . . . . . . . . . . | | X |
| | See instructions for details regarding a section 754 election. | | |
| b | Did the partnership make for this tax year an optional basis adjustment under section 743(b) or 734(b)? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions . . . . . . . . . . . . | | X |
| c | Is the partnership required to adjust the basis of partnership assets under section 743(b) or 734(b) because of a substantial built-in loss (as defined under section 743(d)) or substantial basis reduction (as defined under section 734(d))? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions . . . . . | | X |
| 13 | Check this box if, during the current or prior tax year, the partnership distributed any property received in a like-kind exchange or contributed such property to another entity (other than disregarded entities wholly owned by the partnership throughout the tax year) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ | | |
| 14 | At any time during the tax year, did the partnership distribute to any partner a tenancy-in-common or other undivided interest in partnership property? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| 15 | If the partnership is required to file Form 8858, Information Return of U.S. Persons With Respect To Foreign Disregarded Entities, enter the number of Forms 8858 attached. See instructions ▶ | | |
| 16 | Does the partnership have any foreign partners? If "Yes," enter the number of Forms 8805, Foreign Partner's Information Statement of Section 1446 Withholding Tax, filed for this partnership. ▶ | | X |
| 17 | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return. ▶ | | |
| 18a | Did you make any payments in 2015 that would require you to file Form(s) 1099? See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . | X | |
| b | If "Yes," did you or will you file required Form(s) 1099? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | X | |
| 19 | Enter the number of Form(s) 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to this return. ▶ | | |
| 20 | Enter the number of partners that are foreign governments under section 892. ▶        0 | | |

**Designation of Tax Matters Partner** (see instructions)

Enter below the general partner or member-manager designated as the tax matters partner (TMP) for the tax year of this return:

| Name of designated TMP ▶ | | Identifying number of TMP ▶ | |
|---|---|---|---|
| If the TMP is an entity, name of TMP representative ▶ | | Phone number of TMP ▶ | |
| Address of designated TMP ▶ | | | |

Form **1065** (2015)

Form 1065 (2015)   THOMAS WYLDE LLC                         47-1444612                    Page **4**

| | | Schedule K | Partners' Distributive Share Items | | | Total amount |
|---|---|---|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary business income (loss) (page 1, line 22) | | | **1** | -4,613,383 |
| | 2 | Net rental real estate income (loss) (attach Form 8825) | | | **2** | |
| | 3a | Other gross rental income (loss) | **3a** | | | |
| | b | Expenses from other rental activities (attach statement) | **3b** | | | |
| | c | Other net rental income (loss). Subtract line 3b from line 3a | | | **3c** | |
| | 4 | Guaranteed payments | | | **4** | |
| | 5 | Interest income | | | **5** | |
| | 6 | Dividends:  a Ordinary dividends | | | **6a** | |
| | | b Qualified dividends | **6b** | | | |
| | 7 | Royalties | | | **7** | |
| | 8 | Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | | | **8** | |
| | 9a | Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | | | **9a** | |
| | b | Collectibles (28%) gain (loss) | **9b** | | | |
| | c | Unrecaptured section 1250 gain (attach statement) | **9c** | | | |
| | 10 | Net section 1231 gain (loss) (attach Form 4797) | | | **10** | |
| | 11 | Other income (loss) (see instructions) Type ▶ | | | **11** | |
| **Deductions** | 12 | Section 179 deduction (attach Form 4562) | | | **12** | 0 |
| | 13a | Contributions                    See Statement 5 | | | **13a** | 2,400 |
| | b | Investment interest expense | | | **13b** | |
| | c | Section 59(e)(2) expenditures: | | | | |
| | | (1) Type ▶ | | (2) Amount ▶ | **13c(2)** | |
| | d | Other deductions (see instructions)  Type ▶ | | | **13d** | |
| **Self-Employ-ment** | 14a | Net earnings (loss) from self-employment | | | **14a** | |
| | b | Gross farming or fishing income | | | **14b** | |
| | c | Gross nonfarm income | | | **14c** | |
| **Credits** | 15a | Low-income housing credit (section 42(j)(5)) | | | **15a** | |
| | b | Low-income housing credit (other) | | | **15b** | |
| | c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) | | | **15c** | |
| | d | Other rental real estate credits (see instructions)  Type ▶ | | | **15d** | |
| | e | Other rental credits (see instructions)  Type ▶ | | | **15e** | |
| | f | Other credits (see instructions)  Type ▶ | | | **15f** | |
| **Foreign Transactions** | 16a | Name of country or U.S. possession ▶ | | | | |
| | b | Gross income from all sources | | | **16b** | |
| | c | Gross income sourced at partner level | | | **16c** | |
| | | Foreign gross income sourced at partnership level | | | | |
| | d | Passive category ▶   e General category ▶   f Other ▶ | | | **16f** | |
| | | Deductions allocated and apportioned at partner level | | | | |
| | g | Interest expense ▶   h Other ▶ | | | **16h** | |
| | | Deductions allocated and apportioned at partnership level to foreign source income | | | | |
| | i | Passive category ▶   j General category ▶   k Other ▶ | | | **16k** | |
| | l | Total foreign taxes (check one): ▶ Paid ☐  Accrued ☐ | | | **16l** | |
| | m | Reduction in taxes available for credit (attach statement) | | | **16m** | |
| | n | Other foreign tax information (attach statement) | | | | |
| **Alternative Minimum Tax (AMT) Items** | 17a | Post-1986 depreciation adjustment | | | **17a** | |
| | b | Adjusted gain or loss | | | **17b** | |
| | c | Depletion (other than oil and gas) | | | **17c** | |
| | d | Oil, gas, and geothermal properties – gross income | | | **17d** | |
| | e | Oil, gas, and geothermal properties – deductions | | | **17e** | |
| | f | Other AMT items (attach statement) | | | **17f** | |
| **Other Information** | 18a | Tax-exempt interest income | | | **18a** | |
| | b | Other tax-exempt income | | | **18b** | |
| | c | Nondeductible expenses              See Statement 6 | | | **18c** | 48,960 |
| | 19a | Distributions of cash and marketable securities | | | **19a** | |
| | b | Distributions of other property | | | **19b** | |
| | 20a | Investment income | | | **20a** | |
| | b | Investment expenses | | | **20b** | |
| | c | Other items and amounts (attach statement) | | | | |

Form 1065 (2015)   THOMAS WYLDE LLC                    47-1444612                              Page 5

## Analysis of Net Income (Loss)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16l | | | | | **1** | **-4,615,783** |

| 2 | Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|---|
| a | General partners | | | | | | |
| b | Limited partners | -4,615,783 | | | | | |

## Schedule L   Balance Sheets per Books

| | Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|---|
| 1 | Cash | | 179,904 | | 66,706 |
| 2a | Trade notes and accounts receivable | | | 553,507 | |
| b | Less allowance for bad debts | | | | 553,507 |
| 3 | Inventories | | | | 1,101,833 |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets (attach statement) See Stmt 7 | | 4,100,120 | | 2,525,414 |
| 7a | Loans to partners (or persons related to partners) | | | | |
| b | Mortgage and real estate loans | | | | |
| 8 | Other Investments (attach statement) | | | | |
| 9a | Buildings and other depreciable assets | 1,734 | | 27,514 | |
| b | Less accumulated depreciation | | 1,734 | 2,525 | 24,989 |
| 10a | Depletable assets | | | | |
| b | Less accumulated depletion | | | | |
| 11 | Land (net of any amortization) | | | | |
| 12a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | | | | |
| 13 | Other assets (attach statement) See Stmt 8 | | 4,700 | | 2,020,254 |
| 14 | Total assets | | 4,286,458 | | 6,292,703 |
| | **Liabilities and Capital** | | | | |
| 15 | Accounts payable | | 56,777 | | 836,336 |
| 16 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 | Other current liabilities (attach statement) See Stmt 9 | | 111,040 | | 784,884 |
| 18 | All nonrecourse loans | | | | |
| 19a | Loans from partners (or persons related to partners) | | | | |
| b | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 20 | Other liabilities (attach statement) See Stmt 10 | | 4,300,000 | | 2,000,000 |
| 21 | Partners' capital accounts | | -181,359 | | 2,671,483 |
| 22 | Total liabilities and capital | | 4,286,458 | | 6,292,703 |

## Schedule M-1   Reconciliation of Income (Loss) per Books With Income (Loss) per Return

Note. The partnership may be required to file Schedule M-3 (see instructions).

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Net income (loss) per books | -4,651,971 | 6 | Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | a | Tax-exempt interest $ | | |
| 3 | Guaranteed payments (other than health insurance) | | 7 | Deductions included on Schedule K, lines 1 through 13d, and 16l, not charged against book income this year (itemize): | | |
| 4 | Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16l (itemize): | | a | Depreciation $ 12,772 | | |
| a | Depreciation $ | | | | | |
| b | Travel and entertainment $ 48,960 | | | | | 12,772 |
| | | | 8 | Add lines 6 and 7 | | 12,772 |
| | | 48,960 | 9 | Income (loss) (Analysis of Net Income | | |
| 5 | Add lines 1 through 4 | -4,603,011 | | (Loss), line 1). Subtract line 8 from line 5 | | -4,615,783 |

## Schedule M-2   Analysis of Partners' Capital Accounts

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Balance at beginning of year | -181,359 | 6 | Distributions: a Cash | | |
| 2 | Capital contributed: a Cash | 7,504,813 | | b Property | | |
| | b Property | | 7 | Other decreases (itemize): | | |
| 3 | Net income (loss) per books | -4,651,971 | | | | |
| 4 | Other increases (itemize): | | 8 | Add lines 6 and 7 | | |

Form **1125-A**
(Rev. December 2012)
Department of the Treasury
Internal Revenue Service

**Cost of Goods Sold**

▶ Attach to Form 1120, 1120-C, 1120-F, 1120S, 1065, or 1065-B.
▶ Information about Form 1125-A and its instructions is at www.irs.gov/form1125a.

OMB No. 1545-2225

| Name | Employer identification number |
|---|---|
| THOMAS WYLDE LLC | 47-1444612 |

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | |
| 2 | Purchases | 2 | 3,034,674 |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) | 5 | |
| 6 | **Total. Add lines 1 through 5** | 6 | 3,034,674 |
| 7 | Inventory at end of year | 7 | 1,101,833 |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on Form 1120, page 1, line 2 or the appropriate line of your tax return (see instructions) | 8 | 1,932,841 |

**9a** Check all methods used for valuing closing inventory:

   (i) ☐ Cost

   (ii) ☐ Lower of cost or market

   (iii) ☐ Other (Specify method used and attach explanation.) ▶

**b** Check if there was a writedown of subnormal goods ........................................................ ▶ ☐

**c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ........ ▶ ☐

**d** If the LIFO inventory method was used for this tax year, enter the amount of closing inventory computed under LIFO | 9d | |

**e** If property is produced or acquired for resale, do the rules of section 263A apply to the entity (see instructions)? ........ ☐ Yes ☐ No

**f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation ........................................................................ ☐ Yes ☐ No

For Paperwork Reduction Act Notice, see instructions.

Form **1125-A** (Rev. 12-2012)

**SCHEDULE B-1
(Form 1065)**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

# Information on Partners Owning 50% or More of the Partnership

▶ Attach to Form 1065. See instructions on back.

OMB No. 1545-0099

Name of partnership
THOMAS   WYLDE   LLC

Employer identification number (EIN)
47-1444612

**Part I**    Entities Owning 50% or More of the Partnership (Form 1065, Schedule B, Question 3a)

Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, tax-exempt organization, or any foreign government that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| HILLSHORE | INVESTMENTS 99-9999999 | Corporation | United States | 100.000000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II**    Individuals or Estates Owning 50% or More of the Partnership (Form 1065, Schedule B, Question 3b)

Complete columns (i) through (iv) below for any individual or estate that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**

Schedule B-1 (Form 1065) (Rev. 12-2011)

Partner# 1

**Schedule K-1**
**(Form 1065)**

**2015**

Department of the Treasury
Internal Revenue Service

For calendar year 2015, or tax

year beginning _____

ending _____

**Partner's Share of Income, Deductions,**
**Credits, etc.**    ▶ See back of form and separate instructions.

| ☐ Final K-1 | ☒ Amended K-1 | 651113 |
|---|---|---|
| | | OMB No. 1545-0123 |

### Part I    Information About the Partnership

**A** Partnership's employer identification number
47-1444612

**B** Partnership's name, address, city, state, and ZIP code
THOMAS WYLDE LLC

235 W 31ST ST
LOS ANGELES    CA 90007

**C** IRS Center where partnership filed return
e-file

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II    Information About the Partner

**E** Partner's identifying number
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

**F** Partner's name, address, city, state, and ZIP code
JOHN HANNA

6250 HOLLYWOOD BLVD #4H
Los Angeles    CA 90028

**G** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I1** What type of entity is this partner?    Individual

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 7.000000 % | 0.400000 % |
| Loss | 0.000000 % | 0.000000 % |
| Capital | 7.000000 % | 0.400000 % |

**K** Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse | $ _____ |
| Qualified nonrecourse financing | $ _____ |
| Recourse | $ _____ |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 700 |
| Capital contributed during the year | $ _____ |
| Current year increase (decrease) | $ _____ |
| Withdrawals & distributions | $ ( _____ ) |
| Ending capital account | $ 700 |

☑ ___ ☐ GAAP ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No
If "Yes," attach statement (see instructions)

### Part III    Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) | | 15 | Credits |
| 2 | Net rental real estate income (loss) | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions |
| 4 | Guaranteed payments | | | |
| 5 | Interest income | | | |
| 6a | Ordinary dividends | | | |
| 6b | Qualified dividends | | | |
| 7 | Royalties | | | |
| 8 | Net short-term capital gain (loss) | | | |
| 9a | Net long-term capital gain (loss) | | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | | |
| 9c | Unrecaptured section 1250 gain | | | |
| 10 | Net section 1231 gain (loss) | | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | | |
| | | | | |
| | | | 19 | Distributions |
| 12 | Section 179 deduction | | | |
| 13 | Other deductions | | 20 | Other information |
| | | | | |
| 14 | Self-employment earnings (loss) | | | |

*See attached statement for additional information.

For IRS Use Only

Partner# 2

Schedule K-1
(Form 1065)

**2015**

| | Final K-1 | | X | Amended K-1 |

**651113**
OMB No. 1545-0123

Department of the Treasury
Internal Revenue Service

For calendar year 2015, or tax

year beginning _____

ending _____

**Partner's Share of Income, Deductions,
Credits, etc.**  ► **See back of form and separate instructions.**

**Part I  Information About the Partnership**

**A** Partnership's employer identification number
47-1444612

**B** Partnership's name, address, city, state, and ZIP code

THOMAS WYLDE LLC

235 W 31ST ST
LOS ANGELES      CA 90007

**C** IRS Center where partnership filed return
e-file

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II  Information About the Partner**

**E** Partner's identifying number
57-1157980

**F** Partner's name, address, city, state, and ZIP code

STANLEY DUCKS, LLC

18141 IRVINE BLVD
TUSTIN      CA 92780

**G** ☐ General partner or LLC
member-manager      ☒ Limited partner or other LLC
member

**H** ☒ Domestic partner      ☐ Foreign partner

**I1** What type of entity is this partner?    Partnership

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here    ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 3.500000 % | 0.200000 % |
| Loss | 0.000000 % | 0.000000 % |
| Capital | 3.500000 % | 0.200000 % |

**K** Partner's share of liabilities at year end:

Nonrecourse .......................... $ _____
Qualified nonrecourse financing ........ $ _____
Recourse ............................. $ _____

**L** Partner's capital account analysis:

Beginning capital account ............ $ _____
Capital contributed during the year .... $ _____350
Current year increase (decrease) ...... $ _____
Withdrawals & distributions ........... $ ( _____ )
Ending capital account ............... $ _____350

☑ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No
If "Yes," attach statement (see instructions)

**Part III  Partner's Share of Current Year Income,
Deductions, Credits, and Other Items**

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) | | 15 | Credits |
| 2 | Net rental real estate income (loss) | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions |
| 4 | Guaranteed payments | | | |
| 5 | Interest income | | | |
| 6a | Ordinary dividends | | | |
| 6b | Qualified dividends | | | |
| 7 | Royalties | | | |
| 8 | Net short-term capital gain (loss) | | | |
| 9a | Net long-term capital gain (loss) | | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | | |
| 9c | Unrecaptured section 1250 gain | | | |
| 10 | Net section 1231 gain (loss) | | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | | |
| | | | 19 | Distributions |
| 12 | Section 179 deduction | | | |
| 13 | Other deductions | | 20 | Other information |
| 14 | Self-employment earnings (loss) | | | |

*See attached statement for additional information.

For IRS Use Only

Partner# 3

**Schedule K-1**
**(Form 1065)**

**2015**

Department of the Treasury
Internal Revenue Service

For calendar year 2015, or tax
year beginning _____
ending _____

**Partner's Share of Income, Deductions,**
**Credits, etc.**   ▶ See back of form and separate Instructions.

☐ Final K-1   ☒ Amended K-1

651113
OMB No. 1545-0123

**Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

**Part I   Information About the Partnership**

**A** Partnership's employer identification number
47-1444612

**B** Partnership's name, address, city, state, and ZIP code
THOMAS WYLDE LLC

235 W 31ST ST
LOS ANGELES        CA 90007

**C** IRS Center where partnership filed return
e-file

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II   Information About the Partner**

**E** Partner's identifying number
47-1710832

**F** Partner's name, address, city, state, and ZIP code
DSRB, LLC

18141 IRVINE BLVD
TUSTIN          CA 92780

**G** ☐ General partner or LLC   ☒ Limited partner or other LLC
member-manager                member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner?   Partnership
**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

|        | Beginning    | Ending       |
|--------|--------------|--------------|
| Profit | 3.500000 %   | 0.200000 %   |
| Loss   | 0.000000 %   | 0.000000 %   |
| Capital| 3.500000 %   | 0.200000 %   |

**K** Partner's share of liabilities at year end:

Nonrecourse ........................ $ _____
Qualified nonrecourse financing ....... $ _____
Recourse ........................... $ _____

**L** Partner's capital account analysis:

Beginning capital account ............ $ _____
Capital contributed during the year ... $ 350
Current year increase (decrease) ...... $ _____
Withdrawals & distributions .......... $ ( _____ )
Ending capital account .............. $ 350

☒ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

| 1 | Ordinary business income (loss) | 15 | Credits |
|---|---|---|---|
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| | | 19 | Distributions |
| 12 | Section 179 deduction | | |
| 13 | Other deductions | 20 | Other information |
| 14 | Self-employment earnings (loss) | | |

*See attached statement for additional information.

For IRS Use Only

**Partner# 4**

**Schedule K-1**
**(Form 1065)**

**2015**

| Final K-1 | ☐ | X | Amended K-1 |

651113
OMB No. 1545-0123

Department of the Treasury
Internal Revenue Service

For calendar year 2015, or tax
year beginning _____
ending _____

**Partner's Share of Income, Deductions,**
**Credits, etc.**   ► See back of form and separate instructions.

## Part I   Information About the Partnership

**A** Partnership's employer identification number

47-1444612

**B** Partnership's name, address, city, state, and ZIP code

THOMAS WYLDE LLC

235 W 31ST ST
LOS ANGELES        CA 90007

**C** IRS Center where partnership filed return

e-file

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II   Information About the Partner

**E** Partner's identifying number

45-4648680

**F** Partner's name, address, city, state, and ZIP code

THE PALLIATIVE, LLC.

12114 DEWEY ST.
LOS ANGELES        CA 90066

**G** ☐ General partner or LLC
member-manager   ☒ Limited partner or other LLC
member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner?   Partnership

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 9.000000 % | 0.510000 % |
| Loss | 0.000000 % | 0.000000 % |
| Capital | 9.000000 % | 0.510000 % |

**K** Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse | $ _____ |
| Qualified nonrecourse financing | $ _____ |
| Recourse | $ _____ |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ _____ |
| Capital contributed during the year | $ 900 |
| Current year increase (decrease) | $ _____ |
| Withdrawals & distributions | $ ( _____ ) |
| Ending capital account | $ 900 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

### Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| | | 19 | Distributions |
| 12 | Section 179 deduction | | |
| 13 | Other deductions | 20 | Other information |
| 14 | Self-employment earnings (loss) | | |

*See attached statement for additional information.

For IRS Use Only

**Partner# 5**

**Schedule K-1**
**(Form 1065)**

**2015**

Department of the Treasury
Internal Revenue Service

For calendar year 2015, or tax
year beginning _____
ending _____

**Partner's Share of Income, Deductions,**
**Credits, etc.**    ▶ See back of form and separate Instructions.

651113
OMB No. 1545-0123

☐ Final K-1    ☒ Amended K-1

**Part III    Partner's Share of Current Year Income,**
**Deductions, Credits, and Other Items**

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions |
| 13 | Other deductions | 20 | Other Information |
| 14 | Self-employment earnings (loss) | | |

**Part I    Information About the Partnership**

**A** Partnership's employer identification number
47-1444612

**B** Partnership's name, address, city, state, and ZIP code
THOMAS WYLDE LLC

235 W 31ST ST
LOS ANGELES        CA 90007

**C** IRS Center where partnership filed return
e-file

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II    Information About the Partner**

**E** Partner's identifying number
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

**F** Partner's name, address, city, state, and ZIP code
PAULA THOMAS

2514 S. TOLEDO AVE.
PALM SPRINGS        CA 92264

**G** ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I1** What type of entity is this partner?    Individual

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 32.000000 % | 1.830000 % |
| Loss | 0.000000 % | 0.000000 % |
| Capital | 32.000000 % | 1.830000 % |

**K** Partner's share of liabilities at year end:

Nonrecourse .................... $ _____
Qualified nonrecourse financing .... $ _____
Recourse ...................... $ _____

**L** Partner's capital account analysis:

Beginning capital account ............. $ _____
Capital contributed during the year .... $        3,200
Current year increase (decrease) ...... $ _____
Withdrawals & distributions ........... $ ( _____ )
Ending capital account ............... $        3,200

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No
If "Yes," attach statement (see instructions)

*See attached statement for additional information.

For IRS Use Only

Partner# 6

**Schedule K-1**
**(Form 1065)**

**2015**

Department of the Treasury
Internal Revenue Service

For calendar year 2015, or tax
year beginning _____
ending _____

**Partner's Share of Income, Deductions,**
**Credits, etc.**   ► See back of form and separate Instructions.

| | Final K-1 | ☐ | Amended K-1 | ☒ |

651113

OMB No. 1545-01

**Part III   Partner's Share of Current Year Income,**
**Deductions, Credits, and Other Items**

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) -4,613,383 | | 15 | Credits |
| 2 | Net rental real estate income (loss) | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions |
| 4 | Guaranteed payments | | | |
| 5 | Interest income | | | |
| 6a | Ordinary dividends | | | |
| 6b | Qualified dividends | | | |
| 7 | Royalties | | | |
| 8 | Net short-term capital gain (loss) | | | |
| 9a | Net long-term capital gain (loss) | | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | | |
| 9c | Unrecaptured section 1250 gain | | | |
| 10 | Net section 1231 gain (loss) | | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | C* | | 48,960 |
| 12 | Section 179 deduction | | 19 | Distributions |
| 13 | Other deductions A   2,400 | | 20 | Other information |
| | | | Z* | STMT |
| 14 | Self-employment earnings (loss) | | | |

**Part I   Information About the Partnership**

**A** Partnership's employer identification number
47-1444612

**B** Partnership's name, address, city, state, and ZIP code
THOMAS WYLDE LLC

235 W 31ST ST
LOS ANGELES       CA 90007

**C** IRS Center where partnership filed return
e-file

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II   Information About the Partner**

**E** Partner's identifying number
99-9999999

**F** Partner's name, address, city, state, and ZIP code
HILLSHORE INVESTMENTS
CALLE 53 ESTE. URBANIZACION
MARBELLA TORRE MMG

Panama

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☐ Domestic partner   ☒ Foreign partner

**I1** What type of entity is this partner?   Corporation

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 45.000000 % | 96.860000 % |
| Loss | 100.000000 % | 100.000000 % |
| Capital | 45.000000 % | 96.860000 % |

**K** Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse | $ |
| Qualified nonrecourse financing | $ |
| Recourse | $ |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ -182,059 |
| Capital contributed during the year | $ 7,500,013 |
| Current year increase (decrease) | $ -4,651,971 |
| Withdrawals & distributions | $ ( ) |
| Ending capital account | $ 2,665,983 |

☑ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

*See attached statement for additional information.

For IRS Use Only

**SCHEDULE M-3**
**(Form 1065)**

Department of the Treasury
Internal Revenue Service

# Net Income (Loss) Reconciliation
## for Certain Partnerships
▶ Attach to Form 1065 or Form 1065-B.
▶ Information about Schedule M-3 (Form 1065) and its instructions is at www.gov/form1065.

OMB No. 1545-0123

## 2015

| Name of partnership | Employer identification number |
|---|---|
| THOMAS WYLDE LLC | 47-1444612 |

**This Schedule M-3 is being filed because (check all that apply):**

A ☐ The amount of the partnership's total assets at the end of the tax year is equal to $10 million or more.

B ☒ The amount of the partnership's adjusted total assets for the tax year is equal to $10 million or more. If box B is checked, enter the amount of adjusted total assets for the tax year ___10,944,674___.

C ☐ The amount of total receipts for the tax year is equal to $35 million or more. If box C is checked, enter the total receipts for the tax year _____.

D ☐ An entity that is a reportable entity partner with respect to the partnership owns or is deemed to own an interest of 50 percent or more in the partnership's capital, profit, or loss, on any day during the tax year of the partnership.

| Name of Reportable Entity Partner | Identifying Number | Maximum Percentage Owned or Deemed Owned |
|---|---|---|
| | | |
| | | |
| | | |

E ☐ Voluntary Filer.

**Part I** Financial Information and Net Income (Loss) Reconciliation

1a Did the partnership file SEC Form 10-K for its income statement period ending with or within this tax year?
  ☐ Yes. Skip lines 1b and 1c and complete lines 2 through 11 with respect to that SEC Form 10-K.
  ☐ No. Go to line 1b. See instructions if multiple non-tax-basis income statements are prepared.

 b Did the partnership prepare a certified audited non-tax-basis income statement for that period?
  ☐ Yes. Skip line 1c and complete lines 2 through 11 with respect to that income statement.
  ☐ No. Go to line 1c.

 c Did the partnership prepare a non-tax-basis income statement for that period?
  ☐ Yes. Complete lines 2 through 11 with respect to that income statement.
  ☐ No. Skip lines 2 through 3b and enter the partnership's net income (loss) per its books and records on line 4a.

2 Enter the income statement period: Beginning __01/01/15__ Ending __12/31/15__

3a Has the partnership's income statement been restated for the income statement period on line 2?
  ☐ Yes. (If "Yes," attach a statement and the amount of each item restated.)
  ☒ No.

 b Has the partnership's income statement been restated for any of the five income statement periods immediately preceding the period on line 2?
  ☐ Yes. (If "Yes," attach a statement and the amount of each item restated.)
  ☒ No.

| | | |
|---|---|---|
| 4a Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1 | **4a** | −4,651,971 |

 b Indicate accounting standard used for line 4a (see instructions):
  1 ☒ GAAP   2 ☐ IFRS   3 ☐ 704(b)
  4 ☐ Tax-basis   5 ☐ Other: (Specify) ▶ _____

| | | |
|---|---|---|
| 5a Net income from nonincludible foreign entities (attach statement) | **5a** | ( ) |
| b Net loss from nonincludible foreign entities (attach statement and enter as a positive amount) | **5b** | |
| 6a Net income from nonincludible U.S. entities (attach statement) | **6a** | ( ) |
| b Net loss from nonincludible U.S. entities (attach statement and enter as a positive amount) | **6b** | |
| 7a Net income (loss) of other foreign disregarded entities (attach statement) | **7a** | |
| b Net income (loss) of other U.S. disregarded entities (attach statement) | **7b** | |
| 8 Adjustment to eliminations of transactions between includible entities and nonincludible entities (attach statement) | **8** | |
| 9 Adjustment to reconcile income statement period to tax year (attach statement) | **9** | |
| 10 Other adjustments to reconcile to amount on line 11 (attach statement) | **10** | |
| 11 Net income (loss) per income statement of the partnership. Combine lines 4a through 10 | **11** | −4,651,971 |

Note: Part I, line 11, must equal Part II, line 26, column (a) or Schedule M-1, line 1 (see instructions).

12 Enter the total amount (not just the partnership's share) of the assets and liabilities of all entities included or removed on the following lines:

| | Total Assets | Total Liabilities |
|---|---|---|
| a Included on Part I, line 4 | 6,292,703 | 3,621,220 |
| b Removed on Part I, line 5 | | |
| c Removed on Part I, line 6 | | |
| d Included on Part I, line 7 | | |

Form **4562**

Department of the Treasury
Internal Revenue Service (99)

**Depreciation and Amortization**

**(Including Information on Listed Property)**

▶ Attach to your tax return.

▶ Information about Form 4562 and its separate instructions is at www.irs.gov/form4562.

OMB No. 1545-0172

**2015**

Attachment
Sequence No. **179**

Name(s) shown on return
THOMAS WYLDE LLC

Identifying number
47-1444612

Business or activity to which this form relates
Regular Depreciation

### Part I   Election To Expense Certain Property Under Section 179
Note: If you have any listed property, complete Part V before you complete Part I.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Maximum amount (see instructions) | | | **1** | 500,000 |
| 2 | Total cost of section 179 property placed in service (see instructions) | | | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation (see instructions) | | | **3** | 2,000,000 |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | | | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | | | **5** | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |

| | | | | | |
|---|---|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | | **7** | | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | | | **8** | |
| 9 | Tentative deduction. Enter the smaller of line 5 or line 8 | | | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2014 Form 4562 | | | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 (see instructions) | | | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11 | | | **12** | |
| 13 | Carryover of disallowed deduction to 2016. Add lines 9 and 10, less line 12 ▶ | **13** | | | |

Note: Do not use Part II or Part III below for listed property. Instead, use Part V.

### Part II   Special Depreciation Allowance and Other Depreciation (Do not include listed property.) (See instructions.)

| | | | | |
|---|---|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year (see instructions) | | **14** | 12,888 |
| 15 | Property subject to section 168(f)(1) election | | **15** | |
| 16 | Other depreciation (including ACRS) | | **16** | |

### Part III   MACRS Depreciation (Do not include listed property.) (See instructions.)

**Section A**

| | | | | |
|---|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2015 | | **17** | 239 |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ | | | |

**Section B—Assets Placed in Service During 2015 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only—see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a  3-year property | | | | | | |
| b  5-year property | | 5,683 | 5.0 | HY | 200DB | 1,138 |
| c  7-year property | | 7,209 | 7.0 | HY | 200DB | 1,030 |
| d  10-year property | | | | | | |
| e  15-year property | | | | | | |
| f  20-year property | | | | | | |
| g  25-year property | | | 25 yrs. | | S/L | |
| h  Residential rental property | | | 27.5 yrs. | MM | S/L | |
| | | | 27.5 yrs. | MM | S/L | |
| i  Nonresidential real property | | | 39 yrs. | MM | S/L | |
| | | | | MM | S/L | |

**Section C—Assets Placed in Service During 2015 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a  Class life | | | | | S/L | |
| b  12-year | | | 12 yrs. | | S/L | |
| c  40-year | | | 40 yrs. | MM | S/L | |

### Part IV   Summary (See instructions.)

| | | | | |
|---|---|---|---|---|
| 21 | Listed property. Enter amount from line 28 | | **21** | |
| 22 | Total. Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations—see instructions | | **22** | 15,295 |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | | |

| 47-1444612 | **Federal Statements** |
|---|---|

### Statement 1 - Form 1065, Page 1, Line G(5) - Reason for Amended Return

#### Description

This amended return is to correct only partners' share of profit and
capital. Partners' share of loss is same as original return.
Since the taxpayer made loss in current year, change in partners' share of
profit and capital will not affect partner's share of current year income,
deductions, credits, and other items in Part III of Schedule K-1.

### Statement 2 - Form 1065, Page 1, Line 7 - Other Income (Loss)

| Description | Amount |
|---|---|
| Freight Income | $    38,080 |
| Other Income | 39,581 |
| Total | $    77,661 |

### Statement 3 - Form 1065, Page 1, Line 15 - Interest

| Description | Amount |
|---|---|
| Interest expense | $   200,000 |
| Total | $   200,000 |

### Statement 4 - Form 1065, Page 1, Line 20 - Other Deductions

| Description | Amount |
|---|---|
| ADVERTISING AND PROMOTION | $   284,574 |
| AUTO EXPENSE | 12,320 |
| SOCIAL MEDIA | 1,969 |
| WEBSITE EXPENSE | 67,850 |
| FACTORING CHARGE | 28,616 |
| BANK FEES | 30,148 |
| COMMISSION | 320,091 |
| COPYRIGHT,PATENT & TRADEMARK | 604 |
| DUES AND SUBCRIPTIONS | 30,168 |
| EQUIPMENT RENTAL | 20,327 |
| GIFTS | 3,502 |
| INSURANCE | 19,985 |
| MISCELLANEOUS | 108 |
| OFFICE EXPENSE | 4,162 |
| OFFICER ALLOWANCE | 20,794 |
| OFFICE SUPPLIES | 34,825 |
| OUTSIDE SERVICE | 420,514 |
| PHOTOSHOOT EXPENSE | 125,415 |
| PICK AND PACK EXPENSE | 127,888 |
| Postage & CARRIER | 392 |
| PROFESSIONAL FEES | 160,591 |
| PUBLIC RELATIONS | 217,342 |
| REFERENCE AND MATERIALS | 23,010 |
| SAMPLES | 1,389,957 |
| SHIPPING EXPENSE | 156,303 |
| SHOWROOM EXPENSE | 102,112 |
| STORAGE | 29,784 |
| SUPPLIES | 26,212 |

| 47-1444612 | **Federal Statements** |

### Statement 4 - Form 1065, Page 1, Line 20 - Other Deductions (continued)

| Description | | Amount |
|---|---|---|
| TELEPHONE | $ | 28,912 |
| TRADE SHOW | | 439,670 |
| TRAVEL | | 290,350 |
| UTILITIES | | 11,632 |
| Meals and Entertain (50%) | | 48,960 |
| Total | $ | 4,538,117 |

# Federal Statements

1444612

### Statement 5 - Form 1065, Schedule K, Line 13a - Contributions

| Description | 100% | 50% | 30% | 20% | Total |
|---|---|---|---|---|---|
| CHARITABLE CONTRIBUTION | $ | $ 2,400 | $ | $ | $ 2,400 |
| Total | $ 0 | $ 2,400 | $ 0 | $ 0 | $ 2,400 |

5

47-1444612                    **Federal Statements**

### Statement 6 - Form 1065, Schedule K, Line 18c - Nondeductible Expenses

| Description | Amount |
|---|---|
| Nondeductible Meals and Entertainment | $ 48,960 |
| Total | $ 48,960 |

### Statement 7 - Form 1065, Schedule L, Line 6 - Other Current Assets

| Description | Beginning of Year | End of Year |
|---|---|---|
| ADVANCE TO OFFICERS | $ 74 | $ 2,514 |
| ADVANCE TO PDTW, LLC | 4,052,052 | 2,434,663 |
| VENDOR DEPOSITS | 47,994 | 80,657 |
| EMPLOYEE ADVANCE | | 900 |
| Undeposited Funds | | 6,680 |
| Total | $ 4,100,120 | $ 2,525,414 |

### Statement 8 - Form 1065, Schedule L, Line 13 - Other Assets

| Description | Beginning of Year | End of Year |
|---|---|---|
| PREPAID EXPENSES | $ 4,700 | $ 22,317 |
| ADVANCE ON COMMISSION | | 13,600 |
| GOODWILL | | 1,984,337 |
| Total | $ 4,700 | $ 2,020,254 |

### Statement 9 - Form 1065, Schedule L, Line 17 - Other Current Liabilities

| Description | Beginning of Year | End of Year |
|---|---|---|
| ACCRUED EXPENSES | $ 7,671 | $ 201,107 |
| ADVANCE FROM PDTW, LLC | 36,734 | |
| CUSTOMER DEPOSITS | 66,635 | 29,616 |
| FACTORING PAYABLE | | 430,409 |
| ADVANCES FROM OFFICERS | | 12,737 |
| AMERICAN EXPRESS | | 111,015 |
| Total | $ 111,040 | $ 784,884 |

### Statement 10 - Form 1065, Schedule L, Line 20 - Other Liabilities

| Description | Beginning of Year | End of Year |
|---|---|---|
| NOTE PAYABLE - LONG TERM | $ 4,300,000 | $ 2,000,000 |
| Total | $ 4,300,000 | $ 2,000,000 |

TAXABLE YEAR

**2015**

## Limited Liability Company
## Return of Income

■

CALIFORNIA FORM

**568**

RP

201420310399   THOM   47-1444612
TYB  01-01-2015   TYE  12-31-2015
THOMAS WYLDE LLC

235 W 31ST ST
LOS ANGELES      CA   90007

15   PBA   315990

ACCTMETHOD 2  07-22-2014   ASSETS   6292703.
INITIAL 0  FINAL 0  AMENDED 1

**J  (1)** During this taxable year, did another person or legal entity acquire control or majority ownership (more than a 50% interest) of this LLC or any legal entity in which the LLC holds a controlling or majority interest that owned California real property (i.e., land, buildings), leased such property for a term of 35 years or more, or leased such property from a government agency for any term? ............................................................................................................................... ● ☐ Yes ☒ No

**(2)** During this taxable year, did this LLC acquire control or majority ownership (more than a 50% interest) in another legal entity that owned California real property (i.e., land, buildings), leased such property for a term of 35 years or more, or leased such property from a government agency for any term? ...................................................................... ● ☐ Yes ☒ No

**(3)** During this taxable year, has more than 50% of the LLC's ownership interests cumulatively transferred in one or more transactions after an interest in California real property (i.e., land, buildings) was transferred to it that was excluded from property tax reassessment under Revenue and Taxation Code Section 62(a)(2) and it was not reported on a previous year's tax return? ........................................................................................................... ● ☐ Yes ☒ No

**(Yes requires filing of statement, penalties may apply – see instructions.)**

| | | | Whole dollars only | |
|---|---|---|---|---|
| Complete Schedule IW, LLC Income Worksheet (on Side 7) first to determine Line 1. | | | | |
| | 1 | Total income from Schedule IW, Limited Liability Company Income Worksheet. See instructions ............ ● | 1 | 4,049,442 00 |
| | 2 | Limited Liability Company fee. See instructions ............................................................ ● | 2 | 6,000 00 |
| | 3 | 2015 annual Limited Liability Company tax. See instructions ............................................ ● | 3 | 800 00 |
| | 4 | Nonconsenting nonresident members' tax liability from Schedule T (Side 4) ............................ ● | 4 | 00 |
| | 5 | Total tax and fee. Add line 2, line 3, and line 4 ......................................................... | 5 | 6,800 00 |
| | 6 | Amount paid with form FTB 3537 and 2015 form FTB 3522 and form FTB 3536 .................... ● | 6 | 6,800 00 |
| | 7 | Overpayment from prior year allowed as a credit ........................................................ | 7 | 00 |
| | 8 | Withholding (Form 592-B and/or 593) .................................................................... ● | 8 | 0 00 |
| | 9 | Total payments. Add line 6, line 7, and line 8 ........................................................... | 9 | 6,800 00 |
| | 10 | Use Tax. This is not a total line. See instructions ● | 10 | 00 |
| | 11 | Payments balance. If line 9 is more than line 10, subtract line 10 from line 9 ● | 11 | 6,800 00 |
| | 12 | Use Tax balance. If line 10 is more than line 9, subtract line 9 from line 10 ● | 12 | 00 |

*Enclose, but do not staple, any payment.*