Dimitrios P. Biller (SBN: 142730)
15113 West Sunset Blvd., Suite #9
Pacific Palisades, California 90272
(310) 459-9870
biller_ltdconsulting@verizon.net

Attorneys for Paula Thomas

**JUDGE'S COPY**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

| | |
|---|---|
| In re<br>PDTW, LLC<br><br>Debtor | Case No.: 6:16-bk-15889 SY<br><br>Chapter 7<br><br>Case No: 6:17-ap-01200-SY |
| PDTW, LLC,<br><br>    PLAINTIFF,<br><br>vs.<br><br>PAULA THOMAS, TW HOLDING, LLC, THOMAS WYLDE, LLC,<br><br>    DEFENDANTS. | **DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF PAULA THOMAS' NOTICE OF MOTION AND MOTION FOR AN ORDER DISMISSING THE COUNTER-CLAIM AND CLAIMS FILED BY TW IN THE ADVERSARY AND BANKRUPTCY PROCEEDINGS; MEMORANMUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION; REQUEST FOR ATTORNEY FEES IN THE AMOUNT OF $20,000.00**<br><br>**EXHIBITS 18 THROUGH 29** |

# Table of Contents

A.  Meet & Confer With Richard Peddie on October 27, 2018 ................................ 8

B.  TW/Richard Peddie's Objections to Cost Shifting and Violation of The Court's
    Order ........................................................................................................ 9

C.  Richard Peddie's Violation of the October 1, 2018 Court Order ...................... 11

D.  Without An Accurate/Complete Set of QuickBooks Thomas Cannot Defend
    Herself. .................................................................................................... 12

E.  Jene Park Has and Had a Motive to Destroy Computers .................................. 13

F.  The Computers and Hard Drives in the Computers Are Essentia In Determining
    if any ESI in a Cloud are Complete ............................................................ 14

G.   TW Has Produced Documents in "Bits and Pieces" and "Dribs    and Drabs"
    for Over One Year........................................................................................ 20

H.  Authentication of Exhibits ......................................................... 21

## INDEX OF DOCUMENTS

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT |
|---|---|
| Exhibit No. "1" | Thomas Wylde's Claim No. 9 for $2.4 million |
| Exhibit No. "2" | QuickBooks Report Relating to $4.4 TW allegedly advanced to PDTW |
| Exhibit No. "3" | 2015 Tax Returns for TW |
| Exhibit No. "4" | 2014 Tax Returns for PDTW |
| Exhibit No. "5" | Action by Written Consent of the Members of PDTW, LLC |
| Exhibit No. "6" | Use of Proceeds Agreement between TW and Paula Thomas |

DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF PAULA THOMAS' NOTICE OF MOTION AND MOTION FOR AN ORDER
DISMISSING THE COUNTER-CLAIM AND CLAIMS FILED BY TW IN THE ADVERSARY AND BANKRUPTCY PROCEEDINGS;
MEMORANMUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION; REQUEST FOR ATTORNEY FEES IN THE AMOUNT OF
$20,000.00EXHIBITS 18 THROUGH 30        - 3

| | |
|---|---|
| Exhibit No. "7" | David Schnider's Testimony on alleged tax benefit |
| Exhibit No. "8" | David Schnider's e-mail to Andrew Apfelberg that there is not a tax benefit |
| Exhibit No. "9" | E-mail on Litigation Committed from Schnider |
| Exhibit No. "10" | E-mail from Schnider to Ed Smith regarding Notice for Litigation Hold |
| Exhibit No. "11" | Peddie's Opposition to Motion to Compel Admitting the computers were disposed of at TW |
| Exhibit No. "12" | Ed Smith's Testimony that ESI was removed to Cloud |
| Exhibit No. "13" | Richard Peddie's analysis of debt sent to Trustee |
| | |

| Exhibit No. "14" | Original Complaint filed in the USDC on June 6, 2017 |
| Exhibit No. "15" | Revised 1st Amended Complaint in federal court |
| Exhibit No. "16" | Order by Superior Court Judge Malcolm Mackey DENYING Peddie's Anti-SLAPP Motion |
| Exhibit No. "17" | Plaintiff Paula Thomas' 2nd Set of Request for Production Served on TW in the State Court Action. |
| Exhibit No. "18" | Plaintiff Paula Thomas' 2nd Set of Request for Production Served on TW in the State Court Action. |
| Exhibit No. "19" | Index of Documents that TW produced to Plaintiff in 2016 (over 2 years ago) while Kring & Chung represented her |
| Exhibit No. "20" | List of Documents Schnider was obligated to Produce |

| Exhibit No. "21" | September 13, 2018 Court Transcript for TW's Motion for Protective Order |
| Exhibit No. "22" | October 1, 2018 Order issued by Judge Yun |
| Exhibit No. "23" | October 16, 2018 Order issued by Judge Yun |
| Exhibit No. "24" | Status Report TW filed with Judge Kronstradt |
| Exhibit No. "25" | TW's Objections to Cost Shifting |
| Exhibit No. "26" | E-mails exchanged between Peddie, Ed Smith, and Jessica Bagdanov regarding passwords of computers |
| Exhibit No. "27" | Don Fife's Declaration |

| Exhibit No. "28" | December 9, 2015 e-mail from Schnider to Accountant Hank Kahrs |
| Exhibit No. "29" | E-mail's Peddie and Biller exchanged over PMK Witness Depositions |
| Exhibit "30" | Deposition of Larry Simons |

## DECLARATION OF DIMITRIOS P. BILLER

1. I am the attorney for Paula Thomas and I have represented her various litigations before the Superior Court, USDC and United States Bankruptcy Court since July 2017. While representing Paula Thomas in these actions, I have been responsible for all litigation, discovery and trial preparation. All the facts, situations, circumstances, events and documents described and stated in this Declaration are based on my personal knowledge. If called to testify I would and could provide competent testimony.

DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF PAULA THOMAS' NOTICE OF MOTION AND MOTION FOR AN ORDER DISMISSING THE COUNTER-CLAIM AND CLAIMS FILED BY TW IN THE ADVERSARY AND BANKRUPTCY PROCEEDINGS; MEMORANMUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION; REQUEST FOR ATTORNEY FEES IN THE AMOUNT OF $20,000.00EXHIBITS 18 THROUGH 30          - 7

## A.    Meet & Confer with Richard Peddie on October 27, 2018

2.    On Saturday I had a meet & confer.  Richard Peddie refused to provide information regarding the number of computers that are now available, where the said computers are located, whether the said computers still have hard drives, whether there is ESI contained in these hard drives, what the difference is between the ESI in hard drives in the computers and the ESI in the cloud.  Peddie refused to answer even the most basic questions about the identity of the computers. Then he stated that I don't need the computers because the ESI is available. I told him the obvious: that the ESI in an alleged cloud can or cannot be all the ESI in the computers and I have to do deep dive inspections of the hard drives of the actual computers to compare any date in the alleged cloud.  I told Peddie that if he would give me the information requested, allow me to see the exterior of the computers to identify the type, model and other information, then I would not file this motion. He refused.

3.    The ESI from both PDTW and TW are essential for Thomas to defend herself with regard to fraud, accounting, self-dealing, open book, unfair/illegal/fraudulent business practices and to prove that TW's bankruptcy claims for nearly $3 millions are bogus.  There is a reason why Jene Park destroyed the computers: she wanted to conceal the damaging evidence.

**B.    TW/Richard Peddie's Objections to Cost Shifting and Violation of The Court's Order**

4.    TW's filing of "TW Objections to Cost Shifting" regarding production of documents is in violation of two Orders: (1) the Court informed Peddie to file a Motion and discovery process then Judge Yun would decide the issue of costs; (2) it is clear TW will not produce documents as Ordered by the Court.  At the September 13, 2018 Hearing, Judge Yun stated:

MR. PEDDIE: Your Honor, I request the right to or the permission --- request permission to brief this issue of who in discovery is to bear the costs of document production and what producing means under the Rules because --

THE COURT:  You're not going to like it if you make me do that because ---

Mr. Peddie: No.  I would like to brief this issue.

THE COURT: You're -- I'm going to tell you right now, if you -- one, nothing is here before me.  I'm not giving you a date.  File the motion, comply with the Local Bankruptcy Rules regarding discovery dispute.  Set it for a hearing.  I'll resolve it.  What I'm trying to prevent from happening is a thing that everyone doesn't want, is to allow Mr.

Biller to go actually physically inspect computers, iPads, servers. I

think Mr. Biller would be thrilled to be given this opportunity on

behalf of the client if actual documents are not produced. If Thomas

Wylde's position is, "we're going to make it available," then I'm going

to give Mr. Biller the opportunity that he's been asking for that I have

consistently denied. You want to make it available you don't want to

actually physically produce it, I'm going to then allow Mr. Biller to

have physical inspection of computers and IPads and servers and

Quickbooks accounts. That's what I'm trying to prevent by this "I'm

going to make it available and he can come look at it." If that's

Thomas Wylde's position, Mr. Biller is going to have a field day.

**(Exhibit "21")**

5.     **Exhibit "21"** is a true and correct copy of the transcripts related to

the September 13, 2018 hearing regarding TW's Motion for Protective Order that I

caused to be generated and paid for. I received this document in the ordinary

course of my law practice and I have maintained a copy in a safe place as is my

custom.

6.     Despite this stern Order, on October 27, 2018 Peddie put the Court on

Notice that TW may not produce documents, so it should not be sanctioned or

receive a Court reprisal.  Peddie/TW filed an Objection to Cost Shifting that did

not comply with the Bankruptcy Rules and did not seek a hearing date.  **Exhibit**

**"22"** is a true and correct copy of that pleading that I received on October 27, 2018.

Richard Peddie wrote in the Conclusion of his Objections:

**IV. Conclusion**

**TW has no duty whatsoever to supply Thomas or any other party**

**free photocopies of documents it produces in discovery. That**

**being the case, neither sanctions nor judicial reprisals of any sort**

**can be inflicted upon TW should it elect not to do so.**  (Emphasis

added)

7.     Why would TW and Peddie accept the consequences of not

producing documents?  Why would Peddie allow to inspect computers,

servers, iPads at TW by failing to produce documents?

**C.     Richard Peddie's Violation of the October 1, 2018 Court**

**Order**

8.     The October 1, 2018 Order regarding the PMK Witness

Deposition form TW states Paula Thomas has up to January 31, 2018 to take

depositions of the PMK Witnesses and documents should be produced 30

days before the depositions.  For nearly one month I have attempted to take

PMK Witness depositions (October 2, 2018 to October 31, 2019)  Richard

Peddie and I have had a telephonic meet and confer but he refuses to give me

dates for PMK witnesses and state he does not have to until January 2019.

Even when I agreed to forsake the production of documents to take Jene

Park's deposition, Richard Peddie refused to give me a date on which he will

produce her for deposition and now he claims she needs a Korean interpreter.

Since the Court's Order states that I can take the PMK deposition up to

January 31, 2018 I can take them anytime up until January 31, 2018.

However, Richard Peddie refuses to produce anyone. **Exhibit "29"** are true

and copies of the e-mails Richard Peddie and I exchanged regarding my

request to take PMK witness depositions now.

### D.    Without An Accurate/Complete Set of QuickBooks Thomas Cannot Defend Herself.

9.    Thomas has stated that CFO Joel Keyser was responsible for failing to

properly identify the $121,000.00, but he cannot testify because he will take the

benefits of the 5th Amendment.  She will not be able to prove the Chief Financial

Officer for PDTW (Joel Keyser) embezzled $800,000.00 from PDTW to show a

pattern and practice of fraud by CFO Joel Keyser who was arrested and is going to

plead the 5th to avoid being subject to cross-examination.  I attempted to schedule

his deposition but was told by his counsel he would plead the 5th.

## E.  Jene Park Has and Had a Motive to Destroy Computers

10.    The computers were destroyed soon after December 2017 when five

legal actions were pending that involved TW and Jene Park: (a) Jene Park's claim

for 10% in PDTW and nearly $3 million dollars in claims by TW pending in

Bankruptcy Court against PDTW; (b) PDTW's claims in the adversary proceedings

in which Richard Peddie and TW are feeding the Trustee with analysis and

allegations to increase alleged debt that Thomas owes PDTW; (c) Superior Court

action against Park for negligence, abuse of process and defamation; (d) Superior

Court action by TW against Paula Thomas for numerous business and IP claims;

and (e) the original federal complaint that was stayed on July 29, 2017 for

trademark and copyright infringement, RICO Act copyright infringement, fraud

and fraud by concealment against TW, Jene Park, John Hanna, David Schnider,

Stephen Choi, Doug Lee, Roger Kuo, TW and Hillshore Investments.  Richard

Peddie represented both Jene Park and TW up until November 9, 2017.  The

original federal Complaint was filed with the United States District Court on or

about June 6, 2017 and Jene Park is a named defendant.

**F.      The Computers and Hard Drives in the Computers Are Essential to Determining if any ESI in a Cloud are Complete**

11.      There may be some ESI in a cloud, but Park and Peddie will not confirm it.  Even if there is some ESI from TW and/or PDTW in a cloud, there is absolutely no way to confirm its completeness, and authenticity because the computers and hard drives are not available.  If the computers and hard drives/servers were available then deep dive inspections could be completed to retrieve and analyze the meta data to determine what information was inputted, deleted, modified and/or erased.  This meta data then can be used to match any remaining ESI outside of computers.  Therefore, any remaining ESI is immaterial.

**G.      The Testimony of Ed Smith and Larry Simons Shows TW and Richard Peddie Concealed Computers from the Trust and Paula Thomas**

14.      Paula Thomas submitted the following summation of testimony by Larry Simons and Ed Smith to the Court in her prior *Rule 37(e)* request for an order dismissing PDTW.

Larry Simons testified that he picked up five or six computers, IMACs, and six iPads from David Spears' preemies (**Exhibit "30, Depo. of Simons, pg.32, ln. 3 -pg. 33, ln.13**) David Spears picked the

computers up from PDTW, which is the same place as TW. (**Simons'**
**Depo., pg. 33, ln. 14 - pg. 34, 1**)  He took possession of the
computers 30 to 45 days before the auction. (**Simons' Depo., pg. 40,**
**lns. 2-14**)  Simons then picked up the computers and iPads and drove
them to his office, and then he took them to David Seror's office, 60
days before his May 2, 2018 deposition; the computers were all-in-
one computers. (**Simons' Depo. pg. 41, lns. 4-23**).

The tax returns for PDTW date September 14, 2015 was
prepared nine months before the Petition for Chapter 7 Relief was
field. (**Simons' Depo., pg. 49, lns. 6-20**)  Those tax returns indicate
that 38 computers and two iPads were at PDTW/TW, but Peddie
informed Simons that the computers were being withheld because the
computers contained information. (**Simons' Depo., pg. 53, lns. 6-15**)
Peddie was withholding the computers. (**Simons, pg. 53, lns. 6-15**)
Peddie represented to Simons that the five computers and six iPads
that Simons had picked up were property belonging to PDTW and the
computers that were withheld were either TW's or disputed. (**Simons,**
**pg. 53, ln. 22 - pg. 54, ln. 12**)  Simons relied on Richard Peddie's
representations. (**Simons' Depo., pg. 54, ln. 21 - pg. 55, ln. 17**)

Peddie also gave Larry Simons a copy of the Quickbooks. (**Simons' Depo., pg. 56, ln. 13 - pg. 57, ln. 18**) The five computers were older. (**Simons' Depo., pg. 58, lns. 14-22**) Larry Simons intentionally left the 18 computers with TW and did not determine for himself if any PDTW data was included in those computers.

Ed Smith was the person in charge of maintaining the computer systems at PDTW and TW. Ed Smith worked for Paula Thomas setting up about three to five computers in Thomas' residence when she first launched PDTW, and he continued to work for Thomas when she expanded the Santa Fe address. He continued to work for Paula Thomas at the La Cienega Address (**Ed Smith's Depo., pg. 118, ln. 21 - pg. 119, ln. 17**) The computers at Thomas reside were Mac's ad Apple iMacs, and those were moved from Paula Thomas' residence to Venice to the location on Santa Fe in Los Angeles. (**Smith's Depo., pg. 119, pg. 14 - pg. 120, ln. 9**) At the Santa Fe address there were 10 computers that included five new computers in addition to the iMacs and one laptop. (**Smith's Depo., pg. 121, ln. 16 - pg. 122, ln. 17**)

There was a server at the Santa Fe location that he did not install but it contained accounting information. (**Smith, pg. 122, lns. 18-25**) In total, there were three servers at the Santa Fe location. (**Smith, pg. 123, lns. 8-11**) The servers contained accounting data and maybe some "design" stuff; (**Smiths' Depo., pg. 123, lns. 16-22**) The older server was moved from the Santa Fe address to the La Cienega address when he law saw it in 2015. (**Smith's Depo., pg. 124, lns. 10-25**) PDTW expanded in 2010 to eight designers and he remembers installing three PCs for accounting. (**Smith's Depo.' pg. 120, ln. 15- pg. 121, ln. 10**) There were three laptops at the Santa Fe location. (**Smith, pg. 126, lns. 2-12**) Five computers and three lap tops were over from the Santa Fe location to the La Cienega address, but the number of computers increased from five to eight while at Santa Fe. (**Smith, pg. 126, lns. 15-21**) From 2012 to the present PDTW and TW purchased 30 computers. (**Smith, pg. 128, lns.12-21**)

He believes that 40 computers were installed between 2009 and 2017 at PDT and TW. (**Smith, pg. 46, lns. 13-24**) Those computers primarily included 80% Apple, and 20% PCs. (**Smith, pg. 46, ln. 25 - pg. 46, ln. 4**) He last visited TW in December [20017] and there were

only five computers. (**Smith, pg. 50, ln. 24 - pg. 51, ln. 4**)  The last

time he visited the PDTW/TW La Cienega Facility there were 25

computers, and he does not know what happened to the 20 computes

[difference between 5 computers and 25 computers]. (**Smith, pg. 51,

lns. 5-15**)  There was never a discussion about issuing a Notice of

Litigation Hold with Richard Peddie or David Schnider.  (**Smith, pg.

54, ln. 10 – pg. 56, ln. 20**)  **Exhibit "7"** attached to Smith's

deposition transcript is a good estimate of the number of computers at

TW/PDTW in 2015, but **Exhibit "8"** includes his changes; he change

the number of PCs from 3 to 4 and reduced the number of Apples by

one; a total of 25 computers.  (**Smith, pg. 68, ln. 21 - pg. 70, ln.22**)

In 2017 there were 15 computers at TW and two servers. Ed Smith

does not know what happened to the other computer when PDTW/TW

had 25 to 30 computers.  (**Smith, pg. 138, lns. 9-19**)  The last time he

saw the old server that was upgraded to a larger model of Sygnology

was on December 20, 2017.  (**Smith, pg. 139, lns. 4-15**)  The last time

he was the 15 computers was a couple of months before December

2017; the last time he saw the three or four laptops was in 2015.

**(Smith, pg. 139, lns. 14-25)** Two of the laptops belonged to sales

persons and included QuickBooks data. **(Smith, pg. 140, lns. 1-13)**

### 1.  Servers Where Not Preserved

Smith saw two servers at TW on December 20, 2017. The

servers were 12 inches wide and six inches deep and six inches tall.

**(Smith, pg. 32, ln. 10-pg. 33, 11)** Jene Park asked him to move one

server to a storage facility in Los Angeles, near the corner of Santa Fe

Avenue and Olympic Blvd.  **(Smith, pg. 33, lns. 11-25)**    He saw the

older server on December 20, 2017.  **(Smith, pg. 36, ln. 16 - pg. 38,

ln. 7)**  Ed Smith does not know what happened to two original servers.

**(Smith, pg. 141, lns. 2-8)** There are at least four sources that would

include TW ESI, including the Cloud, serves, computers and hard

drives.  **(Smith, pg.38, ln. 13 - pg. 40, ln. 15)**

### 2.  There Might Be ESI in an Amazon Cloud

ESI for PDTW and TW was allegedly backed-up into a Cloud

as of December 2017.  **(Smith, pg. 21, ln. 5 - pg. 23, ln. 2)** Jene Park

is the only person who has access to it. **(Smith, pg. 23, lns. 3-16)**

## H.   TW Has Produced Documents in "Bits and Pieces" and "Dribs and Drabs" for Over One Year

12.   Richard Peddie, Jene Park and David Schnider have entered into a conspiracy to deny Thomas evidence, documents and facts.  I have gone through 16 months with these criminals of concealment and destruction of evidence.  After I took the deposition of Meldy Rafols I told her that I was going to notice her deposition again and demand production of her personal computer that she used at TW and PDTW.  I caused subpoena duces tecum to be served twice and she was served.  However, she never appeared at her depositions.  I served two subpoena duces tecum on Jene Park and she failed to appear at her depositions.  Richard Peddie represented both at the time of service.

13.   David Schnider is perhaps the biggest criminal of concealment and destruction of evidence.  I took the deposition of Schnider four times with demands to produce documents on August 10, 2017, September 12, 2017, September 28, 2017 and April 4, 2018.  I deposed him as the PMK at TW and in his individual capacity.  **Exhibit "17" and "18"** are true and correct copies of the Notices of Taking David Schnider's Deposition and Demands for Production of Documents, and the Notice of Taking the PMK deposition that TW designated Schnider to represent the company.  He produced less than 200 documents; TW produced 1000

documents in August 2017 and September 2017.  They produced 1,200 documents combine to 182 demands.  Pursuant to this Court's Order David Schnider produced **7115 pages of documents**.  There were only **26 categories of documents** that generated the **7115 production of documents**.  192 categories of documents reflected in **Exhibits "17" and "18"** should generate a lot more documents than **7117**.  However, TW produced the documents identified on Exhibit "19" and 1000 more pages in August 2017; **Exhibit "19"** represents the documents TW produced to Plaintiff while represented by Kring & Chung.  **Exhibit "20"** is a true and correct copy of the list of documents that Schnider was obligated to produce on June 18, 2018.  TW has only produced **approximately 4,000 pages of documents** in over three years of litigation under Richard Peddie and Jene Park's helm.  In other words, Schnider and TW have produced approximately **11,000 pages of documents**.  By way of example to illustrate how few documents this amount is, **Ed Smith alone, in one sitting, produced 17,500 pages** of documents.  For only six months of legal work, Greenberg Glusker produced over **6,000 pages of documents**.

## I.    Authentication of Exhibits

14.    Three of the most important e-mails related to preservation of ESI and the importance of QuickBooks to trace money were in Schnider's possession but

not produced until September 28, 2018. **Exhibit "28" and "29"** were produced to Thomas by David Schnider under Court Order in response to discovery prepared for Thomas and served to Schnider.

15.    Richard Peddie is responsible for this entire nightmare because he is the attorney and he is responsible to preserve and produce evidence. He had the power to preserve those computers, but he did not because he did not give the PDTW computers over to PDTW and the Trustee. He must have intentionally done so to prevent PDTW and Thomas from getting access to the ESI while it existed. According to Dr. David Fuchs' Declaration, Peddie and Jene Park have a very close personal/professional relationship. Exhibit "20" is a true and correct copy of that Declaration.

16.    **Exhibit "1"** is a true and correct copy of the Claim No. 9 form that Richard Peddie prepared and filed with the United States Bankruptcy Court. I obtained this document from the court's docket in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

17.    **Exhibit "2"** is a true and correct copy of the QuickBooks Report that Meldy Rafols produced at her deposition that I took in August 2017. I obtained this document in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

18.   **Exhibit "3"** is a true and correct copy of the 2015 income tax return for TW that Meldy Rafols produced at her deposition that I took in August 2017. I obtained this documents in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

19.   **Exhibit "4"** is a true and correct copy of the 2014 income tax return for PDTW, LLC that I received as part of the discovery in the Superior Court action. I obtained this documents in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

20.   **Exhibit "5"** is a true and correct copy of the "Action by Written Consent of the Members of PDTW, LLC" that I obtained in the Superior Court action through discovery from TW. I obtained this documents in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

21.   **Exhibit "6"** is a true and correct copy of the Use of Proceeds Agreement between TW and Paula Thomas that I obtained in the Superior Court action through discovery from TW. I obtained this documents in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF PAULA THOMAS' NOTICE OF MOTION AND MOTION FOR AN ORDER
DISMISSING THE COUNTER-CLAIM AND CLAIMS FILED BY TW IN THE ADVERSARY AND BANKRUPTCY PROCEEDINGS;
MEMORANMUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION; REQUEST FOR ATTORNEY FEES IN THE AMOUNT OF
$20,000.00EXHIBITS 18 THROUGH 30          - 23 -

22.    **Exhibit "7"** is part of the deposition testimony of David Schnider that I took related to his comments about a "tax benefit." I obtained this transcript in the Superior Court action through discovery from TW. I obtained this document in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

23.    **Exhibit "8"** is an e-mail from David Schnider to Andrew Apfelberg that Greenberg Glusker produced under subpoena. I obtained this document via subpoena in this action through discovery from TW. I obtained this document in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

24.    **Exhibit "9"** is an e-mail from David Schnider regarding a Special Litigation Committee and the retention of an accountant to do an audit that I obtained under Court Order from David Schnider in this case. I obtained this document via subpoena in this action through discovery from TW. I obtained this documents in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

25.    **Exhibit "10"** is an e-mail from David Schnider to Ed Smith regarding the issuance of a Notice for Litigation Hold that I obtained under Court Order from David Schnider in this case. I obtained this document via subpoena in this action

through discovery from TW. I obtained this documents in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

26.    **Exhibit "11"** is a true and correct copy of the Opposition to Paula Thomas' Motion to Compel Documents that was filed on behalf of TW and that I received from the Court. I obtained this document in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

27.    **Exhibit "12"** is a true and correct copy of Ed Smith's deposition testimony transcript related to his knowledge about Jene Park putting ESI on a cloud. I obtained this document in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

28.    **Exhibit "13"** is a true and correct copy of an e-mail exchange between Nancy Zamora and Richard Peddie related to an analysis of debt Peddie generated. Larry Simons produced this e-mail on May 2, 2018 at his deposition. I obtained this document in the ordinary course of my law practice and have maintained it in a safe and secure place as is my routine.

29.    **Exhibits "14"** is a true and correct copy of the original federal complaint that I prepared and caused to be filed on or about June 6, 2017. I then lodged, in April 2018, a Revised 1st Amended Complaint that is attached as

DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF PAULA THOMAS' NOTICE OF MOTION AND MOTION FOR AN ORDER DISMISSING THE COUNTER-CLAIM AND CLAIMS FILED BY TW IN THE ADVERSARY AND BANKRUPTCY PROCEEDINGS; MEMORANMUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION; REQUEST FOR ATTORNEY FEES IN THE AMOUNT OF $20,000.00EXHIBITS 18 THROUGH 30          - 25

**Exhibit "15."** Of course, all the litigation started on October 1, 2014 with the

Derivative Action Paula Thomas filed.

30.     Paula Thomas has named Jene Park and Richard Peddie in a case

pending in the Superior Court before Judge Malcolm Mackey.  Both are named as

Defendants for negligence, defamation and abuse of process.  Judge Mackey

denied Peddie's Anti-SLAPP Motion.  **Exhibit "16"** is a true and correct copy of

that Order that I obtain from the Court.

31.  **Exhibit "30"** is a true and correct copy of Larry Simons' Deposition

Testimony Transcripts that I paid for in the ordinary course of my business and

that I received from the court report agency transcribing the testimony.

32.     I, Dimitrios P. Biller, declare under penalty of perjury under the laws

of the State of California, that the foregoing is true and correct.  I executed this

Declaration in Pacific Palisades, California on October 31, 2018.

/S/ Dimitrios P. Biller

## PROOF OF SERVICE
### STATE OF CALIFORNIA
### COUNTY OF LOS ANGELES

I declare under penalty of perjury that I live in the County of Los Angeles, state of California, I am over the age of 18 years; my business is located at 15113 West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272. On October 31, 2018, I caused to be served, via e-mail, the following pleadings:

**DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF PAULA THOMAS' NOTICE OF MOTION AND MOTION FOR AN ORDER DISMISSING THE COUNTER-CLAIM AND CLAIMS FILED BY TW IN THE ADVERSARY AND BANKRUPTCY PROCEEDINGS; MEMORANMUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION; REQUEST FOR ATTORNEY FEES IN THE AMOUNT OF $20,000.00**

**EXHIBITS 18 THROUGH 30**

Will be served or was served (a) on the judge in chambers in the form and (b) the interested parties in this action by e-mail:

> Richard Byron Peddie,
> lawstudios@comcast.net
> Lawstudios Richard Bryon Peddie
> 5051 Euclid Avenue
> Boulder, Co 80303-2811
> Counsel for ALL Defendants
>
> Larry D. Simon:  larry@lsimonslaw.com
> Richard B. Peddie: lawstudios@comcast.net
> Andrew Haley: ahaley@shoreline-law.com
> Misty A. Perry Isaacson: misty@ppilawyers.com
> Nancy J. Zamora: zamora3@aol.com

DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF PAULA THOMAS' NOTICE OF MOTION AND MOTION FOR AN ORDER DISMISSING THE COUNTER-CLAIM AND CLAIMS FILED BY TW IN THE ADVERSARY AND BANKRUPTCY PROCEEDINGS; MEMORANMUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION; REQUEST FOR ATTORNEY FEES IN THE AMOUNT OF $20,000.00EXHIBITS 18 THROUGH 30            - 28

OUST-Riverside: ustpregion16.rs.ecf@usdoj.gov

**XXXX** BY MAIL – I placed such envelope for deposit in the U.S. Mail for service by the United States Postal service, with postage thereon fully prepaid.  I am "readily familiar" with the practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pacific Palisades, California.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____ BY FEDERAL EXPRESS – I am familiar with the practice at my place of business for collection and processing of correspondence for overnight delivery maintained by Federal Express.  Such correspondence will be deposited with a facility regularly maintained by Federal Express for receipt on the same day in the ordinary course of business.  The envelope was sealed and placed for collection and delivery by Federal Express with delivery fees paid or provided for in accordance with ordinary business practices.

_____ BY PERSONAL SERVICE – I caused such envelope to be delivered by hand to the offices of the addressee.

_____: E-mail via ECF.

**XXX** (State) I declare **under penalty of perjury under the laws of the State of California** that the foregoing is true and correct.

Executed on **October 31, 2018**, at Pacific Palisades, California.

/S/ Dimitrios P. Biller
Dimitrios P. Biller

DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF PAULA THOMAS' NOTICE OF MOTION AND MOTION FOR AN ORDER DISMISSING THE COUNTER-CLAIM AND CLAIMS FILED BY TW IN THE ADVERSARY AND BANKRUPTCY PROCEEDINGS; MEMORANMUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION; REQUEST FOR ATTORNEY FEES IN THE AMOUNT OF $20,000.00EXHIBITS 18 THROUGH 30          - 29

# EXHIBIT "19"

| Bates | Doc | Batch |
|---|---|---|
| 00001 -- 00002 | | FIRST |
| 00003 -- 00034 | Amended & Restated Operating Agreement | SECOND |
| 00035 -- 00088 | Employee Handbook, April 1, 2010 | SECOND |
| 00089 -- 00114 | Bank of America xxx5234 (2014) | THIRD |
| 00115 -- 00164 | Bank of Manhattan xxx5534 (2014) | THIRD |
| 00165 -- 00297 | Bank of Manhattan/Plaza Bank xxx5534 (2015) | FOURTH |
| 00298 -- 00385 | Bank of America xxx0527 (2015) | FIFTH |
| 00386 -- 00459 | Bank of America xxx5234 (2015) | FIFTH |
| 00460 -- 00518 | American Express xxx22003 | SIXTH |
| 00519 -- 00615 | American Express xxx31002 | SIXTH |
| 00616 -- 00678 | American Express xxx51004 | SIXTH |
| 00679 -- 00781 | American Express xxx52002 | SIXTH |
| 00782 -- 00804 | American Express xxx53000 | SIXTH |
| 00805 -- 00811 | Promissory Note: $1.8M held by Hillshore Investments, Aug. 13, 2014 | SEVENTH |
| 00812 -- 00814 | Promissory Note: $225K held by Consumer Resource Ntwk, Aug. 19 2014 | SEVENTH |
| 00815 -- 00819 | Secured Note: $2M held by Ahmed & Gonzalez, Dec. 1, 2014 | SEVENTH |
| 00820 -- 00821 | Promissory Note: $100K held by The Palliative, LLC, Nov. 11, 2015 | SEVENTH |
| 00822 -- 00842 | TW, LLC 2014 Tax Return on Form 1065 (partnership), Schedules, K-1s | SEVENTH |
| 00843 -- 00854 | CA State TW, LLC 2014 LLC Return, Schedules | SEVENTH |
| 00855 -- 00856 | TW, LLC 2014 Depreciation/Amortization Schedules Form 4562 | SEVENTH |
| 00857 -- 00883 | CA State TW, LLC 2014 Additional Tax Schedules, K-1s, Etc. | SEVENTH |
| 00884 -- 00885 | Meldy Rafols/John Hanna e-mail exchange confirming 1/3 pay cut, Mar. 26, 2015 | SEVENTH |
| 00886 -- 00888 | Hanna/Schnider e-mail exchange re termination of Paula Thomas, May 5-6, 2015 | SEVENTH |
| 00889 -- 00892 | E-mail exchanges re employment termination buyout, Apr. 10-13, 2015 | SEVENTH |
| 00893 -- 00895 | E-mail exchanges re PT requesting surreptitious fwding of employee e-mails, Apr. 10-11 | SEVENTH |
| 00896 -- 00897 | E-mail exchanges re accommodating Japanese and Russian markets, Mar. 7, 2015 | SEVENTH |
| 00898 -- 00899 | E-mail exchanges re PT's directive not to sell without her approval, Mar. 2, 2015 | SEVENTH |
| 00900 -- 00900 | Citizens Medical Group doctor's note dated Aug. 31, 2015 | SEVENTH |
| 00901 -- 00901 | Citizens Medical Group doctor's note dated Apr. 8, 2015 | SEVENTH |
| 00902 -- 00902 | Advice of Deposit -- PT pay, Aug. 2014 | SEVENTH |
| 00903 -- 00915 | Personnel File: Earnings Withholding Order Materials -- PT's Earnings/Failure to Pay Tax | SEVENTH |
| 00916 -- 00918 | Personnel File:  Additional | SEVENTH |
| 00919 -- 00919 | Dec. 2, 2015 Notice of UI Claim Filed by PT | SEVENTH |
| 00920 -- 00920 | Mar. 24, 2015 E-Mail Admonition/Warning, David Schnider to PT re Sia & Decisionmakir | SEVENTH |
| 00921 -- 00937 | Operating Agreement:  H&H Fashion, LLC | SEVENTH |
| 00938 -- 00938 | Jene Park May 14, 2012 E-Mail to PDTW Management re Red Crow & Jen F Jen Activiti | EIGHTH |
| 00939 -- 00942 | Mar. 1, 2005 Da Da // Dadatex USA Sales Representative Agreement | EIGHTH |
| 00943 -- 00943 | 2012 Termination of Da Da // Dadatex USA Sales Representative Agreement | EIGHTH |
| 00944 -- 00967 | Red Crow Productions Chase Account Satements xxx6261 | EIGHTH |
| 00968 -- 00970 | Chase Account Printout -- 24 Months -- xxx1606 -- The Palliative, LLC | EIGHTH |
| 00971 -- 00997 | Chase Statements xxx1606 -- Account Statements -- The Palliative, LLC | EIGHTH |
| 00998 -- 01057 | Chase Statements xxx2425 -- Account Printouts/Statements -- The Palliative, LLC | EIGHTH |
| 01058 -- 01141 | Steve Prestemon Personal Account xxx9750 -- Account Printouts/Statements | EIGHTH |
| 01142 -- 01202 | Steve Prestemon Savings Account xxx1942 -- Account Printouts/Statements | EIGHTH |
| 01203 -- 01204 | Jene Park Savings Account xxx8018 -- Account Printouts/Statements | EIGHTH |
| 01205 -- 01302 | Jene Park Checking Account xxx9928 -- Account Printouts/Statements | EIGHTH |
| 01303 -- 01366 | Park/Prestemon Joint Account xxx1170 -- Account Printouts/Satements | EIGHTH |
| 01367 -- 01368 | H&H LLC Articles of Organization | NINTH |
| 01369 -- 01370 | Shot in the Armoire, LLC Articles of Organization | NINTH |
| 01371 -- 01371 | City of Los Angeles Tax Registration Certificate -- Thomas Wylde, LLC | NINTH |
| 01372 -- 01372 | Federal Fish & Wildlife Permit -- Thomas Wylde, LLC | NINTH |
| 01373 -- 01373 | California State Board of Equalization Seller's Permit -- Thomas Wylde, LLC | NINTH |
| 01374 -- 01374 | Jan. 26, 2016 Notice of Issuance of New Membership Interest -- Thomas Wylde, LLC | NINTH |
| 01375 -- 01383 | Agreement to Purchase Membership Interest & Amended Exhibit B to Operating Agreem | NINTH |
| 01384 -- 01392 | Thomas Employment Agreement with Exhibits/Attachments | NINTH |
| 01393 -- 01401 | Thomas Employment Agreement with Exhibits/Attachments (duplicate?) | NINTH |
| 01402 -- 01408 | Hanna Employment Agreement with Exhibits/Attachments | NINTH |
| 01409 -- 01415 | Park Employment Agreement with Exhibits/Attachments | NINTH |
| 01416 -- 01417 | E-mail exchange related to Thomas bringing dogs to offices | NINTH |



EXHIBIT 76
Schnider
PENGAD 800-631-6989

| | | |
|---|---|---|
| 01418 – 01419 | E-mail exchange re Thomas not attending 2014 holiday dinner | NINTH |
| 01420 – 01423 | David Schnider e-mail exchange with Olivia Goodkin culminating on/about Mar. 3, 2015 | NINTH |
| 01424 – 01427 | David Schnider e-mail exchange with Olivia Goodkin culminating on/about Apr. 7, 2015 | NINTH |
| 01428 – 01428 | Citizens Medical Group doctor's note dated Apr. 8, 2015 | NINTH |
| 01429 – 01433 | David Schnider e-mail exchange with Olivia Goodkin culminating on/about Apr. 15, 2015 | NINTH |
| 01434 – 01435 | Olivia Goodkin e-mail of April 20, 2015 confirming Paula Thomas will not be coming in, e | NINTH |
| 01436 – 01436 | Jene Park e-mail of Mar. 3, 2015 to John Hanna re PT's instructions to sales team | NINTH |
| 01437 – 01438 | David Schnider e-mail exchange with Olivia Goodkin culminating on/about Apr. 5, 2015 | NINTH |
| 01439 – 01440 | John Hanna Mar. 26, 2015 e-mail re 1/3 paycut, all executives | NINTH |
| 01441 – 01442 | Meldy Rafols Mar. 30 e-mail to Paula Thomas re 1/3 paycut | NINTH |
| 01443 – 01443 | Jean Johnston e-mail of Apr. 10, 2015, complaining of secret forwarding of e-mails to Pa | NINTH |
| 01444 – 01444 | Siim Kohv e-mail of April 29, 2015 | NINTH |
| 01445 – 01447 | E-mails with Ed Smith relating to Paula giving passwords out to Tony Jay and Joshua | NINTH |
| 01448 – 01448 | Olivia Goodkin e-mail of May 12, 2015 – cover to DRAFT settlement agreement | NINTH |
| 01449 – 01461 | DRAFT settlement agreement, late April/early March 2015 | NINTH |
| 01462 – 01466 | Park / Rafols e-mails culminating Dec. 13, 2015 re another loan and reimbursement of B | NINTH |
| 01467 – 01467 | Paula Thomas' June 1, 2015 press release announcing "exit" from Thomas Wylde | NINTH |
| 01468 – 01479 | E-mail and Expedia and Mercer Hotel materials, PT trip to NYC Nov. 10-13, 2015 | NINTH |
| 01480 – 01482 | Schnider / Hanna e-mail of May 6, 2015 | NINTH |
| 01483 – 01486 | Hanna fwd of Schnider / Goodkin correspondence to Roger Kuo & Doug Lee, Apr. 13 20 | NINTH |
| 01487 – 01489 | E-mails related to PT's request to receive secretly Jean Johnston's e-mails, Apr. 10 201 | NINTH |
| 01490 – 01491 | Hanna e-mails relating to accommodating Russian and Japanese markets, etc. Mar. 7 2 | NINTH |
| 01492 – 01493 | Hanna e-mail to Paula Thomas admonishing re her instructions to sales team Mar. 2, 20 | NINTH |
| 01494 – 01494 | Citizens Medical Group doctor's note dated Aug. 31, 2015 | NINTH |
| 01495 – 01495 | Citizens Medical Group doctor's note dated Apr. 8, 2015 | NINTH |
| 01496 – 01496 | Advice of Deposit – PT pay, Aug. 2014 (personnel file material) | NINTH |
| 01497 – 01509 | PT Earnings Withholding Order Materials (California) (personnel file material) | NINTH |
| 01510 – 01510 | PT British Passport | NINTH |
| 01511 – 01511 | PT U.S. Permanent Resident Card | NINTH |
| 01512 – 01520 | EDD Materials re Notice of Hearing & Request for Hearing, Etc. | NINTH |
| 01521 – 01555 | EDD Materials – Record of Claim Status Interview & Assorted Materials | NINTH |
| 01556 – 01562 | June 7, 2013 agreement with Vendome and attachments | NINTH |
| 01563 – 01563 | Murphy Rosen Invoice to PDTW, Jan. 31, 2016 – Schiffman litigation apparently | NINTH |
| 01564 – 01564 | Jene Park text messages with Giselle Limtao during requested period | NINTH |
| 01565 – 01571 | June 7, 2013 agreement with Vendome and attachments | NINTH |
| 01572 – 01572 | Articles of Dissolution – Thomas Wylde Holdings, LLC | NINTH |
| 01573 – 01573 | Certificate of Cancellation – Thomas Wylde Holdings, LLC | NINTH |
| 01574 – 01577 | DEAL DOCUMENT: Clawback Agreement – Paula Thomas clawback arrangement | NINTH |
| 01578 – 01580 | DEAL DOCUMENT: Indemnity Agreement | NINTH |
| 01581 – 01591 | DEAL DOCUMENT: THOMAS Agreement to Purchase Membership Interest & Certain A | NINTH |
| 01592 – 01594 | DEAL DOCUMENT: Use of Proceeds Agreement | NINTH |
| 01595 – 01596 | Paula Thomas Unemployment Insurance Claim Materials: Notice of UI Claim from EDD | NINTH |
| 01597 – 01608 | Mutual Release & Settlement Agreemen w/Stipulated for Entry of Judgment – Schiffman | NINTH |
| 01609 – 01634 | Schiffman Note, Security Agreement & UCC-1 Filing | NINTH |
| 01635 – 01667 | Certain check images, PDTW payments to Schiffman | NINTH |
| 01668 – 01672 | David Schnider e-mail exchange with Olivia Goodkin culminating on/about Apr. 15, 2015 | NINTH |
| 01673 – 01676 | David Schnider e-mail exchange with Olivia Goodkin culminating on/about Apr. 7, 2015 | NINTH |
| 01677 – 01678 | Schnider / Hanna exchange March 12, 2015 & May 12, 2015 | NINTH |
| 01679 – 01680 | Olivia Goodkin e-mail of April 20, 2015 confirming Paula Thomas will not be coming in, e | NINTH |
| 01681 – 01682 | David Schnider e-mail exchange with Olivia Goodkin culminating on/about Mar. 3, 2015 | NINTH |
| 01683 – 01683 | David Schnider admonition/warning e-mail to Paula Thomas dated March 24 2015 | NINTH |
| 01684 – 01694 | Jene Park / Giselle Limtao WhatsApp exchanges Feb. 1 – April 30, 2015 | TENTH |
| 01695 – 01698 | Management e-mail exchanges re Omaha store and instructions to sales team | TENTH |
| 01699 – 01699 | Park / Hanna e-mail of March 3, 2015 re PT's instructions to sales team | TENTH |
| 01700 – 01701 | E-mail exchange between Jene Park & Emma Murmuridis, circa July 26, 2015 | TENTH |
| 01702 – 01703 | E-mails – Jill Eisenstadt-Chayet relating to LA Times articles/Booth Moore questions | TENTH |
| 01704 – 01705 | Promissory Note: $228K held by Steven Prestemon, Mar. 27, 2011 | TENTH |
| 01706 – 01708 | Promissory Note: $50K held by Jene Park, signed Apr. 23, 2013 & Supporting Materials | TENTH |
| 01709 – 01710 | Promissory Note: $131,337.00 held by Steven Prestemon, Jan. 1, 2013 | TENTH |
| 01711 – 01712 | Release letter dated May 13, 2014 | TENTH |
| 01713 – 01713 | Thomas Wylde, LLC – Organizational Chart | TENTH |

| | | |
|---|---|---|
| 01714 – 01846 | MissPaulaThomas Instagram | ELEVENTH |
| 01847 - 01965 | MissPaulaThomas Instagram | TWELFTH |
| 01966 – 02075 | MissPaulaThomas Instagram | THIRTEENTH |
| 02076 – 02174 | MissPaulaThomas Instagram | FOURTEENTH |
| 01275 – 02175 | Murphy Rosen Invoice to PDTW, Feb. 29, 2016 | FIFTEENTH |
| 02176 – 02176 | Palliative Check 12/23/2014 Capital Contribution | FIFTEENTH |
| 02177 – 02182 | Commercial Lease Agreement – Palm Springs Storage | FIFTEENTH |
| 02183 – 02186 | Payment Receipts, March 2016 Storage Units – Price Self Storage, La Brea | FIFTEENTH |
| 02187 – 02204 | Jene Park Restricted Equity Agreement, PDTW 2006 | FIFTEENTH |
| 02205 – 02205 | David Schnider admonition/warning e-mail to Paula Thomas dated March 24 2015 | FIFTEENTH |
| 02206 – 02207 | Meldy Rafols Mar. 30 e-mail to Paula Thomas re 1/3 paycut & deduction to pay capital cc | FIFTEENTH |
| 02208 – 02209 | E-mail exchange between David Schnider & Olivia Goodkin culminating April 20, 2015 | FIFTEENTH |
| 02210 – 02210 | Olivia Goodkin of May 19, 2015, covering letter and listing PT personal items | FIFTEENTH |
| 02211 – 02212 | Olivia Goodkin letter of April 20, 2015 | FIFTEENTH |
| 02213 – 02215 | E-mail exchange between David Schnider & Olivia Goodkin culminating April 20, 2015 | FIFTEENTH |
| 02216 – 02216 | E-mail from Luis B. at Flaunt [enclosed with O. Goodkin letter of May 19 02211 – 02212] | FIFTEENTH |
| 02217 – 02220 | Thomas Wylde, LLC – Resolution re Transfer of Membership Interests & Exhibit | FIFTEENTH |
| 02221 – 02222 | Thomas Wylde, LLC – Resolution re Hillshore Investment | FIFTEENTH |
| 02223 – 02223 | PDTW, LLC – Resolution re Transferring Liabilities | FIFTEENTH |
| 02224 – 02225 | Thomas Wylde, LLC – Resolution re Thomas Investment | FIFTEENTH |
| 02226 – 02226 | Thomas Wylde, LLC – Notice of Approval of Action [Fall 2015 Unit Issuance] | FIFTEENTH |
| 02227 – 02232 | Thomas Wylde, LLC – Notice of Proposed Action/Request for Written Consent [Fall 2015 | FIFTEENTH |
| 02233 – 02233 | Thomas Wylde, LLC – Notice of Hillshore's Exercise of Option – Oct. 13, 2015 | FIFTEENTH |
| 02234 – 02240 | Thomas Wylde, LLC – Notice of Issuance of New Membership Interest w/Attachments | FIFTEENTH |
| 02241 – 02243 | Jill Eisenstadt-Chayet E-Mail Chain re L.A. Times | FIFTEENTH |
| 02244 – 02245 | Jill Eisenstadt-Chayet E-Mail Chain re L.A. Times – Second | FIFTEENTH |
| 02246 – 02246 | Report Output: Payments to Dr. Michael Schiffman | FIFTEENTH |
| 02247 – 02248 | Schiffman UCC-1 Financing Statement | FIFTEENTH |
| 02249 – 02251 | L.A. Times Article re Jene Park becoming Creative Director – October 2015 | FIFTEENTH |
| 02252 – 02254 | L.A. Times re Thomas Wylde – Aug. 2015 | FIFTEENTH |
| 02255 – 02256 | RBP – Michael Crain e-mails culminating June 11, 2015 | FIFTEENTH |
| 02257 – 02257 | RBP – Michael Crain e-mails culminating June 19, 2015 enclosing financials | FIFTEENTH |
| 02258 – 02259 | RBP – Michael Crain e-mails culminating June 26, 2015 | FIFTEENTH |
| 02260 – 02309 | MissPaulaThomas Instagram | SIXTEENTH |
| 02310 – 02383 | MissPaulaThomas Instagram | SEVENTEENTH |
| 02384 – 02483 | MissPaulaThomas Instagram | EIGHTEENTH |
| 02484 – 02589 | MissPaulaThomas Instagram | NINETEENTH |
| 02590 – 02592 | MissPaulaThomas Instagram | TWENTIETH |
| 02593 – 02715 | MissPaulaThomas Instagram | TWENTY-FIRST |
| 02716 – 02835 | MissPaulaThomas Instagram | TWENTY-SECOND |
| 02836 – 02931 | MissPaulaThomas Instagram | TWENTY-THIRD |
| 02932 – 03081 | Sanli Pastore & Hill Valuation of IP, Oct. 2013 | TWENTY-FOURTH |
| 03082 – 03083 | Jene Park Feb. 24 2015 e-mail to David Schnider and others re upcoming meeting with F | TWENTY-FOURTH |
| 03084 – 03085 | Jene Park Mar. 3 2015 to John Hanna re concerns | TWENTY-FOURTH |
| 03086 – 03086 | Jene to Paula Mar. 3 e-mail to Paula T. referred to in above e-mail | TWENTY-FOURTH |
| 03087 – 03089 | E-mail chain, management, culminating Mar. 2, 2015 re Omaha store opportunity | TWENTY-FOURTH |
| 03090 – 03093 | E-mail chain re demand under Schiffman note culminating in Paul Murphy e-mail | TWENTY-FOURTH |
| 03094 – 03094 | TW [David Schnider] Mar. 17, 2015 letter to Murphy Rosen guarantying collection of PDT | TWENTY-FOURTH |
| 03095 – 03107 | Notices of Unit Issuance, exercise by Hillshore, etc. | TWENTY-FOURTH |
| | | |
| HC/AEO | QuickBooks file in *.qbm format, Feb. 23, 2016 ***DIGITAL FILE*** | AEO |
| | Video File in *.mp4 format from Jene Park Mar. 10, 2015 WhatsApp message to Giselle Limtao | |
| | Jene Park e-mail during specified time period in *.pst format | |

# EXHIBIT "20"

## ATTACHMENT "A" TO DAIVD SCHNIDER'S SUBPEOAN

## DEFINITIONS

1. **"YOU"**, **"YOUR"**, and **"YOU'RE"** are defined as David Schnider.

2. **"DOCUMENT"** or **"DOCUMENTS"** includes "handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored." California Evidence Code §250. DOCUMENT AND DOCUMENTS also include any writing, letter, correspondence, electronically stored information ("ESI"), meta data, e-mails, attachments to e-mails, including pdf copies, spread sheets, word documents, reports, records, statements, materials containing any writing and written data, forms, policies, any tangible items containing any form of images, communications, voices mail recordings, tape records, photographs, videotapes, digital images, declarations, signed statements, and correspondence.

3. **GARMENTS** is defined to be any tangible object that can be worn on a human to cover any part of the human body including but not limited to articles of clothing, suits, pants, pant suits, dresses, skirts, shirts, t-shirts, shoes, bags, sweaters, overalls, jackets, coats, boots, jewelry, hats, scarfs, gloves, accessories, swim suits, fabric, buttons, stitching, materials used to create **GARMENTS** and anything that Plaintiff Paula Thomas designed.

## DAMAND FOR PRODUCTION FOR DOCUMENTS

## REQUEST FOR PRODUCTION NO. 1:

Produce any and all **DOCUMENTS** related to any legal malpractice

insurance policy that provided **YOU** will legal malpractice insurance coverage
between 2013 and$ the present time.

**REQUEST FOR PRODUCTION NO. 2**:

Produce any and all **DOCUMENTS** related to any and all legal matters
YOU managed/handle to Paula Thomas, the individual, in a sealed envelope so not
to result in the waiver of the attorney-client privilege.

**REQUEST FOR PRODUCTION NO. 3**:

Produce any and all **DOCUMENTS** contained in any file(s) related to any
and all legal matters **YOU** managed/handle to Paula Thomas, the individual, in a
sealed envelope so not to result in the waiver of the attorney-client privilege.

**REQUEST FOR PRODUCTION NO. 4**:

Produce any and all **DOCUMENTS** related to the Employment Agreement
that **YOU** negotiated on behalf of Thomas Wylde, Inc. related to Plaintiff's
employment possession in 2015 with Thomas Wylde, Inc. attached as Exhibit "1."

**REQUEST FOR PRODUCTION NO. 5**:

Produce any and all **DOCUMENTS** related to the negotiations of the
Purchase Agreement attached as **Exhibit "2."**

**REQUEST FOR PRODUCTION NO. 6**:

Produce any and all **DOCUMENTS** related to any negotiations with
Hillshore Investments, S.A. regarding the amount of money and schedule of

payments to invest in Thomas Wylde, Inc. related to the approximately $2 million to $9.5 million invested into Thomas Wylde, Inc.

**REQUEST FOR PRODUCTION NO. 7**:

Produce any and all **DOCUMENTS** informing Plaintiff that Hillshore Investment, Inc. was going to invest approximately $2 million to $9.5 into Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 8**:

Produce any and all **DOCUMENTS** informing any person holding Units of Membership of Thomas Wylde, Inc. that Hillshore Investment, Inc. was going to invest approximately $9.5 into Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 9**:

Produce any and all **DOCUMENTS** related to company records for Thomas Wylde, LLC including but not limited to, notes of any meetings with the Unit Members in 2014 and 2015

**REQUEST FOR PRODUCTION NO. 10**:

Produce any and all **DOCUMENTS** related to the termination of Paula Thomas from Thomas Wylde, Inc.

**REQUEST FOR PRODUCTION NO. 11**:

Produce any and all **DOCUMENTS** regarding any discussions and communications related to the decision to terminate Paula Thomas.

## REQUEST FOR PRODUCTION NO. 12:

Produce any and all **DOCUMENTS** that relate to providing Plaintiff a 30 days' written notice of termination sent to Paula Thomas.

## REQUEST FOR PRODUCTION NO. 13:

Produce any and all **DOCUMENTS** that relate to any facts that resulted in the belief that Paula Thomas committed any of the five grounds justifying termination for Cause as defined in the Employment Agreement **(Exhibit "1").**

## REQUEST FOR PRODUCTION NO. 14:

Produce any and all **DOCUMENTS** related to any money paid to Paula Thomas as part of her Severance Package as described in the Employment Agreement **(Exhibit "1").**

## REQUEST FOR PRODUCTION NO. 15:

Produce any and all **DOCUMENTS** related to the decision to dilute the Units of Membership Paula Thomas purchase with the $3,200.00 described in the Purchase Agreement **(Exhibit "2").**

## REQUEST FOR PRODUCTION NO. 16:

Produce any and all **DOCUMENTS** related to the number of Units of Membership of everybody holding such Units in July 2014.

## REQUEST FOR PRODUCTION NO. 17:

**Produce any and all DOCUMENTS related to the number of Units of**

Membership of everybody holding such Units in from August 1, 2014 to
August 1, 2015.

<u>REQUEST FOR PRODUCTION NO. 18</u>:

Produce any and all DOCUMENTS exchanged between Thomas Wylde,
LLC and Hillshore Investment, S.A. related to investments in Thomas Wylde,
including but not limited to (a) money of invests/transactions of money up to
$9.5 million and (b) issuance of Units Hillshore Investment, Inc.

<u>REQUEST FOR PRODUCTION NO. 19</u>:

Produce any and all DOCUMENTS exchanged between Thomas Wylde,
LLC and Stephen Choi related to investments in Thomas Wylde, including
but not limited to (a) money of invests/transactions of money up to $9.5
million and (b) issuance of Units of Membership to Hillshore Investment, S.A.

<u>REQUEST FOR PRODUCTION NO. 20</u>:

Produce any and all DOCUMENTS communicating to Paula Thomas
that Hillshore Investment, Inc. invested money in Thomas Wylde, LLC money
before November 2014.

<u>REQUEST FOR PRODUCTION NO. 21</u>:

Produce any and all DOCUMENTS related to your resume YOU
created/maintained from 2013 to the present time.

<u>REQUEST FOR PRODUCTION NO. 22</u>:

Produce any and all **DOCUMENTS** related to the job description of everybody working for Thomas Wylde's, including Jene Park and John Hanna, from 2013 to the present.

## REQUEST FOR PRODUCTION NO. 23:

Produce any and all **DOCUMENTS** any and all retainer fees, including but not limited to engagements, contracts, and agreement of understanding between **YOU** and Thomas Wylde, Inc. in 2014 and 2015.

## REQUEST FOR PRODUCTION NO. 24:

Produce any and all **DOCUMENTS** related to any income and management from 2013 and 2015.

## REQUEST FOR PRODUCTION NO. 25:

**Produce any and all DOCUMENTS regarding any and all communications YOU had with Stephon Choi between 2014 and 2015.**

## REQUEST FOR PRODUCTION NO. 26:

Produce any and all **DOCUMENTS** regarding any and all communications **YOU** had with John Hanna between 2014 and 2015.

## REQUEST FOR PRODUCTION NO. 27:

Produce any and all **DOCUMENTS** regarding any and all communications **YOU** had with Jene Park between 2014 and 2015.

## REQUEST FOR PRODUCTION NO. 28:

Produce any and all **DOCUMENTS** regarding any and all communications

**YOU** had with Jene Park between 2014 and 2015.

**REQUEST FOR PRODUCTION NO. 29**:

Produce any and all **DOCUMENTS** regarding any and all communications

**YOU** had with Paul Thomas between 2014 and 2015.

**REQUEST FOR PRODUCTION NO. 30**:

Produce any and all **DOCUMENTS** regarding any and all communications

**YOU** had with any actual or potential investors between 2014 and 2015.

**REQUEST FOR PRODUCTION NO. 31**:

Produce any and all **DOCUMENTS** regarding any and all drafts of the

Purchase Agreement attached as **Exhibit "1."**

**REQUEST FOR PRODUCTION NO. 32**:

Produce any and all **DOCUMENTS** regarding any and all drafts of the

Employment Agreement attached as **Exhibit "2."**

**REQUEST FOR PRODUCTION NO. 33**:

Produce any and all **DOCUMENTS** regarding Jene Park's background in

designing **GARMENTS**.

**REQUEST FOR PRODUCTION NO. 34**:

Produce any and all **DOCUMENTS** regarding the income Thomas Wylde,

Inc. generated between 2014 and the present time.

**REQUEST FOR PRODUCTION NO. 35**:

Produce any and all **DOCUMENTS** regarding any money distributed to any investor, including but not limited to Plaintiff, Hillshore Investment, Inc., John Hanna, Jene Park, Stephon Choi, Doug Lee and Roger Kou, between 2014 and the present time.

**REQUEST FOR PRODUCTION NO. 36**:

Produce any and all **DOCUMENTS** regarding the salaries and bonuses paid to John Hanna, Jene Park, and all other employees between 2014 to the present time.

**REQUEST FOR PRODUCTION NO. 37:**

**Produce any and all DOCUMENTS related to the revenues Thomas Wylde, LLC received for the calendar/fiscal years of 2014 to the present time.**

**REQUEST FOR PRODUCTION NO. 38**:

Produce any and all **DOCUMENTS** related to all state and federal income tax returns for Thomas Wylde, LLC between 2014 and the present.

**REQUEST FOR PRODUCTION NO. 39**:

Produce any and all **DOCUMENTS** related to all the expenses Thomas Wylde, LLC has incurred between 2014 and the present time.

**REQUEST FOR PRODUCTION NO. 40:**

**Produce any and all DOCUMENTS related to any agreements**

negotiated with people/companies/corporations/entities regarding investments in Thomas Wylde, LLC (including Stephon Choi, Doug Lee, Roger Kou, Jene Park, John Hana and David Schneider).

**REQUEST FOR PRODUCTION NO. 41:**

**Produce any and all DOCUMENTS related to any and all business plans for Thomas Wylde, LLC from 2013 to the present.**

**REQUEST FOR PRODUCTION NO. 42:**

Produce any and all **DOCUMENTS** related to any **GARMENTS** that Jene Park personally designed.

**REQUEST FOR PRODUCTION NO. 43:**

Produce any and all DOCUMENTS related Jene Park's qualifications as a design of GARMENTS.

**REQUEST FOR PRODUCTION NO. 44:**

Produce any and all DOCUMENTS related to the sale of any and all GARMENTS by Thomas Wylde, LLC from 2014 to the present time.

**REQUEST FOR PRODUCTION NO. 45:**

Produce any and all DOCUMENTS inventory lists of any and all GARMENTS that Thomas Wylde, LLC sold or attempted to sell from 2014 to the present.

**REQUEST FOR PRODUCTION NO. 46:**

**Produce any and all DOCUMENTS related to invoices, receipts and proof of payment by customers, distributors and retailers regarding the sale of GARMENTS by Thomas Wylde, LLC from 2013 to the present.**

**REQUEST FOR PRODUCTION NO. 47:**

**Produce any and all DOCUMENTS related to Profit & Loss Statements for Thomas Wylde, LLC between 2013 and the present time.**

**REQUEST FOR PRODUCTION NO. 48:**

**Produce any and all DOCUMENTS related to Balance Sheets for Thomas Wylde, LLC between 2014 and the present time.**

REQUEST FOR PRODUCTION NO. 49:

Produce any and all DOCUMENTS generated by QuickBooks for Thomas Wylde, LLC regarding information inputted from 2014 to the present time.

REQUEST FOR PRODUCTION NO. 50:

Produce any and all DOCUMENTS related to all information and DOCUMENTS given to anybody who prepared the 2014, 2015, 2016 tax returns for Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 51:**

Produce any and all **DOCUMENTS** related to the decision to terminate Plaintiff in 2015.

**REQUEST FOR PRODUCTION NO. 52:**

Produce any and all **DOCUMENTS** considered in reaching the decision to terminate Plaintiff in 2015.

**REQUEST FOR PRODUCTION NO. 53**:

Produce any and all **DOCUMENTS** related to employee manuals that existed from 2014 to the present time that exists at Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 54**:

Produce any and all **DOCUMENTS** regarding an employee's employment rights that existed between 2014 and the present time that existed at Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 55**:

Produce any and all **DOCUMENTS** related to employee retaliation by management that existed from 2014 to the present time that existed at Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 56**:

Produce any and all **DOCUMENTS** regarding discrimination of any kind that existed between 2014 and the present time that existed at Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 57**:

Produce any and all **DOCUMENTS** regarding reasonable accommodations for disabilities of any kind that existed between 2014 and the present time that

existed at Thomas Wylde, LLC.

## REQUEST FOR PRODUCTION NO. 58:

Produce any and all **DOCUMENTS** regarding sick leave at Thomas Wylde, LLC between 2013 and the present.

## REQUEST FOR PRODUCTION NO. 59:

Produce any and all **DOCUMENTS** related to the payment of MLCE courses from 2013 to the present.

## REQUEST FOR PRODUCTION NO. 60:

Produce any and all **DOCUMENTS** related to employment law.

## REQUEST FOR PRODUCTION NO. 61:

Produce any and all **DOCUMENTS** related to intellectual property rights (copyrights and trademarks).

## REQUEST FOR PRODUCTION NO. 62:

**Produce any and all DOCUMENTS related to contracts (copyrights and trademarks) involving Thomas Wylde, LLC from 2013 to the present time.**

## REQUEST FOR PRODUCTION NO. 63:

**Produce any and all DOCUMENTS that YOU claim to show the intellectual property Plaintiff owned before December 31, 2014 transferred to anybody, including Hillshore Investment, Inc.**

## REQUEST FOR PRODUCTION NO. 64:

Produce any and all **DOCUMENTS** related to any and all communications

with the attorney representing Plaintiff in the negotiations regarding the

Employment Agreement.

**REQUEST FOR PRODUCTION NO. 65**:

Produce any and all **DOCUMENTS** regarding the attorney **YOU** referred to

represent Paula Thomas and all communications **YOU** had with that attorney prior

to December 31, 2014 at any time.

**REQUEST FOR PRODUCTION NO. 66**:

Produce any and all **DOCUMENTS** related to contracts with anybody

responsible for all or some of the manufacturing of Thomas Wylde, LLC's

**GARMENTS**.

**REQUEST FOR PRODUCTION NO. 67**:

Produce any and all **DOCUMENTS** related to contracts with anybody

responsible for all or some of the manufacturing of fabric purchased by Thomas

Wylde, LLC's **GARMENTS**.

**REQUEST FOR PRODUCTION NO. 68**:

Produce any and all **DOCUMENTS** related to any designs (sketches and

computer created) that Jene Park claims she personally designed.

**REQUEST FOR PRODUCTION NO. 69**:

Produce any and all **DOCUMENTS** related to any designs (sketches and

computer created) that Plaintiff personally designed.

**REQUEST FOR PRODUCTION NO. 70**:

Produce any and all **DOCUMENTS** related Jene Park's contention she is a "self-tough designer."

**REQUEST FOR PRODUCTION NO. 71**:

Produce any and all **DOCUMENTS** related to the decision that somebody other than Plaintiff could create designs for **GARMENTS**.

**REQUEST FOR PRODUCTION NO. 72**:

**Produce any and all DOCUMENTS related to any kind of loan that Thomas Wylde, LLC has outstanding.**

**REQUEST FOR PRODUCTION NO. 73**:

Produce any and all **DOCUMENTS** related to bank accounts (savings, checking, CD) in the name of Thomas Wylde, LLC from 2013 to the present.

**REQUEST FOR PRODUCTION NO. 74**:

Produce any and all **DOCUMENTS** related to the opening and closing of any bank accounts (savings, checking, CD) in the name of Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 75**:

Produce any and all **DOCUMENTS** related to the transfer of money as investments into the accounts for Thomas Wylde.

**REQUEST FOR PRODUCTION NO. 76**:

Produce any and all **DOCUMENTS** sent to investors between 2013 and present regarding the financial status of Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 77**:

Produce any and all **DOCUMENTS** regarding the projection of growth of Thomas Wylde, LLC from 2013 to the present time.

**REQUEST FOR PRODUCTION NO. 78**:

Produce any and all **DOCUMENTS** that **YOU** and Thomas Wylde, LLC gave to potential and actual investors in 2013 to the present regarding Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 79**:

Produce any and all **DOCUMENTS** related to any and all marketing efforts, fashion shows, and advertisements Thomas Wylde, LLC distributed between 2013 and 2014.

**REQUEST FOR PRODUCTION NO. 80**:

Produce any and all **DOCUMENTS** exchanged between Thomas Wylde, LLC and any third party having any responsibilities to market Thomas Wylde, LLC and its **GARMENTS**, promote fashion shows, and create advertisements Thomas Wylde, LLC distributed between 2013 and 2014.

**REQUEST FOR PRODUCTION NO. 81**:

Produce any and all **DOCUMENTS** (including but not limited to contracts

with web designers) related to any and all website for Thomas Wylde, LLC put on

the internet between 2013 and the present time.

**REQUEST FOR PRODUCTION NO. 82**:

Produce any and all **DOCUMENTS** related to any and all photographs of

GARMENTS Thomas Wylde, LLC sold from 2013 to the present.

**REQUEST FOR PRODUCTION NO. 83**:

Produce any and all **DOCUMENTS** regarding contracts with models and

photographers depicting GARMENTS sold by Thomas Wylde, LLC from 2013 to

the present.

**REQUEST FOR PRODUCTION NO. 84**:

Produce any and all **DOCUMENTS** regarding how to engage in the

interactive process when employment issues arise.

REQUEST FOR PRODUCTION NO. 85:

Produce any and all DOCUMENTS regarding any insurance policy

(including but not limited to general commercial insurance, employment insurance,

worker' compensation insurance, and umbrella policies) that existed and provide

any type of insurance to Thomas Wylde, LLC from 2013 to the present.

**REQUEST FOR PRODUCTION NO. 86**:

Produce any and all **DOCUMENTS** regarding any insurance policy that

existed and provide any type of insurance to the people working in any

management capacity (including CFO, CEO, Creative Designer, In-house Counsel)

from 2013 to the present.

**REQUEST FOR PRODUCTION NO. 87**:

Produce any and all **DOCUMENTS** related to any employment dispute with

John Hanna.

**REQUEST FOR PRODUCTION NO. 88**:

Produce any and all **DOCUMENTS** related to any settlement, compromise

and/or agreement reached between Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 89**:

Produce any and all **DOCUMENTS** related to the nature of the dispute and

cause of any disagreements that led to John Hanna leaving Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 90**:

Produce any and all **DOCUMENTS** related to any legal services **YOU**

provided to PDTW, LLC (Paula Dorothy Thomas Wylde) from January 1, 2013 to

the present time.

**REQUEST FOR PRODUCTION NO. 91**:

Produce any and all **DOCUMENTS** related to any legal services **YOU**

provided to Paula Thomas from January 1, 2013 to the present time.

# EXHIBIT "21"

```
1                     UNITED STATES BANKRUPTCY COURT

2             CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE

3                            --oOo--

4    In Re:                      )   Case No. 6:16-bk-15889-SY
                                 )
5    PDTW, LLC,                  )   Chapter 7
                                 )
6    Debtor,                     )   Riverside, California
                                 )   September 13, 2018
7    --------------------------) Thursday, 9:30 A.M.
     LARRY D. SIMONS (TR),       )
8                                )
                 Plaintiff,      )
9                                )
                 v.              )   Adv. No. 6:17-ap-01200-SY
10                               )
     PAULA THOMAS, an individual,)
11   et al.,                     )
                                 )
12               Defendants.     )
     --------------------------)
13
                                     DEFENDANT'S MOTION FOR
14                                   PROTECTIVE ORDER RE:
                                     THOMAS WYLDE, LLC
15
                      TRANSCRIPT OF PROCEEDINGS
16             BEFORE THE HONORABLE SCOTT YUN
               UNITED STATES BANKRUPTCY JUDGE
17

18   APPEARANCES:

19   For Defendant Paula      DIMITROS P. BILLER, ESQ.
     Thomas:                  LDT Consulting, Inc.
20                            15113 West Sunset Boulevard
                              Suite #9
21                            Pacific Palisades, CA 90272

22   For Defendant Thomas     RICHARD B. PEDDIE, ESQ.
     Wylde, LLC:              Richard Byron Peddie, PC
23                            5051 Euclid Avenue
                              Boulder, Colorado 80303
24
     Proceedings produced by electronic sound recording;
25   transcript produced by transcription service.
```

| | | |
|---|---|---|
| 1 | Court Recorder: | Shari Mason<br>U.S. Bankruptcy Court |
| 2 | | Central District of California<br>3420 Twelfth Street |
| 3 | | Riverside, California 92501-3819<br>(855) 460-9641 |
| 4 | | |
| 5 | Court Transcriptionist: | Ruth Ann Hager, C.E.T.**D-641<br>Ben Hyatt Certified Deposition<br>  Reporters |
| 6 | | 17835 Ventura Boulevard, Suite 310<br>Encino, California  91316 |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page                                                            3

1      RIVERSIDE, CALIFORNIA, THURSDAY, SEPTEMBER 13, 2018,

2                        10:33 A.M.

3                          --oOo--

4           THE CLERK:  Going forward is #11.10, PDTW,

5   Chapter 7 Trustee v. Thomas, *et al.*  This is the defendant

6   Thomas Wylde's motion for a protective order.  May I have

7   appearances, please?

8           MR. BILLER:  Good morning, Your Honor.  Dimitrios

9   Biller on behalf of Paula Thomas.

10          THE COURT:  Good morning.

11          MR. PEDDIE:  Good morning, Your Honor.  Richard

12   Peddie appearing on behalf of Thomas Wylde, LLC.

13          THE COURT:  All right.  Good morning.

14          So before we begin, Mr. Peddie --

15          Oh, please sit.

16          I have some questions for Mr. Peddie.  As usual,

17   there are tons of pleadings filed in connection with this

18   even though the Local Bankruptcy Rule we really, really

19   trust and never not to have any of the pleadings in

20   discovery dispute other than the joint stipulation.

21          First, I want to make it clear because part of

22   that is because of the way in which the discovery request

23   was served, which is a deposition and a request for

24   production of documents.

25          Mr. Peddie, is it my -- is it -- was it your

Page                                                              4

1   intent -- this protective order was not about document

2   request at all, but just the subject of the deposition of

3   the person most knowledgeable?

4          MR. PEDDIE:  Exactly, Your Honor.

5          THE COURT:  Fine.  It was a little confusing

6   looking at the joint stipulation and some of the pleadings

7   that have been filed what the parties were fight --

8   fighting over.  So then I did see you did file written

9   responses to the document request.  Has Thomas Wylde going

10  to also produce whatever documents that it believes are not

11  privileged?

12         MR. PEDDIE:  Your Honor, these -- this combined

13  discovery request -- the notice was served in March of 2018

14  and I believe it was April 12th or 13th, right around then,

15  a timely set of objections and responses were served to the

16  document requests and that's when we were going through the

17  initial attempts to confer over the PMK designation's use.

18         THE COURT:  Um-hum.

19         MR. PEDDIE:  So we have responded and we had a

20  telephonic meet-and-confer in late April -- I think it

21  might have been April 23rd -- and we were collaborating to

22  put together a joint stipulation with regards to the

23  document issues and got pretty far along.  My understanding

24  was there was a final version of that joint stipulation but

25  that was, you know, something that was being promoted by

Page                                                      5

1   Mr. Biller on behalf of Paula Thomas.  No motion was filed

2   and that stipulation was never filed.  That was all in his

3   hands.  That's as far as that went.  So my stipulation only

4   had to deal with the 30(b)(6) issue and that's what my

5   motion was about.

6              THE COURT:  Okay.  But I -- I'm still trying to

7   understand.  Has Thomas Wylde produced documents in

8   response to the request for produc -- production of

9   documents component of that discovery request?

10             MR. PEDDIE:  No, Your Honor.

11             THE COURT:  Okay.  So we've got to eventually --

12  even though this protective motion for protective order is

13  only about the deposition of the PMK, I want to make sure

14  one way or another we pick a date by which documents are

15  produced.

16             MR. BILLER:  Your Honor, may I make a comment?

17             THE COURT:  Sure.

18             MR. BILLER:  I don't want to interfere with your

19  train of thought, but Mr. Peddie said something that's just

20  not true.  We never had a meet-and-confer on April 23.  He

21  has claimed there's a 34-minute telephone call that we had

22  and he claims he has a telephone bill to prove it, that we

23  went over 27 topics of PMK witnesses in 37 minutes in a

24  meet-and-confer.  That never happened, Your Honor.  It

25  never happened.  That's why you ordered an in-person meet-

Page                                                                6

1    and-confer and we had an in-person meet-and-confer because

2    the motion that he filed for a protective order was filed

3    prematurely.  He gave me notice that he was -- he gave me

4    notice that he was going to file a protective order on

5    April 12th.  Then he filed the actual motion on April 14th,

6    Your Honor.  And then on April 16 he filed an opposition to

7    my motion for summary judgment and PW file -- PDTW filed a

8    motion for summary judgment and then everybody started

9    filing emergency motions, Your Honor.  I have written them

10   down.  There are 12 emergency motions and motions for

11   protective order by everybody, including third-party

12   witnesses.  And I think I called this Court.  I had 2.6

13   hours of sleep in a four-month period.  This was a well-

14   coordinated attack, Your Honor.  That's what it was.

15          THE COURT:  I -- I understand.  But that's sort

16   of in the past.  We have not had any other emergency

17   motions or protective orders --

18          MR. BILLER:  No, Your Honor.

19          THE COURT:  -- filed since then and I think

20   everyone sort of now understands some of the ground rules

21   and how we're going to proceed here.  So let's just sort of

22   get to this motion for protective order.  And one of the

23   ways we can do this -- if this is just about designating a

24   person most knowledgeable and Ms. Thomas's responses to

25   many of the issues is, "I just need someone to authenticate

Page                                                                7

1    the documents, whatever documents that are produced."

2          Some of the dispute, not all of them, can be

3    resolved just by both parties agreeing whatever documents

4    you produce with your Bates stamp number will be deemed

5    self-authenticated and we or -- if not self-authenticated

6    we will not object to the introduction and use of that

7    document as evidence in connection with this case.  If you

8    do that, some -- not all, of the issues that we have to

9    resolve today -- can be done.  In fact, I can see if and

10   when someone from Thomas Wylde has to be deposed as a

11   person most knowledgeable it would also lead to a shorter

12   deposition because then Mr. Biller doesn't have to go

13   through document after document after document to try to

14   get somebody to authenticate it.

15         Mr. Peddie, is there any interest on the part of

16   your client -- and it will be mutual -- to just agree

17   whatever document we produce to you with the Bates stamp

18   number at the bottom we're not going to object to based on

19   the fact that it hasn't been authenticated?

20         MR. PEDDIE:  Your Honor, if we get into producing

21   more documents then certainly that I suppose could be a

22   presumption.  I don't know what kind of strange document

23   may come up where we would say, "Hey, there's a history to

24   this and here's why, it actually came from you but we don't

25   think it's authentic," or something like that, you know.

Page                                                                    8

1   But certainly as a presumption, sure.

2          THE COURT:  Right.  Definitely a presumption and

3   you serve the document.  But I really think even though

4   there has been some acrimony in relationship between

5   Mr. Peddie and Mr. Biller you're going to be able to work

6   that out.  And I don't -- I think it's in both parties'

7   mutual interest not to have a ridiculously lengthy

8   deposition of the person most knowledgeable where the

9   primary job is, now, I have to look at this document, and

10  then spend hours authenticating documents.  It -- nobody

11  wants to do it.  Mr. Biller doesn't want to do it.

12  Mr. Peddie, I don't think you want to sit through that.

13         So as documents have not been produced this

14  concept may be premature but I do have confidence both of

15  you will work it out because it is in both parties' in --

16  both attorneys' mutual interest to do that rather than, you

17  know, waste everyone's time having a deposition of the PMK.

18         MR. BILLER:  I agree, Your Honor.  Just for the

19  record I just want to say I agree.

20         THE COURT:  All right.  So let's try to go

21  through this item by item and because as I was reviewing

22  the motion I wasn't quite sure whether this motion for

23  protective order was just about PMK or the documents as

24  well.  Some of the comments that I posted in my tentative

25  ruling may not be relevant.  Let's just go through this

Page                                                                    9

1    item by item.

2             MR. BILLER:  Your Honor, can I --

3             THE COURT:  Yeah.  Go ahead.

4             MR. BILLER:  So we're going to go through the PMK

5    and the documents together and documents that are going to

6    be produced?

7             THE COURT:  Well --

8             MR. PEDDIE:  Your Honor, I'm not -- we're not

9    agreeing to that at all.

10            THE COURT:  What Mr. Peddie has said is his

11   motion only relates to PMK.  So I don't have anything

12   before me on the documents but what I'm going to do is in

13   connection with resolving this motion set a deadline for

14   the deposition of the PMK, because I basically waived it

15   when the deposition date was held in abeyance until this

16   matter could get resolved, but this will also mean

17   documents have to be produced, you know, before the

18   deposition deadline.  So we're going to get to that and

19   hopefully -- I know it's not going to resolve all the

20   issues but it will resolve some of the issues.

21            MR. BILLER:  In reading over your tentative, Your

22   Honor, I don't know when you want me to do this but I think

23   it's incumbent upon me to explain to you what's happened

24   recently and it goes to your issue of scope in terms of

25   time.  So I can wait until we get the end and I can bring

Page                                                                10

1   these issues up then or I can do it now if you'd like,

2   whatever your pleasure.

3           THE COURT:  Let -- let's wait until the end.

4           MR. BILLER:  Okay.

5           THE COURT:  And let's get through the nitty-

6   gritty.  So -- and the other concept is -- I mean,

7   obviously it would be great if there is one PMK on all

8   issues but it is allowed, permissible and often necessary.

9   There are multiple PMKs and it is really up to the

10  plaintiff initially and really up to the party who is the

11  subject of the discovery to designate who the PMK is.  But

12  some of the issue that I see in reading the joint

13  stipulation is, well, how can one person possibly know all

14  of this.  Well, it doesn't have to be one person.  It could

15  be different people.  And

16          I don't know the state of Thomas Wylde today

17  since Thomas Wylde, other than being a party to litigation,

18  is not a debtor in the case, what type of company it is,

19  how many employees it has, whether it's an active company

20  or not.  Now -- but Thomas Wylde can designate multiple

21  people as the person most knowledgeable on different

22  issues.  So it doesn't have to be one human being.  It

23  could be multiple people.  Other -- obviously, it's

24  convenient if it's one person.

25          So let's get to topics one, two, three are all

Page                                                                11

1   sort of related and it might be easier if there is some

2   sort of a time limitation on -- for the most part I agree,

3   people know what accounting records are; people know what

4   business records are; people know what financial records

5   are.  It's not that confusing but there should be a time

6   limitation based on the scope of this litigation.

7              MR. BILLER:  That's what I needed to fill you in

8   on, Your Honor.  Do you want me to sit down and continue

9   talking?

10             THE COURT:  Yeah.  Go ahead.  All right.

11             MR. BILLER:  Okay.

12             THE COURT:  Go ahead.

13             MR. BILLER:  I received 24,000 pages of documents

14  in July including 7,000 pages from Greenberg Glutberg --

15  Glut -- Glutsker.  Six, seven -- those 7,000 pages of

16  evidence proved to me that David Schnider, who've I

17  mentioned before, and Andrew Apfelberg, a partner at

18  Greenberg who represented my client Paula Thomas, conspired

19  together in 2000 -- early 2014 to defraud my client at her

20  business and her IP.  I filed this 500-page complaint in

21  Superior Court naming Greenberg and attaching 90 exhibits

22  of emails and documents proving that Greenberg was

23  recruited by David Schnider in 2014 to help him perpetrate

24  a fraud.

25             THE COURT:  Okay.

Page                                                          12

1          MR. BILLER:  That fraud was first committed on

2    July 22, 2014 when there was an agreement as to a contract

3    for the sale -- for the investment of 5.5 million dollars

4    and two-point million dollars by Stephen Choi into --

5    between Steven Choi and my client.

6          Then TW was open four days later on July 22.

7    Then the operating agreement was signed on September 22,

8    2014 by Jene Park, Doug Lee, Roger Kuo and John Hanna.  Not

9    my client.  They kept it away from my client.  And for five

10   months, Your Honor, they didn't do anything with my client.

11   But all of a sudden on December 18th they dropped seven

12   agreements on our lap, not completed agreements.  Redlined

13   agreements.  And who drafted those agreements?  Not her

14   lawyer.  David Schnider.  David Schnider drafted those

15   agreements.

16         And so on January 13, 2015 David Schnider and my

17   client's lawyer dissolved TW Holding, LLC.  That owned the

18   IP.  That is the company that owned the IP.  And so that

19   company when it was dissolved -- my client signed the

20   article of dissolution -- was dissolved it went

21   automatically back to my client.  And then one of the

22   sneaky agreements that they had my client sign while she

23   was on vacation in Uruguay on December 31st transferred

24   that IP immediately to TW.

25         Under the original contract TW Holding was

Page                                                    13

1  supposed to be part of the new company.  In other words, TW

2  Holding and TW were supposed to be together.  My client was

3  supposed to read a five -- he had a five-year management

4  agreement.  My client was supposed to be in charge of all

5  branding and all imagery designs for the company.  She was

6  then terminated three months later through Richard Peddie

7  in a fraudulent termination letter.

8              THE COURT:  And what year was that?  2015?

9              MR. BILLER:  2015.  This is --

10             THE COURT:  2015.  All right.

11             MR. BILLER:  He terminated her on April --

12 May 14, 2015.  Steven Choi never signed any of the

13 documents, never.  The contract was between my client and

14 Stephen Choi.  Instead, he got a dum -- he made a dummy

15 corporation.  Everything went into the dummy corporation.

16 All the documents went into the dummy corporation.  So

17 Stephen Choi -- not Stephen Choi -- Hill -- Hillshore

18 Investment, S.A., the dummy corporation invest 5.5 million

19 dollars into TW by April 15.  My client is gone by then.

20 And then another four millions dollars or 3.8 million

21 dollars in November '16.  So a total amount of 9.1 million

22 dollars in investments, not including -- not including all

23 the loans.

24             This is where it really gets bad, Your Honor.

25 They dumped 4.4 million dollars in expenses on my client's

Page                                                                14

1    lap and PDTW.  Those expenses never were incurred.  It was

2    a tax fraud.

3            TW is a money laundering company.  Thirty-one

4    million dollars as gone through that company.  Thirty-one

5    million dollars has gone through that company since

6    August 13, 2014 to July 2017.  Now, the 4.4 dollars that

7    TP -- PDTW supposedly owns, that's all a fraud.  It's all a

8    fraud.  I took the financial controller's deposition,

9    Melody Raffels (phonetic).  I asked her, "Are all these

10   expenses accurate?" and she said, "I don't know."  "Well,

11   do you have the backup materials?"  "Yes, I·have the backup

12   materials."  "Did you use your computer?"  "Yes, I used my

13   computer."  I tried to notice her deposition three more

14   times.  She would never come.  Mr. Peddie is the one who is

15   responsible for that.  He represented her at my deposition,

16   the initial deposition.

17           Now, the scope it's ongoing.  These are pants my

18   client designed and the print is copy protected --

19   copyright protected and it's in dispute.  It's in dispute

20   in this case.  Jene Park just posted on Instagram new

21   designs using this same print.  New designs.

22           Now, I think PDTW would be interested at what

23   Jene Park is producing and selling in South Korea and all

24   over the world because it's really money that's in dispute

25   but nobody seems to be taking an interest in that.  Nobody

Page                                                                    15

1   seems to take an interest that she is designing clothes, my

2   client's prints and label, and selling them around the

3   world and nobody is stopping her.

4           THE COURT:  Well, the Trustee also did sue Thomas

5   Wylde.

6           MR. BILLER:  Yeah, but there's not been anything

7   to stop them.  He hasn't filed a motion for preliminary

8   injunction.  He hasn't filed --

9           THE COURT:  Well, he --

10          MR. BILLER:  Believe me, it's coming.

11          THE COURT:  Maybe you should --

12          MR. BILLER:  It's coming, Your Honor.  Believe

13  me, it's coming.

14          THE COURT:  Either file the motion yourself or --

15          MR. BILLER:  I'm going to.

16          THE COURT:  -- you know, give --

17          MR. BILLER:  But that's what I'm saying.

18          THE COURT:  Notify the Trustee what's happening.

19          MR. BILLER:  The scope of this goes back to 2013

20  to the present.

21          THE COURT:  I hear you about the ongoing present

22  issues but the scope of this adversary proceeding really

23  goes back to who owns that and what happened in the 2013,

24  '14, '15 time period.

25          MR. BILLER:  Except for the accounting.  PDTW is

Page                                                              16

1   in bankruptcy because it was loaded up with 4.4 million

2   dollars of debt it never incurred.  That debt never

3   incurred.  The last year the --

4            THE COURT:  But that -- that's irrelevant to the

5   whole bankruptcy case but in this adversary case the

6   Trustee's complaint is basically it comes down to some

7   money that the Trustee believes Ms. Thomas owns, but that's

8   sort of, you know, tail wagging the dog and let's put that

9   aside for now.

10           The main dispute is the Trustee believes PDTW

11  owns all of the copyrights and trademark.  Ms. Thomas

12  claims she owns it.  TW says they own it.  All of that

13  dispute goes back to the 20 -- maybe '13 to the '15 time

14  period.  This lawsuit is about who owns those rights in the

15  first place.  If and when somebody prevails there is going

16  to be then an infringement lawsuit and if it's as between

17  Ms. Thomas and Thomas Wylde this has nothing to do with the

18  bankruptcy case.  You go back to Judge Kronstadt in the

19  district court.

20           So this lawsuit -- this adversary is about who

21  owns those rights in the first place.

22           MR. BILLER:  And it's also about -- there are 18

23  claims by the Trustee.  Eighteen claims.  Four are for

24  infringement.  The others are fraud, accounting, open book,

25  breach of fiduciary duty.  How is my client going to prove

Page                                                              17

1   that she doesn't own -- she doesn't -- she's not guilty of

2   any of those torts when we don't even know what the

3   electronic and stored information is at this point.  She

4   has a right to know whether their accountant is accurate in

5   his estimates.

6              Here's another point, Your Honor.  Brian

7   (phonetic) -- Bruce Penny (phonetic) is giving, is giving,

8   PDTW access to ESI.  I attached an exhibit to my

9   declaration that was between Peddie, Jene Park and one of

10  the attorneys at David Seror's office.  But I can't get

11  access to that ESI from PDTW.  They don't have any more

12  information to give me other that was attached to the

13  complaint, Your Honor.  That's what they told me yesterday.

14  That's all the information they have.  They don't have

15  anything new.

16             Now, I'm bringing a motion to compel.  I'm

17  preparing that and we can go through the process but

18  there's a lot going on behind the scenes.  And I have ten

19  emails from Peddie telling the -- PDTW to "File the

20  adversary proceeding.  File the adversary proceeding.

21  Knock some sense into Biller.  Let's nuke Paula Thomas."

22  Saw that, "Here's how you do it."

23             And what's this all about, Your Honor?  Thus,

24  just a reminder and preview.  "We agreed the estate could

25  take and sell everything contingent upon it recognizing

Page                                                              18

1  that we claim an interest in that stuff but we agree we can

2  argue about that money later."   What is "that stuff," Your

3  Honor?   What -- he wrote the email.   He could tell us.

4          MR. PEDDIE:   I'd be happy to say what it is.

5          MR. BILLER:   Okay.   No, you're under oath.

6          THE COURT:   Well, let's --

7          MR. BILLER:   You know, and the point is they've

8  been going back and forth colluding -- and I've said that

9  since day one; now I have the emails to prove it --

10 colluding about evidence, what to argue before this Court.

11 Peddie is their lawyer.   Peddie dra -- Peddie reviews and

12 drafts their pleadings.   Peddie tells them what legal

13 strategy to pursue.   1839 Peddie -- emails of Peddie

14 telling them what they need to do.   "Have -- this is how

15 you prevent Biller from taking the auctioneer's deposition.

16 And I'll even file it so you can not have -- so you can

17 avoid making a filing fee."   That's what's going on here,

18 Your Honor, and I can't get any evidence from anybody?

19         Six months, PDTW has been claiming protective

20 order, protective order, and now they say they don't have

21 anything.   Don't have anything.

22         THE COURT:   All right.   Let's try to go through

23 this.   I still think as to topics one, two, three, and

24 we're just talking -- not documents; we'll get to that I

25 guess one day -- the topic that the person most

Page                                                                          19

1   knowledgeable should be deposed or not.  I really think the

2   time period should be -- I don't know if as early as 2012

3   but from 2013 to 2015.

4          MR. BILLER:  Well, it should be 2012 because

5   that's what the Trustee is claiming.

6          THE COURT:  Right.  Okay.

7          Mr. Peddie.

8          MR. PEDDIE:  Your Honor, this is a motion for a

9   protective order and it's the first motion for a protective

10  order TW has brought and the first lawsuit was filed in

11  October 1st I think 2015.

12         THE COURT:  Yeah.

13         MR. PEDDIE:  We've been in almost uninterrupted

14  discovery for 34 months or something with a few months in

15  there that where there was no discovery but it's been on

16  and on.  We've answered almost 1,600 discovery requests or

17  objected.  It's been to the point where it truly is time to

18  draw a line and reel this is and bring it back to what it

19  really should be about.

20         Now, this is the very first motion for a

21  protective order that we ever brought and it is limited to

22  the 30(b)(6) designations and it's mostly to do with can --

23  given the federal standard for a 30(b)(6) deposition can we

24  really be expected to prepare someone to speak

25  authoritatively and bindingly about something that is as

Page                                                                  20

1    vague as accounting records or QuickBooks or something like

2    that?

3              THE COURT:  But to me one, two and three really

4    goes back to the dispute that I think the parties can

5    resolve easily.  This is about authenticating documents

6    that are produced.  What Mr. Biller doesn't want is Thomas

7    Wylde produces a financial statement as part of the

8    discovery and during the lawsuit, whether it's a trial or

9    some motion, Thomas Wylde objects to the admissibility or

10   the use of that document because no one appeared at the

11   deposition of Thomas Wylde as a person most knowledgeable

12   and said, "Yes, I can authenticate that document."  If

13   parties agree they're not going to object to the use of

14   documents that are produced, accounting records, business

15   records, financial records, maybe we don't even have to

16   have this motion.

17             MR. PEDDIE:  Right, Your Honor.  Well, I would

18   say that again this presumption that you have proposed to

19   me seems to be a good and fair mechanism where if we

20   produce it with our Bates stamp he can assume it's

21   authentic from our point of view and it's admitted to be

22   authentic and let's we somehow footnoting it -- we footnote

23   it giving some kind of history about that particular

24   document.  I think that that's a fine mechanism.

25             MR. BILLER:  Your Honor, this man is out of mi --

Page                                                           21

1   is out of his mind.  He produced 175 documents.  That's it.

2   In two lit -- two cases, two separate cases, 175 documents,

3   4100 documents.  I just got 27,000 docu -- or 25,000

4   documents last month.  I'm going to dispute everything they

5   produce.

6           MR. PEDDIE:  Your Honor --

7           THE COURT:  Well --

8           MR. PEDDIE:  I'm sorry.  Go ahead.

9           THE COURT:  Let's -- the document issue, I'm

10  really hoping parties can resolve it.  But today, really

11  this, you know, as Mr. Peddie clarified, is about

12  designation of the person most knowledgeable and really it

13  could really be multiple people.  It could be nobody.  We

14  don't have anybody from back in the 2012 era who's the

15  person most knowledgeable.

16          MR. BILLER:  Jene Park.

17          THE COURT:  Yeah.  But in theory, you know.

18  People quit, they got fired and no one is around who

19  prepared any of their accounting financial records of a

20  business going back five, six years.  In theory that's

21  possible but for the purposes of establishing some ground

22  rule for the deposition of a PMK, unless I'm hearing

23  something else what I want to do is for now like limit that

24  PMK to the time period between 2012 and 2015.

25          MR. PEDDIE:  Your Honor, Thomas Wylde, LLC was

Page                                                                    22

1  not even formed until July 22, 2014.  It didn't even exist.

2          MR. BILLER:  It used -- TW used the accounting

3  records and systems of PDTW.  Now, this is going to be the

4  problem, Your Honor.  There are no hard -- there are no

5  computers anymore.

6          THE COURT:  Okay.  I'm still going to use 2012 to

7  2015 because I think that's the relevant time period for

8  this adversary proceeding.  Thomas Wylde had a deposition

9  of -- as the person most knowledgeable they can just take

10 the position, we weren't even around until 2014 so we don't

11 have the person most knowledgeable going back to 2012.

12 That's fine.  And if that deposition takes place, there is

13 a dispute.  I hope somebody says, "Can you just mark

14 this" -- the court re -- the recorder, "We're going to have

15 a motion to compel later" and then just keep going.  And

16 then if another issues comes out and Mr. Peddie instructs

17 his client, "We didn't exist before 2014 so I'm instructing

18 my client not to answer," just when -- mark it and just

19 keep going with the deposition and if and when your parties

20 can't resolve this it's going to come back here and I'll

21 try to resolve it.  But for now the relevant time period

22 for this adversary proceeding is 2012 to 2015 so I'm

23 limiting one, two, three to that time period.

24         MR. PEDDIE:  Your Honor, let me just --

25         THE COURT:  Go ahead.

Page                                                         23

1           MR. PEDDIE:  -- clarify something that goes back

2   to something that was -- that you said earlier, which was

3   that one of the issues here is who owned the intellectual

4   property --

5           THE COURT:  Right.

6           MR. PEDDIE:  -- originally?  Understand TW makes

7   no claim whatsoever to having owned any of this

8   intellectual property originally.  TW concedes that

9   somebody else was the -- if its copyright -- was the

10  author, whether it by statute as an employer and if it

11  happened in 2005 or '06 or something.  Our only claim is

12  that we purchased it in 2014 December.  And I don't know

13  when the documents got signed.  It could have been January

14  2015.  And that is why I have been advocating what I call

15  "bifurcated discovery" but really I guess it's "phase

16  discovery" because as Your Honor just said if it turns out

17  that Paula Thomas owns the IP then that other dispute of,

18  did we really buy it from her or if we did does she get it

19  back because we defrauded her, and all of that, that's for

20  Judge Kronstadt.

21          MR. BILLER:  No.

22          MR. PEDDIE:  And that's not something that's here

23  before this Court.  It has nothing to do with liquidating

24  the debtor PDTW.  It's a completely separate dispute.

25          THE COURT:  Well, no.  But the problem is as

Page                                                      24

1  between vis-à-vis TW and Ms. Thomas that might be true but

2  the Trustee filed a complaint, declaratory relief, naming

3  Ms. Thomas saying, "PDTW owns this" without really

4  clarifying how or why.  There are other causes of action,

5  claim for relief, where Trustee's allegations against

6  Ms. Thomas are more concrete but the declaratory relief is

7  sort of broad.  Based on everything that I've said in this

8  complaint about every -- all the prior paragraphs there is

9  a dispute about who owns these, including the archives.

10 PDTW owns it, not you.

11         MR. PEDDIE:  Right.

12         THE COURT:  That could play out a lot of

13 different ways and --

14         MR. PEDDIE:  But I'm discussing IP.

15         THE COURT:  -- with or without Thomas Wylde.

16         MR. PEDDIE:  I'm discussing IP in particular, not

17 a physical unit that has IP in it, like an archive or

18 inventory unit or something like that.  What I'm saying is

19 that if it turns out -- and the Trustee has already

20 abandoned certain copyrights from 2006 through '13 or

21 whatever it was, something in there, or the -- or before

22 PDTW's stuff anyway, their dispute is as to who is the

23 author under the Copyright Act, for example, to establish

24 who is the original owner of that stuff?  Once that's

25 determined that will say, "Oh, Paula Thomas was all along

Page                                                                    25

1    the author.  She's the owner.  She never gave it to PDTW."

2    Or it's going to say that the result will be, "Hey, this

3    was an employer.  PDTW is the original owner" and,

4    therefore, the dispute becomes, "Well, we didn't transfer

5    it to -- we PDW -- DW" -- bleh -- "PDTW did not sell this

6    to you, TW.  What's your defense to that?"

7              THE COURT:  Right.

8              MR. PEDDIE:  So --

9              MR. BILLER:  Do you know what the problem is with

10   that, Your Honor?  TW has a lawsuit against PDTW and they

11   claim that they own it.  And one way to prove that they

12   don't own it is with all this transferring of money and

13   fraud that the whole -- the scheme is just not ownership at

14   this level.  It's much broader because there was truly, you

15   know, transfer of wires of tens of millions of dollars for

16   what?  Really, for what?

17             MR. PEDDIE:  Your Honor, we're here --

18             THE COURT:  I -- my concern about bifurcating

19   either discovery or this adversary as a multi-transaction

20   phase is I've done that several times and I've regret it

21   every single time.  I regretted it because even after I

22   granted judgment on the first one where I've actually

23   entered an order under the Federal Rules of Civil Procedure

24   bifurcating it when it went up on appeal, the appellate

25   court said, "What the hell is this?  This is not a final

Page                                                                              26

1   order."  I'm like, "But there is this order bifurcating the

2   case."  Appellate courts didn't like it.  They really don't

3   like trial court judges doing that.

4         Two, I've had cases where I bifurcated a trial

5   where I entered a judgment in one.  While that was still

6   pending on appeal, the long tortuous appeal of matters, I

7   had to think, we'll try the second part.  And it's really,

8   really hard to try the second part when I have no idea if

9   the first part is going to be affirmed or not and it may

10  impact the second part.  So then I'm then forced to, well,

11  let's do nothing for three, four years while the first part

12  is on appeal.

13        I used to bifurcate litigation for -- to make it

14  easy on the parties and to make it easy on me and I realize

15  I'm not going to be making it easy on anybody else.

16  It's -- appellate courts don't like it and it either causes

17  potential conflicting rulings or it just causes delay.

18        MR. BILLER:  I'm in the same situation right now,

19  Your Honor.  You're absolutely right.

20        THE COURT:  I wish the appellate courts liked it

21  but they really, really, really do not like try court --

22  trial court judges to bifurcate trials.  So --

23        MR. PEDDIE:  Well, in any event, we have never

24  claimed original ownership of any of this stuff.

25        THE COURT:  Yeah.  And --

Page                                                              27

1          MR. PEDDIE:  We would love to see them fight that

2    out and see where it comes out, just to see if we have any

3    real dispute there.

4          THE COURT:  Right.  And even if I wanted to, I

5    really can't make any decision about that today without the

6    Chapter 7 Trustee and Trustee's counsel here because

7    Trustee has sued both Thomas Wylde and Ms. Thomas.  And

8    since they are the original plaintiff, even though we have

9    counterclaims, I need to know whether Trustee has any

10   interest in proceeding against one party first and then

11   another party before I can even consider that.  So --

12         MR. BILLER:  But even if they wanted to, Your

13   Honor, I still have a right to go after TW as a third

14   party, you know.  If TW, you know, doesn't want to be part

15   of this litigation, first of all, they shouldn't convince

16   the Trustee to file it; second of all, they can drop their

17   cross-claim and I can sue them as a third party -- I mean,

18   I could pursue them as a third-party witness.

19         MR. PEDDIE:  Your Honor, we have no cross-claim.

20   There is no counterclaim -- or cross-claim here whatsoever.

21         THE COURT:  But there could be.  Well, there is a

22   counterclaim by Thomas against the Trustee and a

23   counterclaim by --

24         MR. BILLER:  Yes.

25         THE COURT:  -- TW against the Trustee.

Page                                                                    28

1              MR. BILLER:  That's right.

2              THE COURT:  But nothing as between, at least in

3    this adversary proceeding --

4              MR. BILLER:  Right.

5              THE COURT:  -- Thomas v. TW --

6              MR. BILLER:  That's right.

7              THE COURT:  -- other then, you know, they're all

8    potential witnesses.

9              MR. BILLER:  Right.

10             THE COURT:  So let's keep going.  Number 4, loan

11   and investments in TW.  Once again, I think there has to be

12   a time limitation.  If TW is an active business today and

13   it has a loan from B of A or Wells Fargo it's really not

14   that relevant.  I think what you're really looking at is,

15   you know, the birth of TW and what happened to Thomas

16   Holdings I guess.  It's an entity that I keep forgetting

17   about and --

18             MR. BILLER:  It turns out to be the most

19   important entity, Your Honor.

20             THE COURT:  Well --

21             MR. BILLER:  I was with you, too.

22             THE COURT:  Yeah.

23             MR. BILLER:  Until I read those Greenberg emails.

24             THE COURT:  So I would, you know, once again

25   impose the same time limit here, 2012, 2015, and really I

Page                                                                29

1   don't want to rule on this in such specificity but -- and I

2   hope the parties can agree.  If TW in 2012 and 2015 entered

3   into a financing agreement with Pitney Bowes, one of those

4   stamp machines -- every business has one.  You know, Pitney

5   Bowes it -- you prepay for stamps and then it -- or you

6   just put a bunch of letters in it and it cranks out

7   catalogues and it pre-stamps.  That's usually financed.  I

8   hope that's not the type of documents you're looking for,

9   Mr. Biller, with Thomas -- so --

10          MR. BILLER:  No, Your Honor.

11          THE COURT:  I'm not going to rule with

12  specificity here but if Thomas Wylde, for example, that

13  like employed credit cards for gas or, you know -- I hope

14  that's not the type of loans and investments you're looking

15  for.

16          MR. BILLER:  Do you really have the time -- do

17  you think I have the time to look through those documents?

18          THE COURT:  No.  That's why I'm not even going to

19  rule.

20          MR. BILLER:  Yeah.

21          THE COURT:  I'm just giving that as an example --

22          MR. BILLER:  Yeah.

23          THE COURT:  -- because I believe you can work

24  this out with Mr. Peddie.

25          MR. PEDDIE:  Your Honor, but once again, are we

Page                                                                  30

1   talking about situations where we're really just

2   authenticating things?

3          THE COURT:   This is about since -- you clarify

4   this is about the person most knowledgeable it is who's

5   going to appear if and when there's a deposition of the

6   person most knowledgeable who can testify about and

7   authenticate loans and investments.   And I suspect in some

8   ways one, two, three and four are all subsets of each

9   other.   They're all interrelated.

10         Now, accounting records can be somebody put in a,

11   you know, expense reimbursement for lunch for 7.95.   That

12   theoretically falls under accounting records and that

13   really, at the end of the day, is it really about

14   authentication and I don't think Mr. Biller's going to

15   fight over whether or not someone actually has knowledge to

16   testify.

17         But number four, on the other hand I can see is

18   not just about authenticating documents.   This is about

19   Thomas Wylde doing its reasonable and best efforts --

20   providing reasonable and best efforts to provide a person

21   most knowledgeable regarding loans and investments in TW in

22   that time period to come testify.   It could be one person.

23   It could be multiple people.   So this is, you know,

24   authentication of documents but it's also about someone who

25   is going to go testify about loans and investments in TW.

Page                                                    31

1  But all I'm doing is TW only has to produce the person most

2  knowledgeable within that time period.

3           MR. PEDDIE:  And so 1 through 3 are really just

4  about authentication?

5           THE COURT:  Well, I --

6           MR. PEDDIE:  Look, this about particularity.  The

7  demand needs to be particular and then I have a

8  corresponding duty to prepare somebody.

9           MR. BILLER:  No, he -- Your Honor, he just has to

10  produce a person --

11          MR. PEDDIE:  Yeah.  There's --

12          MR. BILLER:  -- who knows something on the topic.

13  He doesn't have to prepare anybody.  The fact that he

14  prepares somebody, he's tainting the testimony of that

15  witness.

16          THE COURT:  Well, this is -- all of it in some

17  ways is about authentication and the producing person most

18  knowledgeable at a deposition.  But once again, I don't

19  want to enter an order that tries to anticipate every

20  single problem but a -- even if Thomas Wylde produces a

21  person most knowledgeable on business records from 2012 to

22  2015, there is a piece of document that's produced and

23  Mr. Biller says, "Take a look at this.  What do you know

24  about it?" it is possible there is no one who might know

25  their business record.  It is possible.  All that Thomas

Page                                                              32

1   Wylde is required to do under the Federal Rules of Civil

2   Procedure is to use his reasonable efforts to designate and

3   produce a person most knowledgeable because there are broad

4   categories of documents and even though I'm trying to put a

5   time limitation, though it's not, you know, forever in the

6   fu -- into the past and to the present, it could very well

7   be there is no one who knows something about every single

8   document produced.

9           MR. BILLER:  Your Honor, we went through this in

10  the state court action.  He produced three witnesses, David

11  Schnider, Pen -- Penny Park -- Jene Park and Yung Soon Bay

12  (phonetic).  That's who he produced.  He produced three

13  witnesses, one to testify on accounting; one to testify on

14  finance and other issues, business issues; and Schnider

15  seemed to be the catch-all guy.  So this is the first time

16  we've done this and I can tell you who those -- the

17  witnesses are.  Just throw Melody in there.  I mean, those

18  are the witnesses.

19          THE COURT:  Well --

20          MR. PEDDIE:  Your Honor, Mr. Biller knows that

21  I've offered to produce specific individuals.  That's not

22  something I have a problem with.  This is not state court.

23  This is under the Federal Rules where the demand has to be

24  specific and then I have a corresponding duty to prepare

25  that witness adequately, so I'm really caught between the

Page                                                                 33

1    horns of the bull here.

2           MR. BILLER:  No, you're -- he is not, Your Honor.

3    He is not.  The --

4           THE COURT:  Well --

5           MR. PEDDIE:  Then just -- then he could -- then

6    Paula Thomas can take David Schnider's deposition, Jene

7    Park's --

8           MR. BILLER:  No.

9           MR. PEDDIE:  -- deposition.

10          MR. BILLER:  I want to --

11          MR. PEDDIE:  -- Melody Raffels' deposition and we

12   could be done with this.

13          MR. BILLER:  Your Honor, TW doesn't exist.  Let's

14   just say it.  TW does not exist as a design company.

15   That's why he doesn't want to produce anybody from TW

16   because when I get them under -- in cross-examination I

17   will be able to show this Court TW does not exist.  It's

18   Jene Park.  It's only Jene Park and she's using the brand

19   name to sell her own products through other companies.

20          MR. PEDDIE:  Your Honor, it's true that we are

21   down to an almost inert company at this point.

22          THE COURT:  Yeah.  But --

23          MR. PEDDIE:  And that is also a problem, a

24   practical problem in trying to --

25          THE COURT:  I -- again, but what you want me to

Page                                                    34

1   do, Mr. Peddie, is anticipate what's going to happen at

2   this deposition and give you some relief.  I don't know

3   what's going to happen at this deposition.

4            MR. PEDDIE:  What I'm trying to avoid is a

5   situation where we sit down, Mr. Biller asks all kinds of

6   questions about accounting records.  "This question is

7   about accounting records.  You're the designated person.

8   You're supposed to be able to answer intelligently in a

9   binding way authoritatively about the topic of accounting

10  records.  I just asked you a question about that you don't

11  know anything."  Your Honor, I want some sanctions.

12           MR. BILLER:  That's badgering, Your Honor.

13           MR. PEDDIE:  I want some --

14           MR. BILLER:  That's badgering.  And as soon as

15  they say, "I don't know anything about it" --

16           MR. PEDDIE:  I want some sanctions, Your Honor.

17           MR. BILLER:  -- I stop.  I move on.

18           THE COURT:  All right.  So this is the example of

19  what all the bad things could happen in a deposition that

20  you want me to help you avoid but I can't help you until it

21  happens.

22           MR. PEDDIE:  Okay.  Fair enough.  I just want you

23  to remember this moment --

24           THE COURT:  Right.

25           MR. PEDDIE:  -- because I have a feeling we're

Page                                                                    35

1   going to be back here.

2          THE COURT:  As you know, I've not imposed

3   discovery sanctions on anybody to date even though, I'm

4   going to be honest, fairly both sides have not fully

5   complied with our Local Rules and the Federal Rules of

6   Civil Procedure, Federal Rules of Bankruptcy Procedures.

7   Everyone has tried to cut the corners on fully complying

8   with our procedural rules in trying to get these discovery

9   disputes in front of me but --

10         MR. BILLER:  I haven't even filed mine yet, Your

11  Honor.

12         THE COURT:  I'm not -- I've not imposed sanctions

13  yet and it is -- and my -- you know, I really want to get

14  through this because I have a lengthy afternoon calendar

15  including an evidentiary hearing that where we have the

16  same disputes, person most knowledgeable, and it's a small

17  company.  And they're -- even though there are 19 employees

18  they only have two executive-level employees and, you know,

19  creditors, you know, screaming bloody murder, "This person

20  was -- produces a person most knowledgeable and she didn't

21  know about these issues and how is that possible?"  And my

22  response to that creditor was, "This is a small, little

23  rinky-dink company with a reorganization value of a million

24  and a quarter dollars.  It's a peanut.  It's a nothing."

25  I'm not surprised when little, tiny company's person most

Page                                                                    36

1  knowledgeable doesn't know every single thing that happened

2  in this company and the accounting records.

3           So that's -- if that's the reality, that's the

4  reality.  But I want to state the ground rule so that

5  depositions start happening.  Documents aren't getting

6  produced.  Unless something happens, Thomas Wylde, you

7  know, files for bankruptcy itself or parties settle.  We

8  have to get to trial here.  This is not going to resolve

9  itself through the motion practice.  You've got to get to

10 trial.  I want these depositions to happen.  I want

11 documents produced so that we can get to trial and that all

12 of us can go on with our lives post-PDTW.

13          MR. BILLER:  Yeah.  You know, I -- since you have

14 a calendar issue, you know, I think you've couched all of

15 the topics that -- I'm concerned about frankly because I

16 have to live with what you said.  But what I can't live

17 with is the computers.

18          THE COURT:  Well, but we're -- let's get to that.

19          MR. BILLER:  Well, I'll just say --

20          THE COURT:  I do want to --

21          MR. BILLER:  -- that's one issue I really want to

22 fight on.

23          THE COURT:  Okay.  All right.  Let's --

24          MR. BILLER:  The others I could live with.

25          THE COURT:  Well, let's keep going here.

Page                                                            37

1              MR. BILLER:  Okay.

2              THE COURT:  So, number five, I'm going to impose

3    the same requirement 2012 to 2015.  Once again, this is the

4    designation of the person most knowledgeable is not the

5    actual communications themselves, which will be part of the

6    discovery.

7              So let's get to number six, which are the

8    computers.  Once again, for today the only dispute that I

9    have in front of me is producing the person most

10   knowledgeable about computers, iPad, laptop, servers and

11   any devices storing ESI.  It is a human being who has to

12   come and testify.

13             MR. BILLER:  That's right.

14             THE COURT:  It is not documents in those devices.

15   It is not whether or not they should be physically

16   inspected.  That dispute hasn't come to me yet.  This is

17   just about Thomas Wylde producing a human being who is the

18   person most knowledgeable.  And once again, other than

19   imposing a time limit because there might be a computer,

20   you know, a long time --

21             MR. BILLER:  Can I just --

22             THE COURT:  Go ahead.

23             MR. BILLER:  I think this is an accurate

24   statement.  All of ESI for Thomas Wylde had been moved in

25   the Amazon cloud and the person in custody and control of

Page                                                          38

1  that cloud is Jene Park.  Everything else is gone.

2          THE COURT:  Okay.  So once -- I know you're going

3  to do your job.  You've been a very zealous advocate for

4  your client.  So if Mr. Peddie on behalf of Thomas Wylde

5  does not produce Jene Park as the person most knowledgeable

6  about this category, computer, iPads, you know, laptop,

7  servers, you can just depose her individually to ask.  I

8  know it is very inefficient.  It forces you to --

9          MR. BILLER:  No.  He'll just have to produce her

10 individually.

11         THE COURT:  Yeah.

12         MR. BILLER:  And, you know --

13         THE COURT:  Yeah.

14         MR. BILLER:  -- I'll -- and I'll cross her at

15 trial to show what she's done.

16         THE COURT:  Right.

17         MR. BILLER:  Because anything in a cloud is not

18 reliable because we don't know what was in the computers.

19 That's the problem when you destroy computers.

20         THE COURT:  All right.  So once again,

21 number six, I'm going to impose a time limit.  Maybe it's

22 Ms. Park, maybe it's somebody else but we're now --

23         MR. BILLER:  Can you --

24         THE COURT:  -- just talking about a human being

25 who's going to appear.

Page                                                          39

1            On number seven I think this is generally

2    specific and descriptive enough so, you know, my

3    inclination is to overrule it.  There has to be a human

4    being from Thomas Wylde who knows about meetings of the

5    executive committee and actions taken by -- I mean, there's

6    got to be a corporate secretary.  Every single action has

7    to be signed off by a corporate secretary.  So there -- you

8    know, if it's not that person, somebody else who oversees

9    this entity who should be there to testify about this.

10           MR. PEDDIE:  Well, Your Honor, this is a limited

11   liability company and it does not have a secretary.

12           THE COURT:  Who's the managing member?

13           MR. PEDDIE:  We have a managing member in -- oh,

14   I mean, during some of this time period John Hanna was the

15   acting president.  They had very few actual executive

16   meetings.

17           MR. BILLER:  John Hanna was a CEO, Your Honor,

18   and he was the manager of the corporation.

19           MR. PEDDIE:  Right.  President and CEO.

20           MR. BILLER:  He was in charge of the corporation.

21           THE COURT:  Right.  Okay.

22           MR. BILLER:  Okay.

23           THE COURT:  But whoever they are, Thomas Wylde

24   can designate it.  If it's one person, that's great.  If

25   not and it has to be multiple people, that's great.

Page                                                                    40

1   Unfortunate, but I'm overruling that issue.

2              On number eight, changes made to the operating

3   agreement, once again, I'll impose the same time

4   limitation, 2012 to 2015.  You know, if Thomas Wylde is

5   amending its operating agreement like today that's

6   unrelated.

7              MR. BILLER:  I think it was amended once, Your

8   Honor.

9              THE COURT:  Hmm?

10             MR. BILLER:  I think this is a narrow issue.

11             THE COURT:  Okay.  So on --

12             MR. BILLER:  I think it was amended once.  I'm

13  not sure.

14             THE COURT:  All right.  So same time limit.  On

15  number 9, financial reports given to Hillshore, Choi or

16  Gonzalez.

17             MR. BILLER:  Can we please extend this to the

18  pres --

19             THE COURT:  Hum?

20             MR. BILLER:  Can we please extend this to the

21  present time so I can see if Hillshore is still involved

22  with this business?  Because they invested 31 million

23  dollars in the company and they would be getting supposedly

24  financial reports and I've got one email where Choi is just

25  like gone kind of nuts because "You guys were spending so

Page                                                                      41

1   much money." I mean, he's clearly getting financial

2   reports. So I want to know how far -- how -- did he get

3   them in 2016, 2017, 2018?

4            THE COURT: But you're --

5            MR. PEDDIE: Which one we talking about,

6   number eight?

7            THE COURT: Number nine.

8            MR. PEDDIE: Oh, we're already on number nine.

9            THE COURT: Yes.

10           MR. PEDDIE: Okay.

11           THE COURT: Number nine, your theory of this case

12  is Hillshore is just nothing and you don't need to know

13  what Hillshore is doing today to prove that this was a

14  nothing. This was just a --

15           MR. BILLER: Again, you need to prove that's a --

16  it's a money laundering company.

17           MR. PEDDIE: Well, that would be in the federal

18  case, not this one.

19           MR. BILLER: No, this is this case. We're

20  dealing with the same facts.

21           THE COURT: All right. I'm --

22           MR. PEDDIE: We need to liquidate an estate here

23  in an efficient manner and figure out who has claims and

24  who owes money to the estate. This is what we're trying to

25  do here.

Page                                                            42

1           THE COURT:  But that's the duty of the Chapter 7

2    Trustee.

3           MR. BILLER:  That's right.  What are you --

4           THE COURT:  And the --

5           MR. BILLER:  What are you so worried about that

6    for, Richard?

7           THE COURT:  Okay.  All right.  Mr. Biller,

8    yeah --

9           MR. BILLER:  Huh?

10          THE COURT:  Mr. Biller, just -- let's just direct

11   the comments to me.

12          MR. BILLER:  Well, I'd like to know, Your

13   Honor --

14          THE COURT:  Yeah.

15          MR. BILLER:  What is in it for him?

16          THE COURT:  Yeah.  I --

17          MR. BILLER:  What is -- why is he working so hard

18   for PDTW?

19          THE COURT:  Yeah.  I don't know.  But how this

20   estate is administered and whether or not is efficient is

21   the duty of the Chapter 7 Trustee.  And it often happens.

22   I used to represent Chapter 7 Trustee.  After three years

23   of working hard and piling up years of litigation and

24   million dollars in receivable it turns out there is nothing

25   and the Trustee files a no asset report and closes the

Page                                                          43

1   case.  Maybe that's going to happen to this case.  I don't

2   know.  But that obligation and duty belongs to the Trustee.

3   And neither Ms. Thomas nor Thomas Wylde or any other

4   creditor they don't have that burden, only the Trustee has

5   that burden.

6         MR. PEDDIE:  Right.  And I understand that and I

7   agree completely.  However, we're in discovery and I'm

8   trying to keep always in front of the Court of notion of a

9   proper scope of discovery for this case and the

10  proportionality requirements.  Allowing Paula Thomas to do

11  all of her federal RICO discovery in this case is not going

12  to lead to any kind of efficiency for the Trustee, for the

13  Court or for anyone.

14        THE COURT:  Look, I didn't ask the Trustee to

15  file this adversary proceeding.

16        MR. BILLER:  Yeah.

17        THE COURT:  I wasn't quite sure --

18        MR. BILLER:  Peddie did.

19        THE COURT:  -- what the Trustee was going to do.

20  I thought the Trustee would do something.  Trustee filed

21  this.  The scope of this adversary proceeding was

22  significantly broader than what I had anticipated what

23  happened in the case.  But Trustee in the exercise of his

24  business judgment and fiduciary duty filed this adversary

25  proceeding, which then precipitated defendants to file

Page                                                                    44

1   counterclaims against the estate.  All of this happened --

2   I'm sure nobody is happy about it.  I'm not happy about it

3   either but -- and I know for sure, Mr. Peddie, you and your

4   client don't like it.  The -- but the theory that

5   Ms. Thomas has consistently throughout the bankruptcy case

6   in this adversary proceeding has pursued and I have

7   knowledge --  this is like watching an early Quentin

8   Tarantino movie.  It's sometimes not in a clearly linear

9   way but I get it.

10          You know, one day Mr. Biller has to prove all of

11  this but I get it.  Thomas Wylde doesn't like it but I

12  understand the theory.  We'll one day have to try this and

13  figure out if it all is provable, but I get it.  I

14  understand what Ms. Thomas' theory is and we'll see what

15  happens.  And that clearly encompasses financial reports

16  given to Hillshore, Choi and Gonzalez because one of the

17  theories -- it's like an octopus.  There are a lot of arms

18  to this theory in that -- is that if Hillshore is a dummy

19  corporation and if Thomas Wylde took improper actions some

20  of the transactions could be avoided or collapsed and

21  ultimately Ms. Thomas owns TW.  She's the managing member.

22  So it's I want to say relevant as between Trustee versus

23  Thomas Wylde and Trustee versus Paula Thomas.  Since

24  Ms. Thomas still owns and controls Thomas Wylde it still

25  belongs to her.  I don't know if that's true or not.  And

Page                                                                45

1   clearly Thomas Wylde and Ms. Park contest that theory but

2   that's one of the theories is collapsing the transactions.

3   Once you disregard certain entities, once you collapse the

4   transactions the net result is Ms. Thomas controls Thomas

5   Wylde.

6              MR. BILLER:  Your Honor, thank you very much.  I

7   really appreciate what you just said.  It really means a

8   lot.  I -- so let me thank you.  But I will produce the

9   emails in my motion -- my upcoming motion in which Peddie

10  tells the Trustee, or Nancy Zamora, "File the adversary

11  proceedings so you could put all the debt on plaintiff," my

12  client.  "So we can show the judge how much debt she has."

13  Well, I have a right to determine she has no debt, but

14  that's the purpose behind this adversary.  His own words.

15  His own words.  "We can show the judge how much debt she

16  has."  Well, let's go see how much debt she has.

17             THE COURT:  All right.  Let's -- so keep going.

18             And number nine for now, Mr. Peddie, I'm still

19  going to limit it to 2015.  If you really want more than

20  that and you think there's a reasonable basis why it's

21  relevant you can file a motion and then I'll reconsider

22  number nine to make it present.

23             MR. BILLER:  You can tell me, Your Honor

24  (phonetic)?

25             THE COURT:  Sure.

Page                                                              46

1           MR. BILLER:  Yeah, okay.

2           THE COURT:  All right.  So number ten, documents

3   reflecting the units of interest in membership 20 -- 7/22

4   to present.  Once again, I'm going to overrule that

5   objection.  I suspect it's not, one, there is a human being

6   who knows this and, two, although we're not talking about

7   documents there are clearly documents reflecting unit

8   transfers or changes in Thomas Wylde and I suspect it's not

9   that burdensome.

10          MR. PEDDIE:  Let me see there.  Look on.

11          THE COURT:  All right.  Number 11, backup

12  materials for the data inputted into QuickBooks from 7/22

13  to present.  The backup materials is what I'm not sure

14  about.

15          MR. BILLER:  It's like -- now, you know what a

16  tax return -- yes, you know on a tax re -- they have all

17  the expenses of the company for the year and they have them

18  itemized like supplies and photoshoots or website.  Well,

19  that's based on something, right?  It has to be based on

20  something.  So according to Melody Raffels she testified

21  that there's backup material for all those tax items and

22  all the financials that she keeps them in the drawer for

23  seven years.  That was her policy to keep everything in a

24  drawer.  And she described the drawers as, you know, a long

25  countertop with six drawers and a -- the higher one with

Page                                                          47

1    five drawers and that's where they were all kept.

2         Now, if I need to do an audit I'm not going to

3    rely on QuickBooks.  Everybody knows QuickBooks is not

4    reliable.  So I need a -- I need to be able to photocopy

5    the backup material.

6         THE COURT:  Right.  But one --

7         MR. BILLER:  Because it goes straight to the 4.4

8    million.

9         THE COURT:  So once again, we're now talking

10   about a human being who has to come testify first.

11        MR. BILLER:  Right.  That's right.  That's right.

12        THE COURT:  So -- and number 12 is sort of

13   related.  You know, you got the backup materials and the

14   QuickBooks.

15        MR. BILLER:  Yes, Your Honor.  I get it.

16        THE COURT:  And so now based on the clarification

17   given by Mr. Biller and since for today we're only talk

18   about a human being who is going to come in and talk about

19   as a person most knowledgeable, it sounds like, Mr. Biller,

20   you already have that information.

21        MR. BILLER:  Based -- then I subsequently

22   subpoenaed her three times and she never showed up.

23        THE COURT:  All right.  So 11 and 12, I mean, why

24   shouldn't this be limited to 2015?  What more do you need

25   beyond 2015?

Page                                                              48

1                MR. PEDDIE:  Are we on 13?

2                THE COURT:  11 and 12.

3                MR. PEDDIE:  11 and 12.

4                THE COURT:  Yeah.

5                MR. BILLER:  Well, Your Honor, the petition for

6    bankruptcy was filed in 2016.

7                THE COURT:  All right.  Then we'll go to 2016.

8                MR. BILLER:  Yeah.

9                THE COURT:  Is -- I think that is sort of

10   relevant to how the information -- in fact, this is only

11   solely relevant I think in some ways for Ms. Thomas because

12   Trustee is suing her for what Trustee believes for loans --

13               MR. BILLER:  Right.

14               THE COURT:  -- that were documented into

15   QuickBooks.

16               MR. BILLER:  Right.

17               THE COURT:  I don't know who has that

18   information.  PDTW -- TW's claim may be, we don't have any

19   of that; we don't -- have nothing of that, but we'll see.

20               MR. BILLER:  Well, they gave them to PDTW so they

21   better have them.

22               MR. PEDDIE:  I'm sorry.  Are we talking about

23   backup materials for the data for PDTW's QuickBooks?

24               THE COURT:  No, no, no.  QuickBooks.  I think

25   Mr. Biller believes whatever PDTW had, TW must have

Page                                                                49

1  acquired it when things were purchased.  It could very well

2  be TW's person most knowledgeable's testimony is, "Nope,"

3  they don't have any.  "We don't have any."

4          But with respect to, you know, setting some

5  ground rules to begin the deposition on -- in 11 and 12 for

6  purposes of designating the person most knowledgeable both

7  11 and 12 -- 2012 to 2016.  That's the applicable time

8  period.  And, Mr. Peddie, it could very well be the person

9  most knowledgeable from TW comes and says, "We don't have

10 any of that.  We don't have any backup materials for

11 QuickBooks related to PDTW."

12          MR. PEDDIE:  Relating to PDTW because --

13          THE COURT:  Anything.  Well, that's the subset of

14 what -- I used the PDTW issue as an example of the -- why

15 it's relevant to this adversary proceeding but there could

16 be other things.

17          MR. PEDDIE:  So a person who's most knowledgeable

18 about the backup materials for the data used to create the

19 QuickBooks entries for PDTW?

20          THE COURT:  No.  Just it's for both.  But for

21 PDTW might be a subset of 11 and 12 and if no one at TW

22 today knows anything about transfer of data and information

23 from PDTW to TW that's fine, too.  Whatever is, whatever it

24 is.

25          MR. BILLER:  The financial controller worked for

Page                                                          50

1   both companies, Your Honor, and that would be the person.

2   She worked for both companies until 2016.  She started in

3   2014 -- or '13.  She worked until 2016.

4           THE COURT:  Now who is this person?

5           MR. BILLER:  Melody Raffels.

6           THE COURT:  Nobody knows where she is?

7           MR. BILLER:  Oh, yeah.  We just served her with a

8   complaint yesterday at her place of work but every time I

9   subpoena her they accept it but she never shows up.  She

10  takes the money, but she never shows up because according

11  to Richard it's defective.  The subpoena is defective.

12  It's always defective.  It's always Biller's fault.

13          THE COURT:  Well, if you subpoena her in this

14  case and there is a motion for -- motion to compel or

15  sanctions for not appearing we'll figure it out.

16          MR. BILLER:  Well, she should be the one who

17  should be appearing for all these things.  They still have

18  control over her.

19          MR. PEDDIE:  Your Honor, we do not have control

20  over Melody Raffels.

21          THE COURT:  I -- yeah.

22          MR. PEDDIE:  She's not an employee.

23          THE COURT:  I -- right.  I know that's what you

24  want but TW has the right to designate its own people.

25          MR. BILLER:  You're right, Your Honor.  You're

Page                                                        51

1   absolutely right.

2            MR. PEDDIE:  We have the right but we don't have

3   control over this individual anymore.  She knows about the

4   past.  She was an employee.  She was let go in 2016 just

5   right after or around of the bankruptcy when we were

6   downsizing.

7            THE COURT:  Yeah.

8            MR. PEDDIE:  And this is a person who at best

9   would be doing us a favor if I could even get her to come.

10           THE COURT:  Okay.  Again, if you don't have

11  control over this person TW could not produce her as its

12  person most knowledgeable but I suspect what that's going

13  to mean is at that deposition of whoever the person most

14  knowledgeable, that person is going to testify, "You got to

15  go talk to this person."  And then I'm sure Mr. Biller is

16  going to subpoena this person, Melody or whoever she is,

17  and, you know, if she's served with a subpoena, she takes

18  the money and she doesn't show up there's going to be some

19  consequences and it sounds -- I -- because she doesn't show

20  up to, you know, her deposition after she's been subpoenaed

21  I thought maybe she disappeared or something.  I mean,

22  she -- you know, we had -- we've had so many people moving

23  to like --

24           MR. BILLER:  No.

25           THE COURT:  -- Nicaragua and things like that.

Page                                                          52

1             MR. BILLER:  Jene Park, too, Your Honor.  I

2    served her with two subpoenas, gave her the money and she

3    never showed up.  In fact --

4             THE COURT:  Got subpoenaed in this case?

5             MR. BILLER:  Yes.

6             THE COURT:  Well, Mr. Biller, then I think you

7    know what you need to do.

8             MR. BILLER:  You know, Your Honor, I can't

9    remember, I think it was in this case.  I think it was in

10   this case but she called on the -- when I was at the office

11   ready to take her to the deposition she said, "Oh, I have

12   a -- I have to go to a doctor's now."  And she called and

13   gave an excuse.  That was the second time.  You know,

14   there's only so many times I can try one method of

15   discovery, then I go to another method, PMK.  It's the PMK

16   method.  If I can't get witnesses to show up for depos,

17   PMK.

18            THE COURT:  Anyway, you know what you're doing.

19   So 13, any and all documents related to any and all

20   agreements to purchase membership interest in TW.  All

21   right.  Once again, I would impose the same time period,

22   2012 to 2015.

23            Number 14, loan agreements, lines of credit,

24   guarantees, and promissory notes executed between 7/22 and

25   present.  I would also impose the same time period, 2012 to

Page                                                                    53

1   2015.  And once again, I'm not going to -- I don't want

2   this in any order but as I've said before in a related

3   topic you're not going to -- you don't want to know about

4   Pitney Bowes contracts.

5            MR. BILLER:  Your Honor, I have 50,000 documents.

6   I don't need to waste my time.

7            THE COURT:  Okay.  All right.  On number 15,

8   profit and loss statements from 7/22 to the present.  Once

9   again, 2012 to 2015.

10           MR. BILLER:  That would be also --

11           THE COURT:  That is profit and loss statements of

12  Thomas Wylde, right?

13           MR. BILLER:  Thomas Wylde, yeah.

14           THE COURT:  Yeah.

15           MR. BILLER:  Yeah.

16           THE COURT:  So --

17           MR. PEDDIE:  The person who knows most about

18  those.

19           THE COURT:  Right.

20           MR. BILLER:  And that would be with the income

21  tax returns as well, Your Honor.

22           And I suspect that would be you someday.

23           And, Your Honor, on this one -- actually, just

24  for your consideration would -- if -- I would ask that the

25  Court consider elevating the date from 2015 to the date the

Page                                                              54

1  petition was filed.

2         THE COURT:  Yeah, but Thomas Wylde and PDTW were

3  separate companies by then, right?

4         MR. BILLER:  They were separate companies but

5  in -- yeah, they were separate companies by 2016.  They

6  were.

7         THE COURT:  Yeah.  Number 16 is pretty much a

8  similar request, balance sheets from 7/22 -- July 2014 to

9  the present.  I would impose the same time limitation, 2012

10 to 2015.  Number 17 is about state and federal income tax

11 returns and once again it's not about production of tax

12 returns.  This is merely designating the PMK.  Is there --

13 I'm assuming there -- somebody is signing these tax returns

14 so there has to be a person most knowledgeable.

15        MR. BILLER:  Jene Park.  She's the --

16        THE COURT:  Is there any reason why you need to

17 know who the person most knowledgeable is in 2018 or 2017,

18 Mr. Biller?

19        MR. BILLER:  Well, I would like to know -- are

20 you -- Your Honor, it's my belief TW does not exist and

21 that it should had -- it should not be in these proceedings

22 at all.  If it does exist my com -- my client owns it.  But

23 I need to find out whether it's making any money and if

24 it's making money is it making money off my client's

25 designs, copyright or a trademark?  I know it is because

Page                                                                55

1   Jene Park posts it every day, a new clothing with my

2   client's prints on it and she uses the word "Thomas Wylde."

3              Now, I'll be filing a motion for protective --

4   motion for preliminary injunction to stop this soon but the

5   fact of the matter is, you know, that's irrelevant to the

6   copyright.  We're letting -- the copyright and the brand

7   are being destroyed by her.  She's slapping it on products

8   that are embarrassing.  My client would not use -- design

9   those products.

10             THE COURT:  Okay.  So 17 and 18 are sort of

11  related.  They all relate to tax returns --

12             MR. BILLER:  Yes.

13             THE COURT:  -- or backup documents for tax

14  returns.

15             MR. BILLER:  Right.

16             THE COURT:  So this is where -- and it sort of

17  applies to 19, 20 as well -- this is where I sort of think

18  Trustee has filed a very broad complaint against Thomas

19  Wylde and Paula Thomas asking for a bunch of things,

20  including accounting and what happened to -- how did you

21  use our -- as Trustee's contention is it owns the

22  copyrights and trademark.  In this lawsuit Ms. Thomas's

23  counterclaim against the Trustee is in some ways like

24  they're broad declaration relief action.  "No, PDTW doesn't

25  own it.  I own all this."  But Trustee himself is not

Page                                                                    56

1   producing goods.  You know, he's not, you know,

2   manufacturing anything.  It's actually Thomas Wylde, if

3   that's true.  So in this adversary, not necessarily what's

4   happening in another court, even if Ms. Thomas hits a home

5   run and wins, defeats the Trustee's claim, wins on its

6   counterclaim, all that's going to happen is there is going

7   to be a judgment for Mis -- in favor of Ms. Thomas that

8   says, "She owns all the trademark and copyrights.  She owns

9   all the archives."  And the counterclaim is only against

10  the Trustee.  Trustee has not been using the copyright or

11  trademark, not producing any goods, not selling any goods

12  other than, you know, the inventory that I authorize to

13  sell which, you know, that information the Trustee has.

14  Thomas Wylde doesn't have anything.  So like it -- this

15  adversary for Ms. Thomas to try to figure out what Thomas

16  Wylde is making, using the copyrights and trademark is

17  beyond the scope of this adversary proceeding.

18          MR. BILLER:  No, not -- Your Honor, I disagree.

19  I respectfully disagree because we have a cro -- a

20  counterclaim, okay, for fraud and breach of contract and my

21  client is responsible for anything she -- any debt PDTW

22  has -- owes or any residue in the estate if she prevails.

23  She gets the residue of the estate after everything's paid

24  off.  So just because, you know, PDTW and TW have agreed

25  not to pursue the money that has been lost for the breach

Page                                                                              57

1    of or the infringement of copyright and trademark, it

2    doesn't mean it's not important.  My client gets credit for

3    that.

4            THE COURT:  I understand, but as against Thomas

5    Wylde if she prevails all of the copyright and trademarks

6    belong to her and she wants to sue Thomas Wylde for

7    infringing and using the trademark and copyright for

8    selling.  That's the district court lawsuit before Judge

9    Kronstadt.  It's not here.  All I can do if she hits a

10   grand slam homerun in this adversary is I enter a judgment

11   in her favor.  She owns copyrights, trademarks, archives.

12   It's all hers.  Then she gets to with that judgment go back

13   to Judge Kronstadt in district court and continue the

14   infringement lawsuit against Thomas Wylde.

15           MR. BILLER:  Yeah.  But you would agree with me,

16   Your Honor, that if it -- if we had a normal Trustee who's

17   following his duties and obligations to protect the estate

18   that we would have had a preliminary injunction order

19   issued last year.  That's the first thing that would

20   happen.  And we would have collected all the property that

21   belongs to PDTW or that has the trademark or the copyrights

22   of PDTW.  That's -- in the normal case that is what's going

23   to happen.  I'm going to have to do that.  I'm going to

24   have to do that because the Trustee has no interest in

25   doing that or has shown no interest in doing that.

Page                                                              58

1            THE COURT:  Well, that's true especially if

2    Ms. Thomas wins this adversary proceeding.  Then

3    bankruptcy -- the Trustee has nothing to do with it.  If I

4    enter a judgment that all -- the copyrights, trademarks,

5    archives belong to Ms. Thomas and not to the Trustee,

6    Trustee doesn't even have the right to try to enforce the

7    copyright and trademarks.  It really just then belongs to

8    Ms. Thomas.  So that's what I'm trying to say here Mis --

9    the victory for Ms. Thomas here is a judgment that she owns

10   all of these things and thus Trustee couldn't do it, never

11   should have been doing it and he's wrong if he was trying

12   to enforce it.  So that's right, Ms. Thomas's position.

13   Trustee really shouldn't be using and trying -- her really

14   real position is Trustee should not even be demanding that

15   Thomas Wylde not infringe because it belongs to Ms. Thomas.

16           MR. BILLER:  Okay.  I'm -- I will file a

17   counterclaim -- no, a cross-claim on behalf of TW Holding,

18   LLC, and Paula Thomas against TW.  I will file that claim

19   because they are ultimately in -- responsible for

20   destroying my client's copyright.  And then I have a

21   right -- I have a right to get an estimate of what damages

22   are collected to preserve -- just to preserve my rights,

23   because she -- this -- these proceedings are about who owns

24   the copyright and the trademark but they're also about how

25   much damage has that -- how much damage it incurred because

Page                                                                      59

1   it goes to the estate ultimately.

2           THE COURT:  Not really.  Because if Ms. Thomas

3   wins this adversary proceeding and copyrights, trademarks

4   and archives belong to her and not PDTW, it doesn't belong

5   to the estate.  It doesn't belong to the Trustee.  It's

6   really hers.  And then the bankruptcy estate has nothing to

7   do with it.  It's then purely a district court litigation

8   between Ms. Thomas and Thomas Wylde.

9           MR. BILLER:  Okay.

10          MR. PEDDIE:  And, Your Honor, isn't there --

11          THE COURT:  It doesn't involve bankruptcy Trustee

12  at all.

13          MR. BILLER:  Okay.  Your Honor --

14          MR. PEDDIE:  Your Honor, isn't there another

15  possibility where the Court rules that PDTW never owned the

16  IP, the estate doesn't own the IP, and just doesn't rule on

17  stuff that happened after the original vesting of

18  intellectual property whether by authorship under the

19  Copyright Act or trademark through usage and says that

20  dispute, other stuff, whatever else happened to other

21  people, yeah, Paula Thomas transferring, assigning, getting

22  paid, not getting paid, getting paid and then a default

23  where she gets it back, that's for the district court and

24  only ruling that, look, estate, you don't owe it -- own it?

25          THE COURT:  Only if that's what the Trustee

Page                                                                60

1   wants.  Trustee filed this really, really broad expansive

2   complaint and asked me in addition to like 12 claims for

3   relief, Trustee then stuck in that declaratory relief

4   saying, "This is all mine.  All belong to the estate."  So

5   unless the Trustee's going to drop those claims and say, "I

6   only want to -- I'm going to drop all these claims.  I only

7   want to go to trial on this discrete as -- just between

8   PDTW and Thomas -- you know, on, you know, who owns it and

9   if I lose that issue I'm out, I'm dropping all the other

10  claims for relief," but once again, I have to live in the

11  reality of the pleadings that have been filed and Trustee

12  is asserting claims that the Trustee wants me to adjudicate

13  as between Thomas Wylde, Ms. Thomas and PDTW who owns

14  copyrights, trademarks and archives on the petition.

15          MR. BILLER:  Your Honor, just as a side note

16  because I'm going to go with you on this one -- I mean, I

17  can get it when I file a new complaint -- you know, I have

18  this motion for compel coming up that I'm going to be

19  filing because PDTW doesn't have anything to give me and in

20  that motion I am going to file my client's declaration with

21  newspaper articles proving she's the one who put this --

22  the trademark into commerce first for use, conclusively

23  proving that.  And once the trademark is give -- once she

24  gets the trademark this case is over.  As you said, it's

25  gutted because if she has a trademark she has the

Page                                                                    61

1   copyrights, too.

2          And so I'm going to ask for a termination

3   sanction because they won't give me anything.  They've

4   destroyed -- they've allowed 40 computers to be destroyed

5   because they didn't take custody of 40 computers.  They

6   allowed Penny -- they trusted Penny and Penny gave them

7   five computers, old computers that were back in 2006, 2007

8   that don't contain anything relevant.  So what -- now what

9   I -- I don't have the 40 computers.  The five computers

10  they gave -- that Penny gave them are just junk.  They

11  won't give me anything from those computers, by the way,

12  and they won't give me the QuickBooks.

13         Under 37(d) or (e) when you're destroying

14  electronically stored information you're gone.  You're

15  gone.  And on top of that her declaration is absolute.  She

16  has newspaper articles from 2004 and 2005 when her

17  trademark became, you know, famous.  I mean, this case --

18  the Trustee brought this case for two illicit purposes,

19  both from Peddie's brain to try and destroy my client life

20  -- my client's life and to try to put all the debt on her.

21  This is not what Bankruptcy Court is about.  And here we're

22  sitting going over, you know, 27 categories of documents

23  for PMK witnesses because he wanted to be an adversary

24  proceeding but he doesn't want to deal with the

25  consequences.  I didn't bring it here.  I want to be in

Page                                                                62

1   federal court.

2          THE COURT:  Yeah.  I agree with you.  I wish this

3   was somewhere else.  It's the wish every judge --

4          MR. BILLER:  I mean, so I'm going to ask for

5   termination sanctions, Your Honor.

6          THE COURT:  -- someone else will do it.

7          MR. BILLER:  Forty computers gone, destroyed.

8          THE COURT:  All right.  So when you file that

9   we'll get to it.  So let's try to wrap this up here.

10          MR. BILLER:  Okay.

11          THE COURT:  So 17 and 18, once again I'm going to

12   impose the same time period, 2012 to 2015.  19, 20, 21, 22,

13   I'm going to sustain.  They're basically, you know, the

14   damages for TW's infringement.

15          MR. BILLER:  That's fine, Your Honor.

16          THE COURT:  And if and when there is a cross-

17   claim filed maybe you get to do that discovery here but

18   at -- based on the pleadings that are filed today I think

19   they're beyond.  Number --

20          MR. BILLER:  Well, I'll file -- if I have to file

21   the cross-claim I'll file it.

22          THE COURT:  Okay.  So that's 19, 20, 21 and 22.

23   They're sustained.  23, lease agreement for the premises

24   where TW is located.

25          Is that really that important, Mr. Peddie?

Page                                                          63

1           MR. PEDDIE:  No, Your Honor, it's not.

2           THE COURT:  Fine.

3           MR. PEDDIE:  Just take it off.

4           THE COURT:  Yeah.  So 24, backup tapes for any

5    ESI.

6           MR. BILLER:  That's because Jene Park said in my

7    presence when I asked Richard Peddie for a meet-and-confer

8    in this courtroom, "Where are the computers?"  He wouldn't

9    tell me and Jene Park barked out, "I have backup tapes."

10   That's why I made the request, Your Honor.  If she has

11   backup tapes I -- I'm entitled to those.  If her backup

12   tapes are the cloud then let me know if it's the cloud.

13   Then I'm not -- I won't pursue them.  But Jen -- that cloud

14   is in her name and her control and it should not be.

15          THE COURT:  All right.  Right now it's about --

16          MR. BILLER:  Dates.

17          THE COURT:  -- designating the person most

18   knowledgeable.

19          MR. BILLER:  Right.  Right.

20          THE COURT:  So that's fine.

21          MR. BILLER:  Okay.

22          THE COURT:  Thomas Wylde has to designate the

23   person most knowledgeable about backup tapes from ESI and

24   if that's Ms. Park, that's Ms. Park.

25          MR. PEDDIE:  Your Honor, I'm not sure what's

Page                                                            64

1  going to come back on that.  You know how people speak kind

2  of loosely and they say "backup tapes" and they really

3  meant the cloud or something because --

4            THE COURT:  Yeah.  Well, she --

5            MR. PEDDIE:  -- backup media, whatever it is.

6            THE COURT:  She did not say that under penalty of

7  perjury so she'll get an opportunity under penalty of

8  perjury to clarify what she meant.

9            MR. PEDDIE:  Right.

10           THE COURT:  So number 25, all documents that are

11 required to be made available for inspection by any member

12 under the amended operating agreement.  Is Ms. Thomas still

13 technically a member of Thomas Wylde?

14           MR. BILLER:  No.  She's not -- I don't think

15 she's a member but she's an owner.  She's 1.8 percent

16 owner.

17           THE COURT:  So she's still an owner.

18           MR. BILLER:  So here -- and the other people like

19 Doug Lee and Roger Kuo and John Hanna they don't have

20 equity interest.  So the only two parties that have any

21 equity is my client and a company called Hillshore that

22 doesn't exist.

23           THE COURT:  But they're equity holders but not

24 members of an LLC?

25           MR. BILLER:  May -- well, maybe --

Page                                                                    65

1          THE COURT:  How about, Mr. Peddie, any --

2          MR. PEDDIE:  All of those people are still

3  members.

4          THE COURT:  Okay.

5          MR. PEDDIE:  And the word "owner" and "member"

6  are synonymous in LLC land.

7          THE COURT:  Okay.  So if Ms. Thomas is still an

8  owner/member all she's asking for in connection with 25 --

9  well, it -- right now it's designating the person who knows

10 about what are the documents members are entitled to get.

11         MR. BILLER:  Right.

12         MR. PEDDIE:  Under the operating agreement.

13         THE COURT:  Under the operating agreement.

14         MR. PEDDIE:  So it's a document that speaks for

15 itself and I just don't feel like producing some layperson

16 to be subject to a quiz over what the operating agreement

17 says.

18         MR. BILLER:  No.  This is --

19         MR. PEDDIE:  They -- we -- anybody can read it.

20         MR. BILLER:  This is a company that does business

21 around the world.  It has an operating -- they won't

22 even -- by the way, Your Honor, I'm entitled to all these

23 documents under the operating agreement.

24         THE COURT:  Yeah.  The -- I'm going to allow it

25 only because this person most knowledgeable could also be a

Page                                                                66

1   member and he or she can be questioned and testify about

2   what he or she got from the LLC as documents he or she as a

3   member that -- amended operating agreement.

4          MR. PEDDIE:  If I were designating a person, Your

5   Honor, to testify as to all documents that are required to

6   be made under the operating agreement, you know, I would be

7   designating a lawyer and I would say, "Here is the

8   operating agreement.  So what is a member require" --

9          THE COURT:  Not really.

10         MR. PEDDIE:  -- "or entitled to under the

11  operating agreement?"  Not --

12         THE COURT:  It could be a member.

13         MR. PEDDIE:  Not one of the members.

14         THE COURT:  It could be a member and the question

15  could be, "What documents have you received from this

16  company?  Do you think you were given these documents

17  because you're entitled to get that as a member?"

18         MR. PEDDIE:  But how is that it --

19         THE COURT:  It could be as simple as that.

20         MR. PEDDIE:  How is that an entity representative

21  testifying as a PMK?  That's a member testifying as to

22  their experience as an owner over time and what documents

23  they received from the company.

24         MR. BILLER:  Every member gets a copy of the

25  operating agreement.  David Schnider wrote the operating

Page                                                                67

1  agreement.

2          MR. PEDDIE:  But he's not a member.

3          THE COURT:  Right.

4          MR. BILLER:  It -- it get --

5          THE COURT:  Lawyers -- well, you don't even need

6  lawyers.  You could go to lawyers at that company, you

7  know, LegalZoom, and get an operating agreement.  So I do

8  not buy this premise that only lawyers know what's required

9  under the operating agreement and only lawyers can

10 interpret it -- interpret what's written in it.

11         MR. PEDDIE:  No, I don't either.  You can just

12 read the document.  I don't think that we need to designate

13 somebody because it's just right there.  It's -- you know,

14 it's a legal document.  It speaks for itself.

15         THE COURT:  Well, it's not just documents.  It's

16 also about, well, what did you get?  What documents did you

17 get, what documents do you think you're required to give to

18 members?

19         MR. BILLER:  It's an interesting point, Your

20 Honor, because when I cross-examined Melody about this

21 issue and I said, "Under this operating agreement shouldn't

22 my client get ev -- all the books and records for

23 inspection?" and said, "Yes, I've asked for the books and

24 records for inspection and I don't get them."  How can --

25 my owner of the company cannot look at the books and

Page                                                                68

1    records of the company.  That's -- you know what his

2    explanation is?  Penny's explanation, "Well, she's doubting

3    that the company exists so she can't have access to the

4    books and records."  Really?

5              MR. PEDDIE:  Yes, really, Your Honor.  This is

6    not the forum for a member or a shareholder to invoke and

7    litigate inspection rights.  Those are rights under the

8    statute or under the operating agreement.

9              MR. BILLER:  Okay.

10             MR. PEDDIE:  And it's not an adjunct --

11             MR. BILLER:  She's an owner, Your Honor.

12             MR. PEDDIE:  -- to discovery in a bankruptcy

13   case.

14             MR. BILLER:  She's an owner.  I asked them in a

15   letter and a -- or an email.

16             MR. PEDDIE:  And in --

17             MR. BILLER:  She's an owner.

18             THE COURT:  But --

19             MR. PEDDIE:  And in the case law --

20             MR. BILLER:  Okay?

21             MR. PEDDIE:  -- governing membership --

22             THE COURT:  But --

23             MR. PEDDIE:  -- member and shareholder inspection

24   rights it says that an adverse shareholder or member can be

25   blocked from seeing certain documents --

Page                                                                    69

1              THE COURT:  Yeah.

2              MR. PEDDIE:  -- if it's --

3              THE COURT:  But --

4              MR. PEDDIE:  -- antithetical to the company's --

5              THE COURT:  But whether or not Thomas Wylde is a

6    legitimate operating company is potentially relevant

7    because the Trustee sued Thomas Wylde.

8              MR. PEDDIE:  Right.

9              THE COURT:  And because Trustee sued Thomas Wylde

10   whether or not Thomas Wylde is really an operating company

11   today, whether or not it's maintaining its corporation

12   governance, you know, doing -- holding whatever be -- I

13   don't know, whatever law this entity is incorporated under,

14   having annual meetings or whether it -- because there are

15   consequences for corporate entities who don't comply with

16   corporate governance.

17             So it might be highly relevant whether or not

18   Thomas Wylde is an active entity and whether or not Thomas

19   Wylde is complying with its corporate documents.  It could

20   very well be that if Thomas Wylde is not doing any of that

21   its ability to participate in this litigation and defend

22   itself, you know, may be undermined.

23             MR. PEDDIE:  Well, number 25 says, "All documents

24   that are required to be made available for inspection by

25   any member of the operating agreement."  And it's a PMK.

Page                                                              70

1        THE COURT:  Um-hum.  Yeah.  I don't see any
2  problem with that.  There is a human being who works at
3  Thomas Wylde who is affiliated with Thomas Wylde who knows
4  the answer to that question.  Over the la -- well, and one
5  other thing I'll do is I'll put a time limitation that I
6  did before, 2012 to 2015.  "Between 2012 to 2015 what
7  documents did you give to the members of Thomas Wylde that
8  were required to provide to that under the op -- amended
9  operating agreement?"  There's a human being I hope who can
10  answer that.  That's it.  Then right now I'm not talking
11  about the actual underlying documents.  I'm just talking
12  about a human being who can answer that question.  And
13  because once again I know the Trustee and Trustee's counsel
14  are not here, Trustee and Trustee's counsel filed a very
15  expansive complaint naming a bunch of people and entities
16  as defendants.  And both under the state law but also under
17  corporate law but also under, you know, Federal Rules of
18  Civil Procedure, entities that are defunct, entities that
19  are not operating, entities that are not following
20  corporate governance rules or requirements there are
21  consequences for them participating as a litigant in a
22  case.  So I think this is, one, relevant based on the
23  complaint the Trustee filed and, two, I don't really think
24  this is burdensome.  There has got to be an answer to this
25  and --

Page                                                              71

1          MR. PEDDIE:  I think that it's a semantical

2   difference.  I think that I was interpreting what you were

3   saying to be the legal question as to what must the company

4   provide as opposed to --

5          THE COURT:  Right.  Well, I get your distinction.

6          MR. PEDDIE:  Yeah.

7          THE COURT:  And you're right.  If the person most

8   knowledgeable is not an attorney the question -- all right,

9   Mr. Biller can ask, I'm sure someone will object, this

10  person is not an attorney and it requires a legal opinion.

11  It's not what do think under the law you're required to

12  produce?  It's what did you produce?  What documents were

13  sent to the members?

14         MR. BILLER:  See, and this is the problem, Your

15  Honor, because this is why I'm cross-noticing sources of

16  documents.  David Schnider testified a million times.  He

17  never had any communications with Stephen Choi and he never

18  gave him any documents.  Well, when I got the Greenberg

19  documents there are emails from Schnider to Choi giving him

20  documents.  I mean, he -- Schnider never gave them to me

21  but I got them from Greenberg.  And so I'm sure Choi was

22  receiving documents.  I just haven't seen them or they

23  haven't been produced in 14 months of discovery.

24         THE COURT:  All right.  So we went through all

25  the topics --

Page                                                    72

1          Mr. Peddie, if possible, if you can prepare an

2    order granting this motion in part based on what we just

3    discussed and the tentative ruling because when I denied

4    setting this on an order shortening or an emergency basis I

5    basically sort of vacated or held in abeyance the date of

6    the deposition.  I feel like the order should also -- pick

7    a date, an outer date by which the PMK or PMKs needs to be

8    deposed and also for practical reasons I think we should

9    also pick a date when the documents should be de -- should

10   be produced.

11         MR. BILLER:  I would just ask, Your Honor, the

12   documents be produced before the PMK depositions.

13         THE COURT:  That makes sense to me.

14         Mr. Peddie, how long?

15         MR. PEDDIE:  Your Honor, we reserved all of our

16   rights to object documents productions and those are set

17   forth in --

18         THE COURT:  Right.

19         MR. PEDDIE:  -- what was sent in April and we

20   went through and we did a joint stipulation which we

21   finalized I think it was on April 24th and we did -- the

22   phone call that we had was not over the PMK.  It was over

23   the requests for production of documents.

24         THE COURT:  Okay.  So but --

25         MR. PEDDIE:  So I reserve everything up to and

Page                                                           73

1  including lateness at this point in time because we are

2  talking about his motion to compel and at this point I just

3  simply cannot allow my client to be forced through all of

4  these hoops that really have to do with --

5         THE COURT:  Okay.  I heard what you said.  What I

6  want to see if these discovery disputes come to me -- I've

7  already mentioned this.  I know it is in some ways costlier

8  and more burdensome on the parties but it helps me to

9  adjudicate disputes.  You're -- if parties are going to

10 fight about production of documents I want the party who is

11 the target of that discovery request to have already

12 produced all non-privileged documents provide a privilege

13 log if one is required and then come to me over document

14 fights.  Do not come to me before non-privileged documents

15 have been produced.  Do not come to me without a privilege

16 log that's been provided to the other party.  Then I know

17 what's been produced, what documents are being deemed

18 privilege.  Coming here and asking me hypothetical

19 questions about what have not been produced, what have not

20 been marked as privileged is really, really difficult for

21 judges.

22        MR. BILLER:  Can we have a date, Your Honor,

23 then?  I'll wait until --

24        MR. PEDDIE:  Your Honor, we responded.  We

25 responded in April of 2018.  We gave our objections and

Page                                                    74

1   responses.  To undertake now all of this extra stuff when

2   actually we're talking about a motion that's brought five

3   months late to compel, okay, and now I have to go

4   through --

5            THE COURT:  There is no deadline for a motion to

6   compel.

7            MR. PEDDIE:  Well, there's no deadline except for

8   courts generally don't go for five months.  They do -- a

9   federal court does impose a deadline at a certain point and

10  this is late.  We have gone forward now.  Five months --

11           MR. BILLER:  Your Honor, this was a joint --

12           MR. PEDDIE:  -- of foot dragging.

13           MR. BILLER:  This was a joint notice of

14  production and notice of taking deposition.  That's what it

15  was.

16           THE COURT:  And I would be a little more

17  sympathetic if in addition to sending written responses

18  documents were produced.

19           MR. PEDDIE:  Well, some documents have been

20  produced --

21           MR. BILLER:  Oh, my --

22           MR. PEDDIE:  -- to this litigant and this --

23           THE COURT:  And --

24           MR. PEDDIE:  -- and even since Mr. Biller entered

25  the picture, et cetera, and at a certain point we have to

Page                                                              75

1   draw the line because 1,600 --

2           MR. BILLER:  They produced 1,000 pages.

3           MR. PEDDIE:  -- 1,600 discovery requests.

4           MR. BILLER:  That's not true.

5           MR. PEDDIE:  And we hear Mr. Biller complain

6   about 2.6 hours --

7           MR. BILLER:  And he objected --

8           MR. PEDDIE:  -- of sleep in 14 -- in April --

9           MR. BILLER:  -- 500 objections.

10          MR. PEDDIE:  In April we hear about this.  Well,

11  you've never heard me winging about this kind of stuff and

12  let me tell you --

13          MR. BILLER:  Well, you just filed --

14          MR. PEDDIE:  -- I went through motion after

15  motion in June and July of last year, federal court,

16  emergency motion, emergency motion to take Mr. Peddie's

17  deposition, motion to disqualify Mr. Peddie in the state

18  court.  Then like six discovery demands and three motions

19  to compel he lost every single one of them, this was --

20  this is now a redux of last summer.  What's really going on

21  here is we're having a redux of the discovery disputes of

22  last summer.  This notice was from March of 2018.  He had

23  our answers by April.  He insisted that we work on a

24  stipulation.  That was ready by April 24th.  At a certain

25  point it's too late.  This is a bankruptcy.

Page                                                          76

1          THE COURT:  Well, I get to decide when it's too

2    late, not you.

3          MR. PEDDIE:  You're the one who will decide that.

4    You will decide if it is and I'm reserving --

5          THE COURT:  I will decide --

6          MR. PEDDIE:  -- my right to argue that it's too

7    late.

8          THE COURT:  Whether it's too late.  But I'm

9    telling you right now if parties want to sleep and not have

10   to fight over a discovery dispute and do all this work

11   there's a simple way.  Just cooperate and produce

12   documents.  And just like I told David Schnider's lawyer,

13   the fact that David Schnider produced documents in other

14   litigation is -- I'm sorry, you're involved in multiple

15   litigation but that's too bad.  I don't care.  You have to

16   produce those documents again.  In fact, if you've already

17   produced the documents in other proceedings with modern

18   technology and zip drives and .pdf copies it should be

19   easy.  Produce them again.

20         MR. PEDDIE:  If they're on -- I agree if they're

21   on a PDF.  If they are, they it should be easy but that's

22   not the entire universe of documents.

23         THE COURT:  Everyone can have a full night's

24   sleep if they just stop fighting discovery requests.  Start

25   producing.  What I really, really -- and it's just not me,

Page                                                                77

1  every single judge when they get these discovery disputes,

2  so you haven't produced nothing; not even the non-

3  privileged documents; you didn't produce a privilege log

4  and then you are then coming to court and asking me to fix

5  this for you?  It -- it's a hard thing for a judge to

6  swallow.  Like parties that are the target of discovery

7  requests stand in a much better position if they've already

8  produced non-privileged documents, they've already produced

9  a privilege log and then come to the Court and say, "These

10 are the open issues after we produced the non-privileged

11 documents, after we produced the privilege log.  We still

12 can't agree."  Then you are in a much better position and

13 favorable.  And here -- unfortunately Mr. Snider is not

14 here.  He's not involved in this.

15         What -- the worst example is what Mr. Schnider's

16 lawyer filed.  They -- he filed an emergency motion, one,

17 asking if Mr. Schnider should not be deposed at all and,

18 two, if we produced these documents we don't produce

19 anything.  That is just not a credible opening position or

20 offer.  And when I saw that, you know, as I've told

21 everyone here I have pretty thick skin.  I criticize

22 people.  They criticize me.  I don't care.  I almost blew

23 my top.  That is just indefensible position on an emergency

24 basis, "My client can't be deposed.  I'm not producing

25 anything because I've already been through this and I've

Page                                                                    78

1   already produced documents."  I blew my lid on a Friday

2   afternoon when I saw that emergency motion.  That you -- a

3   lawyer or a party, a target of discovery who takes that

4   position, puts it in writing and files an emergency motion

5   on a Friday afternoon it's just -- Mr. Schnider really is

6   lucky or his lawyer is lucky he didn't get sanctioned just

7   for that.  It's just not defensible.  If you want to win

8   discovery disputes do everything possible and try to

9   minimize what the judge has to decide and you'll have a

10  much better chance winning those discovery motions.  But I

11  have a hard time accepting discovery disputes when the

12  party says, "I haven't produced anything, not even the non-

13  privileged documents."  Then why are you here?  You're

14  wasting my time.  And so that dispute is not before me.

15       MR. PEDDIE:  Right.  And we have offered to allow

16  Mr. Biller to come in with a copy service and copy

17  documents and all the rest.  So -- and also an ESI

18  protocol.  We've done all of these things.

19       THE COURT:  All right.  So now let's pick -- once

20  again, I don't want to pick the date itself -- an outer

21  date by which a PMK is going to be deposed and then we'll

22  backtrack from that for the document production.

23       MR. BILLER:  Would -- 30 days, Your Honor, is

24  that fair?

25       THE COURT:  Well, I -- I'm going to ask

Page                                                                79

1  Mr. Peddie, because we have --

2          MR. PEDDIE:  I don't know that --

3          THE COURT:  There hasn't been a document

4  production yet.  One, he needs to produce these documents,

5  then the person has to be deposed and it could be persons,

6  not one person.  So how long do you need, Mr. Peddie?

7          MR. PEDDIE:  Doc -- documents that will be

8  produced related to these PMK designations?

9          THE COURT:  Documents related to the --

10         MR. BILLER:  To the -- they're the same.

11         THE COURT:  -- related requests for production of

12  documents.

13         MR. BILLER:  They're the same.  They're --

14         MR. PEDDIE:  Well, they're not 100 percent the

15  same and it's very broad discovery that has been sought

16  here and we --

17         THE COURT:  I --

18         MR. PEDDIE:  He has had the objections for five

19  months.  He understands what they are.  He understands he

20  was invited to come and copy everything in terms of

21  invoices and things like that that he's asked for and

22  invited to enter into an ESI protocol to look at computers

23  and all the rest.  For me now and in 30 days and then we're

24  backtracking from that in terms of getting a production

25  date, that's why we're in a bottleneck, five months of

Page                                                                    80

1   sitting on your hands.

2         THE COURT:  And you could have used those five

3   months for Thomas Wylde to prepare these documents because

4   inevitably one way or another documents were going to be

5   produced.

6         MR. PEDDIE:  Not all of these documents because

7   now we're talking blind.  We don't even have the requests

8   in front of us.  We're just assuming that they're, you

9   know --

10        MR. BILLER:  The requests are identical to the

11  PMK, Your Honor.  They're identical.

12        MR. PEDDIE:  We're here to talk about -- I have a

13  motion for a protective order relating to the PMK here

14  today.  That's why we're here and then --

15        MR. BILLER:  Your Honor, you know --

16        MR. PEDDIE:  -- due process comes in terms of

17  this other thing where, you know, nobody's taking any

18  action.  I have followed the rules.  I have given him my

19  objections.  I've worked on the stipulation that was done

20  on April 24th.  He was ready to go.  He was ready to fight.

21        THE COURT:  Like I said, if he -- Thomas Wylde

22  had already produced non-privileged documents and produced

23  the privileged ones --

24        MR. PEDDIE:  We offered them.  We did produce

25  them.

Page                                                           89

1  country.  You own a business, you participate in business

2  activity, unfortunately you're going to get sued and when

3  you get sued you have to participate in discovery.  It

4  stinks.  Nobody likes it but I don't know what to say if

5  Thomas Wylde says, "This is too expensive.  We can't afford

6  to pay it.  We're a small company.  We're -- well, go file

7  for bankruptcy and just end all this."  I don't know what

8  to tell you.

9          MR. PEDDIE:  Well, Your Honor, are you going to

10 take offense if I filed just a bench memo saying where the

11 expense of this discovery should be because it sounds like

12 you're ordering the Thomas Wylde Company, which is

13 operating at a trickle, okay.  It's not operating at all

14 really.  It's not producing stuff in Asia.  It's not

15 producing anything at all.  Okay.  It doesn't even have any

16 employees anymore.  Or it might have one, some guy who

17 packs stuff or helps with a sample sale because we try to

18 make a little money here and there, but we're basically

19 inert, almost all but inert.

20         MR. BILLER:  This is coming from a man who

21 started these proceedings.  He is the one who sent the

22 emails to the Trustee, Nancy Zamora, "File your adversary

23 proceeding.  File your adversary proceeding.  Give them a

24 nuke. Knock Biller's head around.  Knock some heads into

25 him."  This is the man who started this nonsense.  He's

Page                                                                    90

1  responsible, Your Honor.  Do you think I want to spend most

2  of my practice for the last year doing this case?  I have

3  other cases I need to worry about.  I had a case to try

4  next month.  I can't try it because I have too much work in

5  this case.  I had to go get relief.  He's the one who

6  started this.

7         THE COURT:  I don't want a brief.  If you're

8  really going to fight over this either before or after

9  documents are due I'm going to make sure you present a

10 joint stipulation, present this discovery dispute to me,

11 but I -- just so you know if we take this endeavor, if your

12 position is Thomas Wylde should not have to bear the

13 burden, we decided to make it available, I think Mr. Biller

14 and Ms. Thomas they're entitled to go look at the computers

15 and iPads and Quicken of Thomas Wylde.

16        MR. PEDDIE:  Your Honor, I guess we'll cross that

17 bridge when we come it.  I'm going to go back and look at

18 it.  I'm surprised.  To me it sounds like an order shifting

19 a burden and it seems like to me that the Rules point the

20 other way.  It's my custom and my practice whenever

21 somebody asks for discovery and it's only even a couple

22 thousand pages I just get it out to them because I don't

23 want to waste time dilly-dallying with that.  At the same

24 time I've gone and I've done shareholder inspections in

25 other situations where I've had to bring in a copier myself

Page                                                                    91

1   and go into a company and do all of the copying and the

2   scanning because they were not going to extend to me the

3   same courtesy and because they have the right to do that.

4           THE COURT:  Yeah.  And I got to tell you, and

5   I've been a judge for over four years, but even before that

6   I just cannot remember the last time -- and I've been

7   involved in massive litigation suing *Suisse First Boston*,

8   big, big Chapter 11 cases where millions of pages were

9   involved where we actually produced real documents.  It was

10  all scanned in, zip drive, electronically by .pdf.  I just

11  can't re -- it's cheap.  It's literally the cost of paying

12  an attorney to fight over this is going to be ten times the

13  cost of scanning these documents in and putting in a zip

14  drive.  I just --

15          MR. PEDDIE:  Well, Your Honor, what you said is

16  that, you know, you've just saying certain things and that

17  these have a relation to the documents that we're expected

18  to produce and all those.  I need to go back and look at

19  what remains and look at what we did in April and look at

20  what I can just hand over to Mr. Biller and look at what

21  the Rules say about the expense and all that.  I mean, I

22  didn't come in here prepared to argue that today.  I came

23  in here to argue the PMK issue and that's it.

24          THE COURT:  Yeah.  And believe me, I'm not

25  prepared either because I -- over four years as a judge in

Page                                                              92

1  big cases, small cases, I'm even talking about, you know,

2  *pro se* debtor suing a *pro se* creditor or opposite where

3  people have complained about producing documents and the

4  cost of it.  Everyone does it.  Everyone does it.  Big

5  companies, small companies, individual debtors.  You know,

6  people who've filed bankruptcy that have no money have

7  produced documents and copied them and sent it to the other

8  side.  It's just -- I'm not prepared for this argument

9  either because I've never heard in over four years as a

10 judge, big parties, small parties, individuals, corporate

11 entities, someone who said, "I shouldn't have to" -- a

12 party, not a third party who -- a witness -- who has

13 complained about having to bear the cost of producing

14 documents.  So anyway --

15       MR. PEDDIE:  Well, all you've got is small

16 parties at this point in time and none of them has any

17 money.

18       THE COURT:  Yeah.

19       MR. PEDDIE:  So --

20       THE COURT:  But I'm talking about individual

21 debtors.

22       Anyway, Mr. Peddie, if you can prepare and lodge

23 an order resolving the motion for a protective order, the

24 order should also state a PMK deposition should be taken no

25 later than January 31, 2019 at a time mutually agreeable

Page                                                                93

1   and any document production should occur 30 days before.

2              MR. BILLER:  Thank you, Your Honor.

3              THE COURT:  All right.

4              MR. PEDDIE:  Thank you very, Your Honor.

5   (End at 12:33 p.m.)

6                      * * * * * * * *

7              I certify that the foregoing is a correct

8   transcript from the electronic sound recording of the

9   proceedings in the above-entitled matter.

10

11

12   _____         Date:   10/8/2018

13   RUTH ANN HAGER, C.E.T.**D-641

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT "22"

Richard Byron Peddie, SBN 193770
lawstudios@comcast.net
Lawstudios | Richard Byron Peddie, P.C.
5051 Euclid Avenue
Boulder, CO 80303-2831
Tel.: 303.444.5447
Fax: 720.222.4766
*Attorney for Thomas Wylde, LLC*

> **FILED & ENTERED**
>
> **OCT 01 2018**
>
> CLERK U.S. BANKRUPTCY COURT
> Central District of California
> BY jeanmari DEPUTY CLERK

CHANGES MADE BY COURT

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>PDTW, LLC,<br><br>    Debtor.<br><br>――――――――――――――――<br>LARRY D. SIMONS (TR)<br><br>          Plaintiff,<br><br>          v.<br><br>PAULA THOMAS, THOMAS WYLDE, LLC,<br>and THOMAS WYLDE HOLDINGS, LLC,<br><br>          Defendants. | Case No.: 6:16-bk-15889-SY<br><br>Chapter 7<br><br>Adv. No. 6:17-ap-01200-SY<br><br>**ORDER GRANTING IN PART AND DENYING IN PART THOMAS WYLDE, LLC'S MOTION FOR PROTECTIVE ORDER**<br><br>Hearing:<br>Date: Sept. 13, 2018<br>Time: 9:30 a.m.<br>Place: Courtroom 302<br>       3420 Twelfth Street<br>       Riverside, CA 92501 |

      Thomas Wylde, LLC's Motion for Protective Order ("Motion") filed by Thomas Wylde, LLC ("TW") on April 16, 2018, at docket number 149 in this adversary proceeding, came on regularly for hearing on September 13, 2018 at 9:30 a.m. before the above-referenced court.

Case 6:17-ap-01200-SY    Doc 386    Filed 11/01/18    Entered 11/01/18 15:27:56    Desc
Case 6:17-ap-01200-SY Main Document Filed 10/26/18 Page 141 of 256    03/18 21:55:49    Desc
Imaged Certificate of Notice    Page 3 of 6

1   Having considered the Motion, including all pleadings in support thereof, any and all oppositions

2   to the Motion (collectively, "Opposition") [Doc. Nos. 187, 310 & 315] and exhibits, any and all

3   replies to the Opposition [Doc. Nos. 199, 322 & 323], any and all materials filed in compliance

4   or partial compliance with LBR 7026-1(c)(4) relating to joint stipulations [Doc. No. 299], and

5   the oral arguments made at the hearing, and for the reasons stated on the record, and for good

6   cause otherwise appearing,

7        IT IS HEREBY ORDERED that the Motion is granted in part, and denied in part, as

8   follows: TW's motion relates solely to protection as to the designation of representative

9   witnesses under FRCP Rule 30(b)(6). In terms of such designations, and without ruling on

10  Thomas' contemporaneously-served request for production of documents, the court hereby orders

11  and otherwise determines this discovery dispute as follows:

12  No. 1 - Accounting Records

13       As to this item, the motion is granted in part and denied in part: TW's sole obligation

14  shall be to present a person with knowledge sufficient to authenticate accounting records

15  presented to him or her, where such records are from the time period of 2012 – 2015. To the

16  extent possible, the parties are expected to cooperate with one another to reduce the need for

17  such testimony and to stipulate to the authenticity of such documents.

18  No. 2 - Business Records

19       As to this item, the motion is granted in part and denied in part: TW's sole obligation

20  shall be to present a person capable of authenticating any business records presented to him or

21  her, where such records are from the time period of 2012 – 2015. To the extent possible, the

22  parties are expected to cooperate with one another to reduce the need for such testimony and to

23  stipulate to the authenticity of such documents.

24  No. 3 - Financial Records

25       As to this item, the motion is granted in part and denied in part: TW's sole obligation

26  shall be to present a person capable of authenticating any financial records presented to him or

27  her, where such records are from the time period of 2012 – 2015. To the extent possible, the

28

1   parties are expected to cooperate with one another to reduce the need for such testimony and to

2   stipulate to the authenticity of such documents.

3   <u>No. 4 - Loans & Investments in TW</u>

4       As to this item, the motion is granted in part and denied in part: TW's sole obligation

5   shall be to present a person knowledgeable as to insider loans made to, and investment in, TW,

6   during the time period of 2012 – 2015. An insider shall be understood to mean a member or an

7   affiliate of a member. An "affiliate of a member" shall mean any equity holder of such member

8   as well as persons who are part of the family of such affiliate or of any member. The intent here

9   is to include all loans and investments made by any person or entity in any way related to any

10  member, but to exclude commercial loans obtained from unaffiliated third parties in the ordinary

11  course of business.

12  <u>No. 5 - Communications w/ Stephen Choi, Eniluz Gonzalez, and Hillshore Investments</u>

13      As to this item, the motion is granted in part and denied in part: TW's sole obligation

14  shall be to present that person most knowledgeable as to communications between it and Stephen

15  Choi, Eniluz Gonzalez, and Hillshore Investments, S.A., but only during the time period of 2012

16  – 2015.

17  <u>No. 6 - Computers, iPads, Laptops, Servers, and Any Device Storing ESI</u>

18      As to this item, the motion is granted in part and denied in part: TW's sole obligation

19  shall be to present that person with the most knowledge as to its computers, iPads, laptops,

20  servers, and other devices containing ESI during the time period of 2012 – 2015. "Knowledge"

21  for the purposes of this topic shall mean knowledge of what devices TW had and not technical

22  knowledge or expertise concerning such devices.

23  <u>No. 7 - Minutes of Any Meetings of the Executive Committee and Notices of Action Taken by a</u>

24  <u>Supermajority Vote from 7/22/14 to Present</u>

25      As to this item, the motion is denied in part and the objection is OVERRULED. TW shall

26  present that person most knowledgeable as to the minutes of any meetings of its executive

27  committee, if any, and any notices of action taken by a supermajority of its members from July

28  22, 2014 to the present.

1  No. 8 - Changes Made to the Amended Operating Agreement

2      As to this item, the motion is granted in part and denied in part: TW's sole obligation

3  shall be to present a person knowledgeable as to changes made to TW's operating agreement

4  during the time period of 2012 – 2015.

5  No. 9 - Financial Reports Given to Hillshore Investments, Choi, or Gonzalez

6      As to this item, the motion is granted in part and denied in part: TW's sole obligation

7  shall be to present a person knowledgeable as to any financial reports given to Hillshore

8  Investments, S.A., or Stephen Choi or Eniluz Gonzalez, but only during the time period of 2012

9  – 2015.

10  No. 10 - Documents Reflecting the Units of Interests in Membership from 7/22/14 to Present

11      As to this item, the motion denied in part and the objection is OVERRULED. TW shall

12  produce a deponent knowledgeable as to those documents reflecting the units of interest in TW

13  from July 22, 2014 to-date.

14  No. 11 - Back-up Materials for the Data Inputted into Quickbooks from 7/22/14 to Present

15      As to this item, the motion is granted in part and denied in part: TW's sole obligation

16  shall be to present a person knowledgeable as to what sorts of materials were generally relied

17  upon in making entries into TW's Quickbooks accounting program during the time period of

18  2012 – 2016. To the extent TW has control over any person having similar information as to

19  entries made into the Debtor's Quickbooks accounting program during that same time period, it

20  shall produce that person, who may or may not be the same person.

21  No. 12 - Quickbooks

22      The court has determined that this item is subsumed by Item No. 11. The request lacks

23  the requisite specificity, and compliance by TW with Item No. 11 above shall be sufficient.

24  No. 13 - Any and All Documents Related to Any and All Agreements to Purchase Membership

25  Interests in TW

26      As to this item, the motion is granted in part and denied in part: TW's sole obligation

27  shall be to present a person knowledgeable as to agreements to purchase membership interests in

28  TW during the time period of 2012 – 2015.

Case 6:17-ap-01200-SY    Doc 386    Filed 11/01/18    Entered 11/01/18 15:27:56    Desc
Case 6:17-ap-01200-SY    Main Document    Page 144 of 256    '03/18 21:55:49    Desc
    ...aged Certificate of Notice    Page 6 of 8

1    <u>No. 14 - Loan Agreements, Lines of Credit, Guarantees, and Promissory Notes Executed</u>

2    <u>Between 7/22/14 and Present</u>

3         As to this item, the motion is granted in part and denied in part: TW's sole obligation

4    shall be to present a person knowledgeable as to those loan agreements, lines of credit,

5    guarantees, and promissory notes during the time period of 2012 – 2015 that are:

6         (a) between TW and any of its members (or affiliates of its members); or

7         (b) from third parties and for general operations.

8    TW shall have no obligation to present any deponent concerning such instruments entered into in

9    the ordinary course of business to obtain goods or services needed for routine operations. Thus,

10   by way of illustration only, TW shall have no obligation to present a person most knowledgeable

11   to testify about any such instrument related to the leasing or financing of a postage metering

12   machine or copy machine between it and an independent third-party vendor.

13   <u>No. 15 - Profit and Loss Statements from 7/22/14 to Present</u>

14        As to this item, the motion is granted in part and denied in part: TW's sole obligation

15   shall be to present a person knowledgeable as to any profit and loss statements from the time

16   period of 2012 – 2015.

17   <u>No. 16 - Balance Sheets from 7/22/14 to Present</u>

18        As to this item, the motion is granted in part and denied in part: TW's sole obligation

19   shall be to present a person knowledgeable as to balance sheets from the time period of 2012 –

20   2015.

21   <u>No. 17 - State and Federal Income Tax Returns from 2014 to Present</u>

22        As to this item, the motion is granted in part and denied in part: TW's sole obligation

23   shall be to present a person knowledgeable as to its 2012 – 2015 tax returns.

24   <u>No. 18 - Back up Materials and Documents Provided to the Accountant or CPA Who Prepared</u>

25   <u>the State and Federal Tax Returns for 2014 to Present</u>

26        As to this item, the motion is granted in part and denied in part: TW's sole obligation

27   shall be to present a person knowledgeable as to materials furnished to TW's tax preparer for

28   fiscal years corresponding to 2012 – 2015.

1   No. 19 - All Invoices, Statements, Bills, Receipts for All Sales

2        The motion is granted in part and the objection is SUSTAINED. If Thomas prevails in

3   this adversary proceeding, she could proceed with the infringement lawsuit before the U.S.

4   District Court where those documents may be relevant. At this point, they are not relevant.

5   No. 20 - All Sales Orders for Any Product TW Received from 7/22/14 to Present

6        The motion is granted in part and the objection is SUSTAINED. If Thomas prevails in

7   this adversary proceeding, she could proceed with the infringement lawsuit before the U.S.

8   District Court where those documents may be relevant. At this point, they are not relevant.

9   No. 21 - Any and All Documents Exchanged Between TW and Any Manufacturer of Clothes

10   who Manufactured TW's Products that were Sold from 7/22/14 to Present

11        The motion is granted in part and the objection is SUSTAINED. If Thomas prevails in

12   this adversary proceeding, she could proceed with the infringement lawsuit before the U.S.

13   District Court where those documents may be relevant. At this point, they are not relevant.

14   No. 22 - Any and All Documents Regarding the Purchase of Any Materials, Fabric, Products,

15   and Items Used to Manufacture the Products TW Sold Between 7/22/14 and Present

16        The motion is granted in part and the objection is SUSTAINED. If Thomas prevails in

17   this adversary proceeding, she could proceed with the infringement lawsuit before the U.S.

18   District Court where those documents may be relevant. At this point, they are not relevant.

19   No. 23 - Lease Agreement for the Premises where TW is Located

20        The motion is granted in part and the objection is SUSTAINED. The request is beyond

21   the scope of discovery in this case.

22   No. 24 - Back up Tapes for Any ESI from 7/22/14 to Present

23        As to this item, the motion is granted in part and denied in part: While Thomas has

24   deposed at least one third party as to this topical area, TW shall produce a deponent with

25   knowledge concerning whether or not TW maintains back up tapes containing ESI and where

26   such media is held and by whom.

27   //

28   //

1    <u>No. 25 - All Documents that are Required to be Made Available for Inspection by Any Member</u>

2    <u>Under the Amended Operating Agreement</u>

3         As to this item, the motion is granted in part and denied in part: TW's sole obligation

4    shall be to present a person knowledgeable as to what TW company documents have been

5    furnished to members under any requirement to do so, and only during the time period of 2012 –

6    2015. In so doing, TW may choose to present a member to testify about what documents were

7    furnished by TW to that member during that time period.

8    <u>Deposition Timing & Documents:</u>

9         The deposition Thomas seeks shall occur no later than January 31, 2019. The court is

10   aware that TW has responded and objected to Thomas' March 2018 requests for production of

11   documents. The court makes no ruling as to documents at this time. However, any documents to

12   be supplied must be supplied at least 30 days prior to the FRCP Rule 30(b)(6) deposition.

13                           ###

14

15

16

17

18

19

20

21

22

23

24

25

26   Date: October 1, 2018

27                                            Scott H. Yun
United States Bankruptcy Judge

28

United States Bankruptcy Court
Central District of California

Simons (TR),
            Plaintiff                                                    Adv. Proc. No. 17-01200-SY

Thomas, an individual,
            Defendant                          **CERTIFICATE OF NOTICE**

District/off: 0973-6        User: admin            Page 1 of 1          Date Rcvd: Oct 01, 2018
                            Form ID: pdf031        Total Noticed: 2

Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on
Oct 03, 2018.
aty           +Reagan E Boyce,   Brutzkus Gubner,   21650 Oxnard Street,   Suite 500,
               Woodland Hills, CA 91367-4911
Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.
pla           +E-mail/Text: larry@lsimonslaw.com Oct 02 2018 04:34:41    Larry D. Simons (TR),
               7121 Magnolia Avenue,   Riverside, CA 92504-3805
                                                                                    TOTAL: 1

              ***** BYPASSED RECIPIENTS (undeliverable, * duplicate) *****
intp          Courtesy NEF
wit           David Schnider,   c/o Kaufman Dolowich & Voluck LLP,   11755 Wilshire Blvd.,   Suite 2400,
               Suite 2400,   Los Angeles
dft           Paula Thomas, an individual
cc            Paula Thomas, an individual
dft           Thomas Wylde Holdings, LLC, a California limited l
dft           Thomas Wylde, LLC, a California limited liability
cc            Thomas Wylde, LLC, a California limited liability
cd*          +Larry D. Simons (TR),   7121 Magnolia Avenue,   Riverside, CA 92504-3805
                                                                       TOTALS: 7, * 1, ## 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

Transmission times for electronic delivery are Eastern Time zone.

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner
shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309):** Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social
Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required
by the bankruptcy rules and the Judiciary's privacy policies.

Date: Oct 03, 2018                         Signature:   /s/Joseph Speetjens

---

# CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email)
system on October 1, 2018 at the address(es) listed below:
              David  Seror   on behalf of Plaintiff Larry D. Simons (TR) dseror@bg.law,   ecf@bg.law
              Dimitrios P Biller   on behalf of Defendant    Thomas Wylde, LLC, a California limited liability
               company biller_ldtconsulting@verizon.net
              Dimitrios P Biller   on behalf of Interested Party   Courtesy NEF biller_ldtconsulting@verizon.net
              Dimitrios P Biller   on behalf of Defendant Paula  Thomas, an individual
               biller_ldtconsulting@verizon.net
              Jessica L Bagdanov   on behalf of Plaintiff Larry D. Simons (TR) jbagdanov@bg.law,   ecf@bg.law
              Jessica L Bagdanov   on behalf of Trustee Larry D Simons (TR) jbagdanov@bg.law,   ecf@bg.law
              Larry D Simons (TR)   larry@lsimonslaw.com,
               cl19@ecfcbis.com;nancy@lsimonslaw.com;cynthia@lsimonslaw.com;simonsecf@gmail.com
              Marcia L Daley   on behalf of Defendant Paula  Thomas, an individual marciad@daleyandsackslaw.com,
               mldaley.law@gmail.com
              Marcia L Daley   on behalf of Interested Party   Courtesy NEF marciad@daleyandsackslaw.com,
               mldaley.law@gmail.com
              Nancy H Zamora   on behalf of Plaintiff Larry D. Simons (TR) zamora3@aol.com
              Reagan E Boyce   on behalf of Plaintiff Larry D. Simons (TR) rboyce@bg.law,   ecf@bg.law
              Reagan E Boyce   on behalf of Trustee Larry D Simons (TR) rboyce@bg.law,   ecf@bg.law
              Reagan E Boyce   on behalf of Attorney Reagan E Boyce rboyce@bg.law,   ecf@bg.law
              Richard B Peddie   on behalf of Counter-Claimant    Thomas Wylde, LLC, a California limited
               liability company lawstudios@comcast.net,   lawstudios@gmail.com
              Richard B Peddie   on behalf of Defendant    Thomas Wylde, LLC, a California limited liability
               company lawstudios@comcast.net,   lawstudios@gmail.com
              Susan S Baker   on behalf of Witness David  Schnider sbaker@kdvlaw.com,   maguiniga@kdvlaw.com
              United States Trustee (RS)   ustpregion16.rs.ecf@usdoj.gov
                                                                                    TOTAL: 17

# EXHIBIT "23"

**CHAMBERS PREPARED ORDER**

```
FILED & ENTERED

OCT 16 2018

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Mason   DEPUTY CLERK
```

<div align="center">

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

</div>

| | |
|---|---|
| In re:<br><br>PDTW, LLC,<br><br>        Debtor(s). | Case No.: 6:16-bk-15889-SY<br><br>Chapter 7 |
| LARRY D. SIMONS,<br><br>        Plaintiff,<br>v.<br><br>PAULA THOMAS, THOMAS WYLDE,<br>LLC, and THOMAS WYLDE HOLDINGS,<br>LLC,<br><br>        Defendants. | Adv. No.: 6:17-ap-01200-SY<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART MOTION FOR<br>ORDER COMPELLING RESPONSES**<br><br>Hearing<br>Date: October 18, 2018<br>Time: 9:30 a.m.<br>Place: Courtroom 302 |

Paula Thomas ("Thomas") filed a Motion to Compel Responses and Documentation of Documents from PDTW, LLC and to Dismiss the Adversarial Complaint filed by TW, LLC ("Motion") on September 18, 2018, at docket number 328, requesting the court to enter an order that compels responses and the production of documents from the chapter 7 trustee, Larry D. Simons ("Trustee"), that belong to the bankruptcy estate of PDTW, LLC. Thomas set a hearing on the Motion for October 18, 2018. Trustee filed an opposition to the Motion ("Trustee Opposition")

1    on October 4, 2018, at docket number 351, and Thomas Wylde, LLC ("TW") filed an opposition
2    to the Motion on October 4, 2018, at docket number 354 (collectively, the "Oppositions").
3    Thomas and Trustee filed a joint stipulation regarding the Motion on October 4, 2018, at docket
4    number 353 ("Joint Stipulation"). Thomas filed replies to the Oppositions on October 13, 2018, at
5    docket numbers 360, 361, and 362 (collectively, the "Replies").

6         Having considered the Motion, the Oppositions, the Replies, the Joint Stipulation, and all
7    other related pleadings, for good cause:

8         IT IS HEREBY ORDERED that:

9         1.    The Motion is GRANTED IN PART and DENIED IN PART.

10        2.    Trustee shall complete his production of documents, including the production of a
11   privilege log, by no later than January 31, 2019. From the Motion and Trustee Opposition, it
12   appears Trustee is currently producing documents as requested by Thomas's First Set of Requests
13   for Production of Documents. Therefore, the Motion is premature. The delay in Trustee's
14   production is caused in part by Thomas's refusal to finish negotiating a bilateral stipulation for
15   protective order regarding "Confidential" and "Highly Confidential Attorney's Eyes Only"
16   designations that would apply only to the Trustee and Thomas.

17        3.    If Thomas and Trustee enter into a stipulation for a protective order regarding the
18   designation of documents as "Confidential" and "Highly Confidential Attorney's Eyes Only," then
19   the court may reconsider the January 31, 2019 production deadline for an earlier time.

20        4.    Any requested relief as it relates to TW is denied because Thomas failed to meet
21   and confer with TW, as required by Federal Rule of Civil Procedure 37(a)(1). Also, the First Set
22   of Requests for Production of Documents, which the Motion seeks to compel, does not seek any
23   documents from TW.

24        5.    The request for dismissal is denied. As to PDTW, LLC, the relief is denied because
25   PDTW is not a party to the adversary proceeding. From the Motion, Thomas appears to be
26   confusing Trustee with PDTW. As to Trustee, the relief is denied because Thomas has offered
27   insufficient evidence to show Trustee failed to take reasonable steps to preserve electronically
28

1    stored information ("ESI") or acted with intent to deprive ESI, as required by Federal Rule of

2    Civil Procedure 37(e). Ed Smith's deposition testimony about TW's 15 or more computers does

3    not establish that Trustee failed to preserve PDTW's ESI. TW is not PDTW. Ed Smith's testimony

4    also does not prove that TW's missing computers belonged, at any point, to PDTW. Thomas can

5    pursue TW regarding ESI contained in TW's 15 or more computers.

6        6.      Sanctions are not awarded to either party under Federal Rule of Civil Procedure

7    37(a)(5)(C). Both parties are partially at fault and the proper apportionment of reasonable

8    expenses would offset, resulting in neither party owing expenses to the other.

9        7.      The hearing on the Motion, currently set for October 18, 2018 at 9:30 a.m. at

10   calendar number 9, is VACATED.

11       8.      Neither party may file another discovery motion related to Thomas's First Set of

12   Requests for Production of Documents until after the production deadline of January 31, 2019,

13   unless Trustee and Thomas enter into a stipulation for a protective order, governing documents

14   under the designation of "Confidential" or "Highly Confidential Attorney's Eyes Only."

15                                                            ###

16

17

18

19

20

21

22

23

24

25   Date: October 16, 2018

26                                                   Scott H. Yun
                                                     United States Bankruptcy Judge

27

28

# EXHIBIT "24"

Richard Byron Peddie, SBN 193770
lawstudios@comcast.net
Lawstudios | Richard Byron Peddie, P.C.
5051 Euclid Avenue
Boulder, CO 80303-2831
Tel.: 303.444.5447
Fax: 720.222.4766
*Attorney for Thomas Wylde, LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Paula Thomas, | **Case No.: 2:17-cv-04158-JAK-PJW** |
| Plaintiff, | **THOMAS WYLDE, LLC'S STATUS REPORT** |
| v. | |
| Thomas Wylde, LLC, et al. | **Hon. John A. Kronstadt** |
| | **DATE: n/a** <br> **TIME: n/a** <br> **COURTROOM.: 10B** |

**THOMAS WYLDE, LLC'S STATUS REPORT**

## Table of Contents

I.    Introduction ................................................................ 1

II.   Status Report .............................................................. 2

III.  Future Status Reports ...................................................... 2

THOMAS WYLDE, LLC'S STATUS REPORT

## I.    Introduction

On June 29, 2017, this Court stayed this action. *See* Minutes of 6/29/2017 – DKT. NO. 38 ("Order"). In the Order, this Court commanded those parties who had appeared to file status reports every 90 days, commencing 9/29/17, concerning the status of matters before the Los Angeles Superior Court in the LASC Action, as that term is defined in the Order. *Id.* at 3.

On September 27, 2018, this Court issued its ORDER RE PLAINTIFF'S MOTION FOR RECONSIDERATION OF THIS COURT'S ORDER STAYING THE ACTION. *See* DKT.NO. 172. In addition to denying Plaintiff's motion for reconsideration of the Court's prior order refusing to lift the stay in effect in this case, the Sept. 27 order contained supplementary instructions concerning the parties' duties to file status reports:

> The parties shall continue to file reports as to the status of each of those proceedings on the earlier of every 90 days, or within 10 days after what any party contends is a dispositive determination of one or more issues in either of the parallel proceedings that would warrant lifting the stay in this action. The first reports shall be filed by October 31, 2018.

*See* Sept. 27, 2018 order at 9 (final paragraph)(DKT.NO. 172).

On October 10, 2018, however, the Court issued an order including, *inter alia*, specific instructions related to status reports to be filed upon the occurrence of events in the U.S. Bankruptcy Court for the Central District of California:

> The parties shall continue to file reports as to the status of the other relevant proceedings on the earlier of every 90 days, or within 10 days after what any party contends is a dispositive determination of one or more issues in those proceedings that would warrant lifting the stay in this action. However, given the statement in Plaintiff's September 30, 2018 Status Report (Dkt. 171) that "[t]he United States Bankruptcy Court will determine the ownership issue for copyrights and trademarks . . . on October 18, 2018," the parties shall file reports within 10 days of any such determination. If no such filings are made due to the timing of the decision on the ownership issue, the next reports shall be filed by January 4, 2019.

*See* Oct. 10, 2018 order at p. 1 (bottom of page)(DKT.NO. 173).

On Oct. 16, 2018, the United States Bankruptcy Court issued its order denying Plaintiff's requested determination of ownership of the subject intellectual property, triggering the duty to submit this status report. Therefore, Thomas

1   Wylde, LLC ("TW") submits what follows as its sixth status report.

2   **II.   Status Report**

3       Nothing noteworthy has happened in any of the related proceedings since

4   TW's last status report of Sept. 30, 2018, save only the following:

5       On October 16, 2018, the United States Bankruptcy Court issued an order

6   denying any request by Plaintiff that would determine ownership of the subject IP.

7   A true and correct copy of that order is attached hereto for the Court's reference.

8   **III.   Future Status Reports**

9       Given the Court's recent orders, TW will assume that the next status report

10   will be due on Jan. 4, 2019, unless significant developments trigger a requirement

11   to file earlier in accordance with the Court's instructions.

12   *Respectfully submitted, October 26, 2018:*

Lawstudios | Richard Byron Peddie, P.C.

13

14   By:
Richard Byron Peddie

15   Lawstudios |Richard Byron Peddie, P.C.

16   5051 Euclid Avenue
Boulder, CO 80303-2831

17   Tel.: 303.444.5447
*Attorney for Thomas Wylde, LLC*

18

19

20

21

22

23

24

25

26

27

28

THOMAS WYLDE, LLC'S STATUS REPORT

**CHAMBERS PREPARED ORDER**

FILED & ENTERED

OCT 16 2018

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Mason    DEPUTY CLERK

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>PDTW, LLC,<br><br>              Debtor(s). | Case No.: 6:16-bk-15889-SY<br><br>Chapter 7 |
| LARRY D. SIMONS,<br><br>              Plaintiff,<br>v.<br><br>PAULA THOMAS, THOMAS WYLDE,<br>LLC, and THOMAS WYLDE HOLDINGS,<br>LLC,<br><br>              Defendants. | Adv. No.: 6:17-ap-01200-SY<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART MOTION FOR<br>ORDER COMPELLING RESPONSES**<br><br><u>Hearing</u><br>Date: October 18, 2018<br>Time: 9:30 a.m.<br>Place: Courtroom 302 |

Paula Thomas ("Thomas") filed a Motion to Compel Responses and Documentation of Documents from PDTW, LLC and to Dismiss the Adversarial Complaint filed by TW, LLC ("Motion") on September 18, 2018, at docket number 328, requesting the court to enter an order that compels responses and the production of documents from the chapter 7 trustee, Larry D. Simons ("Trustee"), that belong to the bankruptcy estate of PDTW, LLC. Thomas set a hearing on the Motion for October 18, 2018. Trustee filed an opposition to the Motion ("Trustee Opposition")

1   on October 4, 2018, at docket number 351, and Thomas Wylde, LLC ("TW") filed an opposition

2   to the Motion on October 4, 2018, at docket number 354 (collectively, the "Oppositions").

3   Thomas and Trustee filed a joint stipulation regarding the Motion on October 4, 2018, at docket

4   number 353 ("Joint Stipulation"). Thomas filed replies to the Oppositions on October 13, 2018, at

5   docket numbers 360, 361, and 362 (collectively, the "Replies").

6        Having considered the Motion, the Oppositions, the Replies, the Joint Stipulation, and all

7   other related pleadings, for good cause:

8        IT IS HEREBY ORDERED that:

9        1.    The Motion is GRANTED IN PART and DENIED IN PART.

10       2.    Trustee shall complete his production of documents, including the production of a

11  privilege log, by no later than January 31, 2019. From the Motion and Trustee Opposition, it

12  appears Trustee is currently producing documents as requested by Thomas's First Set of Requests

13  for Production of Documents. Therefore, the Motion is premature. The delay in Trustee's

14  production is caused in part by Thomas's refusal to finish negotiating a bilateral stipulation for

15  protective order regarding "Confidential" and "Highly Confidential Attorney's Eyes Only"

16  designations that would apply only to the Trustee and Thomas.

17       3.    If Thomas and Trustee enter into a stipulation for a protective order regarding the

18  designation of documents as "Confidential" and "Highly Confidential Attorney's Eyes Only," then

19  the court may reconsider the January 31, 2019 production deadline for an earlier time.

20       4.    Any requested relief as it relates to TW is denied because Thomas failed to meet

21  and confer with TW, as required by Federal Rule of Civil Procedure 37(a)(1). Also, the First Set

22  of Requests for Production of Documents, which the Motion seeks to compel, does not seek any

23  documents from TW.

24       5.    The request for dismissal is denied. As to PDTW, LLC, the relief is denied because

25  PDTW is not a party to the adversary proceeding. From the Motion, Thomas appears to be

26  confusing Trustee with PDTW. As to Trustee, the relief is denied because Thomas has offered

27  insufficient evidence to show Trustee failed to take reasonable steps to preserve electronically

28

1    stored information ("ESI") or acted with intent to deprive ESI, as required by Federal Rule of

2    Civil Procedure 37(e). Ed Smith's deposition testimony about TW's 15 or more computers does

3    not establish that Trustee failed to preserve PDTW's ESI. TW is not PDTW. Ed Smith's testimony

4    also does not prove that TW's missing computers belonged, at any point, to PDTW. Thomas can

5    pursue TW regarding ESI contained in TW's 15 or more computers.

6          6.    Sanctions are not awarded to either party under Federal Rule of Civil Procedure

7    37(a)(5)(C). Both parties are partially at fault and the proper apportionment of reasonable

8    expenses would offset, resulting in neither party owing expenses to the other.

9          7.    The hearing on the Motion, currently set for <u>October 18, 2018 at 9:30 a.m.</u> at

10   calendar number 9, is VACATED.

11         8.    Neither party may file another discovery motion related to Thomas's First Set of

12   Requests for Production of Documents until after the production deadline of January 31, 2019,

13   unless Trustee and Thomas enter into a stipulation for a protective order, governing documents

14   under the designation of "Confidential" or "Highly Confidential Attorney's Eyes Only."

15                                              ###

16

17

18

19

20

21

22

23

24

25   Date: October 16, 2018

26                                              Scott H. Yun
                                                United States Bankruptcy Judge

27

28

                                                 3

# EXHIBIT "25"

Richard Byron Peddie, SBN 193770
lawstudios@comcast.net
Lawstudios | Richard Byron Peddie, P.C.
5051 Euclid Avenue
Boulder, CO 80303-2831
Tel.: 303.444.5447
Fax: 720.222.4766
*Attorney for Creditor/Defendant Thomas Wylde, LLC*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>PDTW, LLC,<br><br>     Debtor<br><br>/-----------------------------------------/<br><br>Larry Simons, Trustee,<br>     Plaintiff,<br><br>          v.<br><br>Paula Thomas et al.<br>     Defendants | **Case No.: 6:16-bk-15889-SY**<br>**Adv. Proc. No.: 6:17-ap-01200-SY**<br><br>**THOMAS WYLDE, LLC'S OBJECTION TO COST SHIFTING**<br><br>**Hon. Scott H. Yun**<br><br>**DATE: n/a**<br>**TIME: n/a**<br>**COURTROOM.: 302** |

### THOMAS WYLDE, LLC'S OBJECTION TO COST SHIFTING

THOMAS WYLDE, LLC'S OBJECTION TO COST SHIFTING

**I.   Introduction**

On September 13, 2018, Thomas Wylde, LLC ("TW") appeared, through undersigned counsel, in connection with the hearing of TW's April 16, 2018 motion captioned THOMAS WYLDE, LLC'S MOTION FOR PROTECTIVE ORDER ("Motion"). *See* ADV.DKT.NO. 149. At that hearing, the Court queried TW's counsel concerning the status of document production under certain requests for production of documents served by co-defendant Paula Thomas ("Thomas") upon TW. Transcript of Sept. 13, 2018 ("Tr.") at 4:9-11 & 5:7-9. During the colloquy that ensued, the undersigned indicated that TW had not "produced" any documents to Thomas pursuant to any discovery served in this case in terms of physical copies. Tr. at 5:10. When discussion returned to this topic later in the hearing, the undersigned did, however, indicate that TW had, in counsel's opinion, "produced" certain documents for purposes of the FRCP. Tr. at 78:15-18 & 80:24-25 & 81:14 & 81:17-18 & 82:4-10.

The Court indicated its belief that "production" under the FRCP meant the provision of copies at the responding party's (*i.e.,* TW's) expense, and not merely making documents available to the party seeking discovery. *See, e.g.,* Tr. at 81:1 – 82:18. The Court therefore indicated that, in its view, TW had not produced anything. TW disagreed. *Id.* The Court indicated that if TW persisted in its position that the party conducting discovery must bear the cost of copying paper documents, the Court would essentially retaliate by permitting Thomas full access to all of TW's documents, computers, and ESI. Tr. at 83:21 – 84:6. The Court went on to suggest that TW should simply file for bankruptcy if it cannot bear the expense of supplying Thomas free photocopies or Bates-stamped scans of physical documents in response to her discovery requests. Tr. at 89:3-8.

**II.   Objection**

TW OBJECTS to this unwarranted shifting of the costs of discovery from the party seeking discovery to the party responding to discovery.

TW therefore FURTHER OBJECTS to any form of sanction or judicial reprisal or any negative consequence whatsoever should it, at any point in time, stand upon its right to allow the costs of discovery to allocate themselves in accordance with the FRCP and applicable law.

THOMAS WYLDE, LLC'S OBJECTION TO COST SHIFTING

## III.    Authority

While the Court is correct in asserting that parties generally must bear their own costs in responding to discovery – see *Zubalake v. UBS Warburg, LLC*, 216 FRD 280, 283 (SDNY 2003) – this has apparently never been interpreted to extend to the costs of photocopies. That the responding party need not itself provide photocopies is in the first instance suggested by the very language of FRCP Rule 34 – the rule governing requests for production of documents and other things:

A party may serve on any other party a request within the scope of Rule 26(b):

> (1) to produce and permit the *requesting party* or its representative *to inspect, copy, test, or sample* the following items in the responding party's possession, custody, or control:
>
> (A) any designated documents or electronically stored information . . .

FRCP Rule 34(a)(emphasis supplied). Thus, the rule itself implies that the producing party's duty is to produce and permit the requesting party to inspect and, should the requesting party so choose, copy, test, or sample whatever has been produced.

Unsurprisingly, this is precisely the way the rule has been construed:

> A party producing documents will ordinarily not be put to the expense of making copies for the requesting party. Rule 34(b) merely requires that the responding party make documents available for inspection and copying. If the requesting party seeks production of "hard copies" of the documents, the producing party may charge the requesting party a reasonable amount to photocopy the documents it makes available for the requesting party to review.

MOORE'S FEDERAL PRACTICE 3D § 34.14[5](footnotes omitted); *see also Clever View Investments, Ltd. v. Oshatz*, 233 FRD 393, 394 (SDNY 2006)(producing party need only make requested document available; no duty to pay copying costs); *Riddell Sports, Inc. v. Brooks*, 158 FRD 555, 559 (SDNY 1994)(defendant required to pay costs of copy of transcripts produced by plaintiff); *Mezu v. Morgan State Univ.*, 269 FRD 565, 575 (D.Md. 2010)(defendant not obligated to photocopy and mail documents);[1] *Monarch Ins. Co. v. Spach*, 281 F.2d 401, 413 n. 30 (5th Cir.

---

[1] *See also Mezu v. Morgan State Univ.*, 775 F.Supp. 2d 801, 802 & 805 (D.Md. 2011)(later stage of same case; unfortunately, "after a long series of discovery disputes" the trial court had to emphasize once again that "Defendant was not obligated to photocopy the documents and mail them to Plaintiff; Defendant only was obligated to make the documents

THOMAS WYLDE, LLC'S OBJECTION TO COST SHIFTING

1  1960)(FRCP Rule 34 does not usually require responding party to provide copies); *Delozier v.*

2  *First Nat'l Bank of Gatlinburg*, 109 FRD 161, 164 (E.D. Tenn. 1986)(expense of printouts from

3  microfilm to be borne by requesting party); *Pappas v. Loew's Inc.*, 13 FRD 471, 473 (M.D. Pa.

4  1953)(responding party need not furnish copies); *Niagara Duplicator Co. v. Shackleford*, 160

5  F.2d 25, 27 (D.C. Cir. 1947)(Rule 34 held not "to allow the court to cast on the producing party

6  the burden and expense of making the copies or photostats."). *See also* SCHWARZER ET AL.,

7  FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:1932 (requesting party ordinarily pays for

8  copies).

9  **IV.    Conclusion**

10      TW has no duty whatsoever to supply Thomas or any other party free photocopies of

11  documents it produces in discovery. That being the case, neither sanctions nor judicial reprisals

12  of any sort can be inflicted upon TW should it elect not to do so.

13  *For Thomas Wylde, LLC, October 26, 2018:*      Lawstudios | Richard Byron Peddie, P.C.

14

15                                                          By:

16                                                          Richard Byron Peddie
                                                            Lawstudios | Richard Byron Peddie, P.C.

17                                                          5051 Euclid Avenue
                                                            Boulder, CO 80303-2831

18                                                          Tel.: 303.444.5447
                                                            *Attorney for Thomas Wylde, LLC*

19

20

21

22

23

24

25

26

27  _____

28  available to Plaintiff for inspection and copying.").

THOMAS WYLDE, LLC'S OBJECTION TO COST SHIFTING

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

5051 Euclid Avenue, Boulder, CO 80303-2831

A true and correct copy of the foregoing document entitled (*specify*): THOMAS WYLDE, LLC's OBJECTION
TO COST SHIFTING

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 10/26/2018_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☑ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On (*date*) 10/26/2018_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☑ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) __10/26/2018_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☑ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/26/2018 | Richard Byron Peddle | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**

SERVICE LIST ATTACHMENT [In re PDTW 6:16-bk-15889-SY]
[Adversary Proceeding: 6:17-ap-01200-SY]

1.  SERVED VIA CM/ECF

Jessica L Bagdanov jbagdanov@bg.law, ecf@bg.law
Susan S Baker    sbaker@kdvlaw.com, sbaker@kdvlaw.com
Dimitrios P Biller biller_ldtconsulting@verizon.net
Reagan E Boyce    rboyce@bg.law, ecf@bg.law
Marcia L Daley marciad@daleyandsackslaw.com, mldaley.law@gmail.com
David Seror dseror@bg.law, ecf@bg.law
Larry D Simons (TR) larry@lsimonslaw.com, c119@ecfcbis.com; nancy@lsimonslaw.com;
cynthia@lsimonslaw.com
United States Trustee (RS) ustpregion16.rs.ecf@usdoj.gov
Nancy H Zamora zamora3@aol.com
Keith Patrick Banner  kbanner@greenbergglusker.com, sharper@greenbergglusker.com;
        calendar@greenbergglusker.com

2.  SERVED VIA U.S. MAIL



3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE
    TRANSMISSION OR EMAIL

# EXHIBIT "26"

**Nicole Russell**

| | |
|---|---|
| **From:** | Jene Park [jene@thomaswylde.com] |
| **Sent:** | Thursday, May 03, 2018 3:16 PM |
| **To:** | Ed Smith; Yoonsung Bae |
| **Cc:** | Richard |
| **Subject:** | Re: In re PDTW, LLC -- |

Ed and YS,

Pls. note and provide whatever we have or had.


Warm Regards,

Jene Park

Instagram

T H O M A S   W Y L D E

229 W. 31st Street
2nd Floor.
Los Angeles, CA 90007

Phone: +1 323 360 2111


**From:** Richard Peddie <lawstudios@comcast.net>
**Date:** Thursday, May 3, 2018 at 3:13 PM
**To:** Jene Park <jene@thomaswylde.com>
**Cc:** Ed Smith <ed@organicintelligence.co>, Yoonsung Bae <accounting@thomaswylde.com>
**Subject:** Re: In re PDTW, LLC --

Hi All,

What this amounts to at this time is giving whatever passwords we have for any workstations or iPads or laptops or whatever to Trustee's litigation counsel at Brutzkus Gubner -- so Jessica Bagdanov or David Seror or anyone working with them, or to Nancy Zamora or even the Trustee himself, Larry Simons.

It doesn't matter.  We can change the passwords for TW computers currently in use, so just give it all to them if you can't figure out which is which, although to the extent you can, indicate the computer somehow, username obviously, and password.

Thanks!

rbp



1

**From:** "Jene Park" <jene@thomaswylde.com>
**To:** "Ed Smith" <ed@organicintelligence.co>, "Yoonsung Bae" <accounting@thomaswylde.com>
**Cc:** "Richard Peddie" <lawstudios@comcast.net>
**Sent:** Thursday, May 3, 2018 4:04:13 PM
**Subject:** In re PDTW, LLC --

Hi Ed and Yoonsung,

Hope you are well,

I am in China for another week and I would like to ask you to help with the matter below:

Ed, I think we have asked you this before and you said just reset the passwords.

Whatever you can jump in and help will be greatly appreciated.

Warm Regards,

Jene Park

Instagram

T H O M A S   W Y L D E

229 W. 31st Street

2nd Floor.

Los Angeles, CA 90007

Phone: +1 323 360 2111

**From:** "Jessica Bagdanov" <jbagdanov@bg.law>
**To:** "Richard" <lawstudios@comcast.net>, "David Seror" <dseror@bg.law>
**Sent:** Thursday, May 3, 2018 11:34:56 AM
**Subject:** RE: In re PDTW, LLC --


Thank you. I have placed a call to Ed Smith.  Please also check to see if TW has any potential passwords Epiq can try to use to access the devices and let me know if you find anything else as soon as possible.



Jessica






Jessica Bagdanov

**Brutzkus Gubner Rozansky Seror Weber LLP**
21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911

www.bg.law

(818) 827-9000 Main

(818) 827-9212 Direct

(818) 827-9032 Fax
jbagdanov@bg.law


The preceding e-mail message is subject to Brutzkus Gubner Rozansky Seror Weber LLP's e-mail policies, which can be found at: http://www.bg.law/disclaimer

**Nicole Russell**

| | |
|---|---|
| **From:** | Richard [lawstudios@comcast.net] |
| **Sent:** | Thursday, May 03, 2018 3:13 PM |
| **To:** | Park, Jene |
| **Cc:** | Ed Smith; Yoonsung Bae |
| **Subject:** | Re: In re PDTW, LLC -- |

**Flag Status:**     Flagged

Hi All,

What this amounts to at this time is giving whatever passwords we have for any workstations or iPads or laptops or whatever to Trustee's litigation counsel at Brutzkus Gubner -- so Jessica Bagdanov or David Seror or anyone working with them, or to Nancy Zamora or even the Trustee himself, Larry Simons.

It doesn't matter.  We can change the passwords for TW computers currently in use, so just give it all to them if you can't figure out which is which, although to the extent you can, indicate the computer somehow, username obviously, and password.

Thanks!

rbp

---

**From:** "Jene Park" <jene@thomaswylde.com>
**To:** "Ed Smith" <ed@organicintelligence.co>, "Yoonsung Bae" <accounting@thomaswylde.com>
**Cc:** "Richard Peddie" <lawstudios@comcast.net>
**Sent:** Thursday, May 3, 2018 4:04:13 PM
**Subject:** In re PDTW, LLC --

Hi Ed and Yoonsung,

Hope you are well,

I am in China for another week and I would like to ask you to help with the matter below:

Ed, I think we have asked you this before and you said just reset the passwords.

Whatever you can jump in and help will be greatly appreciated.

4

Warm Regards,


Jene Park

Instagram

T H O M A S   W Y L D E

229 W. 31st Street

2nd Floor.

Los Angeles, CA 90007


Phone: +1 323 360 2111




**From:** "Jessica Bagdanov" <jbagdanov@bg.law>
**To:** "Richard" <lawstudios@comcast.net>, "David Seror" <dseror@bg.law>
**Sent:** Thursday, May 3, 2018 11:34:56 AM
**Subject:** RE: In re PDTW, LLC --


Thank you. I have placed a call to Ed Smith.  Please also check to see if TW has any potential passwords Epiq can try to use to access the devices and let me know if you find anything else as soon as possible.




Jessica






Jessica Bagdanov

Brutzkus Gubner Rozansky Seror Weber LLP
21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911

5

www.bg.law

(818) 827-9000 Main

(818) 827-9212 Direct

(818) 827-9032 Fax
jbagdanov@bg.law

The preceding e-mail message is subject to Brutzkus Gubner Rozansky Seror Weber LLP's e-mail policies, which can be found at: http://www.bg.law/disclaimer

**Nicole Russell**

| | |
|---|---|
| **From:** | Jene Park [jene@thomaswylde.com] |
| **Sent:** | Thursday, May 03, 2018 3:04 PM |
| **To:** | Ed Smith; Yoonsung Bae |
| **Cc:** | Richard Peddie |
| **Subject:** | In re PDTW, LLC -- |

Hi Ed and Yoonsung,

Hope you are well,

I am in China for another week and I would like to ask you to help with the matter below:

Ed, I think we have asked you this before and you said just reset the passwords.
Whatever you can jump in and help will be greatly appreciated.


Warm Regards,

Jene Park

Instagram

T H O M A S   W Y L D E

229 W. 31st Street
2nd Floor.
Los Angeles, CA 90007

Phone: +1 323 360 2111


**From:** "Jessica Bagdanov" <jbagdanov@bg.law>
**To:** "Richard" <lawstudios@comcast.net>, "David Seror" <dseror@bg.law>
**Sent:** Thursday, May 3, 2018 11:34:56 AM
**Subject:** RE: In re PDTW, LLC --


Thank you. I have placed a call to Ed Smith. Please also check to see if TW has any potential passwords Epiq can try to use to access the devices and let me know if you find anything else as soon as possible.



Jessica



Jessica Bagdanov

**Brutzkus Gubner Rozansky Seror Weber LLP**
21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

(818) 827-9000 Main
(818) 827-9212 Direct
(818) 827-9032 Fax
jbagdanov@bg.law

The preceding e-mail message is subject to Brutzkus Gubner Rozansky Seror Weber LLP's e-mail policies, which can be found at: http://www.bg.law/disclaimer

# EXHIBIT "27"

## DECLARATION OF DONALD FIFE

I, Donald Fife, declare:

1.      I am a certified public accountant licensed to practice in the State of California.   I am the managing member of the consulting firm, Donald T. Fife, CPA (the "Firm").  I am authorized to make this declaration on behalf of the Firm.  I have personal knowledge of the facts contained in this declaration and if called as a witness, I would and could competently testify thereto under oath.

2.      I make this declaration in support of the Motion to which it is appended.  All initial capitalized terms used but not defined herein shall have the same meaning ascribed to them in the Motion.

3.      On January 23, 2017, the Trustee filed an Application to Employ the Firm as his accountants pursuant to 11 U.S.C. § 327 [Bk. Doc. 57].  Thereafter, I was provided a backup of the Debtor's QuickBooks records.  On February 22, 2017, the Court approved the Firm's employment as accountant for this estate [Bk. Doc. 61].

4.      I am informed and believe that on or about September 24, 2015, counsel for TW delivered to Thomas' counsel a flash drive containing a backup copy and portable company copy of the books and records, including QuickBooks, of the Debtor.  Upon the Debtor's bankruptcy filing, TW provided these same records to the Trustee and on or about December 26, 2016, I obtained a copy of the Debtor's QuickBooks file from the Trustee.

5.      I have kept the original files intact as I received them, and am advised these files constitute part of the business records of the Debtor.  I qualify as the custodian for the books and records maintained by the Firm.  The Firm's records were made on or about the time of the events recorded in such documents, and have been maintained in the ordinary course of the Firm's business at or near the time of the acts, conditions, or events to which they relate.

6.      The documents appended to this Declaration constitute part of the business records of the Debtor.  I understand that such records were made on or about the time of the events recorded in such documents, and have been maintained in the ordinary course of the Debtor's business at or near the time of the acts, conditions, or events to which they relate.

21

1930741

7.     The books and records of the Debtor reflect that the Debtor loaned Thomas sums of money from time to time during the time of its operation.  Utilizing the Debtor's QuickBooks records taken into the possession of the Trustee, I performed a search of Debtor's QuickBooks of all "Advances to Officer," which reflect "loans" or "advances" to Paula Thomas between the dates of approximately September 11, 2009 and August 1, 2015.  Attached hereto as **Exhibit 3** is a true and correct printout from the Debtor's QuickBooks of this report.

8.     Additionally, I noted that Debtor's records also included a separate account showing certain "loans" made by Thomas that were not reflected in **Exhibit 3**.  Attached hereto as **Exhibit 4** is a true and correct copy of this report.

9.     Given that the Trustee received the Debtor's books and records from TW, I performed "audit trail" reports on **Exhibits 3 and 4** to determine whether any of the data or descriptions contained in these reports had been altered by anyone at TW after the dates of each original entry on these reports.  Based on my investigation and analysis, I am informed and believe that the data contained in **Exhibits 3 and 4** was not altered by other users after its original entry into the Debtor's QuickBooks records.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _13th_ day of April, 2018 at Pasadena, California.

Donald Fife

1930741

## DECLARATION OF DAVID SPEAR

I, David Spear, declare:

1.      I am over the age of eighteen years and am the President of R.L. Spear Co., Inc., the Trustee's employed Auctioneer in this bankruptcy case. I am authorized to make this declaration on behalf of the Auctioneer. I have personal knowledge of the facts contained in this declaration and if called as a witness, I would and could testify thereto under oath.

2.      I make this declaration in support of the Trustee's Motion to which it is appended. All initial capitalized terms used but not defined herein have the same meanings ascribed to them in the Motion.

3.      On or about July 27, 2017, the Court entered the Sale Order, which, among other things, authorized the Auctioneer's employment pursuant to 11 U.S.C. § 327.

4.      After approval of the Auctioneer's employment, I participated in a lengthy investigation and analysis of the Debtor's inventory located at multiple storage facilities in order to sort items to be sold at auction for the benefit of the estate. During the investigation, Thomas, along with her counsel, examined most if not all of the inventory in storage, selected an "archive" item from each design collection for each season of every year, photographed each item, and set each archive item aside to be excluded from the Trustee's auction.

5.      After completing the inventory process, the Auctioneer conducted an auction of the undisputed inventory. The Auctioneer has retained custody of the Archive Pieces in storage (at the estate's expense) pending further order of Court in accordance with the requirements in the Sale Order.

///

1930741

6.      The first phase of the auction is complete (*i.e.*, everything sold except for the disputed Archive Pieces).  Currently, the Auctioneer has approximately 77 large storage bins full of accessories such as handbags, scarves, shoes, belts, jewelry, etc.  The Auctioneer also has approximately four (4) hanging racks that hold approximately 210 garments, including gowns, fur, silk, cashmere, and other couture garments.  These are the "Archive Pieces" referred to in the Court's Sale Order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13 day of April, 2018, at Westlake Village, California.


David Spear

24

1930741

# EXHIBIT "28"

From: **David Schnider** david@thomaswylde.com 📎 
Subject: Re: Engagement
Date: December 10, 2015 at 10:28 AM
To: Henry J. Kahrs hkahrs@rgl.com
Cc: Doug Lee dlee@lpdirect.com, Richard Peddie lawstudios@comcast.net, Meldy Rafols meldy@thomaswylde.com

Hank:

Attached for your review are the following documents:

1. The Complaint filed by Paula Thomas on behalf of herself, PDTW, LLC, and derivatively on behalf of Thomas Wylde, LLC;
2. The Amended Operating Agreement for Thomas Wylde, LLC;
3. The second Amended Exhibit B to the Operating Agreement showing Thomas Wylde, LLC's current members;
4. The employment agreements for John Hanna, Jene Park, and Paula Thomas.

As previously advised, the company, Thomas Wylde, LLC, has appointed a Special Litigation Committee ("SLC") made up of the representatives of the Members who are not named parties to the lawsuit or representatives of such parties. It consists of Stephen Choi, Roger Kuo, and Doug Lee. Doug Lee is your primary contact person on the committee. The SLC has also asked me to assist in coordinating in house to support your investigation. If you need any documents or information, please feel free to contact Doug, me, or Meldy Rafols, the company Financial Controller.

The scope of your engagement is to investigate the derivative claims made by Paula Thomas on behalf of Thomas Wylde, LLC relating to payments made to the officers of the company and their related entities, contained in the 10th through 15th causes of action. The SLC has asked that you trace all funds paid by Thomas Wylde, LLC to John Hanna, Jene Park, H&H Fashion, LLC, Shot in the Armoire, LLC, and The Palliative, LLC (note they are not named in the Complaint) to determine whether those payments were legitimate. I realize that there is also a claim that Hanna and Park used company funds and credit cards to pay for their own personal, non-business expenses. After you begin your work, please determine what it would take to investigate that claim as well and provide an estimate to the SLC to have you do so.

Please provide us with an engagement letter and let us know what additional information you will need to get started. I have already instructed Meldy to give you access to the Quickbooks files. You have unfettered access to any other company information you may need.

Regards,
David



Complaint.pdf



Amended
Operati...ent.pdf


## AMENDED EXHIBIT B

## MEMBERS AND CAPITAL CONTRIBUTIONS
### April 15, 2015

| Name | Contact Information | Capital Contributions and Due Dates | No. Units | Initial Capital Account Balance |
|------|--------------------|-----------------------------------|-----------|--------------------------------|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700 December 15, 2014 | 14 | $700 |

| | | | | |
|---|---|---|---|---|
| The Palliative, LLC | 12114 Dewey St., Los Angeles, CA 90066 Fax: 310-559-5765 Email: jeno@thomaswylde.com | $900 December 15, 2014 | 18 | $900 |
| Stanley Ducks, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@ztherz.com | $350 December 15, 2014 | 7 | $350 |
| DSRB Group, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350 December 15, 2014 | 7 | $350 |
| Paula Thomas | 2514 S. Toledo Ave. Palm Spring, CA 92264 Email: paulathomas@me.com *With a copy to: Andrew Apfelberg Greenberg Glusker 1900 Avenue of the Stars 21st Floor Los Angeles, CA 90067 Email: aapfelberg@ggfirm.com* | $3,200 + intellectual property and certain liabilities December 22, 2014 | 64 | $3,200 |
| Hillshore Investments | Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá Attn: Eniluz Gonzalez, General Manager | $5,500,000 January 1, 2015 | 90 | $5,500,000 |



JH Employment
Agreement.pdf



Park
Employ...ted.pdf



Thomas
Employ...ted.pdf

On Dec 10, 2015, at 9:45 AM, Hank Kahrs <hkahrs@rgl.com> wrote:

Hi David,

Yes, please send me the complaint as soon as you can and I will set up a retainer agreement.
If you can e-mail quickbooks we can open it here.  If the file is too big, I can set up a
sharefile.  Thank you!!


**Hank Kahrs** CPA/ABV/CFF, CFE, CMA, CM
*Partner*

**D** +1 714 740 6164
**M** +1 714 392 4587
Download vCard
hkahrs@rgl.com

View our new website www.rgl.com

**RGL Forensics**
625 City Drive South
Suite 290
Orange, CA 92868
**T** +1 714 740 2100

&lt;image2a6c91.JPG&gt;

Asia | Australia | Europe | North America | South America | rgl.com

DISCLAIMER:
The above information is confidential to the addressee and may be privileged. Unauthorized access and use is prohibited. Internet
communications are not secure and therefore this company does not accept legal responsibility for the contents of this message. If you are
not the intended recipient, any disclosure, copying, distribution or any action taken or omitted in reliance on it is prohibited and may be
unlawful.


**From:** David Schnider [mailto:david@thomaswylde.com]
**Sent:** Wednesday, December 09, 2015 5:17 PM
**To:** Hank Kahrs
**Cc:** Doug Lee
**Subject:** Engagement

Hank:

I confirmed that Thomas Wylde's Special Litigation Committee would like to retain
you to conduct an audit of the claims asserted by Paula Thomas on behalf of the
company. The client will be Thomas Wylde, LLC located at 3231 S. La Cienega Blvd.
Unit A, Los Angeles, CA 90013. I think probably the member of the SLC who will be
your primary contact is Doug Lee, who is a representative of one of the non-interested
members. I have copied Doug on this email and his cell number is (310) 720-9933.
However, I believe the committee will use me as the primary contact to coordinate your
work. Please let me know what additional information you need to get an engagement
letter set up and what we need to do to get started. We will likely prepare a "packet" for
you consisting of the complaint and relevant agreements, but we also need to know

you consisting of the complaint and relevant agreements, but we also need to know
how best to get you access to the Quickbooks records.

Regards,
David


David Schnider
General Counsel
david@thomaswylde.com

T H O M A S   W Y L D E
www.thomaswylde.com

SCHNIDER_BK 002037

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF THOMAS WYLDE, LLC

This Amended and Restated Operating Agreement (the "Agreement") of THOMAS WYLDE, LLC, a limited liability company formed under the California Revised Uniform Limited Liability Company Act (the "Company"), is entered into as of December 22, 2014 by John Hanna, Jene Park, Doug Lee, Roger Kuo and Paula Thomas (each a "Member," and collectively the "Members").

The Articles of Organization of the Company were filed with the California Secretary of State on July 22, 2014 and have been adopted and approved by the Members. The Operating Agreement of Thomas Wylde ("July Agreement") was entered into concurrently therewith.

Contemporaneous herewith, Paula Thomas ("Paula") is making a capital contribution and being admitted as a Member. In connection therewith, the Company and Members desire to amend and restate the July Agreement which shall be replaced and superseded in its entirety by this Agreement.

The Members enter into this Agreement to memorialize the terms and conditions of governance of the Company, the conduct of its business, and their relative rights and obligations.

Now therefore, the parties agree as follows:

### ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article, Exhibit C, or elsewhere in this Agreement, and when not so defined shall have the meanings set forth in Corporations Code § 17701.02.

1.1.   "**Act**" means the California Revised Uniform Limited Liability Company Act (Corporations Code §§ 17701.01-17713.13), including amendments from time to time.

1.2.   "**Affiliate**" of a Member or Manager means (i) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or Manager or (ii) a family member of the Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.3.   "**Available Cash**" means all net revenues from the Company's operations, including net proceeds from all sales, re-financings, and other dispositions of Company property that the Members, by Vote of a Supermajority of Members, deem in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves.

SCHNIDER_BK 002038

# EXHIBIT "29"

| From: | Richard PEDDIE |
|---|---|
| To: | Dimitrios Biller |
| Subject: | Re: Motion to Dismiss under Rule 37(e) |
| Date: | Friday, October 26, 2018 3:36:32 PM |

Dimitrios,

You have already essentially brought, and lost, this motion.

I know of no computers that were "destroyed" and have never admitted that any ESI has been disposed of, so forget it.

TW's counterclaim is asserted against the Trustee. Thomas has no standing to bring this motion.

But sure, call me during the next half hour if you like. Or, call me at 8 a.m. tomorrow, Sunday, or Monday -- you choose.

Best Regards,

Richard Byron Peddie
Lawstudios | Richard Byron Peddie, P.C.

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303.444.5447), and delete the Communication, together with any attachments, from your system.

On October 26, 2018 at 3:51 PM Dimitrios Biller
<biller_ldtconsulting@verizon.net> wrote:

This is your last opportunity to give a time on Monday, October 29, 2031.  You have already admitted the computers have be "deposed of" (destroyed) and Park may have some type of cloud with some of the ESI remaining.  It is your obligation now to give me the details and please don't say you don't know.


Dimitrios P. Biller

LDT Consulting, Inc.

15113 West Sunset Blvd., Suite 9

Pacific Palisades, California 90272

(310) 459-9870

biller_ldtconsulting@verizon.net


This e-mail and/or attachments may contain confidential information protected by the Attorney-Client Privilege, Attorney Work-Product Privilege and/or the concept of "Confidentiality" as defined by the *California*

*Rules of Professional Conduct.*  If you have
mistakenly received this e-mail please
immediately delete it and confirm you have
deleted it from your systems.

| From: | Richard PEDDIE |
|---|---|
| To: | Dimitrios Biller |
| Subject: | Re: Meet & Confer |
| Date: | Monday, October 22, 2018 2:04:21 PM |

Dimitrios,

I apologize if I missed your call earlier, but I had no idea that you were expecting to speak with me at 9:00 a.m. Yes, I knew I was to check in with you today and perhaps do the Doug Lee/Launchpad meet-and-confer, but did not know that you were expecting that to occur at any particular time. Anyway, I am available now, so let's do it.

As to what you have written, below, I am not prepared to discuss that yet. Suffice it to say that I disagree with your characterization of anything I have said and any conclusions you draw.

I will try calling you in a few minutes

Best Regards,

Richard Byron Peddie
Lawstudios | Richard Byron Peddie, P.C.

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303444.5447), and delete the Communication, together with any attachments, from your system.

On October 21, 2018 at 1:23 PM Dimitrios Biller
<biller_ldtconsulting@verizon.net> wrote:

It is time to bring this case to an end.  You know
and have admitted the computers at TW and
PDTW have be destroyed ("deposed") and you
cliam you do not know anything about the
destrution of evidence.  If that were the case
how do you know the computers have been
desposed?  I will bring a Rule 37(e) Motion to
have TW dismissed from the adversary
proceedings and have its bogus $2.4 cliam
dismiss from the bankrutcy proceedings.  There
is no way for Paula Thomas defend against that
claim with out computer records.

Based on Ed Smith's testimony Park may have
moved the ESI to an Amazon Cloub.  What ESI
did she move?  Did she move all ESI in the hard
drives of the computers, or some it?  She broke
the chain of custody.  She has prejudicued Paula
and she is seling Paula's designs in South
Korea.  In order to avoid this motion I have to
get an admission from Park that she did what we
know she did.  Alternatively, just dismiss TW
from the adversary/bankruptcy proceedings,
with prejudice, and stipulate to a default

judgment in the federal district court case.


Judge Yun stated that Paula Thomas can pursue the 15 computers for the ESI contained in TW's 15 or more computers.  I will.  Please meet with me tomorrow to discuss these issues.  If you refuse then meet me on or before  October 29, 2018 for a meet and confer.


Richard, your clients are goint down.  They were arrogant and sluppy.  This is the beginning for the end.


Dimitrios P. Biller

LDT Consulting, Inc.

15113 West Sunset Blvd., Suite 9

Pacific Palisades, California 90272

(310) 459-9870

biller_ldtconsulting@verizon.net


This e-mail and/or attachments may contain

confidential information protected by the Attorney-Client Privilege, Attorney Work-Product Privilege and/or the concept of "Confidentiality" as defined by the *California Rules of Professional Conduct.* If you have mistakenly received this e-mail please immediately delete it and confirm you have deleted it from your systems.

From:       Richard B PEDDIE
To:         Dimitrios Biller
Subject:    RE: Request for Meet-and-Confers Re: Discovery Disputes; Jene Park FRCP Rule 30(b)(1) Deposition
Date:       Friday, October 19, 2018 8:58:12 AM

Dimitrios,

1   Clarify why you think I have filed five motions for protective orders on behalf of TW   I can think of only two  plus one related ex-parte motion to try to get the U S  Bankruptcy Court to stay Ed Smith's deposition during the pendency of the motion for a protective order concerning his deposition   The Ed Smith motion was rendered moot because you proceeded to depose Ed Smith notwithstanding the pending motion   Thus, we have litigated to its conclusion only one motion for a protective order  and I have only brought two as far as I can recall   Tell me if I'm missing something,

2   Indicate where you are in obtaining information from Sheila Vance and SAMA Eyewear   As far as I could tell  you were already receiving information from them and from their attorney, Hayes Michel, a year ago   The reason I wish to know this is that I await a communication from Hayes that may affect what I do with regards to these subpoenae duces tecum

3   I am likewise revisiting what I wish to do with regards to Andrew Apfelberg   As you know  as far as I am concerned, all discovery sought from Vance/SAMA, Greenberg Glusker/Andrew Apfelberg, and Doug Lee/Launchpad is beyond the scope of discovery in these adversary proceedings and instead delves into things that are, in fact, beyond the U S  Bankruptcy Court's jurisdiction  Still  I await certain input from third parties to decide whether or not I am in fact going to move for a protective order   I do not have everything in front of me yet, in other words, to make that decision   In other words, while I have my arguments and position as to the basis for such motions  there are other factors at play which may cause me not to bring some or all of these motions   Thus  it would be my preference to reschedule our meet-and-confer for next week sometime, or to do only the Doug Lee portion now – even though that too conceivably might go away either completely or at least in terms of my involvement

        just ask if you would please go and consider this e-mail and then either reply or call to proceed with the meet and        am standing by,

Thanks

Best Regards,

Richard Byron Peddie
Lawstudios | Richard Byron Peddie, P.C

This e-mail, including any included attachments or links (collectively: "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well
The Communication may be protected as an attorney-client communication and/or attorney work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.
If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303.444.5447), and delete the Communication, together with any attachments, from your system.

        On October 18, 2018 at 12:48 PM Dimitrios Biller <biller_ldtconsulting@verizon.net> wrote

        From: Richard PEDDIE [mailto:lawstudios@comcast.net]
        Sent: Wednesday, October 17, 2018 10:37 AM
        To: Dimitrios Biller <biller_ldtconsulting@verizonnet>
        Subject: RE: Request for Meet-and-Confers Re: Discovery Disputes; Jene Park FRCP R. 1

        Dimitrios,

        Are we meeting and conferring on Friday at 9 a.m. over the motions for protective orders concerning Lee/Launchpad  Vance/SAMA Eyewear, and Andrew Apfelberg?

        As to Park, I do not know of any "meet and confer agreement" so do not see how I could have violated it   I know of FRCP Rule 30(b)(6) and the Court's recent order, and you have yet to identify how I have violated either

        TW will produce its first 30(b)(6) witness on January 24, 2019

        I remain open to producing organizational representatives earlier by mutual agreement. That includes producing Jene Park during mid-November so long as you agree, as I have asked, that it will be a no document, 30(b)(6) deposition. What that means is that you will accept the fact that no documents will be produced at or before the deposition and confine your questioning to things reasonably related to the 30(b)(6) topical areas assigned to her

        Again, I do not mean to straightjacket you to the topics too narrowly, but the areas of inquiry must bear at least some relation to the topical areas or otherwise have to do with this case, be fair and reasonable to the extent they stray off-topic, and not amount to an unfair ambush, hit-and-run deposition over other disputes.

        I was attempting to clear Nov  16 for this deposition, but it sounds like you are unwilling to agree to any ground rules whatsoever. Let me know if this is not the case

        Best Regards,

        Richard Byron Peddie
        Lawstudios | Richard Byron Peddie, P.C

        This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product.
        In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.

If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303-444-5447), and delete the Communication, together with any attachments, from your system.

On October 16, 2018 at 12:10 PM Dimitrios Biller <biller_jdhconsulting@verizon.net> wrote

I'm not wasting my time "meeting and conferring" with you via e-mail. Tell me today when you will produce Park and the topics. If you don't you violated the meet and confer agreement and I'm filing a motion to dismiss you claim and counter-claim.

Dimitrios,

Best Regards,

Richard Byron Peddie
Law studios | Richard Byron Peddie, P.C

This e-mail, including any included attachments or links (collectively, "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product. In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.
If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303-444-5447), and delete the Communication, together with any attachments, from your system.

On October 16, 2018 at 8:03 AM Dimitrios Biller <biller_jdhconsulting@verizon.net> wrote

I will respond to you e-mail in blue.  However, you have failed to "meet & confer" and provide the date/time when Park will be produced.  If I don't get that date today, I will file my Motion to Dismiss TW's claims and counter-claim.

/* RBP: We met and conferred on Oct. 8th. I have told you that 30(b)(6) witnesses will be produced to you in or around mid-January. I am not required to present Park at all. Producing Park was merely something proposed because you were in a hurry to take her deposition. There is no violation of the Court's order; there is no violation of the rule. As such, I am still open to producing Park early. */

From: Richard PEDDIE [mailto:law@pas.cs___.com:att:net]
Sent: Monday, October 15, 2018 3:01 PM
To: Dimitrios Biller <Biller_jdfconsulting@verizon.net>
Subject: Request for Meet-and-Confers Re: Discovery Disputes; Jene Park FRCP Rule 30(b)(6) Deposition

I need to address the subpoenas duces tecum I have now received.  I also promised to get back to you today regarding presenting Jene Park in November as a FRCP Rule 30(b)(6) deposition witness.

I.  New Round of Deposition Subpoenas

By this e-mail, I request that you meet-and-confer with me as required under the Local Bankruptcy Rules with regard to motions for protective orders I intent to bring barring or at least limiting the following depositions and associated document demands, notices of which I have just received:

**Any meet and confer has to be in person or by telephone.**

/* RBP:  I understand  but what follows is to give you some idea what will be discussed and the basis for the motions for protective orders. */

1.  Doug Lee;

2.  Launchpad Communications;

3.  Sheila Vance & Sama Eyewear, Inc., and

4.  Andrew Apfelberg.

It is plain that all of these depositions and document demands are aimed at things that are beyond the scope of proper discovery under FRCP Rule 26(b)(1) inasmuch as none of them has to do with the vesting of any IP at any time in Paula Thomas, or Thomas' debts to PDTW/Debtor, or Debtor's personal property held by Thomas or the ownership of archives  Instead, it is clear that you are essentially attempting to conduct discovery for your other cases or indeed simply trying to harass people.



too narrow
of a view
of this
case.  TW
claims
ownership
of the IP

because of the agreement to purchase, but Paula TW

maintains that agreement is a fraudulent instrument and the

July 18, 2014 contract was supposed to be the contract

that
created
TW, but
Doug Lee
and
Stephen
Choi

breached that contract, so every contract after the original is

a fraud. Doug Lee has numerous e-mails that support his

# theory and he should be in position to have even more.

/* RBP  The U.S. Bankruptcy Court has zero jurisdiction over a state law fraud claim asserted by Paula Thomas against Thomas Wylde, LLC  TW claims ownership through Paula Thomas  after all  The U.S. Bankruptcy Court is simply not there to decide all grievances brought before 4, including disputes between claimants that do not relate to the objectives of a bankruptcy or arise under Title 11  */

Judge Yun has acknowledged that the U.S. Bankruptcy Court has no jurisdiction over any internal control struggles occurring within TW  There being no jurisdiction over such questions, discovery sought concerning such questions is improper and beyond the scope allowable under FRCP Rule 26(b)(1).

Stop using this argument; it is too tiresome.  That was not his holding.  He also said that the adversary complaint is very wide and fraud opens the issues up in discovery.

/* RBP  You may find it tiresome, but that is what he said last December  and it is also correct  The adversary complaint says nothing about the internal control struggles within TW  */

A  Doug Lee & Launchpad

Thus, any attempt to depose Doug Lee or Launchpad Communications is simply improper. You know this because you know that neither Doug Lee nor any company associated with him was anywhere in the picture when these things occurred which by law establish initial copyright ownership. Neither proposed deponent has any knowledge whatsoever of PDTW's internal workings from 2006 - 2014+ what dictated ownership of archives, Paula Thomas' debts to PDTW, etc. You are quite obviously flailing about, looking for evidence to support your bizarre theory that Thomas actually controls TW when you have not even presented a cogent legal theory leading to that result, much less done so in a court with any jurisdiction over such things.

TW is claiming ownership because of the creation of TW and Doug Lee's finger prints are all over that issue. You continue to insult as you major form of argument; it means nothing. Unless you represent Doug Lee you do not have standing to file a Motion for Protective Owner; you cannot represent Doug Lee because of the inherent conflict of interests (Jene Park) and all members have not sign a conflict waiver.

/* RBP: The creation of TW has nothing to do with anything before the U.S. Bankruptcy Court. It is enough that it exists. I am sorry if you feel insulted, but you really have presented nothing, whether law or facts, to suggest that Paula Thomas controls TW. A party has standing under FRCP 26(c) to move for a protective order. I don't need to represent Doug Lee to bring that motion. And I actually could represent Doug Lee as there is no conflict of interest and whatever requirements there may be do not require that I seek Paula Thomas' waiver of any conflict. */

B. Sheila Vance & Sam Vaziri Vance Eyewear

As you must know, Sheila Vance is the principal of Sam Vaziri Vance Eyewear, and the latter company sued TW sometime in 2016. You may be free to go off on this particular fishing expedition at another time, should one of Thomas' other cases permit it, but you may not do so here. The TW/Vance Eyewear dispute simply has nothing to do with any issue before the bankruptcy court and all events associated with it occurred during time periods also having nothing to do with ownership of archives, Thomas' debts to PDTW personally that should be returned to PDTW, or IP ownership. Once again, your true aims are improper and have to do with things beyond the jurisdiction of the U.S. Bankruptcy Court.

# Sheila Vance and Sam Vaziri are cooperating

witnesses. She has already produced documents. Do you real think

you can go
around
and stab
people in
the back
all the
time?  You

# do not have any standing to complain.

/* RBP:  Again, a party has standing to move for a protective order  */

   C  Andrew Apfelberg

This is neither the time nor the place for you to be conducting discovery over Thomas' newly-confected claims against the law firm of Greenberg Glusker or any attorney at that firm. While Andrew Apfelberg may have been involved in drafting the transactional documents for the transaction that occurred in December of 2014, it is clear that here too the proposed discovery has nothing to do with the actual issues before the Bankruptcy Court and everything to do with something outside of that court's jurisdiction – or with these new claims against the deponent, which are also outside the Bankruptcy Court's jurisdiction.

Stop already.  Anybody having personal knowledge of the facts between September 13, 2013 and the preset time regarding TW and IP has relevant information.  PDTW claims the assignment from Paula to TW Holding is invalid because of the alleged employee acting within the scope of employment theory; Paula Thomas claims Schnider/Apfelberg conspired to steal her IP there a series of illegal agreements and the dissolution of TW Holding, and you claim for TW that it owns the IP through the agreement to purchase.  Greenberg is representing Apfelberg, not you.

/* RBP: Again, the US. Bankruptcy Court has zero jurisdiction over unwinding any Thomas-to-TW transaction  And again a party has standing to move for a protective order */

in each case – (i) - (iii), above  the document demands are objectionable for the very same reason, at times seeking materials that are confidential or otherwise privileged and protected.

Paula Thomas is an owner so confidentiality does not apply.  Prepare a Privilege Log like Judge Yun Ordered Schnider to do.

/* RBP: I am not at all sure what you mean  if you are talking about TW's expectation of confidentiality  any ownership Thomas has in TW does not destroy confidentiality, especially now that Thomas has been adverse and suing TW for over three years. GM doesn't waive confidentiality vis-a-vis my grandma simply because she has ten shares of stock  */

TW is a party to these proceedings and has standing to move for protective orders  it intends to do so  Kindly let me know when we may meet-and-confer

After Court on Thursday or Friday at 9:00 a.m. my time.  You move for a Protective Order, then I'm asking for sanctions (monetary and non-monetary)

/ RBP  Okay  Friday But  please clarify  You say "after court" but you also say "at 9 00 am " which is when you would in many instances be in the middle of doing something in court  Do you truly mean 9 00 a m  Friday? *

   ii  FRCP Rule 30(b)(6) Deposition of Jane Park

on to the idea of producing Jene Park as a designee. However, this recent round of subpoenas raises the issue of your true objectives

Again, you have stipulated that this deposition would be without documents. That is key to our willingness to consider it. But, I also need your assurances that you will in fact stick pretty closely to the topics we allot to Jene Park under FRCP Rule 30(b)(6). While I have no intention of preventing you from probing areas that bear at least some relation to the designated topics  I have no intention of exposing Jene Park to a personal deposition-by-ambush concerning unrelated matters or matters beyond the U.S. Bankruptcy Court's jurisdiction

Unlike you, I follow Court Orders.  I'm not giving you my outline for cross examination.  I have my own documents from third party sources to use.  Whether those documents are relevant or not dependents on the topics and how much she lies.  Credibility is always an issue in every deposition. Give a the dates, times and subject matters that Park will cover today, or I will file a motion to dismiss for your violation of the Court Order.

/* RBP  Then you are required to meet-and-confer over that proposed motion  You have yet to identify, with any specificity, how I have violated the court order or any rule. You must do so */

.  .  .  .  .

Kindly get back to me about the meet-and-confers

See above

Kindly also let me know that you agree that any 30(b)(6) deposition involving Park that we do in November will in fact be just that. A 30(b)(6) deposition concerning topical areas assigned to Park. I intend to arrive in Los Angeles sometime around November 12 and we can certainly fit this in provided we can agree to some ground rules

The ground rules are in the order.  Do not attempt to limit or control my examination.  This is my attorney work product.

/* RBP  This is a 30(b)(6) deposition  It is  by its nature  limited to certain topics. I have no intention of exposing Park to an ambush deposition about the RICO case or the equally frivolous new claims asserted against her in the "Lawyer Lawsuit"  Agree to stay within a reasonable orbit of the 30(b)(6) topics  as limited by Judge Yun in the order  and we can set this up  Otherwise, confer and file your motion. */

Thanks!

Best Regards,

Richard Byron Peddie
Law studios | Richard Byron Peddie, P C

This e-mail, including any excluded attachments or links (collectively, "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney  work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.
If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303) 444-5447), and delete the Communication, together with any attachments, from your system.

From: Richard PEDDIE
To: Dimitrios Biller
Subject: RE: Request for Meet and Confers Re: Discovery Disputes; Jene Park FRCP Rule 30(b)(6) Deposition
Date: Wednesday, October 17, 2018 6:49:29 PM

Dimitrios,

Best Regards,

Richard Byron Peddie
Law studios | Richard Byron Peddie, P.C.

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney -client communication and/or attorney work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.
If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303) 444 5447), and delete the Communication, together with any attachments, from your system.

   On October 17, 2018 at 11:47 AM Dimitrios Biller <biller_kbiconsulting@verizon.net> wrote:

   Read below.

   From: Richa...
   Sent: Wedn...
   To: Dimitrio...
   Subject: RE:

   Are we meeting and conferring on Friday at 9 a.m. over the motions for protective orders concerning Lee/Launchpad, Vance/SAMA Eyewear, and Andrew Apfelberg?

   As to Park, I do not know of any "meet and confer agreement" so do not see how I could have violated it. I know of FRCP Rule 30(b)(6) and the Court's recent order, and you have yet to identify how I have violated either.

   TW will produce its first 30(b)(6) witness on January 24, 2019.

   I may be able to live with this if you are only producing a few people. Who are you producing and on what topics?

   I remain open to producing organizational representatives earlier by mutual agreement. That includes producing Jene Park during mid-November so long as you agree, as I have asked, that it will be a no document, 30(b)(6) deposition. What that means is that you will accept the fact that no documents will be produced at or before the deposition and confine your questioning to things reasonably related to the 30(b)(6) topical areas assigned to her.

   That is fine, but I can ask her about documents I have and I will.

   Again, I do not mean to straightjacket you to the topics too narrowly, but the areas of inquiry must bear at least some relation to the topical areas or otherwise have to do with this case. be fair and reasonable to the extent they stray off-topic, and not amount to an unfair ambush, hit-and-run deposition over other disputes

   I was attempting to clear Nov. 16 for this deposition, but it sounds like you are unwilling to agree to any ground rules whatsoever. Let me know if this is not the case

   Best Regards,

   Richard Byron Peddie
   Law studios | Richard Byron Peddie, P.C.

   This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney -client communication and/or attorney work product.
   In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.
   If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303) 444 5447), and delete the Communication, together with any attachments, from your system.

      On October 16, 2018 at 12:10 PM Dimitrios Biller <biller_kbiconsulting@verizon.net> wrote:

      I'm not wasting my time "meeting and conferring" with you via e-mail. Tell me today when you will produce Park and the topics. If you don't you violated the meet and confer agreement and I'm filing a motion to dismiss you claim and counter-claim.

      From: Richard PEDDIE [mailto:lawstudios@comcast.net]

Dimitrios,

Best Regards.

Richard Byron Peddie
Law studies | Richard Byron Peddie, P.C

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.
If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303) 444-5447), and delete the Communication, together with any attachments, from your system.

On October 16, 2018 at 8:03 AM Dimitrios Biller <biller_ldconsulting@verizon.net> wrote:

I will respond to you e-mail in blue.  However, you have failed to "meet & confer" and provide the date/time when Park w    e produced.  If I don't get that date today, I will file my Motion to Dismiss TW's claims and counter-claim.

/* RBP: We met and conferred on Oct 5th.  That is from you that 30 minutes session a little ahead. As to you to or around mid January I am not required to present Park as witness thing or receive it exists you were in a hurry to take her deposition.  There is no need one of the courts order there is no dilution of the rule. As I said I am on the Park earlier. */

**From:** Richard PEDDIE [mailto:rapstudios@comcast.net]
**Sent:** Monday, October 15, 2018 3:01 PM
**To:** Dimitrios Biller <biller_ldconsulting@verizon.net>
**Subject:** Request for Meet-and-Confers Re. Discovery Disputes, Jene Park FRCP Rule 30(b)(6) Deposition

Dimitrios,

I need to address the subpoenas duces tecum I have now received.  I also promised to get back to you today regarding presenting Jene Park in November as a FRCP Rule 30(b)(6) deposition witness

*I  New Round of Deposition Subpoenas*

By this e-mail, I request that you meet-and-confer with me as required under the Local Bankruptcy Rules with regard to motions for protective orders I intent to bring barring or at least limiting the following depositions and associated document demands, notices of which I have just received

**Any meet and confer has to be in person or by telephone.**

/* RBP:  I understand, but what follows is to give you some idea what will be discussed and the basis for the motions for protective orders  */

1. Doug Lee;

2. Launchpad Communications;

3  Sheila Vance & Sama Eyewear  Inc.; and

4  Andrew Apfelberg.

It is plain that all of these depositions and document demands are aimed at things that are beyond the scope of proper discovery under FRCP Rule 26(b)(1) inasmuch as none of them has to do with the vesting of any IP at any time in Paula Thomas, or Thomas' debts to PDTW/Debtor, or Debtor's personal property held by Thomas, or the ownership of archives   Instead, it is clear that you are essentially attempting to conduct discovery for your other cases or indeed simply trying to harass people

# You have
# too narrow

of a view
of this
case.  TW
claims
ownership
of the IP
because of

the agreement to purchase, but Paula TW maintains

that
agreement
is a
fraudulent
instrument
and the
July 18,

2014

contract

was

supposed

to be the

contract

that

created
TW, but
Doug Lee
and
Stephen
Choi
breached

that contract, so every contract after the original is a fraud.

# Doug Lee has numerous e-mails that support his theory and

# he should be in position to have even more.

/* RBP: The U.S. Bankruptcy Court has zero jurisdiction over a state law fraud claim asserted by Paula Thomas against Thomas Wylde, LLC. TW claims ownership through Paula Thomas; after all. The U.S. Bankruptcy Court is simply not there to decide all grievances brought before it, including disputes between claimants that do not relate to the objectives of a bankruptcy or arise under Title 11. */

Judge Yun has acknowledged that the U.S. Bankruptcy Court has no jurisdiction over any internal control struggles occurring within TW. There being no jurisdiction over such questions, discovery sought concerning such questions is improper and beyond the scope allowable under FRCP Rule 26(b)(1)

Stop using this argument; it is too tiresome. That was not his holding. He also said that the adversary compliant is very wide and fraud opens the issues up in discovery.

/* RBP: You may find it tiresome, but that is what he said last December, and it is also correct. The adversary complaint says nothing about the internal control struggles within TW. */

A. Doug Lee & Launchpad

Thus, any attempt to depose Doug Lee or Launchpad Communications is simply improper. You know this because you know that neither Doug Lee nor any company associated with him was anywhere in the picture when those things occurred which by law establish initial copyright ownership. Neither proposed deponent has any knowledge whatsoever of PDTW's internal workings from 2006 - 2014+ what dictated ownership of archives, Paula Thomas' debts to PDTW, etc. You are quite obviously flailing about, looking for evidence to support your bizarre theory that Thomas actually controls TW when you have not even presented a cogent legal theory leading to that result, much less done so in a court with any jurisdiction over such things.

TW is claiming ownership because of the creation of TW and Doug Lee's finger prints are all over that issue. You continue to insult as you major form of argument; it means nothing. Unless you represent Doug Lee you do not have standing to file a Motion for Protective Owner; you cannot represent Doug Lee because of the inherent conflict of interests (Jene Park) and all members have not sign a conflict waiver.

B   Sheila Vance & Sam Vaziri Vance Eyewear

As you must know  Sheila Vance is the principal of Sam Vaziri Vance Eyewear  and the latter company sued TW sometime in 2016  You may be free to go off on this particular fishing expedition at another time, should one of Thomas' other cases permit it, but you may not do so here  The TW/Vance Eyewear dispute simply has nothing to do with any issue before the bankruptcy court and all events associated with it occurred during time periods also having nothing to do with ownership of archives, Thomas' debts to PDTW personally that should be returned to PDTW or IP ownership. Once again, your true aims are improper and have to do with things beyond the jurisdiction of the U S  Bankruptcy Court.

# Sheila Vance and Sam Vaziri are cooperating witnesses.

She has already produced documents. Do you real think you can go

around
and stab
people in
the back
all the
time?  You
do not

# have any standing to complain.

/* RBP:  Again, a party has standing to move for a protective order  */

C. Andrew Apfelberg

This is neither the time nor the place for you to be conducting discovery over Thomas' newly-concocted claims against the law firm of Greenberg Glusker or any attorney at that firm. While Andrew Apfelberg may have been involved in drafting the transactional documents for the transaction that occurred in December of 2014, it is clear that here too the proposed discovery has nothing to do with the actual issues before the Bankruptcy Court and everything to do with something outside of that court's jurisdiction -- or with these new claims against the deponent, which are also outside the Bankruptcy Court's jurisdiction.

Stop already.  Anybody having personal knowledge of the facts between September 13, 2013 and the preset time regarding TW and IP has relevant information.  PDTW claims the assignment from Paula to TW Holding is invalid because of the alleged employee acting within the scope of employment theory; Paula Thomas claims Schnider/Apfelberg conspired to steal her IP there a series of illegal agreements and the dissolution of TW Holding, and you claim for TW that it owns the IP through the agreement to purchase.  Greenberg is representing Apfelberg, not you.

/* RBP: Again, the US Bankruptcy Court has zero jurisdiction over unwinding any Thomas-to-TW transaction And again  a party has standing to move for a protective order */

In each case -- (I) - (III)  above, the document demands are objectionable for the very same reason, at times seeking materials that are confidential or otherwise privileged and protected

Paula Thomas is an owner so confidentiality does not apply.  Prepare a Privilege Log like Judge Yun Ordered Schnider to do.

/* RBP: I am not at all sure what you mean  If you are talking about TWs expectation of confidentiality, any ownership Thomas has in TW does not destroy confidentiality, especially now that Thomas has been adverse and suing TW for over three years. GM doesn't waive confidentiality vis-a-vis my grandma simply because she has ten shares of stock. */

TW is a party to these proceedings and has standing to move for protective orders.  It intends to do so.  Kindly let me know when we may meet-and-confer.

After Court on Thursday or Friday at 9:00 a.m. my time.  You move for a Protective Order, then I'm asking for sanctions (monetary and non-monetary)

/ RBP: Okay, Friday But, please clarify: You say "after court" but you also say "at 9:00 a.m." which is when you would in many instances be in the middle of doing something in court  Do you truly mean 9:00 a.m. Friday? */

II.  FRCP Rule 30(b)(6) Deposition of Jene Park

TW remains open to the idea of producing Jene Park as a designee  However, this recent round of subpoenas raises the issue of your true objectives

Again  you have stipulated that this deposition would be without documents. That is key to our willingness to consider this. But, I  also need your assurances that you will in fact stick pretty closely to the topics we allot to Jene Park under FRCP Rule 30(b)(6). While I have no intention of preventing you from probing areas that bear at least some relation to the designated topics, I have no intention of exposing Jene Park to a personal deposition-by-ambush concerning unrelated matters or matters beyond the U.S  Bankruptcy Court's jurisdiction

Unlike you, I follow Court Orders.  I'm not giving you my outline for cross examination.  I have my own documents from third party sources to use.  Whether those documents are relevant or not dependents on the topics and how much she lies.  Credibility is always an issue in every deposition. Give a the dates, times and subject matters that Park will cover today, or I will file a

motion to dismis

/* RBP.  Then you are required t
must do so  */

# See above

Kindly also let me know that you agree that any        )(      eposition involving Park that we do in November will in fact be just that: A 30(b)(6) deposition concerning topical areas assigned to Park. I intend to arrive in Los Angeles sometime around November 12 and we can certainly fit this in provided we can agree to some ground rules.

The ground rules are in the order.  Do not attempt to limit or control my examination.  This is my attorney work product.

/* RBP  This is a 30(b)(6) deposition.  It is  by its nature  limited to certain topics  I have no intention of exposing Park to an ambush deposition about the RICO case or the equally frivolous new claims asserted against her in the "Lawyer Lawsuit"  Agree to stay within a reasonable orbit of the 30(b)(6) topics  as limited by Judge Yun in the order  and we can set this up  Otherwise  confer and file your motion  */

Thanks!

Best Regards,


Richard Byron Peddie
Law studios | Richard Byron Peddie, P C


This e-mail, excluding any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U S C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product.
In any  event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.
If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303 444 5447), and delete the Communication, together with any attachments, from your system.

**From:** Richard PEDDIE
**To:** Dimitrios Biller
**Subject:** RE: Request for Meet-and-Confers Re: Discovery Disputes; Jene Park FRCP Rule 30(b)(6) Deposition
**Date:** Tuesday, October 16, 2018 10:28:25 AM

Dimitrios,

Best Regards,

Richard Byron Peddie
Lawstudios | Richard Byron Peddie, P C

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited
If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303).444.5447), and delete the Communication, together with any attachments, from your system.

On October 16, 2018 at 8 03 AM Dimitrios Biller <biller_ldtconsulting@verizon.net> wrote.

I will respond to you e-mail in blue.  However, you have failed to "meet & confer" and provide the date/time when Park will be produced.  If I don't get that date today, I will file my Motion to Dismiss TW's claims and counter-claim.

/* RBP: We met and conferred on Oct  8th  I have told you that 30(b)(6) witnesses will be produced to you in or around mid-January  I am not required to present Park at all  Producing Park was merely something proposed because you were in a hurry to take her deposition  There is no violation of the Court's order  there is no violation of the rule  As I said  I am st ll open to producing Park  or F   */

**From:** Richard PEDDIE [mailto:lawstudios@comcast.net]
**Sent:** Monday, October 15, 2018 3:01 PM
**To:** Dimitrios Biller <biller_ldtconsulting@verizon.net>
**Subject:** Request for Meet-and-Confers Re: Discovery Disputes; Jene Park FRCP Rule 30(b)(6) Deposition

Dimitrios,

I need to address the subpoenas duces tecum I have now received  I also promised to get back to you today regarding presenting Jene Park in November as a FRCP Rule 30(b)(6) deposition witness

 I  New Round of Deposition Subpoenas

By this e-mail  I request that you meet-and-confer with me as required under the Local Bankruptcy Rules with regard to motions for protective orders I intent to bring barring or at least limiting the following depositions and associated document demands  notices of which I have just received

**Any meet and confer has to be in person or by telephone.**

/* RBP:  I understand, but what follows is to give you some idea what will be discussed and the basis for the motions for protective orders  */

   1  Doug Lee;

   2  Launchpad Communications;

   3  Sheila Vance & Sama Eyewear, Inc  and

   4  Andrew Apfelberg

It is plain that all of these depositions and document demands are aimed at things that are beyond the scope of proper discovery under FRCP Rule 26(b)
(1) inasmuch as none of them has to do with the vesting of any IP at any time in Paula Thomas, or Thomas' debts to PDTW/Debtor, or Debtor's personal property held by Thomas  or the ownership of archives  Instead  it is clear that you are essentially attempting to conduct discovery for your other cases or indeed simply trying to harass people

You have too narrow of a view of this case. TW

claims ownership of the IP because of the

agreement to purchase, but Paula TW maintains

that

agreement

is a

fraudulent

instrument

and the
July 18,
2014
contract
was
supposed

to be the contract that created TW, but

# Doug Lee and Stephen Choi breached that

contract,
so every
contract
after the
original is

a fraud.
Doug Lee
has
numerous
e-mails
that

support
his theory
and he
should be
in position

# to have

# even

# more.

/* RBP  The U.S. Bankruptcy Court has zero jurisdiction over a state law fraud claim asserted by Paula Thomas against Thomas Wylde, LLC  TW claims ownership through Paula Thomas, after all  The U.S. Bankruptcy Court is simply not there to decide all grievances brought before it, including disputes between claimants that do not relate to the objectives of a bankruptcy or arise under Title 11. */

Judge Yun has acknowledged that the U.S. Bankruptcy Court has no jurisdiction over any internal control struggles occurring within TW. There being no jurisdiction over such questions, discovery sought concerning such questions is improper and beyond the scope allowable under FRCP Rule 26(b)(1).

Stop using this argument; it is too tiresome.  That was not his holding.  He also said that the adversary compliant is very wide and fraud opens the issues up in discovery.

/* RBP  You may find it tiresome, but that is what he said last December  and it is also correct  The adversary complaint says nothing about the internal control struggles within TW  */

A. Doug Lee & Launchpad

Thus, any attempt to depose Doug Lee or Launchpad Communications is simply improper  You know this because you know that neither Doug Lee nor any company associated with him was anywhere in the picture when those things occurred which by law establish initial copyright ownership  Neither proposed deponent has any knowledge whatsoever of PDTW's internal workings from 2008 - 2014+, what dictated ownership of archives, Paula Thomas' debts to PDTW, etc  You are quite obviously flailing about, looking for evidence to support your bizarre theory that Thomas actually controls TW when you have not even presented a cogent legal theory leading to that result, much less done so in a court with any jurisdiction over such things

TW is claiming ownership because of the creation of TW and Doug Lee's finger prints are all over that issue.  You continue to insult as you major form of argument; it means nothing.  Unless you represent Doug Lee you do not have standing to file a Motion for Protective Owner; you cannot represent Doug Lee because of the inherent conflict of interests (Jene Park) and all members have not sign a conflict waiver.

/* RBP  The creation of TW has nothing to do with anything before the U.S. Bankruptcy Court. It is enough that it exists  I am sorry if you feel insulted, but you really have presented nothing, whether law or facts, to suggest that Paula Thomas controls TW  A party has standing under FRCP 26(c) to move for a protective order  I don't need to represent Doug Lee to bring that motion. And  I actually could represent Doug Lee as there is no conflict of interest and whatever requirements there may be do not require that I seek Paula Thomas' waiver of any conflict  */

B. Sheila Vance & Sam Vaziri Vance Eyewear

As you must know  Sheila Vance is the principal of Sam Vaziri Vance Eyewear, and the latter company sued TW sometime in 2016  You may be free to go off on this particular fishing expedition at another time; should one of Thomas' other cases permit it, but you may not do so here  The TW/Vance Eyewear dispute simply has nothing to do with any issue before the bankruptcy court and all events associated with it occurred during time periods also having

nothing to do with ownership of archives. Thomas' debts to PDTW, personally that should be returned to PDTW, or IP ownership. Once again, your true aims are improper and have to do with things beyond the jurisdiction of the U.S Bankruptcy Court.

Sheila Vance and Sam Vaziri are cooperating witnesses. She has already produced documents. Do you real think you can go around and stab people in the back all the time? You do not have any standing to complain.

/* RBP  Again  a party has standing to move for a protective order  */

C  Andrew Apfelberg

This is neither the time nor the place for you to be conducting discovery over Thomas' newly-confected claims against the law firm of Greenberg Glusker or any attorney at that firm. While Andrew Apfelberg may have been involved in drafting the transactional documents for the transaction that occurred in December of 2014, it is clear that here too the proposed discovery has nothing to do with the actual issues before the Bankruptcy Court and everything to do with something outside of that court's jurisdiction -- or with these new claims against the deponent, which are also outside the Bankruptcy Court's jurisdiction.

Stop already.  Anybody having personal knowledge of the facts between September 13, 2013 and the preset time regarding TW and IP has relevant information.  PDTW claims the assignment from Paula to TW Holding is invalid because of the alleged employee acting within the scope of employment theory; Paula Thomas claims Schnider/Apfelberg conspired to steal her IP there a series of illegal agreements and the dissolution of TW Holding, and you claim for TW that it owns the IP through the agreement to purchase.  Greenberg is representing Apfelberg, not you.

/* RBP  Again  the US Bankruptcy Court has zero jurisdiction over unwinding any Thomas-to-TW transaction  And again  a party has standing to move for a protective order */

In each case -- (i) - (iii), above, the document demands are objectionable for the very same reason  at times seeking materials that are confidential or otherwise privileged and protected

Paula Thomas is an owner so confidentiality does not apply.  Prepare a Privilege Log like Judge Yun Ordered Schnider to do.

/*  RBP  I am not at all sure what you mean  If you are talking about TW's expectation of confidentiality, any ownership Thomas has in TW does not destroy confidentiality, especially now that Thomas has been adverse and suing TW for over three years  GM doesn't waive confidentiality vis-a-vis my grandma simply because she has ten shares of stock. */

TW is a party to these proceedings and has standing to move for protective orders  It intends to do so  Kindly let me know when we may meet-and-confer.

After Court on Thursday or Friday at 9:00 a.m. my time.  You move for a Protective Order, then I'm asking for sanctions (monetary and non-monetary)

/ RBP. Okay, Friday But, please clarify  You say "after court" but you also say "at 9:00 a m " which is when you would in many instances be in the middle of doing something in court  Do you truly mean 9:00 a.m. Friday? */

II  FRCP Rule 30(b)(6) Deposition of Jene Park

TW remains open to the idea of producing Jene Park as a designee. However, this recent round of subpoenas raises the issue of your true objectives

Again, you have stipulated that this deposition would be without documents. That is key to our willingness to consider this. But, I also need your assurances that you will in fact stick closely to the topics we allot to Jene Park under FRCP Rule 30(b)(6). While I have no intention of preventing you from probing areas that bear at least some relation to the designated topics, I have no intention of exposing Jene Park to a personal deposition-by-ambush concerning unrelated matters or matters beyond the U S  Bankruptcy Court's jurisdiction

Unlike you, I follow Court Orders.  I'm not giving you my outline for cross examination.  I have my own documents from third party sources to use.  Whether those documents are relevant or not dependents on the topics and how much she lies.  Credibility is always an issue in every deposition. Give a the dates, times and subject matters that Park will cover today, or I will file a motion to dismiss for your violation of the Court Order.

/*  RBP  Then you are required to meet-and-confer over that proposed motion  You have yet to identify  with any specificity  how I have violated the court order or any rule  You must do so. */

.  .  .  .  .

Kindly get back to me about the meet-and-confers

See above.

Kindly also let me know that you agree that any 30(b)(6) deposition involving Park that we do in November will in fact be just that  A 30(b)(6) deposition concerning topical areas assigned to Park  I intend to arrive in Los Angeles sometime around November 12 and we can certainly fit this in provided we can agree to some ground rules

The ground rules are in the order.  Do not attempt to limit or control my examination.  This is my attorney work product.

/* RBP  This is a 30(b)(6) deposition.  It is, by its nature, limited to certain topics.  I have no intention of exposing Park to an ambush deposition about the RICO case or the equally frivolous new claims asserted against her in the "Lawyer Lawsuit"  Agree to stay within a reasonable orbit of the 30(b)(6) topics, as limited by Judge Yun in the order, and we can set this up  Otherwise  confer and file your motion.  */

Thanks!

Best Regards,

Richard Byron Peddie
Lawstudios | Richard Byron Peddie, P.C.

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well  The Communication may be protected as an attorney-client communication and/or attorney work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient  If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.
If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303-444-5447), and delete the Communication, together with any attachments, from your system.

| | |
|---|---|
| **From:** | Richard PEDDIE |
| **To:** | Dimitrios Biller |
| **Subject:** | Re: Depositions of PMK Witnesses at TW |
| **Date:** | Monday, October 08, 2018 12:17:13 PM |

Dimitrios,

First, as a courtesy, when we set a meet-and-confer for 11 a.m., please call at 11 a.m.  As it happened, I was available, but I might not have been, or I might not have been ready.

The purpose of the meet-and-confer is not to extract information out of or interrogate opposing counsel "to work out a solution" unilaterally in the way you want; it is to work out a solution mutually that is generally acceptable to both parties.

I again invite you to submit to me any authority that compels me to divulge to you my designations, number of witnesses, and what each will testify to upon demand or at any time prior to the 30(b)(6) deposition. Thus far, you have simply redirected me to the Court's order, which contains no such requirements; nor does the rule. Thus, there is no violation of the Court's order as I am working with you to set up the 30(b)(6) deposition on a date in January, with documents to be provided 30 days beforehand.

Judge Yun had a reason for setting the deadline for this 30(b)(6) deposition at Jan. 31, 2019.  He appreciates what may be involved in producing the documents.

You have requested Park's deposition as a 30(b)(6) deponent, stipulating it would be without documents, and I told you I would get back to you within one week, because that is what you demanded. I indicated to you that I thought sometime in early to mid November might be acceptable, but have committed to nothing, because I must consider whether or not splitting the 30(b)(6) deposition up like this is advisable as well as whether or not Judge Yun himself might find it unacceptable.

Jene has indicated that, in future, she will require a Korean translator. I believe this is justified. Already in this case deposition testimony taken from persons who are not native English speakers has led to mischief, notwithstanding the fact that the person involved -- and here I am thinking of Meldy Rafols -- is quite fluent: You have taken

what she said in response to your questions regarding her "personal computer" to mean that computer belonging to her that she owns and currently has. From this you claim she still has ESI and also apparently physical documents in file cabinets.  But that simply is not the case.  It is clear to me that she understood "personal computer" variously to mean: (a) that type of computer that is known as a "PC" -- which stands for personal computer of the IBM variety and is a term generally (but not exclusively) used to distinguish it from an Apple laptop or desktop computer; (b) that computer assigned to her and personal to her while she worked for TW, but not owned by her and never taken with her when she left; and (c) perhaps *also* her own computer that belongs to her -- I don't know, I would have to go back and try to decipher that passage. Anyway, TW never allowed her to leave with any ESI or documents, and I believe she has none.

The point is that as well as Jene speaks and understands English, sometimes nuances can be lost on her, and these nuances are sometimes proving to be important. We can talk about it, but you indicated to me once that you have the "best" Korean translator, and perhaps for your own purposes you would want that person to be at any deposition involving Jene Park.

Best Regards,

Richard Byron Peddie
Lawstudios | Richard Byron Peddie, P.C.

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303.444.5447), and delete the Communication, together with any attachments, from your system.

On October 8, 2018 at 11:22 AM Dimitrios Biller <biller_ldtconsulting@verizon.net> wrote:

I write to confirm our discussion that you will call a "meet & confer."  I asked a the meeting to "meet & confer" but you did not give me a lot of information to work out a solution.  You would not tell me the topices witnesses would cover.  You would not tell me how many witnesses would be designate (1 to 4).  You would not tell me when documents will be produce other than some time in December so I can take deposition in January 2019.  You are clearly pushing production of document as late as you can to force me to take depositions in January 2019.  Consequently, I requested Park's depositoin now without documents.  You state you "might" be able to produce her in early November, 2018; if you do not give me a date for her depositon that will be recorded videotape, audiotape and sterngrapic reporter, I will file a motion to dismiss TW for violating the Court Order.

Dimitrios P. Biller

LDT Consulting, Inc.

15113 West Sunset Blvd., Suite 9

Pacific Palisades, California 90272

(310) 459-9870

biller_ldtconsulting@verizon.net

This e-mail and/or attachments may contain
confidential information protected by the
Attorney-Client Privilege, Attorney Work-
Product Privilege and/or the concept of
"Confidentiality" as defined by the *California
Rules of Professional Conduct*.  If you have
mistakenly received this e-mail please
immediately delete it and confirm you have
deleted it from your systems.

I plan on taking the depositions of all the PMK witnesses that is allowed by the Court Order dated October 1, 2018 and I'm not waiting to receive documents. I want to schedule these depositions now. I am free for the first three weeks in November 2018. I assume you will be in LA on November 9, 2018 for the Status Report with Judge Landin ("great judge"), so we can do the depositions that week. I want to know who the PMK witnesses are and what topics they will cover. Provide me with a list of PMK Topics and the names of witnesses cooresponding to the topics.

I have sent you three e-mails requesting the opportunity to take these depositions and you have not responded. Therefore, this is my formal request to "meet & confer" on these issues to avoid having to file Motion for an Order under *Rule 37 of the Federal Rules of Civil Procedure* for appropriate sanctions. Under *Rule 37(b) of the Federal Rules of Civil Procedure*

(b) Failure to Comply with a Court Order

(1) *Sanctions Sought in the District Where the Deposition Is Taken.* ... if the court where the discovery ... which ... orders a deponent fails to obey an order to answer a question ... may ... the deponent in contempt of court. If a deposition-related motion is transferred to the court where the action is pending, and that court orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of either the court where the discovery is taken or the court where the action is pending.

(2) *Sanctions Sought in the District Where the Action Is Pending*

(A) For Not Obeying a Discovery Order. If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

# Paula Thomas will seek all available sanctions. It's

time to stop playing these games and to dismiss TW. Paula Thomas is the majority holder of units. Hillshore Investment, S.A. does not exist and

never funded the $2 million loan as a condition precedent in the Agreement to Purchase.  I have e-mails between you and Adnrew Apfelberg negotiating Park's percentage of

ownership interests with TW that is in direct conflict with the other owners and TW.  You cannot represent Park to get 10% ownership interests in TW,

then represent TW
against Paula
Thomas, another
owner without full
disclosure and
consent under
*Rule 3-310 of the
Rules of
Professional
Conduct*.  There
are many e-mails

# proving collusion/conspiracy between you/TW and Truste/PDTW.

TW is not a opeational company but a front.  Park has hung herself with all the instagram messages ("Former" Chief Creative Designer)  She has started working for another company  and opened up her own company selling clothes based on Paula's designs.  She has infringed on Paula Thomas' trademarks and copyrights, and you conspired to help her do so.

I'm sure you received and read Judge Kronstradt's Order, the last paragraph in particular  I have paid the filing fee and file the Civil Cover Sheet as ordered, so he will not rule on the Writ of Mandamus.

I don't know who is paying you.  It's either Choi and someone connected to him because you are to cheap to work for free.  Your four year run of attempting to destoy Paula Thomas' life is OVER.  You have come to a cross-road in you personal and professional life.  You can do the right thing, or taken the easy way out of continue to fight a lost cause  There is no doubt in my mind that you will do the wrong thing.  That's who you are.

**We have to complete the "meet & confer" by October 9, 2018.**  If you do not identify and provide me with dates in early November 2018 for PMK depositions within the next seven days, then I'm filing a motion to dismiss TW as a Creditor and Cross-Complaint.  I will file a status report with Judge Kronstradt informing him of these developments to support my Motion to Lift the Stay.

The parties shall continue to file reports as to the status of each of those proceedings on the earlier of

every 90 days, or within 10 days after what any party contends is a dispositive determination of one or

more issues in either of the parallel
proceedings that would warrant lifting the
stay in this action. The

# first reports

# shall be filed by

# October 31, 2018. This is without prejudice to the ability of any party to

bring a motion to lift the stay entirely or for a limited purpose based on changed circumstances or the

presence of a particular issue whose resolution would arguably advance party and judicial efficiency.

I will be filing a report on October 31, 2018 to include a discussion of what you do or do not do. Again, give me all the names of PMK witnesses and dates for depositions in the early November 2018

Dimitrios P. Biller
LDT Consulting, Inc.
15113 West Sunset Blvd., Suite 9
Pacific Palisades, California 90272
(310) 459-9870
biller_ldtconsulting@verizon.net

This e-mail and/or attachments may contain confidential information protected by the Attorney-Client Privilege, Attorney Work-Product Privilege and/or the concept of "Confidentiality" as defined by the *California Rules of Professional Conduct*. If you have mistakenly received this e-mail please immediately delete it and confirm you have deleted it from your systems.

**From:** Full ADDRESS
**To:** Dimitrios Biller
**Subject:** RE: Meet & Confer Regard Violations of the Court's Order
**Date:** Friday, October 05, 2018 2:24:13 PM

Dimitrios

Richard Byrne Peddie
Lawstudion  Richard Byrne Peddie, P.C

This e-mail, including          [added attach]                     e Privacy Act, 18 U.S.C. 2510-2521, and may be protected under law s as well. The Communication may be protected as
an attorney-client comm.                                           the designated recipient. You are notified that any revision, dissemination, distribution, or copying of the Communication is
In any event, the Com.
strictly prohibited                                               the Communication, together with any attachments, from your system.
If you have received

On October 4

When time
confer but
talk) then I

**From:** Dimitrios Biller [mailto:biller_Attconsulting@verizon.net]
**Sent:** Wednesday, October 03, 2018 7:33 AM
**To:** Richard PEDDIE <rlawstudion@comcast.net>
**Subject:** RE: Meet & Confer Regard Violations of the Court's Order

Yes, the court has decided that I can take depositions up until January 1, 2018 and documents have to be produced 30 days in advance.  I want to start taking deposition now as soon as possible; I'm not waiting for your schedule; mutual agreeable time does not mean when you wait to take depositions.

I want to start scheduling depositions, now.  I am asking you to call me now, today until 3:00 p.m., tomorrow all day, Friday.  We need to set up a time to talk.  Give me a specific time and day we can talk

I don't know what rules you are talking about.  The Order is the Order.  Again, if you do not give me date and time to talk, I'm filing a Motion to Dismiss for violation of the Court Order.

If you are telling me you are not going to be at the Status Conference in the Superior Court on November 9, 2018 then you are violating that Order

Dimitrios

**From:** Richard PEDDIE [mailto:rlawstudion@comcast.net]
**Sent:** Tuesday, October 02, 2018 2:10 PM
**To:** Dimitrios Biller <biller_attconsulting@verizon.net>
**Subject:** Re: Meet & Confer Regard Violations of the Court's Order

ng the Court's Oct. 1, 2018 order concerning this discovery dispute, which we have already litigated.

As I stated in my last e-mail, these depositions are to be scheduled at a time that is mutually agreeable. I currently have no plans to be in LA on November 9

I will follow the Court's order in terms of topics.  I will make designations in accordance with the rules as and when required by the rules.

Please clarify what type of conferral you are asking for over this matter, a matter which, I will again point out, the Court has already decided.

I have no court order that talks about a civil cover sheet and filing fee relating to a writ of mandamus. Please clarify what that might be and forward the same

Best Regards,

Richard Byrne Peddie
Lawstudion  Richard Byrne Peddie, P.C

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any revision, dissemination, distribution, or copying of the Communication is strictly prohibited
If you have received this transmission in error, please notify us immediately by return e-mail or by telephone: 360-444-5447), and delete the Communication, together with any attachments, from your system

On October 2, 2018 at 8:36 AM Demetrios Diltse <dilse.filse@pacbeng.n.stscp.net> wrote:

I plan on taking the depositoins of all the PMK witnesses that is allowed by the Court Order dated October 1, 2018 and I'm not waiting to receive documents. I want to schedule these depositions now. I am free for the first three weeks in November 2018. I assume you will be in LA on November 9, 2018 for the Status Report with Judge Landin ("great judge"), so we can do the depositions that week. I want to know who the PMK witnesses are and what topics they will cover. Provide me with a list of PMK Topics and the names of witnesses cooresponding to the topics.

I have sent you three e-mails requesting the opportunity to take these depositions and you have not responded. Therefore, this is my formal request to "meet & confer" on these issues to avoid having to file Motion for an Order under *Rule 37 of the Federal Rules of Civil Procedure* for appropriate sanctions. Under *Rule 37(b) of the Federal Rules of Civil Procedure*:

> (b) Failure to Comply with a Court Order.

> (1) *Sanctions Sought in the District Where the Deposition Is Taken.* If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court. If a deposition-related motion is transferred to the court where the action is pending, and that court orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of either the court where the discovery is taken or the court where the action is pending

> (2) *Sanctions Sought in the District Where the Action Is Pending.*

> (A) For Not Obeying a Discovery Order. If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

> (i)    directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

> (ii)   prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

> (iii)  striking pleadings in whole or in part;

> (iv)   staying further proceedings until the order is obeyed;

> (v)    dismissing the action or proceeding in whole or in part;

> (vi)   rendering a default judgment against the disobedient party; or

> (vii)  treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

> (B) For Not Producing a Person for Examination. If a party fails to comply with an order under Rule 35(a) requiring it to produce another person for examination, the court may issue any of the orders listed in Rule 37(b)(2)(A)(i)–(vi), unless the disobedient party shows that it cannot produce the other person.

> (C) Payment of Expenses. Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Paula Thomas will seek all available sanctions. It's time to stop playing these games and to dismiss TW. Paula Thomas is the majority holder of units. Hillshore Investment, S.A. does not exist and never funded the $2 million loan as a condition precedent in the Agreement to Purchase. I have e-mails between you and Adnrew Apfelberg negotiating Park's percentage of ownership interests with TW that is in direct conflict with the other owners and TW. You cannot represent Park to get 10% ownership interests in TW, then represent TW against Paula Thomas, another owner without full disclosure and consent under *Rule 3-310 of the Rules of Professional Conduct*. There are many e-mails proving collusion/conspiracy between you/TW and Trustee/PDTW.

TW is not a operational company but a front. Park has hung herself with all the instagram messages ("Former" Chief Creative Designer). She has started working for another company and opened up her own company selling clothes based on Paula's designs. She has infringed on Paula Thomas' trademarks and copyrights, and you conspired to help her do so.

I'm sure you received and read Judge Kronstradt's Order, the last paragraph in particular. I have paid the filing fee and file the Civil

Cover Sheet as ordered, so he will not rule on the Writ of Mandamus.

I don't know who is paying you. It's either Choi and someone connected to him because you are to cheap to work for free. Your four year run of attempting to destoy Paula Thomas' life is OVER. You have come to a cross-road in you personal and professional life. You can do the right thing, or taken the easy way out of continue to fight a lost cause. There is no doubt in my mind that you will do the wrong thing. That's who you are.

**We have to complete the "meet & confer" by October 9, 2018.** If you do not identify and provide me with dates in early November 2018 for PMK depositions within the next seven days, then I'm filing a motion to dismiss TW as a Creditor and Cross-Complaint. I will file a status report with Judge Kronstradt informing him of these developments to support my Motion to Lift the Stay:

> The parties shall continue to file reports as to the status of each of those proceedings on the earlier of
>
> every 90 days, or within 10 days after what any party contends is a dispositive determination of one or
>
> more issues in either of the parallel proceedings that would warrant lifting the stay in this action. The
>
> first reports shall be filed by October 31, 2018. This is without prejudice to the ability of any party to

bring
a
motion
to
lift
the
stay
entirely
or
for
a
limited
purpose
based
on
changed
circumstances
or
the

> presence of a particular issue whose resolution would arguably advance party and judicial efficiency.

I will be filing a report on October 31, 2018 to include a discussion of what you do or do not do. Again, give me all the names of PMK witnesses and dates for depositions in the early November 2018.

Dimitrios P. Biller

LDT Consulting, Inc.

15113 West Sunset Blvd., Suite 9

Pacific Palisades, California 90272

(310) 459-9870

biller_ldtconsulting@verizon.net

This e-mail and/or attachments may contain confidential information protected by the Attorney-Client Privilege, Attorney Work-Product Privilege and/or the concept of "Confidentiality" as defined by the *California Rules of Professional Conduct*. If you have mistakenly received this e-mail please immediately delete it and confirm you have deleted it from your systems.

| From: | Richard PEDDIE |
|---|---|
| To: | Dimitrios Biller |
| Subject: | Re: PMK Depositions |
| Date: | Tuesday, October 02, 2018 1:49:23 PM |

Dimitrios,

The Court explicitly gave us until Jan. 31, 2019, to complete the PMK depositions.

At the appropriate time, TW will designate PMK deponents in accordance with the Court's order concerning those topics allowed by the Court, with whatever other limitations the Court imposed.

While you have woven an interesting tale concerning TW and its non-existence, or its existence as a front, I have no reason to believe that any of it is true.

While TW will certainly consider allowing the PMK deposition to occur at an earlier date, this will only occur by mutual agreement.

Best Regards,

Richard Byron Peddie
Lawstudios | Richard Byron Peddie, P.C.

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product.
In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303.444.5447), and delete the Communication, together with any attachments, from your system.

On October 1, 2018 at 10:41 AM Dimitrios Biller

&lt;biller_ldtconsulting@verizon.net&gt; wrote:

I want to take my PMK depositions now. Who are the PMK you are putting up? When can you make them avaiable in October? What topics are they going to cover? If you do not respond by Wednesday with the information requested, then I'm filing a really emergency ex parte application for sanctions/compel/violation of court order.

I have photographs of Jene Park stating she is the FORMER CCD of TW; who is the current CCD? You know as well as I TW does not exist as a funtioning company and is a front. You are committing a fraud on the Bankruptcy Court.

Dimitrios P. Biller

LDT Consulting, Inc.

15113 West Sunset Blvd., Suite 9

Pacific Palisades, California 90272

(310) 459-9870

biller_ldtconsulting@verizon.net

This e-mail and/or attachments may contain confidential information protected by the Attorney-Client Privilege, Attorney Work-Product Privilege and/or the concept of "Confidentiality" as defined by the *California Rules of Professional Conduct*.  If you have mistakenly received this e-mail please immediately delete it and confirm you have deleted it from your systems.