1   Dimitrios P. Biller (SBN: 142730)
    LDT Consulting, Inc.
2   15113 West Sunset Blvd., #9
    Pacific Palisades, California 90272
3   (310) 459-9870
    biller_ltdconsulting@verizon.net
4

5   Attorney for Defendant Paula Thomas

6               UNITED STATES BANKRUPTCY COURT

7       CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

8                                    | Case No.: 6:16-bk-15889 SY

9   In re

10  PDTW, LLC                          Chapter 7

11          Debtor                     Adv. No. 6:17-ap-01200 SY

12  _____

13                                     **EXHIBITS "2" TO "11" IN**
                                       **SUPPORT OF EX PARTE**
                                       **APPLICATION FOR AN ORDER**
14  LARRY SIMONS, Chapter 7 Trustee,   **OVERRULING OBJECTIONS**
                                       **DAVID SCHNIDER HAS INVOKED**
15          Plaintiff,                 **BASED ON THE ATTORNEY-**
                                       **CLIENT PRIVILEGE**
16  vs.

17  PAULA THOMAS, an individual;       **DATE:TBD**
    THOMAS WYLDE, LLC, a California     **TIME: TBD**
18  Limited Liability Company; THOMAS  **PLACE: COURTROOM 302**
    WYLDE HOLDGINS, LLC, a California
19  Limited Liability; and DOES 1-10

20          Defendants.
    DEFENDANT'S EX PARE APPLICATION FOR AN ORDER STRIKING THE EX PARTE REQUEST FOR PROTECTIVE
    ORDER                                                                    - 1

| | | | | | | |
|---|---|---|---|---|---|---|
| 1195 | 2/14/2015 | E-mail w attachment | David Schnider | John Hanna | Jene Park; Meldy Rafols | E-mail correspondence regarding guidance on issues | Attorney-Client |
| 1196 | 2/16/2015 | E-mail | David Schnider | John Hanna | Jene Park; Meldy Rafols | E-mail correspondence regarding Thomas Wylde | Attorney-Client |
| 1197 | 2/16/2015 | E-mail | David Schnider | John Hanna | Jene Park; Meldy Rafols | E-mail correspondence regarding Thomas Wylde | Attorney-Client |
| 1198 | 2/16/2015 | E-mail w attachment | David Schnider | Jene Park; John Hanna; Meldy Rafols | | E-mail correspondence regarding Zaneta in France | Attorney-Client |
| 1199 | 2/17/2015 | E-mail | David Schnider | Jene Park | | E-mail correspondence regarding distributor agreements | Attorney-Client |
| 1200 | 2/17/2015 | E-mail | David Schnider | Meldy Rafols | John Hanna | E-mail correspondence regarding EPLI quote | Attorney-Client |
| 1201 | 2/17/2015 | E-mail | David Schnider | Meldy Rafols | John Hanna | E-mail correspondence regarding Murphy Rosen invoice | Attorney-Client |
| 1202 | 2/19/2015 | E-mail | David Schnider | John Hanna | Jene Park; Meldy Rafols | E-mail correspondence regarding LOI | Attorney-Client |
| 1203 | 2/21/2015 | E-mail | David Schnider | John Hanna | John Hanna; Meldy Rafols | E-mail correspondence regarding call with John | Attorney-Client |

| | |
|---|---|
| Exhibit No. "5" | Portions of Stephen Choi's Deposition Transcript |
| Exhibit No. "6" | Summary of Gonzalez Deposition Testimony Biller Prepared |
| Exhibit No. "7" | Portion of Doug Lee's Deposition Testimony |
| Exhibit No. "8" | David Schnider's Resume produced on September 28, 2018 |
| Exhibit No. "9" | November 21, 2014 e-mail to Ko regarding Operating Agreement |
| Exhibit No. "10" | E-mails John Hanna and Choi exchange making the IP collateral for the $2 million |
| Exhibit No. "11" | December 1, 2014 $2 million Promissory Note |

1

**PROOF OF SERVICE**
**STATE OF CALIFORNIA**
2
**COUNTY OF LOS ANGELES**

3

   I declare under penalty of perjury that I live in the County of Los Angeles,
4
state of California, I am over the age of 18 years; my business is located at 15113
West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272.  On **November 23,**
5
**2018**, I caused to be served, via e-mail, the following pleadings:

6
EXHIBITS "2" TO "11" IN SUPPORT OF EX PARTE APPLICATION FOR AN
ORDER OVERRULING OBJECTIONS DAVID SCHNIDER HAS INVOKED
7
BASED ON THE ATTORNEY-CLIENT PRIVILEGEdATE:TBDtIME:
TBDpLACE: cOURTROOM 302
8

Will be served or was served (a) on the judge in chambers in the form and (b)  the
9
interested parties in this action:

10

David Seror
11
Jessica L. Bagdanov
Brutzkus Guber
12
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91376
13


14
Richard Byron Peddie,
lawstudios@comcast.net
15
Lawstudios Richard Bryon Peddie
5051 Euclid Avenue
16
Boulder, Co 80303-2811
Counsel for ALL Defendants
17


18
Robert Silver
Jennifer Trayor
19
Susan Baker
Kaufman Dolowich Voluck
20

DEFENDANT'S EX PARE APPLICATION FOR AN ORDER STRIKING THE EX PARTE REQUEST FOR PROTECTIVE
ORDER                                                                                                    - 4

11755 Wilshire Blvd., Suite 2400
Los Angeles, CA 90025

**XXX** BY MAIL – I placed such envelope for deposit in the U.S. Mail for service by the United States Postal service, with postage thereon fully prepaid.  I am "readily familiar" with the practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pacific Palisades, California.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____BY FEDERAL EXPRESS – I am familiar with the practice at my place of business for collection and processing of correspondence for overnight delivery maintained by Federal Express.  Such correspondence will be deposited with a facility regularly maintained by Federal Express for receipt on the same day in the ordinary course of business.  The envelope was sealed and placed for collection and delivery by Federal Express with delivery fees paid or provided for in accordance with ordinary business practices.

_____BY PERSONAL SERVICE – I caused such envelope to be delivered by hand to the offices of the addressee.

_____: E-mail at the above e-mail addresses.

XXX (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **November 23, 2018**

/S/ Dimitrios P. Biller
Dimitrios P. Biller

# EXHIBIT "2"

**Dimitrios Biller**

| | |
|---|---|
| **From:** | Dimitrios Biller <biller_ldtconsulting@verizon.net> |
| **Sent:** | Wednesday, November 21, 2018 1:55 PM |
| **To:** | 'Robert Silver' |
| **Subject:** | RE: Ex Parte Application |

Thanks.  Of course the log requires additionally specificity:

*Kaiser Found. Hosps. V. Superior Court, 66 Cal.App.4ᵗʰ 1217, 1227-1228* held:

[T]he information in Kaiser's log must be sufficiently specific to permit the trial court to determine
whether each withheld document is or is not privileged. Should the trial court find the information in
the privilege log insufficiently specific to allow such a determination, it may order Kaiser to prepare
a new privilege log containing more particularized information about the nature of each document as
to which the attorney-client privilege is claimed.

The Court of Appeal in *Catalina Island Yacht Club v. Superior Court (2015) 242 Cal.App.4ᵗʰ 1116,
1130* held:

A privilege log must identify with particularity each document the responding party claims is
protected from disclosure by a privilege and provide sufficient factual information for the
propounding party and court to evaluate whether the claim has merit. [Citation] The precise
information required for an adequate privilege log will vary from case to case based on the privileges
asserted and the underlying circumstances. In general, however, **a privilege log typically should
provide [1] the identity and [2]capacity of all individuals who [a] authored, [b] sent, or [c]
received each allegedly privileged document, [d] the document's date, [d] a brief description of
the document and [e] its contents or subject matter sufficient to determine whether the
privilege applies, and [f] the precise privilege or protection asserted**.  (Emphasis added)

**I will address you other comments below.**

From: Robert Silver [mailto:rsilver@kdvlaw.com]
Sent: Wednesday, November 21, 2018 12:18 PM
To: Dimitrios Biller <biller_ldtconsulting@verizon.net>
Subject: RE: Ex Parte Application

Hi, Dimitirios:

I'm cutting to the chase on some of the recent emails/issues you've raised.
Again, I apologize for the brevity, but I lost a long email response I prepared, and it is taking too long to re-draft the thing.

1.  **Emails between David and Bruce Kirkland**.  You say Bruce was just a friend of Paula's. He may well have a been a friend of Paula's, but it seems clear
    that Bruce was also an outside consultant to PDTW. He was the person who brought David into doing work for PDTW. He was involved in marketing
    issues; vendors, and the CBC loan, among other things.  As such, even as a consultant, he was an agent of PDTW and I assume the privilege
    applies. See *U.S. v. Graf*, (9ᵗʰCir. 2010) 610 F.3d 1148, 1156 ["As an inanimate entity, a corporate most act through agents. A corporation cannot speak
    directly to its lawyers." (internal citation omitted)]; see also *Admiral v. U.S. District Court*,(9ᵗʰCir. 1989) 881 F.2d 1486, 1492 ("As fictitious entities,
    corporations can seek and receive legal advice and communicate with counsel only through individuals empowered to act on behalf of the
    corporation."); and *Carpenters Pension Trust v. Lindquist Family LLC*, (N.D.Cal. 2014) 2014 U.S.Dist. LEXIS 54335 [holding that communications between
    counsel and a member of an LLC may be subject to attorney-client privilege.]

**The problem with your client here is clear line between his representation of Paula and
PDTW; there is not.  Remember Paula Thomas owns and has always owned the IP.  When TW Holding,
LLC was created, he represented all three.  He never got an engagement letter from Paula, PDTW or TW
Holding, LLC.  When Bruce was dealing with marketing issues, vendors and CBC Loan, he was acting
for Paula and PDTW, LLC.  The CBC loan was based on the collateral of the IP; $1.65 million loan for
Paula Thomas to put IP in TW Holding, LLC and for Paula to own 100% of TW Holding, LLC. Please
read Schnider's documents.  He drafted and prepared a "Conflict Waiver" for PDTW and Paula Thomas
because he represented both regarding the licensing agreements for copyright and trademark.  He refers
to this a "simultaneous representation."  Bruce was not an employee; he was an independent control just
like John Hanna.  There cannot be a privilege between an in-house lawyer and independent contractors.**

2.  **Emails with Paul Murphy**.  You say he was Paula's attorney.  I don't know if that was the case or not, but the documents indicate that he was counsel to
    PDTW.  Specifically, Paul was (and maybe still is) an attorney at Murphy Rosen who acted as counsel to PDTW with regard to at least the Schiffman
    litigation and the Keyser litigation, and perhaps other matters. As such, my client is obligated to assert the privilege on his communications with PDTW's
    attorney.

3.  **Emails with Choi, Kou, and Lee**.  With regard to Kou and Lee, we have already produced all the communications between them and Schnider people to
    that pre-date their respective contactor agreements with PDTW.  Even after those signings, we still produced those communications where a third party
    was also included on the communication  (e.g., Choi, prior to Hillshore's operating agreement).  With regard to Choi himself, I have agreed with you that
    he seems to never have been an owner/officer of Hillshore.  However, TW treated him as the authorized representative – i.e., the main point of contact -
    - for Hillshore.  You may be right on your position, but it is not incumbent on me or my client to determine whether the apparent privilege is in fact
    valid.  The privilege is held by PDTW and/or TW.  Each of those entities has been served with our comprehensive privilege log.  And I have even gone
    above and beyond by asking them to review that log and advise if either entity is waiving privilege (or claiming it doesn't exist) with respect to any

1

document on the log. I have not received your corrected danswer from Paula or the privilege holders. Basically, it's on them, not me or my client, and I believe Judge Yun saw it the same way, regardless of whether or not you're correct about some waiver issues.

**What "pre-date their respective contractor agreements with PDTW" are you talking about? "Contractor" is not a "employee." Please produce the agreements you call "Contractor." Hillshore does not exist, so Choi is not an authorized representative. It does not matter that TW or PDTW hold the privilege because they destroyed their computers. He is the only one who has the documents. It does not matter that PDTW/TW are holding the privilege, because Schnider is and he has the burden; if he raises it, then he needs to provide a declaration laying the foundation.**

4. <u>Declaration re: foundation for privilege</u>. You keep telling me that the burden is on Schnider to prepare a declaration to establish the basis for the attorney-client privilege. I disagree. My client's obligation as the attorney for PDTW and TW is to protect their privilege. It as been asserted, and the subject documents have been identified with what I believe to be sufficient particularity, and in compliance with Judge Yun's order. If you think that more detail is required on some entries, let me know and I will see if that is something I can accommodate. Otherwise, to the extent you claim that TW's or PDTW's privilege has been waived, or is otherwise doesn't exist, then that is Paula's burden to establish by way of a motion.

I will re-iterate: I don't care at all if every one of these communications is ultimately produced. Again, I would be delighted if these privilege issues didn't exist in the first place. But they are not my client's privilege to waive or otherwise independently assess.

**I'm going to file the ex parte unless you are going to agree with me on one or more points. We have exhausted the process -- it started on April 24, 2018 (7 months ago). If we don't talk, Happy Thanksgiving.**

Again, let me know if you think the log requires additional specificity in any particular area.

Otherwise, I wish you a very happy Thanksgiving, and I'm sure I will talk with you soon.

Thanks,
Robert

**Robert Silver**
*Partner*



**KAUFMAN DOLOWICH VOLUCK**
ATTORNEYS AT LAW
135 South LaSalle St., Suite 2100
Chicago, IL, 60603

| | |
|---|---|
| Direct: | 312-863-3692 |
| Cell: | 310-889-4496 |
| Main: | 312-759-1400 |
| Fax: | 312-759-0402 |
| Email: | rsilver@kdvlaw.com |

**WWW.KDVLAW.COM**



**LONG ISLAND | NEW YORK CITY | PENNSYLVANIA | CHICAGO
NEW JERSEY | SAN FRANCISCO | LOS ANGELES | FLORIDA**

PLEASE NOTE This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system

Please consider the environment before printing

**From:** Robert Silver <rsilver@kdvlaw.com>
**Sent:** Wednesday, November 21, 2018 10:07 AM
**To:** Dimitrios Biller <biller_ldtconsulting@verizon.net>
**Subject:** RE: Ex Parte Application

Thanks.
I'm going to call you this morning.

**Robert Silver**
*Partner*

**KAUFMAN DOLOWICH VOLUCK**
ATTORNEYS AT LAW
135 South LaSalle St., Suite 2100
Chicago, IL, 60603

| | |
|---|---|
| Direct: | 312-863-3692 |
| Cell: | 310-889-4496 |
| Main: | 312-759-1400 |
| Fax: | 312-759-0402 |
| Email: | rsilver@kdvlaw.com |

**WWW.KDVLAW.COM**

  

**LONG ISLAND | NEW YORK CITY | PENNSYLVANIA | CHICAGO
NEW JERSEY | SAN FRANCISCO | LOS ANGELES | FLORIDA**

PLEASE NOTE: This message, including any attachments, may include
privileged, confidential and/or inside information. Any distribution or use of this
communication by anyone other than the intended recipient(s) is strictly
prohibited and may be unlawful. If you are not the intended recipient, please
notify the sender by replying to this message and then delete it from your
system

🖎 Please consider the environment before printing.

**From:** Dimitrios Biller <biller_ldtconsulting@verizon.net>
**Sent:** Wednesday, November 21, 2018 9:54 AM
**To:** Robert Silver <rsilver@kdvlaw.com>
**Subject:** RE: Ex Parte Application

**From:** Robert Silver [mailto:rsilver@kdvlaw.com]
**Sent:** Wednesday, November 21, 2018 7:20 AM
**To:** Dimitrios Biller <biller_ldtconsulting@verizon.net>
**Subject:** RE: Ex Parte Application

Ok. You are raising new issues by the hour.
I can't finish responding to one thing before you start with 4 others.
Basically, you want all documents, irrespective of privilege because -- at a minimum -- you think no privilege applies due to the crime/fraud exception. You are planning on filing that motion anyway as we discussed. If you're correct, then you're going to receive every communication. So go ahead and file it, because I'm obviously not agreeing that the crime /exception applies.

I prepared a written response to your recent emails, and then somehow I lost my draft – as in wiped off my computer.
So I'm re-drafting that now. You were good enough to lay our your position in writing, and I think it's appropriate that I do the same.
After I do that, I will look at this most recent issue you've raised, and I will try to answer that as well to see if we can agree on anything.

Thanks,
Robert

**Robert Silver**
*Partner*

**KAUFMAN DOLOWICH VOLUCK**
ATTORNEYS AT - AW
135 South LaSalle St., Suite 2100
Chicago, IL, 60603

Direct:    312-863-3692
Cell:      310-889-4496
Main:      312-759-1400
Fax:       312-759-0402
Email:     rsilver@kdvlaw.com

**WWW.KDVLAW.COM**

  

**LONG ISLAND | NEW YORK CITY | PENNSYLVANIA | CHICAGO
NEW JERSEY | SAN FRANCISCO | LOS ANGELES | FLORIDA**

PLEASE NOTE: This message, including any attachments, may include
privileged, confidential and/or inside information. Any distribution or use of this
communication by anyone other than the intended recipient(s) is strictly
prohibited and may be unlawful. If you are not the intended recipient, please
notify the sender by replying to this message and then delete it from your
system.

🖎 Please consider the environment before printing.

**From:** Dimitrios Biller <biller_ldtconsulting@verizon.net>
**Sent:** Tuesday, November 20, 2018 5:26 PM
**To:** Robert Silver <rsilver@kdvlaw.com>
**Subject:** Ex Parte Application

Robert, Schnider has to produce all e-mails with Bruce Kirkland on the communications; he is a friend of Paula and does not have anything to do with TW or PDTW. You need to revise the log to include the positions for each person and with whom they work. You cannot withhold documents with Paul Murphy's name on them because he was Paula's attorney. You need to produce all e-mails with Choi, Kou and Lee's names on those e-

mails – not owners.  There about 40 people identified but I don't know who they are and why a privilege applies.

If we are going down this road, you need to lay the foundation for the privilege.  If you are not going to do that by the end of the work, then I'm just filing the Emergency Ex Parte Application for all the documents.


Dimitrios P. Biller
LDT Consulting, Inc.
15113 West Sunset Blvd., Suite 9
Pacific Palisades, California 90272
(310) 459-9870
biller_ldtconsulting@verizon.net

This e-mail and/or attachments may contain confidential information protected by the Attorney-Client Privilege, Attorney Work-Product Privilege and/or the concept of "Confidentiality" as defined by the *California Rules of Professional Conduct*.  If you have mistakenly received this e-mail please immediately delete it and confirm you have deleted it from your systems.

# EXHIBIT "3"

The Law Offices of David Schnider
15165 Ventura Blvd., Ste. 245
Sherman Oaks, CA 91403

September 11, 2013

Paula Thomas                          Jene Park
3231A S. La Cienega Blvd.             COO
Los Angeles, CA 90016                 PDTW, LLC
                                      3231A S. La Cienega Blvd.
                                      Los Angeles, CA 90016

Re:    Waiver of Conflict of Interest

Dear Paula and Jene:

I have represented and continue to represent PDTW with respect to intellectual property
matters. I have been asked to act as a scrivener in documenting an agreement between PDTW
and Paula Thomas individually relating to PDTW licensing intellectual property rights held by
Thomas (the "Transaction"). The purpose of this letter is to discuss with each of you the actual
and potential consequences of such simultaneous representation, and to explain the
circumstances under which I would be willing to represent both parties simultaneously if, after
full consideration of the consequences, both clients wish me to do so.

Simultaneous representation of parties with adverse interests by an attorney should not be
undertaken by any such party without careful consideration. In particular, I want you to be
aware of the following.

1.     Under applicable rules of professional conduct, a lawyer owes each of his clients a duty
of loyalty, which would normally preclude undertaking a representation adverse to any client
without the affected client's informed consent. Other rules generally prohibit undertaking any
representation involving an actual or potential conflict of interest without the informed consent
of all affected parties. Such a situation exists whenever a lawyer represents two clients
simultaneously in a situation in which their interests are actually or potentially adverse.

2.     The conflict of interest, and the need for informed consent, exists no matter how cordial
the business relationship between the two parties currently is or is anticipated to be, and no
matter how non-controversial the Transaction is anticipated to be.

3.     I do not recommend simultaneous representation of adverse parties, and have not
recommended this simultaneous representation to you. I have recommended, instead, that each
party seek separate representation. I also recommend that each of you seek the advice of
independent counsel of your own choice regarding this written consent. If, however, it is the
wish of both clients that I undertake the simultaneous representation of both parties with respect
to the Transaction, I will undertake to do so under the terms described herein.

SCHNIDER_BK 003920

4.      It may not be possible for a single lawyer to represent both parties to the Transaction in the same aggressive manner as would two separate and independent lawyers. By giving the consent requested in this letter, you are, in effect, waiving that kind of zealous representation of your individual and conflicting interests with respect to the Transaction. It is possible that each or both of you might be advised by independent counsel to demand or offer different or more favorable terms and conditions with respect to the Transaction than I can or will demand or offer.

5.      Moreover, regardless of the terms upon which the matters between the two clients are concluded, the fact that one lawyer has been involved in the representation of both parties may give rise to a perception on the part of members, investors or other third parties that different terms might have been arrived at had each of you had separate representation by an independent law firm.

6.      If a dispute should arise in the future between the two of you concerning the Transaction or any other aspect of your dealings with each other, I believe I would have to withdraw, or would be disqualified, from representing either of you with regard to that dispute or any other relationship you might then have with each other. You would then each have to retain separate counsel, resulting in additional expense and inconvenience that you might not have incurred had you been separately represented from the outset.

I will be pleased to answer any questions you may have concerning this representation or this requested consent. If you do wish to consent, please sign below.

Regards,

David Schnider

ACKNOWLEDGEMENT AND CONSENT

Despite any potential or actual conflict of interest that may exist now or in the future, I hereby consent to the simultaneous representation of both Thomas and PDTW with respect to the transaction as described above. I further agree that the firm may withdraw its representation of either client or both clients without prejudice should it determine that continued representation might violate applicable rules of professional conduct.

Dated: ____9·16·13____            Dated: ____9/16/'13____

Paula Thomas                      PDTW, LLC

                                  _____
                                  Jene Park, COO

SCHNIDER_BK 003921

| 1294 | 4/30/2015 | E-mail | David Schnider | Jene Park | John Hanna; Meldy Rafols | E-mail correspondence regarding Paula update | Attorney-Client |
| 1295 | 4/30/2015 | E-mail | David Schnider | Jene Park | John Hanna; Meldy Rafols | E-mail correspondence regarding Paula update | Attorney-Client |
| 1296 | 4/30/2015 | E-mail | David Schnider | Jene Park | John Hanna; Meldy Rafols | E-mail correspondence regarding Paula update | Attorney-Client |
| 1297 | 5/1/2015 | E-mail | David Schnider | Meldy Rafols | John Hanna | E-mail correspondence regarding paystubs | Attorney-Client |
| 1298 | 5/2/2015 | E-mail | David Schnider | Jene Park | John Hanna | E-mail correspondence regarding Middle East agent agreement | Attorney-Client |
| 1299 | 5/4/2015 | E-mail | David Schnider | John Hanna | Jene Park | E-mail correspondence regarding Middle East agent agreement | Attorney-Client |
| 1300 | 5/5/2015 | E-mail | David Schnider | John Hanna; Richard Peddie; Jene Park; Meldy Rafols | | E-mail correspondence regarding Paula termination agreement | Attorney-Client |
| 1301 | 5/6/2015 | E-mail | David Schnider | John Hanna | Richard Peddie; Jene Park; Meldy Rafols | E-mail correspondence regarding Paula email | Attorney-Client |

9.    Indemnity.  Licensee shall indemnify and hold harmless Licensor from any and all claims, demands, actions and causes of action arising from Licensee's use of the Marks. Licensor shall have the right to participate in any compromise, settlement, or defense thereof. This indemnification obligation shall include, without limiting the generality of the foregoing, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any and all such claims, demands, actions, or causes of action, and shall extend to the officers, employees, and agents of Licensor.

10.    Disclaimer of Partnership.  Nothing contained herein shall constitute this arrangement to be employment, a joint venture, or a partnership.

11.    Other Agreements.  This Agreement contains the complete agreement between the parties and supersedes all other agreements between the parties relating to the Marks. The parties stipulate that neither of them has made any representation with respect to the subject matter of this Agreement or the execution and delivery hereof except such representations as are specifically set forth herein.

12.    Modification.  Any amendment or modification of this Agreement, or any waiver of its terms, must be written and signed by the parties.

13.    Waiver.  Forbearance or neglect on the part of either party to insist upon strict compliance with the terms of this Agreement shall not be construed as or constitute a waiver thereof.

14.    Benefit.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns, subject to any restrictions on assignment set forth herein.

15.    Choice of Law and Venue.  The laws of the State of California govern this Agreement. Any suit or proceeding arising out of the Agreement shall be exclusively venued in the County of Los Angeles in the State of California or in the Central District of California.  In any action or proceeding arising out of this Agreement the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs.

16.    Drafting.  The parties acknowledge that each of them has had an equal opportunity to participate in the drafting of this Agreement.  Therefore, in any construction of this Agreement, the parties agree that it shall not be construed against any party on the basis of authorship.  This Agreement has been carefully read by, the contents hereof are known and understood by, and each party signs it freely.

17.    Severability.  If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement..

18.    Execution.  This Agreement may be executed in one or more counterparts, and by facsimile or digital transmission, each copy of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.


Dated:    9.16.13 .                        Dated:    9/16/13

Paula Thomas                            PDTW, LLC


_____         _____
                                        Jene Park, COO

Schedule A

|    | Mark | Trademark Status |
|----|------|------------------|
| 1. | Thomas Wylde | Reg. No. 3283944 |
| 2. | Henna Skull Design | Reg. No. 4045284 |
| 3. | Wylde by Thomas Wylde | App. No. 85020665 |
| 4. | The Wylde | App. No. 86003488 |

## COPYRIGHT LICENSE AGREEMENT

This agreement is made effective September 1, 2013 by and between Paula Thomas, an individual residing in California ("Licensor") and PDTW, LLC, a California company with its principal place of business located at 3231 S. La Cienega Blvd., Los Angeles, CA 90016 ("Licensee").

### RECITALS:

Licensor is the sole and exclusive owner of certain fabric print designs, listed on Schedule "A" to this Agreement (the "Designs"), and has the power and authority to grant Licensee a license to use those Designs.

Licensee has used the Designs pursuant to an oral agreement with Licensor and now seeks a written exclusive license to continue such use and/or engage in new uses of the Designs.

### AGREEMENT:

NOW, THEREFORE, for and in consideration of the Recitals, the agreements of the parties set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Incorporation of Recitals.  The Recitals are hereby incorporated into this Agreement by this reference.

2.    License.  Licensor hereby grants Licensee the exclusive rights to use the Designs in connection with apparel and related accessories. Licensee may not grant any sublicenses to any third party or modify the Designs without the prior express written consent of the Licensor, which consent may be withheld for any reason. Licensor retains all rights not expressly licensed hereunder.

3.    Term.  This License shall commence on the date this Agreement is signed by both parties and shall continue in effect until terminated as set forth in section 4, below.

4.    Termination.  Either party may terminate this Agreement for any reason by giving at least thirty (30) days written notice. Upon termination, Licensee must immediately cease all use of the Designs for any purpose whatsoever.

5.    Royalties.  Licensee shall pay Licensor an annual royalty of $1,000, payable on January 1st of every year during the Term.

6.    Acknowledgement of Rights.  Licensee acknowledges that the Designs were created by Licensor during personal time and not within the scope of her employment, if any, by Licensee. Licensee further acknowledges that Licensor is the sole and exclusive owner of all rights in the Designs, including without limitation all copyrights therein. Licensee further agrees that it will not contest Licensor's rights and that it waives any claims it may have that Licensor does not have rights in the Designs.

7.    Warranties.  Licensor represents and warrants that it has the right and power to grant the license granted herein and that the Designs do not infringe the rights of any third party. Licensee represents and warrants that it shall be solely responsible for its import, use, and sale of the Designs and that its use shall not infringe the rights of any third party.

8.    Notices.  Licensee shall place notices where appropriate, indicating that copyright in the Designs is held by Licensor.

SCHNIDER_BK 000428

9.     Indemnity. Licensee shall indemnify and hold harmless Licensor from any and all claims, demands, actions and causes of action arising from Licensee's use of the Designs. Licensor shall have the right to participate in any compromise, settlement, or defense thereof. This indemnification obligation shall include, without limiting the generality of the foregoing, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any and all such claims, demands, actions, or causes of action, and shall extend to the officers, employees, and agents of Licensor.

10.    Disclaimer of Partnership. Nothing contained herein shall constitute this arrangement to be employment, a joint venture, or a partnership.

11.    Other Agreements. This Agreement contains the complete agreement between the parties and supersedes all other agreements between the parties relating to the Designs. The parties stipulate that neither of them has made any representation with respect to the subject matter of this Agreement or the execution and delivery hereof except such representations as are specifically set forth herein.

12.    Modification. Any amendment or modification of this Agreement, or any waiver of its terms, must be written and signed by the parties.

13.    Waiver. Forbearance or neglect on the part of either party to insist upon strict compliance with the terms of this Agreement shall not be construed as or constitute a waiver thereof.

14.    Benefit. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns, subject to any restrictions on assignment set forth herein.

15.    Choice of Law and Venue. The laws of the State of California govern this Agreement. Any suit or proceeding arising out of the Agreement shall be exclusively venued in the County of Los Angeles in the State of California or in the Central District of California. In any action or proceeding arising out of this Agreement the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs.

16.    Drafting. The parties acknowledge that each of them has had an equal opportunity to participate in the drafting of this Agreement. Therefore, in any construction of this Agreement, the parties agree that it shall not be construed against any party on the basis of authorship. This Agreement has been carefully read by, the contents hereof are known and understood by, and each party signs it freely.

17.    Severability. If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement..

18.    Execution. This Agreement may be executed in one or more counterparts, and by facsimile or digital transmission, each copy of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

Dated:____9· 16·13·____          Dated:_____9/16/13_____

Paula Thomas                     PDTW, LLC

                                 Jene Park, COO

SCHNIDER_BK 000429

| 626 | 3/26/2014 Email | David Schnider | Andrew Apfelberg | | E-mail correspondence regarding possible funding options | Attorney-Client |
|---|---|---|---|---|---|---|
| 627 | 3/26/2014 E-mail | David Schnider | Andrew Apfelberg | | E-mail correspondence regarding teaser | Attorney-Client |
| 628 | 3/26/2014 E-mail | David Schnider | Andrew Apfelberg | | E-mail correspondence regarding teaser | Attorney-Client |
| 629 | 3/26/2014 E-mail | David Schnider | Andrew Apfelberg | | E-mail correspondence regarding teaser | Attorney-Client |
| 630 | 3/26/2014 E-mail | David Schnider | Andrew Apfelberg | | E-mail correspondence regarding teaser | Attorney-Client |
| 631 | 3/26/2014 E-mail | David Schnider | Paula Thomas | Jene Park | E-mail correspondence regarding Vendome | Attorney-Client |
| 632 | 3/26/2014 E-mail | David Schnider | Jene Park | Paula Thomas | E-mail correspondence regarding call | Attorney-Client |
| 633 | 3/26/2014 E-mail | Kim & Chang IP | David Schnider | Jene Park; Sung Nam Kim; Nayoung Kim | E-mail correspondence regarding Korea trademark application | Attorney-Client |
| 634 | 3/26/2014 E-mail | Kim & Chang IP | David Schnider | Jene Park; Sung Nam Kim; Nayoung Kim | E-mail correspondence regarding Trademark Opposition | Attorney-Client |

# EXHIBIT "4"

From: **David Schnider** david@schniderlaw.com
Subject: Paula Thomas
Date: June 2, 2015 at 4:01 PM
To: Olivia Goodkin OGoodkin@greenbergglusker.com

Olivia:

Given the present situation between Paula and the company, I felt it best to write to you, as her counsel, rather than contact her directly.

During the initial negotiations between Paula and the company, I mentioned that I was concerned about a potential conflict of interest because of my personal and professional relationship with Paula. At the time it seemed that we would be able to reach a resolution and that there was mutual agreement to my involvement. The situation has now changed and I believe it is important that I am up front with both parties about my conflict of interest.

I have reviewed California Rule of Professional Conduct 3-310. Pursuant to section (B)(1) of that rule, I believe that I have a conflict of interest because I have a personal and professional relationship with Paula and a professional relationship with Thomas Wylde, LLC and the parties now seem to be adverse to each other. I have, therefore, informed the company that I will not represent it in connection with its dispute with Paula. As you have noted, the company has retained Richard Peddie to handle that matter and I am no longer involved.

I continue to represent Thomas Wylde, LLC in connection with matters that do not concern Paula and in which I do not believe there would be any potential conflict with her interests. Under section (C)(2) of the rule, it is my reading that I may continue to do so.

If Paula feels otherwise, please advise me so that we can discuss my role with the company and determine whether a written conflict waiver would be necessary and agreeable.

I had, until recently, been assisting Paula with two matters. The first involved a claim against Grandpa Johnsons LLC. Paula asked me to recommend litigation counsel for her in that matter, so I believe that my involvement is now complete. That matter is unrelated to the company so I do not believe that there is any potential conflict of interest. Nevertheless, I believe that I am no longer representing Paula in connection with it. Please let me know if Paula feels otherwise.

I am also counsel of record for Paula on a trademark registration application for "The Wylde Hotel." Based on the company's last settlement proposal, I believe that representation does present a conflict of interest now and that I must withdraw as counsel. Prior to my becoming aware of the potential conflict, I had advised Paula to abandon the application and to refile if and when she begins using the mark and to apply to the supplemental register. If she chooses to follow that advice, then no further action is necessary and the application will be abandoned. In any event, please confirm that she is amenable to me withdrawing as counsel of record and I will prepare the appropriate filing with the USPTO.

I have discussed these issues with the company so that they are similarly aware of my views.

If you and/or Paula would like to discuss this further or feel that my view of the situation is in any way mistaken, please let me know.

Regards,
David


**SCHNIDERLAW**

15165 Ventura Blvd., Ste. 245
Sherman Oaks, CA 91403

david@schniderlaw.com
www.schniderlaw.com
(818) 207-5134

SCHNIDER_BK 003454

# EXHIBIT "5"

```
1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

3

4    PAULA THOMAS, et al.,                )
                                          )
5                     Plaintiffs,         )
                                          )
6         vs.                             )Case No. BC596495
                                          )
7    THOMAS WYLDE, LLC, et al.,           )
                                          )
8                     Defendants.         )
     _____)

9

10

11

12

13                  DEPOSITION OF STEPHEN CHOI

14                      Irvine, California

15                        March 1, 2017

16

17

18

19

20

21   Reported by:

22   DENISE HERFT

23   CSR No. 12983

24

25

                                               Page 1
```

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2          FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT
 3
 4    PAULA THOMAS, et al.,              )
                                        )
 5                  Plaintiffs,         )
                                        )
 6         vs.                          )Case No. BC596495
                                        )
 7    THOMAS WYLDE, LLC, et al.,        )
                                        )
 8                  Defendants.         )
      _____)
 9
10
11
12
13
14
15         DEPOSITION OF STEPHEN CHOI, taken on
16    behalf of the Plaintiffs at 38 Corporate Park,
17    Irvine, California, commencing at 10:04 a.m. on
18    March 1, 2017, reported by DENISE HERFT, CSR No.
19    12983, pursuant to Notice.
20
21
22
23
24
25
```

Page 2

```
 1    APPEARANCES OF COUNSEL:
 2
      For the Plaintiffs:
 3
      KRING & CHUNG, LLP
 4    BY:  LAURA BOOTH, ESQ.
      38 Corporate Park
 5    Irvine, California   92606
      (949) 261-7700
 6    (949) 261-8800  Facsimile
      lbooth@kringandchung.com
 7
 8
      For the Defendants:
 9
      RICHARD BYRON PEDDIE P.C.
10    BY:  RICHARD BYRON PEDDIE, ESQ. (Telephonic Appearance)
      5051 Euclid Avenue
11    Boulder, Colorado  80303
      (303) 444-5447
12    (720) 222-4766  Facsimile
      lawstudios@comcast.net
13
14    For the STEPHEN CHOI:
15    LAW OFFICES OF JOHN D. WILSON
      BY:  JOHN D. WILSON, ESQ.
16    1900 Avenue of the Stars
      Suite 960
17    Los Angeles, California   90067-4310
      (310) 277-2323
18    (310) 556-2308  Facsimile
      johnw@jdwilsonlaw.net
19
20    Also Present:
      Paula Thomas
21
      Amber Valles, Student Reporter
22
23
24
25

                                         Page 3
```

```
1                        I  N  D  E  X
2    EXAMINATION BY:                           PAGE
3    Ms. Booth        --------------------------- 5
4
5
6                        E X H I B I T S
7
     PLAINTIFFS'   DESCRIPTION                    PAGE
8
     Exhibit 1     Amended Notice of Deposition of    35
9                  Stephen Choi and Request for
                   Production of Documents
10
     Exhibit 2     Thomas Wylde LLC Transactions      42
11                 by Account
12   Exhibit 3     Amendment to Secured Promissory    61
                   Note
13
     Exhibit 4     Complaint for Sama Eyewear vs.    124
14                 Thomas Wylde
15
16
17
18            QUESTIONS INSTRUCTED NOT TO ANSWER
19                      PAGE    LINE
                         12      9
20                       21      4
                         24      14
21                       98      10
                        102      9
22
23
24
25
                                              Page 4
```

```
 1                Irvine, California, March 1, 2017

 2                        10:04 a.m.

 3

 4                        STEPHEN CHOI,

 5     called as a witness, and having been first duly

 6     sworn by the Certified Shorthand Reporter, was

 7     examined and testified as follows:

 8

 9                        EXAMINATION

10     BY MS. BOOTH:

11         Q    Could you please state your full name and

12     spell it for the record.

13         A    Stephen Choi, S-t-e-p-h-e-n, C-h-o-i.

14         Q    Mr. Choi, I introduced myself of the

15     record, my name is Laura Booth, and I represent      10:04:06

16     Paula Thomas in this case.

17         A    Okay.

18         Q    And we have called you here for your

19     deposition today with regard to finding out

20     information that you know about Thomas Wylde and      10:04:17

21     the investment of that company and your involvement

22     with the company to date; do you understand that?

23         A    Yes.

24         Q    Have you ever had your deposition taken

25     before?                                              10:04:33
```

                                                    Page 5

```
 1         A    No.

 2         Q    Let me go through a few of the ground

 3    rules with you.  I'm sure your attorney has had a

 4    chance to talk to you, but I'll just go over them

 5    with you so you have an understanding on the        10:04:45

 6    record; okay?

 7         A    Okay.

 8         Q    The first thing is the court reporter is

 9    taking down everything that everybody says here

10    today, and after your deposition has been           10:04:55

11    completed, you'll get a booklet.  It will look like

12    a screenplay.  It will have the question and the

13    answer, and you'll have an opportunity to read that

14    and review it and sign it under penalty of perjury.

15    So you do understand that you're under penalty of   10:05:06

16    perjury today?

17         A    Yes.

18         Q    And that oath carries with it the same

19    force and effect as if you were sitting in a court

20    of law; do you understand that?                     10:05:14

21         A    Okay, sure.

22         Q    I don't know if you knew that before but

23    it is just like we're --

24         A    I've never been in a court of law either

25    so --                                               10:05:25
```

Page 6

```
 1    to him.

 2    BY MS. BOOTH:

 3         Q    Of course, of course.

 4              Do you have a cellphone number that we can

 5    reach you at as well?                              10:11:41

 6         A    Yes, 310-819-5000.

 7              MR. WILSON:  Again, since he's represented

 8    by counsel, you can feel free to call me.

 9              MS. BOOTH:  Of course, I will.

10              MR. WILSON:  That should be your first    10:11:52

11    call.

12              MS. BOOTH:  I will do that.  I wanted to

13    have a back-up in case we can't reach you for some

14    reason.

15              MR. WILSON:  I get it.                    10:12:00

16    BY MS. BOOTH:

17         Q    Are you currently married, Mr. Choi?

18         A    Yes.

19         Q    What is your wife's name?

20         A    Okay.  Does this have anything to do with 10:12:06

21    anything?

22              MR. WILSON:  Not really.

23              Is there a reason why you need to know

24    this?

25              MS. BOOTH:  From what I understand, his   10:12:15
```

Page 11

1   wife is a shareholder in Hillshore who invested in

2   Thomas Wylde.

3            THE WITNESS:   Correct.

4   BY MS. BOOTH:

5        Q    I'm entitled to know the names of --                    10:12:23

6        A    Okay.   So you're asking for names of

7   shareholders of Hillshore, or you're asking the

8   name of my wife?

9        Q    I'm asking the name of your wife at this

10  point.                                                            10:12:31

11           MR. WILSON:   Unless she's a shareholder of

12  Hillshore, then I don't think it's relevant or

13  calculated to lead to the discovery of admissible

14  evidence, and it's also privileged.   Maybe you can

15  go ask another question.                                          10:12:43

16           MS. BOOTH:   Are you instructing him not to

17  answer?

18           MR. WILSON:   At this point, yes.   If he

19  wants to keep that private, I don't blame him.   If

20  you want to ask him questions so that it becomes    10:12:51

21  relevant, I might withdraw the objection.

22  BY MS. BOOTH:

23       Q    Is your wife one of the shareholders at

24  Hillshore?

25       A    Yes.                                                    10:13:00

                                                        Page 12

| 1 | Q | Why don't you start by telling me who all | |
|---|---|---|---|
| 2 | the members of Hillshore are. | | |
| 3 | A | Eniluz Gonzalez, E-n-i-l-u-z, | |
| 4 | G-o-n-z-a-l-e-z. | | |
| 5 | Q | Anyone else? | 10:13:13 |
| 6 | A | No. | |
| 7 | Q | She's 100 percent shareholder? | |
| 8 | A | Yes. | |
| 9 | Q | Has Hillshore ever been held in anyone | |
| 10 | else's name?  Have there ever been any other | | 10:13:21 |
| 11 | shareholders? | | |
| 12 | A | Not that I'm aware of. | |
| 13 | Q | Do you know when Hillshore Investments was | |
| 14 | started? | | |
| 15 | A | No, I mean the exact date, no. | 10:13:32 |
| 16 | Q | How about an estimate? | |
| 17 | A | I mean, you can't hold me to this but | |
| 18 | probably around 2008. | | |
| 19 | Q | Do you know if Hillshore is an LLC or | |
| 20 | incorporated or what form of corporate structure it | | 10:13:52 |
| 21 | has? | | |
| 22 | A | It's a Panamanian Corporation.  I don't | |
| 23 | know anything else in terms of the tax stuff about | | |
| 24 | it. | | |
| 25 | Q | Have you ever been an officer in Hillshore | 10:14:08 |

Page 13

1   Investments?

2       A   No.

3       Q   How about a member?

4       A   I'm not on any documentation to do with

5   Hillshore.                                          10:14:22

6       Q   You didn't have any involvement in the

7   formation of Hillshore?

8       A   I'm not on the documents of Hillshore.

9   Did I have anything to do with it?  I don't know

10  what that means.  Was I in the process?  Was I     10:14:35

11   involved in the process?  I'm sure I was at some

12   point in time involved in that process.  I don't

13   really remember if this entity was formed as an

14   investment arm for our family, and this company was

15   used to invest in Thomas Wylde.                    10:14:54

16      Q   Okay.  The Hillshore -- Hillshore was not

17   formed to invest in Thomas Wylde; correct?

18      A   Correct.

19      Q   It was formed generally for an investment

20   arm for your family you said?                      10:15:11

21      A   It's an investment company, yes.

22      Q   Previously you said it was for your

23   family.  I'm just curious --

24      A   I can't say that because it's been

25   involved in other investments that was not just my  10:15:25

Page 14

1    family.

2        Q    Okay.  We'll get back to Hillshore later.

3        A    Okay.

4        MR. PEDDIE:  Laura, I'm sorry to interrupt

5    again, Richard Peddie speaking.  I'm having the          10:15:42

6    exact same problem, and I'm wondering if there's

7    some threshold beneath which the phone does not

8    pick up voices.  And you tell me if everybody is

9    speaking up or if everybody is speaking with soft

10   voices, and if they are, I would like everybody to      10:15:58

11   speak up a little bit and see if that works.

12       MS. BOOTH:  I think we're all speaking

13   sufficiently loud.  Let me turn up the volume.  I

14   thought I turned it all the way up.

15       MR. PEDDIE:  If there's some kind of          10:16:14

16   sensitivity adjustment on the phone, that may help.

17       MS. BOOTH:  It's a speaker phone, we have

18   the volume all the way up, and you're placed in the

19   middle of the table as far as the phone will reach.

20       MR. PEDDIE:  Okay.  We'll see how it goes.      10:16:31

21       MS. BOOTH:  Back on the record.

22   BY MS. BOOTH:

23       Q    Have you ever been a party to a lawsuit?

24       A    No.

25       Q    Never a plaintiff or defendant?          10:16:42

                                        Page 15

```
1          A    No.

2          Q    Can you tell me how many -- strike that.

3               Do you have any -- what position do you

4     hold with regard to Thomas Wylde, if any?

5          A    I don't work for Thomas Wylde.              10:17:04

6          Q    Are you a member of Thomas Wylde?

7               MR. WILSON:  You mean of Thomas Wylde,

8     LLC?

9     BY MS. BOOTH:

10         Q    LLC, I'm sorry, yes.                        10:17:16

11         A    Not that I'm aware of.

12         Q    If I could, if it's okay with everybody, I

13    just call it TW, and I'm referring to Thomas Wylde

14    LLC?

15         A    Right.  And when you say "he," you were     10:17:26

16    referring to him as an individual and not referring

17    to Hillshore?

18              MS. BOOTH:  Yes.

19    BY MS. BOOTH:

20         Q    Are you an officer with TW?                 10:17:35

21         A    As far as I'm aware, I have no officer,

22    member of TW.

23              MR. WILSON:  As an individual.

24              THE WITNESS:  As an individual, as Stephen

25    Choi.                                                 10:17:54
```

Page 16

```
 1   BY MS. BOOTH:
 2       Q     What is Hillshore's position with regard
 3   to TW?
 4              MR. WILSON:  Vague as phrased, but you can
 5   answer.                                          10:18:05
 6              THE WITNESS:  As far as I'm aware,
 7   Hillshore is just an investor in Thomas Wylde.
 8              MS. BOOTH:  Let me ask your attorney
 9   something, if we wanted to depose Mr. Choi's wife,
10   would we go through you to contact her?          10:18:21
11              MR. WILSON:  Yeah.
12              MS. BOOTH:  Okay.
13              MR. WILSON:  Yes, that would be a start.
14              MS. BOOTH:  Okay.  Thanks because I -- it
15   sounds like he's not going to give me any         10:18:33
16   information as far as -- you're not going to allow
17   him to give me any information with regard to how
18   to locate her otherwise?
19              MR. WILSON:  You can go through me and
20   we'll make a decision.                            10:18:45
21              MS. BOOTH:  Okay.  Thank you.
22   BY MS. BOOTH:
23       Q    Could you please give your education
24   background.  Did you graduate high school?
25       A    Yes.                                     10:18:58
```

Page 17

1    know that on the record.

2        A   Yes.

3        Q   We will reserve our right to bring a

4    motion to compel on that issue.

5            Have you ever been convicted of any          10:24:29

6    crimes?

7        A   No.

8        Q   So would you -- how would you describe

9    your position with regard to Thomas Wylde, LLC,

10   just investor?                                       10:24:43

11       A   I --

12           MR. WILSON:   Again, excuse me one second.

13   When you say how would he, are you talking about

14   him as an individual, or are you talking Hillshore?

15   Hillshore is the super majority member of Thomas     10:24:56

16   Wylde.

17           MS. BOOTH:   Right.   I'm trying to

18   understand how Mr. Choi is involved, because he's

19   saying that his wife is the sole shareholder of

20   Hillshore, so how is he involved with TW is my       10:25:08

21   question?

22           MR. WILSON:   Okay.   I'll object; vague and

23   ambiguous.

24           You can answer.

25           THE WITNESS:   Most of the investments of    10:25:20

                                              Page 22

```
 1    Hillshore I would represent the company in those

 2    investments.

 3    BY MS. BOOTH:

 4        Q    Did your wife have any involvement with

 5    Hillshore investing in TW?                          10:25:43

 6        A    No.

 7        Q    Did she have any conversations with

 8    anybody at TW before you invested in the company?

 9        A    Before we invested, before Hillshore

10    invested?                                           10:25:57

11        Q    Right.

12        A    I don't think so.  I don't know for a

13    fact.  I met Paula and John.  I don't remember if

14    my wife was ever at those meetings to see clothes.

15    I don't remember.                                   10:26:12

16        Q    Do you have any recollection of your wife

17    being involved in any meetings at TW or with

18    anybody involved with TW?

19        A    Eni has definitely met people at Thomas

20    Wylde, if that's the question, what they talked     10:26:31

21    about, I don't know.  I wasn't sitting with them,

22    so I can't -- Eni does not have -- I mean, I can't

23    answer questions for her.  I don't know.  They met

24    at shows or whatever.  I don't know what they

25    talked about.  I don't think they talked about      10:26:48
```

Page 23

1   business.  I think it was nice show and I like your

2   clothes kind of conversations, I assume, but I

3   don't know.

4       Q   Okay.  And I'm not asking you to speculate

5   to anything.                                    10:26:56

6       A   Okay.

7       Q   What I want to know is if you personally

8   have any information.

9       A   Yes, I don't know.

10      Q   You said you represent -- you represent    10:27:02

11  the company Hillshore in their investments;

12  correct?

13      A   Correct.

14      Q   Okay.  What other investments does

15  Hillshore have currently?                       10:27:11

16      A   Currently?

17          MR. WILSON:  You mean investments outside

18  of Thomas Wylde?

19          MS. BOOTH:  Correct.

20          MR. WILSON:  I'll object and instruct him  10:27:20

21  not to answer based on the grounds of right of

22  privacy.

23  BY MS. BOOTH:

24      Q   Are you going to follow your attorney's

25  instructions --                                 10:27:27

                                        Page 24

```
 1            A    Yes.
 2            Q    -- and refuse to answer the question?
 3                 Sorry, can you please let me ask the whole
 4       question before you respond.
 5            A    Okay.                                      10:27:33
 6            Q    Are you going to refuse to answer the
 7       question?
 8            A    That my attorney -- yes.
 9            Q    Okay.  Did your wife have any input as to
10       Hillshore's involvement with TW?                    10:27:51
11            A    I want to make sure I'm clear, from the
12       initial investment?
13            Q    Yes.
14            A    Because Hillshore has done various
15       investments since the initial.                      10:28:07
16            Q    Initial investment.
17            A    Not that I recall.
18            Q    Has she had --
19            A    She was excited about it.  I mean, she was
20       excited about being a part of an apparel line, yes. 10:28:18
21            Q    Did you consult with her before you made
22       the -- before Hillshore made the initial investment
23       into TW?
24            A    Did I consult, like did we analyze the
25       company and go to the numbers, et cetera?           10:28:42

                                                   Page 25
```

```
 1        Q    Yes.

 2        A    We wouldn't have done that kind of

 3    analysis.  Did we talk about it?  More than likely,

 4    yes.

 5              MR. PEDDIE:  Laura?                        10:28:54

 6              MS. BOOTH:  Yes.

 7              MR. PEDDIE:  Hi.  I'm so sorry to crash in

 8    again.  You guys assured me that there would be

 9    technology for me to participate in this way, and

10    my objection does not extend to saying don't have    10:29:01

11    your deposition, because I think that it does need

12    to go forward, but I need your stipulation that all

13    of my objections can be reserved until later

14    because I'm getting literally like 15 percent of

15    what's being said, and it's nothing on my end, as    10:29:19

16    far as I can tell.  I've tried three different

17    calls and different phones or anything.  I want to

18    cooperate with you and make this go forward.

19              If you can stipulate that all my

20    objections are reserved and if we can have the       10:29:34

21    transcript sent to me first, I will flip it in two

22    days and send it to John, so I can understand

23    what's going on.  That may be an acceptable

24    solution, or we can try to figure out what the

25    technology issues are and get me online.             10:29:51
```

                                              Page 26

```
 1              MS. BOOTH:  I don't have a problem with

 2    you reserving your right to object, but I don't

 3    know how Mr. Wilson feels about that or how he

 4    feels about you getting the transcript, I don't

 5    know.                                              10:30:05

 6              MR. WILSON:  I'll stipulate to both of

 7    those things.

 8              MR. PEDDIE:  Thank you, everyone.  I

 9    appreciate that.

10              MS. BOOTH:  So you're going to hang up   10:30:12

11    now?

12              MR. PEDDIE:  No, I'll stay hang on and

13    catch whatever I can, but I probably will hang up.

14    I think it's on your end.  And if anybody has a

15    bright idea about some other phone that could be   10:30:26

16    used for this purpose, again, it seems to give me

17    like ten seconds and cut out for some length of

18    time.  It seems like, Laura, when you speak quite

19    audibly, I pick up a lot of it, and then there's --

20    and then as soon as Laura cuts out, and I don't    10:30:44

21    hear anything.

22              MS. BOOTH:  Off the record.

23              (Off-the-record discussion held.)

24              MS. BOOTH:  Back on the record.

25    ///                                                10:32:16
```

Page 27

Hahn & Bowersock, A Veritext Company
800.660.3187

1    BY MS. BOOTH:

2        Q    Mr. Choi, did you have authority to enter

3    into an investment on behalf of Hillshore without

4    your wife's agreement or say so or acknowledgement?

5        A    That was never brought up.  That has never    10:32:29

6    been brought up.  I'm not -- I don't have it either

7    way.  It's never been brought up.

8        Q    She didn't say, Whatever you want to

9    invest in, go ahead, here's the money?

10       A    No, I don't ever recall us ever having    10:32:48

11   that kind of conversation, either direction, by the

12   way.

13       Q    I understand.  I understand.

14       A    She's obviously aware of this investment.

15       Q    When did you first become aware of TW    10:33:01

16   PDTW, Paula Thomas, any of that line, when were you

17   first made aware of that?

18           MR. WILSON:  Objection; vague and

19   ambiguous and compound as phrased.

20           But if you understand it, you can answer.    10:33:23

21           THE WITNESS:  So I don't remember the date

22   that I first talked about Thomas Wylde.  I don't

23   even remember the date that we first gave money.  I

24   do remember who brought it to my attention.  I met

25   two of my friends, Ian and Roger introduced me to    10:33:50

Page 28

```
 1  another person, John Hanna, and I don't think
 2  Thomas Wylde was the only company mentioned in
 3  these days, the beginning days of investing in
 4  Thomas Wylde, but Thomas Wylde was definitely one
 5  of the entities that was mentioned.                  10:34:15
 6  BY MS. BOOTH:
 7      Q    You said --
 8      A    I think it was -- I think we met before
 9  about something else and Thomas Wylde came after
10  the fact.  I don't know if John met Paula or they   10:34:27
11  heard about Thomas Wylde's issues.  When we first
12  invested in the company, when Hillshore first
13  invested in the company, it was because of some
14  debt issues, and that's how we got involved in the
15  company.                                             10:34:42
16          Her initial, I don't know if it was Paula
17  Thomas or whoever the people were involved in the
18  company those days had issues with those investors,
19  that group, the group that loaned money.  Again, I
20  don't remember the details behind all this, because  10:35:00
21  I never met the other group, so I don't know who
22  and what and how that happened, but Thomas Wylde
23  was in some financial issues because of debt is how
24  I would describe it.
25      Q    Let's go back to the beginning, you said    10:35:18
```

Page 29

```
 1    that two of your friends, Ian and Roger?

 2         A    No, not Ian, Roger and Doug, it was Roger

 3    and Doug.

 4         Q    Can you give me each of their last names?

 5         A    Roger's last name is Kuo, K-u-o, and          10:35:32

 6    Doug's last name is Lee, L-e-e.

 7         Q    These are personal friends of yours?

 8         A    Yes.

 9         Q    Or business associates?

10         A    Personal friends of mine.                     10:35:51

11         Q    Do you know how they knew John Hanna?

12         A    Again, I don't know that answer for sure,

13    but Roger is in Web design, and his company does

14    Web design for some apparel companies.  That's how

15    I believe their paths crossed.                          10:36:09

16         Q    Okay.  Now, you said that you believe that

17    you were possibly approached about TW at some time

18    prior to when you -- when Hillshore actually

19    invested in; is that correct?  Let me ask you

20    this -- let me strike that.                             10:36:31

21         A    Let me just tell you, we met, I met John.

22    They wanted me to meet John, okay.  This is me

23    personally meeting John, not for investment, just

24    to meet John.  I don't remember exactly all the

25    things we talked about, but John had a long résumé     10:36:45
```

Page 30

1   of work in the apparel business.

2       Q    Were you looking --

3       A    I don't know why they were introducing me,

4   because I wasn't looking for an apparel company.

5   If I could go back in time, I would scratch that          10:37:03

6   meeting, but it's too late.  I can't do anything

7   about it.  No, I was not looking for apparel.  I do

8   personally look into investments of all various

9   sorts, so maybe that's how it came up.  I don't

10  recall exactly how it came up, but talking with          10:37:22

11  John at any time at these meetings, and I can't

12  remember if Roger and Doug were at all of them but

13  one or two of them were always there at the initial

14  days.  It was always regarding apparel.

15       When I say "apparel," it could be clothes,          10:37:34

16  it could be shoes, it could be whatever.  It wasn't

17  just Thomas Wylde.

18       Q    Okay.

19       A    Okay.

20       Q    So you don't have an understanding as to        10:37:47

21  why Roger and Doug first brought you and Hanna

22  together; is that correct?

23       A    I don't recall why that happened, no.

24       Q    Okay.

25       A    Except they knew that I looked for            10:37:58

Page 31

# EXHIBIT "6"

1. Eniluz Gonzalez testified on July 31, 2017.  (pg. 8, lns. 7-16)

2. Eniluz Gonzalez was instructed that she was going to have to testify in the state court action and as a Defendant in the federal case.  (pg. 9, ln. 11 - pg. 10, ln. 1)

3. Gonzalez stated she was going to be in the United States until November 2017.  (pg. 14, lns. 13-15)

4. Gonzalez then testified that she has travel plans leaving the next Wednesday and returning on November 2017.  (Gonzalez, pg. 14, ln. 18 through pg. 15, ln. 23)

5. Gonzalez received the subpoena duces tecum and she was required to produced documents, but she did not produce any documents.  (Gonzalez, pg. 19, lns. 4-19)

6. Gonzalez testified that she did not know why she did not produce any documents at the deposition.  (Gonzalez, pg. 19, ln. 23-25)

7. Gonzalez testified that she does not have any documents.  (Gonzalez, pg 21, ln. 17 though pg. 22, ln. 15)

8. Gonzalez claims she is the President of Hillshore Investment.  (Gonzalez, pg. 22, lns. 21-23)

9. Gonzalez did not know if Hillshore Investment invested nearly $10 million in TW.  (Gonzalez, pg 22, ln. 24 though pg. 23, ln. 1)

10. Gonzalez did not know how much money Hillshore Investment invested in TW.  .  (Gonzalez, pg 23, lns. 2-4)

11. Gonzalez does not have any duties or responsibilities as the President of Hillshore. (Gonzalez, pg 23, lns. 11-13)

12. Gonzalez was not familiar with **Exhibit "22",** an Agreement to Purchase Membership Interests (Gonzalez, pg. 23, ln. 19 through pg. 24, ln. 17)

13. Gonzalez testified that she is the General Manager of Hillshore as stated on Exhibit "22." (Gonzalez, pg. 24, lns. 10-25)

14. Gonzalez testified that she holds two positions at Hillshore -- President and General Manager. (Gonzalez, pg. 25, lns. 1-6)

15. She does not have any duties or responsibilities as the General Manager for Hillshore. (Gonzalez, pg. 25, lns. 7-9)

16. Gonzalez testified that she does not know if she has other job positions at Hillshore. (Gonzalez, pg. 25, lns. 10-15)

17. Gonzalez' signature appears on Exhibit "22", but she does not remember signing the documents, and she did not read the document before signing. (Gonzalez, pg. 25, lns. 16-25)

18. She does not know why she signed Exhibit "22" and she does not have a copy of the document. (Gonzalez, pg. 26, lns. 8-15)

19. Gonzalez does not know if Hillshore Investment has a copy of the Exhibit. (Gonzalez, pg. 26, lns. 12-15)

20. Gonzalez does not know if Hillshore have an office. (Gonzalez, pg. 16-18)

21. She does not remember how long she has been the President of Hillshore (Gonzalez, pg. 26, ln. 25 through pg. 27, ln. 3)

2

22. She has not walked into the offices of Hillshore Investment.  (Gonzalez, pg. 27, lns. 4-6)

23. Gonzalez has a laptop computer at home but she does not have any ESI regarding Hillshore Investment on it.  (Gonzalez, pg. 27, lns. 9-12)

24. She does not have any documents regarding Hillshore whatsoever. (Gonzalez, pg. 27, lns. 13-15)

25. Gonzalez claims she owns shares in Hillshore, but her attorney would not allow her to provide the number of shares and she does not have a Certificate of Shares.  (Gonzalez, pg. 27, ln. 25 through pg. 28, ln. 13)

26. She does not have any documents indicating that she owns all the shares of Hillshore.  (Gonzalez, pg. 28, lns. 11-13)

27. Gonzalez does not know the telephone number of Hillshore.  (Gonzalez, pg. 28, lns. 18-20)

28. She does not know of any physical location of Hillshore Investments. (Gonzalez, pg. 28, lns. 21-23)

29. She does nothing to operate Hillshore Investments.  (Gonzalez, pg. 29, lns. 14-19)

30. She does not know if Hillshore Investment has any business operations. (Gonzalez, pg. 29, lns. 21-23)

31. **The only personal knowledge of any business operations she has is of Thomas Wylde.  (Gonzalez, pg. 29, ln. 23 through pg. 30, ln. 8)**

32. She does not know what Hillshore Investment does.  (Gonzalez, pg. 31, lns. 11-12)

33. However, Gonzalez then testified that she does not have any business operations with Thomas Wylde. (Gonzalez, pg. 31, lns. 13-15)

34. Gonzalez does not know why Hillshore Investment invested money into Thomas Wylde. (Gonzalez, pg. 31, lns. 16-18)

35. She did not make the decision to invest $9.1 million into Thomas Wylde. (Gonzalez, pg. 31, ln. 16-18)

36. She does not know whose decision it was to invest $9.1 million into TW (Gonzalez, pg. 31, lns. 22-23) , but then she testified that her husband Stephen Choi made that decision. (Gonzalez, pg. 32, lns. 3-8)

37. She did not have any discussions with Choi regarding his decision to invest in TW. (Gonzalez, pg. 32, 10-20)

38. Gonzalez does not know how many employees Hillshore Investment currently has. (Gonzalez, pg. 35, lns. 7-9)

39. Gonzalez does not know the maximum number of employees it had during its existence. (Gonzalez, pg. 35, ln. 11-13)

40. Gonzalez does not have any documents to prove Hillshore Investment actually employees people. (Gonzalez, pg. 35, lns.11-17)

41. The subpoena duces tecum requested 22 categories of documents to be produced. (Gonzalez, pg. 36, ln. 17 though pg. 37, ln. 20)

42. Gonzalez did not produce and did not have any documents that were subpoenaed, including (a) bylaws of Hillshore; (b) articles of incorporation; (c) minutes of board of directors from 2014 to the present; (d) purchase agreement of TW by Hillshore; (e) physical location of Hillshore; (f)

4

business purpose of Hillshore; (g) advertising for Hillshore; (h)
organizational charts for Hillshore; (i) bank statements reflecting transfer of
money between accounts in the name of Hillshore and Thomas Wylde; (j)
documents regarding the physical location of Hillshore, the names,
addresses, telephone numbers, e-mail addresses of any agents, employees,
directors and officers of Hillshore; (k) documents related to the number of
shares Hillshore issued; (l) documents related to loans Hillshore made to
TW; (m) documents related to investments by Hillshore to TW; (n)
documents regarding returns of investments to TW.  (Gonzalez, pg. 37, ln.
10 through pg. 44, ln. 3)

43. Other than herself, she does not know of shares being issued to anybody else.
(Gonzalez, pg. pg. 44, lns. 16-23)

44. She did not know what Paula Thomas did at TW. (Gonzalez, pg. 47, lns. 7-
23)

45. Gonzalez does not know if Hillshore has any bank accounts. (Gonzalez, pg.
52, lns. 17-19)

46. Gonzalez was born in Venezuela and obtain a high school degree.
(Gonzalez, pg. 57, lns. 5-12)

47. Gonzalez was born on June 18, 1974.  (Gonzalez, pg. 58, lns. 17-18)

48. At the time of her deposition, Gonzalez was 43 years old.  (Gonzalez, pg. 58,
lns. 17-18)

49. Her husband (Stephen Choi) created Hillshore Investment.  (Gonzalez, pg.
60, ln. 22 through pg. 61, ln. 5)

50. She did not know when Hillshore Investment was created.  (Gonzalez, pg. 61, lns. 6-13)

51. Gonzalez' work experience includes working at a bank out of high school, selling phones, buying swim suits for sale, and working as a waitress. (Gonzalez, pg. 59, ln. 6 though pg. 63, ln. 2)

52. From 2000 to the present (2017 at the time of her deposition), she has been a stay at home mom.  (Gonzalez, pg. 64, lns. 21-23)

53. She has not worked outside the home during that time.  (Gonzalez, pg. 64, ln. 25 through pg. 65, ln. 1)

54. She has not worked for any business inside the home.  (Gonzalez, pg. 65, ln. 5-7)

55. Gonzalez does not have any education, background, training, work experience to be a President of an investment company like Hillshore Investment.  (Gonzalez, pg. 66, lns. 4-8)

56. Gonzalez does not have any education, background, training, work experience to be a General Manager of an investment company like Hillshore Investment.  (Gonzalez, pg. 66, lns. 9-13)

57. She learned from her husband that she was the President of Hillshore. (Gonzalez, pg. 67, lns. 3-6)

58. She claims there is a document that states she is the President, but she does not remember the document and she does not remember the last time she saw it.  (Gonzalez, pg. 67, lns. 7-13)

59. Gonzalez claims Hillshore was the only company for which she was a President. (Gonzalez, pg. 74, lns. 1-4)

60. She is noted on Exhibit 25 to be the President and Director **BUCANOS ENTERPRISES** and the President and Founding Member of the company **MAGNETIC BLUE INVESTMENT FOURNDATION**, but she has never utter those words. (Gonzalez, pg. 73, ln. 17 though pg. 75, ln. 7)

61. She does not know if she was the Presidents of those companies. (Gonzalez, pg. 76, lns. 8-18)

62. She does not know that she was a President and Founding Member of **MAGNETIC BLUE INVESTMENT FOURNDATION**. (Gonzalez, pg. 76, ln. 25 through 77, ln. 1)

63. Her brother is the Secretary of **MAGNETIC BLUE INVESTMENT FOURNDATION** but they have never talked about that company. (Gonzalez, pg. 86, ln. 19 though pg. 87, ln. 4)

64. She did not tell anybody or write anything stating she was going to be the President of **MAGNETIC BLUE INVESTMENT FOURNDATION.** (Gonzalez, pg. 87, ln. 23 through pg. 88, ln. 6)

65. John Wilson would not allow the witness to state what Stephen Choi does for a living. (Gonzalez, pg. 91, ln. 23 - pg. 93, ln. 8)

66. She does not know if she ever caused any money to be transferred from a bank account in the name of Hillshore Investment to a bank account in the name of TW. (Gonzalez, pg. 95, lns. 13-17)

67. Gonzalez does not know if she ever caused money to be transferred from Hillshore Investment, S.A. to any bank account in the United States in the name of TW. (Gonzalez, pg. 95, ln. 23 through pg. 96, ln. 2)

68. As the alleged President for Hillshore, Gonzalez has never instructed anybody to wire transfer from a bank account in Hillshore Investment, S.A.'s name to TW. (Gonzalez pg. 96, lns. 6-12)

69. As the alleged General Manager for Hillshore, Gonzalez has never instructed anybody to wire transfer from a bank account in Hillshore Investment, S.A.'s name to TW. (Gonzalez pg. 97, lns. 15 through pg. 98, ln. 1)

70. Gonzalez has never seen **Exhibit "26"** (Certificate of Incorporation for Hillshore Investment). (Gonzalez, pg. 98, lns. 13-20)

71. Gonzalez has never seen the Certificate of Incorporation as the President and General Manager for Hillshore and she does not know what the document is. (Gonzalez, pg. 98, ln. 25 through pg. 99, ln. 6)

72. Gonzalez was never involved in any activities or conversation or cause anybody to get involved in any of the business purposes set forth in Exhibit "26." (Gonzalez, pg. 98, ln. 17 through pg. 103, ln. 23)

73. Gonzalez never had any meetings as 100% Shareholder in Panama City as required by Exhibit "26." (Gonzalez pg. 109, lns. 16-22)

74. There has never been a shareholder's meeting for Hillshore Investment. (Gonzalez pg. 109, ln. 24 through pg. 110, ln. 10)

75. She does not know how many directors are on the board for Hillshore. (Gonzalez, pg. 109, lns. 11-16)

8

76. Gonzalez does not understand the powers of the corporation for Hillshore Investment. (Gonzalez, pg. 112, lns. 11-13)

77. Gonzalez does not know who the officers of Hillshore Investment are. (Gonzalez, pg. 112, lns. 11-14)

78. Gonzalez never voted for officers or directors as the 100% shareholder of Hillshore Investment. (Gonzalez, pg. 115, lns. 6-9)

79. She does not know if Hillshore Investment made any type of loans to Thomas Wylde. (Gonzalez, pg. 118, lns. 9-12)

80. She does not know the difference between a loan and an investment. (Gonzalez, pg. 118, lns. 13-19)

81. Her attorney would not allow Gonzalez to provide her understanding of the relationship between TW and Hillshore. (Gonzalez, pg. 118, ln. 21 through pg. 120, 15)

82. She has never seen the Operating Agreement for TW. (Gonzalez, pg. 126, ln. 25 through pg. 126, ln. 13)

# EXHIBIT "7"

```
1            UNITED STATES BANKRUPTCY COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 RIVERSIDE DIVISION

4    _____

5    In Re                    )  No.

6    PDTW, LLC,               )  6-16-bk-15889-SY

7              Debtor.        )

8    _____)

9    LARRY SIMMONS, Chapter 7  )  Adv. No.

10   Trustee,                  )  6:17-AP-01200-SY

11             Plaintiff,      )

12        vs.                  )

13   PAULA THOMAS, an individual,)

14   et al.,                   )

15             Defendants.     )

16   _____)

17

18       VIDEOTAPED DEPOSITION OF DOUGLAS LEE

19           Los Angeles, California

20           Friday, November 2, 2018

21                  Volume I

22   Reported by:

23   JUDITH A. MANGO

24   CSR No. 5584

25   PAGES 1 - 274
```

Page 1

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              RIVERSIDE DIVISION

4     _____

5     In Re                       )  No.

6     PDTW, LLC,                   )  6:16-bk-15889-SY

7              Debtor.             )

8     _____)

9     LARRY SIMMONS, Chapter 7     )  Adv. No.

10    Trustee,                     )  6:17-AP-01200-SY

11              Plaintiff,         )

12          vs.                    )

13    PAULA THOMAS, an individual,)

14    et al.,                      )

15              Defendants.        )

16    _____)

17

18

19         Videotaped Deposition of DOUGLAS LEE,

20    Volume I, taken on behalf of Defendant Paula Thomas,

21    at 2049 Century Park East, Los Angeles, California,

22    beginning at 10:14 a.m. and ending at 4:32 p.m. on

23    Friday, November 2, 2018, before JUDITH A. MANGO,

24    Certified Shorthand Reporter No. 5584.

25

                                            Page 2

```
1    APPEARANCES:

2

3    For Defendant Paula Thomas:

4            LDT CONSULTING, INC.

5            BY:  DIMITRIOS P. BILLER

6            Attorney at Law

7            15113 West Sunset Boulevard, Suite 9

8            Pacific Palisades, California  90272

9            (310) 459-9870

10           biller_ltdconsulting@verizon.net

11

12   For the Witness:

13           THE BRAND LAW FIRM

14           BY:  DON E. BRAND

15           Attorney at Law

16           2321 East 4th Street, Suite C-473

17           Santa Ana, California  92705

18           (714) 769-6485

19           don@brandlawfirm.net

20

21   Also Present:

22           PAULA THOMAS

23           STEVEN TOGAMI, VIDEOGRAPHER

24

25
```

Page 3

```
 1                            INDEX

 2

 3   WITNESS                                    EXAMINATION

 4   DOUGLAS LEE

 5   VOLUME I

 6

 7                    BY MR. BILLER   11, 166

 8

 9

10

11              INSTRUCTION NOT TO ANSWER

12                  PAGE              LINE

13                   21                6

14                   26                15

15                   28                8

16                   32                19

17                   69                15

18                  167                8

19                  172                3

20

21

22                  EXHIBITS

23

24   NUMBER            DESCRIPTION              PAGE

25   Exhibit 1   Subpoena for Douglas Lee        19


                                          Page 4
```

```
 1                      EXHIBITS (CONTINUED)

 2

 3     NUMBER                DESCRIPTION              PAGE

 4     Exhibit 2    Subpoena for person most          19

 5                  knowledgeable at LaunchPad

 6                  Communications

 7

 8     Exhibit 3    Douglas Lee's responses and       36

 9                  objections to request for

10                  production of documents

11                  pursuant to subpoena

12

13     Exhibit 4    Privilege log                     36

14

15     Exhibit 5    Pages from LaunchPad website      71

16

17     Exhibit 6    Document entitled "Valuation of   92

18                  the Intellectual Property Owned

19                  by Ms. Paula Thomas and Licensed

20                  to PDTW, LLC, Date of Value

21                  October 17, 2013

22

23     Exhibit 7    Document entitled "Thomas Wylde  101

24                  Presentation to Management, January

25                  8, 2016"
```

Page 5

1                    EXHIBITS (CONTINUED)

2

3        NUMBER              DESCRIPTION              PAGE

4        Exhibit 8      Series of e-mails, first dated    104

5                       December 10, 2015 from David

6                       Schnider to Henry J. Kahrs

7

8        Exhibit 9      Series of e-mails, first dated    109

9                       November 5, 2015 from Stephen

10                      Choi to Doug Lee and Roger Kuo

11

12       Exhibit 10     Series of e-mails, first dated    116

13                      March 3, 2015 from Stephen Choi

14                      to Roger Kuo and Doug Lee

15

16       Exhibit 11     Document entitled "Binding Term    120

17                      Sheet"

18

19       Exhibit 12     E-mail dated May 16, 2014 from    131

20                      Doug Lee to John Hanna

21

22       Exhibit 13     E-mail dated July 9, 2014 from    144

23                      Doug Lee to Paula Thomas

24

25

                                            Page 6

```
 1 │ regarding communications between you and Stephen
 2 │ Choi?
 3 │         MR. BRAND:  Objection; asked and answered.
 4 │         THE WITNESS:  No.
 5 │ BY MR. BILLER:                                    10:47:13
 6 │     Q    What documents are you withholding?
 7 │     A    Stuff that's -- that might be social,
 8 │ documents that are -- may be related to other
 9 │ business -- business that's unrelated to Thomas
10 │ Wylde.                                            10:47:40
11 │     Q    Anything else?
12 │     A    I believe those are -- yeah, I believe
13 │ those are the documents.
14 │     Q    Okay.  Were any of those documents related
15 │ to Hillshore Investment?                          10:47:55
16 │     A    I do not believe -- I believe -- I don't
17 │ believe they were related to Hillshore Investment.
18 │     Q    Hillshore is a dummy corporation, correct?
19 │         MR. BRAND:  Objection; vague.
20 │ BY MR. BILLER:                                    10:48:08
21 │     Q    You can answer.
22 │     A    I do -- no, I do not believe it's a dummy
23 │ corporation.
24 │     Q    Well, what -- on what bel -- on what basis
25 │ do you believe it's not a dummy corporation?      10:48:16
```

Page 44

```
 1              MR. BRAND:  Objection; vague.

 2    BY MR. BILLER:

 3        Q    Please explain.

 4        A    I don't understand what -- the definition

 5    of why you would think it's a dummy corporation.    10:48:25

 6        Q    Then why did you ask the -- why did you

 7    answer the question do you think it's a dummy --

 8    it's not -- do you think it's a dummy corporation?

 9    You said "no," you don't think it's a dummy

10    corporation.                                         10:48:38

11              Did you understand the first question and

12    then just not understand the second question because

13    you didn't want to answer it?

14              MR. BRAND:  Objection; argumentative.

15    BY MR. BILLER:                                       10:48:46

16        Q    Okay.  So, please, tell me, do you know

17    what a dummy corporation is, "yes" or "no"?

18        A    Well, I need you to explain what you --

19        Q    No, I don't.  It's common knowledge.

20              MR. BRAND:  Objection --                   10:48:55

21    BY MR. BILLER:

22        Q    You have a tax --

23              MR. BRAND:  -- argumentative.

24    BY MR. BILLER:

25        Q    You have a tax -- international tax degree   10:48:59
```

Page 45

```
 1    from Dartmouth.  You have a UCLA law degree.  I
 2    think you know what a dummy corporation is, sir.
 3             MR. BRAND:  Is there a question pending?
 4    BY MR. BILLER:
 5       Q    So do you know what a dummy corporation is?  10:49:07
 6             MR. BRAND:  Objection; asked and answered.
 7             THE WITNESS:  I don't know what your
 8    definition of --
 9    BY MR. BILLER:
10       Q    Okay.                                       10:49:12
11       A    -- how you're defining dummy corporation.
12       Q    What is your definition?
13       A    A corporation -- a corporation that doesn't
14    legally exist.
15       Q    Okay.  Anything else?  Any other            10:49:28
16    definition?
17       A    No.  I would say that's -- that would be my
18    understanding of what a dummy corporation is.
19       Q    Okay.  And do you believe Hillshore
20    Investment legally exists?                          10:49:41
21       A    Yes, I do.
22       Q    On what basis?
23       A    Based on the information that was provided
24    in the documentation when the deal was structured.
25       Q    What information was provided in the        10:49:52

                                                          Page 46
```

1    documentation that was provided when the deal was

2    structured?

3        A    The name of the corporation, where it was

4    located.

5        Q    So that's it?                                    10:50:00

6        A    Yes.

7        Q    You've never visited the offices of

8    Hillshore Insure -- Investment, correct?

9        A    Yes, I have not.

10       Q    Have you ever purchased any products from    10:50:10

11   that company?

12       A    No.

13       Q    Have you ever pur -- made -- has that

14   company ever provided you with any services?

15       A    No.                                            10:50:18

16       Q    Do you know who the boards of the member --

17   members of the board are for that company?

18       A    No.

19       Q    Do you know how many employees they have?

20       A    No.                                            10:50:25

21       Q    Do you know if it pays taxes?

22       A    No.

23       Q    Do you know if it has any sources of

24   income?

25       A    I do not know.                                 10:50:32

                                                    Page 47

1      Q    Do you know if it has any expenses?

2      A    I do not know.

3      Q    Do you know if it has distribution

4  contracts or other contracts with third parties?

5      A    I do not know.                              10:50:54

6      Q    Okay.  Who owns Hillshore?

7      A    I'm -- I am not sure.

8      Q    Okay.  Who do you think owns Hillshore?

9      A    I -- Stephen Choi or -- and -- and -- or

10  Eniluz.                                             10:51:26

11     Q    Do you know why Stephen Choi would say at

12  his deposition he doesn't own Hillshore?

13          MR. BRAND:  Objection; calls for

14  speculation.

15          THE WITNESS:  I don't know.                 10:51:34

16  BY MR. BILLER:

17     Q    You -- you would -- you would agree with me

18  that that testimony is inconsistent with what you

19  just said, correct?

20     A    Mine was speculation, so --                 10:51:41

21     Q    Oh, thank you.  Everything you've said

22  about Hillshore was speculation, right?

23     A    Yeah, I don't know.

24     Q    No.  You don't know if it was speculation?

25          MR. BRAND:  Objection; mis -- misstates his 10:51:55

Page 48

```
 1    testimony.

 2    BY MR. BILLER:

 3        Q    Do you know if everything you've said was

 4    speculation about Hillshore?

 5              MR. BRAND:  Objection; argumentative.      10:52:04

 6              THE WITNESS:  Yes.

 7    BY MR. BILLER:

 8        Q    Okay.  Is it speculative?

 9              MR. BRAND:  Objection --

10    BY MR. BILLER:                                        10:52:09

11        Q    Was it --

12              MR. BRAND:  -- asked and answered.

13    BY MR. BILLER:

14        Q    Was it speculative?

15              MR. BRAND:  Objection; vague.               10:52:14

16              THE WITNESS:  Yes.

17    BY MR. BILLER:

18        Q    Okay.  So merely because Hillshore's name

19    appears on a piece of paper doesn't mean it exists,

20    does it?                                              10:52:23

21        A    Yes.

22        Q    Okay.  Did you sign an agreement to

23    purchase?

24              MR. BRAND:  Objection; vague.

25              THE WITNESS:  I don't understand your       10:52:42
```

Page 49

# EXHIBIT "8"

# David A. Schnider
14606 Otsego Street, Sherman Oaks, CA 91403
daschnider@sbcglobal.net   (818) 207-5134 (cell)

## SUMMARY

Results-oriented legal and business development executive with over 15 years experience resolving a broad range of challenges related to consumer products businesses. Proven track record of planning and implementing creative and pragmatic solutions that align practical business needs with legal and regulatory requirements. Experience leading teams to develop new business opportunities and streamline existing business operations.

## SPECIALTIES

• intellectual property • licensing • distribution • regulatory compliance • contracts • litigation
• employment • collections • antitrust • government affairs • business development • risk management

## EXPERIENCE

**Leg Avenue, Inc.,** *General Counsel, 2007-Present*
Sole in-house counsel for a closely held, $85 million apparel wholesaler, responsible for all legal issues, regulatory compliance, and business development.

- Developed licensed costume business from scratch, generating over $8 million in new revenue.
- Established industry-leading product safety program to ensure global compliance and protect the company from product liability litigation, Prop 65 claims, and government investigation.
- Implemented legal strategy for international sales resulting in contracts with 11 distributors covering more than 30 countries and annual growth exceeding 15%.
- Created a global intellectual property protection and enforcement program for over 100 assets that led to the removal of dozens of infringing websites.
- Drafted employment policies and handbooks to protect confidential information and intellectual property assets and to limit exposure from potential employment claims.
- Managed a 5-member IT team on an interim basis while the company searched for an IT Manager.
- Counseled owners on corporate strategy leading to new plans for developing business, increasing profitability, and extending the company's brand.
- Implemented standard procedures and forms for multiple departments, ensuring improved internal communication and work flow, better customer service, and greater ability to collect debts.
- Evaluated potential antitrust exposure and created policies to regulate resale channels and pricing.
- Litigated collection and employment claims, significantly reducing outside counsel expenses and protecting the company from potential losses.

**Sedgwick LLP,** *Partner, 2005-2007; Associate, 1998-2004*
Partner in the intellectual property group of a national law firm, protecting clients' intellectual property assets, assisting them in leveraging those assets, and defending them against a variety of business claims.

- Second-chaired two federal trials, one state trial, and two arbitrations.
- Successfully argued dozens of motions summarily terminating claims against clients, limiting the scope of discovery, and otherwise protecting clients' interests.
- Supervised a team of 5 associates handling discovery, motion practice, and trial preparation on a variety of cases, including a number of multi-million dollar claims.
- Negotiated and drafted a variety of general business contracts, including license, distribution, software development, and confidentiality agreements.

SCHNIDER_BK 001531

- Developed a new practice area representing video game developers, successfully negotiating the first publication deal for one client and a major project agreement for another.
- Actively participated in firm management, helping to transition the firm's software platform and develop business strategy for the practice group.

## EDUCATION

**University of California Hastings College of the Law,** *Juris Doctorate, 1998*
> Editor, Hastings Communications and Entertainment Law Journal

**University of California, Berkeley,** *Bachelor of Arts, Rhetoric, 1995*
> Intern to a member of the British House of Commons during year abroad

## PUBLICATIONS

- "Weighing the Benefits of Being an In-House Counsel," *Survival Guide for New Attorneys in California*, September 2011
- **"From the Chair"** Monthly Column, *Los Angeles Lawyer*, July 2009 to July 2010.
- "Computer Counselor: What Lawyers Need to Know about Text Messaging with Clients," *Los Angeles Lawyer Magazine*, February 2009
- "What Every Lawyer Should Know about Trademarks," *L.A. County Bar Association's Update*, May 2007, Vol. 27, No. 5.
- "Practice Basics: Getting the Most out of Support Staff," *Los Angeles Lawyer Survival Guide for New Attorneys*, Fall 2006
- "Preparing a Case: Assuming Ownership of Your Cases," *Los Angeles Lawyer Survival Guide for New Attorneys*, Fall 2005
- Presenter, "Intellectual Property Rights in Videogames," DG Expo, North Carolina, June 2005.
- "Sue different: Apple threatens insider sites after leaks," USC Annenberg, *Online Journalism Review* (interviewed and quoted), January 2005.
- "Licensed to Kill?: The Battle Between Patent and Antitrust Law in Monopoly Leveraging Cases," 20 Hastings Comm. & Ent. L.J. 857 (1997-1998)

## ACTIVITIES

- Assistant Commissioner, AYSO Region 58
- Former Chair, *Los Angeles Lawyer* magazine editorial board
- Completed Association of Corporate Counsel Mini-MBA Program
- Former Member of the Board of Trustees, Temple Beth Hillel

## ORGANIZATIONS

California Bar, Los Angeles County Bar, Association of Corporate Counsel

## INTERESTS

Soccer, history, and video games

SCHNIDER_BK 001532

# EXHIBIT "9"

**From: David Schnider** david@thomaswylde.com 
**Subject:** Fwd: TW Operation Agreement
**Date:** November 21, 2014 at 5:14 PM
**To:** Norman Ko norman@kfpgcpa.com
**Cc:** John Hanna johnhanna@thomaswylde.com, **Meldy Rafols** meldy@thomaswylde.com

Norm:

We received the comments below on the Operating Agreement. In Exhibit C they have substantially rewritten the tax allocations. Can you please take a look at that Exhibit and let me know if you see anything of significant concern that we need to raise?

Thanks,
David

> Begin forwarded message:
>
> **From:** Doug Lee <dlee@lpdirect.com>
> **To:** "David Schnider (david@thomaswylde.com)" <david@thomaswylde.com>, "John Hanna (johnhanna@thomaswylde.com)" <johnhanna@thomaswylde.com>
> **Cc:** "Richard Kim (richarddkim@yahoo.com)" <richarddkim@yahoo.com>
> **Subject:** TW Operation Agreement
> **Date:** November 21, 2014 at 12:43:22 PM PST
>
> Hi David,
>
> Attached is the TW operation agreement with our redlines. Probably about half of the redlines are just for clarification. A quarter of the redlines are not major and another quarter are the real substantive changes.
>
> To expedite this and limit the legal fees, I think the best approach is for David to review and then call our attorney, Richard Kim, so they can discuss and get the agreement finalized.
>
> Richard's number is 310-351-8808.
>
> Thanks.
>
> **LaunchPad Communications**
> *"To Foster Entrepreneurial Spirit and Develop World Class Enterprises"*
> **Douglas Lee | Managing Director | dlee@lpdirect.com | phone: 714.463.4677 | fax: 714.463.4678**



**Thomas Wylde**
**Operari...1.docx**

SCHNIDER_BK 004732

DRAFT OF 11/21/2014
SUBJECT TO COMPLETION

## OPERATING AGREEMENT OF THOMAS WYLDE, LLC

This ~~written operating agreement~~Operating Agreement (the "Agreement") of THOMAS WYLDE, LLC ~~(the "Company"),~~ a limited liability company formed under the California Revised Uniform Limited Liability Company Act~~;~~ (the "Company"), is entered into as of July 22, 2014 by John Hanna, Jene Park, Doug Lee, and Roger Kuo (each a "Member," and collectively the "Members").

The Articles of Organization of ~~Thomas Wylde, LLC~~ (the "Company"), were filed with the California Secretary of State on July 22, 2014 and have been adopted and approved by the Members.

The Members enter into this Agreement to memorialize the terms and conditions of governance of the Company, the conduct of its business, and their relative rights and obligations.

Now therefore, the parties agree as follows:

### ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article, Exhibit C, or elsewhere in this Agreement, and when not so defined shall have the meanings set forth in Corporations Code § 17701.02.

1.1.    "**Act**" means the California Revised Uniform Limited Liability Company Act (Corporations Code §§ 17701.01-17713.13), including amendments from time to time.

1.2.    "**Affiliate**" of a Member or Manager means (i) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or Manager~~,~~ or (ii) a family member of the Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.3.    "**Available Cash**" means all net revenues from the Company's operations, including net proceeds from all sales, re-financings, and other dispositions of Company property that the ~~Manager, in the Manager's sole discretion, deems~~Members, by Vote of a Supermajority of Members, deem in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves.

1.4.    "**Capital Account**" ~~means, with respect to any Member,~~shall mean the account ~~reflecting the capital interest~~maintained for a Member or Assignee pursuant to Section 2.1 of ~~that Member in the Company, consisting of the~~ Exhibit C. Each Member's initial Capital ~~Contribution, maintained and adjusted in accordance with Article III~~Account balance as of the date of this Agreement is set forth in Exhibit A.

SCHNIDER_BK 004733

| | | | | | | |
|---|---|---|---|---|---|---|
| 449 | 12/16/2013 | E-mail w attachment | David Schnider | Paula Thomas | | E-mail correspondence regarding Meet with Mike Preston | Attorney-Client |
| 450 | 12/17/2013 | E-mail | David Schnider | Jene Park | Paula Thomas | E-mail correspondence regarding Finance One Agreement | Attorney-Client |
| 451 | 12/17/2013 | E-mail | David Schnider | Paula Thomas; Jene Park | | E-mail correspondence regarding Wylde trademark | Attorney-Client |
| 452 | 12/17/2013 | E-mail | David Schnider | Jene Park | | E-mail correspondence regarding Manufacturer agreement | Attorney-Client |
| 453 | 12/17/2013 | E-mail | David Schnider | Paula Thomas | Jene Park | E-mail correspondence regarding information gathering | Attorney-Client |
| 454 | 12/17/2013 | E-mail | David Schnider | Jene Park | | E-mail correspondence regarding manufacturing agreement | Attorney-Client |
| 455 | 12/17/2013 | E-mail | David Schnider | Jene Park | | E-mail correspondence regarding Vendome | Attorney-Client |
| 456 | 12/18/2013 | E-mail | David Schnider | Jene Park | | E-mail correspondence regarding CBC agreement | Attorney-Client |

1.~~16~~15.      "**IRC**" or "**Code**" means the Internal Revenue Code of 1986, as amended, and any successor provision.

~~1.17.    "Majority of Members" means a Member or Members whose Unit Percentage represents more than 50% of the Unit Percentages of all the Members.~~

1.16 ~~1.18.    —~~"**Member**" means any of the four initial Members listed herein - John Hanna, Jene Park, Doug Lee, and Roger Kuo - or a Person who subsequently acquires a Membership Interest in the Company, as permitted under this Agreement, and who has not ceased to be a Member under Article VIII or for any other reason.

1.~~19~~17.      "**Membership Interest**" means a Member's entire interest and rights in the Company, collectively, including the Member's ~~Transferable Interest~~economic rights, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.18.  ~~1.20.    "Net Profits" and "Net Loss" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC § 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to IRC § 703(a)(1) shall be included in taxable income or loss), with the following adjustments:~~

~~(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Loss shall be added to such taxable income or loss;~~

~~(b)    Any expenditures of the Company described in IRC § 705(b)(2)(B) or treated as IRC § 705(b)(2)(B) expenditures pursuant to Regulations §§ 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Loss shall be treated as a deductible expense;~~

~~(c)    Items of gain, loss, and deduction shall be computed based upon the Carrying Values of the Company's assets (in accordance with Regulation §§ 1.704-1(b)(2)(iv)(g) and/or 1.704-3(d)) rather than upon the assets' adjusted bases for federal income tax purposes;~~

~~(d)    The amount of any adjustments to the Carrying Values of any assets of the Company pursuant to IRC § 743 shall not be taken into account;~~

~~(e)    The amount of items of income, gain, loss or deduction specially allocated to any Members pursuant to Section 4.1(a) shall not be included in the computation; and~~

~~(f)    The amount of any items of Net Profits or Net Losses deemed realized upon an in-kind distribution or upon an adjustment to the Capital Accounts of the Members at any time specified in Regulation § 1.704-1(b)(2)(iv)(f) shall be included in the computation.~~

~~1.21~~"**Net Profits**" and "**Net Loss**" shall have the meaning set forth in Section 1.7 of Exhibit C attached hereto.

3

SCHNIDER_BK 004735

1.19.    "**Notice**" means a notice in writing required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic transmission by or to the Company; or when delivered to the home or office of a recipient in the care of a person whom the deliverer has reason to believe shall promptly communicate the notice to the recipient.

Any correctly addressed notice that is refused, unclaimed, or undeliverable because of an act or omission of the party to be notified shall be deemed effective as of the first date that the notice was refused, unclaimed, or deemed undeliverable by the postal authorities, messenger, or overnight delivery service.

Any party may change its address, electronic mail address, or fax number by giving the Manager Notice of the change.

1.2~~2~~20.    "**Person**" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.2~~3~~21.    "**Proxy**" means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member.  A Proxy may not be transmitted orally.

1.2~~4~~22.    "**Regulations**," "**Reg**," or "**Treasury Reg**" means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the IRC, as those Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.2~~5~~23.    "**Reserves**" means the aggregate of reserve accounts that the ~~Manager, in the Manager's sole discretion, deems~~Members, by Vote of a Supermajority of Members, deem reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

1.2~~6~~24.    "**Successor in Interest**" means a Transferee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.2~~7~~25.    "**Supermajority of Members**" means a Member or Members whose aggregate Unit Percentage represents at least 66--2/3% of the Unit Percentages of all ~~the~~non-Defaulting Members.

4

SCHNIDER_BK 004736

| 475 | 1/14/2014 | E-mail | David Schnider | Andrew Apfelberg | | E-mail correspondence regarding relevant experience | Attorney-Client |
|-----|-----------|--------|----------------|------------------|--|----|-----------------|
| 476 | 1/14/2014 | E-mail | David Schnider | Andrew Apfelberg | | E-mail correspondence regarding M&A counsel | Attorney-Client |
| 477 | 1/14/2014 | E-mail w attachment | David Schnider | Paula Thomas | Jene Park | E-mail correspondence regarding draft Keyser agreement | Attorney-Client |
| 478 | 1/14/2014 | E-mail w attachment | David Schnider | Jene Park; Paula Thomas | | E-mail correspondence regarding International TM Cost | Attorney-Client |
| 479 | 1/15/2014 | E-mail | David Schnider | Jene Park | | E-mail correspondence regarding All in One Poster Company | Attorney-Client |
| 480 | 1/15/2014 | E-mail | David Schnider | Jene Park | Paula Thomas | E-mail correspondence regarding Keyser | Attorney-Client |
| 481 | 1/16/2014 | E-mail | David Schnider | Jene Park | | E-mail correspondence regarding draft modification | Attorney-Client |
| 482 | 1/16/2014 | E-mail | David Schnider | Paula Thomas | Jene Park | E-mail correspondence regarding Keyser | Attorney-Client |
| 483 | 1/17/2014 | E-mail | David Schnider | Paula Thomas | | E-mail correspondence regarding Keyser | Attorney-Client |

2.2.   **Company Name**. The name of the Company is Thomas Wylde, LLC. The business of the Company may be conducted under that name, or, in compliance with applicable laws, under any other name that the Manager deems appropriate.

2.3.   **Company Offices**. The principal executive office and mailing address of the Company shall be at 3231 S. La Cienega Blvd., Los Angeles, California 90016, or any other place or places determined by the Manager from time to time.

2.4.   **Company Agent**. The initial agent for service of process on the Company shall be David Schnider, Esq. whose street address is 3231 S. La Cienega Blvd., Los Angeles, California 90016. The Manager may from time to time change the Company's agent for service of process. If the agent ceases to act as such for any reason, the Manager shall promptly designate a replacement agent and notify the Secretary of State of the change.

2.5.   **Business**. The purpose of the Company is to (a) engage in any lawful act or activity for which limited liability companies may be organized under the Act and (b) do all things necessary, suitable or proper for the accomplishment of, or in the furtherance of the Company's participation in the luxury fashion industry.

2.6.   **Taxation**. The Members intend the Company to be a limited liability company under the Act, classified as a limited partnership for federal and state income tax purposes, to the maximum extent possible.

2.7.   **Term**. The term of existence of the Company shall commence on the date that the Articles of Organization were filed with the California Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

2.8.   **Members**. The names and addresses (including fax numbers and email addresses) of the Members are as set forth in Exhibit B.

2.9.   **Managed by One Manager**. The Company shall be managed by one Manager, who shall initially be John Hanna, whose address is 3231 S. La Cienega Blvd., Los Angeles, California 90016.

2.10.   **Consent of Spouse or Domestic Partner**. Each and every Member who is a natural person, and who is married or has entered into a domestic partnership under the laws of any jurisdiction, shall cause his or her spouse or domestic partner to execute and deliver a copy of the Consent of Spouse or Domestic Partner attached hereto as Exhibit A.

## ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS

3.1.   **Capital Contributions of the Members**. The capital structure of the Company shall consist of Units all of the same class with equal rights, except as otherwise provided in this Agreement. Units may only exist in positive, whole integer quantities and not in fractional amounts.

6

SCHNIDER_BK 004738

3.1.1.   Members. 3.2 Members' Initial Capital Contribution.  On the Effective Date, each Member shall contribute capital to the Company for the Units as set forth in Exhibit B, attached hereto hereto, which shall thereafter constitute the Capital Contribution for each Member. The 46 Units allocated among issued to the Members initially constitute 100% of all Membership Interest in the Company.  Other than the initial Capital Contributions set forth in Exhibit B, no Member shall be required to make any additional Capital Contributions without such Member's approval.

3.2.   3.  Failure to Make Initial Capital Contributions Mandatory.  If a Member, or other Person, fails to make a the required Capital Contribution within the contractually specified times et forth in in Exhibit B, then the Manager shall provide written notice that such Member is in default of this Agreement (a "Defaulting Member").  On the occurrence of, and for the duration of, a Defaulting Member's default, the Defaulting Member shall forfeit all right to Vote the Defaulting Member's Voting Interest or otherwise participate in the business and affairs of the Company, and any and all provisions of this Agreement relating to Voting or written consent of the Members shall be implemented without including the Voting Interest of the Defaulting Member.  A Defaulting Member's death, disability, or inability to make a required contribution does not relieve that Defaulting Member of its contribution obligations. On satisfaction of a Defaulting Member's obligations, that Member's Voting Interest shall be restored.  In any event, any Defaulting Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to timely make a required Capital Contribution.

3.3.   Member Capital Accounts.   An individual Capital Account shall be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of Net Profits, (2) decreased by that Member's share of Net Losses, and (3) adjusted as required in accordance with applicable provisions of the IRC and the Regulations, and as provided in Article IV.

3.4.   No Withdrawals.  A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.5.   No Interest On Capital.  No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account.

3.6.   Members and Manager Not Liable.  The Members and the Manager shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.  The Manager and the Company shall not take any action that would cause a Member to be personally liable for the Company's obligations without such Member's express written consent, which may be withheld or conditioned in the Member's sole and absolute discretion.

3.7   Right of Participation.  Each Member shall have a right of first refusal to purchase such Member's pro-rata share (based on that Member's Unit Percentage) of any new Membership Interest issued by the Company on the same terms as the other purchaser(s) of such

7

SCHNIDER_BK 004739

Formatted: Not Highlight

newly-issued Membership Interest.  For purposes of clarification, the foregoing participation right is intended to be an anti-dilution right that would enable each Member to maintain that Member's Unit Percentage.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1. — **Allocation**.  ~~The~~After giving effect to the special allocation provisions of Exhibit C attached hereto, Net Profits and Net Losses ~~of the Company and all items of Company income, gain, loss, deduction, or credit~~for any fiscal year shall be allocated, for Company book purposes and for tax purposes, to each Member in accordance with that Member's Unit Percentage.

~~(a)    Notwithstanding anything in this Agreement to the contrary, no Member shall be allocated Net Losses to the extent such allocation would cause the deficit Capital Account balance of the Member receiving the allocation to exceed the Member's allocable share of the Minimum Gain.  For purposes of this Agreement, each Member's Allocable share of the Minimum Gain shall be determined in accordance with Regulation § 1.704-1(b)(4)(iv)(f).  This subsection (iv) shall be disregarded if it would result in Net Losses being unallocable to any Member.~~

~~(b)    Net Losses that are not allocated as a result of Section 4.1(a) shall be allocated instead to another Member, at the Manager's sole discretion.  To the extent any Net Losses are allocated to another Member pursuant to this subsection (b), any Net Income realized by the Company thereafter shall first be allocated to that Member in an amount an amount equal to such Net Losses.~~

4.2. **Distributions**.  Distributions of Available Cash to the Members shall be made on a *pro rata* basis to the Members~~, excluding any Defaulting Members,~~ in accordance with their respective Unit Percentages.  ~~The Manager, in his sole discretion.~~By a Vote of Supermajority of Members, Members shall decide when Available Cash shall be distributed the Members.  All distributions of Available Cash shall be subject to maintaining the Company in a sound financial and cash position.

4.3. **Tax Distribution**.  Notwithstanding Paragraph 4.~~3~~2, and subject to any applicable law, the Manager shall distribute to each Member, within 75 days after the close of each fiscal year ~~(or at such earlier times and in such amounts as determined in good faith by the Manager to be appropriate to enable the Members to pay estimated income tax liabilities)~~ an amount equal to 50% of the ~~combined maximum marginal federal, state and local income tax rates applicable to any Member or its direct or indirect partners, members, or stockholders, if applicable, for such fiscal year (as reasonably determined by the Manager from time to time, and with appropriate adjustments for the federal tax benefits from California taxes) of the~~ Net ~~profits~~Profits (and items of income and gain) for such fiscal year allocated to such Member, less the ~~sum of the losses (and items of deduction and loss) for such fiscal year allocated to such Member and the~~ aggregate amount of prior Distributions by the Company to such Member during such fiscal year; provided that the Members, by Vote of a Supermajority of Members, may change the amount of such tax distribution.

8

SCHNIDER_BK 004740

## ARTICLE V: MANAGEMENT AND EXECUTIVE COMMITTEE

5.1.    **Managed by Manager**.  The business of the Company shall be managed by one Manager, who may also be a Member.  Except as otherwise set forth in this Agreement, all decisions concerning the management of the Company's business shall be made by the Manager.  The Manager shall also serve as the Chief Executive Officer ("CEO") of the Company.  The Manager shall have general supervision of the business and affairs of the Company, shall preside at all meetings of Members and the Executive Committee, and shall have any other powers and duties usually vested in a CEO.  The Manager may also provide for additional Officers of the Company from time to time and shall establish the powers, duties, and compensation of all other Company officers and employees.

5.2.    **Officers**.  The~~Subject to Section 7.3, the~~ Manager may, from time to time, but shall not be required to, designate or appoint one or more Officers of the Company, including without limitation, president, one or more vice presidents, a secretary, an assistant secretary, a treasurer and/or an assistant treasurer.  Such Officers may, but need not, be, employees of the Company or Members ~~or Affiliates~~ of the Company. *Each appointed Officer shall hold such* office until (a) his or her successor is appointed, (b) such Officer submits his or her resignation, or (c) such Officer is removed by the Manager. (subject to Section 7.3).  All Officers of the Company shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances.

5.3.    **Executive Committee**.  The Manager shall be assisted and advised by an Executive Committee, consisting of Company Officers designated herein as Executive Officers of the Company.    Executive Officers may, but need not be, employees of the Company or Members ~~or Affiliates~~ of the Company.

5.3.1. **Executive Officers**.  Executive Officers shall have the duties, functions, and powers described herein.  Each Executive Officer shall serve until he or she (a) submits his or her resignation, or (b) is removed by Vote of the Members holding a majority of Unit Percentages held by all ~~a Supermajority of~~ Members.  Each Executive Officer named below shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances, and shall owe fiduciary duties of loyalty and care to the Company and the other Members.

(a)    **Chief Creative Officer and Creative Director**.  The Chief Creative Officer and Creative Director ("CCOD") shall be in charge of the Company's creative design processes and product conception and shall have sole discretion over the creation and designs marketed by the Company.  The CCOD shall also be the Chairperson of the Executive Committee.  The CCOD for the Company as of the Effective Date shall be Paula Thomas.

(b)    **Chief Operating Officer and Chief Commercial Officer**.  The Chief Operating Officer ("COO") and Chief Commercial Officer ("CCO") shall be in charge of the Company's commercial strategy; development of merchandise and products; customer relations; and sales.  The COO and CCO for the Company as of the Effective Date shall be Jene Park.

9

SCHNIDER_BK 004741

to that purpose, (4) made in confidence (5) by the client, (6) are at his

instance permanently protected (7) from disclosure by himself or by

the legal adviser, (8) unless the protection be waived."

"Furthermore, the party claim privilege that belongs to a corporation

must provide admissible evidence to address the following:"

"In *Bevill*, the Third Circuit made clear that "any privilege that exists

as to a corporate officer's role and functions within a corporation

belongs to the corporation, not the officer." *Id.* at 124. Under

the *Bevill* test, individual corporate officers or employees seeking to

assert a personal claim of attorney-client privilege must affirmatively

show five factors:"

*"First*, they must show they approached counsel for the purpose of

seeking legal advice. *Second*, they must demonstrate that when they

approached counsel they made it clear that they were seeking legal

advice in their individual rather than in their representative

capacities. *Third*, they must demonstrate that the counsel saw fit to

communicate with them in their individual capacities, knowing that a

possible conflict could arise. *Fourth*, they must prove that their

conversations with counsel were confidential. And *fifth*, they must

show that the substance of their conversations with counsel did not

5.8.    **Removal and Replacement of Manager**.   The Manager shall serve until the earlier of (a) the Manager's resignation, retirement, death, or disability, or (b) the Manager's removal for Cause by Vote of ~~a Supermajority of~~ the Members~~.~~ holding a majority of Unit Percentages held by all Members.   A new Manager shall be appointed by Vote of ~~a Majority~~the Members holding a majority of ~~Members on the occurrence of any of the foregoing events.~~Unit Percentages held by all Members.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1.    **Books of Account**.    Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of inspection and copying shall be borne by the Member seeking inspection.

6.2.    **Accounting Method**.   Financial books and records of the Company shall be kept based on the Manager's choice of accounting method. The financial statements of the Company shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be determined by the Manager.

6.3.    **Content of Books**.    At all times during the term of existence of the Company, and beyond that term, if ~~the Manager deems it~~reasonably necessary, the ~~Manager~~Company shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)    A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b)    A copy of the Articles of Organization, as amended;

(c)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d)    An original executed copy or counterparts of this Agreement, as amended;

(e)    Any powers of attorney under which the Articles of Organization or any amendments to said articles were executed;

(f)    Financial statements of the Company for the six most recent fiscal years; and

(g)    The books and ~~Records~~records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

11

SCHNIDER_BK 004743

       (h)     If the Manager deems that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of those items shall be as designated by the Manager.

      6.4.   **Financial Statements**. From time to time as determined by the Manager, and at the end of each fiscal year, the books of the Company shall be closed and examined, statements reflecting the financial condition of the Company and its Profitsprofits or Losseslosses shall be prepared, and a report about those matters shall be issued by the Company's certified public accountants. Copies of the financial statements shall be given to all Members. In addition, all Members shall receive, not less frequently than at the end of each calendar quartermonth, copies of such financial statements regarding the previous calendar quartermonth as may be prepared in the ordinary course of business by the Manager or accountants selected by the Manager. The Manager shall cause an annual report to be sent to each Member within 120 days after the end of the fiscal year of the Company. The annual report may be sent by electronic transmission by the Company and shall include:

       (a)     A balance sheet and, income statement, and a statement of cash flows of the Company for and as of the close of the fiscal year; and

       (b)     A statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year.

      6.5.   **Tax Information**. Within 90 days after the end of each taxable year of the Company, the ManagerCompany shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for that year.

      6.6.   **Tax Matters Partner**. The Manager shall act as Tax Matters Partner of the Company under IRC § 6231(a)(7). The Tax Matters Partner is authorized to do the following:

     (a)     Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC § 6231(a)(3)) at the Company level, as required under IRC § 6223(g) and the implementing Regulations;

     (b)     Enter into settlement agreements under IRC § 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the Secretary) with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that the agreement shall bind the other Members, except that the settlement agreement shall not bind any Member who (within the time prescribed under the IRC and Regulations) files a statement with the Secretary providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on behalf of that Member;

     (c)     On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or

12

SCHNIDER_BK 004744

the United States Court of Federal Claims, all as contemplated under IRC § 6226(a) and applicable Regulations;

(d)     File requests for administrative adjustment of Company items on Company tax returns under IRC § 6227(b) and applicable Regulations; and, to the extent those requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6228(a); and

(e)     Take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Partner may delegate such rights and duties as deemed necessary and appropriate.

## ARTICLE VII: MEMBERSHIP AND UNITS

### 7.1.1.  **Membership Interest and Units**.

7.1.1  **Membership and Units.**     There shall be only one class of membershipMembership Interest and one class of Units. Members shall have the right and power to appoint, remove, and replace the Manager and Executive Officers of the Company as provided in this Agreement, and the right to Vote on all other matters with respect to which this Agreement or the Act requires or permits Member action. Each Member shall Votevote in proportion to the Member's then-existing Voting Interest. If a Member has transferred all or part of the Member's Transferable Interest in Units to a Person who has not been admitted as a Member, the Transferring Member shall Vote in proportion to the Voting Interest that the Transferring Member would have had if the Transfer had not been made.

Formatted: Indent: First line: 1"

7.1.2.  **Units**.  The Company has issued 46 (Forty-Six) Units to the Members as set forth in Exhibit B.

7.2.     **Certificates**.  All issuances, reissuances, exchanges, and other transactions in Units involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.  The Company may, but is not required to, issue certificates evidencing Units ("Unit Certificates") to Members of the Company.  Once Unit Certificates have been issued, they shall continue to be issued as necessary to reflect current Units held by Members. Unit Certificates shall be in a form approved by the Manager, shall be manually signed by the Manager, and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the Units and Members set forth in this Agreement, including the following:

> *THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT OF THE COMPANY, AS AMENDED FROM TIME TO TIME.  THE UNITS MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH SUCH OPERATING AGREEMENT.*

13

SCHNIDER_BK 004745

*THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. THE UNITS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EXEMPTION THEREFROM AND THE COMPANY RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS LEGAL COUNSEL THAT SUCH SALE, PLEDGE, ASSIGNMENT OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.*

7.3.    **Acts Requiring Member Vote**. Except as otherwise provided in this Agreement or by the Act, all of the following acts shall require the consent by Vote of a Supermajority of Members:

(a)    Any act that would make it impossible to carry on the ordinary business of the Company;

(b)    Any confession of a judgment against the Company;

(c)    The dissolution of the Company;

(d)    The disposition of all or a substantial part of the Company's assets not in the ordinary course of business;

(e)    The incurring of any debt not in the ordinary course of business;

(f)    A change in the nature of the principal business of the Company;

(g)    The filing of a petition in bankruptcy or entering into an assignment for the benefit of the Company's creditors;

(h)    The entering into, on behalf of the Company, of any transaction constituting (i) a "reorganization" within the meaning of Corporations Code §17711.01 or (ii) a sale, merger, or conversion of the Company;

(g)    The incurring of any contractual obligation or the making of any capital expenditure with a total cost of more than $500,000;

(a(h)    The issuance or redemption of any Membership Interest (including the terms thereof);

(i)    Making operating or liquidating distributions to Members;.

14

(j)      The Transfer of any ~~Units and the admission of the~~Membership Interest (other than to a Permitted Transferee ~~as a Member of the Company;~~);

~~(b)    Amendment of the Articles of Organization or this Agreement;~~

(e(k)    The admission of any new Member; (other than a Permitted Transferee);

~~(d)    Any issuance of additional Units; and~~

~~(e)    Any other act described in Section 5.4(a) through (i) of this Agreement.~~
(l)      Instituting, settling, or compromising of any claim or litigation for more than $100,000;

(m)     Any transaction between the Company and an Affiliate of a Member or a Manager, including indemnifying any such Person pursuant to Section 11.1 and paying any compensation to any such Person;

(n)      Approval of annual budget and deviation of more than 10% for any line item in any previously-approved budget; and

(o)      Paying any officer or employee more than $200,000 per year.

7.4.    **Record Date**.  The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager, provided that the record date shall not be more than 60, or less than 10 calendar days before the date of the meeting and not more than 60 calendar days before any other action.  In the absence of any action setting a record date, the record date shall be determined in accordance with Corporations Code § 17704.07(p).

7.5.~~1.~~ **Meetings**.

7.5.1.  **General**.  Meetings of the Members may be called at any time by the Manager, Members representing more than 32% of the Unit Percentage, or any member of the Executive Committee, for the purpose of addressing any matters on which the Members may Vote.  If a meeting of the Members is called by the Members or a member of the Executive Committee, Notice of the call shall be delivered to the Manager.  Meetings may be held at the principal executive office of the Company or at any other location designated by the Manager. Following the call of a meeting, the Manager shall give Notice of the meeting not less than 10, nor more than 60, calendar days before the meeting date to all Members entitled to Vote at the meeting. The Notice shall state the place, date, and hour of the meeting, the means of electronic transmission by and to the Company or electronic video communication, if any, and the general nature of business to be transacted. No other business may be transacted at the meeting. A quorum at any meeting of Members shall consist of a ~~Majority~~Supermajority of Members, represented in person or by Proxy.  The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of a sufficient number of Members to leave less than a quorum, if the action

Formatted: Indent: First line: 1"

15

SCHNIDER_BK 004747

taken, other than adjournment, is approved by the requisite Unit Percentage as specified in this Agreement or the Act.

7.5.2. **Quorum**. A meeting of Members at which a quorum is present may be adjourned to another time or place and any business that might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, that meeting may be adjourned by the Vote of a majority of Voting Interests represented either in person or by Proxy. Notice of the adjourned meeting need not be given to Members entitled to Notice if the time and place of the adjourned meeting are announced at the meeting at which the adjournment is taken, unless (a) the adjournment is for more than 45 days, or (b) after the adjournment, a new record date is fixed for the adjourned meeting. In the situations described in clauses (a) and (b), Notice of the adjourned meeting shall be given to each Member of record entitled to Vote at the adjourned meeting.

7.5.3. **Waiver of Notice**. The transactions of any meeting of Members, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice if (a) a quorum is present at that meeting, either in person or by Proxy, and (b) either before or after the meeting, each of the Persons entitled to Vote, not present in person or by Proxy, signs either a written waiver of notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting. Attendance of a Member at a meeting shall constitute waiver of notice, unless that Member objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting.

7.5.4. **Proxies**. At all meetings of Members, a Member may Vote in person or by Proxy.     Any Proxy shall be filed with the Manager before or at the time of the meeting, and may be filed by facsimile transmission to the Manager at the principal executive office of the Company or any other address given by the Manager to the Members for those purposes.

7.5.5. **Video Attendance**. A meeting of the Members may be conducted, in whole or in part, by electronic transmission by and to the Company or by electronic video communication if (a) the Company implements reasonable measures to provide Members (in person or by Proxy) a reasonable opportunity to participate in the meeting and to vote on matters submitted to the Members, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with those proceedings, and if (b) any Member Votes or takes other action at the meeting by means of electronic transmission to the Company or electronic video communication, a record of that vote or action is maintained by the Company.

7.5.6. **Written Consent**. Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Members having not less than the minimum Voting Interest that would be necessary to authorize or take that action at a meeting at which all Members entitled to Vote were present and voted. Prompt Notice of any action taken in such manner shall be given to all Members who have not consented in writing.

16

SCHNIDER_BK 004748

7.5.7.  **No Authority**.  No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company.  Each Member shall indemnify, defend, and hold harmless each other Member and the Company from and against any and all loss, cost, expense, liability, or damage arising from or out of any claim based on any action by the Member in contravention of this Section 7.6.

## ARTICLE VIII: TRANSFER OF UNITS

8.1.  **Dissociation**.  A Member may not dissociate from the Company without the written consents of ~~a Supermajority~~all of ~~the~~ Members.  Dissociation shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of dissociation.  ~~A dissociating Member shall have only the rights of a holder of a Transferable Interest in the Company with respect to the Member's Units. Unless all remaining Members consent to the dissociation, the dissociating Member shall not be entitled to a distribution of its Transferable Interest in Units until the dissolution and liquidation of the Company.~~

8.2.  **Transfers**.  Except as expressly provided in this Agreement, a Member shall not Transfer any Units in the Company, whether now owned or later acquired, unless a Supermajority of Members approves in writing the transferee's admission to the Company as a Member.  No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Units unless the Encumbrance has been approved ~~in writing~~ by the ~~Manager.~~Members by Vote of a Supermajority of Members.  Approval may be granted or withheld in the ~~Manager's~~Members' sole discretion. Any Transfer or Encumbrance of a Membership Interest without the required approval shall be void.  Notwithstanding the foregoing, (x) any ~~other provision of this Agreement to the contrary, a~~ Member ~~who is a natural person~~ may Transfer ~~any or all of his or her Units to any~~ such Member's Membership Interest to (i) such Member's spouse (including domestic partner) or family member, (ii) a company wholly-owned by such Member and such Member's spouse and family member(s), and (iii) any revocable trust created for the benefit of the Member~~, or any combination between or among~~ and/such Member's spouse and family member(s) (each such transferee, a "Permitted Transferee"), (y) the ~~Member,~~Company's and other Members' right of first refusal set forth in this Agreement shall not apply to any such Transfer to a Permitted Transferee, and (z) the ~~Member's spouse or domestic partner, and the Member's issue, provided~~Members shall approve a Permitted Transferee's admission as a substitute Member.  A Permitted Transferee of a Member may transfer its Membership Interest to any Person that is a Permitted Transferee of the initial Member without triggering the ~~Member retains a beneficial interest in the trust and all of the Voting Interest included in the Units~~Company's and other Members' right of first refusal.

8.3.  **No Release on Transfer**.  A Member shall not be released from liabilities as a Member solely as a result of a Transfer of Units, both with respect to obligations to the Company and to third parties incurred before the Transfer.

17

SCHNIDER_BK 004749

8.4.    **Agreement Binds New Members**.  Any new Person admitted to the Company as a Member shall hold one or more Units; if such Unit(s) were obtained by Transfer from a current or former Member, such Unit(s) shall remain subject to all the provisions of this Agreement that applied to the Member from whom such Unit(s) were obtained.

8.5. ~~**Right of First Refusal**. If at any time any Member receives an offer from a prospective third-party purchaser to buy any portion of such Member's Units in the Company, such Member must first offer those Units to the remaining Members on the same terms and conditions as received from the prospective third-party purchaser. The remaining Members shall have 60 days from such date that the Members were informed about the purchase offer to determine whether to exercise their right of first refusal ("ROFR") and purchase the selling Member's Units.~~

8.6. ~~**Death of a Member**. Upon the death of a Member or Members, the remaining Members shall have 60 days during which to elect to exercise their ROFR. If such ROFR is not exercised by any Member, the Transferable Interest in the deceased Members' Units shall be transferred to the lawful Transferee(s).~~

8.5    **Voluntary Lifetime Transfers**.  *No Member may make a Voluntary Lifetime Transfer (as defined below) except pursuant to this Section. Any Member who wishes to make a Voluntary Lifetime Transfer must promptly send a notice ("Member Notice") to the Company and each other Member. Such notice shall include a description of the proposed Transfer, the price and terms on which the Membership Interest is to be Transferred, the name, address (both home and office), and business or occupation of the proposed transferee, and any other facts that are, or would reasonably be deemed to be, material to the proposed Transfer. The Member wishing to make a Voluntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest to be transferred to the Company and the other Members as described in Section 8.7.  A "Voluntary Lifetime Transfer" means any Transfer made during a Member's lifetime, which is not an Involuntary Lifetime Transfer (as defined in Section 8.6).*

8.6    **Involuntary Lifetime Transfer**.  *Any Member who has any information that would reasonably lead him or her to expect that an Involuntary Lifetime Transfer is foreseeable, including bankruptcy, legal action, etc. must promptly send a Member Notice to the Company and each other Member. Such notice shall include a description of the expected Transfer, the name, address (both home and office), and business or occupation of the expected transferee, and any other facts that are, or would reasonably be deemed to be, material to the involuntary Transfer. The Member who may be making an Involuntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest otherwise to be transferred to the Company and the other Members as described in Section 8.7. An "Involuntary Lifetime transfer" means any Transfer made on account of a court order or otherwise by operation of law, including any Transfer incident to any bankruptcy, divorce or marital property settlement or any Transfer pursuant to applicable community property, quasi-community property or similar state law.*

8.7    **Right of First Refusal of the Company and Non-Transferring Members.**

SCHNIDER_BK 004750

8.7.1   **General.**  Each Member shall be deemed to have offered to sell his or her Membership Interest proposed or forced to be Transferred in a Voluntary Lifetime Transfer or an Involuntary Lifetime Transfer ("Offered Membership Interest") to the Company and the other Members pursuant to the Agreement Terms and at the lower of (i) the price and terms set forth in the Member Notice and (ii) the Agreement Price (as defined below).

8.7.2.   **Company's Right.**  Within the later of (i) thirty (30) days following receipt of a Member Notice or (ii) ten (10) days following the determination of the Agreement Price, the Company shall send a written notice ("Company Notice") to the Members stating the portion of the Offered Membership Interest the Company wishes to purchase.

8.7.3.   **Members' Right.**  Unless the Company Notice specifies all of the Offered Membership Interest, within thirty (30) days after mailing of the Company Notice, each Member who desires to purchase a portion of the Offered Membership Interest shall give a written notice to the Company specifying the maximum portion of the Offered Membership Interest that the Member wishes to purchase.  If the aggregate Offered Membership Interest to be purchased by the Members exceeds the total amount of the Offered Membership Interest, the Offered Membership Interest shall be allocated to the exercising Members based on their respective Unit Percentages.

8.7.4   **Remaining Offered Membership Interest.**  If the Company and the other Members do not agree to buy all of the Offered Membership Interest, any remaining Offered Membership Interest may be sold to a non-Member within thirty (30) days after the expiration of the Company's and Members' option period.  If such Transfer does not occur within thirty (30) days, the provisions of this Agreement will continue to apply to such Offered Membership Interest as if no such Transfer had been contemplated and no notice had been given. A Transfer is consummated when the Company has been given notice that legal title to the Membership Interest has been Transferred, subject to recordation on its books.

8.8   **Agreement Price.**  The Agreement Price will be the fair market value of the Membership Interest being Transferred and shall initially be determined in good faith by the Company.  If any Member objects to the Company's determination of the fair market value, the Company and the objecting Member shall attempt to jointly appoint a qualified appraiser.  If the parties cannot agree on a single appraiser, they shall each appoint one appraiser and the two appraisers appointed by the parties shall choose a third appraiser.  In the event that three appraisers are used, the Agreement Price shall be the average of the two closest fair market values proposed by the three appraisers.  The cost of appraisal shall be borne and paid by the objecting Member, unless the Company's proposed fair market value is at least twenty percent (20%) less than the Agreement Price determined by appraisal.

8.9   **Agreement Terms.**

8.9.1   **Installment Note.**  Unless the parties agree otherwise, twenty percent (20%) of the purchase price shall be paid within 30 days of the closing for the sale of the Offered Membership Interest and the balance of the purchase price will be paid pursuant to a promissory

19

SCHNIDER_BK 004751

note equally amortized over four years, principal and interest payable in monthly installments, with interest at the prime rate quoted by the Company's main bank in effect on the date of the closing.

      **8.9.2   Closing.** The purchase of the Offered Membership Interest pursuant to this Agreement will take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the last option to buy is exercised or lapses, or after the last date on which a purchaser becomes obligated to buy, at the Company's primary place of business, or at any other place to which the parties agree. At the closing, the purchaser or purchasers will pay for the Offered Membership Interest in cash, by wire transfer or certified cashier's check, and/or promissory note, and the Company will change its books to indicate that the Offered Membership Interest has been Transferred. If the seller does not appear at the closing, then:

           (a)    The purchaser or purchasers shall deposit the purchase price in full, or the first payment of same, by check (or other verifiable means) with an escrow agent;

           (b)    The escrow agent shall deposit such funds with any bank with which the Company has a bank account on the date of the closing, to be paid to the seller as soon as is reasonably practicable, less an appropriate fee to the Company for administrative costs; and

           (c)    The Company will adjust its transfer books to reflect that the Offered Membership Interest has been Transferred.

      **8.10   Transfers at Death.** Upon the death of any Member, the surviving spouse or any family member of the deceased Member may receive such deceased Member's Membership Interest (without triggering the Company's and Members' right of first refusal with respect to such Transferred Membership Interest). If a deceased Member's proposed transferee is not a Permitted Transferee, such proposed Transfer shall be subject to the Company's and Members' right of first refusal described in section 8.7.

### ARTICLE IX: DISSOLUTION AND WINDING UP

      9.1.   **Dissolution.**  The Company shall be dissolved on the first to occur of the following events:

           (a)    The ~~written agreement of the Manager and the vote~~Vote of a Supermajority of Members to dissolve the Company;

           (b)    The sale or other disposition of substantially all of the Company's assets; or

           (c)    Entry of a decree of judicial dissolution under Corporations Code § 17707.03.

      9.2.   **Winding Up.**  On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company.

20

SCHNIDER_BK 004752

**Formatted:** Indent: First line: 1"

The Manager shall wind up the affairs of the Company, and shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a)     To pay the expenses of liquidation;

(b)     To the establishment of reasonable reserves for contingent liabilities or obligations of the Company. On the determination that reserves are no longer necessary, they shall be distributed as provided in this Section 9.2;

(c)     To repay outstanding loans to Members. If there are insufficient funds to pay those loans in full, each Member shall be repaid in the ratio that the Member's loan, together with accrued and unpaid interest, bears to the total of all loans from Members, including all accrued and unpaid interest. Repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest; and

(d)     AmongTo the Members in accordance with their respective positive Capital Account Balances-as-provided in Article IV-balances.

9.3.     **No Recourse.** Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if Company property remaining after the payment or discharge of the Company's debts and liabilities is insufficient to return the investment of each Member, the Member shall have no recourse against any other Member or the Manager for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

### ARTICLE X: CONFIDENTIALITY

10.1.     **Confidentiality.** Each Member covenants with the Company and each other Member that for so long as a Member holds any Units in the Company, and for a two-year period following the Transfer of a Member's Units, whether voluntary, involuntary, by operation of law, or by reason of any provision of this Agreement, a Member shall not, directly or indirectly, through an Affiliate or otherwise use or disclose in any manner any Confidential Information.

10.2.     **Money Damages Inadequate.** Each Member agrees that a breach of Section 10.1 shall result in irreparable damage and injury to the Company that no money damages could adequately compensate. If the Member breaches Section 10.1, in addition to all other remedies to which the Company may be entitled to, and notwithstanding the arbitration provisions of Article XI, the Company shall be entitled to an injunction to enforce the provisions of this Agreement, to be issued by any court of competent jurisdiction. Each Member expressly waives any claim or defense that an adequate remedy at law exists for any such breach.

10.3.     **Reformation.** If any provision of Section 10.1 is deemed to exceed the time or geographic limits or any other limitation imposed by applicable law in any jurisdiction, that

21

SCHNIDER_BK 004753

provision shall be deemed reformed in that jurisdiction to the extent necessary to permit enforcement.

## ARTICLE XI: INDEMNIFICATION AND ARBITRATION

11.1. **Indemnification.** The Company shall have the power, upon ~~written approval by~~ Vote of a ~~Majority~~ Supermajority of Members, to indemnify any Person who was or is a party, or who is threatened to be made a party, to any legal proceeding by reason of the fact that the Person was or is a Member, Manager, Officer, Executive Officer, employee, or other agent of the Company against expenses including reasonable attorneys' fees, judgments, fines, settlements, and other amounts actually and reasonably incurred by that Person in connection with the proceeding, if (a) that Person acted in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, and (b) in the case of a criminal proceeding, the Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or on a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

11.2. **Advancement of Expenses.** Expenses of each Person indemnified under this Agreement actually and reasonably incurred in connection with the defense or settlement of a legal proceeding may be paid by the Company in advance of the final disposition of that proceeding, as authorized by ~~a Majority~~ Vote of ~~the~~ a Supermajority of Members, on receipt of an undertaking by that Person to repay that amount unless it shall ultimately be determined that the Person is entitled to be indemnified by the Company.

11.3. **Arbitration.** Any action to enforce or interpret this Agreement, or to resolve disputes relating in any way to **(or arising out of)** this Agreement **or the Company among or** between ~~(a)~~**any of** the Company, a current or former Member, or the current or a former Manager~~, (b) between or among any current or former Members, or (c) between or among any current or former Member(s) and the current or a former Manager,~~ shall be settled by binding arbitration before a single arbitrator in accordance with the then-applicable Commercial Arbitration Rules of the American Arbitration Association. The place of arbitration shall be Los Angeles, California. The award of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be entered on any such award in any court of competent jurisdiction.

## ARTICLE XII: ~~ATTORNEY-IN-FACT AND AGENT~~GENERAL PROVISIONS

~~12.1. **Limited Power of Attorney.** Each Member, by execution of this Agreement, irrevocably constitutes and appoints the Manager as the Member's true and lawful attorney-in-fact and agent, with full power and authority in the Member's name, place, and stead to execute, acknowledge, and deliver, and to file or record in any appropriate public office: (a) any certificate or other instrument that may be necessary, desirable, or appropriate to qualify the~~

22

SCHNIDER_BK 004754

~~Company as a limited liability company or to transact business in any jurisdiction in which the~~
~~Company conducts business; (b) any certificate or amendment to the Company's Articles of~~
~~Organization or to any certificate or other instrument that may be necessary, desirable, or~~
~~appropriate to reflect an amendment approved by the Members pursuant to this Agreement; (c)~~
~~any certificates or instruments that may be necessary, desirable, or appropriate to reflect the~~
~~dissolution and winding up of the Company; and (d) any certificates necessary to comply with~~
~~this Agreement.  This power of attorney shall be deemed to be coupled with an interest and shall~~
~~survive any Transfer of a Member's Transferable Interest in Units.  Notwithstanding the~~
~~existence of this power of attorney, each Member agrees to join in the execution,~~
~~acknowledgment, and delivery of the above-referenced instruments if requested to do so by the~~
~~Manager.  This power of attorney is limited, and does not authorize the Manager to act on behalf~~
~~of a Member except as described in this Section 12.1.~~

## ARTICLE ~~XIII~~: GENERAL PROVISIONS

~~13~~12.1.    **Integration**.  This Agreement constitutes the whole and entire agreement of the parties with respect to its subject matter, and it shall not be modified or amended in any respect except by a written instrument as described herein.  No party is relying on any representations or warranties not expressly contained in this Agreement.  This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Manager or any of them.

~~13~~12.2.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Executed counterparts of this Agreement may be delivered by facsimile transmission or in portable document format (PDF) by e-mail.  The signatures in a facsimile or PDF data file shall have the same force and effect as an original.

~~13~~12.3.    **Choice of Law**.  This Agreement shall be construed and enforced under the laws of the State of California, without regard to the conflicts of law provisions thereof.

~~13~~12.4.    **Severability**.  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal, or unenforceable, that provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

~~13~~12.5.    **Binding Effect**.  This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

~~13~~12.6.    **Representation**.  Each party to this Agreement warrants and represents that it has had sufficient time to adequately consult with its own independent counsel prior to execution.

~~13~~12.7.    **Additional Instruments**.  The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things reasonably necessary in connection with the

23

SCHNIDER_BK 004755

performance of their respective obligations under this Agreement and to carry out the intent of the parties.

1312.8.    **Independent Activities**.  Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members or the Manager in the carrying on of their own respective businesses or activities.

1312.9.    **Capacity and Authority**.  Each Member represents and warrants to the other Members that he, she, or it has the capacity and authority to enter into this Agreement.

1312.10.    **Interpretation**.  The article, section, and subsection titles and headings in this Agreement are inserted as matters of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.  Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

1312.11.    **Time of the Essence**.  Time is of the essence for every provision of this Agreement that specifies a time for performance.

1312.12.    **Exhibits**.  The exhibits referenced herein are expressly incorporated into and made part of this Agreement.

1312.13.    **No Third Party Beneficiaries**.  This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and there are no intended third-party beneficiaries.

12.14.  Amendment.  This Agreement may be amended only by the written approval of all of the Members.

24

SCHNIDER_BK 004756

## SECURITIES LAW REPRESENTATIONS

Formatted: Keep with next, Keep lines together

EACH MEMBER OR OTHER PERSON, BY EXECUTING THIS AGREEMENT, AND EVERY OTHER PERSON WHO EXECUTES THIS AGREEMENT OR OTHERWISE THEREAFTER BECOMES A MEMBER, HEREBY REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT HE, SHE, OR IT: (A) IS AWARE THAT THE ACQUISITION OF ITS UNITS IN THE COMPANY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE, (B) IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (C) UNDERSTANDS THAT THE SALE, PLEDGE, ASSIGNMENT OR OTHER TRANSFER OF ITS UNITS IN THE COMPANY IS LIMITED BY THIS AGREEMENT AND IN ANY EVENT MAY NOT BE EFFECTED UNLESS (I) THE TRANSFER IS REGISTERED AND QUALIFIED UNDER APPLICABLE SECURITIES LAWS, OR IS EFFECTED AS A NON-PUBLIC OFFERING THAT IS EXEMPT FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF APPLICABLE SECURITIES LAWS, AND (II) THE PERSON ACQUIRING SUCH UNITS REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT SUCH PERSON IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (D) HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF ACQUIRING ITS UNITS IN THE COMPANY, (E) ACKNOWLEDGES THAT THERE IS NO GUARANTEE THAT THE COMPANY WILL BE A FINANCIAL SUCCESS, AND IS ABLE TO BEAR THE ECONOMIC RISK OF THE LOSS OF ITS UNITS IN THE COMPANY, (F) CONFIRMS THAT THE COMPANY HAS NOT SOLICITED OR ADVERTISED THE UNITS IN ANY WAY, AND (G) ACKNOWLEDGES THAT THE COMPANY AND THE OTHER MEMBERS ARE RELYING ON THE FOREGOING REPRESENTATIONS.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first written above.

Formatted: Keep with next

Formatted: Form:Sig, Indent: First line: 0", Keep with next

Formatted: Indent: Left: 0", Hanging: 3", Keep with next

25

SCHNIDER_BK 004757

Formatted: Keep with next

_____
JOHN HANNA, Manager. Member. and Chief
Executive Officer

_____
JENE PARK, Member, Chief Operations Officer
and Chief Commercial Officer

_____
DOUG LEE, Member

_____
ROGER KUO, Member

26

SCHNIDER_BK 004758

## EXHIBIT A

### CONSENT OF SPOUSE OR DOMESTIC PARTNER

The undersigned is the spouse or registered domestic partner of _____
("Member"), and acknowledges that he or she has read the foregoing Operating Agreement of
Thomas Wylde, LLC (the "Agreement") and understands its provisions. The undersigned is
aware that, by the provisions of the Agreement, Member and the undersigned have consented to
sell or transfer all Units in the Company, including any community property interest or quasi-
community property interest therein, only in accordance with the terms and provisions of the
Agreement. The undersigned expressly approves of and agrees to be bound by the provisions of
the Agreement in its entirety, including, but not limited to, those provisions relating to the sales
and transfers of Units and the restrictions on them. If the undersigned predeceases Member
while Member owns any Units or Transferable Interest therein, the undersigned agrees not to
devise or bequeath any community property interest or quasi-community property interest in
such Units in contravention of the Agreement.

Date: _____

_____
Signature

_____
Name

27

SCHNIDER_BK 004759

**EXHIBIT B**

**MEMBERS AND CAPITAL CONTRIBUTIONS**

| Name | Contact Information | Capital Contributions and Due Dates | No. Units | Initial Capital Account Balance | Formatted Table |
|------|---------------------|-------------------------------------|-----------|----------------------------------|-----------------|
| | | | | | Inserted Cells |
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700 Effective DateNovember ___, 2014 | 14 | $700 | |
| Jene Park | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: jene@thomaswylde.com | $900 Effective DateNovember ___, 2014 | 18 | $900 | |
| Roger Kuo | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: _____ | $350 Effective Date November ___, 2014 | 7 | $350 | |
| Doug Lee | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: _____ | $350 Effective Date November ___, 2014 | 7 | $350 | |

28

SCHNIDER_BK 004760

**EXHIBIT C**
**TAX PROVISIONS**

### ARTICLE 1: DEFINITIONS

1.1    **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

1.1.1    Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

1.1.2    Credit to such Capital Account the amount of the deductions and losses referable to any outstanding recourse liabilities of the Company owed to or guaranteed by such Member to the extent that no other Member bears any economic risk of loss and the amount of the deductions and losses referable to such Member's share (determined in accordance with the Member's Unit Percentage) of outstanding recourse liabilities owed by the Company to non-Members to the extent that no Member bears any economic risk of loss; and

1.1.3    Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.2    **"Code"** means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.3    **"Company Minimum Gain"** has the meaning ascribed to the term "Partnership Minimum Gain" in Regulations Section 1.704-2(d).

1.4    **"Member Nonrecourse Debt"** has the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.5    **"Member Nonrecourse Debt Minimum Gain"** means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

1.6    **"Member Nonrecourse Deductions"** means items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt or to other liabilities of the Company owed to or guaranteed by a Member to the extent that no other Member bears the economic risk of loss.

29

SCHNIDER_BK 004761

1.7    "**Net Profits**" and "**Net Losses**" means, for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

1.7.1    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

1.7.2    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

1.7.3    In the event the book value of any Company asset is adjusted as a result of the application of Regulations Section 1.704-1(b)(2)(iv)(e) or Regulations Section 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

1.7.4    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its book value;

1.7.5    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account book depreciation, amortization, and other cost recovery deductions for such fiscal year, computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); and

1.7.6    Notwithstanding any other provision of this Section 1.7, any items that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall not be taken into account in computing Net Profits or Net Losses (the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall be determined by applying rules analogous to those set forth in Sections 1.7.1 through 1.7.5 above).

The foregoing definition of Net Profits and Net Losses is intended to comply with the provisions of Regulations Section 1.704-1(b) and shall be interpreted consistently therewith. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which Net Profits and Net Losses are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

1.8    "**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(b)(1).

30

SCHNIDER_BK 004762

1.9 **"Nonrecourse Liability"** has the meaning set forth in Regulations Section 1.704-2(b)(3).

## ARTICLE II: CAPITAL ACCOUNT

2.1 **Capital Accounts.** The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv) and, in pursuance thereof, the following provisions shall apply:

2.1.1 To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocated share of Net Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

2.1.2 To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocated share of Net Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

2.1.3 In the event all or a portion of a Membership Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and

2.1.4 In determining the amount of any liability for purposes of Sections 2.1.1 and 2.1.2 of this Exhibit C, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

## ARTICLE III: SPECIAL ALLOCATIONS

3.1 **Adjusted Capital Account Deficit.** An allocation of Net Losses under Section 4.1 of the Agreement shall not be made to the extent it would create or increase an Adjusted Capital Account Deficit for a Member or Members at the end of any fiscal year. Any Net Losses not allocated because of the preceding sentence shall be allocated to the other Member or Members in proportion to such Member's or Members' respective Unit Percentages; provided, however, that to the extent such allocation would create or increase an Adjusted

31

SCHNIDER_BK 004763

Capital Account Deficit for another Member or Members at the end of any fiscal year, such allocation shall be made to the remaining Member or Members in proportion to the respective Unit Percentages of such Member or Members.

### 3.2   Special Allocations.

**3.2.1   Member Nonrecourse Deductions.** Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt or other liability to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i) and Regulations Section 1.704-1(b).

**3.2.2   Nonrecourse Deductions Referable to Liabilities Owed to Non-Members.** Any Nonrecourse Deductions for any fiscal year and any other deductions or losses for any fiscal year referable to a liability owed by the Company to a Person other than a Member to the extent that no Member bears the economic risk of loss shall be specially allocated to the Members in accordance with their Unit Percentages.

**3.2.3   Member Minimum Gain Chargeback.** Except as otherwise provided in Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Agreement, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2). This Section 3.2.3 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

**3.2.4   Minimum Gain Chargeback.** Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Agreement, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 3.2.4 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

32

SCHNIDER_BK 004764

# EXHIBIT "10"

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <only2hanna@yahoo.com> |
| **Sent:** | Thursday, November 06, 2014 4:47 PM |
| **To:** | Stephen Choi |
| **Cc:** | Roger Kuo; Doug Lee; John Hanna |
| **Subject:** | Re: loan |

Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5 M value at stress sale that, is how the CBC loan is based on .  ..

Loan late is 13.5% ...

Regards

*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*


On Friday, November 7, 2014 9:30 AM, Stephen Choi <stephen@choisite.com> wrote:


how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?


On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

> ok so lets talk on this loan..
>
> what is collateral on this loan?.. I suggest we but the IP up as collateral ..
>
> what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. Interest would be paid monthly ..
>
> length of time on this loan? 36 months tenor
>
> can we make part or all of this loan into a convertible note?  difficult since it would change the cap table .. It is best that we pay it off ..
>
> lets start here..if terms are agreeable we can close on this next week

1

LEE00201

2

LEE002012

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <johnhanna@thomaswylde.com> |
| **Sent:** | Thursday, November 06, 2014 4:35 PM |
| **To:** | Stephen Choi |
| **Cc:** | Stephen Choi; Roger Kuo; Doug Lee; John Hanna |
| **Subject:** | Re: loan |

Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

> ok so lets talk on this loan..
>
> what is collateral on this loan?.. I suggest we but the IP up as collateral ..
>
> what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. Interest would be paid monthly ..
>
> length of time on this loan? 36 months tenor
>
> can we make part or all of this loan into a convertible note? difficult since it would change the cap table .. It is best that we pay it off ..
>
> lets start here..if terms are agreeable we can close on this next week

1

LEE002013

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <johnhanna@thomaswylde.com> |
| **Sent:** | Monday, November 10, 2014 5:44 PM |
| **To:** | Stephen Choi |
| **Cc:** | John Hanna; Roger Kuo; Doug Lee; Meldy Rafols |
| **Subject:** | Re: loan |

Stephen .. you were made aware from the beginning of the structure of the IP ( TW. Holdings LLC ) and the operation  PDTW.LLC ..

You approved that we should start a new LLC and move the assets to it hence, (TW. LLC) .. As per first email on the investemt commitment it clearly states that you are investing in the IP as well as operating company ..

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

| | |
|---|---|
| phone: | 310 559 5549 |
| mobile: | 310 770 3741 |

| | |
|---|---|
| email: | johnhanna@ThomasWylde.com |

On Nov 10, 2014, at 5:25 PM, Stephen Choi <stephen@choisite.com> wrote:

whats eta on getting this IP moved..I really wish you guys told me this BEFORE i invested..why would I be putting 5M in a company that does not even own the IP..let me know asap please

On Mon, Nov 10, 2014 at 7:15 PM, John Hanna <johnhanna@thomaswylde.com> wrote:

1

LEE002014

Hi Stephen .. I apologize for delay in getting back to you …

The IP is sitting in a separate LLC, Thomas Wylde Holdings LLC., Paula owns 100% ..

With the new company structure and based on the Operating agreement we are putting together,  we are moving the IP to Thomas Wylde LLC..

Based on the terms you suggested Thomas Holdings LLC would sign the IP to you against the $2M during the term of the loan ..

Please let me have your thoughts on the matter ..

Regards,

John Hanna
Chief Executive Officer

# T H O M A S   W Y L D E

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

| | |
|---|---|
| phone: | 310_559_5549 |
| mobile: | 310_770_3741 |

| | |
|---|---|
| email: | johnhanna@ThomasWylde.com |

On Nov 9, 2014, at 10:33 AM, Stephen Choi <stephen@choisite.com> wrote:

Ok I need to understand how the IP is held as collateral but assume I am comfortable with the setup I will do 2m at 10% for 12 month terms renewable..interest payments quarterly..let me know..

Thanks

On Thursday, November 6, 2014, John Hanna <only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5 M value at stress sale that, is how the CBC loan is based on .  ..

2

LEE002015

Loan late is 13.5% ...

Regards

*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*

On Friday, November 7, 2014 9:30 AM, Stephen Choi <stephen@choisite.com> wrote:

how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?

On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

ok so lets talk on this loan..

what is collateral on this loan?.. I suggest we but the IP up as collateral ..

what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. Interest would be paid monthly ..

length of time on this loan? 36 months tenor

can we make part or all of this loan into a convertible note?  difficult since it would change the cap table .. It is best that we pay it off ..

lets start here..if terms are agreeable we can close on this next week

LEE002016

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <johnhanna@thomaswylde.com> |
| **Sent:** | Monday, November 10, 2014 7:57 PM |
| **To:** | Roger Kuo |
| **Cc:** | Doug Lee |
| **Subject:** | Re: loan |

Roger hi .. PDTW LLC and TWH . LLC are both owned by Paula 100%
Once the transaction is completed Stephen would have 45% of everything .. Regards John

Sent from my iPhone

On Nov 10, 2014, at 5:32 PM, Roger Kuo <roger@zther.com> wrote:

> Hi John, the IP is part of what Stephen invested in right? Just wanted to make sure Paula doesn't
> still own 100% post investment.
>
> Thanks,
> Roger
>
>
>
> On Nov 10, 2014, at 5:25 PM, Stephen Choi <stephen@choisite.com> wrote:
>
>> whats eta on getting this IP moved..I really wish you guys told me this BEFORE i
>> invested..why would I be putting 5M in a company that does not even own the
>> IP..let me know asap please
>>
>> On Mon, Nov 10, 2014 at 7:15 PM, John Hanna
>> <johnhanna@thomaswylde.com> wrote:
>> Hi Stephen .. I apologize for delay in getting back to you …
>>
>> The IP is sitting in a separate LLC, Thomas Wylde Holdings LLC., Paula owns
>> 100% ..
>>
>> With the new company structure and based on the Operating agreement we are
>> putting together,  we are moving the IP to Thomas Wylde LLC..
>>
>> Based on the terms you suggested Thomas Holdings LLC would sign the IP to
>> you against the $2M during the term of the loan ..
>>
>> Please let me have your thoughts on the matter ..
>>
>> Regards,
>>
>> John Hanna
>> Chief Executive Officer

1

LEE002017

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

phone:          310  559  5549
mobile:          310  770  3741


email:          johnhanna@ThomasWylde.com


On Nov 9, 2014, at 10:33 AM, Stephen Choi <stephen@choisite.com> wrote:


Ok I need to understand how the IP is held as collateral but assume I am
comfortable with the setup I will do 2m at 10% for 12 month terms
renewable..interest payments quarterly..let me know..

Thanks

On Thursday, November 6, 2014, John Hanna <only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5 M value at
stress sale that, is how the CBC loan is based on .  ..

Loan late is 13.5% ...

Regards


*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*


On Friday, November 7, 2014 9:30 AM, Stephen Choi
<stephen@choisite.com> wrote:

2

LEE002018

how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?

On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

> ok so lets talk on this loan..
>
> what is collateral on this loan?.. I suggest we but the IP up as collateral ..
>
> what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. Interest would be paid monthly ..
>
> length of time on this loan? 36 months tenor
>
> can we make part or all of this loan into a convertible note?  difficult since it would change the cap table .. It is best that we pay it off ..
>
> lets start here..if terms are agreeable we can close on this next week

3

LEE002019

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <johnhanna@thomaswylde.com> |
| **Sent:** | Monday, November 10, 2014 10:30 PM |
| **To:** | Roger Kuo |
| **Cc:** | Doug Lee |
| **Subject:** | Re: loan |

Guys we need to talk in the morning please .. thanks

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

| | |
|---|---|
| phone: | 310  559  5549 |
| mobile: | 310  770  3741 |

email:          johnhanna@ThomasWylde.com

On Nov 10, 2014, at 7:56 PM, john@thomaswylde.com wrote:

Regards

1

LEE002020

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <johnhanna@thomaswylde.com> |
| **Sent:** | Monday, November 10, 2014 5:16 PM |
| **To:** | Stephen Choi |
| **Cc:** | Roger Kuo; Doug Lee; John Hanna; Meldy Rafols |
| **Subject:** | Re: loan |

Hi Stephen .. I apologize for delay in getting back to you …

The IP is sitting in a separate LLC, Thomas Wylde Holdings LLC., Paula owns 100% ..

With the new company structure and based on the Operating agreement we are putting together, we are moving the IP to Thomas Wylde LLC..

Based on the terms you suggested Thomas Holdings LLC would sign the IP to you against the $2M during the term of the loan ..

Please let me have your thoughts on the matter ..

Regards,

John Hanna
Chief Executive Officer

# T H O M A S   W Y L D E

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

| | |
|---|---|
| phone: | 310  559  5549 |
| mobile: | 310  770  3741 |

email:        johnhanna@ThomasWylde.com

On Nov 9, 2014, at 10:33 AM, Stephen Choi <stephen@choisite.com> wrote:

1

LEE002021

Ok I need to understand how the IP is held as collateral but assume I am comfortable with the setup I will do 2m at 10% for 12 month terms renewable..interest payments quarterly..let me know..

Thanks

On Thursday, November 6, 2014, John Hanna <only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5 M value at stress sale that, is how the CBC loan is based on .  ..

Loan late is 13.5% ...

Regards


*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*


On Friday, November 7, 2014 9:30 AM, Stephen Choi <stephen@choisite.com> wrote:


how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?


On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

ok so lets talk on this loan..

what is collateral on this loan?.. I suggest we but the IP up as collateral ..

what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. Interest would be paid monthly ..

length of time on this loan? 36 months tenor

can we make part or all of this loan into a convertible note?  difficult since it would change the cap table .. It is best that we pay it off ..

lets start here..if terms are agreeable we can close on this next week

LEE002022

3

LEE002023

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <johnhanna@thomaswylde.com> |
| **Sent:** | Tuesday, November 11, 2014 4:04 AM |
| **To:** | John Hanna |
| **Cc:** | Stephen Choi; John Hanna; Roger Kuo; Doug Lee; Meldy Rafols |
| **Subject:** | Re: loan |

Sent from my iPhone

Stephen you are an investor in the IP according to all the documents you have on hand ..
The lawyers are working on the operating agreements we should have the drafts soon
Regards john

Sent from my iPhone

On Nov 10, 2014, at 8:47 PM, "Stephen Choi" <stephen@choisite.com> wrote:

hmm ok so eta on getting this IP transferred from a company that I own 0% to a
company that I own a piece of?

On Mon, Nov 10, 2014 at 7:44 PM, John Hanna
<johnhanna@thomaswylde.com> wrote:
Stephen ..  you were made aware from the beginning of the structure of the IP (
TW. Holdings LLC ) and the operation  PDTW.LLC ..

You approved that we should start a new LLC and move the assets to it hence,
(TW. LLC) .. As per first email on the investemt commitment it clearly states that
you are investing in the IP as well as operating company ..

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

| | |
|---|---|
| phone: | 310_559_5549 |
| mobile: | 310_770_3741 |

| | |
|---|---|
| email: | johnhanna@ThomasWylde.com |

1

LEE002024

On Nov 10, 2014, at 5:25 PM, Stephen Choi <stephen@choisite.com> wrote:

whats eta on getting this IP moved..I really wish you guys told me this BEFORE i invested..why would I be putting 5M in a company that does not even own the IP..let me know asap please

On Mon, Nov 10, 2014 at 7:15 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
Hi Stephen .. I apologize for delay in getting back to you …

The IP is sitting in a separate LLC, Thomas Wylde Holdings LLC., Paula owns 100% ..

With the new company structure and based on the Operating agreement we are putting together,  we are moving the IP to Thomas Wylde LLC..

Based on the terms you suggested Thomas Holdings LLC would sign the IP to you against the $2M during the term of the loan ..

Please let me have your thoughts on the matter ..

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

phone:        310_559_5549
mobile:       310_770_3741

email:        johnhanna@ThomasWylde.com

2

LEE002025

On Nov 9, 2014, at 10:33 AM, Stephen Choi <stephen@choisite.com> wrote:

Ok I need to understand how the IP is held as collateral but assume I am comfortable with the setup I will do 2m at 10% for 12 month terms renewable..interest payments quarterly..let me know..

Thanks

On Thursday, November 6, 2014, John Hanna <only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5 M value at stress sale that, is how the CBC loan is based on .  ..

Loan late is 13.5% ...

Regards


*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*


On Friday, November 7, 2014 9:30 AM, Stephen Choi <stephen@choisite.com> wrote:

how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?


On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

3

LEE002026

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com>
wrote:

> ok so lets talk on this loan..
>
> what is collateral on this loan?.. I suggest we but the IP up as collateral ..
>
> what rate are we willing to pay on this loan? As per loan documents sent to
> you last weak rate is 10% if we can get 8% it Would better for cash flow ..
> Interest would be paid monthly ..
>
> length of time on this loan? 36 months tenor
>
> can we make part or all of this loan into a convertible note?  difficult since it
> would change the cap table .. It is best that we pay it off ..
>
> lets start here..if terms are agreeable we can close on this next week

LEE002027

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <johnhanna@thomaswylde.com> |
| **Sent:** | Tuesday, November 11, 2014 9:28 AM |
| **To:** | Stephen Choi |
| **Cc:** | John Hanna; Roger Kuo; Doug Lee; Meldy Rafols |
| **Subject:** | Re: loan |

Stephen, for sure, In the mean time please let me have your thoughts on loan issue should we renew or should we wait your input .. Many thanks John

Sent from my iPhone

On Nov 11, 2014, at 7:59 AM, "Stephen Choi" <stephen@choisite.com> wrote:

> Look it is not that big of an issue but lets get it fixed.
>
> thanks
>
> On Tue, Nov 11, 2014 at 6:03 AM, John Hanna <johnhanna@thomaswylde.com> wrote:
>
>> Sent from my iPhone
>>
>>
>>
>> Stephen you are an investor in the IP according to all the documents you have on hand ..
>> The lawyers are working on the operating agreements we should have the drafts soon
>> Regards john
>>
>> Sent from my iPhone
>>
>> On Nov 10, 2014, at 8:47 PM, "Stephen Choi" <stephen@choisite.com> wrote:
>>
>>> hmm ok so eta on getting this IP transferred from a company that I own 0% to a company that I own a piece of?
>>>
>>> On Mon, Nov 10, 2014 at 7:44 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
>>> Stephen .. you were made aware from the beginning of the structure of the IP ( TW. Holdings LLC ) and the operation  PDTW.LLC ..
>>>
>>> You approved that we should start a new LLC and move the assets to it hence, (TW. LLC) .. As per first email on the investemt commitment it clearly states that you are investing in the IP as well as operating company ..

1

LEE002028

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

phone:          310_559_5549
mobile:         310_770_3741


email:          johnhanna@ThomasWylde.com


On Nov 10, 2014, at 5:25 PM, Stephen Choi
<stephen@choisite.com> wrote:


whats eta on getting this IP moved..I really wish you guys told me
this BEFORE i invested..why would I be putting 5M in a company
that does not even own the IP..let me know asap please

On Mon, Nov 10, 2014 at 7:15 PM, John Hanna
<johnhanna@thomaswylde.com> wrote:
Hi Stephen .. I apologize for delay in getting back to you …

The IP is sitting in a separate LLC, Thomas Wylde Holdings LLC.,
Paula owns 100% ..

With the new company structure and based on the Operating
agreement we are putting together,  we are moving the IP to
Thomas Wylde LLC..

Based on the terms you suggested Thomas Holdings LLC would
sign the IP to you against the $2M during the term of the loan ..

Please let me have your thoughts on the matter ..

2

LEE002029

Regards,

John Hanna
Chief Executive Officer

# T H O M A S   W Y L D E

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

phone:          310_559_5549
mobile:         310_770_3741

email:          johnhanna@ThomasWylde.com

On Nov 9, 2014, at 10:33 AM, Stephen Choi
<stephen@choisite.com> wrote:

Ok I need to understand how the IP is held as collateral but assume
I am comfortable with the setup I will do 2m at 10% for 12 month
terms renewable..interest payments quarterly..let me know..

Thanks

On Thursday, November 6, 2014, John Hanna
<only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5
M value at stress sale that, is how the CBC loan is based on .  ..

Loan late is 13.5% ...

Regards

*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*

3

LEE002030

*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*

On Friday, November 7, 2014 9:30 AM, Stephen Choi
<stephen@choisite.com> wrote:

how much is the IP really worth approximately? i mean if we
cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-
14%?

On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna
<only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below ..
Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi
<stephen@choisite.com> wrote:

> ok so lets talk on this loan..
>
> what is collateral on this loan?.. I suggest we but the IP up
> as collateral ..
>
> what rate are we willing to pay on this loan? As per loan
> documents sent to you last weak rate is 10% if we can get
> 8% it Would better for cash flow .. Interest would be paid
> monthly ..
>
> length of time on this loan? 36 months tenor
>
> can we make part or all of this loan into a convertible
> note?  difficult since it would change the cap table .. It is
> best that we pay it off ..
>
> lets start here..if terms are agreeable we can close on this
> next week

4

LEE002031

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <johnhanna@thomaswylde.com> |
| **Sent:** | Tuesday, November 11, 2014 9:56 AM |
| **To:** | Doug Lee |
| **Cc:** | Roger Kuo; John Hanna |
| **Subject:** | Re: loan |

Guys we do not have to talk anymore.. Based on the last email from Stephen I guess the matter is clear .. ?
John

Sent from my iPhone

On Nov 11, 2014, at 1:59 AM, "Doug Lee" <dlee@lpdirect.com> wrote:

> Works for me.
>
> Sent from my iPhone
>
> On Nov 10, 2014, at 10:35 PM, Roger Kuo <roger@zther.com> wrote:
>
>> Doug and I have a 9am call but maybe at 10 if that works for you both.
>>
>>
>> **From:** John Hanna <johnhanna@thomaswylde.com>
>> **Date:** Mon, 10 Nov 2014 22:29:32 -0800
>> **To:** Roger Kuo <roger@zther.com>
>> **Cc:** Doug Lee <dlee@lpdirect.com>
>> **Subject:** Re: loan
>>
>> Guys we need to talk in the morning please .. thanks
>>
>> Regards,
>>
>> John Hanna
>> Chief Executive Officer
>>
>> # THOMAS WYLDE
>>
>> 3231 S. La Cienega Blvd.
>> Los Angeles, CA  90016
>>
>> phone:         310  559  5549
>> mobile:        310  770  3741
>>
>>
>> email:          johnhanna@ThomasWylde.com

1

LEE002032

On Nov 10, 2014, at 7:56 PM, john@thomaswylde.com wrote:

Regards

2

LEE002033

**Doug Lee**

| | |
|---|---|
| **From:** | John Hanna <johnhanna@thomaswylde.com> |
| **Sent:** | Tuesday, November 11, 2014 3:59 AM |
| **To:** | Stephen Choi |
| **Cc:** | John Hanna; Roger Kuo; Doug Lee; Meldy Rafols |
| **Subject:** | Re: loan |

Stephen you are in an investor in the IP according to the all the documents you have on hand ..
The lawyers are working on the operating agreements we should have the drafts soon
Regards john

Sent from my iPhone

On Nov 10, 2014, at 8:47 PM, "Stephen Choi" <stephen@choisite.com> wrote:

> hmm ok so eta on getting this IP transferred from a company that I own 0% to a company that I
> own a piece of?
>
> On Mon, Nov 10, 2014 at 7:44 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
> Stephen ..  you were made aware from the beginning of the structure of the IP ( TW. Holdings
> LLC ) and the operation  PDTW.LLC ..
>
> You approved that we should start a new LLC and move the assets to it hence, (TW. LLC) .. As
> per first email on the investemt commitment it clearly states that you are investing in the IP as
> well as operating company ..
>
> Regards,
>
> John Hanna
> Chief Executive Officer
>
> # T H O M A S   W Y L D E
>
> 3231 S. La Cienega Blvd.
> Los Angeles, CA  90016
>
> phone:      310_559_5549
> mobile:     310_770_3741
>
> email:      johnhanna@ThomasWylde.com

1

LEE002034

On Nov 10, 2014, at 5:25 PM, Stephen Choi <stephen@choisite.com> wrote:

whats eta on getting this IP moved..I really wish you guys told me this BEFORE i invested..why would I be putting 5M in a company that does not even own the IP..let me know asap please

On Mon, Nov 10, 2014 at 7:15 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
Hi Stephen .. I apologize for delay in getting back to you …

The IP is sitting in a separate LLC, Thomas Wylde Holdings LLC., Paula owns 100% ..

With the new company structure and based on the Operating agreement we are putting together,  we are moving the IP to Thomas Wylde LLC..

Based on the terms you suggested Thomas Holdings LLC would sign the IP to you against the $2M during the term of the loan ..

Please let me have your thoughts on the matter ..

Regards,

John Hanna
Chief Executive Officer

# T H O M A S   W Y L D E

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

phone:          310_559_5549
mobile:         310_770_3741

email:          johnhanna@ThomasWylde.com

2

LEE002035

On Nov 9, 2014, at 10:33 AM, Stephen Choi <stephen@choisite.com> wrote:

Ok I need to understand how the IP is held as collateral but assume I am comfortable with the setup I will do 2m at 10% for 12 month terms renewable..interest payments quarterly..let me know..

Thanks

On Thursday, November 6, 2014, John Hanna <only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5 M value at stress sale that, is how the CBC loan is based on .  ..

Loan late is 13.5% ...

Regards


*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*


On Friday, November 7, 2014 9:30 AM, Stephen Choi <stephen@choisite.com> wrote:


how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?


On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

ok so lets talk on this loan..

what is collateral on this loan?.. I suggest we but the IP up as collateral ..

what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. Interest would be paid monthly ..

length of time on this loan? 36 months tenor

can we make part or all of this loan into a convertible note?  difficult since it would change the cap table .. It is best that we pay it off ..

LEE002036

lets start here..if terms are agreeable we can close on this next week

4

LEE002037

# EXHIBIT "11"

ʟ.        •

## SECURED PROMISSORY NOTE

$2,000,000                                                    Los Angeles, California
                                                    December 1, 2014 ("Effective Date")

    For value received, Thomas Wylde, LLC, a California limited liability company with its
principal place of business located at 3231 S. La Cienega Blvd., Unit A, Los Angeles, CA 90013, USA
("Maker") promises to pay, jointly, to the order of Khondker Shoeb Ahmed, an individual residing at
Puerto de Hierro #93, Santa Ana, San Jose, Costa Rica and Eniluz Gonzalez, an individual residing at
Puerto de Hierro #5, Santa Ana, San Jose, Costa Rica (jointly "Holder") the sum of two million
dollars ($2,000,000) (the "Principal"), due in full on or before the first anniversary of the Effective
Date set forth above, unless extended as set forth herein.

### 1.    PAYMENTS

    1.1    Maker shall make monthly payments sixteen thousand six hundred and sixty six
dollars and sixty-six cents ($16,666.66), payable by the last day of each month, commencing on the
Effective Date to cover the monthly interest due. Maker shall pay the principal balance in full as a
balloon payment on or before December 1, 2015, unless it exercises its option to renew as set forth
in section 2.1, below. Maker may prepay all or any portion of this Note at any time prior to the
Maturity Date without premium or penalty.

    1.2    Maker shall transmit payments under this Note by check made payable to [INSERT
PAYEE] and delivered to [INSERT ADDRESS TO SEND CHECKS]. Payment shall be deemed made on
the date Maker places the check for delivery. All payments shall be made in US dollars.

    1.3    The Principal shall accrue interest at the rate of ten percent (10%) per annum.
Notwithstanding the foregoing, it is intended that the rate of interest shall never exceed the
maximum rate, if any, which may be legally charged, and if the interest provisions contained in this
Note would result in a higher rate, then interest shall be limited to the legal limit and any amounts
interest paid in excess shall be applied to the reduction of the Principal.

    1.4    Upon payment of all Principal and interest required to be paid under this Note,
Holder will return to Maker a copy of this note marked "CANCELLED/PAID IN FULL," and all of
Maker's obligations under this Note will be terminated.

### 2.    TERM

    2.1    This Note shall commence on the Effective Date and continue for a period of 12
months, with the balance due on or before December 1, 2015 (the "Term"). Maker shall have a
unilateral option to extend the Term for up to two additional twelve-month periods by giving
Holder notice of its intent to do so on or before the final day of the Term. If Maker exercises this
option, the remaining provisions of this Note shall remain in full force and effect, it shall continue to
make the interest payments set forth in section 1.1, above, but the due date for the balloon payment
of the Principal shall be extended to the end of the option period.

**3.    DEFAULT**

3.1    Maker will be in default if it: (i) fails to pay any installment of interest or Principal when due and does not cure such deficiency within thirty (30) days; or (ii) makes an assignment for the benefit of creditors; is subject to a petition in bankruptcy that is not removed within thirty (30) days; has a receiver, trustee, or similar officer appointed to take charge of all or part of its property and same is not removed within thirty (30) days; or is adjudicated bankrupt.

3.2    Whenever Maker is in default, the entire unpaid principal balance inclusive of unpaid interest added to principal and any accrued but unpaid interest shall immediately become due and payable at the option of Holder and without notice or demand of any kind.

3.3    If this Note is not paid when due, or in the event that proceedings at law are instituted in connection with this Note, Maker shall pay all costs of collection, and all expenses in connection with the protection or realization of this Note, which fees, costs and expenses are incurred by Holder on account of such collection, whether or not suit is filed, including without limitation, reasonable attorney's fees incurred by Holder on account of such collection.

3.4    During the existence of any default or delinquency under the terms of this Note, Holder is hereby expressly authorized to apply all payments made on this Note to the payment of such part of any delinquency as it may elect.

**4.    SECURITY INTEREST**

4.1    To secure its obligations under this Note, Maker hereby grants and pledges to Lender a security interest in Maker's right, title and interest in and to all intellectual property rights and associated goodwill relating to the Thomas Wylde brand and designs, including, without limitation, any copyrights, trademarks, patents, trade secrets, moral rights, or any other rights therein including, without limitation, the trademark and copyright registrations or applications set forth on Exhibit A hereto.

**5.    MISCELLANEOUS**

5.1    The headings in this instrument are inserted for convenience and shall not be considered a part of this instrument or used in its interpretation.

5.2    This Note, and the parties' rights and liabilities thereunder, shall be construed under the law of the state of California. Any dispute arising from or relating to this Note shall be solely and exclusively venued in the state or federal courts located in the County of Los Angeles State of California.

5.3    Except as specifically set forth in this Note, Maker waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this note.

5.4    The obligations of Maker under this Note shall not be subject to reduction, limitation, impairment, termination, set-off, or recoupment for any reason.

5.5     No delay or omission on the part of Holder in exercising any right hereunder shall operate as a waiver. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

5.6     Any amendment or modification of the terms of this Note shall be in writing and signed by both parties.

5.7     Failure by Holder to exercise the option of determining this Note to be due and payable or any other option to call the indebtedness for a specific default shall not constitute nor be deemed to be a waiver of the right to exercise the same in the event of any subsequent default. The right to plead any statutes of limitation as a defense to any demand hereunder is hereby waived to the full extent permitted by law.

5.8     If any provision or any word, term, clause, or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provision shall not be affected and shall remain in full force and effect.

5.9     Whenever possible, each provision of this Note will be interpreted in such manner as to be effective, valid and enforceable under applicable law. In case any provision of this Note is held to be prohibited by, invalid, or unenforceable under applicable law, the validity, legality, and enforceability of the remaining provisions shall not be affected or impaired thereby.

Maker acknowledges that Maker has read, understands and agrees to the terms and conditions of this Note. IN WITNESS WHEREOF, Maker hereby executes this Promissory Note.

Thomas Wylde, LLC

John Hanna, Manager

## Exhibit "A" to Agreement to Purchase Membership Interest

TRADEMARKS

| Mark | Serial No. / Reg. No. | Status |
|------|------------------------|--------|
| Henna Skull Design | 4,045,284 | Registered 10/25/11 |
| Henna Skull Design | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | 3,283,944 | Registered 8/21/07 |
| WYLDE BY THOMAS WYLDE | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | 77/737,583 | Abandoned 1/14/13 |
| THOMAS WYLDE | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | 78/778,668 | Abandoned 5/15/08 |
| TW FOR THOMAS WYLDE | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | 78/379,441 | Abandoned 3/22/05 |



## COPYRIGHTS

| Title | Registration Number | Registration Date |
|---|---|---|
| Acid Flower | VA 1-344-484 | 04/14/2006 |
| Henna Skull | VA 1-813-811 | 03/30/2011 |
| Skull Flower | VAu 691-713 | 04/14/2006 |
| Skull Pattern | VA 1-344-483 | 04/14/2006 |
| Money Print | VA 1-853-563 | 10/24/2012 |
| Hidden Death Print | VA 1-853-575 | 10/24/2012 |
| Ballet Bowie Print | VA 1-853-570 | 10/24/2012 |
| Carpe Diem Print | VA 1-853-579 | 10/24/2012 |
| Goth Moth | VA 1-853-573 | 10/24/2012 |
| Madame Butterfly | VA 1-853-576 | 10/24/2012 |
| Samona Print | VA 1-853-569 | 10/24/2012 |
| Cyclops | VA 1-907-692 | 9/11/2013 |
| Louis Skull | VA 1-889-372 | 11/5/2013 |
| Spinal Tap | VA 1-907-688 | 9/11/13 |